UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK NATIONAL ASSOCIATION,
as Indenture Trustee,

    Interpleader Plaintiff,

 – against –

BARCLAYS BANK PLC; THE BANK OF NEW YORK MELLON; MBIA INSURANCE CORPORATION; and ANGELO, GORDON & CO., L.P.

    Interpleader Defendants.

---

No. 11 CIV 9199



## INTERPLEADER COMPLAINT

Plaintiff U.S. Bank National Association ("U.S. Bank") (as successor to Bank of America, National Association, as successor by merger to LaSalle Bank National Association), in its capacity as Trustee under the Indenture dated as of February 27, 2007 (the "Indenture"), by and between U.S. Bank and Cedarwoods CRE CDO II, Ltd., as Issuer, alleges as follows for its interpleader complaint:

## NATURE OF THE ACTION

1. This is an interpleader action for the purpose of obtaining adjudication of the rights of the Interpleader Defendants with respect to certain funds and collateral held by U.S. Bank.[1] U.S. Bank, which serves as Trustee under the Indenture, faces competing demands by the Interpleader Defendants for certain funds, which were collected in respect of the Collateral that was pledged to secure the Notes in connection with the Indenture. In addition, the Trustee faces

---

[1] All capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Indenture. U.S. Bank will provide a copy of the Indenture to the Court upon entry of an appropriate Protective Order.

competing demands by the Interpleader Defendants with respect to the rights of Barclays, as Holder of not less than 66-2/3% of the Controlling Class, to sell and liquidate the Collateral. U.S. Bank cannot determine, without hazard to itself, how to proceed.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1335 because it is a civil action of interpleader or in the nature of interpleader, two or more adverse claimants are of diverse citizenship, the amount in controversy exceeds $500 and, if necessary, U.S. Bank will deposit the Escrowed Funds (defined below) into the registry of the Court.

3. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district. Venue in this district also is proper under 28 U.S.C. § 1397 because one or more defendants is deemed to reside within this judicial district for purposes of determining venue.

## THE PARTIES

4. U.S. Bank is a national banking association with its main office in Cincinnati, Ohio. LaSalle Bank National Association ("LaSalle") was the Trustee under the Indenture. In October 2008, LaSalle merged with and into Bank of America, with Bank of America as the surviving entity. On January 1, 2011, U.S. Bank succeeded Bank of America as Trustee under the Indenture.

5. Upon information and belief, Interpleader Defendant Bank of New York Mellon ("BONY") is a Delaware corporation with its principal place of business in New York, New

2

York. BONY is the Holder of 100% of the Aggregate Outstanding Amount of the Class A-2 Notes under the Indenture.

6. Upon information and belief Interpleader Defendant Barclays Bank PLC ("Barclays") is a public limited company registered in England and Wales, with its registered head office at Churchill Place, London E14 5RB. Barclays Bank maintains a New York Branch at 200 Park Avenue, New York, New York 10166. Barclays is the Holder of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes under the Indenture

7. Upon information and belief, Interpleader Defendant MBIA Insurance Corporation ("MBIA") is a New York corporation with its principal place of business in Armonk, New York. Upon information and belief, MBIA, as controlling party under a separate contractual agreement with BONY, is entitled to enforce the rights of BONY as Holder of 100% of the Aggregate Outstanding Amount of the Class A-2 Notes under the Indenture.

8. Upon information and belief, Interpleader Defendant Angelo, Gordon & Co. L.P. ("AGC") is a Delaware limited partnership with its principal place of business in New York, New York. AGC is the Collateral Manager under a Collateral Management Agreement, dated as of February 27, 2007, among the Issuer and the Collateral Manager.

## BACKGROUND

9. Pursuant to the Indenture, the Issuer issued several classes of Notes. The Notes are secured by a pool of Collateral, which consists of interests in commercial mortgage loans and other assets and accounts. The Collateral includes all payments and proceeds received in respect of such assets.

3

10. The Issuer is a special-purpose vehicle that was formed solely for the purpose of issuing the Notes and Income Notes and acquiring the Collateral and activities incidental thereto. The Issuer has no employees and relies on the Collateral Manager to monitor the Collateral and to perform, on behalf of the Issuer, duties delegated to the Collateral Manager in the Collateral Management Agreement, the Indenture, and certain other Transaction Documents.

