**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

U.S. BANK NATIONAL ASSOCIATION,    :
as Indenture Trustee,

                                            :

                    Interpleader Plaintiff,

                                            :    Index No. 11 Civ. 9199 (WHP)

         v.

                                            :

BARCLAYS BANK PLC; THE BANK OF
NEW YORK MELLON; MBIA INSURANCE    :
 CORPORATION; and ANGELO, GORDON
& CO., L.P.,                             :

                    Interpleader Defendants.  :

----------------------------------------------------------X

### THE BANK OF NEW YORK MELLON'S ANSWER TO INTERPLEADER COMPLAINT, STATEMENT OF CLAIM, COUNTERCLAIMS AND CROSS-CLAIMS FOR DECLARATORY RELIEF

        The Bank of New York Mellon ("BONY"), by its attorneys, Seward & Kissel LLP, for its answer to the interpleader complaint of plaintiff U.S. Bank National Association ("U.S. Bank" or the "Trustee"), dated December 15, 2011 (the "Complaint"), statement of claim, counterclaims and cross-claims for declaratory relief alleges, on knowledge as to itself and otherwise on information and belief as follows:

### NATURE OF THE ACTION[1]

        1.      BONY denies the allegations in paragraph 1 of the Complaint, except that BONY admits that U.S. Bank purports to summarize this action therein.

---

[1] The headings in the Complaint are repeated herein for ease of reference only, and BONY does not admit their accuracy. BONY reserves the right to amend this answer, statement of claim, counterclaims and cross-claims for declaratory relief as necessary, including (without limitation) if BONY obtains new or different information during the course of this litigation.

## JURISDICTION AND VENUE

2.     BONY avers that the allegations in paragraph 2 of the Complaint contain conclusions of law to which no response is required.

3.     BONY avers that the allegations in paragraph 3 of the Complaint contain conclusions of law to which no response is required.

## THE PARTIES

4.     BONY admits, upon information and belief, the allegations in paragraph 4 of the Complaint.

5.     BONY denies the allegations in the first sentence of paragraph 5 of the Complaint, and states that it is a New York banking corporation with its principal place of business in New York, New York.  BONY admits, upon information and belief, the allegations in the second sentence of paragraph 5 of the Complaint.

6.     BONY admits, upon information and belief, the allegations in the first two sentences of paragraph 6 of the Complaint and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in said paragraph.

7.     BONY admits the allegations in the first sentence of paragraph 7 of the Complaint.  BONY denies the allegations in the second sentence of paragraph 7 of the Complaint, except states that MBIA, as controlling party under a separate contractual agreement with BONY, is directing BONY as Holder of 100% of the Aggregate Outstanding Amount of the Class A-2 Notes under the Indenture.

8.     BONY admits, upon information and belief, the allegations in paragraph 8 of the Complaint.

## BACKGROUND

9.      BONY admits, upon information and belief, the allegations in paragraph 9 of the Complaint.

10.     BONY admits, upon information and belief, the allegations in paragraph 10 of the Complaint.

11.     BONY admits, upon information and belief, the allegations in paragraph 11 of the Complaint.

12.     BONY denies the allegations in paragraph 12 of the Complaint, except that BONY admits the existence of the Indenture (as defined in the Complaint) and respectfully refers the Court to the Indenture for a complete and accurate statement of the contents thereof.

## THE FIRST DISPUTE

13.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint.

14.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint.

15.     BONY denies the allegations in paragraph 15 of the Complaint, except that BONY admits the existence of a notice from the Trustee to the noteholders (the "Noteholders") of Cedarwoods CRE CDO II, Ltd. ("Cedarwoods"), dated September 20, 2011, and respectfully refers the Court to this notice for a complete and accurate statement of the contents thereof.

16.     BONY denies the allegations in paragraph 16 of the Complaint, except that BONY admits the existence of a letter from Angelo, Gordon & Co., L.P. ("Angelo Gordon"), Cedarwoods's collateral manager under the Indenture (the "Collateral Manager"), to the Trustee, dated September 22, 2011, and respectfully refers the Court to this letter for a complete and

accurate statement of the contents thereof, and except that BONY admits the existence of a notice from the Trustee to the Noteholders, dated September 23, 2011, that attached Angelo Gordon's September 22, 2011 letter, and respectfully refers the Court to this notice for a complete and accurate statement of the contents thereof.

17.     BONY admits the allegations in paragraph 17 of the Complaint.

18.     BONY admits the allegations in the first sentence of paragraph 18 of the Complaint.  BONY denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in said paragraph.

19.     BONY denies the allegations in the first sentence of paragraph 19 of the Complaint, except that BONY admits upon information and belief that whether or not events of default occurred under Section 5.1(c) of the Indenture would have significant financial implications for the parties.  BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of said paragraph.  BONY denies the remaining allegations in said paragraph, except that BONY admits the existence of the Indenture and respectfully refers the Court to the Indenture for a complete and accurate statement of the contents thereof.

20.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, except that BONY admits that the first dispute involves a clear conflict between Barclays and the Collateral Manager and that U.S. Bank requests that the Court resolve the dispute.

## THE SECOND DISPUTE

21.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint.

22.     BONY denies the allegations in paragraph 22 of the Complaint, except that BONY admits the existence of the Indenture and respectfully refers the Court to the Indenture for a complete and accurate statement of the contents thereof.

