UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK NATIONAL ASSOCIATION,          :
as Indenture Trustee,

                                                                         :

           Interpleader Plaintiff,          **11-CV-9199 (WHP)**

                                                                         :

      - against -          **ECF Case**

                                                                         :

BARCLAYS BANK PLC; THE BANK OF          **Electronically Filed**
NEW YORK MELLON; MBIA INSURANCE  :
CORPORATION; and ANGELO, GORDON &
CO., L.P.,          :

           Interpleader Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF
## BARCLAYS BANK PLC'S MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jay B. Kasner
Christopher P. Malloy
Julie E. Cohen
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Interpleader Defendant*
 *Barclays Bank PLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 3

    A.    The Parties .............................................................................. 3

    B.    Overview of the Cedarwoods CRE CDO II Transaction ................................ 3

    C.    The Cedarwoods CRE CDO II Coverage Tests ................................ 5

    D.    The Coverage Tests Were Misstated  Leading to Violations of the Priority of Payments ................................ 7

    E.    Violation of the Reinvestment Criteria ................................ 8

        1.    Violation of the Reinvestment Criteria ................................ 9

        2.    Failure To Report Accurate Ratings of Collateral Debt Securities ............ 10

        3.    Violation of the Eligibility Criteria ................................ 10

    F.    Events of Default Occurred Under the Indenture ................................ 11

    G.    Barclays Informs the Trustee of an Event of Default ................................ 11

ARGUMENT ................................................................................................. 12

BARCLAYS' MOTION SHOULD BE GRANTED ................................ 12

    A.    Summary Judgment Is Appropriate Where the Contractual Language Is Unambiguous and the Material Facts Are Undisputed ................................ 12

    B.    Mischaracterization of Collateral Debt Securities and the Failure to Account for Downgrades Led to Violations of the Priority of Payments ............ 13

        1.    The Failure to Account for Ratings Downgrades and the Deferred Interest PIK Bond Is Undisputed ................................ 14

        2.    The Defaulted Securities Were Not "Cured" of that Status ................ 14

        3.    Discovery Is Not Needed to Determine the Status of the Defaulted Securities ................................ 15

i

C.    The Events of Default Under Sections 5.1(b) and 5.1(c)......................................16

    1.    An Event of Default Occurred Under Section 5.1(c)............................17

    2.    An Event of Default Occurred Under Section 5.1(b) ...............................19

D.    An Event of Default Under Section 5.1(f) Has Occurred.....................................20

    1.    The Knowledge Requirements of Section 5.1(f) Were Satisfied...............21

    2.    The Incorrect Reports and Breaches of Covenants Had a Material
    Adverse Effect .........................................................................................22

E.    The Court Should Direct the Liquidation of the Collateral ................................24

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

Page

**CASES**

*Bank of America v. AIG Financial Products Corp.*,
    No. 10-CV-5242 (JSR), 2010 WL 5065477 (S.D.N.Y. Dec. 7, 2010) ............................13, 22

*Bank of New York v. First Millennium Inc.*,
    607 F.3d 905 (2d Cir. 2010) .................................................................................13

*Bazin v. Walsam 240 Owner, LLC*,
    72 A.D.3d 190 (1st Dep't 2010) ..........................................................................19

*Beal Savings Bank v. Sommer*,
    8 N.Y.3d 318 (2007) ...........................................................................................18

*BNP Paribas Mortgage Corp. v. Bank of America, N.A.*,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011) .................................................................21

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
    17 N.Y.3d 269 (2011) .........................................................................................15

*Citibank v. Solow*,
    No. 603697/08, 2012 NY Slip Op 1347 (1st Dep't Feb. 23, 2012)........................24

*Cromer Finance Ltd. v. Berger*,
    245 F. Supp. 2d 552 (S.D.N.Y. 2003)..................................................................22

*Deutsche Bank Trust Co. Americas v. Elliot International, L.P.*,
    No. 09-CV-5242 (WHP) (S.D.N.Y. Feb. 14, 2011) .............................................13

*Federal Home Loan Mortgage Corp. v. Bronx New Dawn Renaissance VII, L.P.*,
    No. 93-CV-7970 (CSH), 1995 U.S. Dist. LEXIS 9644 (S.D.N.Y. July 10, 1995).................24

*Fosco v. City University of New York*,
    No. 09-CV-7173 (WHP), 2012 WL 75189 (S.D.N.Y. Jan. 5, 2012).......................12

*MBIA Insurance Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*,
    No. 09-CV-10093 (RJS), 2011 WL 1197634 (S.D.N.Y. Mar. 25, 2011).........................13, 15

*Omni Quartz, Ltd. v. CVS Corp.*,
    287 F.3d 61 (2d Cir. 2002)..................................................................................13

*Red Ball Interior Demolition v. Palmadessa*,
    173 F.3d 481 (2d Cir. 1999)................................................................................13

*Sterling Investor Services, Inc. v. 1150 Nobo Assocs., LLC*,
  30 A.D.3d 579 (2d Dep't 2006)..................................................................15

*Sun American Bank v. Fairfield Financial Services, Inc.*,
  690 F. Supp. 2d 1342 (M.D. Ga. 2010) ....................................................23

*U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*,
  __ F. Supp. 2d __, 2011 WL 6880723 (S.D.N.Y. Dec. 30, 2011).........13

## STATUTES

Federal Rule of Civil Procedure 56(a) .........................................................12

N.Y.U.C.C. Law § 1-201(27) (McKinney 2002).........................................21

N.Y.U.C.C. Law § 9-102(c) (McKinney 2002)...........................................21

## MISCELLANEOUS

DOUGLAS J. LUCAS, LAURIE S. GOODMAN AND FRANK J. FABOZZI, COLLATERALIZED DEBT
  OBLIGATIONS: STRUCTURES AND ANALYSIS 23 (John Wiley & Sons, Inc., 2d ed. 2006)..10, 23

BLACK'S LAW DICTIONARY (7th ed. 2009) ..................................................19

Interpleader Defendant Barclays Bank PLC ("Barclays") respectfully submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

This is an interpleader action relating to Cedarwoods CRE CDO II (the "CDO"), a collateralized debt obligation that invests in commercial real estate debt securities.  Plaintiff U.S. Bank N.A. is the successor trustee (the "Trustee") under a February 27, 2007 Indenture (the "Indenture") by and among LaSalle Bank National Association and Cedarwoods CRE CDO II, Ltd. ("Cedarwoods" or the "Issuer").  The dispute concerns whether any Events of Default have occurred under the Indenture.  If so, then the Trustee is required to follow the directions of Barclays, as the holder of 100% of the Class A-1 Notes and the "Controlling Class" under the Indenture, to liquidate the collateral held by the CDO and distribute the proceeds in accordance with the Indenture.  The Trustee has acknowledged that certain Events of Default occurred and had already taken steps to sell the collateral at an auction.  It commenced this action instead only after receiving objections from defendant MBIA Insurance Corporation ("MBIA"), which is the insurer of the Class A-2 Notes owned by The Bank of New York Mellon ("BONY") and may be required to pay on its policy if the CDO is liquidated, and Angelo Gordon & Co., L.P. ("AGC"), the Collateral Manager of the CDO, which stands to lose its collateral management fees.

