Jay B. Kasner
Christopher P. Malloy
Julie E. Cohen
SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Interpleader Defendant Barclays Bank PLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee, | : | |
| | : | |
| Interpleader Plaintiff, | : | 11-CV-9199 (WHP) |
| | : | |
| - against - | : | **ECF Case** |
| | : | |
| BARCLAYS BANK PLC; THE BANK OF NEW YORK MELLON; MBIA INSURANCE CORPORATION; and ANGELO, GORDON & CO., L.P., | : | **Electronically Filed** |
| | : | |
| Interpleader Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JAKE SCRIVENS IN SUPPORT OF THE MOTION FOR
SUMMARY JUDGMENT OF INTERPLEADER DEFENDANT BARCLAYS BANK PLC**

JAKE SCRIVENS, declares under penalty of perjury pursuant to 28 U.S.C. §

1746, as follows:

1.     I am a Managing Director at Barclays Bank PLC ("Barclays").  I submit this

declaration in support of Barclays' Motion for Summary Judgment.  In my current position, my

responsibilities include managing Barclays' legacy structured credit assets, including its portfolio

of interests in collateralized debt obligations ("CDOs").

2.      Attached as exhibits hereto are true and correct copies of each of the documents relied upon in this declaration, a list of which is set forth in Schedule I.  The exhibits shall be referred to herein as "Ex. ___."

3.      In February 2007, Cedarwoods CRE CDO II, Ltd. ("Cedarwoods" or the "Issuer") issued approximately $600 million of notes (the "Notes"), the proceeds of which issuance was used by Cedarwoods to acquire a portfolio of commercial mortgage backed securities ("CMBS") and other commercial real estate-related debt instruments (the transaction, the "Cedarwoods II CDO").  The CMBS and other securities in which Cedarwoods invested are referred to as "Collateral Debt Securities" – they constitute the collateral backing Cedarwoods' obligations and essentially fund the principal and interest payments it is required to make to the investors in the Notes.  The terms of the Notes are set forth in an indenture (the "Indenture"), dated February 27, 2007, by and among plaintiff U.S. Bank N.A., as successor trustee (the "Trustee") and Cedarwoods.  (Ex. A.)

4.      Barclays is currently the owner of 100% of the Class A-1 Notes issued by Cedarwoods, with a principal amount of $390 million.  The Class A-1 Notes are the senior-most class of Notes issued by Cedarwoods.

5.      Interpleader defendant Angelo Gordon & Co. L.P., ("AGC") serves as the Collateral Manager for Cedarwoods pursuant to a Collateral Management Agreement, dated February 27, 2007.  (Ex. B)  Collateral managers typically select the initial collateral pool, monitor the credit status of the underlying assets, reinvest payment proceeds from maturing underlying assets, and make allowed substitutions in the collateral for the benefit of investors. The conduct of a collateral manager, therefore, can greatly affect the performance of a CDO transaction and either raise or lower its risk profile.

6.     The other parties to this action are interpleader defendant The Bank of New York Mellon ("BONY"), which I understand contends it is the holder of the Class A-2 Notes, which have a principal amount of $78 million, and defendant MBIA Insurance Corporation, which I understand contends that it entered into a surety agreement covering the Class A-2 Notes and is thereby entitled to exercise the rights of BONY as the holder of the Class A-2 Notes.

7.     As set out in greater detail below, in connection with Barclays' investment in the Cedarwoods II CDO, I along with a team reporting to me have been conducting a comprehensive review of the assets held by the Cedarwoods II CDO and monthly reports prepared for Cedarwoods by the Collateral Manager and the Trustee. Based on this review, Barclays determined that a number of errors occurred in the management and reporting of the Cedarwoods II CDO which have resulted in Events of Default under the Indenture.

8.     Beginning in August 2011, Barclays advised the Trustee that Events of Default had occurred and, in accordance with its rights as the Controlling Class under the Indenture, directed the Trustee to accelerate the Notes, causing the principal and accrued interest on all Secured Notes to be immediately due and payable. After enlisting the services of a third party expert, the Trustee agreed with Barclays, declared an Event of Default and accelerated the Notes. On December 5, 2011, in accordance with the Indenture, Barclays directed the Trustee to liquidate the Cedarwoods II CDO. "Liquidation" in this context means an Article 9 UCC-compliant process in which the Trustee oversees the sale of the underlying Collateral Debt Securities of the CDO via an auction process. (Ex. A § 5.4(a)(iii) at 107.) At the conclusion of the auction, the Issuer will have sold all of its collateral and will make a final distribution of the sale proceeds to its creditors in order of their priority with the senior-most creditors being paid first. Following this final distribution the issuing entity itself will be dissolved. Although the

3

Trustee commenced the process of setting up an auction of the collateral, I understand based on a written Notice to Holders of the Cedarwoods II CDO by the Trustee dated December 13, 2011 that AGC and MBIA objected to the liquidation. (Ex. YYY at 2.)  Apparently in response to these objections, the Trustee commenced this litigation rather than proceeding with the liquidation.

9. Liquidation of the collateral as soon as possible is important to Barclays because it is currently exposed to further losses on its investment.  The Class A-1 Notes, which have a face amount of $390 million and an unpaid principal balance of approximately $381 million, are already seriously impaired.  In addition, the Issuer also currently has liability of approximately $69 million on a Hedge Agreement and this liability is senior to the Class A-1 Notes. (Ex. III.) Based upon the prices for the underlying collateral obtained from third party services, and taking into account the liability under the Hedge Agreement, the net asset value of all of the assets in the Cedarwoods II CDO portfolio is presently between $180 million to $210 million, far less than the face amount of the Class A-1 Notes. (Ex. HHH.)  Thus, no noteholder other than Barclays would be entitled to receive any distributions from the liquidation of the collateral and any further declines in the value of the collateral will directly harm Barclays.  Moreover, the Class A-1 Notes (along with the Class A-2 and A-3 Notes) were recently downgraded on January 18, 2012 by Moody's. (Ex. NN.)

## I.   OVERVIEW OF THE CEDARWOODS II CDO TRANSACTION

10. The $600 million in Notes issued by Cedarwoods are secured by assets it purchased, referred to in the Indenture as Collateral Debt Securities, which consist of commercial mortgage-backed securities ("CMBS Securities") (a type of mortgage-backed security secured by loans on commercial properties), REIT Debt Securities, Real Estate CDO

Securities and Real Estate Company Debt Interests. The Collateral Debt Securities are required to comply with a set of criteria set forth in the Indenture. (Ex. A § 1.1 at 51, § 12.2 at 183-86.)

11.     The Indenture requires Cedarwoods to issue two types of monthly reports, a Note Report and a Payment Report, which are permitted to be, and in fact were, combined and will be referred to herein as the "Reports." (Ex. A § 10.11 at 160-61.)

12.     The Note Report is essentially an accounting of the Cedarwoods II CDO which must include, among other things, calculations showing compliance with certain "coverage tests," (discussed *infra*); a listing of all non-performing assets, called Defaulted Securities and Deferred Interest PIK Bonds, and their related market value and rating agency recovery rates; the S&P and Moody's rating for each Collateral Debt Security; and a listing of all securities that have been downgraded since the last payment period. (Ex. A § 10.11 at 160-66.) The Payment Reports in turn, set forth "an accounting of the amounts that will be paid in accordance with the Priority of Payments." (*Id.*)

13.     As of December 22, 2011, Cedarwoods held 195 distinct assets. (Ex. Z at 3.)

14.     The principal liabilities of the Issuer are: (i) the $390 million A-1 Class of Notes; (ii) the $78 million A-2 Class of Notes; (iii) several other subordinate tranches of notes (Classes A-3, B, C, D, E and F) (together, with the Class A-1 and A-2 Notes, the "Secured Notes"); (iv) a class of Combination Notes; and (v) a class of unsecured Income Notes. (Ex. A § 2.2 at 68-70; *see also e.g.* Ex. Z at 3.) In addition, as noted above, the Issuer also has liability of approximately $69 million under the Hedge Agreement.