11. Pursuant to the Indenture, the Issuer pledged the Collateral to U.S. Bank, in its capacity as Trustee, to secure the Issuer's obligations under the Indenture. U.S. Bank holds the Collateral on behalf of the secured parties under the Indenture and receives the proceeds payable in respect thereof. Payments received in respect of the Collateral are applied by the Trustee to, among other things, pay to the Noteholders the debt service on the Notes.

12. The Indenture contains the Class D/E Principal Coverage Test which measures the principal value of the Collateral against the Aggregate Outstanding Amount of the Class A, B, C, D, and E Notes of the Issuer. If the Class D/E Principal Coverage Test is not satisfied, the Issuer is required to divert collections on the Collateral to the senior Noteholders until the Class D/E Principal Coverage Test is satisfied. In order to determine whether this test is satisfied, the Collateral Manager, on behalf of the Issuer, is required to determine the principal value (*i.e.*, the "Principal Coverage Amount") of the Collateral based upon certain measurement guidelines set forth in the Indenture.

## THE FIRST DISPUTE

13. On August 24, 2011, Barclays distributed a notice and direction to the Trustee (the "August 24 Notice and Direction") asserting that a number of errors were made with respect to the determination of whether certain Collateral Debt Securities are or were Defaulted

4

Securities and/or Deferred Interest PIK Bonds (the "Measurement Issues"). In the August 24 Notice and Direction, Barclays stated that "these errors have caused the Issuer to treat the Class D/E Par [sic] Principal Coverage Test as passing when this test was, in fact, failing, causing a misallocation of Collateral Interest Collections" and that "[t]he failure on any Payment Date to disburse amounts available in accordance with Section 11.1 and the continuation of such failure for a period of five Business Days constitutes an Event of Default under Section 5.1(c) of the Indenture." In the August 24 Notice and Direction, Barclays accordingly declared the occurrence of an Event of Default under Section 5.1(c) of the Indenture and directed the Trustee to promptly declare the principal of, and all accrued interest on, the Secured Notes to be immediately due and payable pursuant to Section 5.2(a) of the Indenture.

14. On August 25, 2011, the Trustee informed the Collateral Manager of the Measurement Issues raised by Barclays and sought the Collateral Manager's response to Barclays' assertion. On August 26, 2011, the Collateral Manager sent its response to the Trustee via email disagreeing with Barclays' assertion that errors had been made in connection with the Measurement Issues.

15. On or about September 20, 2011, the Trustee sent a notice (the "September 20 Notice") to, among others, all Noteholders and the Collateral Manager, informing such parties of the Measurement Issues and Barclays' directions to the Trustee to: (i) declare an Event of Default pursuant to Section 5.1(c) of the Indenture; and (ii) accelerate the Secured Notes. The September 20 Notice further stated that the Trustee did not have sufficient information to assess whether the Event of Default declared by Barclays pursuant to Section 5.1(c) had occurred and was continuing, and that the Trustee was conducting its own investigation into the matter.

16. On September 22, 2011, the Collateral Manager distributed a letter to the Trustee (the "September 22 Letter") disputing Barclays' assertion that errors were made with respect to the Measurement Issues. In addition, in the September 22 Letter, the Collateral Manager asserted that, even if errors had been made in connection with the Measurement Issues, an Event of Default had not occurred under Section 5.1(c) of the Indenture because "[a]n Event of Default under that subsection would only occur if amounts available for payment had failed to be disbursed to Noteholders in accordance with the applicable Payment Report" and "[n]o such failure to apply Collections on any Payment Date occurred." On or about September 23, 2011, the Trustee distributed a copy of the September 22 Letter to, among others, all Noteholders.

17. As further described below in the Second Dispute, the Collateral Manager has repeatedly disputed and continues to dispute Barclays' assertion that errors had been made with respect to the Measurement Issues.