23.     BONY denies the allegations in paragraph 23 of the Complaint, except that BONY admits the existence of a notice from the Trustee to the Noteholders, dated October 6, 2011, and respectfully refers the Court to this notice for a complete and accurate statement of the contents thereof.

24.     BONY denies the allegations in the first sentence of paragraph 24 of the Complaint, except that BONY admits the existence of a letter from the Collateral Manager to the Trustee, dated October 11, 2011, and respectfully refers the Court to the letter for a complete and accurate statement of the contents thereof.  BONY denies the allegation in the second sentence of paragraph 24 of the Complaint, except that BONY admits the existence of a notice from the Trustee to the Noteholders, dated October 12, 2011, that attached Angelo Gordon's October 11, 2011 letter, and respectfully refers the Court to this notice for a complete and accurate statement of the contents thereof.  BONY denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in said paragraph.

25.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint, except that BONY admits, upon information and belief, that the Trustee retained a third-party to investigate the alleged misclassification of collateral securities, and except that BONY admits the existence of a document purporting to be a report, dated November 29, 2011, from this third-party and respectfully refers the Court to this document for a complete and accurate statement of the contents thereof.

26.     BONY denies the allegations in paragraph 26 of the Complaint, except that BONY admits, upon information and belief, the existence of a notice from the Trustee to the Noteholders, dated December 2, 2011, and respectfully refers the Court to the notice for a complete and accurate statement of the contents thereof.

27.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 27 of the Complaint.  BONY denies the remaining allegations in said paragraph, except that BONY admits, upon information and belief, the existence of a notice from the Trustee to the Noteholders, dated December 6, 2011, and respectfully refers the Court to the notice for a complete and accurate statement of the contents thereof.

28.     BONY denies the allegations of paragraph 28 of the Complaint, except that BONY admits the existence of a letter from MBIA to the Trustee, dated December 7, 2011, and respectfully refers the Court to the letter for a complete and accurate statement of the contents thereof.

29.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint.

30.     BONY admits the allegations in the first sentence of paragraph 30 of the Complaint.  BONY denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in said paragraph.

31.     BONY denies the allegations in the first sentence of paragraph 31 of the Complaint, except that BONY admits upon information and belief that whether or not events of default occurred under Section 5.1(f) of the Indenture would have significant financial implications for the parties.  BONY denies knowledge or information sufficient to form a belief

as to the truth of the allegations in the second sentence of paragraph 31 of the Complaint and avers that Section 5.1(f) of the Indenture includes certain requirements, including a cure period, that must be satisfied before an Event of Default is deemed to arise thereunder. BONY denies the allegations in the third and fourth sentences of paragraph 31 of the Compliant, except that BONY admits the existence of the Indenture and respectfully refers the Court to the Indenture for a complete and accurate statement of the contents thereof. BONY denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in said paragraph.

32.     BONY denies the allegations in paragraph 32 of the Complaint, except that BONY admits that the position of MBIA and the Collateral Manager that there have been no events of default under the Indenture, on the one hand, and Barclays that there have been events of default under the Indenture, on the other hand, are in conflict and that it is appropriate for the Trustee to seek a ruling from this Court in these circumstances.

## THE ESCROWED FUNDS

33.     BONY denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint.

34.     BONY denies the allegations in paragraph 34 of the Complaint, except that BONY admits that U.S. Bank has no interest in the funds allegedly escrowed or the investment collateral (the "Collateral") securing the notes (the "Secured Notes") issued pursuant to the Indenture except to the extent of any right to payment or reimbursement of its fees, costs, and disbursements pursuant to the Indenture.

35.     BONY admits, upon information and belief, the allegations in paragraph 35 of the Complaint.

## PRAYER FOR RELIEF

36.     BONY avers that the "WHEREFORE" clauses of the Complaint contain only requests for relief as to which no answers are required.

## RESERVATION OF DEFENSES

37.     BONY reserves the right to assert defenses and affirmative defenses, as necessary, as they become known through investigation and discovery and avers that the Trustee must be required to adhere to the requirements of the Indenture.

## STATEMENT OF CLAIM

38.     No events of default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred ("Events of Default").  As a result, there is no legal basis for the Trustee to accelerate the payment of principal or interest under the Secured Notes or liquidate the Collateral.  Hence, the Trustee should be enjoined from taking those actions and ordered to distribute the Escrowed Funds (as defined in the Complaint) in accordance with the terms of the Indenture without giving effect to the alleged defaults or breaches under the Indenture and related alleged Events of Default.

## COUNTERCLAIMS AND CROSS-CLAIMS FOR DECLARATORY RELIEF

BONY, for its counterclaims against U.S. Bank and its cross claims against Barclays Bank PLC, MBIA and Angelo Gordon, alleges as follows:

## THE PARTIES TO THE COUNTERCLAIMS AND CROSS CLAIMS FOR DECLARATORY RELIEF

39.     Counterclaim and cross-claim plaintiff BONY is a New York banking corporation with its principal place of business in New York, New York.  BONY is the registered holder of

100 percent of the outstanding Class A-2 Notes (the second-most senior class of Secured Notes issued under the Indenture).

40.    On information and belief, counterclaim defendant U.S. Bank is a national banking association with its main office in Cincinnati, Ohio.  On information and belief, on January 1, 2011, U.S. Bank became both the Trustee and the collateral administrator (the "Collateral Administrator") under the Indenture.