As explained below, Barclays conducted a detailed review of periodic reports issued by the CDO and determined, based upon objective, undisputed facts, that a host of errors were made in characterizing the "performance" of the underlying debt securities.  In particular, several assets held by the CDO were reported as performing when in fact they had missed multiple interest payments, which should have resulted in these assets being treated as "non-performing" assets under the terms of the Indenture.  Furthermore, the investment ratings for many assets were not reported accurately.  The calculation of the CDO's coverage tests—key metrics that measure the adequacy of the collateral to support the CDO's debts and which, when failing, require the principal on the most senior notes then outstanding (in this case, the Class A-1 Notes) to be paid down—depend on accurate reporting.  Because of the errors that were made, one of these tests

was reported as passing for several months when, in fact, it was failing.  This led to several, undisputable Events of Default under the Indenture, including the failure to pay over $8.5 million in principal to Barclays when it became due and payable (Section 5.1(b)), the failure to pay proceeds from the collateral in accordance with the defined "waterfall" (Section 5.1(c)) and the issuance of inaccurate reports and breach of several covenants (Section 5.1(f)).  It bears emphasis that the Court does not even need to determine that all of these errors occurred.  Indeed, as explained below, the failure to account for the ratings downgrades of assets held by the CDO led to Events of Default that, standing alone, would be grounds for summary judgment.

As explained in the accompanying Declaration of Jake Scrivens ("JS Decl."), the Events of Default can be demonstrated by reference to documentary evidence available to all parties (and submitted with this motion) consisting of the Indenture, performance reports prepared for Cedarwoods, performance reports for the securities held by Cedarwoods and publicly available information relating to the ratings assigned to these securities by Moody's and S&P.  And there is no need for discovery into the drafting history or meaning of the Indenture because the terms at issue are unambiguous.  There is no legitimate basis to dispute the Events of Default and the other parties' insistence that extensive discovery is necessary is clearly a delay tactic.

Given the unequivocal and indisputable evidence of the Events of Default, this Court should grant summary judgment and direct the Trustee to follow Barclays' instructions to liquidate the collateral.  At present, the sum value of all of the collateral held by the CDO is far less than the face amount of even the Class A-1 Notes.  Thus, it will be solely Barclays that will bear any further losses resulting from a delay in the sale of the collateral if market conditions deteriorate further.  When Barclays purchased the $390 million in Class A-1 Notes, it bargained and paid for the right to direct the CDO to be liquidated if defaults occurred, so that it could protect itself from further downturns in the market for commercial real estate debt securities. This Court should not permit the other parties' insistence on delay and obfuscation to deprive Barclays of this bargained-for protection.

**BACKGROUND**

A.      **The Parties**

Interpleader Plaintiff U.S. Bank is presently the Trustee under the Indenture.  (¶ 1.)[1]

Barclays is the Holder of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes under the Indenture, with an aggregate principal amount of $390,000,000 and an unpaid principal balance of approximately $381 million.  (JS Decl. ¶ 9.)  These Notes represent approximately 65% of the total capitalization of the CDO.  (¶ 2.)  Based on information from several bond pricing services, it is apparent that the cumulative market value of the collateral underlying the CDO is far less than the face value of the Class A-1 Notes. (JS Decl. ¶ 9; Ex. HHH.)  Barclays is therefore the only party that would recover any proceeds upon liquidation and sale of the collateral.  (JS Decl. ¶ 9.)

Interpleader defendant AGC is the Collateral Manager of the CDO, and is a party, along with Cedarwoods, to a Collateral Management Agreement, dated February 27, 2007.  (¶ 5; Ex. B.)

Interpleader defendant BONY is the Holder of 100% of the Aggregate Outstanding Amount of the Class A-2 Notes under the Indenture.  (¶ 3.)  The Class A-2 Notes have an aggregate principal amount of $78 million, which is approximately 13% of the total capitalization of Cedarwoods CDO II.  (*Id.*)  The Class A-2 Notes are subordinate to the Class A-1 Notes owned by Barclays.

Interpleader defendant MBIA claims to have a contract to act as surety for BONY's Class A-2 Notes and, as such, is entitled to enforce the rights of BONY as holder of those notes.  (¶ 4.)

B.      **Overview of the Cedarwoods CRE CDO II Transaction**

The Cedarwoods CRE CDO II issued approximately $600 million in notes ("Notes") secured by assets purchased with the proceeds from the Notes, consisting of commercial

---

[1]     Citations to "¶___ " are to the Local Rule 56.1 Statement of Undisputed Facts in Support of the Motion for Summary Judgment of Interpleader Defendant Barclays Bank PLC.  Citations to "Ex. __" are to the exhibits accompanying the JS Decl.

mortgage-backed securities ("CMBS Securities") (a type of mortgage-backed security secured by loans on commercial properties), REIT Debt Securities, Real Estate CDO Securities and Real Estate Company Debt Interests, all of which were required to comply with a set of eligibility criteria set forth in the Indenture.  (¶ 6.)  Proceeds from the asset portfolio are the only source of funds for payment on account of the CDO liabilities.  (*Id*.)

The principal liabilities of the Issuer are:  (i) $390 million Class A-1 Notes; (ii) $78 million Class A-2 Notes; (iii) $28.5 million Class A-3 Notes; (iv) $29.25 million Class B Notes; (v) $20.25 million Class C Notes; (vi) $19.5 million Class D Notes; (vii) $6 million Class E Notes; (viii) $10.5 million Class F Notes; (ix) $11 million Combination Notes; and (x) $18 million unsecured Income Notes.  (¶ 7.)  In addition, the Issuer currently has liability in excess of approximately $69 million under a Hedge Agreement.  (¶ 10.)

The Notes are structured in layers, or tranches, that correspond to the respective noteholders' rights to receive payment.  (JS Decl. ¶ 15.)  The Indenture includes detailed provisions regarding how collections from the underlying collateral are to be allocated to pay expenses of the CDO and to pay the interest and principal on the different classes of Notes.  (Ex. A § 11.1 at 170-81.)  Section 11.1 of the Indenture defines the "waterfall" for the distribution of Interest Proceeds (§11.1(a)), Principal Proceeds (§11.1(b)) and sale proceeds following the sale of the collateral after an Event of Default ((§11.1(c)).  (*Id*.)  The sequential allocation of funds under Section 11.1 is collectively defined as the Priority of Payments.  (Ex. A § 1.1 at 47.)

Cedarwoods issues two types of monthly reports which are permitted to be, and in fact were, combined.  (JS Decl. ¶ 11; Ex. A § 10.11 at 161.)  The Note Report is essentially an accounting of the CDO which must include, among other things, a calculation showing compliance with certain "coverage tests," (discussed *infra*); a listing of all non-performing assets, called Defaulted Securities and Deferred Interest PIK Bonds, and their related market value and rating agency recovery rates; the S&P and Moody's rating for each Collateral Debt Security; and a listing of all securities that have been downgraded since the last payment period.  (JS Decl. ¶ 12; Ex. A § 10.11 at 160-66.)  The Payment Reports (together with the Note Reports, the

"Reports") in turn, set forth "an accounting of the amounts that will be paid in accordance with the Priority of Payments."  (JS Decl. ¶ 12; Ex. A § 10.11 at 160.)