15.     The Notes are structured in layers, or tranches, that correspond to the respective noteholders' rights to receive payment. The cash flows generated by the collateral (for example, by payment of principal and interest in relation to the underlying real estate debt securities) are

5

required to be applied in accordance with a "waterfall" called the "Priority of Payments" set forth in the Indenture, to pay fees and expenses of Cedarwoods, to fund hedge liabilities and to pay the principal and interest due on the Notes. (Ex. A § 11.1 at 170-81.)

16.     The senior tranches of a CDO typically receive principal and interest first and have the lowest risk of loss. Conversely, the junior, or "subordinate," tranches of a CDO (the most junior of which is typically referred to as the "equity" tranche) absorb losses first and have the highest risk of loss, for which they receive a much higher coupon than the holders of the senior tranches. The availability of junior tranches to absorb losses creates structural subordination for the senior tranches and is a factor which permits their higher credit ratings. Thus, in its most basic form, a CDO is structured as follows:



## A.   Barclays' Rights as the Controlling Class Under the Indenture

17.     The Indenture contains several provisions designed to protect Barclays as holder of the Aggregate Outstanding Amount of the Controlling Class of Notes. These contractual protections provide Barclays with the authority to direct the actions of the Trustee in certain circumstances. This includes the authority, once an Event of Default has occurred, to direct the

Trustee to (i) accelerate the maturity date of the Notes (Section 5.2(a)) and (ii) sell and liquidate the collateral of the Cedarwoods II CDO (Section 5.4(a), Section 5.5.) (Ex. A § 5.2 at 103, § 5.4 at 107-09, § 5.5 at 109-10.) Thus, when Barclays purchased the $390 million in Class A-1 Notes, it bargained and paid for the right to direct the Cedarwoods II CDO to be liquidated if Events of Default occurred so that it could protect itself from further downturns in the market for commercial real estate debt securities.

**B.    The Role of the Collateral Manager**

18.    I understand that under the Collateral Management Agreement and in exchange for certain fees, AGC is required to perform certain services for the Cedarwoods II CDO with respect to the collateral.  These services involve monitoring the characteristics and performance of the transaction's Collateral Debt Securities (securities underlying the transaction that fit within certain contractual limitations called "Eligibility Criteria" contained in the Indenture (*see* Ex. A § 1.1 at 19)), including, among many other things, determining whether any Collateral Debt Security is a Defaulted Security and notifying the Trustee and Issuer if an Event of Default under the Indenture has occurred.  (Ex. B § 2.)

**C.    The Coverage Tests**

19.    Cedarwoods, like many CDOs, contains certain coverage tests which measure the amount of collateral available in the Cedarwoods II CDO structure to cover the obligations owed to particular classes of noteholders.  The Cedarwoods II CDO has the following coverage tests: Class A/B Interest and Principal Coverage Tests, Class C Interest and Principal Coverage Tests, and Class D/E Interest and Principal Coverage Tests (the "Coverage Tests").  (Ex. A § 1.1 at 10-13.)

20.     The Coverage Tests are a critical feature of the Cedarwoods II CDO since failure of these tests indicates that the credit quality of the Collateral Debt Securities underlying the transaction has deteriorated.  Furthermore, the Coverage Tests are significant to Barclays because failure of a Coverage Test requires that cash flows be redirected to pay down the principal of Barclays' Class A-1 Notes, and in this sense provides further protection of its investment. (Ex. A § 11.1(a)-(b) at 170-79.)

21.     Of particular relevance in this dispute is the Class D/E Principal Coverage Test. This test is expressed as a ratio.  The numerator, called the "Principal Coverage Amount," is the principal balance of all Collateral Debt Securities held by the Issuer, with reduced values assigned to assets that are categorized as "Defaulted Securities," or "Deferred Interest PIK Bonds" or which have investment ratings below a certain level.  The denominator is the sum of the total outstanding amount of the Class A, B, C, D and E Notes.  The test is "passing" if this ratio is equal to or greater than 102.5%. (Ex. A § 1.1 at 13.)  In other words, if the value of the collateral, as measured in accordance with the terms of the Indenture, is more than 102.5% of the outstanding amount of the notes, the test will pass.

22.     In connection with the calculation of the Principal Coverage Amount, it is therefore necessary to identify whether and when an asset is a "Defaulted Security" or a "Deferred Interest PIK Bond."  Defaulted Securities are carried for purposes of calculating the coverage ratios at their "Defaulted Security Amount," an amount equal to the lesser of the market value and a reduced amount calculated based on rating agency recovery rates defined in the Indenture. (Ex. A § 1.1 at 24, 46-47.)  Deferred Interest PIK Bonds are carried at their "Deferred Interest PIK Bond Amount" which is similarly calculated as the lesser of market value and a reduced amount based on the applicable rating agency recovery rates. (Ex. A § 1.1 at 26, 46-47.)

23.     Under the Indenture, a CMBS Security is defined as a Defaulted Security where, among other things, there has been a failure to pay interest on that security in whole or in part for three consecutive payment periods at a time when the asset is rated below "Baa3" or "BBB-" by Moody's or S&P, respectively.  (Ex. A § 1.1 at 24-25.)  Similarly, under the terms of the Indenture, a security is categorized as a "Deferred Interest PIK Bond" where, among other things, interest has been deferred or capitalized or if the security does not pay interest when scheduled for the lesser of two consecutive payment dates and six months.  (Ex. A § 1.1 at 26.)

24.     I understand that the Collateral Manager may treat a CMBS Security that is otherwise a Defaulted Security as performing if it receives assurance from the rating agencies – a "Rating Agency Confirmation" – that such missed interest payments will not result in a downgrade or other adverse action with respect to the Issuer's Notes.  (Ex. A § 1.1 at 24-25, 49.)  Based upon inquiries we made to the Trustee, no such Rating Agency Confirmation has been obtained with respect to any of the Collateral Debt Securities at issue.

25.     To properly calculate the Principal Coverage Amount and, hence, the Coverage Tests, it is also necessary to accurately track and identify the ratings of each of the assets in the Issuer's portfolio, since assets rated "Ba1" or "BB+" or lower by Moody's and S&P, respectively, are assigned reduced values.  (Ex. A § 1.1 at 46-47.)  In addition, assets rated "Ca" or lower by Moody's or "CC" or lower by S&P must be treated as Defaulted Securities.  (Ex. A § 1.1 at 26.)

26.     The failure of the Class D/E Principal Coverage Test requires redirection of cash flows generated by the Collateral Debt Securities in favor of the Class A-1 Noteholder. Specifically, pursuant to Section 11.1(a)(xvi) of the Indenture, Collateral Interest Collections are required to be redirected to pay principal on the most senior Class of Notes then outstanding (here, the Class A-1 Notes) until the Class D/E Principal Coverage Test is satisfied.  (Ex. A §

11.1(a)(xvi) at 172-73.)  Furthermore, pursuant to Section 11.1(b)(x), to the extent the test is still not satisfied after redirection of Collateral Interest Collections, Collateral Principal Collections are also redirected until the Class D/E Principal Coverage Test is satisfied.  (Ex. A § 11.1(b)(x) at 176.)