18. The legal issue framed by the conflicting position of Barclays, on the one hand, and the Collateral Manager, on the other, is whether an Event of Default under Section 5.1(c) has occurred and is continuing. Such issue requires a number of difficult determinations to be made and the information received by the Trustee from the interested parties provides no adequate basis for the Trustee to make these determinations. Moreover, the legal determinations required to resolve this issue are not of the type that trustees are called upon to make, particularly when the legal issue involves disputed factual issues and no precedents provide guidance.

19. The First Dispute has significant financial implications for the parties. If there has been an Event of Default under Section 5.1(c) of the Indenture, the direction from Barclays in the August 24 Direction and Notice to accelerate the Secured Notes is valid, would be given

6

effect and the Priority of Payments would change in Barclays' favor. Pursuant to Section 11.1(c) of the Indenture, upon acceleration of the Secured Notes, the Class A-1 Noteholders are required to be paid from all collections and proceeds of sale and liquidation of the Collateral, all accrued interest on the Class A-1 Notes (including Defaulted Interest on the Class A-1 Notes) and the outstanding principal balance of the Class A-1 Notes until paid in full prior to the payment of any such amounts to any other Noteholder, including the Class A-2 Noteholder. On the other hand, if there has not been an Event of Default under Section 5.1(c) of the Indenture and Barclays' direction to accelerate is not given effect, and if all the Coverage Tests are satisfied, then the Class A-2 Noteholder is required to be paid, from available collections on the Collateral, all accrued interest on the Class A-2 Notes (including Defaulted Interest on the Class A-2 Notes) prior to the payment of any principal on the Class A-1 Notes.

20. Accordingly, the first dispute involves a clear conflict between Barclays and the Collateral Manager that has significant economic consequences for this transaction, and for that reason the Trustee respectfully requests that the Court resolve this dispute among these Interpleader Defendants.

## THE SECOND DISPUTE

21. On October 6, 2011, Barclays distributed a notice and direction to the Trustee (the "October 6 Notice and Direction") declaring the occurrence of an Event of Default under Section 5.1(f) of the Indenture as a result of the Measurement Issues. Specifically, the October 6 Notice and Direction stated that "the failure to correctly identify Collateral Debt Securities that have become Defaulted Securities or Deferred Interest PIK Bonds has led to a sequence of incorrect Payment Reports and Note Reports which in turn has led to the misallocation of principal and

7

interest receipts" and "[t]hese misallocations represent a significant amount of money and the failure by the Issuer to perform its obligations in this regard has therefore had a material adverse effect on Secured Noteholders."[2] In the October 6 Notice and Direction, Barclays also directed the Trustee to declare the principal of, and accrued interest on, all of the Secured Notes immediately due and payable pursuant to Section 5.2(a) of the Indenture.

22. Pursuant to the Indenture, an Event of Default under Section 5.1(f) is a default in the performance, or breach, of any covenant under the Indenture (other than a payment default) "which default or breach has a material adverse effect on the Secured Noteholders" and has not been cured within the cure period set forth in the Indenture. The term "material adverse effect" is not defined in the Indenture or the other Transaction Documents.

23. On or about October 6, 2011, the Trustee distributed a notice to, among others, all Noteholders and the Collateral Manager notifying them of the Trustee's receipt of the October 6 Notice and Direction, and its content.

24. October 11, 2011, the Collateral Manager distributed a letter to the Trustee (the "October 11 Letter") once again disputing Barclays' assertion that errors were made with respect to the determination of whether certain Collateral Debt Securities are or were Defaulted Securities and/or Deferred Interest PIK Bonds. On or about October 11, 2011, the Trustee distributed a copy of the October 11 Letter to, among others, all Noteholders. On October 14, 2011, Barclays distributed a letter to the Trustee disputing the assertions made by the Collateral Manager in the October 11 Letter.

---

[2] Barclays had earlier stated in the August 24 Notice and Direction that the errors made in connection with the Measurement Issues resulted in a misallocation of approximately $8,500,000 that should have been used to pay down principal of the Class A-1 Notes.