41.    On information and belief, cross-claim defendant Barclays Bank PLC ("Barclays") is a public limited company registered in England and Wales, with its registered head office at Churchill Place, London E14 5RB.  On information and belief, Barclays maintains an office in New York, New York.  On information and belief, Barclays (or an affiliate thereof) holds all the senior-most class of Secured Notes issued under the Indenture, namely, the Class A-1 Notes.  As a result, Barclays is the controlling Noteholder under the Indenture.  On information and belief, Barclays has been directing the Trustee to provide notice to all transaction parties that Events of Default under the Indenture have occurred in order to permit Barclays as controlling Noteholder to cause the Trustee to accelerate payments under the Secured Notes and subsequently liquidate the Collateral.  On information and belief, because of market dislocation affecting collateralized debt obligation securities (like the Secured Notes), liquidation of the Collateral would generate sufficient proceeds to allow the Issuer to repay the principal of the Class A-1 Notes in an amount greater than the mark-to-market value of the Class A-1 Notes on Barclays's books, resulting in a gain for Barclays, but no future payments of principal or interest to the remaining Secured Noteholders.

42.    On information and belief, cross-claim defendant MBIA is a New York corporation with its principal place of business in Armonk, New York.  MBIA is a monoline

insurance company in the business of providing, inter alia, financial guaranty insurance.  As controlling party under a separate contractual arrangement with BONY, MBIA has the right to direct BONY with respect to its contractual rights as a Noteholder.  That separate contractual arrangement relates to a surety bond, which MBIA issued to an unrelated special purpose vehicle, that provides insurance coverage relating to payment of interest and principal due from the Issuer under the Class A-2 Notes in exchange for periodic premium payments (the "Surety Bond").

43.     On information and belief, cross-claim defendant Angelo Gordon is a Delaware limited partnership with its principal place of business in New York.  Angelo Gordon serves as Cedarwoods's Collateral Manager under the Indenture.  As Collateral Manager, Angelo Gordon is responsible for providing, inter alia, information concerning the classification of the Collateral to U.S. Bank, which U.S. Bank is to include in note reports (which were combined, as permitted under the Indenture, with payment reports (the "Payment Reports," and collectively with the note reports, the "Note and Payment Reports")).  U.S. Bank makes payments to Noteholders and to other transaction parties under the Indenture on behalf of the Issuer in accordance with Section 11.1 of the Indenture.

## JURISDICTION AND VENUE

44.     The Court has subject matter jurisdiction over this action under 28 U.S.C. Section 1332.  That U.S. Bank is domiciled in Ohio and BONY is domiciled in New York provides the requisite diversity of citizenship.  In addition, because tens of millions of dollars are at stake here, the amount in controversy requirement is easily satisfied.

45.     Venue in this district is proper under 28 U.S.C. § 1391 because, inter alia, a substantial part of the events giving rise to these counterclaims and cross-claims occurred within this federal judicial district.

## BACKGROUND

### A.     Key Terms of the Indenture

46.     The Indenture governs, inter alia, the issuance of the Secured Notes, the rights of Noteholders, and specified obligations of the Trustee and the Collateral Manager.  The following provisions of the Indenture are relevant to the claims:

### 1.     Section 5.1(c):  Event of Default—Misapplication of Payments

47.     Section 5.1 of the Indenture ("Section 5.1") defines Events of Default.  Under Section 5.1(c), an Event of Default may occur if the Trustee fails to pay Noteholders in accordance with Section 11.1 of the Indenture ("Section 11.1"):

> "**Event of Default**" is defined as any one of the following wherever used herein, means any one of the following events as set forth in Section 5.1(a) through (h) (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):
>
> *        *        *
>
> (c) the failure on any Payment Date to disburse amounts available in accordance with Section 11.1 (except as provided in Section 5.1(a) and (b) above) and a continuation of such failure for five Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days). . . .

(Indenture § 5.1(c) (emphasis added).)

### 2.     Section 11.1(a) and (b):  Disbursements of Funds

48.     Section 11.1(a) requires that, on behalf of the Issuer, the Trustee distribute interest proceeds received in respect of the Collateral securities to Noteholders and other transaction

parties "in accordance with a Payment Report prepared by the Collateral Administrator [U.S. Bank]" and specifies the order of priority of payments (that is, contains the payment "waterfall" with respect to interest proceeds):

> (a) **Collateral Interest Collections**.   On any Payment Date that is not a Redemption Date or a Payment Date following the occurrence and continuation of an acceleration of the Secured Notes in connection with an Event of Default, <u>in accordance with a Payment Report prepared by the Collateral Administrator on behalf of the Issuer</u> as of the last day of the Due Period preceding such Payment Date, Collateral Interest Collections, to the extent of Available Funds in the Collection Account, will be deposited in the Payment Account and applied by the Trustee in the following order of priority. . . .

(Indenture § 11.1(a) (emphasis added).)