**C.**     **The Cedarwoods CRE CDO II Coverage Tests**

The Indenture includes several coverage tests that measure the adequacy of the collateral to support the outstanding Notes.  (JS Decl. ¶ 19; Ex. A § 1.1 at 10-13.)  Of particular relevance here is the Class D/E Principal Coverage Test.  (JS Decl. ¶ 21.)  When the Class D/E Principal Coverage Test is failing, under the Priority of Payments, cash flows that would otherwise be (a) deposited to an account for reinvestment in new collateral, and (b) used to pay interest and make other distributions to noteholders subordinate to Barclays and to pay AGC's Subordinate Collateral Management Fee must all instead be used to pay down the principal on the Class A-1 Notes.  (Ex. A § 11.1(a)(xvi) at 172-73, § 11.1(b)(x) at 176.)

Relatedly, under Section 9.8, the failure of a Coverage Test is a Mandatory Redemption event.  (¶ 30; Ex. A § 9.8 at 154.)  Specifically, when the Class D/E Principal Coverage Test fails, on a given Payment Date "all collections that would otherwise be used . . . to make payments in respect of any Class of Secured Notes subordinate to [the Class D and Class E Notes], distributions in respect of the Income Notes, payments of certain other expenses and reinvestments in Substitute Collateral Debt Securities *will be used instead to redeem ... (i) first, each class of Secured Notes Senior to [the Class D and Class E Notes]*."  (Ex. A § 9.8 at 154 (emphasis added).)  Here, that means that when the Class D/E Principal Coverage Test fails, the designated collections must be used instead to redeem the Class A-1 Notes until the Coverage Test is satisfied.  (*Id.*)

The Class D/E Principal Coverage Test is expressed as a ratio: the numerator is the sum of the principal amount of all the Collateral Debt Securities, with certain adjustments, defined as the "Principal Coverage Amount"; the denominator is the sum of the Aggregate Outstanding Amount of the Class A, B, C, D and E Notes.  (JS Decl. ¶ 21; Ex. A § 1.1 at 13, 46-47.)  To pass the test, this ratio must exceed 102.5%.  (JS Decl. ¶ 21; Ex. A § 1.1 at 13.)

The required adjustments to the Principal Coverage Amount, the numerator of the Class D/E Principal Coverage Test, are at the center of this controversy.  Collateral Debt Securities that are impaired or have low ratings are valued at a fraction of their principal amount for purposes of calculating the Principal Coverage Amount.  First, CMBS Securities rated below "Baa3" or "BBB-" by Moody's or S&P, respectively, are Defaulted Securities once "there has been a failure to pay interest in whole or in part for . . . three consecutive payment periods."  (Ex. A § 1.1 at 24-25.)  Defaulted Securities are carried for purposes of calculating the coverage ratios at their Defaulted Security Amount, an amount equal to the lesser of the market value of the security or an amount calculated based on rating agency recovery rates defined in the Indenture.  (JS Decl. ¶ 22; Ex. A § 1.1 at 24, 46-47.)  This adjustment can be significant.  For example, the S&P Recovery Rate for the LBUBS 2007-C1 C security (discussed below) is 25% of the Principal Balance of that security.  (Ex. Z at 45.)  Thus, in designating this security as a Defaulted Security, it will be treated, for purposes of this crucial calculation, at an amount equal to the product of 25% (rather than 100%) and the outstanding principal amount held by Cedarwoods.  (Ex. A § 1.1 at 24, 46-47.)

Second, securities that by their terms permit interest to be deferred or capitalized or which issue additional securities in lieu of interest payments in cash (so-called "Payment-in-Kind" or "PIK Bonds") are treated as impaired when they defer interest for the lesser of two consecutive payment dates or six months.  These are called "Deferred Interest PIK Bonds" and are carried at their "Deferred Interest PIK Bond Amount," which is similarly calculated as the lesser of market value or a reduced amount based on the applicable rating agency recovery rates. (Ex. A §1.1 at 26, 46-47.)

Third, securities that have ratings of "Ba1" by Moody's or "BB+" by S&P, or lower, are carried at defined lowered percentages.  For example, a bond with a Moody's/S&P rating of "Caa1"/"CCC+" or lower is generally carried at 60% of its principal amount for purposes of the coverage tests.  (¶ 23; Ex. A § 1.1 at 46-47.)  In addition, securities rated "Ca" or lower by Moody's or "CC" or lower by S&P are Defaulted Securities.  (Ex. A § 1.1 at 26.)

**D.     The Coverage Tests Were Misstated**
        <u>**Leading to Violations of the Priority of Payments**</u>

The Class D/E Principal Coverage Test was first reported as failing in May 2011.  (JS
Decl. ¶ 49; Ex. S at 16.)  Based upon an in-depth review of the Reports, Barclays identified a
series of errors that, when corrected, indicate that the Class D/E Principal Coverage Test was, in
fact, failing no later than December 2010, leading to a violation of the Priority of Payments for
the December 2010 through April 2011 Payment Dates.  (JS Decl. ¶¶ 27-54.)

Specifically, at least six securities should have been, but were not, classified as Defaulted
Securities: LBUBS 2007-C1 Classes C, D, and H; LBUBS 2006-C7 Class H; CD 2006-CD3
Class E; and CD 2006-CD2 Class E.  (JS Decl. ¶¶ 28-40; Ex. A § 1.1 at 24-25.)  And a PIK
Bond—CREST 2003-1A Class C1—should have been, but was not, categorized as a Deferred
Interest PIK Bond.  (JS Decl. ¶¶ 42-44; Ex. A § 1.1 at 26.)

Furthermore, two other CMBS Securities, WBCMT 2005-C18 F and WBCMT 2005-C18
G, were downgraded on December 10, 2010 to "Caa3" and "Ca," respectively.  (JS Decl. ¶¶ 45-
47.)  The downgrade of WBCMT 2005-C18 G to "Ca" should also have resulted in the asset
being categorized as a Defaulted Security under the Indenture.  (Ex. A § 1.1 at 26.)  The
December 2010 Report did not reflect these downgrades nor did it reflect the proper
categorization of WBCMT 2005-C18 G as a Defaulted Security.  (Ex. N at 55, 64, 67.)   The
misclassification of these assets led to an overstatement of the Class D/E Principal Coverage Test,
as set forth in the following table:

| Payment Date | Class D/E Principal Coverage Test Passing = 102.5% | | Pass/Fail? |
|---|---|---|---|
| | Reported | Actual | |
| December 21, 2010 | 103.04% | 100.16% | Fail |
| January 19, 2010 | 102.69% | 100.40% | Fail |
| February 18, 2011 | 104.18% | 102.03% | Fail |
| March 21, 2011 | 104.02% | 101.62% | Fail |
| April 19, 2011 | 103.76% | 102.11% | Fail |

7

(JS Decl. ¶ 50.)   Notably, without giving effect to the other misclassifications, the failure to account for the downgrades of WBCMT 2005-C18 F and WBCMT 2005-C18 G alone would have caused the Class D/E Principal Coverage Test to fail at 102.43% for the December 2010 Payment Period.  (JS Decl. ¶ 51.)