## II.  BARCLAYS' IDENTIFICATION OF MISCHARACTERIZED SECURITIES

### A.  The Defaulted Assets

27.  I and my team at Barclays undertook a review of the Collateral Debt Securities in the Cedarwoods II CDO.  We sought to verify the reported performance level of the transaction by looking at the credit quality, characteristics and performance of its assets.  We did this by reviewing the transaction's Reports, by acquiring certain distribution reports issued in connection with underperforming assets held by the Issuer and by conducting a review of the publicly available ratings of the assets.  During this review, Barclays uncovered several significant deficiencies in the characterization of certain of Cedarwoods' assets in the Reports.

28.  In particular, at least six of the securities held by the Issuer were CMBS Securities improperly categorized as "performing" securities when in fact they were Defaulted Securities (collectively, the "Defaulted Assets"), because there had been a failure to pay interest in whole or in part for three or more consecutive payment periods and each of the securities was rated below "Baa3" or "BBB-" by Moody's or S&P, respectively.  (Ex. A § 1.1 at 24-25.)

### 1.  LBUBS-2007 C1 Class C Certificates

29.  The LBUBS-2007 C1 Class C Certificates, with an outstanding principal amount of approximately $1 million, were owned by Cedarwoods as of the December 2011 Payment Report.  (Ex. Z at 38.)  The issuer of these certificates failed to pay interest in whole or in part on the March 17, 2010, April 16, 2010 and May 17, 2010 payment dates for the certificates.  During

that period, the certificates were not rated above "B+" by S&P and were not rated by Moody's. (Ex. DD at 15, 17, 21; Ex. EE at 15, 17, 21; Ex. FF at 15, 17, 21.)

30.     As a result, this asset should have been characterized as a Defaulted Security commencing with the May 19, 2010 Report. (Ex. G at 65.) This asset has been, and as of the December 2011 Report continues to be, improperly reported as "performing." (Ex. G at 65; Ex. H at 66; Ex. I at 64; Ex. J at 65; Ex. K at 66; Ex. L at 67; Ex. M at 68; Ex. N at 67; Ex. O at 64; Ex. P at 64; Ex. Q at 63; Ex. R at 62; Ex. S at 62; Ex. T at 61; Ex. U at 60; Ex. V at 60; Ex. W at 60; Ex. X at 61; Ex. Y at 61; Ex. Z at 60.)

### 2.     LBUBS-2007 C1 Class D Certificates

31.     The LBUBS-2007 C1 Class D Certificates, with an outstanding principal amount of approximately $1 million, were owned by Cedarwoods as of the December 2011 Report. (Ex. Z at 38.) The issuer of these certificates failed to pay interest in whole or in part on the March 17, 2010, April 16, 2010 and May 17, 2010 payment dates for the certificates. During that period, these certificates were not rated above "B" by S&P and were not rated by Moody's. (Ex. DD at 15, 17, 21; Ex. EE at 15, 17, 21; Ex. FF at 15, 17, 21.)

32.     As a result, this asset should have been characterized as a Defaulted Security commencing with the May 19, 2010 Payment Report. (Ex. G. at 65.) This asset has been, and as of the December 2011 Report continues to be, improperly reported as "performing." (Ex. G at 65; Ex. H at 66; Ex. I at 64; Ex. J at 65; Ex. K at 66; Ex. L at 67; Ex. M at 68; Ex. N at 67; Ex. O at 64; Ex. P at 64; Ex. Q at 63; Ex. R at 62; Ex. S at 62; Ex. T at 61; Ex. U at 60; Ex. V at 60; Ex. W at 60; Ex. X at 61; Ex. Y at 61; Ex. Z at 60.)

### 3.     LBUBS 2007-C1 Class H Certificates

33.     The LBUBS 2007-C1 Class H Certificates, with an outstanding principal amount of approximately $10 million, were owned by Cedarwoods until March 2011. (Ex. R at 33.) The issuer of these certificates failed to pay interest in whole or in part on the March 17, 2010, April 16, 2010 and May 17, 2010 payment dates for the certificates. During that period, the certificates were not rated above "B" by S&P and were not rated by Moody's. (Ex. DD at 15, 17, 21; Ex. EE at 15, 17, 21; Ex. FF at 15, 17, 21.)

34.     As a result, this asset should have been characterized as a Defaulted Security commencing with the May 19, 2010 Report. (Ex. G at 65.) Instead, this asset was reported as performing until the June 2010 Report, and then was characterized as a Defaulted Security in the June 2010 through and November 2010 Reports, at which point the asset repaid its past unpaid interest and was again mischaracterized as "performing." (Ex. G at 65; Ex. H at 66; Ex. I at 64; Ex. J at 65; Ex. K at 66; Ex. L at 67; Ex. M at 68; Ex. N at 67.)

### 4.     LBUBS 2006-C7 Class H Certificates

35.     The LBUBS 2006-C7 Class H Certificates, with an outstanding principal amount of approximately $12 million, were owned by Cedarwoods until July 7, 2011. (Ex. U at 32.) The issuer of these certificates failed to pay interest in whole or in part on the September 17, 2010, October 18, 2010 and November 18, 2010 payment dates for the certificates. (Ex. AA at 14; Ex. BB; Ex. CC at 14.) The certificates had an S&P rating of B- in September 2010, which was downgraded to CCC+ on October 13, 2010, and were not rated by Moody's. (Ex. AA at 20; Ex. CC at 20; Ex. OO at 8.)

36.     As a result, this asset should have been characterized as a Defaulted Security commencing with the November 19, 2010 Payment Report. (Ex. M at 68.) Instead it was

12

characterized in the Reports as "performing" until it was further downgraded to "D" by S&P on May 16, 2011. (Ex. M at 68, Ex. N at 67, Ex. O at 64, Ex. P at 64, Ex. Q at 63, Ex. R at 62 *compare* Ex. S at 62, Ex. PP at 5.)

### 5.  CD 2006-CD3 Class E Certificates

37.     The CD 2006-CD3 Class E Certificates, in the outstanding principal amount of approximately $5.321 million, were owned by Cedarwoods until July 7, 2011. (Ex. U at 32.) The issuer of these certificates failed to pay interest in whole or in part on the February 17, 2011, March 17, 2011 and April 15, 2011 payment dates for the certificates. (Ex. JJ at 11, 13, 17; Ex. KK at 11, 13, 17; Ex. LL at 11, 13, 17.)   During that period, the certificates had a rating of "BB-" from S&P and "Caa1" from Moody's. (Ex. JJ at 11, 13, 17; Ex. KK at 11, 13, 17; Ex. LL at 11, 13, 17.)

38.     As a result, this asset should have been characterized as a Defaulted Security commencing with the April 2011 Payment Report. (Ex. R at 62.)   However, the Reports indicate that this asset was not properly characterized as a Defaulted Security until the May 2011 Payment Report. (Ex. R at 62; *compare* Ex. S at 62.)

### 6.  CD 2006-CD2 Class E Certificates

39.     The CD 2006-CD2 Class E Certificates, in an outstanding principal amount of approximately $1 million, was owned by the Issuer until July 7, 2011, when it was sold. (Ex. U at 32.)   The issuer of these certificates failed to pay interest in whole or in part on the March 17, 2011, April 15, 2011 and May 17, 2011 payment dates. (Ex. GG at 4; Ex. HH at 4; Ex. II at 4). During that period, the certificates were rated "BB" by S&P until April 14, 2011, when they were downgraded to "CCC-," and were rated "Caa2" by Moody's from March 2011 to May 2011. (Ex. GG at 7; Ex. HH at 7; Ex. II at 7; Ex. QQ at 3.)