8

25. On or about October 25, 2011, Barclays directed the Trustee to engage an independent expert to investigate the Measurement Issues. The Trustee followed this direction and engaged such an expert (the "Expert") on or about November 3, 2011. On November 29, 2011, the Expert issued a report to the Trustee stating that certain errors were made with respect to the proper classification of the Collateral Debt Securities in question.

26. On or about December 2, 2011, the Trustee sent a notice to, among others, all Noteholders and the Collateral Manager, stating that the Trustee had concluded, on the basis of the Expert Report and the October 6 Notice and Direction that an Event of Default had occurred and was continuing under Section 5.1(f) of the Indenture. The Trustee further stated that pursuant to the October 6 Notice and Direction from Barclays, the Trustee had declared the principal of, and accrued interest on, all of the Secured Notes immediately due and payable under Section 5.2 of the Indenture.

27. On December 5, 2011, Barclays distributed a direction to the Trustee to dispose of and liquidate the Collateral pursuant to Section 5.5(a)(ii) of the Indenture. On or about December 6, 2011, the Trustee notified the Noteholders and the Collateral Manager that it would commence the sale and liquidation of the Collateral in accordance with the Indenture.

28. On December 7, 2011, MBIA distributed a letter to the Trustee (the "December 7 Letter") objecting to the declaration of the Event of Default pursuant to Section 5.1(f) of the Indenture, the acceleration of the Notes pursuant to Section 5.2(a) of the Indenture and the commencement of the Collateral liquidation process pursuant to Section 5.5(a)(ii) of the Indenture. In the December 7 Letter, MBIA asserted that the covenant breach related to the Measurement Issues, as alleged by Barclays, did not result in the occurrence of an Event of

9

Default pursuant to Section 5.1(f) of the Indenture because such breach did not have a material adverse effect on the Secured Noteholders. MBIA further stated in the December 7 Letter that any improper diversion of amounts under the Indenture that may have resulted from the Measurement Issues likely was not material because it would represent only a small percentage of the $600,000,000 in principal outstanding on the Notes. Prior to December 7, 2011, no Noteholder or other interested party disputed Barclays' assertion that the covenant breach related to the Measurement Issues had a material adverse effect on the Secured Noteholders.

29. Through a letter to the Trustee dated December 12, 2011 (the "December 12 Letter"), the Collateral Manager also disputed Barclays' assertion that the covenant breach related to the Measurement Issues resulted in a material adverse effect on the Secured Noteholders. Furthermore, in the December 12 Letter, the Collateral Manager once again disputed Barclays' assertion that errors were made with respect to the Measurement Issues. In addition, in an email to the Trustee dated December 14, 2011, the Collateral Manager further suggested that to the extent there had been any errors in the classification of the securities at issue, any such errors would have only resulted in an immaterial effect on the cash flows to the Secured Noteholders.

30. The legal issue framed by the conflicting positions of MBIA and the Collateral Manager, on the one hand, and Barclays, on the other, is whether an Event of Default under Section 5.1(f) has occurred and is continuing. Such issue requires a number of difficult determinations to be made and the information received by the Trustee from the interested parties provides no basis to make these determinations. Moreover, the legal determinations required to resolve this issue are not of the type that trustees are called upon to make, particularly

10

when the legal issue involves disputed factual issues and there are no precedents to provide guidance.

31. The Second Dispute has significant financial implications for the parties. If an Event of Default under Section 5.1(f) has occurred and is continuing, the directions from Barclays in the October 6 Direction and Notice to accelerate the Secured Notes and sell and liquidate the Collateral are valid, would be given effect, and the Priority of Payments would change in Barclays' favor. Pursuant to Section 11.1(c) of the Indenture, upon acceleration of the Secured Notes, the Class A-1 Noteholders are required to be paid, from all collections and proceeds of sale and liquidation of the Collateral, all accrued interest on the Class A-1 Notes (including Defaulted Interest on the Class A-1 Notes) and the outstanding principal balance on the Class A-1 Notes until paid in full prior to the payment of any such amounts to any other Noteholder, including the Class A-2 Noteholder. On the other hand, if an Event of Default under Section 5.1(f) of the Indenture has not occurred and Barclays' directions to accelerate the Secured Notes and sell and liquidate the Collateral are not given effect, and if all Coverage Tests are satisfied, then the Class A-2 Noteholder is required to be paid, from available collections on the Collateral, all accrued interest on the Class A-2 Notes (including Defaulted Interest on the Class A-2 Notes) prior to the payment of any principal on the Class A-1 Notes. In addition, based upon information and belief, estimated proceeds from the sale and liquidation of the Collateral in the near future will not, following distribution of such proceeds to the Class A-1 Noteholders (and any other persons entitled to a portion of such proceeds prior to the Class A-1 Noteholders), be sufficient to pay any accrued interest on, or the outstanding principal balance of, the Class A-2 Noteholders.