49.     Section 11.1(b) requires that, on behalf of the Issuer, the Trustee distribute principal proceeds received in respect of the Collateral securities to Noteholders and other transaction parties "in accordance with a Payment Report prepared by the Collateral Administrator [U.S. Bank]" and specifies the order of priority of payments (that is, contains the payment "waterfall" with respect to principal proceeds):

> (b) **Collateral Principal Collections**.   On any Payment Date that is not a Redemption Date or a Payment Date following the occurrence and continuation of an acceleration of the Secured Notes in connection with an Event of Default, <u>in accordance with a Payment Report prepared by the Collateral Administrator on behalf of the Issuer</u> as of the last day of the Due Period preceding such Payment Date, Collateral Principal Collections, to the extent of Available Funds in the Collection Account, will be deposited in the Payment Account and applied by the Trustee in the following order of priority. . . .

(Indenture § 11.1(b) (emphasis added).)

50.     The Collateral Manager provides U.S. Bank as Collateral Administrator with information concerning the Collateral Manager's determination of the classification of specified Collateral securities under the transaction, including, for example, which Collateral securities meet the Indenture's criteria for "Defaulted Securities" or "Deferred Interest PIK Bonds."  U.S.

Bank as Collateral Administrator includes such information received from the Collateral Manager in the Note and Payment Report.

51.     Based on information in the Payment Reports, the Trustee, acting on behalf of the Issuer, distributes monies to Noteholders and other transaction parties in accordance with the interest and principal payment waterfalls in the Indenture.

### 3. Section 5.1(f):  Events of Default—Defaults or Breaches Under the Indenture

52.     An Event of Default will occur under Section 5.1(f) of the Indenture ("Section 5.1(f)") if (i) inter alia, certain Breaches (as defined below) occur; (ii) the Breach has a "material adverse effect on the Secured Noteholders"; and (iii) the Breach "continues for a period of 30 days . . . of the earlier of knowledge by the Issuer or the Collateral Manager or notice [meeting specified requirements] to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class…":

> "**Event of Default**" is defined as any one of the following wherever used herein, means any one of the following events as set forth in Section 5.1(a) through (h) (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):
>
> \*       \*       \*
>
> (f) a default in the performance, or breach, of any other covenant (it being understood that non-compliance with any of the Coverage Tests, the Collateral Concentration Limitations or the Collateral Quality Tests will not constitute a default or breach) or of any representation or warranty of the Issuer under this Indenture or if any certificate or writing delivered pursuant hereto proves to be incorrect when made [collectively, a "Breach"], which default or breach has a material adverse effect on the Secured Noteholders and continues for a period of 30 days (or, in the case of Default, breach or failure of a representation or warranty regarding the Collateral, 15 days) of the earlier of knowledge by the Issuer or the Collateral Manager or notice to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the

> Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" under this Indenture. . . .

(Indenture § 5.1(f).)   A notice issued pursuant to this section of the Indenture must "specify[] such default, breach, or failure and requir[e] it to be remedied and state[] that such notice is a 'Notice of Default' under this Indenture."   (*Id.*)

### 4.   Section 5.2:  Acceleration of Maturity

53.   Section 5.2(a) of the Indenture ("Section 5.2(a)") provides for the acceleration of payments under the Secured Notes following the occurrence and continuation of an Event of Default under, inter alia, Sections 5.1(c) and 5.1(f) under certain specified circumstances:

> If an Event of Default occurs and is continuing, the Trustee may or, if so directed by the Holders of not less than 66 2/3% of the Aggregate Outstanding Amount of the Controlling Class, will declare the principal of and accrued interest on all Secured Notes to be immediately due and payable (except that in the case of an Event of Default described in Section 5.1(g) or 5.1(h) above, such an acceleration will occur automatically) whereupon the Secured Notes shall become due and payable at their Aggregate Outstanding Amounts plus accrued and unpaid interest thereon, without further action or formality.

(Indenture § 5.2(a) (emphasis added).)

### 5.   Section 5.4:  Remedies

54.   Section 5.4 of the Indenture ("Section 5.4") allows for the liquidation of the Collateral following the occurrence and continuation of an Event of Default under, inter alia, Sections 5.1(c) and 5.1(f) and the acceleration of payments under Section 5.2:

> (a) If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Issuer agrees that, in addition to the requirements of Section 5.5(a), the Trustee may, after giving notice to the Secured Noteholders, the Combination Noteholders, the Collateral Manager, each Hedge Counterparty and each Rating Agency, and shall, upon written direction by the Holders of not less than 66 2/3% of the then Aggregate Outstanding Amount of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

\*        \*        \*

(v) sell all or a portion of the Collateral or rights or interests therein, at one or more public or private sales conducted in any manner permitted by law. . . . **provided** that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).[2]

(Indenture § 5.4(a)(v) (emphasis added).)

### 6.    Section 13.1(h):  "Claw Back" of Misapplied Funds

55.    Section 13.1(h) of the Indenture ("Section 13.1(h)") grants the Trustee the power to (i) obtain the return of funds that it distributes "contrary to the provisions of this Indenture" and (ii) apply the returned funds "in accordance with this Indenture":

(h) In the event that notwithstanding the provisions of this Indenture, any Holder of any Class A-1 Note or Subordinate Interest shall have received any payment or distribution in respect of such Class A-1 Note or Subordinate Interest contrary to the provisions of this Indenture, then, unless and until all amounts payable to each Hedge Counterparty pursuant to Section 11.1(a)(iii) or to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, shall have been paid in full in Cash, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the applicable Hedge Counterparty or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, in accordance with this Indenture; provided, that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(Indenture § 13.1(h) (emphasis added).)