Because the Class D/E Principal Coverage Test was treated as passing, when it was failing, during December 2010 through April 2011, the Priority of Payments was violated.  When the Class D/E Principal Coverage Test is failing, under Section 11.1(a)(xvi) of the Indenture any amounts that would otherwise be paid under Sections 11.1(a)(xvii) to (xxiii), *i.e.* lower on the waterfall, must be used "to pay principal" on the Class A-1 Notes. (Ex. A § 11.1(xvi) at 172-73.) Furthermore, pursuant to Section 11.1(b)(x), when the Class D/E Principal Coverage Test fails, to the extent the test is still not satisfied after redirection of Collateral Interest Collections, amounts that would otherwise be paid under Sections 11.1(b)(xi) to (xix) must instead be used to pay principal on the Class A-1 Notes. (Ex. A § 11.1(b)(x) at 176.)  Despite these provisions, the following payments were made during December 2010 through April 2011:

| Improper Use | Waterfall Provision | Amount |
| --- | --- | --- |
| Class F Notes | 11.1(a)(xviii) | $151,238.33 |
| AGC Subordinate Collateral Management Fee | 11.1(a)(xxii) | $1,064,830.74 |
| Income Noteholders | 11.1(a)(xxxiii)(B) | $1,038,695.98 |
| Principal Collection Account | 11.1(b)(xiv)(A) | $6,307,244.05 |
| **Total** | | $8,562,009.10 |

(JS Decl.¶ 53.)

All of these amounts should have been paid to Barclays as principal on the Class A-1 Notes.  And under Section 9.8 of the Indenture, these amounts should have been used to mandatorily redeem the Class A-1 Notes. (Ex. A § 9.8 at 154.)

**E.**   **Violation of the Reinvestment Criteria**

In the course of its review of the CDO Reports, Barclays also identified numerous additional errors including the purchase of prohibited assets and the failure to accurately report

the ratings of the Collateral Debt Securities held by the CDO, which resulted in, among other things, erroneous reports and violations of the CDO's "Reinvestment Criteria."

  **1. Violation of the Collateral Concentration Limitations and Ratings Limitations**

  During a defined "Reinvestment Period," a five-year period running from the closing of the Transaction, the Collateral Manager is permitted to sell portfolio collateral and reinvest the proceeds, along with the principal payments (Principal Collections) received by the CDO, to invest in new collateral.  (*See* JS Decl. ¶ 56.)  But these reinvestments must comply with defined "Reinvestment Criteria."  (Ex. A § 1.1 at 51, § 12.1(b) at 182.)  Here, the maximum permitted limit for investment in Real Estate CDO Securities—17% of the CDO's assets—was exceeded during January 2011 through June 2011, but Cedarwoods continued to purchase more Real Estate CDO Securities.  (JS Decl. ¶¶ 59-61.)  For example, the concentration was 19.27% and 19.22% on the February 2011 and March 2011 Payment Dates, respectively.  (JS Decl. ¶ 60.)

  The Ratings Limitations were also violated.  Only 40% of the CDO's total assets may be invested in securities rated below "BBB-" by Moody's or "Baa3" by S&P.  (Ex. A § 1.1 at 17.)  Although this limitation was exceeded in January 2010, when Cedarwoods purchased MLMT 2006-C2 E, a CMBS Security with a par amount of $3,355,000 rated "Ba1"/"BB-" by Moody's and S&P and WBCMT 2007-C30 AJ, a CMBS Security with a par amount of $209,000 rated "Ba3"/"B" by Moody's and S&P, respectively, and the concentration of "BBB-"/"Baa3" or below-rated assets increased from 65.23% before the purchases to 65.45% after the purchases (JS Decl. ¶ 63.)

  Section 12.1 of the Indenture prohibits the Issuer from purchasing assets unless the Reinvestment Criteria are "satisfied, maintained or improved" after such reinvestment.  (Ex. A § 12.1(b) at 182.)  By purchasing assets that caused the above asset concentration limitations to be exceeded, the Issuer violated Section 12.1(b)(iii).  (*Id.*)

####    2.    Failure To Report Accurate Ratings of Collateral Debt Securities

Sections 10.11(a)(xx)-(xxi) of the Indenture require that the Reports identify, among other things, the S&P and Moody's ratings for each asset.[2]  By comparing the Reports to publicly available ratings information, it is apparent that the ratings for at least nine securities were misreported.  (JS Decl. ¶¶ 67-68.)  For example, the Reports from January 2011 to August 2011 reflected that CSFB 2005 C5 J had a Moody's actual rating of "Ba3" and an "assigned" rating of "Ba3," when in fact the asset was never rated by Moody's and its "assigned' rating should have been reported as "Caa2."  (*Id.* ¶ 68.) These errors had a cascading effect on the Reports.  Among other things, by failing to accurately reflect the ratings of the assets, the Reports misstated the Collateral Quality Tests, which are imposed by the rating agencies to prevent a Collateral Manager from trading assets in a way that results in deterioration of the overall quality of the portfolio.  *See, e.g.*, DOUGLAS J. LUCAS, LAURIE S. GOODMAN AND FRANK J. FABOZZI, COLLATERALIZED DEBT OBLIGATIONS: STRUCTURES AND ANALYSIS 23 (2d ed. 2006).

####    3.    Violation of the Eligibility Criteria

The Indenture also specifies certain types of assets, including any securities with Moody's ratings below "B3" or S&P ratings below "B-" or REIT Debt Securities with Moody's ratings below "Ba3" or S&P ratings below "BB-," which may not be purchased at all.  (Ex. A § 12.2(o), (r) at 184-85.)  These "Eligibility Criteria" were breached when Cedarwoods purchased NXL 7.5 07/30/29 with an S&P rating of "CCC+," NXL 7.65 11/02/26 with an S&P rating of "CCC+" and NXL 6.9 02/15/28 with a Moody's rating of "Caa2."  (JS Decl. ¶ 65.)

---

[2]    In some instances, when Moody's or S&P has not rated an asset, the rating must be derived from ratings by other firms through a defined "notching" formula set out in the Indenture. (Ex. A § 1.1 at 39-42, 54-55, Schedule F, Schedule G.)

**F.**      **Events of Default Occurred Under the Indenture**

The matters set forth above led to a series of Events of Default under the Indenture.  First, the violation of the Priority of Payments led to Events of Default under Section 5.1(b) (failure to pay principal when due and payable) and 5.1(c) (failure to comply with the Priority of Payments).

In addition, an Event of Default occurred under Section 5.1(f), which results when a covenant in the Indenture is breached or a "writing delivered pursuant hereto proves to be incorrect when made, which default or breach has a material adverse effect on the Secured Noteholders. . . ."   The applicable cure periods for these Events of Defaults have all expired.

**G.**      **Barclays Informs the Trustee of an Event of Default**

On August 24, 2011, Barclays, the Controlling Class, sent the Trustee a Notice of Event of Default, stating that an Event of Default pursuant to Section 5.1(c) of the Indenture had occurred, and directed the Trustee to accelerate the Notes.  (¶ 146; Ex. JJJ.)

Thereafter, on September 20, 2011, the Trustee notified the noteholders, AGC and other interested parties that it had received the August 24 Default Notice from the Controlling Class and that it was investigating the matter.  (¶ 147; Ex. KKK.)  On September 23, 2011, the Trustee circulated to the noteholders a September 22, 2011 letter that it received from AGC disputing that an Event of Default had occurred.  (¶ 148; Ex. LLL.)