40.     As a result, this asset should have been characterized as a Defaulted Security

commencing with the May 2011 Report, but it was not characterized as a Defaulted Security

until the June 2011 Payment Report.  (Ex. S at 62; *compare* Ex. T at 61.)

41.     A table summarizing the errors with respect to the above assets is set forth below:

| CMBS Asset | 3 Periods of Nonpayment of Interest | Reported Rating in Payment Report for Applicable Periods | Defaulted Security as of: | Faulty Characterization in Reports | Principal Amount | Defaulted Security Amount |
|---|---|---|---|---|---|---|
| LBUBS 2007 C1 C | March 2010 April 2010 May 2010 | B (S&P) | May 2010 | As of December 2011, still "Performing" | $1,000,000 | $250,000 |
| LBUBS 2007 C1 D | March 2010 April 2010 May 2010 | B (S&P) | May 2010 | As of December 2011, still "Performing" | $1,000,000 | $250,000 |
| LBUBS 2007 C1 H | March 2010 April 2010 May 2010 | B (S&P) | May 2010 | "Performing" until June 2010 Payment Report. Defaulted June 2010-November 2010. Performing December 2010 to December 2011 | $10,000,000 | $500,000 |
| LBUBS 2006-C7 H | September 2010 October 2010 November 2010 | B- downgraded to CCC+ on Oct. 13, 2010 (S&P) | November 2010 | Performing until downgraded to "D" by S&P on May 16, 2011 | $12,000,000 | $600,000 |
| CD 2006-CD3 E | February 2011 March 2011 April 2011 | BB- (S&P) Caa1 (Moody's) | April 2011 | Not characterized as Defaulted until May 2011 Payment Report | $5,321,000 | $1,064,200 |
| CD 2006-CD2 E | March 2011 April 2011 May 2011 | CCC+ (S&P) | May 2011 | Not characterized as Defaulted until June 2011 Payment Report | $1,000,000 | $50,000 |

**B.     The Deferred Interest PIK Bond**

42.     In addition to the Defaulted Assets, the Collateral Manager failed to properly

characterize at least one of the assets as a Deferred Interest PIK Bond.

43.     Specifically, the CREST 2003-1A Class C1 Bond is a quarterly-pay Real Estate

CDO Security owned by the Issuer with an outstanding principal amount of approximately $3

million.  (Ex. Z at 36.)  It is a  PIK Bond, meaning that it permits payment of interest to be

deferred or capitalized as additional principal thereof or the issuance of securities in lieu of payments of interest in cash.  (Ex. A § 1.1 at 45.)  It first deferred interest on November 28, 2010 and had its second consecutive deferral of interest on February 28, 2011.  (Ex. OOO; Ex. MM.)

44.     As a result, this security should have been reported as a Deferred Interest PIK Bond in the March 2011 Payment Report, but it was not categorized as a Deferred Interest PIK Bond until the September 2011 Payment Report.  (Ex. Q at 63; Ex. R at 62; Ex. S at 62; Ex. T at 61, Ex. U at 60, Ex. V at 60, *compare* Ex. W at 60.)  The Deferred Interest PIK Bond Amount for this security is $900,000.  (Ex. W at 60.)

## C.     The Downgraded Assets

45.     As a result of our continuing review of the Collateral Debt Securities, Barclays also identified two significant assets for which ratings downgrades had not been properly accounted in the December 2010 Payment Report.

### 1.     WBCMT 2005-C18 Class F Certificates

46.     The WBCMT 2005-C18 Class F Certificates have an outstanding principal amount of approximately $9.5 million and as of the December 20, 2011 Report were currently owned by Cedarwoods.  (Ex. Z at 40.)  The December 21, 2010 Report stated that these certificates had a Moody's rating of "Ba3" and had been put on credit watch with negative implications as of October 28, 2010.  (Ex. N at 64.)  However, these certificates had been downgraded by Moody's on December 10, 2010 to "Caa3."  (Ex. RR.)  This downgrade should have been reflected in the December 2010 Payment Report.  (Ex. N at 64.)  The January 19, 2011 Report properly reflected the revised rating of this asset, but failed to note that it had been downgraded and to identify the date of downgrade in the section of the Report entitled Rating Change History.  (Ex. O at 52, 61.)

### 2.    WBCMT 2005-C18 Class G Certificates

47.    The WBCMT 2005-C18 Class G Certificates have an outstanding principal amount of approximately $1 million and were sold on March 28, 2011. (Ex. R at 33.)  The December 21, 2010 Report stated that these certificates had a Moody's rating of "B2" and that they had been put on credit watch with negative implications as of October 28, 2010. (Ex. N at 64.)  However, these certificates were downgraded by Moody's on December 10, 2010 to "Ca." (Ex. RR.)  This downgrade should have been reflected in the December 2010 Report. (Ex. N at 64.)  The January 19, 2011 Report properly reflected the revised rating of this asset but again failed to note that it had been downgraded and to identify the date of downgrade in the section of the Report entitled Rating Change History. (Ex. O at 52, 61.)  In addition, since this asset was downgraded to "Ca" by Moody's, under the Indenture it should have been characterized as a Defaulted Security commencing with the December 2010 Report. (Ex. A § 1.1 at 26.)  The Defaulted Security Amount for this security is $200,000. (Ex. N at 50.)

48.    A chart summarizing these errors is set forth below:

| Mischaracterized CMBS Asset (Notional Amount) | Rating in December 2010 Payment Report | Ratings Downgrade | Report in Which Downgrade Should Have been Reflected | Faulty Characterization by AGC |
|---|---|---|---|---|
| WBCMT 2005-C18 F ($9.5 million) | Ba3 (Moody's) | December 10, 2010→ Caa3 | December 21, 2010 | Was reported as placed on credit watch with negative implications on October 28, 2010, was not reported in the Report's Rating Change History Section.  Correct ratings were not shown until the January 2011 Payment Report, but the report does not include the date on which the asset was downgraded. |
| WBCMT 2005-C18 G ($1 million) | B2 (Moody's) | December 10, 2010→Ca | December 21, 2010 | Was reported as placed on credit watch with negative implications on October 28, 2010, was not reported in the Report's Rating Change |

| | | | | History Section. Correct ratings were not shown until the January 2011 Payment Report, but the report does not include the date on which the asset was downgraded. This asset also should have been characterized as a Defaulted Security as of the December 2010 Payment Report. |
|---|---|---|---|---|

## D. Recalculation of the Class D/E Principal Coverage Test

49. If the Principal Coverage Amount and the Class D/E Principal Coverage Test are recalculated correcting for the above errors, it is apparent that, while the test was first reported as failing in May 2011, the test was actually failing commencing in December 2010, and continued to fail through April 2011. During the entirety of this time period, however, the Reports reported the Class D/E Principal Coverage Test as "passing," or above the required level of 102.5%. (Ex. S at 16.)