32. In view of the diametrically opposed positions of MBIA and the Collateral Manager on the one hand, and Barclays on the other; the lack of sufficient factual information to assess the merits of the Interpleader Defendants' respective positions; and the lack of express provisions in the Transaction Documents to guide the Trustee in such circumstances, U.S. Bank is unclear as to how to proceed in the future in respect of its duties under the Transaction Documents. Because it is unclear as to whether an Event of Default within the meaning of Section 5.1(f) of the Indenture has occurred and is continuing, U.S. Bank is unable to determine, without exposing itself to risk of liability: (i) the manner in which the Escrowed Funds (defined below) should be distributed; and (ii) whether the sale and liquidation of the Collateral should be continued by the Trustee as directed by Barclays.

## THE ESCROWED FUNDS

33. With respect to the First and Second Disputes described above, U.S. Bank has placed in escrow all amounts distributable pursuant to Sections 11.1(a), 11.1(b), and 11.1(c) of the Indenture since the September 2011 Payment Date (other than amounts distributable to pay: (x) the Issuer's expenses and taxes pursuant to Section 11.1(a)(i) of the Indenture; and (y) the Hedge Counterparty pursuant to Sections 11.1(a)(iii) of the Indenture). The amount of funds escrowed by U.S. Bank relating to this matter is currently $2,273,771.50 (the "Escrowed Funds"). If the dispute between the Interpleader Defendants is not resolved, U.S. Bank will have to continue to hold the Escrowed Funds in escrow and to escrow additional amounts distributable pursuant to Sections 11.1(a), 11.1(b), and 11.1(c) on future Payment Dates.

34. U.S. Bank has no interest in the Escrowed Funds or the Collateral except to the extent of its reasonable attorneys' fees, costs, and disbursements with respect to this action, and

the maintenance and distribution of the Escrowed Funds and Collateral as may be awarded by the Court.

35. U.S. Bank is ready and willing to distribute the Escrowed Funds and act with respect to the sale and liquidation of the Collateral in such manner as the Court shall direct.

## PRAYER FOR RELIEF

**WHEREFORE**, U.S. Bank respectfully asks the Court:

A. To order the Interpleader Defendants to interplead and to settle all claims to the Escrowed Funds and the Collateral among themselves and any other person who claims or may claim an interest, beneficial or legal, in such proceeds;

B. To order U.S. Bank to dispose of the Escrowed Funds and act with respect to the sale and liquidation of the Collateral as directed by the Court upon final judgment determining the respective interests of the Interpleader Defendants and all other persons;

C. Pending such final judgment, to enjoin the Interpleader Defendants and all claiming through or acting with them, or anyone claiming any interest in the Escrowed Funds or the Collateral, from commencing or prosecuting any separate proceeding against U.S. Bank concerning or relating to the issues in this action;

D. To discharge U.S. Bank from liability, conditioned upon its continued compliance with the orders and judgment of the Court with respect to the subject matters of this controversy;

E. To award U.S. Bank its costs and disbursements, including legal fees and expenses, with respect to this action and with respect to maintaining and distributing the Escrowed Funds and the Collateral; and

13

F.      To award U.S. Bank such other and further relief as the Court may deem just and proper.

Dated: New York, New York
December 15, 2011

Respectfully submitted,

JONES DAY

By: /s/ Jayant W. Tambe

Jayant W. Tambe
Todd R. Geremia
Mahesh Venkatakrishnan

222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Interpleader Plaintiff,
U.S. Bank National Association*

14