### B.    Timeline of Key Events

56.    On September 20, 2011, U.S. Bank issued a notice to, inter alia, the Noteholders (which, upon information and belief, most, if not all, Noteholders did not receive on a timely basis) stating that Barclays had directed it to send notice to all Noteholders of an alleged Event

---

[2] Section 5.5(a) does not allow a liquidation of the Collateral unless, either (i) the Trustee determines that the proceeds of a liquidation of the Collateral, inter alia, are sufficient to discharge the notes; or (ii) the controlling Noteholder directs a liquidation.

of Default under Section 5.1(c).  In the notice, U.S. Bank quoted a portion of Barclays' direction

letter setting forth the alleged basis for the alleged Event of Default:

> that a significant number of errors have been made with respect to the determination of whether certain Collateral Debt Securities are or were Defaulted Securities and/or Deferred Interest PIK Bonds and that these errors have caused the Issuer to treat the Class D/E Par Principal Coverage Test as passing when this test was, in fact failing, causing a misallocation of Collateral Interest Collections and Collateral Principal Collections and a loss to the holders of the Class A-1 Notes.

(Sept. 20, 2011 Trustee Notice at 2.)

57.     In a September 22, 2011 letter to the Trustee, the Collateral Manager countered

that "the allegations made in the Default Notice are incorrect and overstated, and [] no Event of

Default has occurred under Section 5.1(c) of the Indenture. An Event of Default under that

subsection would occur only if amounts available for payment had failed to be disbursed to

Noteholders in accordance with the applicable Payment Report.  No such failure to apply

Collections on a Payment Date occurred."  (Sept. 22, 2011 Letter from Angelo Gordon to

Trustee at 1.)

58.     The next day, U.S. Bank issued a notice to, inter alia, the Noteholders of Angelo

Gordon's September 22, 2011 letter.  In the notice, U.S. Bank also solicited "input of interested

parties on these issues" and stated that until "this matter has been resolved to the Trustee's

satisfaction, the Trustee will escrow all amounts payable." (Sept. 23, 2011 Trustee Notice at 2.)

59.     On October 6, 2011, U.S. Bank issued a notice to, inter alia, the Noteholders

stating that Barclays had provided notice of an alleged Event of Default under Section 5.1(f).

This alleged Event of Default was based on Barclays's apparent allegation that Angelo Gordon

had failed to designate specified Collateral securities as "Defaulted Securities" or "Deferred

Interest PIK Bonds" as applicable.  According to the notice, Barclays also alleged that, as a result

of these misclassifications, the Trustee had paid sums to other transaction parties that should

have been paid to Barclays.  According to the Trustee's notice, Barclays described the amount of the misapplied funds as "significant."

60.     On October 11, 2011, Angelo Gordon sent U.S. Bank a letter disputing that it had misclassified a number of Collateral securities and arguing that, in any event, any alleged misclassifications were immaterial in number and impact on Noteholders.

61.     On October 12, 2011, U.S. Bank issued a notice to, <u>inter</u> <u>alia</u>, the Noteholders stating that Barclays had instructed U.S. Bank to "declare the principal of and accrued interest on all Secured Notes immediately due and payable pursuant to Section 5.2 of the Indenture."  (Oct. 12, 2011 Trustee Notice at 2.)  In this notice, U.S. Bank further stated that it lacked sufficient information to decide whether an Event of Default had occurred and thus that it was "conducting its own investigation into the matters."  (*Id.*)  The Trustee also requested the "input of interested parties" regarding "the issues raised by the Controlling Class."  (*Id.*)

62.     On November 14, 2011, at MBIA's direction, BONY sent U.S. Bank a letter stating that it had not received copies of the September 23, 2011 and October 12, 2011 notices until November 1, 2011, when it obtained those documents from a third-party.  BONY also requested information concerning the basis for the alleged Event of Default under Section 5.1(f) because it did "not have sufficient information . . . to provide its view on the events described in the Notices."  (Nov. 14, 2011 Letter from BONY to the Trustee at 1.)  In addition, BONY stated that "given the nature of the dispute, MBIA believes that the issues described in the Notices would most appropriately be resolved by an interpleader action filed by the Trustee.  MBIA believes that such a course would allow the various parties to present their positions to a court, which can then rule based on a fully developed record."  (*Id*. at 2.)

63.     On information and belief, at some point, the Trustee, at the direction of Barclays, retained a third-party, PF2 Securities Evaluations, Inc. ("PF2"), to consider whether Angelo Gordon had misclassified specified Collateral securities as alleged by Barclays.  On or about November 29, 2011, PF2 issued its report, which stated in conclusory terms that the Collateral Manager had misclassified specified Collateral securities.  The report did not address whether an Event of Default had occurred, as well as the impact (if any) of the alleged Breaches on payments to Noteholders, and, by PF2's own admission, did not consider provisions in the Indenture that, on information and belief, would be critical to determining whether Collateral securities were properly classified thereunder:

> We have concerned ourselves only with the status of the Underlying Instruments: we have considered only their classifications on their Payment Dates, and the effects of inter-period rating actions.  Our analysis does not contemplate features of the CRE CDO itself, nuances in respect to calculations made by the Trustee on the Calculation Dates, or when or whether the Trustee may have had access to certain information regarding the Underlying Instruments, that might affect the trustee's determination.