On October 6, 2011, Barclays provided the Trustee with an Additional Notice of Event of Default and Direction to Accelerate pursuant to Section 5.1(f) of the Indenture (the "October 6 Default Notice").  (¶ 149; Ex. MMM.)  AGC responded with a letter on October 11, which continued to dispute the occurrence of an Event of Default.  Among other things, AGC took the position that some of the Defaulted Securities had been cured of that status by making up the missed interest payments, even though (as explained below) the Indenture does not permit such cures.  (¶ 151; Ex. OOO.)

Thereafter, the Trustee retained a third party expert, PF2 Securities Evaluations, Inc. ("PF2"), to assist it in determining whether the subject securities should have been identified as

Defaulted Securities under the terms of the Indenture.  (¶ 154.)  On November 29, 2011, PF2 issued its report (the "PF2 Report") agreeing with Barclays' position confirming the classification of the securities as Defaulted Securities.  (¶ 155; Ex. RRR.)  The Trustee then sent a notification stating that, after conducting its investigation, it had concluded an Event of Default had occurred and was continuing pursuant to Section 5.1(f) of the Indenture and accelerating the Notes in accordance with Barclays' direction.  (¶ 156; Ex. SSS.)

On December 5, 2011, Barclays directed the Trustee to dispose of and liquidate the Collateral pursuant to Section 5.4(a)(iii) and Section 5.5(a)(ii) of the Indenture.  (¶ 157; Ex. TTT.)  In accordance with this direction, on December 6, 2011, the Trustee sent notification that it would commence the sale and liquidation immediately.  (¶ 158; Ex. UUU.)  Thereafter, on December 9, 2011 and December 12, 2011, the Trustee sent formal Notification of the Disposition of the Collateral and a Notice of Public Sale and Invitation to Bid on the collateral, which set forth the details of the public auction of the CDO's collateral.  (¶¶ 159-160; Exs. VVV-WWW.)  It was not until December 13, 2011 that the Trustee sent a notification that it had received further objections from the Collateral Manager and the "representative of the Class A-2 Noteholder to the declaration of the Event of Default under Section 5.1(f) of the Indenture, the acceleration of the Notes and the commencement of the liquidation of the Collateral."  ( ¶ 162; Ex. YYY.)  Rather than complete the sale of the collateral, the Trustee commenced this interpleader action.

## ARGUMENT

## BARCLAYS' MOTION SHOULD BE GRANTED

### A.    Summary Judgment Is Appropriate Where the Contractual Language Is Unambiguous and the Material Facts Are Undisputed

Summary judgment is appropriate where "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Fosco v. City Univ. of N.Y*, No. 09-CV-7173 (WHP), 2012 WL 75189, at *2 (S.D.N.Y. Jan. 5, 2012) (Pauley, J.) (quoting Fed. R. Civ. P. 56(a)).  Courts routinely grant summary judgment based on the unambiguous terms of

CDO indentures.  *See, e.g.*, *Deutsche Bank Trust Co. Am. v. Elliot Int'l, L.P.*, No. 09-CV-5242 (WHP) (S.D.N.Y. Feb. 14, 2011) (Pauley, J.); *U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*, __ F. Supp. 2d __, 2011 WL 6880723 (S.D.N.Y. Dec. 30, 2011); *Bank of Am. v. AIG Fin. Prods. Corp.*, No. 10-CV-5242 (JSR), 2010 WL 5065477 (S.D.N.Y. Dec. 7, 2010).

 Indentures are interpreted in accordance with traditional contract provisions.  *U.S. Bank N.A.*, __ F. Supp. 2d. __, 2011 WL 6880723 at *2 (citing *Jamie Sec. Co. v. Limited, Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989)).  Under New York law, which applies under Section 14.9 of the Indenture, "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such issue may properly be resolved by summary judgment."  *Omni Quartz Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir. 2001); *see also Bank of N.Y. v. First Millennium Inc.*, 607 F.3d 905, 914 (2d Cir. 2010) (affirming grant of summary judgment to noteholder plaintiffs under trust indenture).  It is well-settled that "a party cannot create an ambiguity in an otherwise plain agreement merely by 'urg[ing] different interpretations in the litigation.'"  *Red Ball Interior Demolition v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) (alternation in original) (citation omitted); *see also MBIA Ins. Corp.  v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09-CV-10093 (RJS), 2011 WL 1197634, at *6 (S.D.N.Y. Mar. 25, 2011) ("The language of a contract is not made ambiguous simply because the parties urge different interpretations.") (citation omitted).

Here, the operative terms of the Indenture are unambiguous.  Based upon undisputed facts, Events of Default have occurred under the Indenture and the Court should accordingly grant summary judgment in favor of Barclays.  *See, e.g.*, *Bank of Am.*, 2010 WL 5065477, at *2 (granting summary judgment to claimant in dispute over interpleader funds).

**B.     Mischaracterization of Collateral Debt Securities and the Failure to Account for Downgrades Led to Violations of the Priority of Payments**

As discussed above, it was not until the May 2011 Payment Period that the Class D/E Principal Coverage Test was first reported as failing.  Because of the errors in characterizing the CDO's assets, it should have been reported as failing no later than December 2010.

1.      **The Failure to Account for Ratings Downgrades and the Deferred Interest PIK Bond Is Undisputed**

There can be no dispute that the ratings downgrades of WBCMT 2005-C18-F and WBCMT 2005-C18-G were not reflected in the December 2010 Report and, if they had been, standing alone they would have led to the Class D/E Coverage Test failing in that Payment Period.  (JS Decl. ¶¶ 47-48, 51.)  Moreover, no party has disputed that the CREST 2003-1A C1 security should have been classified as a Deferred Interest PIK Bond beginning with the March 2011 payment period.  Indeed, the Collateral Manager conceded this in its October 11, 2011 letter.  (Ex. OOO at 6.)

2.      **The Defaulted Securities Were Not "Cured" of that Status**

With respect to the Defaulted Securities, the only argument advanced by the Collateral Manager when it was confronted with the errors concerned the interpretation of the Indenture, not any disputed (or disputable) facts.  Specifically, AGC advised Barclays that it did not classify the LBUBS 2007-C1, Classes C, D and H; the LBUBS 2006-C7 H and CD 2006-CD3 E securities as Defaulted Securities, even though each had suffered interest shortfalls for three consecutive payment periods, because some or all of these shortfalls were later recovered, and, as a result, the bonds purportedly "no longer met the requirements of a Defaulted Security."  (Ex. OOO at 7.)