50. The impact of the respective characterization errors on the Principal Coverage Amount and Class D/E Principal Coverage Test from December 2010 through April 2011 is set forth below:

| | Reported Principal Coverage Amount | Reported D/E Coverage Ratio | Actual Principal Coverage Amount | Actual D/E Coverage Ratio | Mischaracterized Assets Affecting Coverage Test |
|---|---|---|---|---|---|
| **December 2010** | 588,868,405.71 | 103.04% | 572,393,788 | 100.16% | LBUBS 2007-C1 C<br>LBUBS 2007-C1 D<br>LBUBS 2007-C1 H<br>LBUBS 2006-C7 H<br>WBCMT 2005-C18 G<br>WBCMT 2005-C18 F |
| **January 2011** | 586,891,598.39 | 102.69% | 573,791,598 | 100.40% | LBUBS 2007-C1 C<br>LBUBS 2007-C1 D<br>LBUBS 2007-C1 H<br>LBUBS 2006-C7 H<br>WBCMT 2005-C18 G |

| February 2011 | 595,362,767.85 | 104.18% | 583,124,120 | 102.03% | LBUBS 2007-C1 C<br>LBUBS 2007-C1 D<br>LBUBS 2007-C1 H<br>LBUBS 2006-C7 H |
|---|---|---|---|---|---|
| March 2011 | 594,500,420.77 | 104.02% | 580,750,885 | 101.62% | LBUBS 2007-C1 C<br>LBUBS 2007-C1 D<br>LBUBS 2007-C1 H<br>LBUBS 2006-C7 H<br>CREST 2003-1A C1 |
| April 2011 | 592,956,911.53 | 103.75% | 583,531,745 | 102.11% | LBUBS 2007-C1 C<br>LBUBS 2007-C1 D<br>LBUBS 2007-C1 H<br>LBUBS 2006-C7 H<br>CREST 2003-1A C1<br>CD 2006-CD3 E |

51.    Notably, without giving effect to any of the other errors noted above, and correcting only for the failure to reflect the downgrades of WBCMT 2005-C18 Class F and G Bonds, the Class D/E Principal Coverage Test was failing at 102.43% as of the December 2010 Report.

52.    The December 2010 through April 2011 Reports indicate that collections for the Cedarwoods II CDO were distributed as if the Class D/E Principal Coverage Test was passing. If the test had been properly reported, $8,562,009.10 in collections would have been paid to Barclays as principal on the Class A-1 Notes.  The amounts that should have been paid to Barclays are as follows:

| Payment Report | Collateral Interest Collections | Collateral Principal Collections |
|---|---|---|
| December 2010 | $584,671.64 | $1,257,775.32 |
| January 2011 | $413,905.38 | $4,493,289.08 |
| February 2011 | $373,762.45 | $287,044.49 |
| March 2011 | $466,927.36 | $131,530.01 |
| April 2011 | $415,498.22 | $137,605.15 |
| Total | $2,254,765.05 | $6,307,244.05 |

53.    According to the Reports, the above amounts were instead used, in violation of the Priority of Payments to: (1) pay interest on the Class F Notes; (2) pay AGC's Subordinate

Collateral Management Fee; (3) make distributions to the holders of the Income Notes and (4) fund the Principal Collection Account, pending reinvestment of such funds in new assets. Under Sections 11.1(a)(xvi) and 11.1(b)(x), collections are not permitted to be applied in this manner while the Class D/E Principal Coverage Test is failing. The following summarizes the payments that were made in violation of the Priority of Payments:

| Improper Payment | Priority of Payments Provision | Collateral Interest Collections | Collateral Principal Collections |
|---|---|---|---|
| Class F Notes | 11.1(a)(xviii) | $151,238.33 | |
| AGC Subordinate Collateral Management Fee | 11.1(a)(xxii) | $1,064,830.74 | |
| Income Noteholders | 11.1(a)(xxxiii)(B) | $1,038,695.98 | |
| Principal Collection Account | 11.1(b)(xiv)(A) | | $6,307,244.05 |
| **Total** | | $2,254,765.05 | |

54.     The above-referenced errors caused the Class D/E Principal Coverage Test to be reported as passing, when in fact it was failing, which in turn caused the above funds to be paid from available collections in a manner contrary to the Priority of Payments. This failure, in Barclays' view, constituted multiple Events of Default, including: (1) a "default in the payment of principal, when due and payable" of Barclays' Class A-1 Notes, under Section 5.1(b); (2) "the failure on any Payment Date to disburse amounts available in accordance with Section 11.1" under Section 5.1(c); and (3) a "writing delivered . . . which was incorrect when made" which had a "material adverse effect on the Secured Noteholders" under Section 5.1(f). (Ex. A §§ 5.1(b), (c), (f) at 101-02.)

**E.     Additional Violations of the Indenture**

55.     Barclays' review of the Cedarwoods II CDO also identified a significant number of additional errors related to (i) the purchase of assets during the Reinvestment Period in

violation of the CDO's Reinvestment and Eligibility Criteria and (ii) the ratings reported for nine different securities.

### 1.    Purchase of Assets in Violation of Reinvestment Criteria

56.    The Cedarwoods II CDO is a so-called "managed CDO," which means that there is a period of several years called a "Reinvestment Period" during which the Collateral Manager, in compliance with certain "Reinvestment Criteria" specified in the Indenture (Ex. A § 1.1 at 51), is permitted to sell portfolio collateral and reinvest the proceeds of any such sale, along with other available Principal Collections of the CDO, in new collateral.  The Reinvestment Period of the Cedarwoods II CDO runs from closing (February 27, 2007) to February 27, 2012.  (Ex. A § 1.1 at 51.) The Reinvestment Criteria requires, among other things, that certain limitations regarding the type (the "Collateral Concentration Limitations") and quality (the "Collateral Quality Tests") of Collateral Debt Securities in the portfolio are satisfied or that if they are "not satisfied immediately prior to such investment, such compliance . . . will be maintained or improved following such reinvestment."  (Ex. A § 1.1 at 51, § 12.1(b) at 182.)  These limitations are meant to regulate the amount and type of risk to which the noteholders are exposed by virtue of the collateral underlying the Cedarwoods II CDO.

57.    Pursuant to the Collateral Concentration Limitations in the Indenture, the aggregate principal balance of all Real Estate CDO Securities in the Cedarwoods II CDO may not exceed 17%.  (Ex. A § 1.1 at 17.)

58.    The Trustee acknowledged to us that the concentration limits for Real Estate CDO Securities had been violated.  Specifically, on January 17, 2012, Adam Jacobs at U.S. Bank informed a member of my team that several assets – CREST 2002-1A B2, CREST 2003-1A C1, FAIRF 2004-1A A1, LNR 2003-1A C-FX, LNR CDO 2003-1 EFL and NSTAR 2004-2A B2,

which are all Real Estate CDO Securities – were not recorded as such. (Ex. DDD.) Instead, each of these assets was treated as a "CDO of CDO," or what are sometimes called CDO-squareds, which are CDOs that invest in lower-rated tranches of other CDOs. This seemed particularly odd to us, since CDO of CDO is an asset class that the Cedarwoods II CDO is not permitted to hold at all. (Ex. A § 1.1 at 47, § 12.2(xi) at 186.) In addition, certificates of AHR 2004-1A BFL and Anthracite CDO III CFL were purchased by the Issuer on February 24, 2010 and April 6, 2010, respectively. (Ex. E at 34; Ex. F at 34.) The Trustee recorded each of these assets as a CMBS Security even though they were Real Estate CDO Securities. (Ex. E at 34; Ex. F at 34.)

59.     On January 18, 2012, U.S. Bank confirmed these errors and provided us with an updated Real Estate CDO Security concentration test calculation. A true and correct copy of the e-mail exchange and spreadsheet is attached hereto as Exhibit DDD. U.S. Bank's analysis shows that the Collateral Concentration Limitation for Real Estate CDO Securities was understated and failing in the Reports from December 2010 through June 2011. In addition, it conceded that this limit was reported as passing at below 17%, when in it fact it was above 17% in the January 2011 Report.