(Nov. 29, 2011 PF2 Report at 3.)

64.     On December 2, 2011, U.S. Bank issued a notice to, inter alia, the Noteholders stating that U.S. Bank had concluded that an Event of Default under Section 5.1(f) had occurred and therefore that it was accelerating payment under the Secured Notes.

65.     On information and belief, on December 5, 2011, Angelo Gordon sent U.S. Bank a letter, "question[ing] the factual basis for the Trustee's determination that an Event of Default has occurred and is continuing" and "request[ing] that the Trustee send us [Angelo Gordon] a complete statement of the specific facts and circumstances comprising the purported Event of Default and a complete copy of any analysis supporting your [the Trustee's] determination that such Event of Default occurred and is continuing."  (Dec. 5, 2011 Letter from Angelo Gordon to U.S. Bank at 1.)

66.     The next day, U.S. Bank issued a notice to, inter alia, the Noteholders stating that, pursuant to Section 5.5(a)(ii) of the Indenture, Barclays "has informed the Trustee that the sale and liquidation of the Collateral is to be consummated as promptly as possible, subject to the terms of the Indenture."  (Dec. 6, 2011 Trustee Notice at 2.)

67.     The same day, upon information and belief, U.S. Bank and MBIA among others participated in a teleconference in which U.S. Bank informed the other participants for the first time that the Trustee had retained a third-party (which U.S. Bank did not identify at the time) to consider whether the Collateral Manager had misclassified Collateral securities.  Notably, on this call, U.S. Bank disclosed the amount of allegedly misapplied cash:  approximately $6 million. The Trustee described the amount of these allegedly misallocated funds as "significant."

68.     In fact, upon information and belief, the Trustee has disbursed only approximately $2.25 million of this cash, and, in any event, pursuant to Section 13.1(h), the Trustee may "claw back" these amounts from other transaction parties.   Upon information and belief, another approximately $6.25 million of cash alleged by Barclays to have been misallocated was reinvested under the terms of the Indenture in additional Collateral securities that the Issuer continues to own for the benefit of the Noteholders.

69.     On information and belief, on December 7, 2011, Angelo Gordon sent U.S. Bank another letter asking U.S. Bank to file an interpleader action to determine whether an Event of Default had occurred.

70.     The same day, MBIA sent U.S. Bank a letter reiterating that it had not received a copy of the September 20, 2011, September 23, 2011, October 6, 2011, or October 12, 2011 notices until November 1, 2011, and repeating its position that the "issues described in the Notices would most appropriately be resolved by an interpleader action filed by the Trustee."

(Dec. 7, 2011 Letter from MBIA to U.S. Bank at 3.)  In addition, MBIA once more requested information from U.S. Bank regarding the purported Breaches.  MBIA further reiterated that any alleged misapplication of funds did not "appear to be material, and to the extent there was such improper diversion of proceeds, the Trustee could easily have remedied such diversion. . ."  Last, MBIA noted that it "believe[d] that the Trustee should have informed the Noteholders and the Collateral Manager of such direction [to engage PF2] and of such engagement [with PF2], and . . . request[ed] that the Trustee immediately provide a notice to all Noteholders and the Collateral Manager that describes such direction, the details of such engagement, and the details of the results of such investigation, and includes a copy of the direction of the Controlling Class related thereto."  (*Id*. at 2.)

71.     On information and belief, on December 9, 2011, U.S. Bank provided MBIA with a copy of PF2's report, but the Trustee did not provide MBIA with any other information or materials relating to PF2's report or engagement or the information upon which PF2 purportedly relied.

72.     Also on December 9, 2011, U.S. Bank provided notice to the Issuer, copying the Collateral Manager and the Noteholders, that it had scheduled a public sale of the Collateral for December 20 and 21, 2011.  Upon information and belief, in arranging the public sale, U.S. Bank failed to "obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers" named by the Collateral Manager, in breach of Section 5.5(c) of the Indenture.

73.     On information and belief, on December 12, 2011, Angelo Gordon sent U.S. Bank a letter again disputing the occurrence of an Event of Default and the findings of PF2 and

again requesting that the Trustee file an interpleader action to determine whether an Event of Default had occurred.

74.     On December 13, 2011, U.S. Bank sent a notice to the Noteholders in which it stated that U.S. Bank decided to indefinitely suspend the scheduled sale of the Collateral and file an interpleader action to resolve the disputed positions.

75.     On December 15, 2011, U.S. Bank filed this interpleader action.

**C.     <u>No Event of Default Under Section 5.1(c) Has Occurred</u>**

76.     No Event of Default under Section 5.1(c) (or any other section of the Indenture) has occurred.  Section 5.1(c) requires a "failure on an any Payment Date to disburse amounts available in accordance with Section 11.1 . . . and a continuation of such failure for five Business Days . . ."  (Indenture § 5.1(c).)  Section 11.1 requires payment of interest and principal from the Collateral to the Noteholders "in accordance with" the Payment Report.  (Indenture § 11.1(a) and (b).)

77.     Here, neither Barclays nor any other party has alleged that the Issuer (or the Trustee acting on its behalf) failed to distribute funds in accordance with the Payment Reports. To the contrary, Barclays's later assertion that an Event of Default occurred under Section 5.1(f) is predicated on the Trustee's distribution of monies in accordance with such Payment Reports. Moreover, Angelo Gordon, in its September 22, 2011 letter, stated that funds were, in fact, distributed in accordance with the Payment Reports.  Thus, the Trustee did not fail to disburse amounts in accordance with Section 11.1 and no Event of Default under Section 5.1(c) has occurred.