This argument simply cannot be squared with the unambiguous language of the Indenture. "Defaulted Security" is defined in the Indenture with great specificity:

> "Defaulted Security" means any Collateral Debt Security or any other security included in the collateral: (i) as to which (a) *except with respect to CMBS Securities* there has occurred and is continuing a default with respect to the payment of interest or principal, *which default has not been cured . . . or (b) with respect to a CMBS Security*, (1) as to which there has been a failure to pay interest in whole or in part for the lesser of (A) six months or (B) three consecutive payment periods (if such security is rated (or privately rated for purposes of the issuance of the Notes) below "Baa3" by Moody's or "BBB-" by S&P), *even if by its terms it provides for the deferral and capitalization of interest thereon*; **provided, however** that if a Rating Agency Confirmation has been obtained, the Collateral Manager may choose not to treat such security as a Defaulted Security

or (2) as to which there has been a failure to pay interest in whole or in part for the lesser of (A) one year or (B) six consecutive payment periods (if such security is rated (or privately rated for purposes of the issuance of the Notes) "BBB-" or higher by S&P or "Baa3" or higher by Moody's), even if by its terms it provides for the deferral and capitalization of interest thereon . . . .

(Ex. A § 1.1 at 24-25 (emphasis added).)

It cannot be disputed that each of the relevant securities was a CMBS Security and that each failed to pay interest for three consecutive payment periods during a time when it was rated below "Baa3" by Moody's or "BBB-" by S&P.  (¶¶ 31-78.)  Once a CMBS Security becomes a Defaulted Security, it cannot be "cured" of that status by making up the past interest shortfalls. Indeed, while Part (i)(a) of the above definition specifically permits the cure of a payment default on a *non-CMBS Security*, similar cure language is omitted for CMBS Securities under Part (i)(b). Pursuant to "accepted canons of contract construction, when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional." *Sterling Investor Servs., Inc. v. 1150 Nobo Assocs., LLC*, 30 A.D.3d 579, 581 (2d Dep't 2006); *see also Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011) (inclusion of limiting term in one agreement and omission of same term in another simultaneously-executed agreement indicated that other agreement was intended to lack such limitation); *MBIA*, 2011 WL 1197634, at *8 (collecting cases and noting that the granting clauses of the CDO transaction's indenture specifically omitted reference obligations from the definition of collateral thereunder).

### 3.     Discovery Is Not Needed to Determine the Status of the Defaulted Securities

Any suggestion that discovery is needed to evaluate these Defaulted Securities is wrong. For example, MBIA has argued that there is a need for discovery into the terms of the underlying securities to determine if they were Defaulted Securities.  (Dkt. No. 23; Dkt. No. 31 at 11.) Under the definition quoted above, however, whether a CMBS Security is a Defaulted Security turns on its investment rating and whether it had interest shortfalls for the required consecutive

pay periods, not on the consequences of such a shortfall under the security's governing documents.  Indeed, the Indenture instructs that the underlying terms of the securities should be disregarded and that the assets should be treated as Defaulted Securities, after missing the requisite number of interest payments, "even if by [their] terms [they] provide[] for the deferral and capitalization of interest thereon."  (Ex. A § 1.1 at 25.)

Similarly, MBIA has argued that discovery is needed because the determination whether a security was a Defaulted Security involved discretion on the part of the Collateral Manager. (Dkt. No. 31 at 11.)  Part (i)(a) of the definition of Defaulted Security provides some discretion for the Collateral Manager not to classify certain securities—*other than CMBS Securities*—as defaulted, for example where it determines the "default is not credit related" or is "reasonably likely to be cured," but no such discretion is available to the Collateral Manager where, as here, the security at issue is a CMBS Security.[3]  It bears emphasis that the Collateral Manager does not claim to have exercised "discretion" with respect to the Defaulted Securities, it simply misconstrued the Indenture.

**C.     The Events of Default Under Sections 5.1(b) and 5.1(c)**

As a result of the improper categorization of the Defaulted Securities and the Deferred Interest PIK Bond, as well as the failure to properly account for the downgrade of the investment ratings of WBCMT 2005-C18 F and WBCMT 2005-C18 G, commencing in December 2010, the Payment Reports improperly stated that the Class D/E Principal Coverage Test was passing when it was, in fact, failing.  (¶¶ 95-117.)  This erroneous report in turn caused the Trustee, on behalf of the Issuer, to improperly distribute over $8.5 million in funds under the Priority of

---

3     For CMBS Securities, the only possible discretion afforded to the Collateral Manager is that "if a Rating Agency Confirmation has been obtained, the Collateral Manager may choose not to treat such security as a Defaulted Security."  (Ex. A § 1.1 at 25.)  A Rating Agency Confirmation is a written certification from Moody's or S&P that the specified action or event, here not treating securities that had failed to pay interest for several consecutive months as "Defaulted Securities," would not lead to a downgrade or other adverse action. (Ex. A §1.1 at 49.)  No Rating Agency Confirmations were obtained for the securities at issue here, so this provision is inapplicable.  (JS Decl. ¶ 24.)

Payments—an Event of Default under Section 5.1(c) of the Indenture—and to fail to pay those amounts as principal due and owing to Barclays, an Event of Default under Section 5.1(b). There are no notice or knowledge conditions to these Events of Default and the cure periods, assuming they were applicable, all lapsed more than a year ago.

### 1. An Event of Default Occurred Under Section 5.1(c)

Section 5.1(c) of the Indenture defines an Event of Default as the "failure on any Payment Date to disburse amounts available in accordance with Section 11.1 . . . and a continuation of such failure for five Business Days . . . ."  (Ex. A § 5.1(c) at 102.)  Section 11.1, in turn, requires that on each Payment Date, Collateral Interest Collections and Collateral Principal Collections be applied by the Trustee in accordance with the Priority of Payments.  (Ex. A §§ 11.1(a), (b) at 170-79.)

The only argument that has been advanced as to why the clear violation of the Priority of Payments described above was not an Event of Default under Section 5.1(c) is, once again, a legal argument regarding the interpretation of the Indenture, not a factual dispute that would preclude summary judgment.  In particular, AGC, BONY and MBIA have advanced a contrived and unsupported argument that the priorities set forth in Section 11.1 are not violated so long as the Trustee applies the payments at issue "in accordance with a Payment Report," *even if the Payment Report is erroneous*.  (*See* Dkt. No. 17 at ¶ 77; Dkt. No. 27 at ¶ 77.)  They derive this theory from a misreading of the plain language of Section 11.1.  For example, as to Interest Collections, Section 11.1(a) provides as follows:

> (a) **Collateral Interest Collections**.   On any Payment Date that is not a Redemption Date or a Payment Date following the occurrence and continuation of an acceleration of the Secured Notes in connection with an Event of Default, *in accordance with a Payment Report prepared by the Collateral Administrator* on behalf of the Issuer as of the last day of the Due Period preceding such Payment Date, Collateral Interest Collections, to the extent of Available Funds in the Collection Account, will be deposited in the Payment Account and applied by the Trustee in the following order of priority: . . . .

(Ex. A § 11.1(a) at 170 (emphasis added).)

The other parties' theory that the italicized phrase means that the defined Priority of Payments—the very core provisions of the Indenture—can be violated without consequence falls apart on scrutiny.  It is elementary that the Court should "'construe the agreements so as to give full meaning and effect to the material provisions'" and the reading "should not render any portion meaningless."  *Beal Savs. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) (citations omitted). The reading suggested by MBIA, AGC and BONY ignores the command that the available funds "*will be . . . applied* by the Trustee in the following order of priority . . . ."  (Ex. A § 11.1 at 170.) That command cannot be satisfied where, as here, the priority following that directive indisputably was not followed.  Moreover, the definition of a Payment Report is "an accounting of the amounts that will be paid in accordance with the Priority of Payments."  (Ex. A § 10.11(a) at 160.)  The Priority of Payments, in turn, is defined as "collectively, the priority of payments specified in Section 11.1(a), (b), and (c)."  (Ex. A § 1.1 at 47.)  It would therefore not be possible for the Trustee to make payments "in accordance with a Payment Report" if the report did not comport with the Priority of Payments.  Thus, ultimately, the only logical way to read Section 11.1 consistent with Section 10.11 and the definitions is that the payments must be made in accordance with the specified priorities in accordance with a report that accurately reflects those priorities.