60.     Barclays recalculated the collateral concentration for Real Estate CDO Securities, based on information provided by the Trustee. The results of this calculation are attached as Exhibit EEE and are summarized for the period December 2010 through December 2011 as follows:

| Payment Period | Reported Real Estate CDO Security Concentration | Recalculated Real Estate CDO Security Concentration | Test Failed? |
|---|---|---|---|
| December 2010 | 12.78% | 16.98% | No |
| January 2011 | 15.43% | 17.26% | Yes |
| February 2011 | 17.39% | 19.27% | Yes |
| March 2011 | 17.34% | 19.22% | Yes |
| April 2011 | 17.67% | 19.59% | Yes |
| May 2011 | 17.74% | 19.37% | Yes |
| June 2011 | 17.84% | 19.19% | Yes |
| July 2011 | 14.56% | 16.01% | No |
| August 2011 | 14.57% | 16.02% | No |
| September 2011 | 14.49% | 15.94% | No |
| October 2011 | 14.50% | 15.95% | No |
| November 2011 | 14.49% | 15.95% | No |
| December 2011 | 14.26% | 15.71% | No |

61.     Furthermore, the purchase of Real Estate CDO Securities in violation of the concentration limits has resulted in significant losses to the Cedarwoods II CDO.  In particular, Cedarwoods purchased NSTAR 1A A2A, a Real Estate CDO Security with a par amount of $10 million, on February 4, 2011.  (Ex. P at 34.)  The January 19, 2011 and February 18, 2011 Reports indicate that the Real Estate CDO Security Concentration Limitation, as set forth above, exceeded the concentration limitation and thus the purchase of NSTAR 1A A2A did not maintain or improve compliance with the limitation and was therefore in violation of the Reinvestment Criteria.  (Ex. P at 11.)  The asset was purchased for approximately $9.5 million (approximately 94.25% of its par amount).  (Ex. P at 34.)  Based on pricing data obtained from a December 2011 auction, the estimated market price of this asset had declined to only 75% of its par value, equating to a market value loss of an estimated $1.925 million.  (Ex. HHH.)  In addition, on January 14, 2011, Cedarwoods purchased FAIRF 2004-1A A1, a Real Estate CDO Security with a par amount of $1 million, for $770,190.  (Ex. O at 34.)  As set forth above, the Real Estate CDO Security Concentration Limitation in February 2011 exceeded the concentration limitation

and thus FAIRF 2004-1A A1 was purchased in violation of the Reinvestment Criteria. (Ex. O at 34; Ex. EEE.) We received an estimate of the price for this position from a December 2011 auction as 53%, which would generate $454,677 in principal proceeds, for a mark-to-market loss of $315,513. (Ex. HHH.) This bond has amortized since purchase by $110,911, resulting in a current net loss to Cedarwoods of $204,602.

62.    The Indenture also imposes Collateral Concentration Limitations with respect to the amount of Collateral Debt Securities that can be rated below certain levels. In particular, the aggregate Principal Balance of all Collateral Debt Securities with a rating from S&P below "BBB-" or a rating from Moody's below "Baa3" may not exceed 40% (the "Ratings BBB-/Baa3 Limitation"). (Ex. A § 1.1 at 17.)

63.    According to the January 2010 Report, in January 2010, Cedarwoods purchased MLMT 2006-C2 E, a CMBS Security with a par amount of $3,355,000 rated "Ba1" and "BB-" by Moody's and S&P, respectively, and WBCMT 2007-C30 AJ, a CMBS Security with a par amount of $209,000 rated "Ba3" and "B" by Moody's and S&P, respectively. (Ex. D at 34, 60, 62.) Recalculating the concentration of assets with Moody's/S&P ratings below BBB-/Baa3 reveals that the concentration of such assets after the purchases of these two assets exceeded 40%, and these purchases failed to maintain or improve the Ratings Limitation Collateral Concentration Limitation. The concentration of such assets went from 65.23% before the purchases to 65.45% after the purchases. Thus, these assets were purchased in violation of the Reinvestment Criteria. Exhibit FFF sets forth my revised calculation of the Ratings BBB-/Baa3 Limitation.

64.    Had the Collateral Manager not violated the Reinvestment Criteria by investing in these assets (i) an alternative investment in compliance with the Reinvestment Criteria would

have been made and the portfolio would not have been exposed to the risks inherent in low-rated securities or the risks that led to the substantial losses on NSTAR 1A A2A or (ii) AGC would have been unable to reinvest principal proceeds in securities that met all of the parameters specified in the Reinvestment Criteria and, consequently, such proceeds used to purchase the assets would have been instead applied to pay down the outstanding principal amount of the Class A-1 Notes, as required by the Priority of Payments.

65.     The Indenture also sets forth certain Eligibility Criteria, which identify assets that may not be purchased at all.  (Ex. A §12.2 at 183-86.)  These include any securities with Moody's ratings below "B3" or S&P ratings below "B-" or REIT Debt Securities with Moody's ratings below Ba3 or S&P ratings below "BB-" at the time of purchase.  In violation of these Eligibility Criteria, on May 18, 2009, AGC purchased NXL 7.5 07/30/29 with an S&P rating of "CCC+," NXL 7.65 11/02/26 with an S&P rating of "CCC+" and NXL 6.9 02/15/28 with a Moody's rating of Caa2.  (Ex. C at 33; Ex. SS; Ex. TT; Ex. UU; *see also* Ex. C at 58.)

66.     It is Barclays' position that the purchase of these assets in violation of the Reinvestment Criteria is an Event of Default under Section 5.1(f) for two reasons: (1) the improper characterization of these securities caused the Reports to set forth an incorrect percentage of Real Estate CDO Securities in the portfolio, making it a writing which was incorrect when made, which had a material adverse effect on noteholders; and (2) the purchase of these assets constituted a breach of a Section 12.1(b) of the Indenture, which restricts the Issuer from purchasing assets when the Reinvestment Criteria (including, among other things, the Collateral Concentration Limitations) were not "satisfied, maintained or improved" after the purchase.  Both of these respective breaches of Section 5.1(f) had a material adverse effect on the

noteholders since they exposed all noteholders to additional risks in contravention of the express terms of the Indenture.

### 2.     Ratings Discrepancies

67.     A member of my team contacted U.S. Bank regarding several of the ratings of the Collateral Debt Securities underlying the Cedarwoods II CDO.  It appeared to us that the ratings reported in the Reports were incorrect, either because (i) they did not state the correct S&P or Moody's rating of the asset or (ii) they did not properly account for the fact that the rating was actually a "derived" rating, meaning that, for example, if the security was not actually publicly rated by Moody's, a Moody's rating was derived from some other source, such as the S&P or Fitch ratings of such security as permitted under the Indenture.

68.     In response to our inquiries, on January 5, 2012, U.S. Bank sent us a spreadsheet in which it noted numerous errors with respect to the ratings of nine Collateral Debt Securities. (Ex. GGG.)  We then took the information from U.S. Bank and incorporated it into a spreadsheet showing the various ratings discrepancies, which is attached hereto as Exhibit GGG.  I have also set forth below a summary of the errors with respect to these securities and the Trustee's comments admitting such errors:

| Asset (CUSIP) | Asset Type | Payment Dates Mischaracterized | Reported Ratings | Corrected Ratings[1] | Summary of Trustee Admissions of Errors |
|---|---|---|---|---|---|
| BSCMS 2006-PW14 B (07388PAL5) | CMBS | February 2009 to August 2011 | Moody's Actual: Aa3 (2009-5/10) Moody's Assigned: Aa3 (2/09-5/10), Ba2 (6/10-9/11) | Moody's Actual: Not Rated Moody's Assigned: A1 (2/09-3/09), A2 (4/09-8/09), B1 (9/09-8/11) | No rating per Moody's and error with respect to derivation calculation. |
| CMFUN 1999-1E (161582A66) | CMBS | January 2011 to May 2011 | Moody's Actual: Aaa Moody's Assigned: Aaa | Moody's Actual: Not Rated Moody's Assigned: Aa1 | Never rated by Moody's, should have a derived rating of Aa2. |
| CGCMT 2006-C5 D (17310MAL4) | CMBS | January 2011 to August 2011 | S&P Actual: B+ S&P Assigned: B+ | S&P Actual: Not Rated S&P Assigned: B- | Not rated by S&P, needs to be updated |
| CSFB 2005-C5 J (225470BE2) | CMBS | January 2011 to August 2011 | Moody's Actual: Ba3 Moody's Assigned: Ba3 | Moody's Actual: Not Rated Moody's Assigned: Caa2 | Never rated by Moody's, needs to be updated |
| GSMS 2007-EOP L (36228CC27) | CMBS | June 2007 | Moody's Actual: Ba2 Moody's Assigned: Ba2 | Moody's Actual: Not Rated | N/A |
| LBUBS 2007-C7 AJ (52109RBQ3) | CMBS | February 2009 to May 2010 | Moody's Actual: Aa2 Moody's Assigned: Aa2 | Moody's Actual: Not Rated Moody's Assigned: Aa3 (7/09-8/09), A1 (9/09), B1 (10/09-5/10) | Currently no Moody's rating but derived rating is correct. |
| MLMT 2006-C1 AJ (59023BAH7) | CMBS | January 2011 to August 2011 | Moody's Actual: Aaa Moody's Assigned: Aaa | Moody's Actual: Not Rated Moody's Assigned: Ba1 | Rating is still incorrect and was for all the dates mentioned. |
| MLCFC 2006-1 AJ (606935AK0) | CMBS | January 2011 to August 2011 | Moody's Actual: Baa3 Moody's Assigned: Baa3 | Moody's Actual: Not Rated Moody's Assigned: Correct until May 2011, should thereafter be Ba3 (6/11-8/11) | Not rated by Moody's per Bloomberg, needs to be updated. Derived rating is accurate from January 2011 to May 2011 and incorrect thereafter and still incorrect. |
| NXL 6.9 02/15/28 (64806QAL8) | REIT | May 2007 to October 2009 | S&P Actual: BBB (5/07-12/07), NR (1/08), CCC+ (2/08-10/09) S&P Assigned: BBB- (5/07-9/07), BBB (10/07-12/07), C (1/08), CCC+ (2/08-10/09) | S&P Actual: Not Rated S&P Assigned: BB (5/07-11/07), CCC+ (12/07), CCC- (1/08), CCC (2/08-9/08), CC+ (10/08-10/09) | Not rated by S&P, needs to be updated. Will need to be notched in accordance with schedule F of the Indenture. Was not notched correctly for all the dates mentioned. |

69.    The impact of the mischaracterization of the ratings of these nine assets was that it caused the Collateral Quality Tests of the CDO to be overstated.  These tests generally are

---

[1] (*See* Ex. GGG; *see also* Exs. VV, WW, XX, YY, ZZ, AAA, BBB, CCC, and UU.)

imposed by the rating agencies to prevent a collateral manager from trading assets so as to result in a deterioration of the quality of the portfolio.

70.     It is Barclays' position that these ratings discrepancies constituted an Event of Default under Section 5.1(f) of the Indenture for two reasons: first, the fact that the ratings were improperly recorded made the Reports "incorrect when made." Second, the understatement of the Collateral Quality Tests led to a material adverse effect on noteholders.

**F.      Barclays Informs the Trustee of Events of Default**

71.     Prior to the Trustee's commencement of this action, Barclays sent two Notices of Events of Default to the Trustee, in August 2011 and October 2011, stating that the mischaracterization of the Defaulted Securities and Deferred Interest PIK Bond had led to Events of Default pursuant to Sections 5.1(c) and 5.1(f) of the Indenture. The Collateral Manager disputed that these Events of Default occurred in multiple letters that the Trustee circulated to the noteholders. A true and correct copy of this correspondence between the parties is attached hereto as Exhibits JJJ to PPP.

72.     Faced with a dispute over whether an Event of Default had occurred, the Trustee contacted us and told Barclays that it required the help of a third party expert to determine whether an Event of Default had in fact occurred. In accordance with the Indenture, on October 25, 2011, at the Trustee's request, Barclays directed the Trustee to engage an independent third party to assist it in determining whether the subject securities are or were correctly identified by Barclays as Defaulted Securities pursuant to the terms of the Indenture. (Ex. QQQ at 1.)

73.     It is my understanding that on November 3, 2011, the Trustee retained PF2 Securities Evaluation Inc. ("PF2"), an expert valuation service, to review the attributes of certain Collateral Debt Securities underlying the Cedarwoods II CDO. On November 29, 2011, PF2

issued its report (the "PF2 Report"), which confirmed the classification of the securities as

Defaulted Securities. Thus, the PF2 Report confirmed that certain of the collateral was

improperly categorized by the Collateral Manager, which in turn led to inaccurate Reports. (Ex.

RRR.)

74.     Barclays subsequently received a December 2, 2011 Notification from the Trustee

addressed to all noteholders, which stated:

> The Trustee has conducted an investigation of the facts regarding the occurrence
> of the Event of Default declared in the Event of Default Notice and has concluded
> that an Event of Default has occurred and is continuing pursuant to Section 5.1(f)
> of the Indenture.  Accordingly, as directed by the Holder of 100% of the
> Aggregate Outstanding Amount of the Controlling Class, the Trustee has declared
> the principal of and accrued interest on all Secured Notes to be immediately due
> and payable pursuant to Section 5.2 of the Indenture.

(Ex. SSS at 2.)

75.     As a result of the Trustee's declaration of an Event of Default, on December 5,

2011, Barclays, as Holder of at least 66 2/3% of the Aggregate Outstanding Amount of the

Controlling Class, directed the Trustee to dispose of and liquidate the Collateral pursuant to

Section 5.4(a)(iii) and Section 5.5(a)(ii) of the Indenture. (Ex. TTT at 1.)

76.     On December 6, 2011, the Trustee sent a Notification that it had received

direction from the Holder of at least 66 2/3% of the Aggregate Outstanding Amount of the

Controlling Class (Barclays) to sell and liquidate the Collateral in accordance with Section

5.5(a)(ii) of the Indenture and that, accordingly, it would commence such sale and liquidation.

(Ex. UUU.)

77.     On December 9, 2011, the Trustee sent a Notification of Disposition of the

Collateral and Notice of Public Sale and Invitation to Bid, setting forth the details, including time

and place, of the public sale of the Cedarwoods II CDO Collateral. (Ex. VVV.) On December

12, 2011, it is my understanding that to correct a small error in the original December 9

28

Notifications, the Trustee sent a revised Notification of Disposition of the Collateral and Notice of Public Sale and Invitation to Bid.  (Ex. WWW.)

78.     Thereafter, we received a letter from AGC, dated December 12, 2011, in which AGC disputed several of the conclusions in the PF2 Report, objected to the liquidation of the collateral and suggested that the Trustee commence an interpleader action to determine whether an Event of Default had occurred.  (Ex. XXX.)

79.     It was not until December 13, 2011, after the Trustee had already independently declared an Event of Default and after a Notice of Public Sale and Invitation to Bid had been disseminated, that the Trustee sent a notification that it had received further objections from the Collateral Manager and the "representative of the Class A-2 Noteholder to the declaration of the Event of Default under Section 5.1(f) of the Indenture, the acceleration of the Notes and the commencement of the liquidation of the Collateral."  (Ex. YYY at 2.)