**D.**   **No Event of Default Under Section 5.1(f) Has Occurred**

78.     No Event of Default under Section 5.1(f) (or any other section of the Indenture) has occurred.

79.     <u>First</u>, Section 5.1(f) states that, for there to be an Event of Default, there must be a "material adverse effect" on the Secured Noteholders as a whole.  Here, even if Barclays were correct that there were one or more Breaches (which discovery will or will not bear out), there would be no "material adverse effect" on the Secured Noteholders as a whole since, on information and belief, substantially all the supposedly misapplied funds were either distributed to Noteholders or reinvested in new Collateral for the benefit of all the Noteholders as a group. Hence, because there was no or virtually no net impact on the Noteholders as a group, there could be no material adverse effect on such Noteholders as a result of the alleged Breaches.

80.     Moreover, the amount of allegedly misapplied funds -- alleged by Barclays to be $8.5 million but, upon information and belief, substantially less, as alleged in paragraphs 67 and 68 -- as a result of the alleged Breaches is immaterial in comparison with the remaining outstanding principal amount of the Secured Notes (approximately $588,000,000), the outstanding amount of the Class A-1 Notes held by Barclays (approximately $378 million), or to Barclays itself (a multi-billion dollar international financial institution).

81.     Further, pursuant to Section 13.1(h), the Trustee has the ability to "claw back" any misapplied funds, thereby eliminating any loss to the Noteholders as a result of the alleged Breaches.  Thus, there was no material adverse effect on any Noteholder, much less on all the Secured Noteholders.

82.     <u>Second</u>, the 30-day cure period under Section 5.1(f) has not yet begun to run, and for this independent reason, there has also been no Event of Default under this section (or any other section) of the Indenture.  The 30-day Section 5.1(f) cure period begins to run from:

the earlier of knowledge by the Issuer or the Collateral Manager or notice to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a 'Notice of Default' under this Indenture.

(Indenture § 5.1(f).)  In this case, neither the Issuer nor the Collateral Manager has "knowledge" of any alleged Breach because the Collateral Manager -- the party that the Issuer relies on to determine the proper classification of Collateral securities -- disputes these alleged misclassifications.  Moreover, the Trustee has determined (as evidenced by its Complaint) that it is unable to confirm these alleged misclassifications so it necessarily has not yet provided notice to the Issuer and the Collateral Manager.  Indeed, although the Trustee purported to serve a notice of an Event of Default under Section 5.1(f) on October 6, 2011, at that time the Trustee admitted that it lacked sufficient information to determine whether an Event of Default had, in fact, occurred.  Finally, upon information and belief, no notice has been sent under Section 5.1(f) specifying a Breach, requiring that such Breach be remedied, and stating that such notice is a "Notice of Default", in compliance with Section 5.1(f).

### E.      The Trustee Will Be Obligated To Cure Under Section 5.1(f)

83.     Section 5.1(f) provides for a 30-day cure period:

"**Event of Default**" is defined as any one of the following . . . (f) a default in the performance, or breach, of any other covenant . . . or of any representation or warranty of the Issuer under this Indenture or if any certificate or writing delivered pursuant hereto proves to be incorrect when made, which default or breach has a material adverse effect on the Secured Noteholders and continues for a period of 30 days. . . .

(Indenture § 5.1(f).)  Indeed, in order to trigger an Event of Default under Section 5.1(f), a notice must request that the alleged Breach be remedied (within the 30 days contemplated by Section 5.1(f)).  Accordingly, Section 5.1(f) of the Indenture contemplates that the Trustee, the Issuer, and the Collateral Manager will seek to cure, thereby preventing the occurrence of the Event of

23

Default -- which can have draconian consequences.   As a result, if the Court finds (i) the existence of a Breach and (ii) that there was a material adverse effect on all the Secured Noteholders, the Court should declare that, during a 30-day cure period, the Trustee, the Issuer, and the Collateral Manager will be obligated to use best efforts to remedy same and any resulting misapplication of funds, including by directing the Trustee to exercise its authority under Section 13.1(h) to "claw back" the purportedly misapplied funds.

## FIRST CAUSE OF ACTION

### (Counterclaim for Declaratory Relief)

84.      BONY repeats, realleges, and fully incorporates herein by reference all prior allegations contained in these counterclaims and cross-claims as if fully set forth herein.

85.      As more fully alleged above, an actual controversy within this Court's jurisdiction (as required by 28 U.S.C. § 2201) exists between the parties hereto with respect to whether an Event of Default has occurred under Section 5.1(c) or 5.1(f).

86.      As fully alleged above, however, no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred.

87.      The resolution of these disputes will have a substantial impact on BONY as the holder of all of the Class A-2 Notes.

88.      If the declaration requested is not issued, the Trustee may proceed to liquidate the Collateral, and BONY will be forever injured.

89.      As a result, BONY is entitled to a declaration that no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred and that, in consequence, Barclays has no valid basis to direct the Trustee to accelerate payment of the Secured Notes, and that the Trustee may not liquidate the Collateral at this time.   BONY is further entitled to a declaration that the Escrowed Funds (as defined in the Complaint) should be

distributed in accordance with the Indenture without giving effect to the alleged Breaches and related alleged Events of Default.