MBIA and BONY have asserted that their reading makes sense because the Trustee is supposed to be protected if it relies on reports provided to it.  The Trustee may be entitled to certain protections (assuming the reliance is in good faith), but that does not require material provisions of the Indenture to be ignored.  In particular, Section 10.11 of the Indenture provides:

> Subject to the terms of this Agreement, the Trustee shall be entitled to rely on the information supplied by the Collateral Manager in relation to the preparation of the Note Report, and by the Issuer in relation to the Payment Report, and shall not be liable for the accuracy or completeness of such information prepared by the Collateral Manager or the lack thereof.

(Ex. A § 10.11 at 165.)  This section exculpates the Trustee from *its own* liability where it relies on information provided by the Collateral Manager.  But it is the Issuer, not the Trustee, that is the obligor on the Notes and the party ultimately responsible for the Payment Report.  (Ex. A § 10.11(a) at 160.)  There is nothing in the Indenture that would excuse *the Issuer's* default if payments are made in violation of the Priority of Payments.

### 2.    An Event of Default Occurred Under Section 5.1(b)

An Event of Default under Section 5.1(b) occurs when there is a "default in the payment of any principal, when due and payable of any Secured Note."  Here, when the Class D/E Principal Coverage Test is failing, funds must be reallocated pursuant to Sections 11.1(a)(xvi) and 11.1(b)(x) to pay principal on the Class A-1 Notes.  (Ex. A §§ 11.1(a), (b) at 172-73, 176.)  And under Section 9.8, these amounts must be used to redeem the most senior notes.  Thus, principal was "due and payable" to Barclays once the Class D/E Principal Coverage Test failed but was not paid for the December 2010 through April 2011 Payment Periods.

MBIA has argued that no Section 5.1(b) default occurred because principal on the Class A-1 Notes will not be "due and payable" until the stated maturity in 2052.  (Dkt. No. 31 at 14.)  But, if the parties had intended that an Event of Default under Section 5.1(b) would occur only if principal was not paid upon "maturity," they would have said that.  *See Bazin v. Walsam 240 Owner LLC*, 72 A.D.3d 190, 195 (1st Dep't 2010) ("'[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'") (alteration in original) (citation omitted).

To the contrary, there are multiple provisions of the Indenture making clear that principal may be "due and payable" before the Stated Maturity, including upon a redemption.[4]  For instance, Section 2.6(b) provides that:

---

[4]    In plain English, an amount is due and payable if it is owed and the time specified for its payment has arrived.  See BLACK'S LAW DICTIONARY, 515, 1150 (7th ed. 2009) (defining "due" as "immediately enforceable" or "owing or payable, constituting a debt" and defining "payable" as "(Of a sum of money or a negotiable instrument) that is to be paid.  An amount may be payable without being due.  Debts are commonly payable long before they fall due.")

> . . . the principal of each Secured Note shall be payable no later than the Stated Maturity Date thereof <u>unless</u> the unpaid principal of such Secured Note *becomes due and payable at an earlier date by . . . call for redemption or otherwise.*

(Ex. A § 2.6(b) at 85 (emphasis added).)  The Mandatory Redemption called for by Section 9.8 upon the failure of the Class D/E Principal Coverage Test thus caused the principal on Barclays' Class A-1 Notes to become "due and payable."  Additionally, Section 2.6(c) states that principal is payable "(iii) on each Payment Date, *in accordance with Section 11.1*," which in turn sets forth the Priority of Payments that was violated here.  (Ex. A § 2.6(c) at 86 (emphasis added).)  Section 5.9 states that the holders of the Notes have an "absolute and unconditional" right to receive payment of principal and interest on the Notes "as such principal and/or interest become due and payable in accordance with Sections 13.1 and 11.1."  (Ex. A § 5.9 at 112.)  This again makes clear that Section 11.1 specifies when principal becomes "due and payable."

## D.     An Event of Default Under Section 5.1(f) Has Occurred

An Event of Default under Section 5.1(f) occurs when there is

> a default in the performance, or breach, of any other covenant . . . or of any representation or warranty of the Issuer under this Indenture or if any certificate or writing delivered pursuant hereto proves to be incorrect when made, which default or breach has a material adverse effect on the Secured Noteholders and continues for a period of 30 days . . . of the earlier of knowledge by the Issuer or the Collateral Manager or notice to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" under this Indenture . . .

(Ex. A § 5.1(f) at 102.)

As set forth above, the errors made with respect to the categorization of the Mischaracterized Securities, the ratings downgrades, the reported ratings, the Class D/E Principal Coverage Tests, the Collateral Quality Tests and the Collateral Concentration Limitations resulted in incorrect Payment Reports being issued no later than December 2010.  Furthermore, the repeated investments in violation of the Reinvestment Criteria and Eligibility Criteria

constituted breaches of Section 12.1 of the Indenture.  These incorrect reports and breaches concealed significant deterioration in the credit quality and performance of the underlying collateral of the CDO, unnecessarily exposed the CDO's noteholders to inappropriate risk, and deprived Barclays of the right to have $8.5 million of its Class A-1 Notes amortized, any one of which constitutes, and together certainly constitute, a material adverse effect on the noteholders and an Event of Default under Section 5.1(f) of the Indenture.

### 1.   The Knowledge Requirements of Section 5.1(f) Were Satisfied

In its August 24 and October 6, 2011 Default Notices, Barclays gave the Trustee, the Collateral Manager and the Issuer notice of the mischaracterized Defaulted Securities and Deferred Interest PIK Bond, and the resulting inaccurate Reports and violation of the Priority of Payments.  Nevertheless, none of these defaults or errors were cured within 30 days.

Moreover, the conditions to Section 5.1(f) are also satisfied by the "knowledge by the Issuer or the Collateral Manager" of the defaults.  When applied to an organization such as AGC or the Issuer, knowledge includes constructive knowledge, including the knowledge of the entity's employees and matters its employees should be aware of in the exercise of diligence.[5] *BNP Paribas Mort. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 397 (S.D.N.Y. 2011) (interpreting similar indenture provision and noting that the phrase "'charged with knowledge'" is "commonly understood to refer to the imputation of constructive knowledge"); *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 560 (S.D.N.Y. 2003) ("The law presumes that it is fair to find that that which the agent knows, the principal knows as well . . . .").

---

[5]   Indeed, the Indenture incorporates the definitions in Article 9 of the U.C.C.  (Ex. A § 1.1 at 3.)  Under U.C.C. § 1-201(27), which applies to Article 9, "knowledge . . . is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence."  N.Y.U.C.C. Law § 1-201(27) (McKinney 2002); *see also* N.Y.U.C.C. Law § 9-102(c) (McKinney 2002) ("Article 1 contains general definitions and principles of construction and interpretation applicable throughout this article.").