80.     In a telephone conference with the Trustee on that same date, the Trustee informed members of my team that AGC, MBIA and the Class A-2 Noteholder had (i) disputed the conclusions of the PF2 Report and (ii) expressed skepticism as to a material adverse effect on the Secured Noteholders as would be required under Section 5.1(f) of the Indenture. Furthermore, I understand that MBIA notified the Trustee of its position on that day in a discussion directly with the Trustee, separate and apart from the discussion that BONY had with the Trustee.

81.     Based upon these purported objections, none of which were different than the ones the Trustee had previously received, the Trustee stated that it intended to file this interpleader action.

### III.   CONCLUSION

82.     As I stated above, based on the current value of the underlying collateral, Barclays is the only party that would be entitled to recover any proceeds upon liquidation and sale of the collateral.

83.     Thus, Barclays, and Barclays alone, is subject to the market risk that the Collateral Debt Securities will further diminish in value.  For the foregoing reasons, Barclays requests that the Court direct the Trustee to sell the collateral securing the Notes and distribute the proceeds in accordance with the Indenture and grant Barclays motion for summary judgment in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 1, 2012.

Jake Scrivens

## SCHEDULE I

| Exhibit | Description | Referenced in Paragraph(s) |
|---|---|---|
| | **Volume I** | |
| | **DEAL DOCUMENTS** | |
| A | Indenture, dated February 27, 2007 | *passim* |
| B | Collateral Management Agreement, dated February 27, 2007 | 5, 18 |
| | | |
| | **REPORTS ISSUED BY CEDARWOODS** | |
| C | May 2009 Report | 65 |
| D | January 2010 Report | 63 |
| E | March 2010 Report | 58 |
| F | April 2010 Report | 58 |
| G | May 2010 Report | 30, 32, 34 |
| | **Volume II** | |
| H | June 2010 Report | 30, 32, 34 |
| I | July 2010 Report | 30, 32, 34 |
| J | August 2010 Report | 30, 32, 34 |
| K | September 2010 Report | 30, 32, 34 |
| L | October 2010 Report | 30, 32, 34 |
| M | November 2010 Report | 30, 32, 34, 36 |
| N | December 2010 Report | 30, 32, 34, 36, 46, 47 |
| O | January 2011 Report | 30, 32, 36, 46, 47, 61 |
| P | February 2011 Report | 30, 32, 36, 61 |
| | **Volume III** | |
| Q | March 2011 Report | 30, 32, 36, 44 |
| R | April 2011 Report | 30, 32, 36, 38, 44, 47 |
| S | May 2011 Report | 30, 32, 36, 38, 40, 44, 49 |
| T | June 2011 Report | 30, 32, 40, 44 |
| U | July 2011 Report | 30, 32, 34, 37, 39, 44 |
| V | August 2011 Report | 30, 32, 44 |
| W | September 2011 Report | 30, 32, 44 |
| X | October 2011 Report | 30, 32 |
| Y | November 2011 Report | 30, 32 |
| Z | December 2011 Report | 13, 14, 29, 30, 31, 32, 43, 46 |
| | **Volume IV** | |
| | **DISTRIBUTION REPORTS OF COLLATERAL DEBT SECURITIES** | |

| AA | LBUBS 2006-C7 September 2010 Distribution Report | 35 |
|----|---|---|
| BB | LBUBS 2006-C7 Bloomberg Report | 35 |
| CC | LBUBS 2006-C7 November 2010 Distribution Report | 35 |
| DD | LBUBS 2007 C1 March 2010 Distribution Report | 29, 31, 33 |
| EE | LBUBS 2007 C1 April 2010 Distribution Report | 29, 31, 33 |
| FF | LBUBS 2007 C1 May 2010 Distribution Report | 29, 31, 33 |
| GG | CD 2006-CD2 March 2011 Distribution Report | 39 |
| HH | CD2006-CD2 April 2011 Distribution Report | 39 |
| II | CD2006-CD2 May 2011 Distribution Report | 39 |
| JJ | CD2006-CD3 February 2011 Distribution Report | 37 |
| KK | CD2006-CD3 March 2011 Distribution Report | 37 |
| LL | CD2006-CD3 April 2011 Distribution Report | 37 |
| MM | CREST 2003-1A C1 Bloomberg Screenshot | 43 |
| **Volume V** | | |
| | **RATINGS ACTIONS** | |
| NN | January 18, 2012 Moody's Downgrade of Cedarwoods | 9 |
| OO | LBUBS 2006-C7 October 13, 2010 S&P Ratings Action | 35 |
| PP | LBUBS 2006-C7 May 16, 2011 S&P Ratings Action | 36 |
| QQ | CD 2006-CD2 April 14, 2011 S&P Ratings Action | 39 |
| RR | WBCMT 2005-C18 December 10, 2010 Moody's Ratings Action | 46, 47 |
| SS | S&P NXL 7.5 07/30/29 Ratings History | 65 |
| TT | S&P NXL 7.65 11/2/26 Ratings History | 65 |
| UU | Moody's NXL 6.9 2/15/28 Ratings History | 65, 68 |
| VV | BSCMS 2006-PW14 B Ratings Information | 68 |
| WW | CMFUN1999-1E Ratings Information | 68 |
| XX | CGCMT 2006-C5 D Ratings Information | 68 |
| YY | CSFB 2005-C5 J Ratings Information | 68 |
| ZZ | GSMS 2007-EOP Ratings Information | 68 |
| AAA | LBUBS 2007-C7 AJ Ratings Information | 68 |
| BBB | MLMT 2006-C1 AJ Ratings Information | 68 |
| CCC | MLCFC 2006-1 AJ Ratings Information | 68 |
| | | |
| | **ANALYSIS OF ASSETS** | |
| DDD | January 18, 2012 e-mail from U.S. Bank to Barclays, attaching updated Real Estate CDO Concentration Spreadsheet | 58, 59 |
| EEE | Analysis of Real Estate CDO Concentration Spreadsheet | 60, 61, 63 |
| FFF | Concentration of BBB-/Baa3 Securities | 68 |
| GGG | January 5, 2012 e-mail from U.S. Bank to Barclays attaching Identified Ratings Errors | 68 |
| HHH | Third Party Valuation of CDO Assets | 9, 61 |
| | | |
| | **HEDGE DOCUMENTS** | |
| III | Bloomberg Screenshot of Current Liability of Hedge | 9 |

|  | Counterparty |  |
|---|---|---|
|  |  |  |
|  | **CORRESPONDENCE** |  |
| JJJ | August 24, 2011 Barclays Notice of Default | 71 |
| KKK | September 20, 2011 Trustee Notification | 71 |
| LLL | September 23, 2011 Trustee Notification attaching September 22, 2011 AGC letter | 71 |
| MMM | October 6, 2011 Barclays Notice of Default | 71 |
| NNN | October 6, 2011 Trustee Notification | 71 |
| OOO | October 12, 2011 Trustee Notification attaching October 11, 2011 AGC Letter | 43, 71 |
| PPP | October 14, 2011 Barclays Letter | 71 |
| QQQ | Indemnification | 72 |
| RRR | PF2 Report | 73 |
| SSS | December 2, 2011 Trustee Notification | 74 |
| TTT | December 5, 2011 Direction | 75 |
| UUU | December 6 Trustee Notification | 76 |
| VVV | December 9, 2011 Trustee Notification of Disposition of the Collateral Notice of Public Sale and Invitation to Bid | 77 |
| WWW | December 12, 2011 Notification of Disposition of the Collateral and Notice of Public Sale and Invitation to Bid | 77 |
| XXX | December 12, 2011 Letter from AGC | 78 |
| YYY | December 13, 2011 Trustee Notification | 8, 79 |