## SECOND CAUSE OF ACTION

(Counterclaim for Declaratory Relief)

90.     BONY repeats, realleges, and fully incorporates herein by reference all prior allegations contained in these counterclaims and cross-claims as if fully set forth herein.

91.     As more fully alleged above, an actual controversy within the Court's jurisdiction (as required by 28 U.S.C. § 2201) exists between the parties hereto with respect to whether an Event of Default has occurred under Section 5.1(f).

92.     As fully alleged above, no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred.

93.     If, however, the Court finds the existence of a Breach that would trigger the 30-day cure period contemplated by Section 5.1(f), the Trustee, the Issuer, and the Collateral Manager would be obligated to use best efforts to cure the Breach within the next 30 days.

94.     The resolution of this dispute will have a substantial impact on BONY as the registered holder of 100 percent of the outstanding Class A-2 Notes.

95.     If the declaration requested is not issued, the Trustee, the Issuer, and the Collateral Manager may not use best efforts to cure the alleged Breach and, therefore, allow the occurrence of an Event of Default, paving the way for acceleration of Notes and the early liquidation of the Collateral, to BONY's substantial detriment.

96.     As a result, BONY is entitled to a declaration, if the Court finds the existence of a Breach, that the Trustee, the Issuer, and the Collateral Manager are obligated to use best efforts to effect a cure.

## THIRD CAUSE OF ACTION

(Cross-Claim for Declaratory Relief)

97.     BONY repeats, realleges, and fully incorporates herein by reference all prior allegations contained in these counterclaims and cross-claims as if fully set forth herein.

98.     As more fully alleged above, an actual controversy within this Court's jurisdiction (as required by 28 U.S.C. § 2201) exists between and among the parties hereto with respect to whether an Event of Default has occurred under Section 5.1(c) or 5.1(f).

99.     As fully alleged above, however, no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred.

100.    The resolution of these disputes will have a substantial impact on BONY as the holder of all of the Class A-2 Notes.

101.    If the declaration requested is not issued, the Trustee may proceed to liquidate the Collateral, and BONY will be forever injured.

102.    As a result, BONY is entitled to a declaration that no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred and that, in consequence, Barclays has no valid basis to direct the Trustee to accelerate payment of the Secured Notes, and that the Trustee may not liquidate the Collateral at this time.  BONY is further entitled to a declaration that the Escrowed Funds (as defined in the Complaint) should be distributed in accordance with the Indenture without giving effect to the alleged Breaches and related alleged Events of Default.

## FOURTH CAUSE OF ACTION

(Cross-Claim for Declaratory Relief)

103.    BONY repeats, realleges, and fully incorporates herein by reference all prior allegations contained in these counterclaims and cross-claims as if fully set forth herein.

26

104.   As more fully alleged above, an actual controversy within the Court's jurisdiction (as required by 28 U.S.C. § 2201) exists between and among the parties hereto with respect to whether an Event of Default has occurred under Section 5.1(f).

105.   As fully alleged above, no Events of Default under Sections 5.1(c), 5.1(f), or any other section of the Indenture have occurred.

106.   If, however, the Court finds the existence of a Breach that would trigger the 30-day cure period contemplated by Section 5.1(f), the Trustee, the Issuer, and the Collateral Manager would be obligated to use best efforts to cure the Breach within the next 30 days.

107.   The resolution of this dispute will have a substantial impact on BONY as the registered holder of 100 percent of the outstanding Class A-2 Notes.

108.   If the declaration requested is not issued, the Trustee, the Issuer, and the Collateral Manager may not use best efforts to cure the alleged Breach and, therefore, allow the occurrence of an Event of Default, paving the way for acceleration of Notes and the early liquidation of the Collateral, to BONY's substantial detriment.

109.   As a result, BONY is entitled to a declaration, if the Court finds the existence of a Breach, that the Trustee, the Issuer, and the Collateral Manager are obligated to use best efforts to effect a cure.


WHEREFORE, BONY requests:

110.   A declaration that no Event of Default has occurred under Section 5.1(c).

111.   A declaration that no Event of Default has occurred under Section 5.1(f).

112.   A declaration that no Event of Default has occurred under any other section of the Indenture.

113.    A declaration that any acceleration of the Secured Notes or liquidation of the Collateral at this time would violate the Indenture.

114.    A declaration that the Escrowed Funds should be distributed without giving effect to the alleged Breaches and related alleged Events of Default.

115.    If the Court finds that a Breach occurred, a declaration that the Trustee, the Issuer, and the Collateral Manager are obligated to use best efforts to cure the Breach within 30 days of any final judgment so finding.

116.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
         February 10, 2012

                                    Respectfully submitted,

                                    SEWARD & KISSEL LLP


                                    By: _s/ Dale C. Christensen, Jr._____
                                         Dale C. Christensen, Jr.
                                         Brian P. Maloney
                                    One Battery Park Plaza
                                    New York, New York  10004
                                    Tel.: (212) 574-1200
                                    Fax: (212) 480-8421
                                    christensen@sewkis.com
                                    maloney@sewkis.com

                                    *Attorneys for Interpleader Defendant, Counterclaim Plaintiff and Cross Claimant The Bank of New York Mellon*