Here, it is clear that AGC had actual, or at least constructive, knowledge of the Events of Default.  As to the Defaulted Securities and the Deferred Interest PIK Bond, AGC admitted it was aware of the underlying missed interest payments and it cannot disclaim knowledge of a default based on a misreading of the Indenture.  (Ex. OOO at 6-7.)  As to the failure to account for the downgrades of WBCMT-C18 F and WBCMT-C18 G, and to accurately track the ratings of other assets, it was the job of the Collateral Manager to track the ratings and the ratings themselves were public data, so AGC knew of the accurate ratings or, at the least, would have known them had it exercised due diligence.  (¶ 15; Ex. A §§ 10.11 (a)(xx), (xxiii) at 163-64; Ex. B § 2(g) at 2.)  Similarly, as to the failure to invest in accordance with the Reinvestment Criteria, it was the Collateral Manager's job to select assets for the CDO during the reinvestment period that complied with the defined criteria.  (¶ 121; Ex. A § 12.1(b) at 182; Ex. B § 2(a) at 1.)  As such, the Collateral Manager had, at least, constructive knowledge that the investment criteria were not being followed, since this was apparent from a review of the Reports.

### 2.    The Incorrect Reports and Breaches of Covenants Had a Material Adverse Effect

The erroneous Reports and breaches of covenants had a material adverse effect on noteholders as contemplated by Section 5.1(f).  First, these erroneous Reports led to the Class D/E Principal Coverage Test being misreported.  The breach of a coverage test is a critical fact for the noteholders, because it indicates an increase in the risk of default and sets off a reallocation in the Priority of Payments.  As such, the failure of a coverage test signifies a change in the very nature and performance of the noteholders' investment and is, itself, akin to an event of default.  Indeed, as Judge Rakoff recognized, "[t]he failure of a coverage test, like an event of default, signals that trouble lies ahead and that the trustee may not be able to make payments to all of the noteholders, so a similar allocation should be made as would be made in the event of a default." *Bank of Am.*, No. 10-CV-5242(JSR), 2010 WL 5065477, at *3.

Second, the numerous errors in the Reports concealed from the CDO noteholders the deterioration in the credit quality of the CDO's collateral.  *See* Douglas J. Lucas, Laurie S.

GOODMAN AND FRANK J. FABOZZI, COLLATERALIZED DEBT OBLIGATIONS STRUCTURES AND ANALYSIS, 20 (John Wiley & Sons, Inc., 2d ed. 2006) ("Coverage Tests are designed to protect noteholders against deterioration of the existing portfolio.").  Masking the deterioration of the Collateral deprives the noteholders of this bargained-for protection and therefore also constitutes a material adverse effect.  *Cf. Sun Am. Bank v. Fairfield Fin. Servs., Inc.*, 690 F. Supp. 2d 1342, 1358 (M.D. Ga. 2010) (defendant breached contractual obligation to plaintiff to inform it "of any circumstances which 'could have a material, adverse affect [sic] on the Loan'" where it failed to disclose information concerning borrower's "declining liquidity and delinquencies on [other] loans") (first alteration in original); *see also id.*  at 1360 (downgrades of risk rating "were 'material,' in that they were significant to the status of the credit relationship and of such a nature that knowledge of the downgrades would affect [plaintiff's] decision-making"), 1364 (failure to disclose information about borrower's declining liquidity and other delinquencies, deprived "participants . . . of an opportunity to make informed decisions about their own risks").

The argument advanced by other interpleader defendants that there has been no material adverse effect because some of the misallocated funds were "reinvested in new Collateral for the benefit of all the Noteholders as a group" (Dkt. No. 17 ¶ 79; *see also* Dkt. No. 27 ¶ 79), misses the point.  Independent of what was done with the misallocated funds, the fact that the structural protections of the CDO were vitiated by the erroneous Reports constitutes a material adverse effect.  That said, the reinvestments themselves had a material adverse effect on all the noteholders.  As set forth above, certain reinvestments breached the limitations with respect to Real Estate CDO Securities and the ratings limitations, as well as the CDO's Eligibility Criteria, thus increasing the risk the parties obviously bargained to avoid by implementing such restrictions.  These breaches constitute a material adverse effect, especially in light of the fact that, as set forth above, certain of the securities in which the Collateral Manager reinvested have already lost a significant portion of their value.

Moreover, the diversion of over $8.5 million that should have been used to amortize the principal on Barclays' Notes is itself material.  *See Fed. Home Loan Mortg. Corp. v. Bronx New*

*Dawn Renaissance VII, L.P.*, No. 93-CV-7970 (CSH), 1995 U.S. Dist. LEXIS 9644, at *10 (S.D.N.Y. July 11, 1995) ("[T]he requirement that [defendant] make timely payments of principal and interest was obviously a material part of the parties' agreement.").

Finally, there is simply no merit to any suggestion that the inaccurate reporting, violations of investment criteria and misallocation of funds owed to Barclays did not trigger an Event of Default, because the language speaks of "a material adverse effect on the Secured Noteholders," rather than on any one noteholder.  First, as discussed above, the inaccurate reporting and violations of investment criteria had an adverse effect on all noteholders by increasing the risks of the entire CDO.  Moreover, even if all of these defaults impacted only Barclays, the Class A-1 Notes have a face value of $390 million, representing 65% of the CDO's initial capital structure and 100% of the current economic interest in the CDO, given the market value of the collateral.  Since Barclays holds the majority of the CDO's Notes, a material adverse effect as to Barclays *is* a material adverse effect on the noteholders.

### E.    The Court Should Direct the Liquidation of the Collateral

Given that Events of Default have unequivocally occurred, Barclays, as the Controlling Class, was entitled to direct the Trustee to accelerate the Notes and to "direct the sale and liquidation of the Collateral."  (Ex. A § 5.5(a)(ii) at 109.)  Barclays is entitled to have the collateral sold, so that it is not forced to bear the risk of further declines in the market.  *See Citibank v. Solow*, No. 603697/08, 2012 NY Slip Op 1347 (1st Dep't Feb. 23, 2012) (noting that sale of bond collateral was reasonable and plaintiff was not bound to wait and undertake the risk of a declining market).  This Court should grant summary judgment and direct the Trustee to conduct the liquidation, as instructed in Barclays' December 5, 2011 letter, and to distribute the proceeds, along with the amounts currently held by the Trustee in escrow, in accordance with the Indenture.

## <u>CONCLUSION</u>

For the foregoing reasons, Barclays' motion for summary judgment should be granted.

Dated:  New York, New York
       March 1, 2012

                                      Respectfully submitted,

                                      __/s/ Jay B. Kasner_____
                                      Jay B. Kasner
                                      (jay.kasner@skadden.com)
                                      Christopher P. Malloy
                                      (christopher.malloy@skadden.com)
                                      Julie E. Cohen
                                      (julie.cohen@skadden.com)
                                      SKADDEN, ARPS, SLATE, MEAGHER &
                                          FLOM LLP
                                      Four Times Square
                                      New York, New York  10036
                                      (212) 735-3000

                                      *Attorneys for Interpleader Defendant Barclays Bank PLC*

25