# Exhibit A

EXECUTION COPY

CEDARWOODS CRE CDO II, LTD.,
as Issuer


LASALLE BANK NATIONAL ASSOCIATION,
as Trustee


INDENTURE


Dated as of February 27, 2007

# TABLE OF CONTENTS

<u>Page</u>

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

| | | |
|---|---|---|
| Section 1.1 | Definitions | 3 |
| Section 1.2 | Assumptions as to Collateral Debt Securities, Fees, etc | 63 |
| Section 1.3 | Rules of Construction | 65 |

## ARTICLE II

## THE SECURED NOTES AND COMBINATION NOTES

| | | |
|---|---|---|
| Section 2.1 | Forms Generally | 67 |
| Section 2.2 | Authorized Amount; Applicable Periodic Interest Rate; Stated Maturity Date; Denominations | 68 |
| Section 2.3 | Execution, Authentication, Delivery and Dating | 70 |
| Section 2.4 | Registration, Transfer and Exchange of Secured Notes and Combination Notes | 71 |
| Section 2.5 | Mutilated, Defaced, Destroyed, Lost or Stolen Secured Notes or Combination Notes | 82 |
| Section 2.6 | Payment of Principal and Interest; Rights Preserved | 83 |
| Section 2.7 | Certain Tax Forms and Treatment | 88 |
| Section 2.8 | Reserved | 89 |
| Section 2.9 | Cancellation | 89 |
| Section 2.10 | No Gross-Up | 89 |
| Section 2.11 | Treatment of Deemed Owners | 89 |
| Section 2.12 | Certain Procedures | 90 |
| Section 2.13 | Combination Notes | 90 |

## ARTICLE III

## CONDITIONS PRECEDENT

| | | |
|---|---|---|
| Section 3.1 | General Provisions | 93 |
| Section 3.2 | Security for the Secured Notes | 95 |
| Section 3.3 | Custodianship; Transfer of Collateral Debt Securities and Eligible Investments | 96 |

## ARTICLE IV

### SATISFACTION AND DISCHARGE

Section 4.1    Satisfaction and Discharge of Indenture...............................................99
Section 4.2    Application of Trust Money.... ......................................................... 101
Section 4.3    Repayment of Funds Held by Note Paying Agent................. ............   ..........101

## ARTICLE V

### EVENTS OF DEFAULT; REMEDIES

Section 5.1    Events of Default ............................................... ............. .......... ............ .101
Section 5.2    Acceleration of Maturity; Rescission and Annulment.....................................103
Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee... .............. 104
Section 5.4    Remedies................................................ ................ ................ .........107
Section 5.5    Preservation of Collateral ................................. ............... ................ ....109
Section 5.6    Trustee May Enforce Claims Without Possession............. .............. ..... ........110
Section 5.7    Application of Funds Collected ................................ ...............................111
Section 5.8    Limitation on Suits. .... . ............. . ....... .......................... ..................111
Section 5.9    Unconditional Rights of Secured Noteholders to Receive Principal and
                Interest......................................................................................112
Section 5.10   Restoration of Rights and Remedies.... ......... .......................................112
Section 5.11   Rights and Remedies Cumulative.......................................... ..............112
Section 5.12   Delay or Omission Not Waiver ..................................................... .......112
Section 5.13   Control by Controlling Class ............... ......... ........................113
Section 5.14   Waiver of Past Defaults ..............................................................113
Section 5.15   Undertaking for Costs................. . ..................................... .......................114
Section 5.16   Waiver of Stay or Extension Laws................   ....... ..............................114
Section 5.17   Sale of Collateral........................................................ ......................114
Section 5.18   Action on the Secured Notes.............................................................115

## ARTICLE VI

### THE TRUSTEE

Section 6.1    Certain Duties and Responsibilities......:............................. ........ ...................116
Section 6 2    Notice of Default............................................................................118
Section 6 3    Certain Rights of Trustee..... ..  .......................................... ...............118
Section 6.4    Authenticating Agents ............................................. ........ . ....................120
Section 6.5    Not Responsible for Recitals or Issuance of Secured Notes or
                Combination Notes ....................... ............. ............................ .. ...............120
Section 6.6    May Hold Secured Notes and Combination Notes...................................... .......121
Section 6.7    Funds Held in Trust ......................................................................121
Section 6.8    Compensation and Reimbursement ....... ..........................................121
Section 6.9    Corporate Trustee Required; Eligibility.................................. ............... ............123

Section 6.10    Resignation and Removal; Appointment of Successor........... ........................123
Section 6.11    Acceptance of Appointment by Successor ... ...................................................124
Section 6.12    Merger, Conversion, Consolidation or Succession to Business of Trustee......125
Section 6.13    Co-trustees ................... ............. ........................................  ...................... .............125
Section 6.14    Certain Duties Related to Delayed Payment of Proceeds; Other Notices ........126
Section 6.15    Representations and Warranties of the Bank.....................................................127
Section 6.16    Exchange Offers, Proposed Amendments etc....................................................127
Section 6.17    Fiduciary for Secured Noteholders Only; Agent for Other Secured
                Parties.............. ....................... ........................ ......................  .........................128
Section 6.18    Withholding .............. ............. ........................ ........... ......... ...................128

## ARTICLE VII

### COVENANTS

Section 7.1     Payment of Principal and Interest.................... .............................................128
Section 7.2     Maintenance of Office or Agency...... ........ ...... ...................................... ......129
Section 7.3     Funds for Secured Payments to be Held in Trust .. ................................ ....... 130
Section 7.4     Existence of Issuer ... .................. ..............................................................132
Section 7.5     Protection of Collateral.................... . ................................................ ......133
Section 7.6     Opinions as to Collateral................... ........................................................134
Section 7.7     Performance of Obligations........ ................... . ................ ..........................135
Section 7.8     Negative Covenants ................. ......................... ............ .......................135
Section 7.9     Statement as to Compliance........ .............................................................137
Section 7.10    Issuer May Consolidate, etc., Only on Certain Terms...................................137
Section 7.11    Successor Substituted................................. .......... .................. ....................139
Section 7.12    No Other Business ........................................... ...........   ...............139
Section 7.13    Change or Withdrawal of Rating.... ........ ...............................................139
Section 7.14    Reporting.................................................................................................139
Section 7.15    Secured Note Calculation Agent................... ........................................... ......140
Section 7.16    Listing..... ........................................................................  ...................141
Section 7.17    Amendment of Certain Documents ....... ....................    ........... ...........141
Section 7.18    Purchase of Collateral; Information Regarding Collateral; Rating
                Confirmation ..................................................................................141

## ARTICLE VIII

### SUPPLEMENTAL INDENTURES

Section 8.1     Supplemental Indentures Without Consent of Secured Noteholders.............. .143
Section 8.2     Supplemental Indentures with Consent of Secured Noteholders.....................145
Section 8.3     Execution of Supplemental Indentures; Collateral Manager Consent.............148
Section 8.4     Effect of Supplemental Indentures...................................................................149
Section 8.5     Reference in Secured Notes to Supplemental Indentures.......... .. ................ 149

## ARTICLE IX

### REDEMPTION OF SECURED NOTES

Section 9.1    Redemption of Secured Notes ........................................................149
Section 9.2    Redemption Procedures; Auction ............................................. ..................150
Section 9.3    Record Date; Notice to Trustee of Redemption............ ................. ............152
Section 9.4    Notice of Redemption .............................. ...... ........ .152
Section 9.5    Notice of Withdrawal.. ...................... ...........................................153
Section 9.6    Secured Notes Payable on Redemption Date.. ............... .......................... ... 153
Section 9.7    Special Amortization ...................................................................154
Section 9.8    Mandatory Redemption .................... . ........................ ................. ...... ..154

## ARTICLE X

### ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1    Collection of Funds...................... ................................ ................. .155
Section 10.2    General Provisions Applicable to Accounts .......................... ...........155
Section 10.3    Collateral Account .......................................................................156
Section 10.4    Uninvested Proceeds Account ............ ........................................156
Section 10.5    Collection Account ...... .............. .......... ....... .................... .......... .157
Section 10.6    Expense Reserve Account........................................ ...................158
Section 10.7    Interest Reserve Account ......................................................159
Section 10.8    Payment Account ........................... . ................ ........................159
Section 10.9    Ramp-Up Period Interest Reserve Account.......................... .......160
Section 10.10    Reports by Trustee .................................... ......... .................160
Section 10.11    Accountings ........ ......... ....... ................................................160
Section 10.12    Release of Securities .......................................................166
Section 10.13    Reports by Independent Accountants ................ ........................ 167
Section 10.14    Reports to Rating Agencies ......................................................168
Section 10.15    Tax Matters.............................. ..................... .... .............................. ...... ...169
Section 10.16    Tax Information ....... ........................ ......................................169

## ARTICLE XI

### APPLICATION OF MONIES

Section 11.1    Disbursements of Funds from Payment Account; Priority of Payments ......... 170

## ARTICLE XII

### PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES

Section 12.1    Sale of Collateral Debt Securities.......................................................181
Section 12.2    Portfolio Characteristics.... ........ ........................................183

Section 12.3    Conditions Applicable to all Transactions Involving Sale or Grant.... . ......... 186

## ARTICLE XIII

## SECURED PARTIES' RELATIONS

Section 13.1    Subordination............. ...................................................................................187
Section 13.2    Standard of Conduct ....... .................................................................. ....191

## ARTICLE XIV

## MISCELLANEOUS

Section 14.1    Form of Documents Delivered to Trustee .............................. .............191
Section 14.2    Acts of Secured Noteholders and Combination Noteholders ..........................192
Section 14.3    Notices, Etc., to Trustee, the Issuer and the Rating Agencies  ............... ..........193
Section 14.4    Notices and Reports to Secured Noteholders and Combination
                Noteholders; Waiver..... ............................................... ......... ...194
Section 14.5    Effect of Headings and Table of Contents........................................................195
Section 14.6    Successors and Assigns............................... ............... .......... .......195
Section 14.7    Severability ............................................ .. ................. ...........  195
Section 14.8    Benefits of Indenture...................................................................................195
Section 14.9    Governing Law ... ....... .........   ........................................................196
Section 14.10   Submission to Jurisdiction  .............................................................. .........196
Section 14.11   Counterparts........................................................................... ..........196
Section 14.12   Waiver of Jury Trial............ ........................................ .......  ....... ...........196
Section 14.13   Judgment Currency ........................................... ............... .............197
Section 14.14   Confidential Treatment of Documents; Tax Disclosure..............................197

## ARTICLE XV

## ASSIGNMENT OF AGREEMENTS, ETC.

Section 15.1    Assignment ................................... .............................................198
Section 15.2    No Impairment................................... .............................. .... .............198
Section 15 3    Termination, Etc .................................................................................198
Section 15.4    Issuer Agreements, Etc ............................................................ .........199

## ARTICLE XVI

## HEDGE AGREEMENT; PROVISIONS RELATED TO GRANTOR TRUSTS

Section 16.1    Hedge Agreements................................................................... ...199
Section 16.2    Grantor Trusts .................................................................................203

**Schedules**

Schedule A      Schedule of Collateral Debt Securities as of the Closing Date
Schedule B      LIBOR Formula
Schedule C      Schedule of Temporary Ramp-Up Securities
Schedule D-1    S&P's Recovery Rate Matrix
Schedule D-2    Moody's Recovery Rate Matrix
Schedule E      Auction Procedures
Schedule F      S&P's Notching Criteria
Schedule G      S&P's Types of Asset-Backed Securities ineligible for Notching
Schedule H      S&P's Industry Classification Groups

**Exhibits**

Exhibit A-1     Form of Regulation S Global Note
Exhibit A-2     Form of Rule 144A Global Note
Exhibit B       Form of Definitive Class F Note
Exhibit C-1     Form of Rule 144A Transfer Certificate
Exhibit C-2     Form of Regulation S Transfer Certificate
Exhibit C-3     Form of Definitive Class F Transfer Certificate
Exhibit D       Secured Noteholder's Certificate
Exhibit E       Form of Definitive Combination Note
Exhibit F       Form of Regulation S Global Combination Note
Exhibit G       Form of Combination Note Exchange Certificate
Exhibit H       Form of Definitive Combination Note Transfer Certificate

THIS INDENTURE dated as of February 27, 2007 among:

**CEDARWOODS CRE CDO II, LTD.**, an exempted company incorporated and existing under the law of the Cayman Islands; and

**LASALLE BANK NATIONAL ASSOCIATION**, a national banking association, organized under the law of the United States, as trustee.

## PRELIMINARY STATEMENT

The Issuer is duly authorized to execute and deliver this Indenture to provide for the issuance of the Secured Notes and Combination Notes as provided in this Indenture. All covenants and agreements made by the Issuer herein are for the benefit and security of the Secured Parties. The Issuer is entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuer in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, the following property (other than the Excepted Property) (a) the Collateral Debt Securities listed on Schedule A, the Temporary Ramp-Up Securities listed on Schedule C, the Collateral Debt Securities acquired after the Closing Date and any Equity Securities which, in each case, are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Collection Account, the Interest Reserve Account, the Payment Account, the Expense Reserve Account, the Collateral Account, the Hedge Counterparty Collateral Account, the Uninvested Proceeds Account, the Ramp-Up Period Interest Reserve Account (including, in each case, any Collateral Sub-Account) and all amounts credited to each such Account and Eligible Investments purchased with funds credited to such accounts and all income from the investment of funds therein, (c) the rights of the Issuer under each of the Transaction Documents to which the Issuer is a party and all payments to the Issuer thereunder or with respect thereto, (d) all Cash or other property delivered to the Trustee (directly or through a Securities Intermediary) and (e) all proceeds, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "**Collateral**"). Such Grants are made to the Trustee to hold in trust, to secure the Secured Notes and the Combination Notes (only to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance or otherwise, except as expressly provided in this Indenture, and to secure (i) the payment of all amounts due on the Secured Notes and under each Hedge Agreement and the Collateral Management Agreement in accordance with their respective terms, (ii) the payment of all other sums payable under this Indenture and (iii) compliance with the provisions of this

Indenture, each Hedge Agreement and the Collateral Management Agreement, all as provided in this Indenture (collectively, the "**Secured Obligations**").

Except to the extent otherwise provided in this Indenture, the Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises. The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power. This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

This Indenture shall constitute a security agreement under the law of the State of New York. Upon the occurrence of any Event of Default and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the law of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that anything therein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and except as otherwise expressly provided herein, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligations of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim, or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

The designation of the Trustee in any transfer document or record is intended and shall be deemed, first, to refer to the Trustee as custodian on behalf of the Issuer and second, to refer to the Trustee as secured party on behalf of the Secured Parties, **provided** that the Grant made by the Issuer to the Trustee pursuant to the granting clauses hereof shall apply to any Collateral bearing such designation.

The Trustee acknowledges such Grants, accepts the trust hereunder in accordance with the provisions hereof, and agrees to perform the duties herein in accordance with the

required standard of care set forth herein such that the interests of the Secured Parties may be protected.

Each of the Secured Parties hereby agrees and acknowledges that it shall not have any claim on the funds and property from time to time deposited in or credited to the Income Note Distribution Account and the proceeds thereof, unless such funds or property have been deposited in or credited to the Income Note Distribution Account in violation of this Indenture or in error.

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

### Section 1.1     Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture. Whenever any reference is made to an amount the determination of which is governed by Section 1.2, the provisions of Section 1 2 shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision. In addition, terms defined in Article 9 of the UCC and used but not capitalized herein have the meanings assigned thereto in Article 9 of the UCC.

"**Account**" means any of the Collection Account, the Collateral Account, the Uninvested Proceeds Account, the Payment Account, the Interest Reserve Account, the Ramp-Up Period Interest Reserve Account, the Hedge Counterparty Collateral Account and the Expense Reserve Account, including, in each case, any Collateral Sub-Account established therein.

"**Account Control Agreement**" means that certain Account Control Agreement, dated as of the Closing Date, as the same may be amended or supplemented from time to time, among the Issuer, the Trustee and the Custodian.

"**Accountants' Report**" means a report of a firm of Independent certified public accountants of recognized national reputation appointed by the Issuer (or the Collateral Manager on its behalf) on the Closing Date pursuant to Section 10.13(a), which may be the firm of Independent accountants that reviews or performs procedures with respect to the financial reports prepared by the Issuer.

"**Act**" has the meanings specified in Section 14.2.

"**Actual Rating**" means, with respect to any Collateral Debt Security or Eligible Investment, the actual expressly monitored outstanding public rating assigned by a Rating Agency without reference to any other rating by another Rating Agency.

"**Administration Agreement**" means that certain Administration Agreement, dated as of the Closing Date, as the same may be amended or supplemented from time to time, between the Issuer and the Administrator.

"**Administrative Expenses**" means amounts (including any applicable indemnities) due from, or accrued for, the account of the Issuer with respect to any Payment Date or otherwise to (i) the Trustee for Trustee Expenses; (ii) the Income Note Paying Agent pursuant to the Income Note Paying Agency Agreement; (iii) the Collateral Administrator pursuant to the Collateral Administration Agreement; (iv) the independent accountants, agents and counsel of the Issuer for fees and expenses (including, without limitation, tax reports); (v) the Rating Agencies for fees and expenses in connection with any Class of Notes rated by each such Rating Agency (including, without limitation, expenses for credit estimates and ongoing surveillance of the ratings of the Notes) including fees and expenses due or accrued in connection with any credit estimate or rating of the Collateral Debt Securities; (vi) the Administrator pursuant to the Administration Agreement; (vii) the Collateral Manager and its counsel for fees, expenses and indemnities under the Transaction Documents to the extent set forth therein (including, without limitation, amounts payable under the Collateral Management Agreement but excluding the Collateral Management Fee); (viii) any other Person in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees); (ix) any other Person in respect of any other fees or expenses not prohibited under this Indenture and the documents delivered pursuant to or in connection with this Indenture, the Income Note Paying Agency Agreement, the Collateral Management Agreement and the Notes (including, without limitation, the payment of all transaction fees and all legal and other fees and expenses required in connection with the purchase of any Collateral Debt Securities or any other transaction authorized by this Indenture and any amounts due in respect of the listing of any Notes on the Cayman Stock Exchange) and (x) amounts due to any Person who is a party to the Transaction Documents (including fees of its counsel) incurred in connection with any amendment, modification or waiver of any Transaction Document (unless otherwise payable by the Person requesting such amendment, modification or waiver); **provided** that Administrative Expenses may not include any amounts due or accrued with respect to the actions taken on or prior to the Closing Date.

"**Administrator**" means Maples Finance Limited and any successor thereto appointed under the Administration Agreement.

"**Affected Party**" has the meaning given to such term in the applicable Hedge Agreement.

"**Affiliate**" means any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person; **provided** that (i) with respect to the Issuer, "Affiliate" shall be deemed not to include Maples Finance Limited or any entity which Maples Finance Limited controls and (ii) control of a person shall mean the power, direct or indirect, (a) to vote more than 50% of the securities having ordinary voting power for the election of directors of such person or (b) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.

"**Agent Members**" means members of, or participants in, the Clearing Agencies.

"**Aggregate Outstanding Amount**" means, when used with respect to any of the (i) Secured Notes at any time, the aggregate principal amount of such Secured Notes Outstanding at such time or (ii) with respect to the Combination Notes at any time, the Aggregate Outstanding Amount of the Notes represented by the Combination Note Components at such time.  Except as otherwise provided herein, (i) the Aggregate Outstanding Amount of any Class C Notes at any time shall include the Class C Cumulative Applicable Periodic Interest Shortfall Amount with respect to such Class C Notes at such time, (ii) the Aggregate Outstanding Amount of any Class D Notes at any time shall include the Class D Cumulative Applicable Periodic Interest Shortfall Amount with respect to such Class D Notes at such time, (iii) the Aggregate Outstanding Amount of any Class E Notes at any time shall include the Class E Cumulative Applicable Periodic Interest Shortfall Amount with respect to such Class E Notes at such time and (iv) the Aggregate Outstanding Amount of any Class F Notes at any time shall include the Class F Cumulative Applicable Periodic Interest Shortfall Amount with respect to such Class F Notes at such time.

"**Applicable Periodic Interest Rate**" means, for any Interest Period, (i) with respect to the Class A-1 Notes, the Class A-1 Note Interest Rate, (ii) with respect to the Class A-2 Notes, the Class A-2 Note Interest Rate, (iii) with respect to the Class A-3 Notes, the Class A-3 Note Interest Rate, (iv) with respect to the Class B Notes, the Class B Note Interest Rate, (v) with respect to the Class C Notes, the Class C Note Interest Rate, (vi) with respect to the Class D Notes, the Class D Note Interest Rate, (vii) with respect to the Class E Notes, the Class E Note Interest Rate and (viii) with respect to the Class F Notes, the Class F Note Interest Rate.

"**Applicable Recovery Rate**" means, with respect to any Collateral Debt Security on any Measurement Date, the lesser of the Moody's Recovery Rate and the S&P Recovery Rate applicable to such Collateral Debt Security on such date.

"**Approved Replacement Person**" means a replacement or additional Key Manager appointed in accordance with the procedures described in Section 14 of the Collateral Management Agreement.

"**Articles**" means the Amended and Restated Memorandum of Association and Articles of Association of the Issuer, filed under the Companies Law (2004 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time.

"**Asset-Backed Securities**" are debt securities that entitle the holders thereof to receive payments that depend primarily on the cash flow from (i) a specified pool of financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, together with rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities (including, for the avoidance of doubt, leases) or (ii) real estate mortgages, either fixed or revolving, together with rights or other assets designed to assure the servicing or timely distribution of proceeds to the holders of such securities.

"**Asset Specific Hedge**" means, with respect to any Collateral Debt Security that bears interest at a fixed rate, an interest rate swap having (1) a notional schedule equal to the Principal Balance as it is reduced by expected amortization of such Collateral Debt Security over

time and (2) payment dates identical to the Payment Dates of the Issuer under the Indenture or the Collateral Debt Security; *provided* that, (x) such Asset Specific Hedge will require Rating Agency Confirmation from S&P and Moody's to the extent the applicable master agreement and schedule attached thereto is not a Form-Approved Hedge Agreement and (y) the term of the Asset Specific Hedge does not extend beyond the Stated Maturity Date.

"**Assumed Portfolio**" means the portfolio with characteristics developed in accordance with the Eligibility Criteria and Collateral Quality Tests for purposes of determining the Class A Note Break-Even Default Rate, the Class B Note Break-Even Default Rate, the Class C Note Break-Even Default Rate, the Class D Note Break-Even Default Rate, the Class E Note Break-Even Default Rate and the Class F Note Break-Even Default Rate.

"**Assumed Reinvestment Rate**" means, with respect to any Account or fund securing the Secured Notes, the greater of (i) LIBOR minus 0.25% and (ii) zero.

"**Auction**" has the meaning specified in Section 9.2.

"**Auction Call Redemption**" has the meaning specified in Section 9.1(iii).

"**Auction Date**" has the meaning specified in Section 9.2.

"**Auction Procedures**" has the meaning specified in Section 9.2.

"**Auction Purchase Agreement**" has the meaning specified in Schedule E.

"**Authenticating Agent**" means, with respect to any Class of the Secured Notes or the Combination Notes the Person designated by the Trustee, if any, to authenticate such Secured Notes or Combination Notes, as applicable, on behalf of the Trustee pursuant to Section 6.4.

"**Authorized Officer**" means (i) with respect to the Issuer, any Officer of the Issuer who is authorized to act for the Issuer in matters relating to, and binding upon, the Issuer, (ii) with respect to the Collateral Manager, any officer of the Collateral Manager who is authorized to act for the Collateral Manager in matters relating to, and binding upon, the Collateral Manager, (iii) with respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer and (iv) with respect to the Income Note Paying Agent, any officer who is authorized to act for the Income Note Paying Agent in matters relating to, and binding upon, the Income Note Paying Agent. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"**Available Funds**" means, with respect to any Payment Date, the amount of any positive balance (of Cash or Eligible Investments) in the Collection Account as of the Calculation Date relating to such Payment Date and, with respect to any other date, such amount as of that date.

"**Average Life**" means, on any Measurement Date with respect to any Collateral Debt Security, the quotient obtained by the Collateral Manager by dividing (i) the sum of the products of (a) the number of years (rounded to the nearest one tenth thereof) from such Measurement Date to the respective dates of each successive expected distribution of principal of such Collateral Debt Security (assuming that (1) the Collateral Debt Security does not default and is not sold and (2) any optional redemption of the Collateral Debt Securities occurs in accordance with its terms) and (b) the respective amounts of principal of such scheduled distributions by (ii) the sum of all successive expected scheduled distributions of principal on such Collateral Debt Security.

"**Balance**" means at any time, with respect to Cash or Eligible Investments in any Account at such time, the aggregate of the (i) current balance of Cash, demand deposits, time deposits, certificates of deposit and federal funds; (ii) principal amount of interest-bearing corporate and government securities, money market accounts and repurchase obligations; and (iii) purchase price (but not greater than the face amount) of non-interest-bearing government and corporate securities and commercial paper.

"**Bank**" means LaSalle Bank National Association, a national banking association organized under the laws of the United States, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, Title 11 of the United States Code, as amended or where the context requires, the applicable insolvency provisions of the laws of the Cayman Islands.

"**BAS**" means Banc of America Securities LLC.

"**Beneficial Owner**" means, with respect to any Global Note, each Person that appears on the records of a Clearing Agency (other than each such Clearing Agency to the extent that it is an accountholder with the other Clearing Agency for the purpose of operating the "bridge" between them) as entitled to a particular amount of Notes by reason of an interest in a Global Note (for all purposes other than with respect to the payment of principal of and interest on the Secured Notes or the Combination Notes the right to which will be vested, as against the Issuer and the Trustee, solely in the Person in whose name the Global Note is registered in the Note Register (in the case of the Notes) or the Income Note Register (in the case of the Income Notes)); **provided** that the Trustee and the Income Note Paying Agent may conclusively rely upon the certificate of a Clearing Agency as to the identity of such Persons holding an interest in a Global Note.

"**Benefit Plan Investor**" means (i) an "employee benefit plan" as defined in and subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Code, including, without limitation, individual retirement accounts and Keogh plans or (iii) an entity whose underlying assets include plan assets by reason of such an employee benefit plan's or plan's investment in such entity, including, without limitation, as applicable, an insurance company general account or a wholly owned subsidiary thereof.

"**Board of Directors**" means, with respect to the Issuer, the directors of the Issuer duly appointed in accordance with the Articles.

"**Board Resolution**" means, with respect to the Issuer, a resolution of the Board of Directors of the Issuer.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York, Chicago, Illinois or any other city in which the Corporate Trust Office of the Trustee is located are authorized or obligated by law or executive order to be closed; **provided** that, if any action is required of the Issuer (or of the Administrator on its behalf), solely for purposes of determining when such action of the Issuer is required, days on which commercial banking institutions in the Cayman Islands are authorized or obligated by law or executive order to be closed will also be considered in determining whether such day is a "Business Day" (it being understood that payments made by the Trustee pursuant to Article XI shall not constitute an "action required of the Issuer" for purposes of this proviso).

"**Calculation Date**" means, with respect to any Payment Date, the last day of the related Due Period.

"**Cash**" means such funds denominated with currency of the United States as at the time shall be legal tender for payment of all public and private debts, including funds credited to a deposit account or a Securities Account.

"**Cash Flow Swap Agreement**" means any hedge agreement entered into by the Issuer with a Hedge Counterparty to manage potential mismatches between the timing of receipts of interest on the Collateral Debt Securities and the timing of interest payments due on the Notes, including an agreement to convert the periodicity of payments on Collateral Debt Securities, pursuant to which the Issuer will be entitled to receive payments from the related Hedge Counterparty on a certain date in exchange for the Issuer's obligation to make payments to such Hedge Counterparty.

"**CDO of CDO Securities**" means securities that entitle the holders thereof to receive payments that depend on the cash flow from a portfolio of assets, the majority in principal amount of which are collateralized debt obligations.

"**CDS Principal Balance**" means the aggregate Principal Balance of (i) Collateral Debt Securities included in the Collateral (including any Collateral Debt Securities that have become Defaulted Securities or Written Down Securities) and (ii) Eligible Investments, in each case, purchased with the proceeds of the issuance of the Notes or thereafter with Collateral Principal Collections.

"**Certificate of Authentication**" has the meaning specified in Section 2.3(f).

"**Class**" means each of the classes comprised of the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes, the Income Notes and the Combination Notes.

"**Class A Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults

and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class A Notes in full by their Stated Maturity Dates and the timely payment of interest on such Class A Notes.

"**Class A Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class A Note Scenario Default Rate from the Class A Note Break-Even Default Rate.

"**Class A Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class A Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class A Notes**" means the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes.

"**Class A Principal Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is the Principal Coverage Amount as of such Measurement Date and (ii) is the Aggregate Outstanding Amount of the Class A Notes Outstanding as of such Measurement Date.

"**Class A-1 Note Interest Rate**" means LIBOR plus 0.27%, as provided in such Notes.

"**Class A-1 Notes**" means the U.S.$390,000,000 aggregate principal amount of Class A-1 Floating Rate Notes due 2052 of the Issuer.

"**Class A-2 Note Interest Rate**" means LIBOR plus 0.29%, as provided in such Notes.

"**Class A-2 Notes**" means the U.S.$78,000,000 aggregate principal amount of Class A-2 Floating Rate Notes due 2052 of the Issuer.

"**Class A-2 Subordinate Interests**" has the meaning specified in Section 13.1(a).

"**Class A-3 Note Component**" means the component of the Combination Notes consisting of U.S.$6,600,000 initial aggregate principal amount of Class A-3 Notes.

"**Class A-3 Note Interest Rate**" means LIBOR plus 0.31%, as provided in such Notes.

"**Class A-3 Notes**" means the U.S.$28,500,000 aggregate principal amount of Class A-3 Floating Rate Notes due 2052 of the Issuer. Unless the Combination Notes are explicitly addressed in the same context, all references herein to Class A-3 Notes shall be construed to include the Combination Notes to the extent of the Class A-3 Notes represented by Class A-3 Note Component.

"**Class A-3 Subordinate Interests**" has the meaning specified in Section 13.1(b).

"**Class A/B Coverage Tests**" means the Class A/B Interest Coverage Test and the Class A/B Principal Coverage Test.

"**Class A/B Interest Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is equal to the Interest Coverage Amount as of such Measurement Date and where (ii) is the sum of the Periodic Interest for the Class A Notes and the Class B Notes for the Payment Date immediately following such Measurement Date.

"**Class A/B Interest Coverage Test**" means, for so long as any Class A Notes or Class B Notes remain Outstanding, a test that is satisfied if as of any Measurement Date occurring (i) prior to the Effective Date, the Class A/B Interest Coverage Ratio is equal to or greater than 100% and (ii) on or after the Effective Date, the Class A/B Interest Coverage Ratio is equal to or greater than 110.0%.

"**Class A/B Principal Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is the Principal Coverage Amount as of such Measurement Date and (ii) is the sum of the Aggregate Outstanding Amount of the Class A Notes and the Class B Notes Outstanding as of such Measurement Date.

"**Class A/B Principal Coverage Test**" means, for so long as any Class A Notes or Class B Notes remain Outstanding, a test that is satisfied on any Measurement Date if the Class A/B Principal Coverage Ratio as of such Measurement Date is equal to or greater than 106.5%.

"**Class B Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class B Notes in full by their Stated Maturity Date and the timely payment of interest on such Class B Notes.

"**Class B Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class B Note Scenario Default Rate from the Class B Note Break-Even Default Rate.

"**Class B Note Interest Rate**" means LIBOR plus 0.38%, as provided in such Notes.

"**Class B Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class B Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class B Notes**" means the U.S.$29,250,000 aggregate principal amount of Class B Floating Rate Notes due 2052 of the Issuer.

"**Class B Subordinate Interests**" has the meaning specified in Section 13.1(c).

"**Class C Applicable Periodic Interest Shortfall Amount**" means, with respect to any Payment Date, the amount of unpaid Periodic Interest on the Class C Notes as of such Payment Date, which will be treated as being added to the principal amount of the Class C Notes, on such Payment Date.

"**Class C Coverage Tests**" means the Class C Interest Coverage Test and the Class C Principal Coverage Test.

"**Class C Cumulative Applicable Periodic Interest Shortfall Amount**" means, with respect to any date of determination, the sum of all Class C Applicable Periodic Interest Shortfall Amounts, with respect to all Payment Dates preceding such date of determination, less any amounts applied on all preceding Payment Dates pursuant to the Priority of Payments to reduce such sum.

"**Class C Interest Coverage Ratio**" means on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is equal to the Interest Coverage Amount as of such Measurement Date and where (ii) is the sum of the Periodic Interest for the Class A Notes, the Class B Notes and the Class C Notes for the Payment Date immediately following such Measurement Date.

"**Class C Interest Coverage Test**" means, for so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, a test that is satisfied if as of any Measurement Date occurring (i) prior to the Effective Date, the Class C Interest Coverage Ratio is equal to or greater than 100% and (ii) on or after the Effective Date, the Class C Interest Coverage Ratio is equal to or greater than 107 0%.

"**Class C Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class C Notes in full by their Stated Maturity Date and the ultimate payment of interest on such Class C Notes.

"**Class C Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class C Note Scenario Default Rate from the Class C Note Break-Even Default Rate.

"**Class C Note Interest Rate**" means LIBOR plus 0.60%, as provided in such Notes.

"**Class C Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class C Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class C Notes**" means the U.S.$20,250,000 aggregate principal amount of Class C Deferrable Floating Rate Notes due 2052 of the Issuer.

"**Class C Principal Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is the Principal Coverage Amount as of such Measurement Date and (ii) is the sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes and the Class C Notes Outstanding as of such Measurement Date.

"**Class C Principal Coverage Test**" means, for so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, a test that is satisfied as of any Measurement Date when the Class C Principal Coverage Ratio as of such Measurement Date is equal to or greater than 104.8%.

"**Class C Subordinate Interests**" has the meaning specified in Section 13.1(d).

"**Class D Applicable Periodic Interest Shortfall Amount**" means, with respect to any Payment Date, the amount of unpaid Periodic Interest on the Class D Notes as of such Payment Date, which will be treated as being added to the principal amount of the Class D Notes.

"**Class D Cumulative Applicable Periodic Interest Shortfall Amount**" means, with respect to any date of determination, the sum of all Class D Applicable Periodic Interest Shortfall Amounts with respect to all Payment Dates preceding such date of determination, less any amounts applied on all preceding Payment Dates pursuant to the Priority of Payments to reduce such sum.

"**Class D Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class D Notes in full by their Stated Maturity Date and the ultimate payment of interest on such Class D Notes.

"**Class D Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class D Note Scenario Default Rate from the Class D Note Break-Even Default Rate.

"**Class D Note Interest Rate**" means LIBOR plus 1.38%, as provided in such Notes.

"**Class D Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class D Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class D Notes**" means the U.S.$19,500,000 aggregate principal amount of Class D Deferrable Floating Rate Notes due 2052 of the Issuer.

"**Class D Subordinate Interests**" has the meaning specified in Section 13.1(e).

"**Class D/E Coverage Tests**" means the Class D/E Interest Coverage Test and the Class D/E Principal Coverage Test.

"**Class D/E Interest Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is equal to the Interest Coverage Amount as of such Measurement Date and where (ii) is the sum of the Periodic Interest for the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes for the Payment Date immediately following such Measurement Date.

"**Class D/E Interest Coverage Test**" means, for so long as any Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are Outstanding, a test that is satisfied if as of any Measurement Date occurring (i) prior to the Effective Date, the Class D/E Interest Coverage Ratio is equal to or greater than 100% and (ii) on or after the Effective Date, the Class D/E Interest Coverage Ratio is equal to or greater than 102.5%.

"**Class D/E Principal Coverage Ratio**" means, on any Measurement Date, the ratio (expressed as a percentage) of (i) to (ii), where (i) is the Principal Coverage Amount as of such Measurement Date and (ii) is the sum of the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes Outstanding as of such Measurement Date.

"**Class D/E Principal Coverage Test**" means for so long as any Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are Outstanding, a test that is satisfied as of any Measurement Date if the Class D/E Principal Coverage Ratio as of such Measurement Date is equal to or greater than 102.5%.

"**Class E Applicable Periodic Interest Shortfall Amount**" means, with respect to any Payment Date, the amount of unpaid Periodic Interest on the Class E Notes as of such Payment Date, which will be treated as being added to the principal amount of the Class E Notes.

"**Class E Cumulative Applicable Periodic Interest Shortfall Amount**" means, with respect to any date of determination, the sum of all Class E Applicable Periodic Interest Shortfall Amounts, with respect to all Payment Dates preceding such date of determination, less any amounts applied on all preceding Payment Dates pursuant to the Priority of Payments to reduce such sum.

"**Class E Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class E Notes in full by their Stated Maturity Date and the ultimate payment of interest on such Class E Notes.

"**Class E Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class E Note Scenario Default Rate from the Class E Note Break-Even Default Rate.

"**Class E Note Interest Rate**" means LIBOR plus 1.60%, as provided in such Notes.

"**Class E Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class E Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class E Notes**" means the U.S.$6,000,000 aggregate principal amount of Class E Deferrable Floating Rate Notes due 2052 of the Issuer.

"**Class E Subordinate Interests**" has the meaning specified in Section 13.1(f).

"**Class F Applicable Periodic Interest Shortfall Amount**" means, with respect to any Payment Date, the amount of unpaid Periodic Interest on the Class F Notes as of such Payment Date, which will be treated as being added to the principal amount of the Class F Notes.

"**Class F Cumulative Applicable Periodic Interest Shortfall Amount**" means, with respect to any date of determination, the sum of all Class F Applicable Periodic Interest Shortfall Amounts, with respect to all Payment Dates preceding such date of determination, less any amounts applied on all preceding Payment Dates pursuant to the Priority of Payments to reduce such sum.

"**Class F Note Break-Even Default Rate**" means the maximum percentage of defaults that the Assumed Portfolio can sustain, as determined by S&P by application of S&P's proprietary cash-flow model, after giving effect to S&P's assumptions on recoveries, defaults and timing and to the Priority of Payments such that sufficient funds will remain for the payment of principal of the Class F Notes in full by their Stated Maturity Date and the ultimate payment of interest on such Class F Notes.

"**Class F Note Default Differential**" means, with respect to any Measurement Date, the rate obtained by subtracting the Class F Note Scenario Default Rate from the Class F Note Break-Even Default Rate.

"**Class F Note Interest Rate**" means LIBOR plus 3.20%, as provided in such Notes.

"**Class F Note Scenario Default Rate**" means an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio consistent with S&P's rating of the Class F Notes on the Closing Date, determined by S&P by application of the S&P CDO Monitor.

"**Class F Notes**" means the U.S.$10,500,000 aggregate principal amount of Class F Deferrable Floating Rate Notes due 2052 of the Issuer.

"**Class F Subordinate Interests**" has the meaning specified in Section 13.1(g).

"**Clearing Agency**" means DTC, Euroclear or Clearstream.

"**Clearing Corporation**" has the meaning specified in Section 8-102(a)(5) of the UCC.

"**Clearstream**" means Clearstream Banking, société anonyme.

"**Closing Date**" means February 27, 2007.

"**CMBS Conduit Securities**" means Commercial Mortgage Backed Securities (other than CMBS Credit Tenant Lease Securities, CMBS Large Loan Securities and CMBS Single Borrower Securities) (a) issued by a single-seller or multi-seller conduit under which the holders of such Commercial Mortgage Backed Securities have recourse to a specified pool of assets (but not other assets originated by the conduit that support payments on other series of securities) and (b) that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Commercial Mortgage Backed Securities) on the cash flow from a pool of commercial mortgage loans.

"**CMBS Credit Tenant Lease Securities**" means CMBS Securities that entitle the holders thereof to receive payments that depend on the cash flow from a commercial mortgage loan or pool of commercial mortgage loans that are secured by mortgages on commercial mortgaged properties that are typically leased entirely to a single tenant or guaranteed by another party which may be the parent or another affiliate of such tenant. Payments on such loans depend principally on the payments made by the respective tenants or guarantors and consequently on the creditworthiness of any such tenant or guarantor. For the avoidance of doubt, CMBS Credit Tenant Lease Securities shall also include any resecuritizations of CMBS Credit Tenant Lease Securities.

"**CMBS Large Loan Securities**" means Commercial Mortgage Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Commercial Mortgage Backed Securities) on the cash flow from a commercial mortgage loan or a small pool of commercial mortgage loans made to finance the acquisition or improvement of real properties.

"**CMBS Re-REMIC Securities**" means any security that is secured directly by, referenced to or representing ownership of, a pool consisting primarily of CMBS Conduit Securities, other CMBS Securities or certificates representing a beneficial interest therein. For the avoidance of doubt, a CMBS Re-REMIC Security shall not include any security backed by a credit default swap, total return swap or any synthetic collateralized debt obligation, any synthetic resecuritization or other synthetic instrument.

"**CMBS Securities**" means CMBS Conduit Securities, CMBS Credit Tenant Lease Securities, CMBS Large Loan Securities, CMBS Single Borrower Securities or CMBS Re-REMIC Securities, as the case may be.

"**CMBS Single Borrower Securities**" means Commercial Mortgage Backed Securities that entitle the holders thereof to receive payments that depend on the cash flow from one or more loans with a single borrower or group of affiliated borrowers secured by one or

more properties; **provided** that such dependence may in addition be conditioned upon rights or additional assets designed to assure the servicing or timely distribution of proceeds to holders of the Commercial Mortgage Backed Securities such as a financial guaranty insurance policy.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" has the meaning specified in the Granting Clauses

"**Collateral Administration Agreement**" means the Collateral Administration Agreement, dated February 27, 2007, by and among the Issuer, the Collateral Manager and the Collateral Administrator, as the same may be amended and modified from time to time in accordance with its terms.

"**Collateral Administrator**" means LaSalle Bank National Association, solely in its capacity as Collateral Administrator under the Collateral Administration Agreement, unless a successor Person shall have become the Collateral Administrator pursuant to the applicable provisions of the Collateral Administration Agreement, in which case Collateral Administrator shall mean such successor Person.

"**Collateral Assignment of Hedge Agreement**" means the Collateral Assignment of Hedge Agreement, dated as of the date that the Issuer enters into the related Hedge Agreement, among the Issuer, the Trustee and the related Hedge Counterparty, and any other collateral assignment of the related Hedge Agreement in respect of any Hedge Agreement entered into between the Issuer, the Trustee and a Hedge Counterparty after the Closing Date.

"**Collateral Concentration Limitations**" will be satisfied if, as of any Measurement Date after the Effective Date, and after giving effect to any purchase of a Collateral Debt Security, which will be deemed to be the date the Issuer enters into a commitment to purchase the Collateral Debt Security (if such commitment is for a period of 30 days or less), or the date of purchase (if the purchase of such Collateral Debt Security has not been settled within 30 days after the commitment date), with respect to a Measurement Date, each of the following conditions (collectively, the "**Collateral Concentration Limitations**") is satisfied in the aggregate (or, in the case of a Collateral Concentration Limitation not satisfied immediately prior to such purchase, such purchase maintains or improves compliance with such Collateral Concentration Limitation).

    (i)    **General Limitations:**

    (a)    the aggregate Principal Balance of all Collateral Debt Securities that are PIK Bonds (excluding the Collateral Debt Securities identified on Schedule **A** as LNR CDO 2002-1 and LNR CDO 2003-1) does not exceed 7.5% of the CDS Principal Balance;

    (b)    the Hedge Ratio does not exceed 100%;

    (c)    the aggregate Principal Balance of all Fixed Rate Collateral Debt Securities does not exceed 85% of the CDS Principal Balance;

(d)    the aggregate Principal Balance of all Collateral Debt Securities that provide for periodic payments of interest in Cash less frequently than monthly (other than Collateral Debt Securities that are the subject of a Cash Flow Swap Agreement) does not exceed 35% of the CDS Principal Balance;

(e)    the aggregate Principal Balance of all Collateral Debt Securities that mature after the Stated Maturity Date (but in no event later than 10 years after the Stated Maturity Date) does not exceed 10% of the CDS Principal Balance; **provided**, that with respect to any Collateral Debt Security (other than a Real Estate CDO Security) that matures after the Stated Maturity Date, no underlying obligation has a maturity date (including any extension options) less than five years prior to the Stated Maturity Date.

(ii)    **Collateral Debt Security Type Limitations:**

(a)    the aggregate Principal Balance of all Collateral Debt Securities that are CMBS Securities does not exceed 85% of the CDS Principal Balance; **provided** that not more than 30% of the CDS Principal Balance shall consist of CMBS Large Loan Securities, not more than 25% of the CDS Principal Balance shall consist of CMBS Single Borrower Securities, not more than 20% of the CDS Principal Balance shall consist of CMBS Re-REMIC Securities and not more than 15% of the CDS Principal Balance shall consist of CMBS Credit Tenant Lease Securities;

(b)    the aggregate Principal Balance of all Collateral Debt Securities that are REIT Debt Securities does not exceed 25% of the CDS Principal Balance;

(c)    the aggregate Principal Balance of all Collateral Debt Securities that are Real Estate CDO Securities does not exceed 17% of the CDS Principal Balance;

(d)    the aggregate Principal Balance of all Collateral Debt Securities that are Real Estate Company Debt Interests does not exceed 15% of the CDS Principal Balance;

(iii)    **Ratings Limitations:**

(a)    the aggregate Principal Balance of all Collateral Debt Securities with an Actual Rating from S&P that is below "BBB-" or an Actual Rating from Moody's that is below "Baa3" does not exceed 40% of the CDS Principal Balance;

(b)    the aggregate Principal Balance of all Collateral Debt Securities with an Actual Rating from S&P that is below "BB+" or an Actual Rating from Moody's that is below "Ba1" does not exceed 25% of the CDS Principal Balance;

(c)    the aggregate Principal Balance of all Collateral Debt Securities with an Actual Rating from S&P that is below "BB-" or an Actual Rating from Moody's that is below "Ba3" does not exceed 7% of the CDS Principal Balance;

(iv)    **Single Issue Limitations:**

(a)    the aggregate Principal Balance of all Collateral Debt Securities that have an Actual Rating from S&P that is above "BB+" and that are part of the same Issue does not exceed 3% of the CDS Principal Balance except for one issuer, not to exceed 5%;

(b)    the aggregate Principal Balance of all Collateral Debt Securities that have an Actual Rating from S&P that is below "BBB-" and that are part of the same Issue does not exceed 2% of the CDS Principal Balance except for up to 7 issuers, not to exceed 5% per Issue;

(v)    **Servicer Limitations**:  with respect to the Servicer of the security being acquired, the aggregate Principal Balance of all Collateral Debt Securities serviced by such Servicer does not exceed 25% of the CDS Principal Balance, except that (1) the aggregate Principal Balance of all Collateral Debt Securities serviced by Servicers rated "Below Average" by S&P, or if there is no servicer rating by S&P, having long-term unsecured debt securities rated "BB" or lower, shall not exceed 10% of the CDS Principal Balance and (2) the aggregate Principal Balance of all Collateral Debt Securities serviced by Wachovia Bank, National Association shall not exceed 35% of the CDS Principal Balance.

(vi)    **Property Type Limitations**:  as determined by the Collateral Manager, the aggregate Principal Balance of all CMBS Conduit Securities, CMBS Single Borrower Securities, CMBS Large Loan Securities and CMBS Credit Tenant Lease Securities that are collateralized or backed by:  (A) multifamily properties does not exceed 25% of the CDS Principal Balance; (B) retail properties does not exceed 30% of the CDS Principal Balance; (C) office properties does not exceed 40% of the CDS Principal Balance; (D) lodging or hospitality properties does not exceed 25% of the CDS Principal Balance; (E) healthcare properties does not exceed 10% of the CDS Principal Balance; (F) industrial properties does not exceed 10% of the CDS Principal Balance; (G) manufactured housing properties does not exceed 10% of the CDS Principal Balance; (H) self storage properties does not exceed 10% of the CDS Principal Balance; and (I) any other property type other than those specified in clauses (A) through (H) above does not exceed 10% of the CDS Principal Balance;

(vii)    **Geographic Limitations**:  as determined by the Collateral Manager, the aggregate Principal Balance of all CMBS Conduit Securities, CMBS Single Borrower Securities, CMBS Large Loan Securities and CMBS Credit Tenant Lease Securities related to Mortgaged Properties located in:  (A) California does not exceed 30% of the CDS Principal Balance; (B) New York does not exceed 30% of the CDS Principal Balance; (C) Texas does not exceed 30% of the CDS Principal Balance; (D) Florida does not exceed 20% of the CDS Principal Balance; and (E) any other single state other than

California, New York, Texas and Florida does not exceed 15% of the CDS Principal Balance.

For purposes of determining compliance with any Collateral Concentration Limitation, (a) all calculated percentages will be rounded to the nearest hundredth of 1% (e.g., 5 13%) and (b) Temporary Ramp-Up Securities will be excluded from the calculation of the Collateral Concentration Limitations.    During the Ramp-Up Period, the Collateral Concentration Limitations will not be taken into account for the purpose of determining compliance by the Issuer with any requirements under this Indenture.

"**Collateral Debt Security**" means an item of Collateral which satisfies the Eligibility Criteria specified in Section 12.2, including any Trust Certificate.

"**Collateral Interest Collections**" means, with respect to any Due Period and the related Payment Date, without duplication, the sum of (i) all cash payments of interest with respect to any Collateral Debt Securities and Eligible Investments included in the Collateral (including any Sale Proceeds of a Collateral Debt Security sold at a price greater than or equal to its Principal Balance representing unpaid interest accrued thereon to the date of the sale thereof to the extent not treated as Collateral Principal Collections at the option of the Collateral Manager and any amount representing the accreted portion of discount from the face amount of an Eligible Investment, but excluding all funds received on a Defaulted Security (including any unpaid interest) and any unpaid interest accrued on a Deferred Interest PIK Bond or a Written Down Security to the date of sale) that are received during the related Due Period, (ii) all payments on Eligible Investments purchased with Collateral Interest Collections, (iii) payments received or scheduled to be received from a Hedge Counterparty under any Hedge Agreement (including the Initial Hedge Agreement) on the related Payment Date, excluding any payments received from a Hedge Counterparty upon reduction of the notional amount and any termination payments (**provided** that so long as the Notes are Outstanding, any termination payments received from a Hedge Counterparty will be used to enter into a substitute Hedge Agreement to the extent required to maintain the then-current rating of the Notes by each Rating Agency), (iv) all amendment and waiver fees, all late payment fees, all prepayment premiums and make-whole amounts and all other fees and commissions received during the related Due Period (other than fees and commissions received in connection with the sale, restructuring, workout or default of Collateral Debt Securities or in connection with Defaulted Securities or Written Down Securities), (v) the Principal Balance of any Eligible Investments purchased with Collateral Interest Collections, (vi) all interest accrued on the Closing Date on Collateral Debt Securities included in the Collateral, (vii) any amounts transferred from the Expense Reserve Account to the Payment Account, at the direction of the Collateral Manager, as Collateral Interest Collections (i.e., amounts in the Expense Reserve Account in excess of U.S.$25,000) and upon redemption of the Notes in full, all amounts remaining on deposit in the Expense Reserve Account, (viii) all amounts transferred from the Uninvested Proceeds Account to the Collection Account and designated by the Collateral Manager as Collateral Interests Collections (subject to the limitations set forth in Section 10.4 herein), (ix) if, as of the related Calculation Date, the Principal Coverage Ratios are not less than the Principal Coverage Ratios as of the Effective Date, Sale Proceeds on any Defaulted Security, Written Down Security, Credit Risk Security, Equity Security or Tax Withholding Security in excess of its par value, (x) any amounts transferred from the Interest Reserve Account to the Collection Account with respect to the

related Payment Date, (xi) any amounts in the Ramp-Up Period Interest Reserve Account that are transferred to the Collection Account with respect to the related Payment Date and (xii) all proceeds from the foregoing; **provided, however**, that Collateral Interest Collections shall not include (i) the funds and other property (including, without limitation, the paid-up share capital of the Issuer) with respect to the Income Notes and the bank account in which such funds and the proceeds thereof are held, (ii) principal of any Collateral Debt Security representing capitalized interest after the date of purchase thereof by the Issuer, (iii) Purchased Accrued Interest and (iv) with respect to any Non-Monthly Pay Asset, the portion of any interest received that was deposited into the Interest Reserve Account.

"**Collateral Interest Collections Sub-Account**" has the meaning specified in Section 10.5(a) hereof.

"**Collateral Management Agreement**" means the Collateral Management Agreement, dated as of the Closing Date, as the same may be amended or supplemented from time to time, between the Issuer and the Collateral Manager.

"**Collateral Management Fee**" means the Senior Collateral Management Fee, the Subordinate Collateral Management Fee and the Incentive Collateral Management Fee.

"**Collateral Manager**" means Angelo, Gordon & Co., L.P., a Delaware limited partnership, unless a successor Person shall have become Collateral Manager pursuant to the applicable provisions of the Collateral Management Agreement, in which case Collateral Manager shall mean such successor Person.

"**Collateral Principal Collections**" means, with respect to any Due Period and the related Payment Date, all amounts received by the Issuer during such Due Period that do not constitute Collateral Interest Collections and any amounts in the Uninvested Proceeds Account that have been transferred to the Collection Account and designated as Collateral Principal Collections.

"**Collateral Principal Collections Sub-Account**" has the meaning specified in Section 10.5(a) hereof.

"**Collateral Principal Payments**" means Collateral Principal Collections other than Sale Proceeds and any amounts received in respect of Eligible Investments.

"**Collateral Quality Tests**" will be satisfied if, as of any Measurement Date after the Effective Date, in the aggregate after giving effect to any purchase of a Collateral Debt Security, which will be deemed to be the date the Issuer enters into a commitment to purchase the Collateral Debt Security (if such commitment is for a period of 30 days or less), or the date of purchase (if the purchase of such Collateral Debt Security has not been settled within 30 days after the commitment date), with respect to the Measurement Date, the Collateral Debt Securities comply with all of the requirements set forth below (collectively, the "**Collateral Quality Tests**"):

(1)    (a) the Weighted Average Fixed Rate Coupon as of such date equals or exceeds the Minimum Fixed Coupon and (b) the Weighted Average Spread as of such date equals or exceeds 1.15%;

(2)    the Weighted Average Life Test is satisfied;

(3)    the S&P CDO Monitor Test is satisfied;

(4)    the S&P Weighted Average Recovery Rate Test is satisfied;

(5)    the Moody's WARF Test is satisfied;

(6)    the Moody's Recovery Rate Test is satisfied; and

(7)    the Herfindahl Score of the Collateral Debt Securities is at least 50.

For purposes of determining compliance with any Collateral Quality Test, (x) all calculated percentages will be rounded to the nearest hundredth of 1% and (y) Temporary Ramp-Up Securities will be excluded from the calculation of the Collateral Quality Tests. During the Ramp-Up Period, the Collateral Quality Tests shall not be taken into account for the purpose of determining compliance by the Issuer with any requirements under Section 7.18.

"**Collateral Sub-Account**" means any sub-account established within an Account.

"**Collateralization Event**" means, with respect to any Hedge Agreement (unless Rating Agency Confirmation has otherwise been obtained) and **provided** that no Substitution Event has occurred, the short term rating of the Hedge Ratings Determining Party from S&P falls below "A-1" or, if the Hedge Ratings Determining Party does not have a short term rating from S&P, the long-term rating of such Hedge Ratings Determining Party falls below "A+."

"**Collection Account**" means the Securities Account designated the "Collection Account" and established in the name of the Trustee pursuant to Section 10.5, including the Collateral Principal Collections Sub-Account.

"**Collections**" means, with respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period.

"**Combination Note Components**": The Class A-3 Note Component and the Income Note Component

"**Combination Noteholder**" means, with respect to any Combination Note, the person in whose name such Combination Note is registered.

"**Combination Note Principal Balance**" means U.S.$11,000,000, as the same may be reduced from time to time by all distributions with respect to the Combination Notes, on a dollar-for-dollar basis. Upon any exchange of any Combination Notes pursuant to Section

2.13(b), the Combination Note Principal Balance will be reduced by the same percentage as the Aggregate Outstanding Amount of each Combination Note Component is reduced in such exchange. The Combination Note Principal Balance shall not be reduced below U.S.$1.00 unless redeemed in full in a Redemption or on the Stated Maturity Date.

"**Combination Notes**" means the U.S. $11,000,000 aggregate principal amount of Combination Notes due 2052 of the Issuer.

"**Commercial Mortgage Backed Security**" means securities backed by obligations (including certificates of participations in obligations) that are principally secured by mortgages on real property or interests therein having a multifamily or commercial use, such as regional malls, retail space, office buildings, warehouse or industrial properties, hotels, nursing homes and senior living centers.

"**Commission**" means the United States Securities and Exchange Commission.

"**Controlling Class**" means the Class A-1 Notes, so long as any Class A-1 Notes are Outstanding, and then the Class A-2 Notes, so long as any Class A-2 Notes are Outstanding, and then the Class A-3 Notes, so long as any Class A-3 Notes are Outstanding, and then the Class B Notes, so long as any Class B Notes are Outstanding, and then the Class C Notes, so long as any Class C Notes are Outstanding, and then the Class D Notes, so long as any Class D Notes are Outstanding, and then the Class E Notes, so long as any Class E Notes are Outstanding, and then the Class F Notes, so long as any Class F Notes are Outstanding, in each case, based on the Aggregate Outstanding Amount thereof.

"**Controlling Class Objection**" means written notice to the Collateral Manager by the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class objecting in their reasonable discretion to a Proposed Replacement.

"**Controlling Person**" any other Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer, a Person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer, or any "affiliate" (within the meaning of 29 C.F.R. Section 2510.3-101(f)(3)) of any such Person.

"**Corporate Trust Office**" means the designated corporate trust office of the Trustee, currently located at LaSalle Bank National Association, 181 West Madison Street, 32nd Floor, Chicago, Illinois 60602 Attention: CDO Trust Services Group – Cedarwoods CRE CDO II, telephone number (312) 904-0467, or such other address as the Trustee may designate from time to time by notice to the Secured Noteholders, the Combination Noteholders, the Income Noteholders, the Collateral Manager and the Issuer or the principal corporate trust office of any successor Trustee.

"**Coverage Tests**" means the Class A/B Coverage Tests, the Class C Coverage Tests and the Class D/E Coverage Tests.

"**Credit Risk Security**" means, any Collateral Debt Security with respect to which there has been an event or circumstance that constitutes a change in the condition of the issuer of such Collateral Debt Security (or of available information with respect to such issuer)

that evidences, in the good faith judgment of the Collateral Manager, (a) a significant risk of such Collateral Debt Security materially declining in credit quality, or (b) a significant risk, with a lapse of time, of such Collateral Debt Security becoming a Defaulted Security or a Written Down Security.

"**Credit Support Annex**" means the ISDA Credit Support Annex to a Hedge Agreement between a Hedge Counterparty and the Issuer

"**Current Portfolio**" means the portfolio (measured by Principal Balance) of (a) the Collateral Debt Securities and the proceeds of the disposition thereof held as cash, (b) Collateral Principal Collections held as Cash and (c) Eligible Investments purchased with proceeds of the disposition of Collateral Debt Securities, existing immediately prior to the sale, maturity or other disposition of a Collateral Debt Security or immediately prior to the acquisition of a Collateral Debt Security, as the case may be.

"**Custodian**" has the meaning specified in Section 3.3(a).

"**Deemed Floating Asset Hedge**" means the Asset Specific Hedge related to any Deemed Floating Rate Collateral Debt Security..

"**Deemed Floating Rate Collateral Debt Security**" means a Collateral Debt Security that (1) bears interest at a fixed rate the interest rate of which is hedged into a floating rate using an Asset Specific Hedge and (2) the Collateral Manager has elected, by notice to the Trustee, to treat as a "Deemed Floating Rate Collateral Debt Security"; *provided* that (x) at the time of entry into the related Deemed Floating Asset Hedge (i) the Average Life of such Deemed Floating Rate Collateral Debt Security would not increase or decrease by more than one year from its expected Average Life if it were to prepay at either 50% or 150% of its pricing speed, (ii) the expected principal payments on such Collateral Debt Security will not extend beyond the Stated Maturity Date and (iii) the scheduled notional amount of such Asset Specific Hedge at any time is equal to the expected principal amount of such Collateral Debt Security (as calculated at such time), (y) the Rating Agencies and the Trustee are notified prior to the Issuer's entry into the related Deemed Floating Asset Hedge, and each will be provided with the identity of the proposed hedge counterparty and copies of the hedge documentation and notional schedule and (z) such Deemed Floating Asset Hedge is priced at then-current market rates. Pursuant to the Indenture, a Deemed Floating Rate Collateral Debt Security will be deemed a Floating Rate Collateral Debt Security with a spread over LIBOR equal to the related Deemed Floating Spread.

"**Deemed Floating Spread**" means, with respect to each Deemed Floating Rate Collateral Debt Security, the difference between the stated rate at which interest accrues on such Collateral Debt Security (without regard to any Deemed Floating Asset Hedge) and the fixed rate that the Issuer agrees to pay on the Deemed Floating Asset Hedge at the time such swap is executed.

"**Default**" means any Event of Default or any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"**Defaulted Interest**" means any interest due and payable in respect of any Class A Note or Class B Note or, if no Class A Notes or Class B Notes are Outstanding, in respect of any Class C Note or, if no Class C Notes are Outstanding, in respect of any Class D Note, or if no Class D Notes are Outstanding, in respect of any Class E Note, or if no Class E Notes are Outstanding, in respect of any Class F Notes, and any interest on such Defaulted Interest that (in each case) is not punctually paid or duly provided for on the applicable Payment Date (including the applicable Stated Maturity Date) of the applicable Secured Note.

"**Defaulted Security Amount**" means, with respect to any Defaulted Security in the Collateral, the lesser of (i) the product of the Principal Balance of such Defaulted Security and the Applicable Recovery Rate of such Defaulted Security and (ii) the product of the Principal Balance of such Defaulted Security and the Market Value of such Defaulted Security.

"**Defaulted Security**" means any Collateral Debt Security or any other security included in the Collateral:

(i)        as to which (a) except with respect to CMBS Securities there has occurred and is continuing a default with respect to the payment of interest or principal, which default has not been cured; **provided** that, (1) if, in the Collateral Manager's reasonable judgment (which judgment shall not be called into question as a result of subsequent events), such default is not credit related but is solely administrative or ministerial in nature (such as a failure by paying agent relating to such Collateral Debt Security not related to the status of the obligor), the Collateral Manager will have the right to defer treating such Collateral Debt Security as a Defaulted Security until the earlier of (A) the expiration of any applicable grace period associated with such default and (B) a date selected by the Collateral Manager in its discretion that is not later than 3 Business Days following the date of such default, and (2) if, the Collateral Manager certifies to the Trustee that, in the Collateral Manager's reasonable judgment (which judgment shall not be called into question as a result of subsequent events), such default is reasonably likely to be cured on or before the expiration of any applicable grace period associated with such default and does not result from credit deterioration, the Collateral Manager will have the right to defer treating such Collateral Debt Security as a Defaulted Security if, on or before the fifth Business Day following such default, the Collateral Manager is advised, following the request of the Collateral Manager, by each Rating Agency that rates such Collateral Debt Security that such Rating Agency's rating of such Collateral Debt Security is not being withdrawn or reduced as a result of such default, in which case such deferral will extend until the earliest of (A) the expiration of any applicable grace period associated with such default, (B) the date, if any, on which any such rating is withdrawn or reduced by any Rating Agency as a result of such default and (C) a date selected by the Collateral Manager in its reasonable discretion; **provided, further**, that such Collateral Debt Security shall cease to be a Defaulted Security if such security has resumed current payments of interest and scheduled principal in cash (including all past due interest and scheduled principal) and, in the Collateral Manager's judgment, will continue to make such current payments of interest in cash (**provided** that no restructuring has been effected) or (b) with respect to a CMBS Security, (1) as to which there has been a failure to pay interest in whole or in part for the lesser of (A) six months or (B) three consecutive payment periods (if such security is rated (or privately rated for

purposes of the issuance of the Notes) below "Baa3" by Moody's or "BBB-" by S&P), even if by its terms it provides for the deferral and capitalization of interest thereon; **provided**, **however**, that if a Rating Agency Confirmation has been obtained, the Collateral Manager may choose not to treat such security as a Defaulted Security or (2) as to which there has been a failure to pay interest in whole or in part for the lesser of (A) one year or (B) six consecutive payment periods (if such security is rated (or privately rated for purposes of the issuance of the Notes) "BBB-" or higher by S&P or "Baa3" or higher by Moody's), even if by its terms it provides for the deferral and capitalization of interest thereon;

(ii)    that ranks *pari passu* with or subordinate to any other indebtedness for borrowed money owing by the issuer of such security, if any (for purposes hereof, "**Other Indebtedness**"; **provided**, **however**, that such Other Indebtedness of such issuer will not include series of such Other Indebtedness that may be issued or owing by a separate special purpose entity and is not guaranteed by the issuer) if such issuer had defaulted in the payment of principal or interest in respect of such Other Indebtedness; **provided** that, (A) if, in the Collateral Manager's reasonable judgment (which judgment shall not be called into question as a result of subsequent events), such default is not credit related but is solely administrative or ministerial in nature (such as a failure by a paying agent relating to such Other Indebtedness not related to the status of the obligor), the Collateral Manager will have the right to defer treating the related Collateral Debt Security as a Defaulted Security until the earlier of (x) the expiration of any applicable grace period associated with such default and (y) a date selected by the Collateral Manager in its discretion that is not later than 3 Business Days following the date of such default, and (B) if, the Collateral Manager certifies to the Trustee that, in the Collateral Manager's reasonable judgment (which judgment shall not be called into question as a result of subsequent events), such default is reasonably likely to be cured on or before the expiration of any applicable grace period associated with such default and does not result from significant credit deterioration, the Collateral Manager will have the right to defer treating the related Collateral Debt Security as a Defaulted Security if, on or before the fifth Business Day following such default, the Collateral Manager is advised, following the request of the Collateral Manager, by each Rating Agency that rates the Other Indebtedness that such Rating Agency's rating of such Other Indebtedness is not being withdrawn or reduced as a result of such default, in which case such deferral will extend until the earliest of (x) the expiration of any applicable grace period associated with such default, (y) the date, if any, on which any such rating is withdrawn or reduced by any Rating Agency as a result of such default and (z) a date selected by the Collateral Manager in its reasonable discretion; **provided**, **further**, that the related Collateral Debt Security shall cease to be a Defaulted Security if such Other Indebtedness has resumed current payments of interest and scheduled principal (including all due interest and scheduled principal) in cash (whether or not any waiver or restructuring has been effected) and, in the Collateral Manager's judgment, will continue to make such current payments of interest and scheduled principal in cash; **provided** that a security shall be considered a Defaulted Security pursuant to this clause (ii) only if the Collateral Manager knows, after due inquiry as required pursuant to the Collateral Management Agreement, that the issuer thereof is (or is reasonably expected by the Collateral Manager to be, as of the next scheduled payment distribution date) in default (without giving effect to any

applicable grace period or waiver) as to payment of principal and/or interest on another obligation (and such default has not been cured or waived) which is senior or pari passu in right of payment to such Collateral Debt Security;

(iii)   with respect to which any bankruptcy, insolvency or receivership proceeding has been initiated in respect of the issuer of such Collateral Debt Security, or there has been proposed or effected any distressed exchange or other debt restructuring where the issuer of such Collateral Debt Security has offered the debt holders a new security or package of securities that, in the judgment of the Collateral Manager either (a) amounts to a diminished financial obligation or (b) has the purpose of helping the issuer to avoid default.  For the avoidance of doubt in applying and interpreting this definition of Defaulted Security, the Collateral Manager shall be deemed to have knowledge of all information that Authorized Officers of the Collateral Manager have actually received, and shall be responsible under the Collateral Management Agreement for obtaining and reviewing information available to it either in its capacity as an investment manager of national standing or as holder of such Collateral Debt Security;

(iv)   if such Collateral Debt Security has been rated "Ca" or lower by Moody's or "CC" or lower by S&P or if S&P has withdrawn its rating and has not provided the Issuer with a shadow rating; or

(v)   which is a Written Down Security unless S&P has affirmed its rating of such Written Down Security.

"**Defaulting Party**" has the meaning given to such term in the applicable Hedge Agreement.

"**Deferred Interest PIK Bond**" means a PIK Bond with respect to which interest has been deferred or capitalized or does not pay interest when scheduled (other than a Defaulted Security) for each consecutive payment date occurring over a period of the lesser of (i) six months or (ii) two consecutive payment dates, but only until such time as payment of interest on such PIK Bond has resumed and all capitalized and deferred interest and any interest thereon has been paid in cash in accordance with the terms of the Underlying Instruments.

"**Deferred Interest PIK Bond Amount**" means, with respect to each Deferred Interest PIK Bond in the Collateral, the lesser of (i) the product of the Principal Balance of such Deferred Interest PIK Bond and the Applicable Recovery Rate of such Deferred Interest PIK Bond and (ii) the product of the Principal Balance of such Deferred Interest PIK Bond and the Market Value of such Deferred Interest PIK Bond.

"**Definitive Class A-E Note**" has the meaning specified in Section 2.1(c).

"**Definitive Class F Note**" has the meaning specified in Section 2.1(d).

"**Definitive Combination Note**" has the meaning specified in Section 2.1(d).

"**Definitive Note**" means any Definitive Class A-E Note or any Definitive Class F Note.

"**Definitive Class F Note Transfer Certificate**" has the meaning specified in Section 2.4(d)(i).

"**Definitive Combination Note Transfer Certificate**" has the meaning specified in Section 2.4(d)(i).

"**Definitive Income Notes**" means Income Notes issued in the form of physical certificates in definitive, fully registered form.

"**Depositary**" means, with respect to the Secured Notes or the Combination Notes, as applicable, issued in the form of one or more Global Notes, the Person designated as Depositary pursuant to Section 2.2(f), or any successor thereto, appointed pursuant to the applicable provisions of this Indenture.

"**Depositary Participant**" means a broker, dealer, bank or other financial institution or other Person for whom from time to time the Depositary effects book-entry transfers and pledges of notes deposited with the Depositary.

"**Distribution**" means any payment of principal, interest or fee or any dividend or premium payment made on, or any other distribution in respect of, an obligation or security.

"**Dollar**" or "**U.S.$**" means currency of the United States as at the time shall be legal tender for all debts, public and private.

"**DTC**" means the Depository Trust Company, and its nominees and their respective successors.

"**Due Date**" means each date on which a Distribution is due on a Pledged Security.

"**Due Period**" means, with respect to each Payment Date, the period beginning on the day following the last day of the preceding Due Period relating to the preceding Payment Date (or, in the case of the Due Period that is applicable to the first Payment Date, beginning on the Closing Date) and ending at the later of (i) the close of business on the fourth Business Day preceding such Payment Date and (ii) the close of business on the fourth Business Day following the 13th day of the same calendar month as such Payment Date, or if the 13th day of such calendar month is not a Business Day, the fifth Business Day following the 13th day of such calendar month.

"**Effective Date**" means the date that is the earliest of (i) the 120th day following the Closing Date, (ii) the date on which the Issuer has purchased Collateral Debt Securities, excluding Temporary Ramp-Up Securities, having an aggregate par amount of U.S.$ 600,000,000 or (iii) such earlier date (if any) that is designated by the Collateral Manager by notice to the Trustee under this Indenture; **provided** that in the event that such day does not fall on a Business Day, the Effective Date shall be the next succeeding Business Day.

"**Eligibility Criteria**" has the meaning specified in Section 12.2.

"**Eligible Guarantee**" means an unconditional and irrevocable guarantee (satisfying S&P's then published criteria relating to guarantees) that is provided by a guarantor as principal debtor rather than as surety and is directly enforceable by the Issuer, where either (A) a law firm has given a legal opinion confirming that none of the guarantor's payments to the Issuer under such guarantee will be subject to withholding for tax, or (B) such guarantee provides that, in the event of any such guarantor's payments to the Issuer are subject to withholding for tax, such guarantor is required to pay such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of any withholding tax) will equal the full amount the Issuer would have received had no such withholding been required.

"**Eligible Investments**" means any U.S. dollar denominated investment that, at the time it is delivered to the Trustee, is one or more of the following obligations or securities, including, without limitation, those investments for which the Trustee or an Affiliate of the Trustee provides services:

(i)    Cash;

(ii)    direct Registered obligations of, and Registered obligations the timely payment of principal of and interest on which is fully and expressly guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America;

(iii)    demand and time deposits in, interest bearing trust accounts and certificates of deposit of, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of such investment or contractual commitment providing for such investment have a credit rating of:

(a)    in the case of long-term debt obligations, not less than "Aa2" by Moody's and "AA+" by S&P; or

(b)    in the case of commercial paper and short-term debt obligations including time deposits, "P-1" by Moody's and "A-1+" by S&P (or in the case of the Trustee, "A-1") (**provided** that, in the case of commercial paper and short-term debt obligations with a maturity of longer than 91 days, the issuer thereof must also have at the time of such investment a long-term credit rating of not less than "AA+" by S&P;

(iv)    Registered securities other than mortgage-backed securities bearing interest or sold at a discount issued by any corporation under the laws of the United States of America or any state thereof that have a credit rating of "Aa2" by Moody's and

"AA+" by S&P at the time of such investment or contractual commitment providing for such investment;

    (v)    unleveraged repurchase obligations (if treated as debt for tax purposes by the issuer) with respect to any security described in clause (ii) above, entered into with a depository institution or trust company (acting as principal) described in clause (iii) or entered into with broker-dealers registered with the Commission (acting as principal) whose short-term debt has a credit rating of "P-1" by Moody's and "A-1+" by S&P at the time of such investment in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance, and whose long-term debt has a credit rating of at least "Aa2" by Moody's and "AA+" by S&P at the time of such investment in the case of any repurchase obligation for a security having a maturity more than 183 days, but in any case maturing in no more than 365 days, from the date of its issuance;

    (vi)    commercial paper or other short-term obligations having at the time of such investment a credit rating of "P-1" by Moody's and "A-1+" by S&P that are registered and are either bearing interest or are sold at a discount from the face amount thereof and that have a maturity of not more than 183 days from its date of issuance, **provided** that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by the Rating Agencies, must also have at the time of such investment a long-term credit rating of at least "Aa2" by Moody's and "AA+" by S&P;

    (vii)    money market funds with respect to any investments described in clauses (ii) through (vi) above having, at the time of such investment, a credit rating of not less than "Aaa" by Moody's and "AAA/AAAm/AAAm-G" by S&P, respectively (including those for which the Trustee is investment manager or advisor), **provided** that such fund or vehicle is formed and has its principal office outside the United States; and

    (viii)    any other investments approved in writing by the Rating Agencies;

**provided** that (a) Eligible Investments will be held until maturity except as otherwise specifically provided herein and will include only such obligations or securities as mature no later than the Business Day prior to the Payment Date next succeeding the date of investment in such obligations or securities, unless such Eligible Investments are investments of the type described in clause (i) or (iii) above, in which event such Eligible Investments may mature on such Payment Date and (b) none of the foregoing obligations or securities will constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder will consist of interest and not principal payments, if such security is purchased at a price in excess of 100% of par, if such security is subject to substantial non-credit related risk, as determined by the Collateral Manager in its judgment, if any income from or proceeds of disposition of the obligation or security is or will be subject to deduction or withholding for or on account of any withholding or similar tax unless the payor is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received

had no such deduction or withholding been required or if the acquisition (including the manner of acquisition), ownership, enforcement or disposition of the obligation or security will subject the Issuer to net income tax in any jurisdiction outside its jurisdiction of incorporation, or if such security has an assigned rating with an "r," "t," "p," "pi" or "q" subscript, if such security is a mortgage-backed security or if such security is subject to an Offer.

"**Eligible Replacement**" means an entity that (i) has the Moody's Required Hedge Ratings (or whose obligations are guaranteed by an entity having such ratings), (ii) satisfies the Hedge Counterparty Ratings Requirement, and (iii) has (A) a long-term rating from Moody's (and, if such entity has a Moody's short-term rating, a short-term rating from Moody's), and (B) a short-term rating from S&P (or, if such entity has no short-term S&P rating, a long-term rating from S&P), at least as high as the then-current ratings of the Hedge Counterparty it is replacing as the counterparty to the Issuer under any Hedge Agreement.

"**Eligible SPV Jurisdiction**" means Bahamas, Bermuda, the Cayman Islands, the Channel Islands, the Netherlands Antilles, Luxembourg or any other similar jurisdiction (so long as Rating Agency Confirmation is obtained in connection with the inclusion of such other jurisdiction) generally imposing either no or nominal taxes on the income of companies organized under the laws of such jurisdiction.

"**Emerging Market Issuer**" means a sovereign or non-sovereign issuer located in a country that is in Latin America, Asia, Africa, Eastern Europe or the Caribbean or in a country the dollar-denominated sovereign debt obligations of which are rated lower than "Aa" by Moody's or "AA" by S&P; **provided** that an issuer of Asset-Backed Securities located in any Eligible SPV Jurisdiction shall not be an Emerging Market Issuer for purposes hereof if the underlying collateral of such Asset-Backed Securities consists mainly of obligations of obligors located in the United States and Qualifying Foreign Obligors.

"**Entitlement Holder**" has the meaning specified in Section 8-102(a)(7) of the UCC.

"**Entitlement Order**" has the meaning specified in Section 8-102(a)(8) of the UCC.

"**Equity Security**" means any security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal acquired by the Issuer as a result of the exercise or conversion of Collateral Debt Securities, in conjunction with the purchase of Collateral Debt Securities or in exchange for a Collateral Debt Security; **provided** that the term "Equity Security" will not include any security which otherwise satisfies the Eligibility Criteria which (i) includes, as one of its rights or components, the right to distributions from excess proceeds after required payments are made on other classes of securities or (ii) is a Collateral Debt Security structured as a certificate of beneficial interest.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"**Euroclear**" means Euroclear Bank S.A/N.V., as operator of the Euroclear system.

"**Event of Default**" has the meaning specified in Section 5.1.

"**Excepted Property**" means the U.S.$250 of capital contributed to the Issuer in respect of the Issuer's issued Ordinary Shares in accordance with the Articles, the U.S.$250 paid as a transaction fee to the Issuer, any interest income earned on such amounts and the Cayman Islands bank account in which such amounts are held.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

"**Expense Reserve Account**" means the Securities Account designated the "Expense Reserve Account" and established in the name of the Trustee pursuant to Section 10.6.

"**Fee Basis Amount**" means an amount equal, for any Payment Date, to the average of the aggregate CDS Principal Balance (excluding the aggregate Principal Balance of Defaulted Securities) on the first day of the related Due Period and the aggregate CDS Principal Balance (excluding the aggregate Principal Balance of Defaulted Securities) on the last day of such Due Period.

"**Financial Asset**" has the meaning specified in Section 8-102(a)(9) of the UCC.

"**Financing Statement**" means a financing statement relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"**Fitch**" means Fitch, Inc.

"**Fixed/Floating Swap**" has the meaning specified in Section 16.1(a).

"**Fixed Rate Collateral Debt Security**" means any Collateral Debt Security which bears a fixed rate of interest (and does not include any Deemed Floating Rate Collateral Debt Security).

"**Fixed Rate Excess**" means, as of any Measurement Date, a fraction (expressed as a percentage), the numerator of which is equal to the product of (a) the greater of zero and the excess, if any, of the Weighted Average Fixed Rate Coupon for such Measurement Date over the Minimum Fixed Coupon, and (b) the aggregate Principal Balance of all Collateral Debt Securities that are Fixed Rate Collateral Debt Securities (excluding, in each case, Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) and the denominator of which is the aggregate Principal Balance of all Collateral Debt Securities that are Floating Rate Collateral Debt Securities or Deemed Floating Rate Collateral Debt Securities (excluding, in each case, Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) multiplying the resulting figure by 360 and then dividing by 365.

"**Fixed Rate Swap**" has the meaning specified in Section 16.1.

"**Floating Rate Collateral Debt Security**" means any Collateral Debt Security which bears interest based upon the London interbank offered rate for U.S Dollar deposits in

Europe, prime rate or another floating rate index and any Deemed Floating Rate Collateral Debt Security.

"**Form-Approved Hedge Agreement**" means either (a) a Hedge Agreement relating to a specific Hedge Counterparty, including the Initial Hedge Agreement, with respect to which the documentation conforms in all material respects to a form for which Rating Agency Confirmation was previously obtained or (b) a Hedge Agreement relating to a specific Hedge Counterparty with respect to which the documentation conforms in all material respects to a form for such Hedge Counterparty which does not require Rating Agency Confirmation (as certified to the Trustee by the Collateral Manager, following receipt of confirmation by the Collateral Manager from the relevant Hedge Counterparty and the Rating Agencies); *provided* that (i) such Form-Approved Hedge Agreement shall not provide for any upfront payments to be made to any Hedge Counterparty (except that if such Hedge Agreement is an Asset Specific Hedge and the related Collateral Debt Security was purchased by the Issuer at discount, then such Form-Approved Hedge Agreement may provide for an upfront payment to the Hedge Counterparty in an amount not to exceed the amount of such discount), (ii) any revised Form-Approved Hedge Agreement with respect to a particular Hedge Counterparty shall be approved by each of the Rating Agencies at least 10 days prior to the initial use thereof, (iii) any Rating Agency may withdraw its consent to the use of a particular Form-Approved Hedge Agreement by written notice to the Trustee, the Collateral Manager and the relevant Hedge Counterparty (*provided* that such withdrawal of consent shall not affect any existing Hedge Agreement entered into with such Hedge Counterparty) and (iv) the Issuer (or the Collateral Manager on its behalf) shall deliver to the Trustee and each Rating Agency a copy of each Form-Approved Hedge Agreement specifying the Hedge Counterparty to which it relates upon receipt of Rating Agency Confirmation with respect thereto, and the Trustee's records (when taken together with any correspondence received from the Rating Agencies pursuant to clause (ii)) shall be conclusive evidence of such form.

"**Four-Month Period**" means, at any time during the Reinvestment Period, the four-month period from the date on which a Key Manager Condition has occurred or, if such four-month period ends on a day that is not a Business Day, the next succeeding Business Day.

"**GAAP**" has the meaning specified in Section 6.3(k).

"**Global Class A-E Notes**" means the Rule 144A Global Notes and the Regulation S Global Notes that are Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes.

"**Global Notes**" means the Rule 144A Global Notes and the Regulation S Global Notes.

"**Grant**" means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm. A Grant of the Pledged Securities, or of any other instrument, shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate continuing right to claim for, collect, receive and receipt for principal, interest and fee payments in respect of the Pledged Securities or such

other instruments, and all other amounts payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"**Hedge Agreement**" means, collectively, one or more interest rate protection agreements (including the Initial Hedge Agreement), as amended from time to time, together with any replacement hedge agreements on substantially identical terms (or that otherwise satisfy the conditions of Section 16.1(d)), entered into pursuant to Section 16.1, an Asset Specific Hedge or a Cash Flow Swap Agreement.

"**Hedge Counterparty**" means (a) with respect to the Initial Hedge Agreement entered into on the Closing Date, the Initial Hedge Counterparty (or any permitted assignee or successor) and (b) any hedge counterparty (or any permitted assignee or successor) under a Hedge Agreement (including under an Asset Specific Hedge, a Deemed Floating Asset Hedge or any Cash Flow Swap Agreement) that satisfies the Hedge Counterparty Ratings Requirement when the relevant Hedge Agreement (or confirmation thereunder) is executed. For the avoidance of doubt, a downgraded Hedge Counterparty shall remain a "Hedge Counterparty" for purposes of the Priority of Payments.

"**Hedge Counterparty Collateral Account**" means the Securities Account designated the "Hedge Counterparty Collateral Account" and established in the name of the Trustee pursuant to Section 16.1(e).

"**Hedge Counterparty Ratings Requirement**" means, with respect to any Hedge Ratings Determining Party: either (i) the short-term rating of such Hedge Ratings Determining Party is not lower than "A-1" by S&P or (ii) if such Hedge Ratings Determining Party does not have a short-term rating from S&P, the long-term rating of such Hedge Ratings Determining Party by S&P is not lower than "A+."

"**Hedge Payment Amount**" means, with respect to a Hedge Agreement and any Payment Date, the amount, if any, then payable by the Issuer to the related Hedge Counterparty, including any amounts so payable in respect of a termination of any Hedge Agreement.

"**Hedge Ratings Determining Party**" means (a) unless clause (b) applies with respect to a Hedge Agreement, a Hedge Counterparty or any transferee thereof or (b) any Affiliate of such Hedge Counterparty or any transferee thereof that unconditionally and absolutely guarantees (with the form of such guarantee meeting S&P's then-current published criteria with respect to guarantees) the obligations of such Hedge Counterparty or such transferee, as the case may be, under the related Hedge Agreement. For the purpose of this definition, no direct or indirect recourse against one or more shareholders of such Hedge Counterparty or any such transferee (or against any Person in control of, or controlled by, or under common control with, any such shareholder) shall be deemed to constitute a guarantee, security or support of the obligations of such Hedge Counterparty or any such transferee.

"**Hedge Ratio**" means, as of any Measurement Date the ratio (expressed as a percentage) obtained by dividing (a) the aggregate principal balance of the Fixed Rate Collateral Debt Securities by (b) the sum of (1) the aggregate notional amount of any Hedge Agreements (other than any Cash Flow Swap Agreement and any Deemed Floating Asset Hedge) plus (2) the CDS Principal Balance minus (3) the aggregate outstanding principal amount of the Secured Notes (not including any Cumulative Applicable Periodic Interest Shortfall Amount for any Class of Secured Notes).

"**Hedge Receipt Amount**" means, with respect to a Hedge Agreement and any Payment Date, the amount, if any, then payable to the Issuer by the related Hedge Counterparty, including any amounts so payable in respect of a termination of any Hedge Agreement.

"**Herfindahl Index**" means an index calculated by the Collateral Manager on any Measurement Date by dividing (i) one by (ii) the sum of, with respect to each Collateral Debt Security, (or if more than one Collateral Debt Security is issued by a single obligor, all of the Collateral Debt Securities issued by such obligor), (x) the Principal Balance of such Collateral Debt Security (or Securities) divided by (y) the CDS Principal Balance, raised to the second power. For purposes of calculating the Herfindahl Index, each U.S.$500,000 increment of cash in any Account shall be treated as a single Collateral Debt Security.

"**Herfindahl Score**" means a measurement of the diversity of a pool of loans of unequal size calculated in accordance with the Herfindahl Index.

"**Highest Auction Price**" means, in connection with an Auction Call Redemption, the bid or bids for the Collateral Debt Securities resulting in the highest auction price of one or more Subpools of Collateral Debt Securities.

"**Holder or Noteholder**" means (i) with respect to any Secured Note, any Secured Noteholder, (ii) with respect to any Income Note, any Income Noteholder and (iii) with respect to any Combination Note, any Combination Noteholder, as the context may require. Unless the Combination Notes are explicitly addressed in the same context, all references herein to Holders of the Class A-3 Notes, Class A Notes, Secured Notes, Senior Secured Notes and Income Notes shall be construed to include Holders of Combination Notes, to the extent of the Class A-3 Notes and Income Notes represented by the Class A-3 Note Component and the Income Note Component, respectively.

"**Incentive Collateral Management Fee**" means, with respect to each Payment Date, an incentive fee equal to the sum of (x) 30% of any Collateral Interest Collections remaining after application pursuant to Sections 11.1(a)(i) through 11.1(a)(xxii) and (y) 30% of any Collateral Principal Collections remaining after application pursuant to Sections 11.1(b)(i) through 11.1(b)(xviii) on any Payment Date (including any date on which any of the Income Notes are redeemed) as of which the Income Noteholders have achieved (or will achieve after giving effect to the payments on such date) a cumulative IRR of at least 14.5% with respect to such Payment Date.

"**Income Note Component**" means the component of the Combination Notes consisting of U.S.$4,400,000 initial aggregate principal amount of Income Notes.

"**Income Note Distribution Account**" means the account designated the "Income Note Distribution Account" and established by the Income Note Paying Agent in the name of the Income Note Paying Agent for the benefit of the Issuer pursuant to the Income Note Paying Agency Agreement.

"**Income Note Excess Funds**" means all remaining Collateral Interest Collections and Collateral Principal Collections after payments in Section 11.1(a)(xxiii)(A) and 11.1(b)(xix)(A).

"**Income Note Paying Agency Agreement**" means that certain Income Note Paying Agency and Transfer Agreement, dated as of February 27, 2007, as the same may be amended or supplemented from time to time, between the Issuer and the Income Note Paying Agent.

"**Income Note Paying Agent**" means LaSalle Bank National Association, and any successors or assigns in its capacity as Income Note Paying Agent under the Income Note Paying Agency Agreement.

"**Income Note Redemption Approval Condition**" means the requirement that, unless and to the extent the Holders of not less than 66⅔% of the aggregate principal amount of the Outstanding Income Notes have waived payment in full of the Income Notes Stated Amount, the Income Noteholders receive in connection with an Auction Call Redemption an amount equal to (x) the Income Notes Stated Amount minus (y) the aggregate amount of all cash distributions on the Income Notes (whether in respect of distributions or redemption payments made to the Income Note Paying Agent for distribution to the Income Noteholders) on or prior to the relevant Auction Date.

"**Income Note Register**" means, with respect to the Income Notes, the Income Note Register maintained by the Income Note Registrar.

"**Income Note Registrar**" means LaSalle Bank National Association, and any successors or assigns, in its capacity as Income Note Registrar under the Income Note Paying Agency Agreement.

"**Income Noteholder**" means, with respect to any Income Note, the Person in whose name such Income Note is registered in the Income Note Register.

"**Income Notes**" means the U.S.$18,000,000 Income Notes due 2052. For purposes of determining the aggregate principal balance for any voting, consents or waivers, the "aggregate principal amount" of the Income Notes is the aggregate face amount of the Income Notes issued as of the Closing Date without any reduction for amounts distributed previously with respect to the Income Notes. Unless the Combination Notes are explicitly addressed in the same context, all references herein to the Income Notes shall be construed to include the Combination Notes to the extent of the Income Notes represented by the Income Note Component.

"**Income Notes Stated Amount**" means U.S.$18,000,000 which, for the avoidance of doubt, equals the aggregate face amount of the issued Income Notes as of the

Closing Date without any reduction for amounts distributed previously with respect to the Income Notes.

"**Indenture**" means this instrument and, if from time to time supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, as so supplemented or amended.

"**Independent**" means, as to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions and (iii) if required to deliver an opinion or certificate to the Trustee pursuant to this Indenture, states in such opinion or certificate that the signer has read this definition and that the signer is Independent within the meaning hereof. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

"**Initial Credit Support Annex**" has the meaning specified in Section 16.1(c)(i).

"**Initial Hedge Agreement**" means certain interest rate swap agreements entered into between the Issuer and the Initial Hedge Counterparty on or before the Closing Date.

"**Initial Hedge Counterparty**" means Bank of America, N.A. under the Initial Hedge Agreement and any of its successors, assigns or replacements under the Initial Hedge Agreement appointed in accordance with the terms of this Indenture and the Initial Hedge Agreement.

"**Initial Payment Date**" means the Payment Date occurring in May 2007.

"**Instrument**" has the meaning specified in Section 9-102(a)(47) of the UCC.

"**Interest Coverage Amount**" means, as of any Measurement Date, an amount equal to (i) the amount received or scheduled to be received as Collateral Interest Collections (excluding termination payments to be received from any applicable Hedge Counterparty) during the related Due Period *plus* amounts standing to the credit of the Expense Reserve Account *plus* the amount, if any, scheduled to be transferred from the Interest Reserve Account and the Ramp-Up Period Interest Reserve Account to the Collection Account in respect of the Payment Date relating to such Due Period, *less* (ii)(a) the taxes, fees, expenses, payments to any Hedge Counterparty and all other amounts payable pursuant to Sections 11.1(a)(i), (ii) and (iii) on the related Payment Date and (b) with respect to any Non-Monthly Pay Asset (without duplication), the portion, if any, of the interest collections scheduled to be received during the related Due Period transferred to the Interest Reserve Account; **provided** that (a) following the date on which a Collateral Debt Security becomes a Defaulted Security, scheduled Collateral Interest Collections shall not include any amount scheduled to be received on Defaulted Securities or any amount scheduled to be received on securities that are currently deferring interest until (1) such

scheduled amounts are actually received in Cash or (2) the cumulative aggregate amounts actually received on a Defaulted Security exceed the Principal Balance of such Defaulted Security, (b) the expected interest income on Floating Rate Collateral Debt Securities and Eligible Investments shall be calculated using the then-current interest rate applicable thereto, (c) with respect to any Written Down Security, the Interest Coverage Amount shall exclude any interest accrued on any Written Down Amount and (d) with regards to any amounts scheduled to be received as Collateral Interest Collections, as to which the Trustee or Collateral Manager has actual knowledge will not be made in Cash or will not be received when due, the Interest Coverage Amount shall exclude such amounts.

"**Interest Coverage Tests**" means the Class A/B Interest Coverage Test, the Class C Interest Coverage Test and the Class D/E Interest Coverage Test.

"**Interest Only Security**" means any security that by its terms provides for periodic payments of interest and does not provide for the repayment of a stated principal amount.

"**Interest Period**" means (i) with respect to the Initial Payment Date, the period from and including the Closing Date to but excluding the Initial Payment Date and (ii) thereafter with respect to each Payment Date, the period beginning on the first day following the end of the preceding Interest Period and ending on (and including) the day before the next Payment Date.

"**Interest Reserve Account**" means the Securities Account designated the "Interest Reserve Account" and established in the name of the Trustee pursuant to Section 10.7.

"**Investment Advisers Act**" means the United States Investment Advisers Act of 1940, as amended.

"**Investment Company Act**" means the United States Investment Company Act of 1940, as amended.

"**IRR**" means an annualized internal rate of return on the Income Notes, calculated using the "XIRR" function in Microsoft Excel 2000, or an equivalent function in another software package. The "IRR" will, as of any date, be equal to the per annum discount rate at which the sum of the following cash flows is equal to zero (assuming discounting as of each Payment Date on the basis of a 365 day year and actual days elapsed), calculated from the Closing Date: (i) the original aggregate principal amount of the Income Notes issued on the Closing Date (which will be deemed to be negative for purposes of this calculation) and (ii) the amount of each distribution, if any, on the Income Notes on each Payment Date (which will be deemed to be positive for such purposes).

"**Issue**" of Collateral Debt Securities means Collateral Debt Securities issued by the same issuer secured by the same collateral pool.

"**Issuer**" means Cedarwoods CRE CDO II, Ltd., an exempted company incorporated and existing under the law of the Cayman Islands, unless a successor Person shall have become the Issuer pursuant to the applicable provisions of this Indenture, and thereafter "Issuer" shall mean such successor Person.

"**Issuer Order**" and "**Issuer Request**" mean, respectively, a written order or a written request, which may be in the form of a standing order or request in each case dated and signed in the name of the Issuer (or, as expressly provided herein, the Collateral Manager on its behalf) by an Authorized Officer of the Issuer (or, as expressly provided herein, the Collateral Manager).

"**Key Manager**" means (i) any one of John Angelo and Keith Barket and (ii) any one of Salah Saabneh and Andrew Solomon, or any such other additional person as may be appointed "Key Managers" in accordance with the Collateral Management Agreement (or if any of the foregoing individuals or any such additional Key Managers have been replaced with one or more Approved Replacement Persons, such Approved Replacement Persons).

"**Key Manager Condition**" means, at any time during the Reinvestment Period, if (x) both a Key Manager specified in clause (i) of the definition of "Key Manager" and a Key Manager specified in clause (ii) of the definition of "Key Manager" or (y) both Key Managers specified in clause (i) of the definition of Key Manager are no longer employed on a substantially full-time basis in the position of managing director or another management-level position by the Collateral Manager (or any of its successors or assigns permitted pursuant to the Collateral Management Agreement).

"**Key Manager Event**" means the earlier of either: (a) timely delivery of a Controlling Class Objection to a second Proposed Replacement or (b) termination of the Four Month Period without the appointment of an Approved Replacement Person.

"**LIBOR**" means, with respect to each Interest Period (other than the first Interest Period), a floating rate equal to the London interbank offered rate for one-month U.S. Dollar deposits determined in the manner described in Schedule B. LIBOR for the first Interest Period will be 5.35813%.

"**LIBOR Calculation Date**" has the meaning specified in Schedule B.

"**Listed Bidders**" has the meaning specified in Schedule E.

"**London Banking Day**" has the meaning specified in Schedule B.

"**Majority**" means (a) with respect to any Class or Classes of Secured Notes, the Holders of more than 50% of the Aggregate Outstanding Amount of the Secured Notes of such Class or Classes of Secured Notes, as the case may be, (b) with respect to Income Notes, the Holders of more than 50% of the Income Notes Stated Amount and (c) with respect to the Combination Notes (but only when the consent or approval of the Combination Noteholders is expressly required pursuant to this Indenture), the Holders of more than 50% of the Aggregate Outstanding Amount of the Combination Notes.

"**Mandatory Redemption**" has the meaning specified in Section 9.8.

"**Margin Stock**" means "margin stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System.

"**Market Value**" means, on any date of determination, the average of three or more bid-side prices expressed as a percentage of the par amount, obtained from independent, nationally recognized financial institutions or broker/dealers in the relevant market for one or more Collateral Debt Securities, each unaffiliated with each other and the Collateral Manager, as certified by the Collateral Manager (to the extent that such bid-side prices may be obtained by the Collateral Manager using its commercially reasonable efforts and commercially reasonable business judgment). If three or more bid-side prices cannot be so obtained, then the Market Value on such date of determination will be the lower of two bid-side prices, if two bid-side prices are obtained in the manner described above, and the sole bid-side price if only one bid-side price is obtained in the manner described above. If no bids can be obtained in the manner described above, the Market Value will be the lower of (i) the S&P Recovery Rate and (ii) the Moody's Recovery Rate with respect to such Collateral Debt Security.

"**Measurement Date**" means any of the following: (a) the Effective Date; (b) any date after the Effective Date upon which the Issuer disposes or acquires (which date of acquisition shall be deemed to be the date on which the Issuer enters into binding commitments to acquire such Collateral Debt Security) any Collateral Debt Security; (c) each Calculation Date; (d) the last Business Day of each calendar month (other than any calendar month prior to and including the month in which the Effective Date occurs); and (e) with reasonable notice to the Issuer, the Collateral Manager and the Trustee, any other Business Day that any Rating Agency or Holders of more than 50% of the then Aggregate Outstanding Amount of any Class of Secured Notes requests to be a "Measurement Date"; **provided**, that if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the next succeeding day that is a Business Day.

"**Minimum Fixed Coupon**" means the sum of (i) 1.17% and (ii) the weighted average of the fixed rate of interest payable by the Issuer under any "fixed to floating" Hedge Agreement, excluding any Deemed Floating Asset Hedge and Cash Flow Swap Agreement, calculated based on the notional amount of each such Hedge Agreement.

"**Moneyline Telerate Page 3750**" means the display page so designated on Moneyline Telerate Service (or such other page as may replace that page on that service, or such other service as may be nominated as the information vendor, for the purposes of displaying rates comparable to LIBOR).

"**Moody's**" means Moody's Investors Service, Inc.

"**Moody's First Trigger Required Ratings**" are satisfied with respect to any Person, (x) where such Person is the subject of a Moody's short-term rating, if such rating is "P-1" or above and its long-term, unsecured and unsubordinated debt obligations are rated "A2" or above by Moody's and (y) where such Person is not the subject of a Moody's short-term rating, if its long-term, unsecured and unsubordinated debt obligations are rated "A1" or above by Moody's.

"**Moody's Rating**" of any Collateral Debt Security will be determined as follows:

(i)　(x) if such Collateral Debt Security is publicly rated by Moody's, the Moody's Rating will be such rating, or, (y) if such Collateral Debt Security is not publicly rated by Moody's, but the Issuer has requested that Moody's assign a rating to such Collateral Debt Security, the Moody's Rating will be the rating so assigned by Moody's;

(ii)　with respect to a CMBS Security or REIT Debt Security, if such CMBS Security or REIT Debt Security is not rated by Moody's, then the Moody's Rating of such CMBS Security or REIT Debt Security, as applicable, may be determined using any one of the methods below:

(A)　with respect to any REIT Debt Security not publicly rated by Moody's, if such REIT Debt Security is publicly rated by S&P, then the Moody's Rating thereof will be (x) one subcategory below the Moody's equivalent rating assigned by S&P if the rating assigned by S&P is "BBB-" or greater and (y) two rating subcategories below the Moody's equivalent rating assigned by S&P if the rating assigned by S&P is below "BBB-";

(B)　with respect to any CMBS Conduit Security or CMBS Credit Tenant Lease Security not publicly rated by Moody's, (x) if Moody's has rated a tranche or class of CMBS Conduit Security or CMBS Credit Lease Security senior to the relevant issue, then the Moody's Rating thereof will be one and one-half rating subcategories below the Moody's equivalent of the lower of the rating assigned by S&P and Fitch to such CMBS Conduit Security or CMBS Credit Tenant Lease Security and (y) if Moody's has not rated any such tranche or class and S&P or Fitch have rated the subject CMBS Conduit Security or CMBS Credit Tenant Lease Security, then the Moody's Rating thereof will be two rating subcategories below the Moody's equivalent of the lower of the rating assigned by S&P and Fitch;

(C)　with respect to any CMBS Large Loan Security or CMBS Re-REMIC Security not publicly rated by Moody's, the Issuer or the Collateral Manager on behalf of the Issuer will request Moody's to assign a rating to such CMBS Large Loan Security or CMBS Re-REMIC Security on a case-by-case basis;

(D)　with respect to any other type of CMBS Security or REIT Debt Security not referred to in clauses (A) through (C) above, the Moody's Rating will be determined pursuant to subclause (y) of clause (i) above;

(iii)　with respect to corporate guarantees on any REIT Debt Security, if such corporate guarantees are not publicly rated by Moody's but another security or obligation of the guarantor or obligor (an "**other security**") is publicly rated by Moody's, and no rating has been assigned in accordance with clause (i) above, the Moody's Rating of such Collateral Debt Security will be determined as follows:

(A)   if the corporate guarantee is a senior secured obligation of the guarantor or obligor and the other security is also a senior secured obligation, the Moody's Rating of such Collateral Debt Security will be the rating of the other security;

(B)   if the corporate guarantee is a senior unsecured obligation of the guarantor or obligor and the other security is a senior secured obligation, the Moody's Rating of such Collateral Debt Security will be one rating subcategory below the rating of the other security;

(C)   if the corporate guarantee is a subordinated obligation of the guarantor or obligor and the other security is a senior secured obligation that is: (1) rated "Ba3" or higher by Moody's, the Moody's Rating of such corporate guarantee will be three rating subcategories below the rating of the other security; or (2) rated "B1" or lower by Moody's, the Moody's Rating of such Collateral Debt Security will be two rating subcategories below the rating of the other security;

(D)   if the corporate guarantee is a senior secured obligation of the guarantor or obligor and the other security is a senior unsecured obligation that is: (1) rated "Baa3" or higher by Moody's, the Moody's Rating of such Collateral Debt Security will be the rating of the other security; or (2) rated "Ba1" or lower by Moody's, the Moody's Rating of such Collateral Debt Security will be one rating subcategory above the rating of the other security;

(E)   if the corporate guarantee is a senior unsecured obligation of the guarantor or obligor and the other security is also a senior unsecured obligation, the Moody's Rating of such Collateral Debt Security will be the rating of the other security;

(F)   if the corporate guarantee is a subordinated obligation of the guarantor or obligor and the other security is a senior unsecured obligation that is: (1) rated "B1" or higher by Moody's, the Moody's Rating of such Collateral Debt Security will be two rating subcategories below the rating of the other security; or (2) rated "B2" or lower by Moody's, the Moody's Rating of such Collateral Debt Security will be one rating subcategory below the rating of the other security;

(G)   if the corporate guarantee is a senior secured obligation of the guarantor or obligor and the other security is a subordinated obligation that is: (1) rated "Baa3" or higher by Moody's, the Moody's Rating of such Collateral Debt Security will be one rating subcategory above the rating of the other security; (2) rated below "Baa3" but not rated "B3" by Moody's, the Moody's Rating of such Collateral Debt Security will be two rating subcategories above the rating of the other security; or (3) rated "B3" by Moody's, the Moody's Rating of such Collateral Debt Security will be "B2";

    (H) if the corporate guarantee is a senior unsecured obligation of the guarantor or obligor and the other security is a subordinated obligation that is: (1) rated "Baa3" or higher by Moody's, the Moody's Rating of such Collateral Debt Security will be one rating subcategory above the rating of the other security; or (2) rated "Ba1" or lower by Moody's, the Moody's Rating of such Collateral Debt Security will also be one rating subcategory above the rating of the other security; and

    (I) if the REIT Debt Security is a subordinated obligation of the guarantor or obligor and the other security is also a subordinated obligation, the Moody's Rating of such Collateral Debt Security will be the rating of the other security,

    (iv) if such Collateral Debt Security is a Real Estate CDO Security, no notching is permitted and the Moody's Rating will be the rating so assigned by Moody's;

**provided** that (a) no more than 20% of the CDS Principal Balance may have a Moody's Rating which is based on the rating of one or more Rating Agencies other than Moody's and (b) the Principal Balance of any single Collateral Debt Security which has a Moody's Rating based on the rating of one or more Rating Agencies other than Moody's may not exceed 5% of the CDS Principal Balance

    "**Moody's Rating Factor**" means with respect to any Collateral Debt Security, the number set forth in the table below opposite the Moody's Rating of such Collateral Debt Security.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca or lower | 10,000 |

    "**Moody's Recovery Rate**" means, with respect to any Collateral Debt Security on any Measurement Date, an amount equal to the percentage for such Collateral Debt Security set forth in the Moody's Recovery Rate Matrix attached as Schedule D-2 hereto.

    "**Moody's Recovery Rate Test**" means a test that will be satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is at least 25.8%.

"**Moody's Required Hedge Ratings**" means the Moody's First Trigger Required Ratings or the Moody's Second Trigger Required Ratings.

"**Moody's Second Downgrade Event**" has the meaning specified in Section 16.1(c)(iii).

"**Moody's Second Rating Trigger Requirements**" shall apply in relation to any Hedge Counterparty, so long as such Hedge Counterparty (and, if applicable, its guarantor) does not satisfy the Moody's Second Trigger Required Ratings.

"**Moody's Second Trigger Required Ratings**" are satisfied with respect to any Person, (x) where such Person is the subject of a Moody's short-term rating, if such rating is "P-2" or above and its long-term, unsecured and unsubordinated debt obligations are rated "A3" or above by Moody's and (y) where such Person is not the subject of a Moody's short-term rating, if its long-term, unsecured and unsubordinated debt obligations are rated "A3" or above by Moody's.

"**Moody's WARF**" means, as of any Measurement Date, the number obtained by summing the products obtained by multiplying the Principal Balance of each Collateral Debt Security which is not a Defaulted Security held by the Issuer as of such Measurement Date by its Moody's Rating Factor, dividing such sum by the aggregate Principal Balance of all such Collateral Debt Securities (excluding Defaulted Securities) and rounding the result to the nearest whole number.

"**Moody's WARF Test**" means a test that will be satisfied on the Effective Date and on any Measurement Date thereafter if the Moody's WARF is not more than 800.

"**Moody's Weighted Average Recovery Rate**" means the rate on any Measurement Date calculated as a fraction (expressed as a percentage rounded to the nearest 0.1%) the numerator of which is the sum of the products obtained by multiplying the Principal Balance of each Collateral Debt Security (excluding Defaulted Securities) by the applicable Moody's Recovery Rate and the denominator of which is the Principal Balance of all such Collateral Debt Securities (excluding Defaulted Securities).

"**Non-Monthly Pay Asset**" means Collateral Debt Securities that pay interest less frequently than monthly and are not the subject of a Cash Flow Swap Agreement.

"**Note Paying Agent**" means any Person authorized by the Issuer to pay the principal of or interest on any Secured Notes or amounts due on the Combination Notes, as applicable, on behalf of the Issuer as specified in Section 7.2.

"**Non-Registered Real Estate Company Debt Interest**" has the meaning specified in Section 16.2.

"**Note Register and Note Registrar**" have the respective meanings specified in Section 2.4(a).

"**Note Transfer Agent**" has the meaning specified in Section 2.4(a).

"**Note Report**" has the meaning specified in Section 10.11(a).

"**Notes**" means, collectively, the Secured Notes, the Income Notes and the Combination Notes.

"**Offer**" means, with respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for Cash, securities or any other type of consideration or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"**Offering**" means the offering of the Secured Notes, the Combination Notes and the Income Notes under the Offering Circular.

"**Offering Circular**" means the Offering Circular, prepared and delivered on or prior to the Closing Date in connection with the offer and sale of the Secured Notes, the Combination Notes and the Income Notes, as amended or supplemented from time to time.

"**Officer**" means, (a) with respect to the Issuer and any corporation or limited partnership, the Chairman of the Board of Directors (or, with respect to the Issuer, any director), the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer of such entity; and (b) with respect to any bank or trust company acting as trustee of an express trust or as custodian, any Trust Officer.

"**Opinion of Counsel**" means a written opinion addressed to the Trustee and each Rating Agency (each, a "**Recipient**"), in form and substance reasonably satisfactory to each Recipient, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney may, except as otherwise expressly provided in this Indenture, be inside or outside counsel for the Issuer and which attorney shall be reasonably satisfactory to the Trustee. Whenever an Opinion of Counsel is required hereunder, such Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory which opinions of other counsel shall accompany such Opinion of Counsel and shall either be addressed to each Recipient or shall state that each Recipient shall be entitled to rely thereon.

"**Optional Redemption**" has the meaning specified in Section 9.1(i).

"**Ordinary Shares**" means the 250 ordinary shares, par value U.S.$1.00 per share issued by the Issuer.

"**Outstanding**" means with respect to the Notes as of any date of determination, any and all Notes theretofore authenticated and delivered under this Indenture and the Income Note Paying Agency Agreement other than Notes cancelled, redeemed, exchanged or replaced in accordance with the terms of this Indenture or the Income Note Paying Agency Agreement, as applicable; **provided** that in determining whether the Holders of the requisite percentage of

Notes have given any direction, notice, consent, approval or objection, any Notes held or beneficially owned by the Collateral Manager or any of its Affiliates or by an account or fund for which the Collateral Manager or any of its Affiliates acts as the investment advisor with discretionary voting authority will be disregarded with respect to any vote or consent relating to the removal or termination of the Collateral Manager or the assignment by the Collateral Manager of its rights and obligations under the Collateral Management Agreement, except for any assignments or transfers by the Collateral Manager of its rights and obligations to Affiliates of the Collateral Manager, subject to any applicable requirements under the Investment Advisers Act.

"**Paying Agents**" means, collectively, the Note Paying Agent and the Income Note Paying Agent.

"**Payment Account**" means the Securities Account designated the "Payment Account" and established in the name of the Trustee pursuant to Section 10.8.

"**Payment Date**" means the 25th day of each calendar month, or if such day is not a Business Day, the next succeeding Business Day, commencing in May 2007 and ending on the earlier of the applicable Stated Maturity Date and the Redemption Date.

"**Payment Report**" means with respect to each Payment Date commencing in May 2007, a remittance report that will be made available pursuant to Section 10.4(a) of the Indenture which will provide information with respect to payments to be made on the related Payment Date.

"**Periodic Interest**" means the amount of interest payable, calculated with respect to each such Class for the relevant Interest Period by multiplying the Applicable Periodic Interest Rate by the Aggregate Outstanding Amount of the related Class (including any Class C Cumulative Applicable Periodic Interest Shortfall Amount, Class D Cumulative Applicable Periodic Interest Shortfall Amount, Class E Cumulative Applicable Periodic Interest Shortfall Amount and Class F Cumulative Applicable Periodic Interest Shortfall Amount, as applicable, with respect to such Class of Notes) at the close of the Business Day immediately preceding the relevant Payment Date, multiplying the resulting figure by the actual number of days in such Interest Period, dividing by 360 and rounding the resulting figure to the nearest U.S.$0.01 (U.S.$0.005 being rounded upwards).

"**Person**" means any individual, corporation, partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof or any similar entity.

"**PIK Bond**" means any security that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred or capitalized as additional principal thereof or not pay interest when scheduled (but without being a Defaulted Security) or that issues identical securities in lieu of payments of interest in Cash.

"**Placement Agent**" means BAS.

"**Placement Agreement**" means the agreement, dated as of the Closing Date, between the Issuer and the Placement Agent relating to the placement of the Notes.

"**Pledged Securities**" means on any date of determination, (a) the Collateral Debt Securities, Temporary Ramp-Up Securities, Equity Securities and the Eligible Investments that have been Granted to the Trustee and (b) all non-Cash proceeds thereof, in each case, to the extent not released from the lien of this Indenture pursuant hereto.

"**Principal Balance**" means, with respect to any Collateral Debt Security or Eligible Investment, as of any date of determination, the outstanding principal amount of such Collateral Debt Security or Eligible Investment; **provided**, that the Principal Balance of (i) any Collateral Debt Security which permits the deferral or capitalization of interest will not include any outstanding balance of the deferred and/or capitalized interest, (ii) any Equity Security will be zero, (iii) any putable Collateral Debt Security which matures after the Stated Maturity Date will be the lower of the put price and the outstanding principal amount and (iv) any Collateral Debt Security or Eligible Investment in which the Trustee does not have a first priority perfected security interest shall be deemed to be zero.

"**Principal Coverage Amount**" means, on any Measurement Date, an amount equal to the sum of:

(i)    the aggregate Principal Balance of all Collateral Debt Securities (other than Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) included in the Collateral on such date;

(ii)    the aggregate Principal Balance of the Eligible Investments in the Collateral Account and the Collection Account on such date that represent Collateral Principal Collections;

(iii)    with respect to each Defaulted Security, the Defaulted Security Amount;

(iv)    with respect to each Written Down Security, the Reduced Principal Balance; and

(v)    with respect to each Deferred Interest PIK Bond, the Deferred Interest PIK Bond Amount,

**provided** that for purposes of determining each of the Principal Coverage Ratios, the Principal Balances for Collateral Debt Securities (other than Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds) having an Actual Rating by Moody's of "Ba1" or lower or an Actual Rating by S&P of "BB+" or lower will reflect the following values:

(1)    the Principal Balance of any Collateral Debt Security having an Actual Rating by Moody's of "Caa1" or lower, or an Actual Rating by S&P of "CCC+" or lower, shall be 60% of its principal amount, **provided**, that for purposes of calculating the Principal Coverage Amount for purposes of determining satisfaction of the Special Amortization Pro Rata Condition, the Principal Balance of any Collateral Debt Security having an Actual Rating by

Moody's of "Caa1" or lower, or an Actual Rating by S&P of "CCC+" or lower, shall be 50% of its principal amount; and

(2)    if more than 7% of the CDS Principal Balance is comprised of Collateral Debt Securities that have an Actual Rating by Moody's of "B1" or lower but higher than "Caa1" or an Actual Rating by S&P of "B+" or lower but higher than "CCC+," then the Principal Balance of such Collateral Debt Securities in excess of such 7% shall be 70% of the principal amount thereof; and

(3)    if more than 40% (by Principal Coverage Amount, after giving effect to (1) and (2) above) of the CDS Principal Balance is comprised of Collateral Debt Securities that have an Actual Rating by Moody's of "Ba1" or lower or an Actual Rating by S&P of "BB+" or lower, then:

(a)    the Principal Balance of Collateral Debt Securities having an Actual Rating by Moody's of "B1" or lower but higher than "Caa1" or an Actual Rating by S&P of "B+" or lower but higher than "CCC+" in excess of such 40% shall be 70% of the principal amount thereof, and

(b)    after giving effect to (a) immediately preceding, the Principal Balance of Collateral Debt Securities having an Actual Rating by Moody's of "Ba1" or lower but higher than "Caa1" or an Actual Rating by S&P of "BB+" or lower but higher than "CCC+" in excess of 40% shall be 90% of the principal amount thereof.

"**Principal Coverage Ratios**" means the Class A/B Principal Coverage Ratio, the Class C Principal Coverage Ratio and the Class D/E Principal Coverage Ratio.

"**Principal Coverage Tests**" means the Class A/B Principal Coverage Test, the Class C Principal Coverage Test and the Class D/E Principal Coverage Test.

"**Priority of Payments**" means, collectively, the priority of payments specified in Section 11.1(a), (b) and (c).

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**Prohibited Asset**" means any of the following asset types: aircraft lease securities, enhanced equipment trust certificates, structured settlement securities, tobacco settlement securities, manufactured housing securities, 12(b)-1 fee securities, future flow securities, emerging markets securities, sub and re-performing credit card securities, franchise loan securities, market value collateralized debt obligations, collateralized loan obligations or CDO of CDO Securities.

"**Proposed Portfolio**" means the portfolio (measured by Principal Balance) of (a) the Collateral Debt Securities and the proceeds of disposition thereof held as Cash, (b) Collateral Principal Collections held as Cash and (c) Eligible Investments purchased with Collateral Principal Collections or the proceeds of disposition of Collateral Debt Securities

resulting from the sale, maturity or other disposition of a Collateral Debt Security or a proposed acquisition of a Collateral Debt Security, as the case may be.

"**Proposed Replacement**" means an additional person nominated by the Collateral Manager to replace a Key Manager if such replaced Key Manager is no longer employed on a substantially full-time basis in the position of managing director or another management-level position by the Collateral Manager.

"**Purchased Accrued Interest**" means all payments of interest received, or amounts collected that are attributable to interest received on Collateral Debt Securities and Eligible Investments, to the extent such payments or amounts constitute accrued interest purchased with Collateral Principal Collections or Uninvested Proceeds except for interest accrued on Collateral Debt Securities prior to the Closing Date.

"**Qualified Bidder List**" means a list of not less than three Persons that are Independent from one another and the Issuer prepared by the Collateral Manager and delivered to the Trustee prior to an Auction, as may be amended and supplemented by the Collateral Manager from time to time upon written notice to the Trustee; **provided** that (i) the Qualified Bidder List may include the Collateral Manager as a Qualified Bidder if it is Independent from the other Persons on such list and (ii) any such notice referred to above shall only be effective on any Auction Date if it was received by the Trustee at least two Business Days prior to such Auction Date.

"**Qualified Bidders**" means the Persons whose names appear from time to time on the Qualified Bidder List.

"**Qualified Institutional Buyer**" has the meaning given in Rule 144A under the Securities Act.

"**Qualified Purchaser**" means a "qualified purchaser" as defined in Section 2(a)(51) of the Investment Company Act and the rules thereunder.

"**Qualifying Foreign Obligor**" means a corporation, partnership or other entity organized or incorporated under the law of any of Australia, Canada, France, Germany, Ireland, Italy, New Zealand, Sweden, Switzerland or the United Kingdom, so long as the unguaranteed, unsecured and otherwise unsupported long-term U.S. Dollar-denominated sovereign debt obligations of such country are rated "AA" or better by S&P.

"**Ramp-Up Collateral Debt Security**" means each additional Collateral Debt Security selected by the Collateral Manager for purchase by the Issuer and pledged to the Trustee during the Ramp-Up Period.

"**Ramp-Up Period**" means the period commencing on the Closing Date and ending on the Effective Date.

"**Ramp-Up Period Interest Reserve Account**" means the Securities Account designated the "Ramp-Up Period Interest Reserve Account" and established in the name of the Trustee pursuant to Section 10.9.

"**Rating**" means, as the context requires, a Moody's Rating or an S&P Rating.

"**Rating Agency**" means each of Moody's and S&P.

"**Rating Agency Confirmation**" means, with respect to any specified action or determination, for so long as any of the Secured Notes or the Combination Notes are Outstanding and rated by Moody's or S&P, the receipt of written confirmation that such specified action or determination will not result in the downgrade, qualification or withdrawal or other adverse action with respect to their then-current ratings on the Secured Notes or the Combination Notes (including any private or confidential rating) unless Rating Agency Confirmation is specified herein to be required by only Moody's or S&P, in which case such confirmation from such Rating Agency will be sufficient.

"**Rating Confirmation**" has the meaning specified in Section 7.18(e).

"**Ratings Confirmation Failure**" has the meaning specified in Section 7.18(e).

"**Real Estate CDO Securities**" means securities that entitle the holders thereof to receive payments that depend on the cash flow from or the credit exposure to a portfolio consisting primarily of (i) REIT Debt Securities, (ii) Commercial Mortgage Backed Securities, (iii) interests in mortgages on commercial real estate, including interests in mezzanine loans or (iv) a combination of the foregoing; **provided** that such dependence may in addition be conditioned upon rights or additional assets designed to assure the servicing or timely distribution of proceeds to holders of the Real Estate CDO Securities such as a financial guaranty insurance policy.

"**Real Estate Company Debt Interests**" means interests in securities related to (or issued directly by), or loans (other than mortgage loans, subordinate mortgage loan interests or mezzanine loans) made to, real estate operating companies, homebuilding companies or their subsidiaries.

"**Record Date**" means the date on which the Holders of Secured Notes or Combination Notes entitled to (i) vote with respect to any matters under the Indenture (but with respect to the Combination Notes, only when the consent or approval of the Combination Noteholders is expressly required pursuant to this Indenture) are determined, such date being the 15th day (whether or not a Business Day) prior to the date the Trustee delivers notice with respect to such vote and (ii) receive a payment in respect of principal or interest on the succeeding Payment Date or Redemption Date are determined, such date as to any Payment Date or Redemption Date being the 15th day (whether or not a Business Day) prior to such Payment Date or Redemption Date.

"**Redemption**" means an Optional Redemption, an Auction Call Redemption or a Tax Redemption.

"**Redemption Date**" means the Payment Date upon which the Secured Notes are redeemed pursuant to an Optional Redemption, an Auction Call Redemption or a Tax Redemption.

"**Redemption Date Statement**" has the meaning specified in Section 10.11(c).

"**Redemption Price**" means (i) with respect to each Class of Secured Notes, (a) their then Aggregate Outstanding Amount (including, without limitation, any Class C Cumulative Applicable Periodic Interest Shortfall Amount, Class D Cumulative Applicable Periodic Interest Shortfall Amount, Class E Cumulative Applicable Periodic Interest Shortfall Amount and Class F Cumulative Applicable Periodic Interest Shortfall Amount plus (b) accrued interest thereon to the date of redemption to the extent not already paid and (ii) with respect to the Income Notes, an amount equal to the aggregate of any amounts distributable on the Income Notes in respect of such redemption pursuant to Sections 11.1(a) and (b) and in any instance where the Income Note Redemption Approval Condition applies, an amount equal to the amounts necessary to satisfy the Income Note Redemption Approval Condition.

"**Reduced Principal Balance**" means, with respect to each Written Down Security, the amount to which the original Principal Balance of such Written Down Security is reduced.

"**Reference Banks**" has the meaning specified in Schedule B.

"**Reference Date**" means February 13, 2007.

"**Registered**" means in registered form for U.S. federal income tax purposes and issued after July 18, 1984; **provided** that a certificate of interest in a trust that is treated as a grantor trust for U.S. federal income tax purposes will not be treated as Registered unless each of the obligations or securities held by the trust was issued after that date.

"**Registered Form**" has the meaning specified in Section 8-102(a)(13) of the UCC.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Combination Note**" means a Regulation S Global Note that is a Combination Note.

"**Regulation S Global Note**" has the meaning specified in Section 2.1(a).

"**Regulation S Global Class A-E Note**" means a Regulation S Global Note that is a Class A Note, Class B Note, Class C Note, Class D Note or Class E Note.

"**Regulation S Global Class F Note**" means a Regulation S Global Note that is a Class F Note.

"**Regulation S Note**" has the meaning specified in Section 2.1(a).

"**Regulation S Transfer Certificate**" has the meaning specified in Section 2.4(c)(i)(C).

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 221, or any successor regulation.

"**Reinvestment Criteria**" means, with respect to any reinvestment of Collateral Principal Payments, the following criteria:

      (i)     After the Effective Date, the Collateral Quality Tests are satisfied, or, if any Collateral Quality Test was not satisfied immediately prior to such investment, the extent of compliance with such Collateral Quality Test will be maintained or improved immediately following such reinvestment;

      (ii)     After the Effective Date, the Collateral Concentration Limitations are satisfied, or, if any of the Collateral Concentration Limitations was not satisfied immediately prior to such investment, such compliance with the Collateral Concentration Limitations will be maintained or improved following such reinvestment;

      (iii)     After the Effective Date, the Coverage Tests are satisfied, or, if any Coverage Test was not satisfied immediately prior to such investment, such Coverage Test will be maintained or improved following such reinvestment;

      (iv)     No Event of Default has occurred and is continuing, and

      (v)     With respect to Sale Proceeds from the sale of Collateral Debt Securities that are Defaulted Securities, Equity Securities, Credit Risk Securities, Written Down Securities or Withholding Tax Securities, in addition to the requirements set forth in (i) – (iv) above, the Principal Balance of the Substitute Collateral Debt Securities purchased with such Sale Proceeds must be at least equal to the amount of such Sale Proceeds or to the extent less than all of such Sale Proceeds are used, the remaining amount must be designated as Principal Proceeds.

"**Reinvestment Period**" means the period beginning on the Closing Date and ending on and including the Payment Date in February, 2012; **provided, however**, that if (i) a Key Manager Event occurs and (ii) the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class direct the Trustee in writing to terminate the Reinvestment Period, then the Reinvestment Period shall instead end upon the Trustee's issuance of written notice of such termination to the Collateral Manager.

"**REIT**" means a real estate investment trust, as defined in Section 856 of the Code or any successor provision

"**REIT Debt Securities**" means, collectively, REIT Debt Securities—Diversified, REIT Debt Securities—Health Care, REIT Debt Securities—Hotel, REIT Debt Securities—Industrial, REIT Debt Securities—Mortgage, REIT Debt Securities—Multi-Family, REIT Debt Securities—Office, REIT Debt Securities—Retail and REIT Debt Securities—Storage.

"**REIT Debt Securities—Diversified**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets

consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of diverse real property interests.

"**REIT Debt Securities—Health Care**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of properties including hospitals, clinics, sport clubs, spas and other health care facilities and other similar real property interests used in one or more similar businesses.

"**REIT Debt Securities—Hotel**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of properties including hotels, motels, youth hostels, bed and breakfasts and other similar real property interests used in one or more similar businesses.

"**REIT Debt Securities—Industrial**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of properties including warehouse, industrial and distribution facilities, factories, refinery plants, breweries and other similar real property interests used in one or more similar businesses.

"**REIT Debt Securities—Mortgage**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of mortgages, commercial mortgage-backed securities, collateralized mortgage obligations and other similar mortgage-related securities (including securities issued by a hybrid form of such trust that invests in both commercial real estate and commercial mortgages).

"**REIT Debt Securities—Multi-Family**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of properties including multi-family dwellings such as apartment blocks, condominiums and co-operative owned buildings.

"**REIT Debt Securities—Office**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of a portfolio of properties including office buildings, conference facilities and other similar real property interests used in the commercial real estate business.

"**REIT Debt Securities—Retail**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets

consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) of regional malls, neighborhood shopping centers, big box centers, retail stores, restaurants, bookstores, clothing stores and other similar real property interests used in one or more similar businesses.

"**REIT Debt Securities—Storage**" means securities issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision) whose assets consist (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) a portfolio of properties including storage facilities and other similar real property interests used in one or more similar businesses.

"**Relevant Jurisdiction**" means, as to any obligor on any Collateral Debt Security, any jurisdiction (a) in which the obligor is incorporated, organized, managed and controlled or considered to have its seat, (b) where an office through which the obligor is acting for purposes of the relevant Collateral Debt Security is located, (c) in which the obligor executes Underlying Instruments or (d) in relation to any payment, from or through which such payment is made.

"**Reserved Matters**" has the meaning specified in Section 8.2(i).

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Rule 144A Definitive Note**" has the meaning specified in Section 2.4(c)(i)(E).

"**Rule 144A Global Note**" has the meaning specified in Section 2.1(b).

"**Rule 144A Information**" means such information as is specified pursuant to Rule 144A(d)(4) under the Securities Act (or any successor provision thereto).

"**Rule 144A Note**" has the meaning specified in Section 2.1(b).

"**Rule 144A Transfer Certificate**" has the meaning specified in Section 2.4(c)(i)(B).

"**S&P**" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor or successors thereto.

"**S&P CDO Monitor**" means the dynamic, analytical computer model provided by S&P to the Collateral Manager and the Trustee (together with such instructions and assumptions as are necessary to run such model) on or prior to the Effective Date used to determine the credit risk of a portfolio of Collateral Debt Securities, as may be modified by S&P from time to time.

"**S&P CDO Monitor Test**" means the test which is satisfied, as of any Measurement Date, if each of the Class A Note Default Differential, the Class B Note Default Differential, the Class C Note Default Differential, the Class D Note Default Differential, the Class E Note Default Differential and the Class F Note Default Differential of the Current Portfolio or the Proposed Portfolio, as applicable, is positive. The S&P CDO Monitor Test will

be considered to be improved if the Class A Note Default Differential of the Proposed Portfolio is greater than the Class A Note Default Differential of the Current Portfolio, the Class B Note Default Differential of the Proposed Portfolio is greater than the Class B Note Default Differential of the Current Portfolio, the Class C Note Default Differential of the Proposed Portfolio is greater than the Class C Note Default Differential of the Current Portfolio, the Class D Note Default Differential of the Proposed Portfolio is greater than the Class D Note Default Differential of the Current Portfolio, the Class E Note Default Differential of the Proposed Portfolio is greater than the Class E Note Default Differential of the Current Portfolio and the Class F Note Default Differential of the Proposed Portfolio is greater than the Class F Note Default Differential of the Current Portfolio.

"**S&P Industry Classification Group**" means any of the S&P industrial classification groups as set forth on Schedule H and any additional classification groups established by S&P with respect to the Collateral Debt Securities and provided, in each case, by the Collateral Manager or S&P to the Trustee.

"**S&P's Preferred Format**" means an electronic spreadsheet file to be provided to S&P, which file shall include the following information, if available (to the extent such information is not confidential) with respect to each Collateral Debt Security: (a) the name and country of domicile of the issuer thereof and the particular issue held by the Issuer, (b) the CUSIP or other applicable identification number associated with such Collateral Debt Security, (c) the par value of such Collateral Debt Security, (d) the type of issue (including, by way of example, whether such Collateral Debt Security is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee, (e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Debt Security is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR), (f) the coupon (in the case of a Collateral Debt Security which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Debt Security which bears interest at a floating rate), (g) the S&P Industry Classification Group for such Collateral Debt Security, (h) the Stated Maturity Date of such Collateral Debt Security, (i) the S&P Rating of such Collateral Debt Security or the issuer thereof, as applicable, (j) the Principal Balance in cash and in Eligible Investments, (k) the priority category assigned by S&P to such Collateral Debt Security, if available, and (l) such other information as the Trustee may determine to include in such file.

"**S&P Rating**" means the rating by S&P of any Collateral Debt Security determined as follows:

(a)    if S&P has assigned a rating to such Collateral Debt Security either publicly or privately (in the case of a private rating, with the written consent of the issuer of such Collateral Debt Security for use of such private rating and delivery of a copy of such consent to S&P), the S&P Rating shall be the rating assigned thereto by S&P; **provided** that if such Collateral Debt Security is placed on a watch list for possible upgrade or downgrade by S&P, the S&P Rating applicable to such Collateral Debt Security shall be one rating subcategory above or below, respectively, the S&P Rating applicable to such Collateral Debt Security immediately prior to such Collateral Debt Security being placed on such watch list;

(b)    if such Collateral Debt Security is not rated by S&P but the Issuer or the Collateral Manager on behalf of the Issuer has requested that S&P assign a rating to such Collateral Debt Security, the S&P Rating shall be the rating so assigned by S&P; **provided** that pending receipt from S&P of such rating, if such Collateral Debt Security is not eligible for notching in accordance with Schedule G, such Collateral Debt Security shall have an S&P Rating of "CCC-," otherwise such S&P Rating shall be the rating assigned according to Schedule F until such time as S&P shall have assigned a rating thereto; or

(c)    if any Collateral Debt Security is a Collateral Debt Security that has not been assigned a rating by S&P and is not a Collateral Debt Security listed in Schedule G, as identified by the Collateral Manager, the S&P Rating of such Collateral Debt Security shall be the rating determined by reference to Schedule F; **provided** that (i) if any Collateral Debt Security shall, at the time of its purchase by the Issuer, be listed for a possible upgrade or downgrade on Moody's then-current credit rating watch list, then the S&P Rating of such Collateral Debt Security shall be one subcategory above or below, respectively, the rating then assigned to such item as set forth in Schedule F and (ii) the aggregate Principal Balance that may be given a rating based on this subparagraph (c) may not exceed 20% of the aggregate Principal Balance of all Collateral Debt Securities; **provided** that if any Collateral Debt Security has not been assigned a rating by S&P and is a type of Collateral Debt Security listed on Schedule G, subsequent to the Closing Date, the acquisition of any such Collateral Debt Security will require an estimate or shadow rating from S&P and the assignment of an S&P Recovery Rate to such Collateral Debt Security.

"**S&P Recovery Rate**" means, with respect to a Collateral Debt Security on any Measurement Date, an amount equal to the percentage for such Collateral Debt Security set forth in the S&P Recovery Rate Matrix attached as Schedule D-1 hereto (determined in accordance with procedures prescribed by S&P for such Collateral Debt Security on such Measurement Date or, in the case of Defaulted Securities, the S&P Rating immediately prior to default).

"**S&P Weighted Average Recovery Rate**" means, as of any Measurement Date, a rate expressed as a percentage equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Debt Security by its S&P Recovery Rate and (ii) dividing such sum by the aggregate Principal Balance of the Collateral Debt Securities and (iii) rounding up to the first decimal place. For this purpose, the Principal Balance of a Defaulted Security or Deferred Interest PIK Bond will be deemed to be equal to its outstanding principal amount (excluding any capitalized interest thereon).

"**S&P Weighted Average Recovery Rate Test**" means a test that will be satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate is greater than or equal to (i) 37.72% with respect to the Class A Notes, (ii) 41.13% with respect to the Class B Notes, (iii) 44.71% with respect to the Class C Notes, (iv) 48.16% with respect to the Class D Notes, (v) 48.16% with respect to the Class E Notes and (vi) 51.69% with respect to the Class F Notes.

"**Sale**" has the meaning specified in Section 5.17(a).

"**Sale Proceeds**" means all proceeds (including accrued interest) received with respect to Collateral Debt Securities and Equity Securities as a result of sales of such Collateral Debt Securities and Equity Securities pursuant to the Indenture, net of any reasonable amounts expended by the Collateral Manager or the Trustee in their good faith determination in connection with such sale or disposition.

"**Schedule of Collateral Debt Securities**" means the list of Collateral Debt Securities securing the Secured Notes and the Combination Notes (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) that is attached as Schedule A.

"**Scheduled Distribution**" means, with respect to any Pledged Security, for each Due Date, the scheduled payment in Cash of principal and/or interest and/or fees due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.2.

"**Second Currency**" has the meaning specified in Section 14.13.

"**Secured Note Calculation Agent**" has the meaning specified in Section 7.15.

"**Secured Noteholder**" means, with respect to any Secured Note, the Person in whose name such Note is registered and the Secured Noteholder may be treated by the Issuer and the Trustee (and any agent of any of the foregoing) as the owner of such Global Notes for all purposes whatsoever; **provided**, that Beneficial Owners or Agent Members will have no rights under the Indenture with respect to Global Notes.

"**Secured Notes**" means, collectively, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes. Unless the Combination Notes are explicitly addressed in the same context, all references herein to Secured Notes shall be construed to include the Combination Notes only to the extent of the Class A-3 Notes, represented by the Class A-3 Note Component.

"**Secured Parties**" means the Trustee, for the benefit of the Secured Noteholders, the Combination Noteholders (only to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) the Collateral Manager and each Hedge Counterparty.

"**Securities Account**" has the meaning specified in Section 8-501(a) of the UCC.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Intermediary**" has the meaning specified in Section 8-102(a)(14) of the UCC.

"**Security**" has the meaning specified in Section 8-102(a)(15) of the UCC.

"**Senior**" means having a higher position or priority in respect of rights (including, unless otherwise specified, a right to payment) vis-à-vis one or more other parties or classes, including among Classes of Notes.

"**Senior Secured Notes**" means, collectively, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes. Unless the Combination Notes are explicitly addressed in the same context, all references herein to Senior Secured Notes shall be construed to include the Combination Notes to the extent of the Class A-3 Notes represented by the Class A-3 Note Component.

"**Senior Collateral Management Fee**" means, with respect to each Payment Date, an amount equal to 0.15% *per annum* of the Fee Basis Amount payable to the Collateral Manager pursuant to the Collateral Management Agreement.

"**Servicer**" means, with respect to any Collateral Debt Security that is a CMBS Security, the entity (howsoever described in the applicable Underlying Instrument) that, absent any default, event of default or similar condition (however described), is primarily responsible for master servicing or special servicing the collections on the commercial mortgage loan or loans underlying such CMBS Security from which payments to investors in such CMBS Security are made.

"**Similar Law**" means any federal, state, local or foreign law that is substantially similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Code.

"**Special Amortization**" has the meaning specified in Section 9.7.

"**Special Amortization Pro Rata Condition**" means a condition that will be satisfied if, with respect to any Payment Date, the aggregate CDS Principal Balance as of the related Calculation Date is at least equal to 50% of the aggregate CDS Principal Balance on the Effective Date, the Collateral Quality Tests and the Collateral Concentration Limitations are satisfied, no Principal Coverage Test is failing as of such Payment Date and no Principal Coverage Test has previously failed for two or more Calculation Dates unless, as of the related Payment Date, the Principal Coverage Ratio related to such Principal Coverage Test equals or exceeds the related Principal Coverage Ratio in existence on the Effective Date.

"**Specified Currency**" has the meaning specified in Section 14.13.

"**Specified Person**" has the meaning specified in Section 2.5(a).

"**Specified Place**" has the meaning specified in Section 14.13.

"**Specified Types**" means CMBS Securities, REIT Debt Securities, Real Estate CDO Securities and Real Estate Company Debt Interests.

"**Spread Excess**" means, as of any Measurement Date, a fraction (expressed as a percentage), the numerator of which is equal to the product of (a) the greater of zero and the excess, if any, of the Weighted Average Spread for such date over 1.15%, and (b) the aggregate

Principal Balance of all Floating Rate Collateral Debt Securities and Deemed Floating Rate Collateral Debt Securities (excluding, in each case, Defaulted Securities, Written Down Securities or Deferred Interest PIK Bonds) and the denominator of which is the aggregate Principal Balance of all Collateral Debt Securities that are Fixed Rate Collateral Debt Securities (excluding Defaulted Securities, Written Down Securities and Deferred Interest PIK Bonds).

"**Stated Maturity Date**" means the Payment Date occurring in February 2052.

"**Subordinate**" means having a lower position or priority in respect of rights (including, unless otherwise specified, a right to payment) vis-à-vis one or more other parties or Classes, including among Classes of Notes.

"**Subordinate Collateral Management Fee**" means, with respect to each Payment Date, an amount equal to 0.35% *per annum* of the Fee Basis Amount payable to the Collateral Manager pursuant to the Collateral Management Agreement.

"**Subordinate Interests**" means the Class A-2 Subordinate Interests, the Class A-3 Subordinate Interests, the Class B Subordinate Interests, the Class C Subordinate Interests, the Class D Subordinate Interests, the Class E Subordinate Interests and the Class F Subordinate Interests, as the case may be.

"**Subpool**" means each of the groups of the Collateral Debt Securities designated by the Collateral Manager in accordance with the Auction Procedures on which the Listed Bidders may provide a separate bid in an Auction.

"**Substitute Collateral Debt Security**" means a Collateral Debt Security acquired by or on behalf of the Issuer in substitution for securities previously pledged to the Trustee or with Collateral Principal Collections or Sale Proceeds that are reinvested in accordance with the provisions of the Indenture.

"**Substitute Party**" has the meaning specified in Section 16.1(d).

"**Substitution Event**" means, with respect to any Hedge Agreement, so long as any of the Notes are Outstanding and rated by S&P, the short-term rating from S&P of the Hedge Ratings Determining Party from S&P is withdrawn, suspended or downgraded below "A-3" or, if no short-term rating is available, the long-term rating of the Hedge Ratings Determining Party is withdrawn, suspended or downgraded below "BBB-."

"**Successful Auction**" means an Auction which is conducted in accordance with Section 9.2(b) and the Auction Procedures.

"**Tax Event**" means a new, or change in any, U.S. or foreign tax statute, treaty, regulation, rule, ruling, practice, procedure or judicial decision or interpretation, occurring in each case after the Closing Date, which results in (i) any portion of any payment due from any issuer or obligor under any Collateral Debt Security becoming properly subject to the imposition of U.S. or foreign withholding tax, which withholding tax is not compensated for by a "gross up" provision under the terms of the related Collateral Debt Security, (ii) any jurisdiction imposing net income, profits, or similar tax on the Issuer, (iii) the Issuer being required to deduct or

withhold from any payment under a Hedge Agreement for or on account of any tax and the Issuer being obligated to make a gross up payment (or otherwise pay additional amounts) to a Hedge Counterparty, or (iv) a Hedge Counterparty being required to deduct or withhold from any payment under a Hedge Agreement for or on account of any tax for whatever reason if such Hedge Counterparty is not required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required, and where the sum of the amount of (i) such a tax or taxes imposed on the Issuer or withheld from payments to the Issuer to the extent the Issuer receives less than the full amount that the Issuer would have received had no such deduction occurred, and (ii) such gross up payments required to be made by the Issuer to the extent they exceed the amounts that the Issuer would have been required to pay had no deduction or withholding been required, in the aggregate for any 12-month period, equals 10% or more of the amount of aggregate interest payments on all of the related Collateral Debt Securities during such 12-month period.

"**Tax Redemption**" has the meaning specified in Section 9.1(b).

"**Tax Subsidiary**" has the meaning specified in Section 7.7(d).

"**Taxed Collateral Debt Security**" has the meaning specified in Section 7.7(d).

"**Taxes**" means any present or future taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by any governmental authority having power to tax.

"**Temporary Ramp-Up Security**" means each security that is listed on Schedule C hereto that is acquired by the Issuer on or prior to the Closing Date in furtherance of interest rate hedging of the Issuer's portfolio by being sold on or prior to the Effective Date in conjunction with the acquisition of one or more Ramp-Up Collateral Debt Securities and is rated in the highest rating category by at least one nationally recognized rating agency.

"**Total Redemption Price**" means, in connection with a Redemption, (i) the aggregate Redemption Prices of the Notes, (ii) all administrative and other fees, indemnities and expenses, the Collateral Management Fee and any other amount payable under Section 11.1(b)(i) and (xvi) through (xviii) (including any termination payments payable by the Issuer resulting from the termination of each Hedge Agreement pursuant to the Redemption and all fees, indemnities and expenses due to the Collateral Manager, the Trustee, the Note Paying Agent and the Administrator) and (iii) all other expenses in connection with such Redemption.

"**Trust Agreement**" has the meaning specified in Section 16.2.

"**Trust Certificate**" has the meaning specified in Section 16.2.

"**Transaction Documents**" means the Indenture, the Collateral Management Agreement, the Account Control Agreement, each Hedge Agreement, the Administration Agreement, the Collateral Administration Agreement, the Income Note Paying Agency Agreement, any Trust Agreement and the Placement Agreement.

"**Trust Officer**" means, when used with respect to the Trustee, any Officer within the CDO Trust Services Group of the Corporate Trust Office working on the transaction described in this Indenture and (or any successor group of the Trustee) authorized to act for and on behalf of the Trustee, including any vice president, assistant vice president or other Officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such Officers, respectively, or to whom any corporate trust matter is referred at the CDO Trust Services Group of the Corporate Trust Office because of such person's knowledge of and familiarity with the particular subject.

"**Trustee**" means LaSalle Bank National Association, and any successors or assigns, in its capacity as Trustee under this Indenture.

"**Trustee Expenses**" means, with respect to any Payment Date, an amount equal to the sum of all expenses and indemnities incurred by or otherwise owing to the Trustee during the preceding Due Period in accordance with the Indenture, other than the Trustee Fee, including, without limitation, any expenses and indemnities incurred by the Trustee in its capacity as Collateral Administrator, Secured Note Calculation Agent, Underlying Trustee (if applicable), Note Paying Agent, Income Note Paying Agent and Registrar.

"**Trustee Fee**" means, with respect to any Payment Date, the fee payable to the Trustee pursuant to the fee letter dated July 14, 2006 between the Trustee and the Collateral Manager.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**Underlying Asset**" has the meaning specified in Section 16.2.

"**Underlying Instrument**" means each of the agreements pursuant to which a Pledged Security has been issued or created and each other agreement that governs the terms of or secures the obligations represented by such Pledged Security or of which holders of such Pledged Security are the beneficiaries.

"**Underlying Trust**" has the meaning specified in Section 16.2.

"**Underlying Trustee**" has the meaning specified in Section 16.2.

"**Uninvested Proceeds**" means, at any time, the net proceeds received by the Issuer on the Closing Date from the initial issuance of the Notes and the Upfront Payment, to the extent such proceeds have not theretofore been invested in Collateral Debt Securities.

"**Uninvested Proceeds Account**" has the meaning specified in Section 10.4.

"**United States or U.S.** " means the United States of America, including the States thereof and the District of Columbia.

"**Unregistered Securities**" has the meaning specified in Section 5.17(c).

"**U.S. Person**" has the meaning given in Regulation S under the Securities Act.

"**Upfront Payment**" has the meaning specified in Section 16.1.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56 (2001).

"**Weighted Average Fixed Rate Coupon**" means, as of any Measurement Date, the sum (rounded up to the next 0.001%) of:

        (a)     the number obtained by (i) multiplying the Principal Balance of each Fixed Rate Collateral Debt Security held in the portfolio as of such date by the then-current interest rate, (ii) summing the amounts determined pursuant to clause (i) for all Fixed Rate Collateral Debt Securities held in the portfolio as of such date and (iii) dividing such sum by the aggregate Principal Balance of all Fixed Rate Collateral Debt Securities held in the portfolio as of such date; **provided** that for purposes of calculating the Weighted Average Fixed Rate Coupon, (1) Collateral Debt Securities that are Defaulted Securities, Deferred Interest PIK Bonds and Equity Securities will be excluded, except for those Defaulted Securities that at the time of such calculation have fully become current on all past due interest and scheduled principal and are paying full current interest in cash pursuant to the terms of their respective Underlying Instrument and (2) the Principal Balance of any Written Down Security will be its Reduced Principal Balance; **plus**

        (b)     if the number obtained in clause (a) is less than the Minimum Fixed Coupon, the Spread Excess.

"**Weighted Average Life**" means, on any Measurement Date with respect to all Collateral Debt Securities (excluding any Defaulted Securities), the number obtained by the Collateral Manager by (i) summing the products obtained by multiplying (a) the Average Life at such time of each Collateral Debt Security by (b) the outstanding Principal Balance of such Collateral Debt Security and (ii) dividing such sum by the aggregate Principal Balance at such time of all Collateral Debt Securities (excluding any Defaulted Securities).

"**Weighted Average Life Test**" means a test that shall be satisfied as of any Measurement Date during any period set forth below if the Weighted Average Life of all Collateral Debt Securities (excluding any Defaulted Securities) as of such Measurement Date is less than or equal to the number of years set forth in the table below:

| As of any Calculation Date Occurring During the Period Below | Weighted Average Life (in Years) |
| --- | --- |
| Closing Date – ≤1.0 year | 9.5 years |
| >1.0 year – ≤2.0 years | 9.0 years |
| >2.0 years – ≤3.0 years | 8.5 years |
| >3.0 years – ≤4.0 years | 8.0 years |

| | |
|---|---|
| >4.0 years – ≤5.0 years | 7.5 years |
| >5.0 years – Stated Maturity Date | 7.0 years |

"**Weighted Average Spread**" means, as of any Measurement Date, the sum (rounded up to the next 0.001%) of:

        (a)     the number obtained by (i) summing the products obtained by multiplying (A) for each Floating Rate Collateral Debt Security, the stated spread above LIBOR at which interest accrues on such Collateral Debt Security as of such date and, for each Deemed Floating Rate Collateral Debt Security, the Deemed Floating Spread by (B) the Principal Balance of such Collateral Debt Security as of such date and (ii) dividing such sum by the aggregate Principal Balance of all Floating Rate Collateral Debt Securities and all Deemed Floating Rate Collateral Debt Securities; **provided** that for purposes of calculating the Weighted Average Spread, (1) the Collateral Debt Securities that are Defaulted Securities, Deferred Interest PIK Bonds and Equity Securities will be excluded, except for those Defaulted Securities that at the time of such calculation have fully become current on all past due interest and scheduled principal and are paying full current interest in cash pursuant to the terms of their respective Underlying Instrument and (2) the Principal Balance of any Written Down Security will be its Reduced Principal Balance; **plus**

        (b)     if the number obtained pursuant to the calculations in clause (a) is less than 1.15%, the Fixed Rate Excess.

"**Withholding Tax Security**" means a Collateral Debt Security if:

        (i)     any payments thereon to the Issuer are subject to withholding tax imposed by any jurisdiction (other than U.S. backup withholding tax or other similar withholding tax); and

        (ii)     under the underlying documentation with respect to such Collateral Debt Security, the issuer of or counterparty with respect to such Collateral Debt Security is not required to make "gross-up" payments to the Issuer that cover the full amount of such withholding tax on an after-tax basis.

"**Written Down Amount**" means, with respect to each Written Down Security, the amount by which the original Principal Balance of such Written Down Security is reduced as notified by or on behalf of the related issuer or trustee to the holders of such Written Down Security (including appraisal reductions on CMBS Securities).

"**Written Down Security**" means any Collateral Debt Security as to which the aggregate par amount of such Collateral Debt Security and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Debt Security exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding

defaulted collateral); **provided** that the Issuer shall immediately send notice to S&P by facsimile and e-mail upon any Collateral Debt Security becoming a Written Down Security.

**Section 1.2    Assumptions as to Collateral Debt Securities, Fees, etc.**

The provisions set forth in this Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Collateral, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Account.

(a)    All calculations with respect to Scheduled Distributions on the Pledged Securities securing the Secured Notes and the Combination Notes (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) shall be made by the Issuer or the Collateral Administrator on behalf of the Issuer using (in the case of the Collateral Debt Securities) the assumptions that (i) no Pledged Security defaults or is sold, (ii) any clean-up call with respect to a Pledged Security will be exercised when economic to the Person or Persons entitled to exercise such call and (iii) no other optional redemption of any Pledged Security will occur except for those that have actually occurred or as to which irrevocable notice thereof shall have been given.

(b)    For purposes of determining compliance with the Interest Coverage Tests, except as otherwise specified in the Interest Coverage Tests, there shall be excluded all payments in respect of Defaulted Securities and Deferred Interest PIK Bonds unless the Trustee or Collateral Manager has actual knowledge such payments will be made in Cash and will be received on or before the Due Date therefor and all other scheduled payments (whether of principal, interest, fees or other amounts) including payments to the Issuer under any Hedge Agreement, as to which the Trustee or Collateral Manager has actual knowledge will not be made in Cash or will not be received when due.  For purposes of calculating the Class A/B Interest Coverage Ratio, the Class C Interest Coverage Ratio and the Class D/E Interest Coverage Ratio:

(i)    the expected interest income on Collateral Debt Securities and Eligible Investments and the expected interest payable on the Secured Notes and amounts, if any, payable under each Hedge Agreement will be calculated using the interest rates applicable thereto on the applicable date of determination;

(ii)    accrued original issue discount on Eligible Investments will be deemed to be a scheduled interest payment thereon due on the date such original issue discount is scheduled to be paid; and

(iii)    it will be assumed that no principal payments are made on the Secured Notes during the applicable periods.

(c)    For each Due Period, the Scheduled Distribution on any Pledged Security (other than (i) a Defaulted Security, (ii) a Deferred Interest PIK Bond or (iii) an Equity Security, which, in each case except as otherwise provided herein, shall be assumed to have a Scheduled

Distribution of zero and with respect to any Written Down Security, the Interest Coverage Amount shall exclude any interest accrued on any Written Down Amount) shall be the sum of (x) the total amount of payments and collections in respect of such Pledged Security (including the proceeds of the sale of such Pledged Security received during the Due Period) that, if paid as scheduled, will be available in the Collection Account at the end of the Due Period for payment on the Secured Notes or other amounts payable pursuant to this Indenture and of certain expenses of the Issuer **plus** (y) any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date (**provided** that such sum shall be computed without regard to any amounts excluded from the determination of compliance with the Coverage Tests pursuant to Section 1.2(b)).

(d)    Subject to Section 1.2(b), each Scheduled Distribution receivable with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account and earn interest at the Assumed Reinvestment Rate.

(e)    With respect to any Collateral Debt Security as to which any interest or other payment thereon is subject to withholding tax of any Relevant Jurisdiction, each Distribution thereon shall, for purposes of the Coverage Tests and each Collateral Quality Test, be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments sufficient on an after tax basis to cover any withholding tax imposed on payments to the Issuer with respect thereto (including in respect of any such additional payment). On any date of determination, the amount of any Scheduled Distribution due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon withholding tax rates in effect on such date of determination.

(f)    For purpose of determining compliance with the Interest Coverage Tests, it will be assumed that any amount required to be paid for taxes, filing and registration fees on the Payment Date immediately following the relevant Due Period shall be equal to the aggregate amount for which the Trustee has received an invoice or demand for payment on or prior to the relevant Measurement Date.

(g)    Any reference in the definition of "Senior Collateral Management Fee" or "Subordinate Collateral Management Fee" in Section 1.1(a) to an amount calculated with respect to a period at a *per annum* rate shall be computed on the basis of a 360-day year consisting of twelve 30-day months and any interest earned thereon will be calculated for each Interest Period on the basis of the actual number of days elapsed during the applicable Interest Period divided by 360.

(h)    Unless otherwise specified, test calculations that evaluate to a percentage will be rounded to the nearest one-hundredth, and test calculations that evaluate to a number or decimal will be rounded to the nearest one hundredth.

(i)    Unless otherwise specified, all calculations required to be made and all reports which are to be prepared pursuant to this Indenture with respect to the Collateral Debt Securities, shall be made on the basis of the date on which the Issuer makes a commitment to acquire or to sell an asset, as applicable (the "**trade date**"), unless such acquisition or sale has

not been settled by the 30th day after the applicable trade date, in which case the determination date will be the settlement date.  If such acquisition or sale has not been settled by the 30th day after the applicable trade date, such Collateral Debt Security will not be treated as a Collateral Debt Security until the settlement date thereof.

(j)     For the purpose of determining fees constituting Administrative Expenses payable under the Priority of Payments hereunder, periods longer or shorter than a one-month period shall be prorated based on the number of days in such period.

(k)     Notwithstanding the foregoing, in connection with the acquisition by the Issuer of a Collateral Debt Security, the only Collateral Concentration Limitations that shall be required to be satisfied are:

(i)     any Collateral Concentration Limitations that relate to the type of Collateral Debt Security being acquired (for example, Collateral Concentration Limitation (i)(a) (among others, as applicable) with respect to the acquisition of a PIK Bond); and

(ii)     any Collateral Concentration Limitations that relate to all types of Collateral Debt Securities (for example, Collateral Concentration Limitation (v)).

### Section 1.3    Rules of Construction

Unless the context otherwise clearly requires:

(a)     the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)     whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)     the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)     the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)     any definition of or reference to any agreement, statute, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(f)     any reference herein to any Person, or to any Person in a specified capacity, shall be construed to include such Person's successors and assigns or such Person's successors in such capacity, as the case may be;

(g)     all references in this instrument to designated "Sections," "clauses" and other subdivisions are to the designated Sections, clauses and other subdivisions of this

instrument as originally executed, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Section, clause or other subdivision; and

(h)    unless otherwise stated to the contrary herein, any payments to be made by the Issuer (or by the Trustee on behalf of the Issuer) in respect of a Class of Notes shall be payable *pari passu* between any subclasses of such Class of Notes.

(i)    Unless the Combination Notes are explicitly addressed in the same context, (i) all references in this Indenture to (A) the rights of Holders or Noteholders of the Class A-3 Notes, Class A Notes, Secured Notes and Senior Secured Notes (including, in each case, with respect to any payments, distributions, security, redemptions, votes or consents to be given by such Holders or notices and reports to be delivered to the Holders of Class A-3 Notes), shall be construed to include the rights of Holders of the Combination Notes to the extent of the Class A-3 Notes represented by the Class A-3 Note Component (whether or not explicitly mentioned) and (B) the rights of Holders or Noteholders of Income Notes (including with respect to any payments, distributions, redemptions, security, votes or consents to be given by such Holders or notices and reports to be delivered to the Holders of Income Notes) shall be construed to include the rights of holders of the Combination Notes, to the extent of the Income Notes represented by the Income Note Component (whether or not explicitly mentioned) and (ii) and any reference to Holders of the Combination Notes in connection with any such matters relating to the Notes shall only be interpreted to include the Combination Notes to the extent of the applicable Combination Note Component(s). All references to Class A-3 Notes and Income Notes shall be construed to include the Combination Notes, to the extent the related underlying Combination Note Components of such Combination Notes are comprised of Class A-3 Notes or Income Notes, respectively. Accordingly, the Holders of Combination Notes will be entitled to voting, notice or other rights of action with respect to each of the Class A-3 Note Component and the Income Component in the proportion that the related Combination Note Component bears to the principal amount of the Class A-3 Notes or Income Notes, as applicable (including the Combination Note Components). On each Distribution Date on which payments of interest are made on the Class A-3 Notes or amounts are distributed in respect of interest to the Holders of the Income Notes pursuant to Section 11.1(a), or payments of principal, redemption amounts or other amounts are made in respect of the Class A-3 Notes or the Income Notes, as applicable, a pro rata portion of such payment shall be allocated to each Combination Note Component (in the proportion that the Aggregate Outstanding Amount of the Class A-3 Notes or Income Notes, as applicable, represented by such Combination Note Component bears to the Aggregate Outstanding Amount of the Notes of such Class (including all Combination Note Components)) as a whole, and payment thereof shall be made to the applicable Holders of the Combination Notes. No other payments shall be made in respect of the Combination Notes. All payments on the Combination Notes will be applied as a reduction of the Combination Note Principal Balance until reduced to U.S.$1.00, and any payments thereafter applied as additional distributions.

## ARTICLE II

### THE SECURED NOTES AND COMBINATION NOTES

### Section 2.1    Forms Generally

(a)    The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Combination Notes offered and sold in reliance on Regulation S (each, a "**Regulation S Note**") shall be issued in fully Registered form without interest coupons substantially in the form of the note attached as Exhibit A-1 with respect to the Class A Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes and Class F Notes and Exhibit F with respect to the Combination Notes (each, a "**Regulation S Global Note**") with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at its Corporate Trust Office in Chicago, Illinois, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.    The Aggregate Outstanding Amount of each Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(b)    The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes offered and sold in the United States pursuant to an exemption from the registration requirements of the Securities Act ("**Rule 144A Notes**") shall be issued in fully Registered form without interest coupons substantially in the form of the note attached as Exhibit A-2 (each, a "**Rule 144A Global Note**"), with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and such legends as may be applicable thereto, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for DTC and registered in the name of DTC or a nominee of DTC, duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. The Aggregate Outstanding Amount of each Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC or its nominee, as the case may be.

(c)    Regulation S Global Notes and Rule 144A Global Notes that are Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes may also be exchanged under the limited circumstances set forth in Section 2.4 for notes in definitive fully Registered form without interest coupons (each, a "**Definitive Class A-E Note**"), which may be either a Regulation S Definitive Class A-E Note or a Rule 144A Definitive Class A-E Note, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(d)    The Class F Notes and the Combination Notes offered or sold in the United States or to U.S. Persons pursuant to Rule 144A or another applicable exemption from registration under the Securities Act shall be issued in the form of physical certificates in definitive fully Registered form without interest coupons substantially in the form of the certificated note attached as Exhibit B (each, a "**Definitive Class F Note**") and Exhibit E (each, a

"**Definitive Combination Note**"), as the case may be, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided. Regulation S Global Notes that are Class F Notes or Combination Notes may also be exchanged under the limited circumstances set forth in Section 2.4(d)(iii) for notes in definitive fully Registered form without interest coupons, with such legends as may be applicable thereto, which shall be duly executed by the Issuer and authenticated by the Trustee or the Authenticating Agent as hereinafter provided.

(e)     The Issuer, in issuing the Secured Notes and the Combination Notes, may use "CUSIP" or "private placement" numbers (if then generally in use), and, if so, the Trustee will indicate the "CUSIP" or "private placement" numbers of the Secured Notes and Combination Notes in notices of redemption and related materials as a convenience to Holders; **provided** that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Secured Notes or Combination Notes, as applicable, or as contained in any notice of redemption and related materials.

**Section 2.2     Authorized Amount; Applicable Periodic Interest Rate; Stated Maturity Date; Denominations**

(a)     The aggregate principal amount of Secured Notes which may be issued under this Indenture may not exceed U.S.$582,000,000 (inclusive of the Class A-3 Note Component), excluding (x) Secured Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Secured Notes pursuant to Section 2.4, 2.5 or 8.5 and (y) Secured Notes issued upon the exchange of Combination Notes pursuant to Section 2.13(b) hereof. The aggregate principal amount of Combination Notes which may be issued under this Indenture may not exceed U.S.$11,000,000 (inclusive of the Class A-3 Component), excluding Combination Notes issued upon registration of, transfer of, or in exchange for, or in lieu of, other Combination Notes, as the case may be, pursuant to Section 2.4, 2.5 or 8.5.

(b)    As provided pursuant to the terms of the Secured Notes, the Secured Notes shall be divided into eight Classes having designations, original principal amounts, original Applicable Periodic Interest Rates and Stated Maturity Dates as follows:

| Designation | Original Principal Amount | Applicable Periodic Interest Rate | Secured Note Stated Maturity Date |
|---|---|---|---|
| Class A-1 Notes | U.S.$390,000,000 | LIBOR + 0.27% | February 25, 2052 |
| Class A-2 Notes | U.S.$78,000,000 | LIBOR + 0.29% | February 25, 2052 |
| Class A-3 Notes | U.S.$28,500,000 | LIBOR + 0.31% | February 25, 2052 |
| Class B Notes | U.S $29,250,000 | LIBOR + 0.38% | February 25, 2052 |
| Class C Notes | U.S.$20,250,000 | LIBOR + 0.60% | February 25, 2052 |
| Class D Notes | U.S.$19,500,000 | LIBOR + 1.38% | February 25, 2052 |
| Class E Notes | U.S.$6,000,000 | LIBOR + 1.60% | February 25, 2052 |
| Class F Notes | U.S.$10,500,000 | LIBOR + 3.20% | February 25, 2052 |
| Combination Notes* | U.S.$11,000,000 | N/A | February 25, 2052 |

---

\* The original principal amounts of the Class A-3 Note Component and the Income Note Component are included in (i) the original principal amount of the Class A-3 Notes and the Income Notes, respectively, and (ii) the original principal amount of the Combination Notes. The Class A-3 Notes and the Income Notes constituting the Class A-3 Note Component and the Income Note Component, respectively, will not be separately issued.

The Secured Notes, and with respect to the Combination Notes, each respective Combination Note Component (determined on a basis consistent with the calculation of the related Note), will be issuable in minimum denominations of U.S.$250,000 and, in each case, only in integral multiples of U.S.$1,000 in excess of such minimum denominations.    After issuance, (x) a Secured Note or, with respect to a Combination Note, the Class A-3 Note Component, may fail to be in compliance with the minimum denomination requirement as a result of the repayment of principal thereon in accordance with the Priority of Payments and (y) the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes may fail to be in an amount which is an integral multiple of U.S.$1,000 due to the addition to the principal amount thereof of deferred interest.

(c)    Interest shall accrue on the Aggregate Outstanding Amount of each Class of Secured Notes (determined as of the first day of each Interest Period and after giving effect to any payment of principal occurring on such day) from the Closing Date and will be payable in arrears on each Payment Date.  Interest on each Class of Secured Notes and interest on Defaulted Interest will be calculated in accordance with the definition of Periodic Interest.

(d)    The Secured Notes shall be redeemable as provided in Article IX.

(e)    The Combination Notes will be subject to Mandatory Redemption, Tax Redemption, Special Amortization, Auction Call Redemption and Optional Redemption to the extent that the underlying Classes of Notes represented by  the Combination Note Components are so redeemed.  Upon any such redemption of the underlying Classes of Notes, the related Combination Note Components of the Combination Notes will be redeemed by allocation of payments in respect of the underlying Classes of Notes to the related Combination Note Components.  In any Redemption, the Combination Notes will be entitled to receive the

Redemption Price of the Class A-3 Note Component (and any amounts payable with respect to the Income Note Component) and upon receipt of such amounts, will be deemed to have been redeemed in full.

(f)    The Depositary for the Global Notes shall initially be DTC.

(g)    The Secured Notes and the Combination Notes shall be numbered, lettered or otherwise distinguished in such manner as may be consistent herewith, determined by the Authorized Officer of the Issuer executing such Secured Notes or Combination Notes as evidenced by its execution of such Secured Notes or Combination Notes, as the case may be

### Section 2.3    Execution, Authentication, Delivery and Dating

(a)    The Secured Notes and the Combination Notes shall be executed on behalf of the Issuer by an Authorized Officer of the Issuer.  The signatures of such Authorized Officers on the Secured Notes and the Combination Notes may be manual or facsimile (including in counterparts).

(b)    Secured Notes and Combination Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer shall bind such Person, notwithstanding the fact that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Secured Notes or Combination Notes, as applicable, or did not hold such offices at the date of issuance of such Secured Notes or Combination Notes, as applicable.

(c)    At any time and from time to time after the execution and delivery of this Indenture, the Issuer may deliver Secured Notes or Combination Notes executed by it to the Trustee or the Authenticating Agent for authentication, and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver such Secured Notes or Combination Notes, as applicable, as provided in this Indenture and not otherwise.

(d)    Each Secured Note and Combination Note authenticated and delivered by the Trustee or the Authenticating Agent to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date.  All other Secured Notes and Combination Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(e)    Secured Notes and Combination Notes issued upon transfer, exchange or replacement of other Secured Notes or Combination Notes, as applicable, shall be issued in authorized denominations reflecting the original aggregate principal amount of the Secured Notes and Combination Notes so transferred, exchanged or replaced, but shall represent only the current Aggregate Outstanding Amount of the Secured Notes or Combination Notes, as applicable, so transferred, exchanged or replaced.  In the event that any Secured Note or Combination Note is divided into more than one Secured Note or Combination Note, as applicable, in accordance with this Article II, the original principal amount of such Secured Note or Combination Note, as applicable, shall be proportionately divided among the Secured Notes or Combination Notes delivered in exchange therefor and shall be deemed to be the original

aggregate principal amount of such subsequently issued Secured Notes, or the original Combination Note Principal Balance in the case of such subsequently issued Combination Notes.

(f)    No Secured Note or Combination Notes shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Secured Note or Combination Note, as applicable, a certificate of authentication (the "**Certificate of Authentication**"), substantially in the form provided for herein, executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and such certificate upon any Secured Note or Combination Note, as applicable, shall be conclusive evidence, and the only evidence, that such Secured Note or Combination Note, as applicable, has been duly authenticated and delivered hereunder.

**Section 2.4    Registration, Transfer and Exchange of Secured Notes and Combination Notes**

(a)    **Registration of Secured Notes and Combination Notes**. The Trustee is hereby appointed as the registrar hereunder (the "**Note Registrar**"). The Trustee is hereby appointed as a transfer agent with respect to the Secured Notes (the "**Note Transfer Agent**"). The Note Registrar shall (acting solely for this purpose as agent for the Issuer) keep a register (the "**Note Register**") at the Corporate Trust Office in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Secured Notes and Combination Notes and the registration of transfers of Secured Notes and Combination Notes. The Note Register also shall indicate the initial principal amount of the Class A-3 Note Component and the Income Note Component as part of the Aggregate Outstanding Amount of the Class A-3 Notes or the Income Notes, as applicable, of which each such Combination Note Component is a part. Upon any resignation or removal of the Note Registrar, the Issuer (after consultation with the Collateral Manager) shall propose a replacement for approval by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class. The Issuer may not terminate the appointment of the Note Registrar or any Note Transfer Agent without the consent of each Holder of Secured Notes.

Subject to this Section 2.4, upon surrender for registration of transfer of any Secured Notes or Combination Notes at the office or agency of the Issuer to be maintained as provided in Section 7.2, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Secured Notes or Combination Notes of any authorized denomination and of a like aggregate principal amount.

At the option of the Holder, Secured Notes or Combination Notes may be exchanged for Secured Notes or Combination Notes, as applicable, of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Secured Notes or Combination Notes, as applicable, to be exchanged at such office or agency. Whenever any Secured Note or Combination Note is surrendered for exchange, the Issuer shall execute and the Trustee shall authenticate and deliver the Secured Notes or Combination Notes, as applicable, that the Secured Noteholder or Combination Noteholder, as applicable, making the exchange is entitled to receive.

All Secured Notes and Combination Notes issued and authenticated upon any registration of transfer or exchange of Secured Notes or Combination Notes, as applicable, shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Secured Notes or Combination Notes, as applicable, surrendered upon such registration of transfer or exchange.

Every Secured Note and Combination Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Note Registrar duly executed, by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Secured Notes or Combination Notes but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith and delivery charges, if any, not made by regular mail.

(b)    The initial sale of each Note may be made in accordance with Section 4(2) of (or another applicable exemption from registration under) the Securities Act or in accordance with Regulation S under the Securities Act.

(c)    **Transfers of Class A Notes, Class B Notes, Class C Notes, Class D Notes and Class E Notes.**

(i)    Subject to Section 2.4(c)(iv), exchanges or transfers of beneficial interests in a Global Class A-E Note may be made only in accordance with the rules and regulations of the Depositary and the transfer restrictions contained in the legend on such Global Class A-E Note and exchanges or transfers of interests in a Global Class A-E Note may be made only in accordance with the following:

(A)    Subject to Section 2.4(c)(i)(B) through (E), transfers of a Global Class A-E Note shall be limited to transfers of such Global Class A-E Note in whole, but not in part, to nominees of the Depositary or to a successor of the Depositary or such successor's nominee.

(B)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Class A-E Note for a beneficial interest in a Rule 144A Global Class A-E Note upon provision to the Trustee and the Issuer of a written certification in the form of Exhibit C-1 (a "**Rule 144A Transfer Certificate**").

(C)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Rule 144A Global Class A-E Note for a beneficial interest in a Regulation S Global Class A-E Note upon provision to the Trustee and the Issuer of a written certification substantially in the form of Exhibit C-2 (a "**Regulation S Transfer Certificate**").

(D)    An owner of a beneficial interest in a Rule 144A Global Note may transfer such interest in the form of a beneficial interest in such Rule 144A Global

Note without the provision of written certification; **provided** that the transferee, by purchase of such interest in such Rule 144A Global Note, will be deemed to have made all representations, warranties and acknowledgements set forth in the Rule 144A Transfer Certificate.

(E)    In the event Definitive Class A-E Notes are issued pursuant to Section 2.4(c)(v), the Trustee shall cause the transfer of (i) any beneficial interest in a Global Class A-E Note for a Definitive Class A-E Note that is a Regulation S Note, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any beneficial interest in a Global Class A-E Note for a Definitive Class A-E Note that is a Rule 144A (a "**Rule 144A Definitive Note**"), upon provision to the Trustee, the Issuer and the Note Registrar of a Rule 144A Transfer Certificate.

(ii)    Subject to Section 2.4(c)(iv), in the event Definitive Class A-E Notes are issued pursuant to Section 2.4(c)(v), the Trustee shall cause the transfer of (i) any Definitive Class A-E Note for a beneficial interest in a Regulation S Global Class A-E Note, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate or (ii) any Definitive Class A-E Note for a beneficial interest in a Rule 144A Global Class A-E Note, upon provision to the Trustee and the Issuer of a Rule 144A Transfer Certificate.

(iii)    A purchaser of any Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes will be deemed to represent and warrant either that (i) it is not and will not be an employee benefit plan subject to Title I of ERISA, a plan subject to Section 4975 of the Code or any entity whose underlying assets include plan assets by reason of such investment in the entity, or another employee benefit plan which is subject to Similar Law or (ii) its acquisition and holding of Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes do not and will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or in the case of such another plan, any Similar Law) for which an exemption is not available.

(d)    **Transfers of Class F Notes and the Combination Notes**.

(i)    If a Holder of a beneficial interest in a Definitive Class F Note or Definitive Combination Note wishes at any time to transfer its interest in such Definitive Class F Note or Definitive Combination Note, as the case may be, such Holder may transfer or cause the transfer of such interest for an equivalent beneficial interest in one or more such Definitive Class F Notes or Definitive Combination Notes, as the case may be, as provided below. Upon receipt by the Issuer and the Note Registrar of (A) such Holder's Definitive Class F Note or Definitive Combination Note, as the case may be, properly endorsed for assignment to the transferee and (B) a certificate in the form of Exhibit C-3 (a "**Definitive Class F Note Transfer Certificate**") or Exhibit H ("**Definitive Combination Note Transfer Certificate**") given by the transferee of such beneficial interest then the Note Registrar shall cancel such Definitive Class F Note or Definitive Combination Note, as the case may be, record the transfer in the Note Register and authenticate and deliver one or more Definitive Class F Notes or Definitive

Combination Notes bearing the same designation as the Definitive Class F Notes or Definitive Combination Notes, as the case may be, endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the Class and the aggregate of such amounts being the same as the beneficial interest in the Definitive Class F Notes or Definitive Combination Notes, as the case may be, surrendered by the transferor), and in the minimum denominations and integral multiples in excess thereof. In addition, the Note Registrar shall not register any transfer of Definitive Class F Notes or Definitive Combination Notes, as the case may be, to a proposed transferee of Definitive Class F Notes or Definitive Combination Notes, as the case may be, that has represented that it is a Benefit Plan Investor or a Controlling Person if the transfer would result in Benefit Plan Investors owning 25% or more of the value of the outstanding Definitive Class F Notes or Definitive Combination Notes, as the case may be (as determined without regard to interests held by Controlling Persons, and otherwise contemplated by the applicable regulations under ERISA), immediately after such transfer, based on assurances received from investors. Any purchaser of a Definitive Class F Note or Combination Note (only to the extent of the Income Note Component, such limit being calculated in aggregate with the Income Notes), as the case may be, that is a Benefit Plan Investor will be required to represent and agree that the acquisition and holding of such Class F Note or Definitive Combination Note, as the case may be, does not and will not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or a non-exempt violation any Similar Law. Without limiting the generality of the foregoing, a transfer of beneficial interests in a Definitive Class F Note or Definitive Combination Note, as the case may be, will not be permitted unless a letter or written certification is obtained from each transferee of a Definitive Class F Note or Definitive Combination Note, as the case may be, for the benefit of the Issuer, the Trustee and the Placement Agent, in the case of a Definitive Class F Note or Definitive Combination Note, as the case may be, not represented by a Regulation S Note, regarding whether it is, or is not and will not be, a Benefit Plan Investor or Controlling Person. Any purported transfer in violation of the foregoing requirements shall be null and void ab initio, and the Note Registrar shall not register any such purported transfer and shall not authenticate and deliver such Definitive Class F Notes or Definitive Combination Notes, as the case may be.

(ii)     If a Holder of a beneficial interest in one or more Definitive Class F Notes or Definitive Combination Notes, as the case may be, wishes at any time to exchange its interest in such Definitive Class F Notes or Definitive Combination Notes, as the case may be, for an interest in one or more such Definitive Class F Notes or Definitive Combination Notes, as the case may be, of different principal amounts, such Holder may exchange or cause the exchange of such interest for an equivalent beneficial interest in the Definitive Class F Notes or Definitive Combination Notes, as the case may be, bearing the same designation as the Definitive Class F Notes or Definitive Combination Notes, as the case may be, endorsed for exchange as provided below. Upon receipt by the Note Registrar of (A) such holder's Definitive Class F Notes or Definitive Combination Notes, as the case may be, properly endorsed for such exchange and (B) written instructions from such Holder designating the number and principal amounts of the applicable Definitive Class F Notes or Definitive Combination Notes, as the case may be, to be issued (the aggregate principal amounts of such Definitive Class F Notes

being the same as the Definitive Class F Notes or Definitive Combination Notes, as the case may be, surrendered for exchange), then the Note Registrar shall cancel such Definitive Class F Notes or Definitive Combination Notes, as the case may be, record the exchange in the Note Register and authenticate and deliver one or more Definitive Class F Notes or Definitive Combination Notes, as the case may be, bearing the same designation endorsed for exchange, registered in the same names as the Definitive Class F Notes or Definitive Combination Notes, as the case may be, surrendered by such Holder or such different names as are specified in the endorsement described in clause (A) above, in different principal amounts designated by such holder (the Class and the aggregate principal amounts being the same as the beneficial interest in the Definitive Class F Notes or Definitive Combination Notes, as the case may be, surrendered by such holder), and the minimum denominations and integral multiples in excess.

(iii)    A purchaser or transferee of a Class F Note issued in the form of a Regulation S Global Note or a Combination Note, as the case may be, will be deemed to represent and warrant (a) that it is not, nor is it acting on behalf of, a Benefit Plan Investor or Controlling Person or using the assets of any Benefit Plan Investor or Controlling Person to acquire such Class F Notes or Combination Notes, as the case may be, and (b) that it acknowledges that no sale or transfer of such Class F Notes or Combination Notes, as the case may be, or any interest therein, may be made to any purchaser or transferee that is, or is acting on behalf of, a Benefit Plan Investor or Controlling Person or using the assets of any Benefit Plan Investor or Controlling Person to acquire such Class F Notes or Combination Notes, as the case may be. No transfer of such Class F Notes in the form of a Regulation S Global Note and no transfer of a Combination Note to a Benefit Plan Investor or Controlling Person will be recognized. If at any time a purchaser or transferee of the Class F Notes or Combination Notes, as the case may be, that is, or is acting on behalf of, any other fund or entity that was deemed to have represented that it was not a Benefit Plan Investor or Controlling Person and determines that such is not the case, such transferee will promptly notify the Issuer and the Trustee, and the Issuer will dispose of such Class F Notes or Combination Notes, as the case may be, as soon as practicable following such notification. The purchaser and transferee or any fiduciary of the purchaser or transferee causing such purchaser or transferee to acquire a Class F Note or Combination Note, as the case may be, agrees to indemnify and hold harmless the Issuer, the Collateral Manager, the Trustee, the Administrator, the Placement Agent and their respective Affiliates from any cost, damage or loss incurred by them as a result of the purchaser being or being deemed to be a Benefit Plan Investor or a Controlling Person.

(iv)    The Trustee shall cause the exchange or transfer of any beneficial interest in a Regulation S Global Class F Note or Regulation S Global Combination Note, as the case may be, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate. The Trustee shall cause the transfer of any Definitive Class F Note or Definitive Combination Note, as the case may be, for a beneficial interest in a Regulation S Global Class F Note or Regulation S Global Combination Note, as the case may be, upon provision to the Trustee and the Issuer of a Regulation S Transfer Certificate.

(v)     Upon acceptance for exchange or transfer of a beneficial interest in a Regulation S Global Class F Note for a Definitive Class F Note or a Regulation S Combination Note for a Definitive Combination Note, as the case may be, or upon acceptance for exchange or transfer of a Definitive Class F Note for a beneficial interest in a Regulation S Global Class F Note or a Definitive Combination Note for a beneficiary interest in a Regulation S Global Combination Note, each as provided herein, the Trustee shall approve the instruction at the Depositary to adjust the principal amount of such Regulation S Global Class F Note or Regulation S Global Combination Note, as the case may be, on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Regulation S Global Class F Note or Regulation S Combination Note, as the case may be.

(e)     **Additional Provisions Regarding Transfers of Secured Notes**

(i)     Upon acceptance for exchange or transfer of a beneficial interest in a Global Class A-E Note for a Definitive Class A-E Note, or upon acceptance for exchange or transfer of a Definitive Class A-E Note for a beneficial interest in a Global Class A-E Note, each as provided herein, the Trustee shall approve the instruction at the Depositary to adjust the principal amount of such Global Class A-E Note on its records to evidence the date of such exchange or transfer and the change in the principal amount of such Global Class A-E Note.

(ii)     An owner of a beneficial interest in a Regulation S Global Note may transfer such interest in the form of a beneficial interest in such Regulation S Global Note without the provision of written certification; **provided** that (1) such transfer is made to a Person who is not a U.S. Person in an offshore transaction in reliance on an exemption from the registration requirements of the Securities Act under Regulation S and (2) the transferee, by purchase of such interest in such Regulation S Global Note, will be deemed to have made all representations, warranties and acknowledgements set forth in the Regulation S Transfer Certificate.

(iii)     For so long as one or more Global Notes are Outstanding:

(A)     the Trustee and its directors, officers, employees and agents may deal with the Depositary for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(B)     unless otherwise provided herein and subject to Section 2.4(e)(iii)(A), the rights of Beneficial Owners shall be exercised only through the Depositary and shall be limited to those established by law and agreements between such Beneficial Owners and the Depositary;

(C)     for purposes of determining the identity of and principal amount of Secured Notes beneficially owned by a Beneficial Owner, the records of the Depositary shall be conclusive evidence of such identity and principal amount and the Trustee may conclusively rely on such records when acting hereunder;

(D)    the Depositary will make book-entry transfers among the Depositary Participants of the Depositary and will receive and transmit distributions of principal of and interest on the Global Notes to such Depositary Participants; and

(E)    the Depositary Participants of the Depositary shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depositary, and the Depositary may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(iv)    Subject to the restrictions on transfer and exchange set forth in this Section 2.4 and to any additional restrictions on transfer or exchange specified in the Definitive Notes, the Holder of any Definitive Note may transfer or exchange the same in whole or in part (in a principal amount equal to the minimum authorized denomination or any larger authorized amount) by surrendering such Definitive Note at the Corporate Trust Office or at the office of any Note Transfer Agent, together with (x) in the case of any transfer, an executed instrument of assignment and (y) in the case of any exchange, a written request for exchange.  Following a proper request for transfer or exchange, the Trustee shall (**provided** it has available in its possession an inventory of Definitive Notes), within five Business Days of such request if made at such Corporate Trust Office, or within ten Business Days if made at the office of a Note Transfer Agent (other than the Trustee), authenticate and make available at such Corporate Trust Office or at the office of such Note Transfer Agent, as the case may be, to the transferee (in the case of transfer) or Secured Noteholder (in the case of exchange) or send by first class mail (at the risk of the transferee in the case of transfer or Secured Noteholder in the case of exchange) to such address as the transferee or Secured Noteholder, as applicable, may request, a Definitive Note or Notes, as the case may require, for a like aggregate principal amount and in such authorized denomination or denominations as may be requested.   The presentation for transfer or exchange of any Definitive Note shall not be valid unless made at the Corporate Trust Office or at the office of a Note Transfer Agent or by a duly authorized attorney-in-fact.  Beneficial interests in Global Notes shall be exchangeable for Definitive Notes only under the limited circumstances described in Section 2.4(e)(iv). In addition, beneficial interests in Regulation S Global Class F Notes may be exchanged for Definitive Class F Notes under the limited circumstances described in Section 2.4(d).

(v)    Interests in a Global Note deposited with or on behalf of the Depositary pursuant to Section 2.1 hereunder shall be transferred (A) to the Beneficial Owners thereof in the form of Definitive Notes only if such transfer otherwise complies with this Section 2.4 (including Section 2.4(c)(i), Section 2.4(c)(ii) and Section 2.4(d)) and (1) the Depositary notifies the Issuer that it is unwilling or unable to continue as Depositary for the Secured Notes, (2) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and a successor Depositary is not appointed by the Issuer within 90 days of such notice or (3) as a result of any amendment to or change in the laws or regulations of the Cayman Islands, or of any authority therein or thereof having power to tax, or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer, the Trustee or any Note Paying Agent

becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Global Notes which would not be required if the Global Notes were not represented by a global certificate or (B) to the purchaser thereof in the form of one or more Definitive Notes in accordance with the provisions of Section 2.4(c)(i) or Section 2 4(d), as applicable.

(vi)    If interests in any Global Note are to be transferred to the Beneficial Owners thereof in the form of Definitive Notes pursuant to Section 2.4(e)(iv), as applicable, such Global Note shall be surrendered by the Depositary, or its custodian on its behalf, to the Corporate Trust Office or to the Note Transfer Agent located in Chicago, Illinois and the Trustee shall authenticate and deliver without charge, upon such transfer of interests in such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.    The Definitive Notes transferred pursuant to this Section 2.4 shall be executed, authenticated and delivered only in the denominations specified in Section 2.2(b) and registered in such names as the Depositary shall direct in writing.

(f)    **Denominations; Qualified Purchaser Status.**  No Person may hold a beneficial interest in any Secured Note (or Combination Note Component) except in a denomination authorized for such Secured Note or Combination Note Component, as applicable, under Section 2.2(b).  In addition, no transfer of a Secured Note (including the Class A-3 Note Component represented by a Combination Note) (or any interest therein) may be made to any Person that is a U.S. Person unless such Person is (A) a Qualified Institutional Buyer and (B) a Qualified Purchaser.  In addition, no transfer of a Secured Note or Combination Note (or any interest therein) may be made to any Person that is a U.S. Person unless such Person (A) was not formed for the purpose of investing in the Issuer (except when each beneficial owner of the purchaser is a Qualified Purchaser, (B) has received the necessary consent from its beneficial owners if it is a private investment company formed before April 30, 1996, (C) is not a broker-dealer that owns and invests on a discretionary basis less than U.S.$25,000,000 in securities of unaffiliated issuers, (D) is not a pension, profit, sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, and in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (E) will provide notice to any subsequent transferee of the transfer restrictions provided in the legend, (F) will hold and transfer in a principal amount of not less than U.S.$250,000, for it or for each account for which it is acting and (G) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain .compliance with the foregoing.  Any purported transfer that is not in compliance with this Section 2.4 or the legends on the Secured Notes or Combination Notes will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Trustee or any intermediary.  If any purported transfer of Secured Notes, Combination Notes, as applicable, or any beneficial interest therein to a purported transferee does not comply with the requirements set forth in this Section 2.4 or the legends on the Secured Notes or Combination Notes, then the purported transferor of such Secured Notes, Combination Notes or beneficial interest therein shall be required to cause the purported transferee to surrender the Secured Notes, Combination Notes or any beneficial interest therein in return for a refund of the consideration paid therefor by such transferee (together with interest thereon) or to cause the purported transferee to dispose of such Secured

Notes, Combination Notes, or beneficial interest promptly in one or more open market sales to one or more persons each of whom satisfies the requirements of this Section 2.4 and the legends on such Secured Notes or Combination Notes, as applicable, and such purported transferor shall take, and shall cause such transferee to take, all further action necessary or desirable, in the judgment of the Trustee, to ensure that such Secured Notes, Combination Notes or any beneficial interest therein are held by persons in compliance therewith.

(g)    **Requirement to Sell**.

(i)    If, notwithstanding the restrictions set forth in this Section 2.4, the Issuer determines that any beneficial owner of a Rule 144A Note (or Combination Note Component with respect to a Definitive Combination Note) (A) is a U.S. Person and (B) is not a Qualified Institutional Buyer and also a Qualified Purchaser, the Issuer may require, by notice to such beneficial owner that such beneficial owner sell all of its right, title and interest to such Secured Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such beneficial owner fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner to cause its interest in such Secured Note or Combination Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Sections 9-610 and 9-611 of the UCC as applied to securities that are customarily sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser and (y) pending such transfer, no further payments will be made in respect of such Secured Note or Combination Note (or beneficial interest therein) held by such beneficial owner.

(ii)    If, notwithstanding the restrictions set forth in this Section 2.4, the Issuer determines that any beneficial owner of a Regulation S Note (or Combination Note with respect to a Regulation S Combination Note) is (A) a U.S. Person or (B) a Benefit Plan Investor or a Controlling Person, the Issuer may require, by notice to such beneficial owner that such beneficial owner sell all of its right, title and interest to such Secured Note (or interest therein) to a Person that is not (1) a U.S. Person or (2) a Benefit Plan Investor or a Controlling Person, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such beneficial owner fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner to cause its interest in such Secured Note or Combination Note to be transferred in a commercially reasonable sale (conducted by the Trustee in accordance with Sections 9-610 and 9-611 of the UCC as applied to securities that are customarily sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee, in connection with such transfer, that such Person is neither (1) a U.S. Person nor (2) a Benefit Plan Investor or a Controlling Person and (y) pending such transfer, no further payments will be made in respect of such Secured Note or Combination Note (or beneficial interest therein) held by such beneficial owner.

(h)    **Legends**.    Any Secured Note or Combination Note issued upon the transfer, exchange or replacement of Secured Notes or Combination Notes, as applicable, shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, the Note Registrar and the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, the Note Registrar and the Issuer to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or another exemption from registration under the Securities Act and to ensure that neither the Issuer nor the pool of Collateral becomes an investment company required to be registered under the Investment Company Act.    Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuer, shall authenticate and deliver Secured Notes or Combination Notes that do not bear such applicable legend.

(i)    **Expenses; Acknowledgment of Transfer**.    Transfer, registration and exchange shall be permitted as provided in this Section 2.4 without any charge to the Secured Noteholder or Combination Noteholder except for a sum sufficient to cover any tax or other governmental charge payable in connection therewith or the expenses of delivery (if any) not made by regular mail and payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith pursuant to Section 2.4(a)    Registration of the transfer of a Secured Note or Combination Note by the Trustee shall be deemed to be the acknowledgment of such transfer on behalf of the Issuer.

(j)    **Surrender upon Final Payment**.    Upon final payment due on the date on which all outstanding unpaid principal of a Secured Note and the Combination Note Principal Balance becomes due and payable as therein or herein provided, whether at the Stated Maturity Date or by declaration of acceleration, call for redemption or otherwise, the Holder thereof shall present and surrender such Secured Note or Combination Note at the office of the Note Paying Agent.

(k)    **Repurchase and Cancellation of Secured Notes and Combination Notes**.    The Issuer will not purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the Outstanding Secured Notes or Combination Notes except upon the redemption of such Secured Notes or Combination Notes, as applicable, in accordance with the terms of this Indenture and the Secured Notes or Combination Notes.    The Issuer will promptly cancel all Secured Notes or Combination Notes acquired by them pursuant to any payment, purchase, redemption, prepayment or other acquisition of Secured Notes and Combination Notes, as applicable, pursuant to any provision of this Indenture and no Secured Notes or Combination Notes may be issued in substitution or exchange for any such Secured Notes or Combination Notes, as applicable,.

(l)    **Compliance with Transfer Restrictions**.    Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Note Registrar shall be responsible for ascertaining whether any transfer complies with the registration provisions of or exemptions from the Securities Act, applicable state securities laws, the rules of any Depositary, ERISA, the Code or the Investment Company Act; **provided** that if a certificate is specifically required by the express terms of this Section 2.4 to be delivered to the Trustee or the Note Registrar by a purchaser or transferee of a Secured Note or Combination Notes the Trustee or the Note

Registrar, as the case may be, shall be under a duty to receive and examine the same to determine whether the transfer contemplated thereby substantially complies with the express terms of this Indenture and shall promptly notify the party delivering the same if such transfer does not comply with such terms. To the extent applicable to the Issuer, the Issuer shall impose additional restrictions to comply with the USA PATRIOT Act, and any such transfer restrictions shall be binding on each Holder or Beneficial Owner of a Secured Note or Combination Note. The Issuer shall notify the Trustee and the Note Registrar of the imposition of any such transfer restrictions.

(m)    **Physical Secured Notes or Combination Notes**. The Issuer will promptly make available to the Trustee without charge a reasonable supply of Definitive Notes in definitive, fully Registered Form, without interest coupons.

(n)    **Withholding Certification.** Each purchaser must represent (or, by its acquisition of a Global Note, will be deemed to have represented) that it understands that each of the Issuer, the Trustee and the Note Paying Agent shall require certification acceptable to it (i) as provided under the terms of the Notes, as a condition to the payment of principal of and interest on any Secured Notes without, or at a reduced rate of, U.S. withholding or backup withholding tax, and (ii) to enable each of the Issuer, the Trustee and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to pay, deduct or withhold from payments in respect of such Secured Notes or the Holder of such Secured Notes under any present or future law or regulation of the Cayman Islands or the United States or any present or future law or regulation of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirements under any such law or regulation. Such certification may include U.S. federal income tax forms (such as IRS Form W-8BEN (Certification of Foreign Status of Beneficial Owner), Form W-8IMY (Certification of Foreign Intermediary Status), IRS Form W-9 (Request for Taxpayer Identification Number and Certification), or IRS Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms). In addition, each of the Issuer, the Trustee or any Paying Agent may require certification acceptable to it to enable the Issuer to qualify for a reduced rate of withholding in any jurisdiction from or through which the Issuer receives payments on its assets. Each purchaser agrees to provide any certification requested pursuant to this paragraph and to update or replace such form or certification in accordance with its terms or its subsequent amendments.

(o)    **Tax Treatment.** Each Holder of a Secured Note or any interest therein, by virtue of its purchase or other acquisition of such Note or interest therein must represent that it shall agree that, for purposes of U.S. federal, state and local income and franchise tax and any other income taxes, (i) the Issuer will be treated as a corporation, (ii) the Secured Notes will be treated as indebtedness of the Issuer, (iii) the Combination Notes will be treated as direct ownership of the Class A-3 Notes and the Income Notes constituting the Class A-3 Note Component and the Income Note Component, respectively, and (iv) the Income Notes will be treated as equity in the Issuer; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment, unless required by law.

(p)    **Treaty Exemption.** No Note may be purchased by a purchaser unless the purchaser, if not a "United States person" (as defined in Section 7701(a)(30) of the Code),

represents (or, by its acquisition of a Global Note, is deemed to have represented) that such purchaser either. (A) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code); (B) if such purchaser is a bank (within the meaning of Section 881(c)(3)(A) of the Code), after giving effect to its purchase of Notes, the purchaser (x) will not own more than 50% of the Income Notes (by number) and the Combination Notes (to the extent of the Income Note Component) (by number) or 50% by value of the aggregate of the Combination Notes and the Secured Notes that are treated as equity for U.S. federal income tax purposes either directly or indirectly, and will not otherwise be related to the Issuer (within the meaning of Section 267(b) of the Code) and (y) has not purchased such Secured Note in whole or in part to avoid any U.S. federal tax liability (including, without limitation, any U.S. withholding tax that would be imposed on the Notes with respect to the Collateral Debt Securities if held directly by the purchaser); (C) has provided an IRS Form W-8ECI representing that all payments received or to be received by it from the Issuer are effectively connected with the conduct of a trade or business in the United States, or (D) is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and the Issuer is treated as a fiscally transparent entity (as defined in Treasury Regulations Section 1 894-1(d)(3)(ii)) under the laws of the purchaser's jurisdiction with respect to payments made on the Collateral Debt Securities held by the Issuer.

**Section 2.5    Mutilated, Defaced, Destroyed, Lost or Stolen Secured Notes or Combination Notes**

If (a) any mutilated or defaced Secured Note or Combination Note is surrendered to a Note Transfer Agent, or if there shall be delivered to the Issuer, the Trustee and the Note Transfer Agent (each, a Specified Person) evidence to their reasonable satisfaction of the destruction, loss or theft of any Secured Note or Combination Note, as applicable, and (b) there is delivered to the Specified Persons such security or indemnity as may reasonably be required by them to save each of them harmless then, in the absence of notice to the Specified Persons that such Secured Note or Combination Note, as applicable, has been acquired by a *bona fide* purchaser, the Issuer shall execute and shall direct the Trustee to authenticate, and upon Issuer Request the Trustee shall authenticate and deliver, in lieu of any such mutilated, defaced, destroyed, lost or stolen Secured Note or Combination Note a new Note of the same Class as such mutilated, defaced, destroyed, lost or stolen Secured Note or Combination Note, as applicable, of like tenor (including the same date of issuance) and equal principal amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Secured Note or Combination Note, as applicable, and bearing a number not contemporaneously outstanding.

If, after delivery of such new Secured Note or Combination Note a *bona fide* purchaser of the predecessor Secured Note or Combination Note, as applicable, presents for payment, transfer or exchange such predecessor Secured Note or Combination Note, as applicable, the Specified Persons shall be entitled to recover such new Secured Note or Combination Note, as applicable, from the Person to whom it was delivered or any Person taking therefrom, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Specified Persons in connection therewith.

In case any such mutilated, defaced, destroyed, lost or stolen Secured Note or Combination Note has become due and payable, the Issuer in its (as applicable) discretion may, instead of issuing a new Secured Note or Combination Note, as applicable, pay such Secured Note or Combination Note, as applicable, without requiring surrender thereof **except** that any mutilated Secured Note or Combination Note shall be surrendered.

Upon the issuance of any new Secured Note or Combination Note under this Section 2.5, the Issuer, the Trustee or any Note Transfer Agent may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

Every new Secured Note and Combination Note issued pursuant to this Section 2.5 in lieu of any mutilated, defaced, destroyed, lost or stolen Secured Note or Combination Note, as applicable, shall constitute an original additional contractual obligation of the Issuer and such new Secured Note or Combination Note, as applicable, shall be entitled, subject to the second paragraph of this Section 2.5, to all the benefits of this Indenture equally and proportionately with any and all other Secured Notes or Combination Notes, as applicable, duly issued hereunder.

The provisions of this Section 2.5 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, defaced, destroyed, lost or stolen Secured Notes or Combination Notes.

### Section 2.6    Payment of Principal and Interest; Rights Preserved

(a)    As provided under the terms of the Secured Notes, each Class of Secured Notes shall accrue interest during each Interest Period applicable to such Class in the manner and at the Applicable Periodic Interest Rate specified in Section 2.2. As provided under the terms of such Notes, interest on each Class of Secured Notes shall be due and payable on each Payment Date; **provided** that (i) interest on the Class A-2 Notes is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A-1 Notes (together with any Defaulted Interest thereon), (ii) interest on the Class A-3 Notes is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A-1 Notes (together with any Defaulted Interest thereon) and on the Class A-2 Notes (together with any Defaulted Interest thereon), (iii) interest on the Class B Notes is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A Notes (together with any Defaulted Interest thereon), (iv) interest on the Class C Notes and interest on any Class C Cumulative Applicable Periodic Interest Shortfall Amount is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A Notes (together with any Defaulted Interest thereon) and on the Class B Notes (together with any Defaulted Interest thereon), (v) interest on the Class D Notes and interest on any Class D Cumulative Applicable Periodic Interest Shortfall Amount is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A Notes (together with any Defaulted Interest thereon), on the Class B Notes (together with any Defaulted Interest thereon) and on the Class C Notes (together with interest on any Class C Cumulative Applicable

Periodic Interest Shortfall Amount and any Defaulted Interest thereon), (vi) interest on the Class E Notes and interest on any Class E Cumulative Applicable Periodic Interest Shortfall Amount is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A Notes (together with any Defaulted Interest thereon), on the Class B Notes (together with any Defaulted Interest thereon), on the Class C Notes (together with interest on any Class C Cumulative Applicable Periodic Interest Shortfall Amount and any Defaulted Interest thereon) and the Class D Notes (together with interest on any Class D Cumulative Applicable Periodic Interest Shortfall Amount and any Defaulted Interest thereon), (vii) interest on the Class F Notes and interest on any Class F Cumulative Applicable Periodic Interest Shortfall Amount is subordinated in right of payment to the prior payment in full on each Payment Date of the interest due and payable on the Class A Notes (together with any Defaulted Interest thereon), on the Class B Notes (together with any Defaulted Interest thereon), on the Class C Notes (together with interest on any Class C Cumulative Applicable Periodic Interest Shortfall Amount and any Defaulted Interest thereon), on the Class D Notes (together with interest on any Class D Cumulative Applicable Periodic Interest Shortfall Amount and any Defaulted Interest thereon) and the Class E Notes (together with interest on any Class E Cumulative Applicable Periodic Interest Shortfall Amount and any Defaulted Interest thereon), and (viii) interest on all Secured Notes is subordinated in right of payment to the prior payment in full on each Payment Date of other amounts in accordance with Section 11.1. Except as provided in Section 5.5, no payment shall be made by the Issuer hereunder other than on a Payment Date.

As provided under the terms of the Notes, for so long as any Class A Notes or Class B Notes are Outstanding, any Class C Applicable Periodic Interest Shortfall Amount shall be deferred and shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available to pay such Class C Applicable Periodic Interest Shortfall Amount in accordance with Section 11.1.

As provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, any Class D Applicable Periodic Interest Shortfall Amount shall be deferred and shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available to pay such Class D Applicable Periodic Interest Shortfall Amount in accordance with Section 11.1

As provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes, Class C Notes or Class D Notes are Outstanding, any Class E Applicable Periodic Interest Shortfall Amount shall be deferred and shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available to pay such Class E Applicable Periodic Interest Shortfall Amount in accordance with Section 11.1.

As provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are Outstanding, any Class F Applicable Periodic Interest Shortfall Amount shall be deferred and shall not be considered "due and payable" for the purposes of Section 5.1(a) until the Payment Date on which funds are available to pay such Class F Applicable Periodic Interest Shortfall Amount in accordance with Section 11.1.

Any Class C Applicable Periodic Interest Shortfall Amount, Class D Applicable Periodic Interest Shortfall Amount, Class E Applicable Periodic Interest Shortfall Amount and Class F Applicable Periodic Interest Shortfall Amount, respectively, shall be treated as being added to the then Aggregate Outstanding Amount of the Class C Notes, Class D Notes, Class E Notes and Class F Notes, respectively, and shall accrue interest at the Applicable Periodic Interest Rate and shall be paid thereafter in accordance with the Priority of Payments.

The Combination Notes will not bear a stated rate of interest, but the Holders of the Combination Notes will be entitled to the payments made on the related Combination Note Components based on the proportion of the Class A-3 Notes or Income Notes, as the case may be, represented by such Combination Note Component, as applicable, in comparison to the Aggregate Outstanding Amount of all Class A-3 Notes or Income Notes, respectively. The Combination Notes shall not represent an additional obligation of the Issuer in excess of the Issuer's obligations in respect of the related Combination Note Components.

(b)    As provided under the terms of the Notes, the principal of each Secured Note shall be payable no later than the Stated Maturity Date thereof unless the unpaid principal of such Secured Note becomes due and payable at an earlier date by declaration of acceleration, call for redemption or otherwise; **provided** that:

(i)    as provided under the terms of the Notes, for so long as any Class A-1 Notes are Outstanding, except as provided in Sections 9.7 and 11.1, the payment of principal of the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A-1 Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes and other amounts payable in accordance with Section 11.1;

(ii)    as provided under the terms of the Notes, for so long as any Class A-1 Notes or Class A-2 Notes are Outstanding, except as provided in Section 9.7 and Section 11.1, the payment of principal of the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A-1 Notes and the Class A-2 Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-I Notes and the Class A-2 Notes and other amounts payable in accordance with Section 11.1;

(iii)    as provided under the terms of the Notes, for so long as any Class A Notes are Outstanding, except as provided in Section 9.7 and Section 11.1, the payment of principal of the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes and other amounts payable in accordance with Section 11.1;

(iv)    as provided under the terms of the Notes, for so long as any Class A Notes or Class B Notes are Outstanding, except as provided in Sections 9.7 and 11.1, the

payment of principal of the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A Notes and the Class B Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes and Class B Notes and other amounts payable in accordance with Section 11.1;

(v)     as provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, except as provided in Section 9.7 and Section 11.1, the payment of principal of the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A Notes, the Class B Notes and the Class C Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class B Notes and the Class C Notes and other amounts payable in accordance with Section 11.1;

(vi)    as provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes, Class C Notes or Class D Notes are Outstanding, except as provided in Section 9.7 and Section 11.1, the payment of principal of the Class E Notes and the Class F Note (x) may only occur after principal of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and other amounts payable in accordance with Section 11.1; and

(vii)   as provided under the terms of the Notes, for so long as any Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are Outstanding, except as provided in Section 9.7 and Section 11.1, the payment of principal of the Class F Notes (x) may only occur after principal of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes has been paid in full and (y) shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes and other amounts payable in accordance with Section 11.1.

(c)     So long as the Coverage Tests are satisfied, principal will not be payable on any Class of Secured Notes except (i) upon the occurrence of a Redemption, (ii) in the case of any Class C Notes, Class D Notes, Class E Notes or Class F Notes, to pay amounts in respect of the Class C Cumulative Applicable Periodic Interest Shortfall Amount, the Class D Cumulative Applicable Periodic Interest Shortfall Amount, Class E Cumulative Applicable Periodic Interest Shortfall Amount or the Class F Cumulative Applicable Periodic Interest Shortfall Amount, as the case may be, in accordance with Section 11.1 and (iii) on each Payment Date, in accordance with Section 11.1.

(d)     As provided under the terms of the Notes, payments in respect of interest on and principal of the Secured Notes and Combination Notes shall be payable by wire transfer in immediately available funds to a U.S. Dollar account maintained by the Holder thereof (which may be the Depository or its nominee) or, if a wire transfer cannot be effected, by a U.S. Dollar

check in immediately available funds delivered to such Registered Holder. The Issuer expects that the Depository or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note held by the Depository or its nominee, will immediately credit the applicable Agent Members' accounts with payments in amounts proportionate to the respective beneficial interests in such Global Note as shown on the records of the Depository or its nominee. The Issuer also expects that payments by Agent Members to owners of beneficial interests in such Global Note held through Agent Members will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments will be the responsibility of the Agent Members. Upon final payment due on the maturity of a Secured Note, the Holder thereof shall present and surrender such Secured Note or Combination Note at the Corporate Trust Office of the Trustee on or prior to such maturity; **provided, however,** that if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable Secured Note or Combination Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. None of the Issuer nor the Trustee will have any responsibility or liability for any aspects of the records maintained by the Depository or its nominee or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Regulation S Global Note or a Rule 144A Global Note. In the case where any final payment of principal and interest is to be made on any Note (other than on the Stated Maturity Date or any Redemption Date, in respect of which notice shall be given as provided in Article IX hereof) the Issuer, upon Issuer Request, or, the Trustee, in the name and at the expense of the Issuer shall, not more than 30 nor less than 10 days prior to the date on which such payment is to be made, mail to the Persons entitled thereto at their addresses appearing on the Note Register, a notice which shall state the date on which such payment will be made, the amount of such payment per U.S.$1,000 initial principal amount of Secured Notes and Combination Notes and shall specify the place where such Secured Notes and Combination Notes may be presented and surrendered for such payment.

(e)    The principal of and interest on any Secured Note or Combination Note which is payable on a Redemption Date or in accordance with Section 11.1 on a Payment Date and is punctually paid or duly provided for on such Redemption Date or Payment Date shall be paid to the Person in whose name that Secured Note (or one or more predecessor Secured Notes) or Combination Note is registered at the close of business on the Record Date for such payment. All such payments that are mailed or wired and returned to the Note Paying Agent shall be held for payment as herein provided at the office or agency of the Issuer to be maintained as provided in Section 7.2.

Payments to Holders of the Secured Notes and Combination Notes, as provided under the terms of the Notes, of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Secured Notes or Combination Notes registered in the name of each such Holder on the Record Date for such payment bears to the Aggregate Outstanding Amount of all Secured Notes or Combination Notes on such Record Date.

(f)    Payment of any Defaulted Interest may be made in any other lawful manner in accordance with Section 11.1 if notice of such payment is given by the Trustee to the

Issuer and the Secured Noteholders, and such manner of payment shall be deemed practicable by the Trustee.

(g)    All reductions in the principal amount of a Secured Note or a Combination Note (or one or more predecessor Secured Notes or Combination Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding upon all future Holders of such Secured Note or Combination Notes, as applicable, and of any Secured Note or Combination Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, whether or not such payment is noted on such Secured Note or Combination Note.

(h)    As provided under the terms of the Notes, and notwithstanding anything to the contrary herein, the obligations of the Issuer under the Secured Notes, the Combination Notes or this Indenture or arising in connection herewith are limited recourse obligations of the Issuer payable solely from the Collateral and following realization of the Collateral, all obligations of and all claims against the Issuer hereunder or arising in connection herewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, member, director, employee, security holder or incorporator of the Issuer or its respective successors or assigns for the payment of any amounts payable under the Secured Notes, the Combination Notes or this Indenture. It is understood that the foregoing provisions of this Section 2.6(h) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Secured Notes or Combination Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished and shall not thereafter revive. It is further understood that the foregoing provisions of this Section 2.6(h) shall not limit the right of any Person to name the Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Secured Notes, the Combination Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

(i)    As provided under the terms of each Class of Notes, but subject to the provisions of such Notes corresponding to this Section 2.6 and the provisions of such Notes corresponding to Sections 2.4 and 2.5, each Secured Note and Combination Note delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Secured Note or Combination Note, as applicable, shall carry the rights of unpaid interest and principal that were carried by such other Secured Note or Combination Note, as applicable.

### Section 2.7    Certain Tax Forms and Treatment

(a)    If required to prevent or reduce the withholding or imposition of United States income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN or successor applicable form, to each issuer, counterparty or paying agent with respect to any Collateral Debt Security at the time such Collateral Debt Security is purchased or entered into and thereafter prior to the expiration or obsolescence of such form.

(b)    The Issuer shall not file, or cause to be filed, any income or franchise tax return in the United States or any state of the United States unless it shall have obtained advice from Cadwalader, Wickersham & Taft LLP, or Sidley Austin LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

**Section 2.8    Reserved**

**Section 2.9    Cancellation**

All Secured Notes and Combination Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee, shall be promptly canceled by it and may not be reissued or resold. No Secured Notes or Combination Notes shall be authenticated in lieu of or in exchange for any Secured Notes or Combination Notes, as applicable, canceled as provided in this Section 2.9, except as expressly permitted by this Indenture. All canceled Secured Notes and Combination Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to it.

**Section 2.10    No Gross-Up**

All payments of principal and interest in respect of the Secured Notes (or with respect to the Combination Notes, the Class A-3 Note Component), as provided under the terms of such Notes, made by the Issuer shall be made free and clear of, and without withholding or deduction for, Taxes, unless such withholding or deduction is required by the applicable law, as modified by the practice of any relevant governmental revenue authority. If the Issuer is so required to withhold or deduct any Taxes from payments of principal or interest in respect of the Notes (or with respect to the Combination Notes, the Class A-3 Note Component), then the Issuer will make such payments net of such Taxes and shall not be obligated to pay any additional amounts in respect of such withholding or deduction of Taxes.

**Section 2.11    Treatment of Deemed Owners**

The Issuer, the Trustee, and any agent of the Issuer or the Trustee may treat the Person in whose name any Secured Note is registered as the owner of such Secured Note on the Note Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on such Secured Note and on any other date for all other purposes whatsoever (whether or not such Secured Note is overdue), and neither the Issuer nor the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary; **provided, however**, that the Depository, or its nominee, shall be deemed the owner of the Global Notes, and except to the extent expressly provided herein, owners of beneficial interests in Global Notes will not be considered the owners of Secured Notes.

**Section 2.12    Certain Procedures**

(a)    For so long as any Notes may be transferred only in accordance with Rule 144A or another exemption from registration under the Securities Act, the Issuer will ensure that any Bloomberg screen containing information about the Rule 144A Global Notes includes the following (or similar) language:

(i)    The "Note Box" on the bottom of the "Security Display" page describing the Rule 144A Global Notes will state: "Iss'd Under 144A/3c7";

(ii)    The "Security Display" page will have the flashing red indicator "See Other Available Information"; and

(iii)    the indicator will link to the "Additional Security Information" page, which will state that the Notes are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act to persons who are both (i) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (ii) Qualified Purchasers (as defined under Section 3(c)(7) of the Investment Company Act).

(b)    For so long as the Rule 144A Global Notes are registered in the name of DTC or its nominee, the Issuer will instruct DTC to take these or similar steps with respect to the Rule 144A Global Notes:

(i)    The DTC 20-character security descriptor and 48-character additional descriptor will indicate with marker "3c7" that sales are limited to (i) Qualified Institutional Buyers and (ii) Qualified Purchasers;

(ii)    Where the DTC deliver order ticket sent to purchasers by DTC after settlement is physical, it will have the 20-character security descriptor printed on it. Where the DTC deliver order ticket is electronic, it will have a "3c7" indicator and a related user manual for participants, which will contain a description of the relevant restriction; and

(iii)    DTC will send an "Important Notice" outlining the 3(c)(7) restrictions applicable to the Rule 144A Global Notes to all DTC participants in connection the initial offering of Notes by the Issuer.

**Section 2.13    Combination Notes**

(a)    On the Closing Date, the Issuer will issue the Combination Notes. Notwithstanding anything to the contrary set forth in this Indenture, the following terms and conditions shall apply to such Combination Notes:

(i)    The Combination Notes will be comprised of the Combination Note Components, consisting of the Class A-3 Note Component (initial principal amount of U.S.$6,600,000) and the Income Note Component (initial principal amount of U.S.$4,400,000);

(ii)    Except as expressly provided in this Indenture, the Combination Notes shall not be deemed to be Notes with independent voting, consent or approval rights, but rather the owners of Combination Notes shall be included as if they were the "Holder" of the Class A-3 Notes or Income Notes, as applicable, represented by the Combination Note Components represented by such Combination Notes in the Aggregate Outstanding Amount represented by such Combination Note Components, and "Controlling Class" will be construed accordingly;

(iii)    (A) Holders of the Combination Notes shall be paid distributions on the Combination Note Components and other amounts solely to the extent that such amounts are payable on the Class A-3 Notes or Income Notes, as applicable, represented by the Combination Note Components represented by such Combination Notes in accordance with the Priority of Payments; (B) Holders of the Combination Notes shall be paid principal solely to the extent that principal is paid in respect of the Class A-3 Notes or Income Notes, as applicable, represented by the Combination Note Components represented by such Combination Notes in accordance with the Priority of Payments; (C) payments of principal, interest, redemption payments and any other payments in respect of any Class A-3 Notes or Income Notes, as applicable, shall be allocated *pro rata* to the related Combination Notes (in the proportion that the Aggregate Outstanding Amount of the Class A-3 Notes or Income Notes, as applicable, represented by such Combination Note Component bears to the Aggregate Outstanding Amount of the Notes of such Class, including all related Combination Note Components); and (D) no other payment shall be made in respect of the Combination Notes;

(iv)    (A) All payments on the Combination Notes will be applied as a reduction of the Combination Note Principal Balance until reduced to U.S.$1.00, and any payments thereafter applied as additional distributions and (B) the Combination Note Principal Balance shall not be reduced below U.S.$1.00 unless redeemed in full pursuant to a Redemption or on the Stated Maturity Date;

(v)    Each Combination Note Component shall satisfy the required denomination for its underlying Class; and

(vi)    If an owner of a Combination Note wishes at any time to exchange such Combination Note for the Class A-3 Notes and/or Income Notes, as applicable, represented by its underlying Combination Note Components, such exchange may be made, and shall only be made, in accordance with Section 2.13(b) below.

(b)    If a Holder of a Combination Note wishes at any time to exchange such Combination Note for the Class A-3 Notes and/or Income Notes, as applicable, represented by its Combination Note Components, such exchange may be made, and shall only be made, in accordance with this Section 2.13(b) subject to the minimum denomination requirements set forth in Section 2.2(b). A Holder of a Combination Note may exchange such Combination Note for one or more Class A-3 Notes or Income Notes representing the Combination Note Components of such Combination Note (in each case, unless such Combination Note Components have been fully paid); **provided** that, no such exchange of Combination Notes will be recognized if such exchange would result in Benefit Plan Investors holding Notes issued in

exchange for Combination Notes. No exchange of a Combination Note for Notes representing its underlying Combination Note Components shall be made until receipt by the Note Registrar of a certificate substantially in the form of Exhibit H duly executed by the Holder of such Combination Note accompanied by such Holder's Combination Note (if the Combination Note to be exchanged is a Definitive Combination Note). Upon receipt by the Note Registrar of the documents referred to in the preceding sentence, the Note Registrar shall cancel such Combination Note or, in the case of a Regulation S Combination Note, the Note Registrar shall approve the instructions at the Depository to reduce the face amount of the Regulation S Combination Note by the face amount of the Combination Note so exchanged, record the exchange in the Note Register in accordance with Section 2.4 and (i) with respect to any Class A-3 Note Component, (A) the Trustee shall approve the instructions at the Depository to increase the face amount of the applicable Global Class A-3 Note by the face amount of the Class A-3 Note Component to be exchanged or (B) if the Global Class A-3 Notes have been exchanged for Definitive Class A-3 Notes in accordance with the terms of this Indenture, the Transfer Agent shall and instruct the Issuer to execute, and thereafter authenticate and deliver Class A-3 Notes representing the underlying Class A-3 Note Component and (ii) with respect to any Income Note Component, the Trustee shall record the exchange in the Note Register and shall instruct the Income Note Transfer Agent to (A) record the exchange in the Income Note Registrar and (B) issue additional Income Notes in the form so requested and in the aggregate face amount of the Income Note Component to be exchanged. Following any such exchange, the Holder shall be required to comply with all restrictions on transfer and exchange relating to the applicable Classes of Notes. For the avoidance of doubt, Holders of the Classes of Notes to which Combination Note Components relate may not exchange such Classes for Combination Notes or beneficial interest therein.

Combination Notes issued upon transfer, exchange or replacement of other Combination Notes shall be issued with Combination Note Components in denominations reflecting the original Aggregate Outstanding Amount of the applicable Combination Note Components of the Combination Notes so transferred, exchanged or replaced (subject to the requirements set forth in Section 2.2(b) hereof), but shall represent only the current Outstanding principal amount of the applicable Combination Note Components of the Combination Notes so transferred, exchanged or replaced. In the event that any Combination Note is divided into more than one Combination Note in accordance with this Article 2, the original Aggregate Outstanding Amount of the applicable Combination Note Components of the Combination Note so divided and the current outstanding principal amount of the applicable Combination Note Components of such Combination Note shall be proportionately divided among the Combination Notes delivered in exchange therefor and shall be deemed to be the original Aggregate Outstanding Amount of the applicable Combination Note Components or current outstanding principal amount of the applicable Combination Note Components, as the case may be, of such subsequently issued Combination Notes.

## ARTICLE III

## CONDITIONS PRECEDENT

### Section 3.1    General Provisions

The Secured Notes and Combination Notes may be executed by the Issuer and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee (or an Authenticating Agent on its behalf) upon Issuer Request, upon receipt by the Trustee of the following:

(a)    an Officer's certificate of the Issuer, (A) evidencing the authorization by Board Resolution of the execution and delivery of, and the performance of the Issuer's obligations under, each Transaction Document, in each case as may be amended on or prior to, and as in effect on, the Closing Date, and the execution, authentication and delivery of the Secured Notes and Combination Notes, and specifying the Stated Maturity Date, the principal amount and the Applicable Periodic Interest Rate with respect to each Class of Secured Notes and Combination Notes to be authenticated and delivered, and (B) certifying that (1) the attached copy of such Board Resolution is a true and complete copy thereof, (2) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (3) the Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b)    either (A) a certificate of the Issuer, or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee and the Initial Hedge Counterparty on which the Trustee and the Initial Hedge Counterparty are entitled to rely to the effect that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Secured Notes and Combination Notes or (B) an Opinion of Counsel to the Issuer satisfactory in form and substance to the Trustee and the Initial Hedge Counterparty to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Secured Notes and Combination Notes except as may have been given; and

(c)    (i)    an opinion of Cadwalader, Wickersham & Taft LLP, special New York counsel to the Issuer, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date,

(ii)    an opinion of Maples and Calder, special Cayman Islands counsel to the Issuer, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date;

(iii)    an opinion of Kennedy Covington Lobdell & Hickman, L.L.P., counsel to the Trustee, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date;

(iv)    an opinion of Akin, Gump, Strauss, Hauer & Feld, LLP, counsel to the Collateral Manager, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date;

(v)    an opinion of Sidley Austin LLP, counsel to the Collateral Manager, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date; and

(vi)    an opinion of in-house counsel to the Initial Hedge Counterparty, satisfactory in form and substance to, amongst others, the Trustee, dated the Closing Date.

(d)    an Officer's certificate of the Issuer, stating that the Issuer is not in Default under this Indenture and that the issuance of the Secured Notes and Combination Notes will not result in a breach of any of the terms, conditions or provisions of, or constitute a Default under, the Articles, any indenture or other agreement or instrument to which the Issuer is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer is a party or by which it may be bound or to which it may be subject; that no Event of Default shall have occurred and be continuing; that all of the representations and warranties contained herein are true and correct as of the Closing Date; that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Secured Notes and Combination Notes applied for (including in Section 3.2) have been complied with; and that all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid;

(e)    an Accountants' Report (A) confirming, as of the Reference Date, the information with respect to each Collateral Debt Security (other than its price) set forth on a schedule setting forth each Collateral Debt Security and the information provided by the Issuer with respect to every other asset forming part of the Collateral, by reference to such sources as shall be specified therein, (B) reporting the level of satisfaction of the Collateral Quality Tests with respect to the Collateral Debt Securities owned by the Issuer as of the Reference Date and (C) specifying the procedures undertaken by them to review data and computations relating to the foregoing statement;

(f)    executed counterparts of this Indenture, the Account Control Agreement, the Collateral Management Agreement and the other Transaction Documents;

(g)    an executed copy of the Initial Hedge Agreement and an executed copy of the Collateral Assignment of Hedge Agreement with respect thereto (and all acknowledgments thereto);

(h)    execution and delivery of the Financing Statement for filing against the Issuer with the Recorder of Deeds in the District of Columbia; and

(i)    evidence of an entry having been made in the Issuer's Register of Mortgages and Charges in respect of the charge.

**Section 3.2    Security for the Secured Notes**

Prior to the issuance of the Secured Notes on the Closing Date, the Issuer shall cause the following conditions to be satisfied:

(a)    **Grant of Security Interest; Delivery of Collateral Debt Securities**.  The Grant pursuant to the Granting clauses of this Indenture of all of the Issuer's right, title and interest in and to the Collateral and the transfer of all Collateral Debt Securities held by the Issuer on the Closing Date (as set forth in Schedule A) to the Trustee in the manner provided in Section 3.3(b).

(b)    **Certificate of the Issuer**.  The delivery to the Trustee of a certificate of an Authorized Officer of the Issuer or the Collateral Manager, for and on behalf of the Issuer, dated as of the Closing Date, to the effect that (x) the Issuer has no assets other than the Collateral, (y) the Issuer has no investments that do not qualify as Collateral Debt Securities, Temporary Ramp-Up Securities or Eligible Investments and (z) in the case of each Collateral Debt Security identified on Schedule A and pledged to the Trustee for inclusion in the Collateral on the Closing Date:

(i)    the Issuer is the owner of such Collateral Debt Security free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on such Collateral Debt Security prior to the first Payment Date and owed by the Issuer to the seller of such Collateral Debt Security;

(ii)    the Issuer has acquired its ownership in such Collateral Debt Security in good faith without notice of any adverse claim (within the meaning given to such term by Section 8-102(a)(1) of the UCC), except as described in clause (1) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Collateral Debt Security (or, if any such interest has been assigned, pledged or otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant a security interest in and assign and pledge all of its right, title and interest in such Collateral Debt Security to the Trustee;

(v)    the information set forth with respect to such Collateral Debt Security on Schedule A is correct and each such Collateral Debt Security is transferred to the Trustee as required by Section 3.2(a) (or, if any such Collateral Debt Security is not so transferred to the Trustee on the Closing Date, the Issuer has entered into a binding agreement to purchase such Collateral Debt Security for settlement within 10 days after the Closing Date);

(vi)    each such Collateral Debt Security satisfies the requirements of the definition of "Collateral Debt Security" and is not a Defaulted Security; and

(vii)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral (assuming that any Clearing Corporation, Securities Intermediary or other entity not within the control of the Issuer involved in the Grant of Collateral takes the actions required of it under Section 3.3(b) for perfection of that interest) and a "securities entitlement" (as defined in the UCC) with respect to Financial Assets.

(c)    **Rating Letters**.  The delivery to the Trustee of an Officer's certificate of the Issuer, to the effect that (i) attached thereto are true and correct copies of (A) a letter signed by Moody's confirming that the Class A-1 Notes have been rated "Aaa," the Class A-2 Notes have been rated "Aaa," the Class A-3 Notes have been rated "Aaa," the Class B Notes have been rated at least "Aa2," the Class C Notes have been rated at least "A2," the Class D Notes have been rated at least "Baa2," the Class E Notes have been rated at least "Baa3" and the Class F Notes have been rated at least "Ba2" and (B) a letter signed by S&P confirming that the Class A-1 Notes have been rated "AAA," the Class A-2 Notes have been rated "AAA," the Class A-3 Notes have been rated "AAA," the Class B Notes have been rated at least "AA," the Class C Notes have been rated at least "A," the Class D Notes have been rated at least "BBB," the Class E Notes have been rated at least "BBB-", the Class F Notes have been rated at least "BB", the Combination Notes have been rated at least "BB-" and (ii) each such rating is in full force and effect on the Closing Date.

(d)    **Accounts**.  The delivery by the Trustee of evidence of the establishment of the Payment Account, the Collection Account, the Expense Reserve Account, the Interest Reserve Account, the Collateral Account, the Ramp-Up Period Interest Reserve Account, the Uninvested Proceeds Account and the Hedge Counterparty Collateral Account (including, in each case, any sub-account established therein), each to be established on the Closing Date.

**Section 3.3    Custodianship; Transfer of Collateral Debt Securities and Eligible Investments**

(a)    The Trustee shall hold all certificated securities and instruments in physical form at the office of a custodian appointed by it in Illinois (together with any successor, the "**Custodian**").  Initially, such Custodian shall be LaSalle Bank National Association with its address 181 West Madison Street, 32nd Floor, Chicago, Illinois 60602, Attention: CDO Trust Services Group – Cedarwoods CRE CDO II.  Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer, has a long-term debt rating of at least "A+" by S&P and has a combined capital and surplus of at least U.S.$250,000,000.

(b)    Each Collateral Debt Security, Equity Security, Temporary Ramp-Up Security and Eligible Investment shall be credited to the appropriate Account.  Each time that the Issuer shall direct or cause the acquisition of any Collateral Debt Security, Equity Security or Eligible Investment, the Trustee (on behalf of the Issuer) shall, if such Collateral Debt Security, Equity Security, Temporary Ramp-Up Security or Eligible Investment has not already been transferred to the Collateral Account and credited thereto, cause the transfer of such Collateral Debt Security, Equity Security, Temporary Ramp-Up Security or Eligible Investment to the Custodian to be held in and credited to the Collateral Account for the benefit of the Trustee in accordance with the terms of this Indenture.  The security interest of the Trustee in the funds or

other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, be released.   The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Debt Security, Equity Security, Temporary Ramp-Up Security or Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Collateral Debt Security, Equity Security, Temporary Ramp-Up Security or Eligible Investment.

(c)    On the Closing Date, on each day thereafter, if any, that any Collateral is acquired or otherwise becomes subject to the lien of this Indenture and on the Effective Date, the Issuer represents and warrants to the Trustee as follows:

(i)    This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee on behalf and for the benefit of the Secured Parties, which security interest is prior to all other liens and security interests, and is enforceable as such as against creditors of and purchasers from the Issuer and, upon delivery of the Collateral Debt Securities and filing of the appropriate financing statements in the appropriate filing offices, the lien and security interest created by this Indenture shall be a perfected first priority security interest in favor of the Trustee for the benefit of the Secured Parties.

(ii)    The Issuer owns and has good and marketable title to the Collateral free and clear of any liens, claims, encumbrances or defects of any nature whatsoever except for those which are being released on the Closing Date or on the date of purchase by the Issuer or those created pursuant to or contemplated under this Indenture and encumbrances arising from due bills, if any, with respect to interest, or a portion thereof, accrued on any Collateral Debt Security prior to the first payment date and owed by the Issuer to the seller of such Collateral Debt Security.

(iii)    The Issuer has acquired its ownership in each such Collateral Debt Security, or will acquire in the case of any Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date or any additional Collateral Debt Securities or Substitute Collateral Debt Securities acquired by the Issuer after the Closing Date, in good faith without notice of any adverse claim, except as described in clause (ii) above.

(iv)    The Issuer (a) has delivered each such Collateral Debt Security, or will deliver any Collateral Debt Securities which the Issuer has on or before the Closing Date committed to purchase but which will not have settled on or before the Closing Date or any additional Collateral Debt Securities or Substitute Collateral Debt Securities acquired by the Issuer after the Closing Date, to the Trustee and (b) has not assigned, pledged, sold, granted a security interest in or otherwise encumbered any interest in such Collateral Debt Security other than interests granted pursuant to this Indenture.

(v)    The Issuer has full right to grant all security interests granted herein.

(vi)     All Collateral is comprised of either "securities," "instruments," "tangible chattel paper," "accounts," "security entitlements" or "general intangibles," in each case as defined in the applicable Uniform Commercial Code.

(vii)     Each of the Accounts, and all sub-accounts thereof, constitute securities accounts as defined in the applicable Uniform Commercial Code.

(viii)     All items of the Collateral that constitute security entitlements have been and will have been credited to one of the securities accounts. The securities intermediary for each of the Accounts has agreed to treat all assets credited to the securities accounts as financial assets under the applicable Uniform Commercial Code.

(ix)     Other than the security interest granted to the Trustee on behalf and for the benefit of the Secured Parties pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in or otherwise conveyed any of the Collateral. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Trustee on behalf and for the benefit of the Secured Parties hereunder or that has been terminated. The Issuer is not aware of any judgment, Pension Benefit Guarantee Corporation lien or tax lien filings against it.

(x)     The Issuer has caused or will have caused, within ten days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Collateral granted to the Trustee on behalf and for the benefit of the Secured Parties hereunder that constitutes chattel paper, instruments, accounts, securities entitlements or general intangibles under the applicable Uniform Commercial Code, if any.

(xi)     The Trustee or the Custodian has in its possession all original copies of the instruments that constitute or evidence the Collateral, if any.  The instruments, loan agreements and leases that constitute or evidence the Collateral do not have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee on behalf and for the benefit of the Secured Parties.  All financing statements filed or to be filed against the Issuer in favor of the Trustee on behalf and for the benefit of the Secured Parties in connection herewith describing the Collateral contain a statement to the following effect:  "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Trustee on behalf and for the benefit of (A) itself and for the benefit of the Noteholders, (B) the Collateral Manager and (C) each Hedge Counterparty."

(xii)     The authoritative copy of any chattel paper that constitutes or evidences the Collateral, if any, has been communicated to the Trustee and has no marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any Person other than the Trustee on behalf and for the benefit of the Secured Parties.

(xiii)    The Issuer has received or will receive all consents and approvals required by the terms of the underlying loan agreement, indenture or other underlying documentation, if any, relating to the Collateral to the transfer to the Trustee on behalf and for the benefit of the Secured Parties of its interest and rights in the Collateral hereunder.

(xiv)    The Issuer, the Custodian and the Trustee have entered into the Account Control Agreement pursuant to which the Custodian has agreed to comply with all instructions originated by the Trustee relating to the Accounts without further consent by the Issuer.

(xv)    None of the Accounts is in the name of any person other than the Trustee, held on behalf and for the benefit of the Secured Parties.  The Issuer has not consented to the Trustee or the Custodian maintaining any of the Accounts to comply with Entitlement Orders or instructions of any Person other than the Trustee.

(xvi)    Notwithstanding any other provision of this Indenture or any other related Transaction Document, the representations in this Section 3.3(c) shall be continuing and deemed to be updated on any day a new item of Collateral is acquired, and remain in full force and effect until such time as all obligations under this Indenture and the Notes have been finally and fully paid and performed and shall survive the termination of this Indenture for any other reason.

(xvii)    The parties to this Indenture (i) shall not, without obtaining a Rating Agency Confirmation, waive any of the representations in this Section 3.3(c); (ii) shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.3(c) upon becoming aware thereof; and (iii) shall not, without obtaining a Rating Agency Confirmation (as determined after any adjustment or withdrawal of the ratings following notice of such breach), waive a breach of any of the representations in this Section 3.3(c).

## ARTICLE IV

## SATISFACTION AND DISCHARGE

### Section 4.1    Satisfaction and Discharge of Indenture

This Indenture shall be discharged and shall cease to be of further effect with respect to the Collateral securing the Secured Notes and the Combination Notes to the extent of the Class A-3 Notes represented by the Class A-3 Note Component except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, defaced, destroyed, lost or stolen Secured Notes and Combination Notes (iii) rights of Secured Noteholders and Combination Noteholders to receive payments of principal thereof and interest thereon, (iv) the rights, obligations and immunities of the Trustee hereunder, (v) the rights, obligations and immunities of the Collateral Manager hereunder and under the Collateral Management Agreement and (vi) the rights of the Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them; and the Trustee, on

demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

        (a)    either:

        (i)    all Secured Notes and Combination Notes theretofore authenticated and delivered (other than (A) Secured Notes or Combination Notes which have been mutilated, defaced, destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.5 and (B) Secured Notes and Combination Notes for whose payment funds have theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3) have been delivered to the Trustee for cancellation; or

        (ii)    all Secured Notes and Combination Notes not theretofore delivered to the Trustee for cancellation (A) have become due and payable, or (B) will become due and payable at their Stated Maturity Date within one year, or (C) are to be called for redemption pursuant to Section 9.1 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Issuer pursuant to Section 9.3 and the Issuer has irrevocably deposited or caused to be deposited with the Trustee, in trust for such purpose, Cash or non-callable direct obligations of the United States in an amount sufficient, according to the Priority of Payments as verified by a firm of nationally recognized Independent certified public accountants, to pay and discharge the entire indebtedness on all Secured Notes and Combination Notes not theretofore delivered to the Trustee for cancellation, including all principal and interest (including Class C Cumulative Applicable Periodic Interest Shortfall Amount, Class D Cumulative Applicable Periodic Interest Shortfall Amount, Class E Cumulative Applicable Periodic Interest Shortfall Amount and Class F Cumulative Applicable Periodic Interest Shortfall Amount accrued to the date of such deposit) (in the case of Secured Notes which have become due and payable) or to the Stated Maturity Date or the Redemption Date, as the case may be; **provided** that (x) such obligations are entitled to the full faith and credit of the United States and (y) this subclause (ii) shall not apply if an election to act in accordance with the provisions of Section 5.5(a) shall have been made and not rescinded;

        (b)    the Issuer has paid or caused to be paid all other sums payable hereunder (including amounts payable pursuant to each Hedge Agreement, the Income Note Paying Agency Agreement, the Administration Agreement, the Collateral Administration Agreement and the Collateral Management Agreement) and no other amounts will become due and payable by the Issuer; and

        (c)    the Issuer has delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

        Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Issuer, the Trustee and each Hedge Counterparty and, if applicable, the Noteholders, as the case may be, under Sections 2.6, 4.1, 4.2, 5.9, 5.18, 6.7, 6.8, 7.1 and 7.3 shall survive.

### Section 4.2    Application of Trust Money

All funds deposited with the Trustee pursuant to Section 4.1 for the payment of principal of and interest on the Secured Notes and the Combination Notes to the extent of the Class A-3 Component and amounts payable pursuant to each Hedge Agreement, the Collateral Management Agreement, the Income Note Paying Agency Agreement, the Collateral Administration Agreement and the Administration Agreement shall be held in trust and applied by it in accordance with the provisions of the Secured Notes and the Combination Note to the extent of the Class A-3 Component and this Indenture, including the Priority of Payments, for the payment either directly or through any Note Paying Agent, as the Trustee may determine, to the Person entitled thereto of the respective amounts in respect of which such funds has been deposited with the Trustee; but such funds need not be segregated from other funds except to the extent required herein or required by law.

### Section 4.3    Repayment of Funds Held by Note Paying Agent

In connection with the satisfaction and discharge of this Indenture with respect to the Secured Notes and the Combination Notes, all funds then held by any Note Paying Agent other than the Trustee under the provisions of this Indenture shall, upon demand of the Issuer, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon such Note Paying Agent shall be released from all further liability with respect to such funds.

## ARTICLE V

## EVENTS OF DEFAULT; REMEDIES

### Section 5.1    Events of Default

"**Event of Default**" is defined as any one of the following wherever used herein, means any one of the following events as set forth in Section 5.1(a) through (h) (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)    a default for five Business Days in the payment, when due and payable, of any interest on any Class A Note or Class B Note or, if there are no Class A Notes or Class B Notes Outstanding, on any Class C Note or, if there are no Class A Notes, Class B Notes or Class C Notes Outstanding, on any Class D Note or, if there are no Class A Notes, Class B Notes, Class C Notes or Class D Notes Outstanding, on any Class E Note or, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding, on any Class F Note;

(b)    a default in the payment of any principal, when due and payable of any Secured Note (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days);

(c)    the failure on any Payment Date to disburse amounts available in accordance with Section 11.1 (except as provided in Section 5.1(a) and (b) above) and a continuation of such failure for five Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days);

(d)    on any Payment Date (after giving effect to all payments made on such date), the Class A Principal Coverage Ratio is less than 101.75%; and within 30 days after such Payment Date, Holders of at least a Majority, in aggregate principal amount, of the Class A Notes (voting as a single class), shall have delivered a "Notice of Default" under this Indenture;

(e)    the Issuer or the pool of Collateral becomes an investment company required to be registered under the Investment Company Act;

(f)    a default in the performance, or breach, of any other covenant (it being understood that non-compliance with any of the Coverage Tests, the Collateral Concentration Limitations or the Collateral Quality Tests will not constitute a default or breach) or of any representation or warranty of the Issuer under this Indenture or if any certificate or writing delivered pursuant hereto proves to be incorrect when made, which default or breach has a material adverse effect on the Secured Noteholders and continues for a period of 30 days (or, in the case of a Default, breach or failure of a representation or warranty regarding the Collateral, 15 days) of the earlier of knowledge by the Issuer or the Collateral Manager or notice to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" under this Indenture;

(g)    the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under the Bankruptcy Code or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or of any substantial part of its property; ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days; or

(h)    the institution by the Issuer of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or of any substantial part of its property, respectively, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer in furtherance of any such action.

If the Issuer shall obtain actual knowledge that an Event of Default shall have occurred and be continuing, the Issuer shall (unless the Trustee shall have provided notice of such Event of Default pursuant to Section 6.2) promptly notify the Trustee, the Secured Noteholders, each Hedge Counterparty, the Collateral Manager and each Rating Agency in writing of such Event of Default.

### Section 5.2    Acceleration of Maturity; Rescission and Annulment

(a)    If an Event of Default occurs and is continuing, the Trustee may or, if so directed by the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, will declare the principal of and accrued interest on all Secured Notes to be immediately due and payable (except that in the case of an Event of Default described in Section 5.1(g) or 5.1(h) above, such an acceleration will occur automatically) whereupon the Secured Notes shall become due and payable at their Aggregate Outstanding Amounts plus accrued and unpaid interest thereon, without further action or formality.

(b)    Any Hedge Agreement existing on or after such acceleration may not be terminated by the Issuer unless and until liquidation of the Collateral has commenced and annulment of such acceleration may no longer be affected.

(c)    At any time after such acceleration of maturity has been made and before a judgment or decree for payment of the amount due has been obtained by the Trustee as hereinafter provided in this Article V, the Trustee or the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, by written notice to the Trustee, may reverse such acceleration and its consequences if the Trustee determines that:

(i)    the Issuer has paid or deposited with the Trustee funds sufficient to pay:

(A)    all overdue installments of principal of and interest on the Notes (including interest upon the Class C Cumulative Applicable Periodic Interest Shortfall Amount, the Class D Cumulative Applicable Periodic Interest Shortfall Amount, the Class E Cumulative Applicable Periodic Interest Shortfall Amount and the Class F Cumulative Applicable Periodic Interest Shortfall Amount, respectively, at the Applicable Periodic Interest Rate and, to the extent that payment of such interest is lawful, upon Defaulted Interest at the Applicable Periodic Interest Rate);

(B)    any accrued and unpaid amounts (including termination payments, if any) payable by the Issuer pursuant to any Hedge Agreement;

(C)    all unpaid taxes and Administrative Expenses, any accrued and unpaid Collateral Management Fee, and other sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(ii)    the Trustee has determined that all Events of Default of which it has actual knowledge, other than the nonpayment of the principal of or interest on the Secured Notes that have become due solely by such acceleration, have been cured;

(iii)    each Hedge Agreement in effect immediately prior to such acceleration shall remain in effect or the Issuer has entered into a replacement Hedge Agreement (in accordance with the terms of this Indenture) with a Hedge Counterparty for any Hedge Agreement terminated solely as a result of the occurrence of such Event of Default or a declaration of acceleration of maturity; and

(iv)    either (x) the Trustee shall have obtained (and shall be entitled to rely upon) a certification of an Independent accounting firm of national reputation as to the sufficiency of the amounts in Section 5.2(c)(i) above, which certification shall be conclusive evidence as to such sufficiency or (y) the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class by written notice to the Trustee have agreed with such determination as to the sufficiency of such amounts (which agreement shall not be unreasonably withheld) or waived such Event of Default as provided in Section 5.14.

At any such time as the Trustee reverses such acceleration and its consequences, the Trustee shall preserve the Collateral in accordance with the provisions of Section 5.5; **provided** that, if the conditions for liquidation of the Collateral are satisfied pursuant to Section 5.5, the Secured Notes may be accelerated pursuant to Section 5.2(a), notwithstanding any previous reversal of acceleration pursuant to this Section 5.2(c).

No such reversal of acceleration shall affect any subsequent Default or impair any right consequent thereon.

All references to Noteholders, Holders of Notes or Notes of the Controlling Class in this Article V shall be deemed to include reference to the Holders of the Combination Notes with respect to the Class A-3 Component of such Combination Notes.

**Section 5.3    Collection of Indebtedness and Suits for Enforcement by Trustee**

(a)    The Issuer covenants that if a Default shall occur in respect of:

(i)    the payment of any principal of or interest on any Class A-1 Note, as provided under the terms of such Note,

(ii)    the payment of principal of or interest on any Class A-2 Note, as provided under the terms of such Note,

(iii)    the payment of principal of or interest on any Class A-3 Note, as provided under the terms of such Note,

(iv)    the payment of principal of or interest on any Class B Note, as provided under the terms of such Note,

(v)    the payment of principal of or interest on any Class C Note, as provided under the terms of such Note (but with respect to interest, only after the Class A Notes and Class B Notes and all interest accrued thereon have been paid in full),

(vi)    the payment of principal of or interest on any Class D Note, as provided under the terms of such Note (but with respect to interest, only after the Class A Notes, the Class B Notes and the Class C Notes and all interest accrued thereon have been paid in full),

(vii)    the payment of principal of or interest on any Class E Note, as provided under the terms of such Note (but with respect to interest, only after the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and all interest accrued thereon have been paid in full), or

(viii)    the payment of principal of or interest on any Class F Note, as provided under the terms of such Note (but with respect to interest, only after the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes and all interest accrued thereon have been paid in full),

then the Issuer will, upon demand of the Trustee or any affected Secured Noteholder, pay to the Trustee, for the benefit of the Holder of such Secured Note, the whole amount, if any, then due and payable on such Secured Note for principal and interest, with interest upon the overdue principal and, to the extent that payments of such interest shall be legally enforceable, upon overdue installments of interest, at the Applicable Periodic Interest Rate and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and such Secured Noteholder and their respective agents and counsel.

If the Issuer fails to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a Proceeding for the collection of the sums so due and unpaid, and may, and shall, upon the direction by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class, prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or any other obligor upon the Secured Notes and collect the amounts adjudged or decreed to be payable in the manner provided by law out of the Collateral; **provided** that a Holder of a Secured Note may institute any proceeding if (i) such Holder previously has given to the Trustee written notice of an Event of Default, (ii) except in the case of a default in the payment of principal or interest, the Holders of at least 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class have made a written request upon the Trustee to institute such proceedings in its own name as Trustee and such Holders have offered the Trustee reasonable indemnity, (iii) the Trustee has, for 30 days after receipt of notice, request and offer of such indemnity, failed to institute any such proceeding and (iv) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Secured Parties by such appropriate Proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.

The Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class may, in certain cases, waive any default with respect to the Notes, except (i) a default for more than five Business Days in the payment, when due and payable, of any interest on any Secured Note, (ii) a default in the payment of principal on any Secured Note at its Stated Maturity Date or Redemption Date, (iii) the failure on any Payment Date to disburse amounts available in the Collection Account in accordance with Section 11.1 and continuation of such failure for a period of five Business Days, (iv) certain events of bankruptcy or insolvency with respect to the Issuer or (v) a default in respect of any provision of the Indenture that cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Secured Note adversely affected thereby.

(b)     In case there shall be pending Proceedings relative to the Issuer or any other obligor upon the Secured Notes or Hedge Agreement under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or other obligor upon the Secured Notes or Hedge Agreement, or the creditors or property of the Issuer or such other obligor, the Trustee, regardless of whether the principal of any Secured Notes or Hedge Agreement shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of this Section 5.3, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

(i)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Secured Notes or any Hedge Agreement upon direction by the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee) and of the Secured Noteholders allowed in any Proceedings relative to the Issuer or other obligor upon the Secured Notes or to the creditors or property of the Issuer or such other obligor;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of the Secured Notes, upon the direction of such Holders, in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(iii)     to collect and receive any amounts or other property payable to or deliverable on any such claims, and to distribute all amounts received with respect to the claims of the Secured Noteholders and of the Trustee on behalf of the Secured Noteholders and the Trustee; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Secured Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Secured Noteholders, to pay to the Trustee such amounts as shall

be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholder or any Hedge Counterparty, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or the rights of any Holder thereof, any Hedge Agreement or any Hedge Counterparty, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholder or any Hedge Counterparty in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

In any Proceedings brought by the Trustee on behalf of the Holders, the Trustee shall be held to represent, subject to Section 6.17, all the Secured Parties if applicable, pursuant to Section 6.17.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.3 except in accordance with Section 5.5(a).

### Section 5.4    Remedies

(a)    If an Event of Default shall have occurred and be continuing, and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, the Issuer agrees that, in addition to the requirements of Section 5.5(a), the Trustee may, after giving notice to the Secured Noteholders, the Combination Noteholders, the Collateral Manager, each Hedge Counterparty and each Rating Agency, and shall, upon written direction by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights, privileges and remedies:

(i)    institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any amounts adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Secured Parties hereunder;

(iv)    subject to Section 5.4(d) below, exercise any other rights and remedies that may be available at law or in equity; and

(v)    sell all or a portion of the Collateral or rights or interests therein, at one or more public or private sales conducted in any manner permitted by law and in accordance with Section 5.17.

**provided** that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance thereof pursuant to this Section 5.4 except in accordance with Section 5.5(a).

The Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking firm of national reputation as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral to make the required payments of principal of and interest on the Notes and amounts due to each Hedge Counterparty, which opinion shall be conclusive evidence as to such feasibility or sufficiency.

(b)    If an Event of Default as described in Section 5.1(f) shall have occurred and be continuing, the Trustee may, and at the request of at least 25% of the Holders of the Aggregate Outstanding Amount of the Controlling Class shall, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section, and enforce any equitable decree or order arising from such proceeding; **provided** that (i) such request does not conflict with any provision in the Indenture, (ii) the Trustee determines that such action will not involve the Trustee incurring any liability (unless the Trustee is indemnified to its satisfaction against any such liability) and (iii) the Trustee may take other action deemed proper by the Trustee, that is not inconsistent with such direction.

(c)    Upon any sale of the Collateral, whether made under the power of sale hereby given or by virtue of judicial proceedings, the Placement Agent, the Collateral Manager, its Affiliates or any account managed by them, any Hedge Counterparty, any Secured Noteholder or Secured Noteholders may bid for and purchase the Collateral or any part thereof and, upon compliance with the terms of sale, may hold, retain, possess or dispose of such property in its or their own absolute right without accountability.

Upon any sale of the Collateral, whether made under the power of sale hereby given or by virtue of judicial proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial proceedings, shall be a sufficient discharge to the purchaser or purchasers at any sale for its or their purchase price, and such purchaser or purchasers shall not be obliged to see to the application thereof.

Any such sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall bind the Issuer, the Trustee and the Secured Noteholders, shall operate to divest all right, title and interest whatsoever, either at law or in equity, of each of them in and to the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against any and all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, neither the Trustee nor any Noteholder may, prior to the date which is one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Secured Notes, institute against, or join (or direct) any other Person in instituting against, the Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under federal or state bankruptcy or similar laws (of any jurisdiction). Nothing in this Section 5.4 shall preclude, or be deemed to stop, the Trustee (i) from taking any action prior to the expiration of the aforementioned one year and one day period, or if longer the applicable preference period then in effect, in (A) any case or proceeding voluntarily filed or commenced by the Issuer or (B) any involuntary insolvency proceeding filed or commenced by a Person other than the Trustee, or (ii) from commencing against the Issuer or any of its properties any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

### Section 5.5    Preservation of Collateral

(a)    If an Event of Default shall have occurred and be continuing when any Class of Secured Notes is Outstanding, the Trustee shall retain the Collateral securing the Secured Notes and each Hedge Agreement intact, collect and cause the collection of the proceeds thereof and make all payments and deposits and maintain all accounts in respect of the Collateral and the Secured Notes and each Hedge Agreement in accordance with Section 11.1 and the provisions of Articles X, XII and XIII unless:

(i)    the Trustee, pursuant to Section 5.5(c), determines (such determinations may be based upon a certificate from the Collateral Manager) that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting reasonable expenses relating to such sale or liquidation) would be sufficient to discharge in full the Redemption Prices then due on the Notes, any amounts required to be paid under each Hedge Agreement, all unpaid Administrative Expenses and any accrued and unpaid Collateral Management Fee (to the extent not waived by the Collateral Manager) and the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class agrees with such determination; or

(ii)    the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, subject to the provisions hereof, and subject to the Trustee determining that such action will not involve the Trustee incurring any liability (unless the Trustee is indemnified to its satisfaction against any such liability), direct the sale and liquidation of the Collateral in accordance with Section 5.5(c) below.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to each Holder of the Controlling Class of Notes and each Hedge Counterparty. So long as such Event of Default is continuing, any such retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause Section 5.5(a)(i) or (ii) exist.

(b)      Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral securing the Secured Notes if prohibited by applicable law or if the Trustee is directed to liquidate the Collateral pursuant to Section 5.5(a)(ii).

(c)      In determining whether the condition specified in Section 5.5(a)(i) exists and in connection with any liquidation of the Collateral pursuant to Section 5.5(a)(ii) above, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if it is unable in good faith to obtain such bid prices from two nationally recognized dealers, one nationally recognized dealer), as specified by the Collateral Manager in writing, which are Independent from each other and the Collateral Manager, at the time making a market in such securities and shall compute or cause to be computed the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such security.  In addition, for the purposes of determining issues relating to the execution of a sale or liquidation of the Pledged Securities and the execution of a sale or other liquidation thereof in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain and rely on an opinion of an Independent investment banking firm of national reputation.

The Trustee shall deliver to the Noteholders, each Hedge Counterparty, the Rating Agencies and the Issuer a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than ten days after making such determination but in any event prior to the sale or liquidation of the Collateral.  The Trustee shall make the determinations required by Section 5.5(a)(i) within 30 days after an Event of Default and at the request of the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a)(i).  In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an Independent certified public accountant confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture.  In determining whether the Holders of the requisite percentage of any Class of Secured Notes have given any direction or notice or have agreed pursuant to Section 5.5(a), any Holder of a Secured Note of a Class who is also a Holder of Secured Notes of another Class or any Affiliate of any such Holder shall be counted as a Holder of each such Secured Note for all purposes.

**Section 5.6      Trustee May Enforce Claims Without Possession**

All rights of action and of asserting claims under this Indenture, or under any of the Secured Notes or Combination Notes may be enforced by the Trustee without the possession of any of the Secured Notes or Combination Notes, as applicable, or the production thereof in any trial or other Proceedings relative thereto, and any action or Proceedings instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the reasonable expenses, disbursements and compensation of the Trustee, each predecessor trustee and their respective agents and attorneys and counsel, shall be for the benefit of the Secured Parties and Combination Notes and shall be applied as set forth in Section 5.7.

**Section 5.7    Application of Funds Collected**

Any funds collected by the Trustee with respect to the Hedge Agreements or the Secured Notes or Combination Notes pursuant to this Article V and any funds that may then be held or thereafter received by the Trustee with respect to the Hedge Agreements or the Secured Notes or Combination Notes, as applicable, hereunder shall be applied subject to Section 13.1 and in accordance with the provisions of Section 11.1(c), at the date or dates fixed by the Trustee.

**Section 5.8    Limitation on Suits**

Only the Trustee may pursue remedies available hereunder and no Holder of any Secured Note or Combination Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or its Secured Note or Combination Note, as applicable, or otherwise, for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given to the Trustee written notice of a continuing Event of Default;

(b)    except in the case of a default in the payment of principal or interest, the Holders or Holders of at least 25% of the then Aggregate Outstanding Amount of the Secured Notes of the Controlling Class shall have made a written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder and such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(c)    the Trustee for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such Proceeding; and

(d)    no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class;

it being understood and intended that no one or more Holders of Secured Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Secured Notes or to obtain or to seek to obtain priority or preference over any other Holders of the Secured Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Secured Notes of the same Class. In addition, any action taken by any one or more of the Holders of Secured Notes shall be subject to and in accordance with Sections 13.1 and 11.1(d).

If the Trustee shall receive conflicting or inconsistent requests and indemnity with respect to Section 5.8(d) above from two or more groups of Holders of the Notes of the Controlling Class, each representing less than 66⅔% of the then Aggregate Outstanding Amount of Notes of the Controlling Class, the Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

**Section 5.9    Unconditional Rights of Secured Noteholders to Receive Principal and Interest**

Notwithstanding any other provision in this Indenture (other than Section 2.6(i)), the Holder of any Secured Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest (if any) on such Secured Note as such principal and/or interest become due and payable in accordance with Sections 13.1 and 11.1 and, subject to the provisions of Section 5.8, to institute proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Holders of the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes shall have no right to institute proceedings for the enforcement of any such payment until such time as no Class of Secured Note that is senior to such Class of them remains Outstanding, which right shall be subject to the provisions of Section 5.8, and shall not be impaired without the consent of any such Holder.

**Section 5.10    Restoration of Rights and Remedies**

If the Trustee, any Secured Noteholder or any Combination Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee, to such Secured Noteholder or to such Combination Noteholder, as the case may be, then and in every such case the Issuer, the Trustee, the Secured Noteholder and the Combination Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Secured Parties shall continue as though no such Proceeding had been instituted.

**Section 5.11    Rights and Remedies Cumulative**

No right or remedy herein conferred upon or reserved to the Trustee, to the Secured Noteholders or to the Combination Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

**Section 5.12    Delay or Omission Not Waiver**

No delay or omission of the Trustee, any Secured Noteholder, any Combination Noteholder or any Hedge Counterparty to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Trustee, the Secured Noteholders, the Combination Noteholders or any Hedge Counterparty may be exercised from time to time, and as often as may be deemed expedient, by the Trustee, the Secured Noteholders, the Combination Noteholders or any such Hedge Counterparty, as the case may be.

### Section 5.13    Control by Controlling Class

Notwithstanding any other provision of this Indenture (but subject to the proviso in the definition of "Outstanding" in Section 1.1(a), the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or of any sale of the Collateral, in whole or in part, **provided** that:

(a)    such direction shall not conflict with any rule of law or with this Indenture;

(b)    the Trustee may take any other action deemed proper by it that is not inconsistent with such direction; **provided** that, subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received an indemnity reasonably satisfactory to it against such liability as set forth below);

(c)    the Trustee shall have been provided with an indemnity reasonably satisfactory to it; and

(d)    any direction to the Trustee to undertake a Sale of the Collateral shall be made only pursuant to, and in accordance with, Sections 5.4 and 5.5.

### Section 5.14    Waiver of Past Defaults

The Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class may waive any past Default and its consequences, except:

(a)    a Default for more than five Business Days in the payment, when due and payable, of any interest on any Note; or

(b)    a Default in the payment of principal on any Note at its Stated Maturity Date or Redemption Date; or

(c)    the failure on any Payment Date to disburse amounts available in the Collection Account in accordance with Section 11.1 and the continuation of such failure for a period of five Business Days; or

(d)    a Default arising under Section 5.1(g) or 5.1(h); or

(e)    a Default in respect of any provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected thereby.

In the case of any such waiver, (i) the Issuer, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto, and (ii) the Trustee shall promptly give written notice of any such waiver to the Collateral Manager, each Holder of a Secured Note, each Holder of a Combination Note and each Rating

Agency so long as any such Rating Agency is rating any of the Secured Notes or Combination Notes.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

### Section 5.15    Undertaking for Costs

All parties to this Indenture agree, and each Holder of any Secured Note or Combination Note by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.15 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Secured Noteholder, any Combination Noteholder (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) or group of Secured Noteholders or Combination Noteholders, holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Secured Noteholder or any Combination Noteholder (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) for the enforcement of the payment of the principal of or interest on any Secured Note (or with respect to the Combination Notes, the Class A-3 Note Component) on or after the Stated Maturity Date expressed in such Secured Note (or, in the case of redemption, on or after the applicable Redemption Date).

### Section 5.16    Waiver of Stay or Extension Laws

The Issuer covenants (to the extent that they may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force (including but not limited to filing a voluntary petition under Chapter 11 of the Bankruptcy Code and by the voluntary commencement of a proceeding or the filing of a petition seeking winding up, liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect), which may affect the covenants, the performance of or any remedies under this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

### Section 5.17    Sale of Collateral

(a)    The power to effect any sale (a "__Sale__") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of such Collateral remaining unsold, but shall continue unimpaired until the entire

Collateral shall have been sold or all amounts secured by the Collateral shall have been paid. The Trustee hereby expressly waives its rights to any amount fixed by law as compensation for any Sale; **provided** that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it in connection with such Sale from the proceeds thereof notwithstanding the provisions of Section 6.7.

(b)    The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale thereof, by crediting all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7. The Secured Notes, Combination Notes and each Hedge Agreement need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Secured Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral consists of securities not registered under the Securities Act ("**Unregistered Securities**"), the Trustee may, but shall not be required to, seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained, with the consent of the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class seek, a no-action position from the Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities. In no event will the Trustee be required to register Unregistered Securities under the Securities Act.

(d)    The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Collateral in connection with a sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Collateral in connection with a sale thereof, and to take all action necessary to effect such sale. No purchaser or transferee at such a sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent or see to the application of any funds.

### Section 5.18    Action on the Secured Notes

The Trustee's right to seek and recover judgment on the Secured Notes, or Combination Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Secured Parties shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Collateral or upon any of the assets of the Issuer.

# ARTICLE VI

## THE TRUSTEE

### Section 6.1    Certain Duties and Responsibilities

(a)    Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; **provided** that, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they substantially conform to the requirements of this Indenture and shall promptly, but in any event within three Business Days in the case of an Officer's certificate furnished by the Issuer, notify the party delivering the same if such certificate or opinion does not conform.   If a corrected form shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall promptly notify the Secured Noteholders, the Combination Noteholders and each Hedge Counterparty.

(b)    In case an Event of Default actually known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Holders of not less than 66⅔% (or any other percentage as may be required by the terms hereof) of the Aggregate Outstanding Amount of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, **except** that:

(i)    This Section 6.1(c) shall not be construed to limit the effect of Section 6.1(a);

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer in accordance with this Indenture and/or the Holders of not less than 66⅔% (or such other percentage as may be required by the terms hereof) of the Aggregate Outstanding Amount of the

Controlling Class (or other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers contemplated hereunder, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it (if the amount of such funds or risk or liability does not exceed the amount payable to the Trustee pursuant to Section 11.1(a)(i) net of the amounts specified in Section 6.8(a)(i), the Trustee shall be deemed to be reasonably assured of such repayment) unless such risk or liability relates to performance of its ordinary services, including under Article V, under this Indenture; and

(v)    the Trustee shall not be liable to the Secured Noteholders or Combination Noteholders for any action taken or omitted by it at the direction of the Issuer, the Collateral Manager and/or the Holders of the Secured Notes or Combination Notes under the circumstances in which such direction is required or permitted by the terms of this Indenture.

(d)    For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Event of Default described in Section 5.1(e), (f), (g) or (h) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default or such a Default, as the case may be, is received by the Trustee at the Corporate Trust Office. For purposes of determining the Trustee's responsibility and liability hereunder, whenever reference is made in this Indenture to such an Event of Default or such a Default, as the case may be, such reference shall be construed to refer only to such an Event of Default or such a Default, as the case may be, of which the Trustee is deemed to have notice as described in this Section 6.1(d).

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

(f)    The Trustee shall, upon receipt of reasonable (but no less than three Business Days) prior written notice, permit the Collateral Manager, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Secured Notes, the Combination Notes, the Collateral Management Agreement or each Hedge Agreement, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by such Holder) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Secured Notes, the Combination Notes or each Hedge Agreement, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Secured Notes and the Combination Notes; **provided** that under no circumstances shall the

Collateral Manager be permitted to review any documentation containing the names or other indicia of identity of any of the Noteholders unless any such information (including the percentage of the Aggregate Outstanding Amount of the applicable Class of Secured Notes or Combination Notes held by such Noteholder) has been redacted from such documentation.

(g)    With respect to the security interests created hereunder, the Trustee acts as a fiduciary for the Secured Noteholders only, and serves as a collateral agent for the other Secured Parties.

### Section 6.2    Notice of Default

Promptly (and in no event later than three Business Days) after the occurrence of any Default actually known to a Trust Officer of the Trustee or after acceleration has been made pursuant to Section 5.2, the Trustee shall send to the Issuer, the Income Note Paying Agent, each Rating Agency (for so long as any Class of Secured Notes or Combination Notes is Outstanding), the Collateral Manager, each Hedge Counterparty and to all Holders of Secured Notes and Combination Notes, respectively, as their names and addresses appear on the Note Register, notice of all Defaults hereunder known to the Trustee, unless such Default shall have been cured or waived.

### Section 6.3    Certain Rights of Trustee

Except as otherwise provided in Section 6.1 and Article VIII:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting in good faith and in reliance upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Request or Issuer Order, as the case may be;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other Persons qualified to provide the information required to make such determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)      the Trustee shall be under no obligation to exercise or to honor any of the rights or powers vested in it by this Indenture at the request or direction of any of the Secured Noteholders or Combination Noteholders pursuant to this Indenture, unless such Secured Noteholders or Combination Noteholders, as applicable, shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f)      the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon the written direction of the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Notes of any Class, any Hedge Counterparty or any Rating Agency shall make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and, the Trustee shall be entitled, on reasonable prior notice to the Issuer, to examine the books and records of the Issuer or the Collateral Manager relating to the Secured Notes and the Combination Notes and the Collateral, personally or by agent or attorney at a time acceptable to the Issuer or the Collateral Manager in their reasonable judgment during normal business hours; **provided** that the Trustee shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law by any regulatory authority and (ii) to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)      the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys; **provided** that the Trustee shall not be responsible for any misconduct or negligence on the part of any agent (other than any Affiliate of the Trustee) appointed and supervised, or attorney appointed, with due care by it hereunder;

(h)      the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of an Event of Default, prudently believes to be authorized or within its rights or powers hereunder;

(i)      nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Collateral Manager (unless and except to the extent otherwise expressly set forth herein or upon the request of a Rating Agency);

(j)      the Trustee shall not be responsible or liable for the actions or omissions of, or any inaccuracies in the records of, any non-Affiliated custodian, clearing agency, common depository, Euroclear or Clearstream or for the acts or omissions of the Collateral Manager or the Issuer;

(k)      to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to generally accepted accounting principles in the United States (GAAP), the Trustee shall be entitled to request and receive (and rely upon) instruction from the Issuer or the accountants

appointed pursuant to Section 10.13 as to the application of GAAP in such connection, in any instance;

(l)     to the extent permitted by law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise; and

(m)     the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty.

### Section 6.4   Authenticating Agents

If the Trustee so chooses the Trustee may appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Secured Notes and Combination Notes in connection with issuance, transfers and exchanges under Sections 2.4, 2.5 and 8.5, as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by those Sections to authenticate such Secured Notes or Combination Notes, as applicable.  For all purposes of this Indenture, the authentication of Secured Notes and Combination Notes by an Authenticating Agent pursuant to this Section 6.4 shall be deemed to be the authentication of Secured Notes or Combination Notes, as applicable, "by the Trustee."

Any entity into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any entity succeeding to the corporate trust business of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor entity.

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Issuer.  Upon receiving such notice of resignation or upon such a termination, the Trustee shall promptly appoint a successor Authenticating Agent and shall give written notice of such appointment to the Issuer.

The Issuer agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services (**provided, however**, that, so long as an Authenticating Agent is the Trustee, or an Affiliate thereof, such compensation shall be payable by the Trustee, rather than by the Issuer), and reimbursement for its reasonable expenses relating thereto and the Trustee shall be entitled to be reimbursed for such payments, subject to Section 6.8.  The provisions of Sections 2.3, 6.5 and 6.6 shall be applicable to any Authenticating Agent.

### Section 6.5   Not Responsible for Recitals or Issuance of Secured Notes or Combination Notes

The recitals contained herein and in the Secured Notes and Combination Notes other than the Certificate of Authentication thereon, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no

representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations hereunder), of the Collateral or of the Secured Notes and Combination Notes. The Trustee shall not be accountable for the use or application by the Issuer of the Secured Notes and the Combination Notes, respectively, or the proceeds thereof or any amounts paid to the Issuer pursuant to the provisions hereof.

### Section 6.6    May Hold Secured Notes and Combination Notes

The Trustee, any Note Paying Agent, the Note Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Secured Notes or Combination Notes and, may otherwise deal with the Issuer or any of its Affiliates, with the same rights it would have if it were not Trustee, Note Paying Agent, Note Registrar or such other agent.

### Section 6.7    Funds Held in Trust

Funds held by the Trustee hereunder shall be held in trust to the extent required herein. The Trustee shall be under no liability for interest on any funds received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.

### Section 6.8    Compensation and Reimbursement

(a)    The Issuer agrees:

(i)    to pay the Trustee on each Payment Date the Trustee Fee and reasonable compensation for all other services, including custodial services, rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)    except as otherwise expressly provided herein, to reimburse the Trustee (subject to any written agreement between the Issuer and the Trustee) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof and expenses related to the maintenance and administration of the Collateral (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.2, 5.4, 5.5, 6.3(c), 6.3(k), 10.11 or 10.13, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith but only to the extent any such securities transaction charges have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments);

(iii)    to indemnify the Trustee and its Officers, directors, employees and agents for, and to hold them harmless against, any loss, liability or expense incurred by it without negligence, willful misconduct or bad faith on their part, arising out of or in

connection with the acceptance or administration of this trust, including the reasonable costs and expenses (including reasonable counsel fees) of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties hereunder; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.14.

(b)    The Issuer may remit payment for such fees and expenses to the Trustee or, in the absence thereof, the Trustee may from time to time deduct payment of its fees and expenses hereunder from funds on deposit in the Expense Account pursuant to Section 11.1.

(c)    The Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or if longer the applicable preference period then in effect, after the payment in full of all Secured Notes and Combination Notes issued under this Indenture.

(d)    The amounts payable to the Trustee pursuant to Sections 6.8(a)(ii) through (iv) (other than amounts received by the Trustee from financial institutions under Section 6.8(a)(ii) above) shall not, except as provided by Section 11.1(a)(xxi), exceed on any Payment Date the limitation described in Section 11.1(a)(i) for such Payment Date; **provided**, that (A) the Trustee shall not institute any proceeding for enforcement of such lien except in connection with an action pursuant to Section 5.3 or 5.4 for the enforcement of the lien of this Indenture for the benefit of the Secured Parties and (B) the Trustee may only enforce such a lien in conjunction with the enforcement of the rights of the Secured Parties in the manner set forth in Section 5.4.

The Trustee shall, subject to the Priority of Payments, receive amounts pursuant to this Section 6.8 and Section 11.1 only to the extent that the payment thereof will not result in an Event of Default and the failure to pay such amounts to the Trustee will not, by itself, constitute an Event of Default. Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee shall not have received amounts due it hereunder and hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or, if longer, the applicable preference period then in effect, after the payment in full of all Secured Notes and Combination Notes issued under this Indenture. No direction by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

The indemnifications in favor of the Trustee in this Section 6.8 shall (i) survive any resignation or removal of any Person acting as Trustee (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal) and (ii) apply to the Trustee in its

capacities as Custodian, Note Paying Agent, Secured Note Calculation Agent and Authenticating Agent.

### Section 6.9    Corporate Trustee Required; Eligibility

There shall at all times be a Trustee hereunder which shall be a bank, corporation or trust company organized and doing business under the laws of the United States or of any State thereof, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$250,000,000, subject to supervision or examination by federal or state banking authorities, having a rating of at least "A+" by S&P and having an office within the United States.  If such entity publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of such entity shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.9, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

### Section 6.10    Resignation and Removal; Appointment of Successor

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.

(b)    The Trustee may resign at any time by giving 90 days prior written notice thereof to the Issuer, the Secured Noteholders, the Combination Noteholders, each Hedge Counterparty, the Collateral Manager and each Rating Agency.  Upon receiving such notice of resignation, or if the Trustee is removed or becomes incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Issuer shall (after consultation with the Collateral Manager) promptly propose a successor trustee meeting the requirements of Section 6.9 for approval by the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of the Controlling Class.  A proposed successor trustee approved in accordance with the preceding sentence shall be appointed by the Issuer as successor trustee by written instrument, in duplicate, executed by an Authorized Officer of the Issuer, one copy of which shall be delivered to the Trustee so resigning and one copy to the successor trustee or trustees, together with a copy to each Secured Noteholder and Combination Noteholder.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee or any Holder of a Secured Note, any Holder of a Combination Note or any Hedge Counterparty on behalf of itself and all others similarly situated, subject to Section 5.15, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    The Trustee may be removed at any time by an Act of the Holders of not less than 66⅔% of the then Aggregate Outstanding Amount of each Class of Secured Notes delivered to the Trustee and to the Issuer.

(d)    If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.9 and shall fail to resign after written request therefor by any Holder; or

(ii)    the Trustee shall become incapable of acting or shall be adjudged as bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (A) the Issuer, by Issuer Order (which may be executed by the Collateral Manager) shall remove the Trustee, or (B) subject to Section 5.15, any Holder or any Hedge Counterparty may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)    The Issuer shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first class mail, postage prepaid, to each Rating Agency, each Hedge Counterparty, the Collateral Manager and the Holders as their names and addresses appear in the Note Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Issuer fails to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be given at the expense of the Issuer.

**Section 6.11    Acceptance of Appointment by Successor**

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Issuer and the retiring Trustee (with copies to each Hedge Counterparty and the Collateral Manager) an instrument accepting such appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any other act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuer or a Majority of any Class of Secured Notes, any Hedge Counterparty or the successor Trustee, such retiring Trustee shall, upon payment of its charges, fees, indemnities and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and funds held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in Section 6.8(d). Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No successor Trustee shall accept its appointment unless (a) at the time of such acceptance such successor shall be qualified and eligible under Section 6.9 and the other provisions of this Section 6 and (b) a Rating Agency Confirmation shall have been obtained with respect to the appointment of such successor Trustee shall have been satisfied. No appointment of a successor Trustee shall become effective if the Holders of not less than 66⅔% of the then

Aggregate Outstanding Amount of the Controlling Class objects to such appointment; and no appointment of a successor Trustee shall become effective until the date ten days after notice of such appointment has been given to each Secured Noteholder, each Combination Noteholder and each Rating Agency.

### Section 6.12    Merger, Conversion, Consolidation or Succession to Business of Trustee

Any Person into which the Trustee may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; **provided** such Person shall be otherwise qualified and eligible under this Article VI, without the execution or filing of any paper or any further act on the part of any of the parties hereto. The successor Trustee will notify each Rating Agency of any such merger, conversion or consolidation. In case any of the Secured Notes or Combination Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Secured Notes or Combination Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Secured Notes or Combination Notes.

### Section 6.13    Co-trustees

At any time or times, for the purpose of meeting the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Trustee shall have power to appoint one or more Persons to act as Co-trustee, jointly with the Trustee of all or any part of the Collateral, with the power to file such proofs of claim and take such other actions pursuant to Section 5.6 and to make such claims and enforce such rights of action on behalf of the Holders of the Secured Notes or Holders of the Combination Notes, as applicable, subject to the other provisions of this Section 6.13.

The Issuer shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a Co-trustee. If the Issuer does not join in such appointment within 15 days after the receipt by them of a request to do so, the Trustee shall have power to make such appointment.

Should any written instrument from the Issuer be required by any Co-trustee so appointed for more fully confirming to such Co-trustee such property, title, right or power, any and all such instruments shall, on request, be executed, acknowledged and delivered by the Issuer. The Issuer agrees to pay (subject to the Priority of Payments) for any reasonable fees and expenses in connection with such appointment as Administrative Expenses

Every Co-trustee shall, to the extent permitted by law, but to such extent only, be appointed subject to the following terms:

(a)    the Secured Notes and Combination Notes shall be authenticated and delivered and all rights, powers, duties and obligations hereunder in respect of the custody of

securities, funds and other personal property held by, or required to be deposited or pledged with, the Trustee hereunder, shall be exercised solely by the Trustee;

(b)    the rights, powers, duties and obligations hereby conferred or imposed upon the Trustee in respect of any property covered by the appointment of a Co-trustee shall be conferred or imposed upon and exercised or performed by the Trustee or by the Trustee and such Co-trustee jointly, as shall be provided in the instrument appointing such Co-trustee, except to the extent that under any law of any jurisdiction in which any particular act is to be performed, the Trustee shall be incompetent or unqualified to perform such act, in which event such rights, powers, duties and obligations shall be exercised and performed by a Co-trustee;

(c)    the Trustee at any time, by an instrument in writing executed by it, may accept the resignation of or remove any Co-trustee appointed under this Section 6.13.  A successor to any Co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)    no Co-trustee hereunder shall be personally liable by reason of any act or omission of the Trustee or any other Co-trustee hereunder;

(e)    the Trustee shall not be liable by reason of any act or omission of a Co-trustee;

(f)    any Act of Secured Noteholders or Combination Noteholders delivered to the Trustee shall be deemed to have been delivered to each Co-trustee; and

(g)    each Co-trustee hereunder shall at the time of such acceptance satisfy the qualification required of a Trustee under Section 6.9 and the other provisions of this Article VI

**Section 6.14    Certain Duties Related to Delayed Payment of Proceeds; Other Notices**

In the event that the Trustee shall not have received a payment with respect to any Pledged Security within two Business Days after its Due Date, the Trustee shall (i) notify the Issuer and Collateral Manager in writing and (ii) promptly request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  In the event that such payment is not made within such time period, the Trustee, subject to the provisions of Section 6.1(c)(iv), shall, subject to the restrictions on the sale of Collateral Debt Securities set forth in Section 12.1, take such action as the Collateral Manager shall direct in writing.  Any such action shall be without prejudice to any right to claim a Default under this Indenture.  The Trustee will promptly notify the Issuer if the Collateral Manager has determined that (i) any Collateral Debt Security has become a Defaulted Security, a Deferred Interest PIK Bond, a Credit Risk Security or a Written Down Security or (ii) the Trustee has received an Equity Security in connection with any Collateral Debt Security.

Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date

thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.14 and such payment shall not be deemed part of the Collateral.

### Section 6.15    Representations and Warranties of the Bank

(a)    **Organization**.  The Bank has been duly organized and is validly existing as a national banking association under the laws of the United States and has the power to conduct its business and affairs as a trustee.

(b)    **Authorization; Binding Obligations**.  The Bank has the power and authority to perform the duties and obligations of Trustee, Note Registrar and Note Transfer Agent or any other capacity to which it is appointed under this Indenture.  The Bank has taken all necessary action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant hereto.  This Indenture has been duly executed and delivered by the Bank.  Upon execution and delivery by the Issuer, this Indenture will constitute the legal, valid and binding obligation of the Bank enforceable in accordance with its terms.

(c)    **Eligibility**.  The Bank is eligible under Section 6.9 to serve as Trustee hereunder.

(d)    **No Conflict**.  Neither the execution, delivery and performance of this Indenture, nor the consummation of the transactions contemplated by this Indenture, (i) is prohibited by, or requires the Bank to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree that is binding upon the Bank or any of its properties or assets, or (ii) will violate any provision of, result in any default or acceleration of any obligations under, result in the creation or imposition of any lien pursuant to, or require any consent under, any agreement to which the Bank is a party or by which it or any of its property is bound.

(e)    **No Proceedings**.  There are no proceedings pending, or to the best knowledge of the Bank, threatened against the Bank before any federal, state or other governmental agency, authority, administrator or regulatory body, arbitrator, court or other tribunal, foreign or domestic, that could have a material adverse effect on the Collateral or any action taken or to be taken by the Bank under this Indenture.

### Section 6.16    Exchange Offers, Proposed Amendments etc.

In the event that the Trustee receives written notice of any proposed amendment, consent or waiver under the Underlying Instruments of any Collateral Debt Security (before or after any default), the Trustee shall promptly deliver copies of such notice to the Issuer and the Collateral Manager.  The Collateral Manager may, on behalf of the Issuer, instruct the Trustee pursuant to an Issuer Order to, and the Trustee shall, take any of the following actions with respect to a Collateral Debt Security or Equity Security as to which an Offer has been made or as to which any consent, waiver, vote or exercise has been requested:  (i) exchange such instrument for other securities or a mixture of securities and other consideration pursuant to such Offer (and in making a determination whether or not to exchange any security, none of the restrictions set

forth in Article XII shall be applicable); and (ii) give consent, grant waiver, vote or exercise any or all other rights or remedies with respect to any such Collateral Debt Security or Equity Security. In the event that the Trustee does not receive instruction from the Collateral Manager, the Trustee shall not take action with respect to such Offer or such request for consent, waiver, vote or exercise.

### Section 6.17    Fiduciary for Secured Noteholders Only; Agent for Other Secured Parties

With respect to the security interests created hereunder, the pledge of any portion of the Collateral to the Trustee is to the Trustee as representative of the Secured Noteholders and agent for other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any portion of the Collateral and the endorsement to or registration in the name of the Trustee of any portion of the Collateral (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Secured Noteholders and as agent for the other Secured Parties. The Trustee shall not by reason of this Indenture be deemed to be acting as fiduciary for any Hedge Counterparty or the Collateral Manager, **provided** that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

### Section 6.18    Withholding

If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Noteholder, such tax shall reduce the amount otherwise distributable to such Noteholder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is required to be withheld or deducted by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings). The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to such Noteholder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.18. If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Income Notes.

### ARTICLE VII

### COVENANTS

### Section 7.1    Payment of Principal and Interest

The Issuer will duly and punctually pay all principal (including the Class C Cumulative Periodic Interest Shortfall Amount, the Class D Cumulative Periodic Interest

Shortfall Amount, the Class E Cumulative Periodic Interest Shortfall Amount and the Class F Cumulative Periodic Interest Shortfall Amount), interest (including Periodic Interest and Defaulted Interest and interest thereon, if any) in accordance with the terms of the Secured Notes, the Combination Notes and this Indenture and amounts due under each Hedge Agreement in accordance with this Indenture.   Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Secured Noteholder of principal and/or interest shall be considered as having been paid by the Issuer to such Secured Noteholder for all purposes of this Indenture.

The Trustee shall, unless prevented from doing so for reasons beyond its reasonable control, give notice to each Secured Noteholder, each Combination Noteholder and each Rating Agency of any such withholding requirement no later than ten days prior to the date of the payment from which amounts are required to be withheld; **provided** that despite the failure of the Trustee to give such notice, amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided above.

### Section 7.2    Maintenance of Office or Agency

The Issuer hereby appoints the Trustee as Note Paying Agent for the payment of principal of and interest on the Secured Notes and the Combination Notes and appoints the Income Note Paying Agent as paying agent for amounts due on the Income Note Components. Secured Notes and Combination Notes may be surrendered for registration of transfer or exchange at the Corporate Trust Office. The Issuer hereby appoints Maples Finance Limited, as offshore Note Paying Agent and as the Issuer's agent where notices and demands to or upon the Issuer in respect of any Secured Notes and Combination Notes listed on the Cayman Islands Stock Exchange may be served and where such Secured Notes and Combination Notes may be surrendered for registration of transfer or exchange

The Issuer may at any time and from time to time, terminate the appointment of any such agent or appoint any additional agents for any or all of such purposes; **provided** that (A) the Issuer will maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands to or upon the Issuer in respect of the Secured Notes and Combination Notes and this Indenture may be served, (B) no Note Paying Agent shall be appointed in a jurisdiction which subjects payments on the Secured Notes and Combination Notes to withholding tax and (C) the Issuer may not terminate the appointment of any Note Paying Agent without the consent of each Income Noteholder.  The Issuer shall give prompt written notice to the Trustee and each Rating Agency and the Secured Noteholders and the Combination Noteholders of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Issuer shall fail to maintain any such required office or agency in the Borough of Manhattan, The City of New York or shall fail to furnish the Trustee with the address thereof, presentations and surrenders may be made, and Secured Notes and Combination Notes may be presented and surrendered for payment to the Note Paying Agent at its office in Illinois (and the Issuer hereby appoints the same as its agent to receive such respective presentations and surrenders).

### Section 7.3    Funds for Secured Payments to be Held in Trust

All payments of amounts due and payable with respect to any Secured Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Issuer by the Trustee or a Note Paying Agent with respect to payments on the Secured Notes.

When the Issuer shall have a Note Paying Agent or Income Note Paying Agent that is not also the Note Registrar, it shall direct the Note Registrar to furnish to the Note Paying Agent and/or the Income Note Paying Agent, as applicable, no later than the fifth calendar day after each Record Date a list, if necessary, in such form as such Note Paying Agent or Income Note Paying Agent may reasonably request, of the names and addresses of the Holders (or the Combination Noteholders in the case of the Income Note Paying Agent) and of the certificate numbers of individual Secured Notes or Combination Notes held by each such Holder.

The initial Note Paying Agent shall be as set forth in Section 7.2.  Any additional or successor Paying Agents shall be appointed by the Issuer, or by the Collateral Manager on behalf of the Issuer by Issuer Order with written notice thereof to the Trustee and the Rating Agencies; **provided** that so long as any Class of Secured Notes or the Combination Notes are rated by the Rating Agencies and with respect to any additional or successor Note Paying Agent for the Secured Notes and Combination Notes (with respect to the Class A-3 Note Component), as applicable, (a) the Note Paying Agent for the Secured Notes has a rating of not less than "AA-" and not less than "A-1+" by S&P or (b) a Rating Agency Confirmation from S&P shall have been obtained with respect to the appointment of such Note Paying Agent.  In the event that (i) the Issuer has actual knowledge that such successor Note Paying Agent ceases to have a rating of at least "AA-" and of "A-1+" by S&P or (ii) a Rating Agency Confirmation from S&P shall not have been obtained with respect to the appointment of such Note Paying Agent, the Issuer shall promptly remove such Note Paying Agent and appoint a successor Note Paying Agent.  The Issuer shall not appoint any Note Paying Agent (other than an initial Note Paying Agent) that is not, at the time of such appointment, a depository institution or trust company subject to supervision and examination by federal and/or state and/or national banking authorities.  The Issuer shall cause each Note Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which such Note Paying Agent shall agree with the Trustee (and if the Trustee acts as Note Paying Agent, it hereby so agrees), subject to the provisions of this Section 7.3, that such Note Paying Agent will:

(a)    allocate all sums received for payment to the Holders of Secured Notes for which it acts as Note Paying Agent on each Payment Date and Redemption Date among such Holders in the proportion specified in the instructions set forth in the applicable Payment Report or Redemption Date Statement or as otherwise provided herein, in each case to the extent permitted by applicable law;

(b)    hold all amounts held by it for the payment of amounts due with respect to the Secured Notes and the Combination Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(c)    if such Note Paying Agent is not the Trustee, immediately resign as a Note Paying Agent and forthwith pay to the Trustee all amounts held by it in trust for the payment of Secured Notes and the Combination Notes if at any time it ceases to meet the standards set forth above required to be met by a Note Paying Agent at the time of its appointment;

(d)    if such Note Paying Agent is not the Trustee, immediately give the Trustee notice of any Default by the Issuer (or any other obligor upon the Secured Notes) in the making of any payment required to be made; and

(e)    if such Note Paying Agent is not the Trustee at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all amounts so held in trust by such Note Paying Agent.

If the Issuer shall have appointed a Note Paying Agent other than the Trustee, the Trustee shall deposit on or prior to the Business Day next preceding each Payment Date or Redemption Date, as the case may be, with such Note Paying Agent, if necessary, an aggregate amount sufficient to pay the amounts then becoming due (to the extent funds are then available for such purpose in the Collection Account, as the case may be), such amount to be held in trust for the benefit of the Persons entitled thereto.  Any funds deposited with a Note Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Secured Notes and the Combination Notes with respect to which such deposit was made shall be paid over by such Note Paying Agent to the Trustee for application in accordance with Article XI.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, direct any Note Paying Agent to pay to the Trustee all amounts held in trust by such Note Paying Agent, such amounts to be held by the Trustee upon the same trusts as those upon which such amounts were held by such Note Paying Agent; and, upon such payment by any Note Paying Agent to the Trustee, such Note Paying Agent shall be released from all further liability with respect to such amounts

Except as otherwise required by applicable law, any funds deposited with the Trustee or any Note Paying Agent in trust for the payment of the principal of or interest on any Secured Note or Combination Note and remaining unclaimed for two years after the same has become due and payable shall be paid to the Issuer on Issuer Request; and the Holder of such Secured Note or Combination Note (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) shall thereafter, as an unsecured general creditor, look only to the Issuer for payment of such amounts and all liability of the Trustee or such Note Paying Agent with respect to such trust funds (but only to the extent of the amounts so paid to the Issuer) shall thereupon cease.  The Trustee or such Note Paying Agent, before being required to make any such release of payment, may, but shall not be required to, adopt and employ, at the expense of the Issuer, any reasonable means of notification of such release of payment, including mailing notice of such release to Holders whose Secured Notes or Combination Notes have been called but have not been surrendered for redemption or whose right to or interest in amounts due and payable but not claimed is determinable from the records of any Note Paying Agent, at the last address of record of each such Holder.

**Section 7.4    Existence of Issuer**

The Issuer shall maintain in full force and effect its existence and rights as an exempted company incorporated and registered under the laws of the Cayman Islands and shall obtain and preserve its qualification to do business in each jurisdiction in which such qualifications are or shall be necessary to protect the validity and enforceability of this Indenture, the Secured Notes, the Combination Notes or any of the Collateral; **provided, however**, that the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer, so long as (i) a Tax Event shall have occurred and would be cured by such change or the Issuer's remaining in the same jurisdiction would have a material adverse effect on the Holders of the Notes of any Class, (ii) prior written notice of such change shall have been given to the Trustee and by the Trustee to the Holders of the Secured Notes, the Combination Notes, each Rating Agency, for so long as each such Rating Agency is rating any of the Secured Notes or the Combination Notes, and each Hedge Counterparty, (iii) Rating Agency Confirmation is received, (iv) on or prior to the fifteenth Business Day following such notice by the Trustee, the Trustee shall not have received written notice from a Majority of any Class of Secured Notes objecting to such change, (v) the Issuer prepares, executes and delivers any documentation necessary to maintain the perfection of the first-priority security interest in the Collateral and the "securities entitlement" (as defined in the UCC) with respect to Financial Assets under this Indenture and (vi) such change would not have a material adverse effect on the Issuer's obligations under this Indenture or any Hedge Counterparty's rights or obligations under the Indenture or the related Hedge Agreement, respectively; **provided**, that the Issuer shall be entitled to take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States so long as prior to taking any such action the Issuer receives an Opinion of Counsel from nationally recognized counsel to the effect that it is not necessary to take such action outside of the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to any U.S. federal, state or local withholding or other taxes.

The Issuer shall ensure that all corporate or other formalities regarding its existence (including holding regular board of directors' and shareholders', or other similar, meetings) or registrations are followed (including correcting any known misunderstanding regarding its separate existence).  The Issuer shall not take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  At least one director of the Issuer shall be Independent of other parties to the Transaction Documents.  So long as any Note is outstanding, the Issuer shall maintain and implement administrative and operating procedures reasonably necessary in the performance of the Issuer's obligations hereunder, and the Issuer shall at all times keep and maintain, or cause to be kept and maintained, separate books, records, accounts, financial statements, if any, and other information customarily maintained for the performance of the Issuer's obligations hereunder and shall allocate fairly and reasonably and pay any overhead for shared office space utilized, if any; shall at all times hold itself out to the public and all other persons as a legal entity separate from its equity holders and any other person; and shall not become involved in the day-to-day management of any other person (except as otherwise provided or contemplated in this Indenture or other related documents to which it is a party).  Without limiting the foregoing, so long as any

Note is outstanding (i) the Issuer shall (a) pay its own liabilities out of its own funds (b) maintain an arm's-length relationship with its Affiliates and (c) (if utilized) use separate stationery, invoices and checks and (ii) the Issuer shall not (a) have any subsidiaries (other than any Tax Subsidiary), (b) have any employees (other than its directors), (c) engage in any transaction with any shareholder that would constitute a conflict of interest, (d) pay dividends (other than in accordance with the terms of this Indenture, its Articles and the Income Note Paying Agency Agreement), (e) commingle assets with those of any other entity, or (f) conduct business under an assumed name (*i.e.*, no "DBAs"), **provided**, that the foregoing shall not prohibit the Issuer from entering into the transactions contemplated by the Administration Agreement with the Administrator and the Income Note Paying Agency Agreement with the Income Note Paying Agent.

### Section 7.5    Protection of Collateral

(a)    The Issuer shall from time to time, execute and deliver all such supplements and amendments hereto and all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)    Grant more effectively all or any portion of the Collateral;

(ii)    maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)    enforce any of the Pledged Securities or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee, each Hedge Counterparty and the Holders of the Secured Notes against the claims of all Persons and parties; or

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Collateral.

The Issuer hereby designates the Trustee its agent and attorney-in-fact to execute any Financing Statement, continuation statement or other instrument delivered to it pursuant to this Section 7.5, and the Trustee, as agent of the Issuer, agrees to file such continuation statements as are necessary to maintain perfection of the Collateral perfected by the filing of Financing Statements, **provided** that the Issuer retains ultimate responsibility to maintain the perfection of the Collateral perfected by the filing of Financing Statements and any failure of the Trustee to file continuation statements pursuant to this undertaking shall not result in any liability of the Trustee and the Trustee shall be entitled to indemnification pursuant to Section 6.8(a) with respect to any claim, loss, liability or

expense incurred by the Trustee with respect to the filing of such continuation statements. The Trustee agrees that it will from time to time, at the direction of any Secured Party, execute and cause to be filed Financing Statements and continuation statements. The Issuer shall otherwise cause the perfection and priority of the security interest in the Collateral and the maintenance of such security interest at all times. Notwithstanding anything to the contrary herein, the right of a Secured Party to provide direction to the Trustee shall not impose upon the Trustee, as Secured Party, any obligation to provide any such direction   The Issuer agrees that a carbon, photographic, photostatic or other reproduction of this Indenture or of a Financing Statement is sufficient as an Indenture or a Financing Statement as the case may be.

(b)    The Trustee shall not (i) except in accordance with Section 9.2 and 10.12(a) or (b), as applicable, remove any portion of the Collateral that consists of Cash or is evidenced by an Instrument, certificate or other writing (A) from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1(c)(i), if no Opinion of Counsel has yet been delivered pursuant to Section 7.6) or (B) from the possession of the Person who held it on such date or (ii) cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (A) located in a different jurisdiction from the jurisdiction in which such ownership or pledge was recorded at such date or (B) other than the Person on whose books such ownership or pledge was recorded at such date, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c)    The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities that secure the Secured Notes; **provided** that the Issuer shall not be required to pay or discharge or cause to be paid or discharged any such tax whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which disputed amounts or adequate reserves have been made or the failure of which to pay or discharge could not reasonably be expected to have a material adverse effect upon the ability of the Issuer to timely and fully perform any of its payment or other material obligations under this Indenture or upon the interests of the Secured Noteholders in the Collateral.

(d)    The Issuer shall enforce all of its material rights and remedies under the Transaction Documents to which it is a party.

(e)    Without at least 30 days' prior written notice to the Trustee, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature pages hereto.

### Section 7.6    Opinions as to Collateral

On or before the Payment Date in February of each calendar year, commencing in 2008, the Issuer shall furnish to the Trustee and each Rating Agency (with copies to each Hedge

Counterparty) an Opinion of Counsel stating that, in the opinion of such counsel, as of the date of such opinion, the lien and security interest created by this Indenture with respect to the Collateral remains a valid and perfected first priority lien and describing the manner in which such security interest shall remain perfected.

### Section 7.7     Performance of Obligations

(a)     The Issuer may, with the prior written consent of the Holders of a Majority of each Class of Secured Notes and the Holders of not less than 66⅔% of the aggregate principal amount of the Outstanding Income Notes (except in the case of the Transaction Documents as of the Closing Date), contract with other Persons, including the Collateral Administrator, the Collateral Manager and the Bank, for the performance of actions and obligations to be performed by the Issuer hereunder by such Persons.  Notwithstanding any such arrangement, the Issuer shall remain liable for all such actions and obligations.  In the event of such contract, the performance of such actions and obligations by such Persons shall be deemed to be performance of such actions and obligations by the Issuer and the Issuer will punctually perform, and use its best efforts to cause such other Person to perform, all of their obligations and agreements contained in related agreement.

(b)     The Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority.

(c)     In the event that (i) the ownership of a Collateral Debt Security or property acquired in respect of a Collateral Debt Security would result in the Issuer being or becoming subject to U.S. tax on a net income basis or being or becoming subject to the U.S. branch profits tax (in either case, such Collateral Debt Security becoming a "**Taxed Collateral Debt Security**" and such property becoming a "**Taxed Property**"), and (ii) the Issuer does not sell or otherwise dispose of all or a portion of such Taxed Collateral Debt Security or Taxed Property in accordance with the provisions of the Indenture, the Collateral Manager on behalf of the Issuer shall, prior to such Collateral Debt Security becoming a Taxed Collateral Debt Security or such property becoming a Taxed Property, (a) set up a special purpose subsidiary meeting S&P's then current published criteria for bankruptcy remote special purpose entities (a "**Tax Subsidiary**") to receive and hold any such Taxed Collateral Debt Security or Taxed Property or transfer such Taxed Collateral Debt Security or Taxed Property to the Tax Subsidiary or (b) contribute such taxed Collateral Debt Security or Taxed Property to a REMIC or other pass-through entity, unless the Issuer has received an opinion of nationally recognized counsel to the effect that the Issuer can hold such Taxed Collateral Debt Security directly without causing the Issuer to be treated as engaged in a trade or business in the United States for United States federal income tax purposes.  The Issuer shall cause the purposes and permitted activities of any such Tax Subsidiary to be restricted solely to the acquisition, holding and disposition of such Taxed Collateral Debt Security or Taxed Property and shall require such subsidiary to distribute 100% of the proceeds of any sale of such Taxed Collateral Debt Security or Taxed Property, net of any tax liabilities, to the Issuer.

### Section 7.8     Negative Covenants

(a)     The Issuer will not:

     (i)    intentionally operate so as to be subject to U.S. federal income taxes on its net income;

     (ii)    sell, assign, participate, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Collateral, except as expressly permitted by this Indenture;

     (iii)    claim any credit on, make any deduction from, or dispute the enforceability of, the payment of the principal or interest (or any other amount) payable in respect of the Secured Notes (other than amounts required to be paid, deducted or withheld in accordance with any applicable law or regulation of any governmental authority) or assert any claim against any present or future Secured Noteholder by reason of the payment of any taxes levied or assessed upon any part of the Collateral;

     (iv)    (A) incur or assume or guarantee any indebtedness, other than the Secured Notes and this Indenture and the transactions contemplated hereby; (B) issue any additional class of securities other than the Income Notes and the Ordinary Shares; or (C) issue any additional shares of stock;

     (v)    (A) take any action that would impair the validity or effectiveness of this Indenture or any Grant hereunder or the lien of this Indenture, amend hypothecate, subordinate, terminate, discharge or release any Person from any covenants or obligations with respect to this Indenture, the Secured Notes or the Combination Notes, except as may be permitted hereby, (B) create or extend any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) on or to the Collateral or any part thereof, any interest therein or the proceeds thereof, or (C) take any action that would cause the lien of this Indenture not to constitute a valid first priority security interest in the Collateral;

     (vi)    use any of the proceeds of the Secured Notes or Combination Notes, as applicable, issued hereunder (A) to extend "purpose credit" within the meaning given to such term in Regulation U or (B) to purchase or otherwise acquire any Margin Stock;

     (vii)    permit the aggregate book value of all Margin Stock held by the Issuer on any date to exceed the net worth of the Issuer on such date (excluding any unrealized gains and losses) on such date;

     (viii)    dissolve or liquidate in whole or in part, except as permitted hereunder; or

     (ix)    except for any agreements involving the purchase and sale of Collateral Debt Securities having customary purchase or sale terms and documents with customary loan trading documentation (but not excepting each Hedge Agreement), enter into any agreements unless such agreements contain "non-petition" and "limited recourse" provisions with respect to the Issuer, nor shall the Issuer amend any such "non-petition" or "limited recourse" provisions without first obtaining Rating Agency Confirmation from S&P.

(b)    Except as permitted by this Indenture or the Collateral Management Agreement, (i) the Issuer will not do business under any other name other than the name set forth in the Articles and (ii) neither the Issuer nor the Trustee shall acquire any Collateral after the Closing Date, sell, transfer, exchange or otherwise dispose of Collateral, or enter into or engage in any business with respect to any part of the Collateral.

### Section 7.9    Statement as to Compliance

On or before the Payment Date in February of each calendar year commencing in 2008, or immediately if there has been a Default in the fulfillment of an obligation under this Indenture, the Issuer shall deliver to the Trustee, the Income Note Paying Agent, the Collateral Manager and each Rating Agency a certificate of the Issuer stating, as to each signer thereof, that:

(a)    the Officer executing such certificate has conducted a review of the activities of the Issuer and of the Issuer's performance under this Indenture during the 12-month period ending on December 31 of such year (or from the Closing Date until December 31, 2007, in the case of the first such certificate) based on reports and other information delivered to such Officer by the Trustee, the Collateral Manager and the Collateral Administrator and a review of the Accountant's Reports prepared pursuant to Section 10.13 and such other materials as such Officer deems appropriate; and

(b)    to the best of knowledge of the Issuer, based on such review, the Issuer has fulfilled all of its material obligations under this Indenture throughout the period, or, if there has been a Default in the fulfillment of any such obligation, specifying each such Default known to such Officer and the nature and status thereof, including actions undertaken to remedy the same.

### Section 7.10    Issuer May Consolidate, etc., Only on Certain Terms

(a)    The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law and unless:

(i)    the Issuer shall be the surviving entity, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred or conveyed shall be an exempted limited liability company organized and existing under the laws of the Cayman Islands or such other jurisdiction outside the United States as may be approved by a Majority of each Class and each Hedge Counterparty, and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, each Hedge Counterparty, each Secured Noteholder and each Combination Noteholder, the due and punctual payment of the principal of and interest on all Secured Notes and Combination Notes and the performance of every covenant of this Indenture and each Hedge Agreement on the part of the Issuer to be performed or observed, all as provided herein;

(ii)    each Rating Agency and each Hedge Counterparty shall have received written notification from the Issuer of such consolidation, merger, transfer or conveyance

and the identity of the surviving entity and a Rating Agency Confirmation shall have been obtained with respect to the consummation of such transaction;

(iii)    if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred or conveyed shall have agreed with the Trustee (A) to observe the same legal requirements for the recognition of such formed or surviving entity as a legal entity separate and apart from any of its Affiliates as are applicable to the Issuer with respect to its Affiliates and (B) not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with the provisions of this Section 7.10;

(iv)    if the Issuer is not the surviving entity, the Person formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred or conveyed shall have delivered to the Trustee, each Hedge Counterparty and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that such Person shall be duly organized, validly existing and (if applicable) in good standing in the jurisdiction in which such Person is organized; that such Person has sufficient power and authority to assume the obligations set forth in Section 7.10(a)(i) above and to execute and deliver an indenture supplemental hereto for the purpose of assuming such obligations; that such Person has duly authorized the execution, delivery and performance of an indenture supplemental hereto for the purpose of assuming such obligations and that such supplemental indenture is a valid, legal and binding obligation of such Person, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law); that, immediately following the event which causes such Person to become the successor to the Issuer, (A) such Person has good and marketable title, free and clear of any lien, security interest or charge, other than the lien and security interest of this Indenture, to the Collateral; (B) the Trustee continues to have a valid perfected first priority security interest in the Collateral securing all of the Secured Notes; (C) such Person has received an Opinion of Counsel to the effect that such Person will not be subject to net income tax or be treated as engaged in a trade or business within the United States for U.S federal income tax purposes and such other matters as the Trustee, each Hedge Counterparty or any Secured Noteholder may reasonably require;

(v)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(vi)    the Issuer shall have delivered to the Trustee, each Hedge Counterparty and each Secured Noteholder an Officer's certificate and an Opinion of Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Article VII, that all conditions precedent in this Article VII provided for relating to such transaction have been complied with and that no adverse tax consequences will result therefrom to the Issuer, any Secured Noteholder or any Hedge Counterparty; and

(vii)    the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, the Issuer will not be required to register as an investment company under the Investment Company Act.

### Section 7.11    Successor Substituted

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Issuer, in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than the Issuer), or, the Person to which such transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein.  In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article VII may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Secured Notes and Combination Notes and from its obligations under this Indenture.

### Section 7.12    No Other Business

The Issuer shall not engage in any business or activity other than (i) issuing and selling the Secured Notes and the Combination Notes pursuant to this Indenture, (ii) issuing and selling the Income Notes in accordance with the Income Note Paying Agency Agreement (iii) issuing the Ordinary Shares pursuant to the Articles, (iv) acquiring, pledging, holding and disposing of, solely for its own account, Collateral Debt Securities, Temporary Ramp-Up Securities, Eligible Investments and other Collateral described in clauses (a) to (e) of the granting clauses hereof, and (v) such other activities that are incidental thereto and connected therewith.  The Issuer will not amend its Articles, if such amendment would result in the rating (including any private or confidential rating) of any Class of Secured Notes or of the Combination Notes being reduced or withdrawn.  The Issuer shall not engage in any business or activity or hold any asset that would cause the Issuer to be treated as being engaged in a U.S. trade or business for U.S. federal income tax purposes.

### Section 7.13    Change or Withdrawal of Rating

The Issuer shall promptly notify the Trustee in writing and upon receipt of such notice the Trustee shall promptly notify the Secured Noteholders, the Combination Noteholders, and each Hedge Counterparty if at any time the rating of any Class of Secured Notes or the Combination Notes has been, or is known will be, changed or withdrawn.

### Section 7.14    Reporting

At any time when the Issuer is not subject to Article XIII or Section 15(d) of the Exchange Act and is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of a Secured Note, Combination Note or Income Note, the Issuer shall promptly furnish or cause to be furnished Rule 144A Information to such Holder or Beneficial Owner, to a prospective purchaser of such Secured Note,

Combination Note or Income Note designated by such Holder or Beneficial Owner or to the Trustee for delivery to such Holder or Beneficial Owner or a prospective purchaser designated by such Holder or Beneficial Owner, as the case may be, in order to permit compliance by such Holder or Beneficial Owner with Rule 144A in connection with the resale of such Secured Note, Combination Note or Income Note by such Holder or Beneficial Owner.

### Section 7.15  Secured Note Calculation Agent

(a)     The Issuer hereby agrees that for so long as any of the Secured Notes remain Outstanding the Issuer will at all times cause there to be an agent appointed to calculate LIBOR in respect of each Interest Period in accordance with the terms of Schedule B (the "**Secured Note Calculation Agent**"), which agent shall be a financial institution, subject to supervision or examination by federal or state authority, having a rating of at least "A+" by S&P and having an office within the United States.  Whenever the Secured Note Calculation Agent is required to act or exercise judgment, it will do so in good faith and in a commercially reasonable manner.  The Issuer has initially appointed the Trustee as Secured Note Calculation Agent for purposes of determining LIBOR for each Interest Period.  The Secured Note Calculation Agent may be removed at the direction of the Issuer at any time; **provided** that for so long as LaSalle Bank National Association is the Trustee, LaSalle Bank National Association shall also be the Secured Note Calculation Agent.  If the Secured Note Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, the Issuer (after consultation with the Collateral Manager) will propose a leading bank which is engaged in transactions in Dollar deposits in the international Eurodollar market and which does not control or is not controlled by or under common control with the Issuer or any of its Affiliates as a replacement Secured Note Calculation Agent for approval by Holders of not less than 66⅔% of the aggregate principal amount of the Outstanding Income Notes.  The Secured Note Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     As soon as possible after 11:00 a.m. (London time) on each LIBOR Calculation Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Calculation Date, the Secured Note Calculation Agent will calculate LIBOR for the next Interest Period and the Periodic Interest payable for such Interest Period in respect of the Outstanding Secured Notes, rounded to the nearest cent, with half a cent being rounded upward, on the related Payment Date to be given to the Issuer, the Trustee, the Collateral Manager, the Depositary, Euroclear, Clearstream, the Note Paying Agent and the Cayman Paying Agent on the Note Report for such Payment Date.  The Secured Note Calculation Agent will also specify to the Issuer and the Collateral Manager the quotations upon which the Applicable Periodic Interest Rate for each Class of Secured Notes is based, and in any event the Secured Note Calculation Agent must notify the Issuer and the Collateral Manager before 5:00 p.m. (New York time) on each applicable LIBOR Calculation Date if it has not determined and is not in the process of determining LIBOR with respect to the Secured Notes and the Periodic Interest with respect to each Class of Secured Notes, together with its reasons for the delay.

### Section 7.16    Listing

The Issuer will use its commercially reasonable efforts to obtain and maintain the listing of each Class of Secured Notes and the Combination Notes on the Cayman Islands Stock Exchange.

### Section 7.17    Amendment of Certain Documents

The Issuer will not agree to any amendment to or modification of its Articles, the Administration Agreement, the Collateral Management Agreement, the Account Control Agreement or any Hedge Agreement at any time without obtaining Rating Agency Confirmation with respect to any such amendment or modification, if such Rating Agency Confirmation is required in such Transaction Document, and will not amend, modify or waive any "non-petition" or "limited recourse" provisions of any Transaction Document to which it is a party without obtaining a Rating Agency Confirmation with respect to such amendment, modification or waiver. The Trustee shall provide each Hedge Counterparty, the Collateral Manager and the Rating Agencies with a copy of any such amendment, modification or waiver at least ten Business Days before effecting such amendment or modification.

### Section 7.18    Purchase of Collateral; Information Regarding Collateral; Rating Confirmation

(a)    The Issuer (or the Collateral Manager on behalf of the Issuer) will use reasonable efforts to purchase or enter into agreements to purchase, on or before the Effective Date, Collateral Debt Securities having an aggregate Principal Balance, together with the aggregate Principal Balance of all Eligible Investments purchased with Uninvested Proceeds, of not less than U.S.$600,000,000 (assuming, for these purposes, settlement (in accordance with customary settlement procedures in the relevant markets) of all agreements entered into by the Issuer to acquire Collateral Debt Securities scheduled to settle on or following the Effective Date). Upon any purchase pursuant to this Section 7.18, all of the Issuer's right, title and interest to the Pledged Security or Pledged Securities shall be, and hereby is, Granted to the Trustee pursuant to this Indenture, such Pledged Security or Pledged Securities shall be registered in the name of the Trustee, and the Trustee shall receive such Pledged Security or Pledged Securities in accordance with Section 3.3(c).

(b)    The Issuer (or the Collateral Manager on behalf of the Issuer) shall cause to be delivered to the Trustee on the Effective Date an amended Schedule A listing all Collateral Debt Securities purchased on or before the Effective Date, which schedule will supersede any prior Schedule A delivered to the Trustee.

(c)    On or before the Effective Date, the Issuer (or the Collateral Manager on its behalf) shall deliver an Officer's certificate to the Trustee, each Hedge Counterparty and each Rating Agency (in addition to any such Officer's certificate, the information set forth in such Officer's certificate shall also be provided to S&P in a form that complies with and includes the information required by S&P's Preferred Format) demonstrating compliance by the Issuer with its obligations under Section 7.18(a) and satisfaction of each applicable Collateral Quality Test and Coverage Test or, if on the Effective Date, the Issuer shall be in default in the performance

of its obligations under this Section 7.18 or any of the Collateral Quality Tests, the Collateral Concentration Limitations or the specified Coverage Tests shall fail to be satisfied, the Issuer (or the Collateral Manager on its behalf) shall deliver an Officer's certificate to the Trustee, each Hedge Counterparty and each Rating Agency specifying the details of such default or failure; **provided**, that the failure to satisfy any of the Collateral Quality Tests, Collateral Concentration Limitations or Coverage Tests does not constitute an Event of Default or Default but such failure may result in a Ratings Confirmation Failure.

(d)    No later than 15 Business Days after the Effective Date, the Issuer (or the Collateral Manager on its behalf) shall deliver or cause to be delivered to the Trustee an accountant's certificate (the "**Accountant's Certificate**") (i) confirming the information with respect to each Collateral Debt Security set forth on the amended schedule delivered pursuant to Section 7.18(b) as of the Effective Date, and the information provided by the Issuer with respect to every other asset included in the Collateral, (ii) certifying as of the Effective Date the procedures applied and their associated findings with respect to the Coverage Tests, the Collateral Concentration Limitations and the Collateral Quality Tests and (iii) specifying the procedures undertaken to review data and computations relating to the foregoing clause (ii) held by the Issuer on the Effective Date.

(e)    The Issuer (or the Collateral Manager on its behalf) shall request in writing that each of the Rating Agencies confirm in writing (a "**Rating Confirmation**"), within 30 Business Days after the Effective Date (or, in the case of each Rating Agency, any such later date (in no event longer than 60 Business Days after the Effective Date) that shall be acceptable to such Rating Agency), the ratings (including any private or confidential ratings) assigned by it on the Closing Date to the Secured Notes and the Combination Notes.

If any rating assigned as of the Closing Date to any Class of Secured Notes or the Combination Notes has not been confirmed, or is reduced or withdrawn, within 30 Business Days after the Effective Date (or such later date acceptable to the Rating Agencies, as described above) by any such Rating Agency, the Collateral Manager shall, on behalf of the Issuer, within 10 Business Days provide to such Rating Agency a proposal (a "**Proposal**") with respect to the Collateral Debt Securities. If such Rating Agency does not accept the Proposal or the Collateral Manager, on behalf of the Issuer, elects not to submit a Proposal, a "**Ratings Confirmation Failure**" shall have occurred. If such Rating Agency accepts the Proposal, a Ratings Confirmation Failure shall not be deemed to have occurred unless and until the Collateral Manager fails to meet the conditions set forth in the Proposal in accordance with the time requirements set forth in such Proposal, at which time, if any, a Ratings Confirmation Failure shall be deemed to have occurred. Within 10 Business Days after the conditions set forth in the Proposal have been satisfied, the Issuer shall request a Ratings Confirmation. Failure to receive such Ratings Confirmation will result in a Ratings Confirmation Failure.

(f)    If a Ratings Confirmation Failure occurs, Uninvested Proceeds and, to the extent Uninvested Proceeds are insufficient therefor, Collateral Interest Collections and Collateral Principal Collections shall be applied on the next Payment Date and each succeeding Payment Date, as applicable as provided in Section 11.1 to the extent necessary for each of the Rating Agencies to provide a Rating Confirmation.

(g)    Notwithstanding the foregoing, if (i) the Issuer (or the Collateral Manager on its behalf) has requested in writing that each of the Rating Agencies provide Rating Confirmation within five Business Days after the Effective Date, (ii) the Issuer (or the Collateral Manager on its behalf) has obtained confirmation by electronic mail, facsimile or telephone that each of the Rating Agencies has received such request and has promptly delivered to the applicable Rating Agency any additional information reasonably requested by such Rating Agency, and (iii) any of the Rating Agencies fails to respond to such request within 30 Business Days after the Effective Date (or such other time frame as was agreed to in writing by the Rating Agency), then such failure to respond will not immediately constitute a Ratings Confirmation Failure but shall not constitute receipt of Rating Confirmation; **provided**, that Ratings Confirmation Failure shall thereafter occur immediately upon receipt from the Rating Agencies of an actual notice of Ratings Confirmation Failure.

(h)    No later than 15 Business Days following the Effective Date and upon receipt of the appropriate model from S&P, the Trustee shall (i) run the S&P CDO Monitor and report to S&P whether or not the S&P CDO Monitor Test has been satisfied and (ii) report the S&P scenario default and break-even default rate for each Class of Secured Notes.

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES

### Section 8.1  Supplemental Indentures Without Consent of Secured Noteholders

Without the consent of the Holders of any Secured Notes, any Hedge Counterparty, the Income Noteholders or the Holders of the Combination Notes, but with Rating Agency Confirmation for so long as any Class of Secured Notes or Combination Notes are rated as such time by any Rating Agency, the Issuer, when authorized by Board Resolutions, and the Trustee, at any time and from time to time subject to the requirement provided below in this Section 8.1 with respect to the ratings of the Secured Notes and Combination Notes and subject to Section 8.3, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for certain limited purposes including, *inter alia*, to:

(a)    evidence the succession of any Person to the Issuer and the assumption by any such successor Person of the covenants of the Issuer herein and in the Secured Notes and Combination Notes pursuant to Section 7.10 or 7.11;

(b)    add to the covenants of the Issuer or the Trustee for the benefit of the Holders of the Secured Notes or the Combination Notes;

(c)    pledge any additional property to the Trustee;

(d)    add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Secured Notes or the Combination Notes;

(e)    effect the appointment of a successor trustee;

(f)    reduce the permitted minimum denomination of the Secured Notes;

(g)    take any action necessary or advisable to prevent the Issuer, any Note Paying Agent or the Trustee from being subject to withholding or other taxes, fees or assessments or to prevent the Issuer from being treated as engaged in a U.S. trade or business or otherwise being subjected to U.S. federal, state or local income tax on a net income tax basis; **provided** that such action will not cause the Noteholders to experience any material change to the timing, character or source of income from the Notes and will not be considered a significant modification resulting in an exchange for purposes of Section 1.1001-3 of the U.S. Treasury regulations;

(h)    modify the restrictions on and procedures for resale and other transfers of the Secured Notes or the Combination Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Issuer to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act (in addition to that provided under Section 3(c)(7) thereunder) or to remove restrictions on resale and transfer to the extent not required thereunder;

(i)    grant, convey, transfer, assign, mortgage or pledge any property to or with the Trustee for the benefit of the Secured Parties;

(j)    correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture;

(k)    make any change required by the stock exchange on which any Class of Secured Notes or the Combination Notes is listed, if any, in order to permit or maintain such listing;

(l)    correct, amend or cure any manifest error, inconsistency, defect or ambiguity, or correct any typographical error in this Indenture;

(m)    modify this Indenture to conform the terms herein to the terms set forth in the Offering Circular;

(n)    facilitate the creation of a Tax Subsidiary;

(o)    modify any provision (other than in respect of a Reserved Matter), with respect to restrictions upon the Issuer's rights to acquire and dispose of Collateral Debt Securities and other assets, that the Issuer or the Collateral Manager determines to be necessary or desirable in order for the Issuer to maintain any desired exemption from registration of the Issuer under the Investment Company Act or of the Notes under the Securities Act;

(p)    with the consent of the Collateral Manager, modify the calculation of the Collateral Quality Tests and the definitions applicable thereto to correspond with published or written changes in the guidelines, methodology or standards established by the Rating Agencies;

(q)     with the consent of the Collateral Manager and the consent of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, to modify the calculation of the Coverage Tests and the definitions applicable thereto to correspond with published or written changes in the guidelines, methodology or standards established by the Rating Agencies; or

(r)     agree to any other modification of this Indenture (other than in respect of a Reserved Matter), which is, in the opinion of the Trustee, proper to make if, in the opinion of the Trustee (based upon an Opinion of Counsel or certification from the Collateral Manager), such modification will not have a material adverse effect on the interests of Holders of any Class or Classes of Notes or any Hedge Counterparty.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

At the cost of the Issuer, the Trustee shall provide to the Secured Noteholders, the Collateral Manager, the Income Note Paying Agent, each Hedge Counterparty and each Rating Agency a copy of any proposed supplemental indenture at least ten days prior to the execution thereof by the Trustee and, for so long as any Secured Notes are Outstanding, request a Rating Agency Confirmation from each Rating Agency with respect to such supplemental indenture. As soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, the Trustee shall provide to the Secured Noteholders, the Combination Noteholders, the Collateral Manager, the Income Note Paying Agent, each Hedge Counterparty and each Rating Agency a copy of the executed supplemental indenture. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair of affect the validity of any such supplemental indenture. For so long as any Secured Notes or any Combination Notes are Outstanding and rated by either of the Rating Agencies, no supplemental indenture shall be effective unless and until a Rating Agency Confirmation from each Rating Agency has been received.

### Section 8.2     Supplemental Indentures with Consent of Secured Noteholders

Except as provided below, with the prior written consent of each Hedge Counterparty (but only if the rights or obligations of such Hedge Counterparty are adversely affected, to be determined by the Hedge Counterparty in its reasonable discretion), the Holders of not less than a Majority of the aggregate principal amount of the Outstanding Secured Notes of each Class (in principal amount) adversely affected thereby and the written consent of Holders of not less than a Majority of the aggregate principal amount of the Outstanding Income Notes (if materially and adversely affected thereby), and the written consent of Holders of not less than a majority of the aggregate principal amount of the Outstanding Combination Notes (if materially and adversely affected thereby), the Trustee and the Issuer may execute a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, the Indenture or modify in any manner the rights of the Holders of the Secured Notes of such Class or of the Income Notes or the Hedge Counterparties under the Indenture.

Without (i) the prior written consent of the Holders of not less than 75% of the then Aggregate Outstanding Amount of each adversely affected Class of Secured Notes, (ii) the prior written consent of the Holders of not less than 75% of the aggregate principal amount of the Outstanding Income Notes if materially and adversely affected thereby, (iii) the prior written consent of the Holders of not less than 75% of the aggregate principal amount of the Outstanding Combination Notes (if materially and adversely affected thereby), (iv) Rating Agency Confirmation and (v) the prior written consent of each Hedge Counterparty (but only if the rights or obligations of such Hedge Counterparty are adversely affected, to be determined by the Hedge Counterparty in its reasonable discretion), the Trustee and Issuer may not, subject to Section 8.3, enter into one or more indentures supplemental hereto in order to:

(a)    change the applicable Stated Maturity Date of the Secured Notes or scheduled redemption of the principal of or the due date of any installment of interest on the Secured Notes, reduce the principal amount thereof or the rate of interest thereon, or the Redemption Price with respect thereto, or change the earliest date on which Secured Notes may be redeemed, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Secured Notes or change any place where, or the coin or currency in which, Secured Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity Date thereof (or, in the case of redemption, on or after the Redemption Date);

(b)    reduce the percentage, in principal amount, of Holders of Secured Notes of each Class, the percentage of the Holders of the aggregate principal amount of the Income Notes, or the percentage of the Holders of the aggregate principal amount of Combination Notes, whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with this Indenture or applicable defaults hereunder or their consequences;

(c)    permit the creation of any security interest ranking prior to or on a parity with the security interest of this Indenture with respect to any part of the Collateral or terminate such security interest on any property at any time subject hereto (other than in accordance with this Indenture) or deprive the Holder of any Secured Note, Combination Note (to the extent of the Class A-3 Notes represented by the Class A-3 Note Component) or any Hedge Counterparty of the security afforded by the security interest of this Indenture;

(d)    reduce the percentage of the aggregate principal amount of Holders of Secured Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or rescind the Trustee's election to preserve the Collateral pursuant to Section 5.5 or to sell or liquidate the Collateral pursuant to Section 5.4 or 5.5;

(e)    modify any of the provisions of this Section 8.2, except to increase the percentage of the Aggregate Outstanding Amount of Secured Notes of each Class whose Holders' consent is required for any such action or to provide that other provisions of this Indenture cannot be modified or waived without the written consent of the Holders of not less than 75% of the then Aggregate Outstanding Amount of each affected Class of Secured Notes or any Hedge Counterparty adversely affected thereby;

(f)    modify the definition of the term "Outstanding" or Section 11.1;

(g)    modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of interest or principal of any Secured Note on any Payment Date or to affect the right of the Holders of Secured Notes or any Hedge Counterparty to the benefit of any provisions for the redemption of such Secured Notes or for payment of amounts due under the applicable Hedge Agreement contained therein or modify any amount distributable to the Income Note Paying Agent for payment to the Income Noteholders on any Payment Date;

(h)    modify provisions related to the bankruptcy or insolvency of the Issuer, or

(i)    modify provisions stating that the obligations of the Issuer are limited recourse obligations of the Issuer payable solely from the Collateral in accordance with the terms of this Indenture (Section 8.2(a) through (i) collectively, the "**Reserved Matters**").

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee shall not be obligated to enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or indemnities under this Indenture or otherwise, except to the extent required by law.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Issuer, shall mail to the Secured Noteholders, Combination Noteholders, Income Note Paying Agent, each Hedge Counterparty, the Collateral Manager and each Rating Agency a copy of such proposed supplemental indenture (or a description of the substance thereof) and shall request Rating Agency Confirmation with respect to such supplemental indenture related to a Reserved Matter. If any Class of Secured Notes or the Combination Notes are then rated by any Rating Agency, the Trustee shall not enter into any such supplemental indenture related to a Reserved Matter if, as a result of such supplemental indenture, Rating Agency Confirmation would not be received with respect to such supplemental indenture, unless each Holder of Secured Notes of each Class, or Combination Noteholders, whose rating will be reduced or withdrawn has, after notice that the proposed supplemental indenture would result in such reduction or withdrawal of the rating of the Class of Secured Notes held by such Holder or Combination Notes, consented to such supplemental indenture. Without having obtained the consent of the applicable parties pursuant to this Section 8.2, the Trustee shall not enter into any such supplemental indenture if, as a result of such supplemental indenture, the interests of any Holder of Secured Notes, Combination Noteholders or of the Income Noteholders would be materially and adversely affected thereby or the interest of any Hedge Counterparty would be adversely affected thereby. Unless notified by (i) the Holders of a Majority of the then Aggregate Outstanding Amount of any Class of Secured Notes that such Class will be materially and adversely affected, (ii) the Holders of a Majority of the then Aggregate Outstanding Amount of Combination Notes that the Combination Notes will be materially and adversely affected or (iii) the Holders of a Majority of aggregate principal amount of the Income Notes that the Income Noteholders will be materially and adversely affected, the Trustee shall be entitled to rely upon an Opinion of Counsel or certificate of the Issuer or the Collateral Manager as to whether the interests of any Holder of

Secured Notes, Combination Notes or of the Income Noteholders would be materially and adversely affected by any such supplemental indenture (after giving notice of such change to the Income Note Paying Agent).

It shall not be necessary for any Act of Secured Noteholders or Combination Noteholders or any consent of Income Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act or consent shall approve the substance thereof.

Promptly after the execution by the Issuer and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Issuer, shall mail or make available to the Secured Noteholders, the Combination Noteholders, the Income Note Paying Agent (for forwarding to the Income Noteholders), each Hedge Counterparty, the Collateral Manager and each Rating Agency a copy thereof. Any failure of the Trustee to publish or mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

### Section 8.3    Execution of Supplemental Indentures; Collateral Manager Consent

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying in good faith upon an Opinion of Counsel (which may rely on an Officer's certificate of the Issuer or Collateral Manager), stating that the execution of such supplemental indenture is authorized, or permitted by this Indenture and that all conditions precedent thereto have been complied with. Any such Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by such relevant certificates and other documents as may be necessary or advisable in the judgment of counsel delivering such Opinion of Counsel. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or indemnities under this Indenture or otherwise. For purposes of this Indenture, the Combination Notes will only be materially and adversely affected by any proposed supplemental indenture if the Combination Notes would suffer a material and adverse effect that does not arise directly from a material and adverse effect suffered by the Holders of the Secured Notes or the Income Notes.

No modification to the Indenture will be effective until the Collateral Manager has received written notice of such amendment and, if such amendment affects the rights, obligations or compensation of the Collateral Manager, the Collateral Manager has consented in writing to the terms of the proposed amendment. In addition, the consent of any predecessor Collateral Manager will be required to implement any such supplemental indenture that would change any provision of this Indenture entitling such predecessor Collateral Manager to any fee or other amount payable to it under the Indenture or to reduce or delay the right of such predecessor to such payment.

Notwithstanding anything herein to the contrary, the Trustee shall not enter into any supplemental indenture unless the Trustee has received advice from Cadwalader,

Wickersham & Taft LLP, Sidley Austin LLP or other nationally recognized U.S. tax counsel experienced in such matters to the effect that (i) the modification will not cause the Secured Noteholders to experience any material change to the timing, character or source of the income from the Secured Notes, and (ii) the proposed supplemental indenture will not cause the Issuer to be treated as engaged in a trade or business within the United States or otherwise subject to U.S. federal income tax on a net income tax basis.

### Section 8.4    Effect of Supplemental Indentures

Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Secured Notes or Combination Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

### Section 8.5    Reference in Secured Notes to Supplemental Indentures

Secured Notes and Combination Notes, as applicable, authenticated and delivered after the execution of any supplemental indenture pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Secured Notes or Combination Notes so modified as to conform in the opinion of the Trustee and the Issuer to any such supplemental indenture, may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Secured Notes or Combination Notes, as applicable.

## ARTICLE IX

## REDEMPTION OF SECURED NOTES

### Section 9.1    Redemption of Secured Notes

The Secured Notes will be subject to redemption in whole but not in part at their respective Redemption Prices, in each case, in accordance with the procedures, and subject to the satisfaction of the conditions, in Section 9.2 below, in the following circumstances:

(i)    on or after the Payment Date occurring in February 2011 and continuing until the Stated Maturity Date, at the direction of the Holders of not less than 66⅔% of the aggregate principal amount of the Outstanding Income Notes (an "**Optional Redemption**");

(ii)    on any Payment Date following the occurrence and during the continuation of a Tax Event, at the direction of the Holders of not less than 66⅔% of the aggregate principal amount of the Outstanding Income Notes (such a redemption, a "**Tax Redemption**"); and

(iii)    automatically and without any direction by any Person, (x) if the Notes have not been redeemed in full on or after the Payment Date occurring in February 2017,

and (y) if a Successful Auction is completed (such a redemption, an "**Auction Call Redemption**").

In the event of an Optional Redemption or a Tax Redemption, the Collateral Manager shall direct the Trustee to sell Collateral on behalf of the Issuer in accordance with Section 9.2(a) and in the event of an Auction Call Redemption, the Collateral Manager shall conduct an Auction in accordance with Section 9.2(b).

**Section 9.2    Redemption Procedures; Auction**

(a)    The Secured Notes shall not be redeemed in an Optional Redemption or a Tax Redemption unless either:

(i)    at least four Business Days before the scheduled Redemption Date, the Collateral Manager has furnished to the Trustee evidence, in form satisfactory to the Trustee, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with an institution or institutions (or guarantor or guarantors of the obligations): (A) with regard to which Rating Agency Confirmation has been received; or (B) whose long-term unsecured debt obligations have a credit rating from each Rating Agency at least equal to the then highest rating of any Notes then Outstanding or whose short-term unsecured debt obligations have a credit rating of "P-1" by Moody's and at least "A-1" by S&P; and in each case, to sell, not later than the Business Day immediately preceding the scheduled redemption date, in immediately available funds, all or part of the Collateral Debt Securities at an aggregate purchase price at least equal to an amount sufficient together with the balance of all Eligible Investments maturing on or prior to the scheduled redemption date and any termination payments received by the Issuer under any Hedge Agreements on or prior to the scheduled redemption date, to pay the Total Redemption Price and to redeem all of the Notes on the scheduled redemption date at the applicable Redemption Price; or

(ii)    prior to selling any Collateral Debt Securities or any other Collateral, the Collateral Manager certifies that the expected proceeds from such sale will, in the aggregate, equal or exceed, in each case, the Total Redemption Price.

The Trustee shall enter into the agreements referred to in Section 9.2(a) upon its determination that it has received agreements in form satisfactory to the Trustee and the required evidence and direction regarding such agreements from the Collateral Manager.

(b)    In connection with any Auction Call Redemption, the Trustee and the Collateral Manager will, in accordance with the Auction Procedures set forth in Schedule E (the "**Auction Procedures**") and at the expense of the Issuer, conduct an auction (an "**Auction**") of the Collateral Debt Securities included in the Collateral on a date (each such date, an "**Auction Date**") occurring no later than ten Business Days prior to the Payment Date occurring in February 2017 (and if the Auction is unsuccessful, not later than ten Business Days prior to each sixth succeeding Payment Date unless the Collateral Manager, in its sole discretion, elects to conduct an Auction on an earlier Payment Date). Any of the Placement Agent, the Collateral Manager, the Income Noteholders, the Trustee, the Secured Noteholders, the Combination

Noteholders, any Hedge Counterparty or their respective Affiliates may, but will not be required to, bid at the Auction. Any Auction Call Redemption will be subject to the satisfaction of each of the following conditions:

(i) the related Auction has been conducted in accordance with the Auction Procedures;

(ii) the Trustee has received bids for the Collateral Debt Securities (or for each of the related Subpools) from at least two Qualified Bidders (including the winning Qualified Bidder) identified on a list of Qualified Bidders provided by the Collateral Manager to the Trustee;

(iii) the Collateral Manager certifies that the highest bids would result in the sale of the Collateral Debt Securities (or the related Subpools) for a purchase price (paid in cash) which together with the balance of all Eligible Investments and cash held by the Issuer will be at least equal to the Total Redemption Price; and

(iv) the bidder(s) who offered the Highest Auction Price for the Collateral Debt Securities (or the related Subpools) enter(s) into a written agreement with the Issuer (which the Issuer will execute if the conditions set forth above and in the Auction Procedures are satisfied, which execution will constitute certification by the Issuer that such conditions have been satisfied) that obligates the highest bidder(s) (or the highest bidder for each Subpool) to purchase all of the Collateral Debt Securities (or the relevant Subpool) and provides for payment in full (in Cash) of the purchase price to the Trustee on or prior to the sixth Business Day following the relevant Auction Date.

Unless and to the extent the Holders of not less than a Majority of the Outstanding Income Notes have waived payment in full of the Income Notes Stated Amount, the Income Noteholders will receive in connection with an Auction Call Redemption an amount equal to (x) the Income Notes Stated Amount minus (y) the aggregate amount of all cash distributions on the Income Notes (whether in respect of distributions or redemption payments made to the Income Note Paying Agent for distribution to the Income Noteholders) on or prior to the relevant Auction Date.

Provided that all of the conditions set forth in Section 9.2(b) have been met, the Trustee will sell and transfer the Collateral Debt Securities (or each related Subpool), without representation, warranty or recourse, to the bidder(s) who offered the Highest Auction Price for the Collateral Debt Securities (or the related Subpools) in accordance with and upon completion of the Auction Procedures. If any of the conditions set forth in Section 9.2(b) are not met, (i) the Auction Call Redemption will not occur on the Payment Date following the relevant Auction Date, (ii) the Trustee will give notice of the withdrawal of the Auction Call Redemption, (iii) subject to clause (iv) below, the Trustee will decline to consummate such sale and may not solicit any further bids or otherwise negotiate any further sale of Collateral Debt Securities in relation to such Auction and (iv) unless the Secured Notes are redeemed in full prior to the next succeeding Auction Date, the Trustee will conduct another Auction on the next succeeding Auction Date.

(c)    In the case of any Redemption, the Trustee will deposit the purchase price for the Collateral Debt Securities in the Collection Account, and the Secured Notes and, to the extent funds are available therefor, the Income Notes, will be redeemed on the Payment Date immediately following the relevant sale in the order of priorities set forth in Section 11.1. Any Redemption will only be effected on a Payment Date. Installments of principal and interest due on or prior to a Redemption Date shall continue to be payable to the Holders of such Secured Notes as of the relevant Record Dates according to their terms. All remaining amounts, if any, shall constitute Income Note Excess Funds, distributable to the Income Note Paying Agent, on behalf of the Issuer, for distributions to the Income Notes in accordance with the Income Note Paying Agency Agreement.

Any Hedge Agreement existing at any time on or after a Redemption has been declared may not be terminated by the Issuer until such date as the notice of Redemption of the Notes can no longer be withdrawn or rescinded in accordance with this Indenture.

**Section 9.3    Record Date; Notice to Trustee of Redemption**

(a)    The Issuer shall set the Redemption Date and the applicable Record Date and give notice thereof to the Trustee pursuant to Section 9.3(b) below and shall issue an Issuer Request to the Trustee for the provision of the information necessary for the Issuer to compile the Redemption Date Statement in accordance with Section 10.11(b).

(b)    In the event of any Redemption, the Issuer shall, at least 45 days (but not more than 90 days) prior to the Redemption Date, notify the Trustee and the Collateral Manager (with a copy to each Hedge Counterparty) of such Redemption Date, the applicable Record Date, the principal amount of each Class of Notes to be redeemed on such Redemption Date and the Redemption Price of such Notes.

**Section 9.4    Notice of Redemption**

Notice of Redemption will be given by first-class mail, postage prepaid, mailed not less than eight Business Days prior to the applicable Redemption Date, to each Hedge Counterparty, each Rating Agency and each Holder of Secured Notes at such Holder's address in the Note Register maintained by the Note Registrar in accordance with the provisions of this Indenture, and to the Collateral Manager. Secured Notes called for Redemption must be surrendered at the office of any Note Paying Agent appointed pursuant to this Indenture in order to receive the Redemption Price. The Issuer will also deliver notice of Redemption to the Cayman Stock Exchange if and so long as any Class of Secured Notes to be redeemed is listed on the Cayman Stock Exchange.

All notices of redemption shall state:

(a)    the applicable Redemption Date;

(b)    the applicable Record Date;

(c)    the Redemption Price;

(d)     that all the Notes of the relevant Class are being redeemed in full and that interest on the applicable principal amount of Notes shall cease to accrue on the date specified in the notice; and

(e)     the place or places where such Secured Notes (including the Combination Note Components) are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Note Paying Agent to be maintained as provided in Section 7.2.

Notice of redemption shall be given by the Issuer or, at the Issuers' request, by the Trustee in the name and at the expense of the Issuer. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption shall not impair or affect the validity of the redemption of any other Notes.

### Section 9.5     Notice of Withdrawal

With regard to an Optional Redemption, a Tax Redemption or an Auction Call Redemption, any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day prior to the Redemption Date by written notice to the Trustee and the Collateral Manager only if (A) in the case of an Optional Redemption or a Tax Redemption the Collateral Manager is unable to deliver such sale agreement or agreements or certifications, as the case may be, in form satisfactory to the Trustee or (B) in the case of an Auction Call Redemption, if a Successful Auction has not occurred prior to such fourth Business Day. With regard to any Redemption, notice of any withdrawal pursuant to Section 9.2 shall be given by the Trustee to each Holder of Secured Notes at such Holder's address in the Note Register maintained by the Note Registrar by overnight courier guaranteeing next day delivery (or second day delivery outside the United States) sent not later than the third Business Day prior to such Redemption Date. In addition, the Trustee will, if any Class of Secured Notes to have been redeemed is listed on the Cayman Islands Stock Exchange, deliver a notice of such withdrawal to the Cayman Islands Stock Exchange not less than three Business Days prior to such Redemption Date.

### Section 9.6     Secured Notes Payable on Redemption Date

Notice of redemption having been given as aforesaid, the Notes so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price therein specified, and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price) such Secured Notes shall cease to bear interest. Upon final payment on a Note to be redeemed, the Holder shall present and surrender such Note at the place specified in the notice of redemption on or prior to such Redemption Date, **provided** that if there is delivered to the Issuer (i) such security or indemnity as may be required by it to save it harmless and (ii) an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer that the applicable Note has been acquired by a *bona fide* purchaser, such final payment shall be made without presentation or surrender. Installments of interest on Secured Notes of a Class so to be redeemed whose Stated Maturity Date is on or prior to the Redemption Date shall be payable to the Holders of such Secured Notes, or one or more predecessor Secured Notes, registered as such at the close of business on the relevant Record Date according to the terms and provisions of Section 2.6(f).

If any Secured Note called for redemption shall not be paid upon surrender thereof for redemption, the principal thereof shall, until paid, bear interest from the Redemption Date at the Applicable Periodic Interest Rate for each successive Interest Period the Secured Note remains Outstanding.

### Section 9.7    Special Amortization

If the Collateral Manager notifies the Trustee in writing that it has determined, in its sole discretion, that investments in additional Collateral Debt Securities would either be impractical or not beneficial, the amount of such Collateral Principal Collections available pursuant to Section 11.1(b)(xiv)(A), as determined by the Collateral Manager (the "**Special Amortization Amount**"), shall be applied to the payment of principal on the Secured Notes on the next succeeding Payment Date (a "**Special Amortization**") in accordance with Section 11.1(b)(xiv)(B).

In order for amounts to be applied for a Special Amortization on any Payment Date, the Collateral Manager is required to deliver, to each of the Trustee and each Rating Agency, advance written notice (which may be included in the related Note Report) (each, a "**Special Amortization Notice**") specifying the identity and principal amount of each Class of Secured Notes to be paid pursuant to such Special Amortization and that the Collateral Manager has determined, in its sole discretion, that investments in additional Collateral Debt Securities would either be impractical or not beneficial.

On each Payment Date on which a Special Amortization occurs, each related Hedge Agreement, to the extent provided for therein, will be terminated in part in accordance with the terms and conditions thereof, including compliance with any applicable requirement that the Issuer receive Rating Agency Confirmation from S&P, and any amounts due and payable pursuant to such Hedge Agreement in connection with such termination thereof will be paid on such Payment Date in accordance with the terms thereof subject to the Indenture.

### Section 9.8    Mandatory Redemption

So long as any Class of Senior Secured Notes is Outstanding, if any Coverage Test applicable to a Class of Senior Secured Notes is not satisfied on any Calculation Date, then Collections that would otherwise be used on the related Payment Date to make payments in respect of interest on any Class of Secured Notes Subordinate to such Class of Secured Notes, distributions in respect of the Income Notes, payments of certain other expenses and reinvestments in Substitute Collateral Debt Securities will be used instead to redeem (such redemption, a "**Mandatory Redemption**") (i) first, each Class of Secured Notes Senior to such Class of Secured Notes (if any) in the order of the Priority of Payments and (ii) second, such Class of Senior Secured Notes, in each case until each applicable Coverage Test is satisfied or the Class of Senior Secured Notes has been paid in full and in accordance with the Priority of Payments.

## ARTICLE X

## ACCOUNTS, ACCOUNTINGS AND RELEASES

### Section 10.1    Collection of Funds

(a)    Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all funds and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities, in accordance with the terms and conditions of such Pledged Securities. The Trustee shall segregate and hold all such funds and property received by it in trust for the Secured Parties and shall apply such funds as provided in this Indenture.

(b)    Each of the parties hereto hereby agrees to cause the Custodian or any other Securities Intermediary that holds any funds or other property for the Issuer in an Account to agree with the parties hereto that (1) each Account is a Securities Account in respect of which the Trustee is the Entitlement Holder, (2) each Account is held by a financial institution that has a combined capital and surplus of at least U.S.$250,000,000 and being subject to supervision or examination by federal or state banking authority, (3) the Cash, Securities and other property credited to any Account is to be treated as a Financial Asset under Article 8 of the UCC and (4) the "securities intermediary's jurisdiction" (within the meaning of Section 8-110 of the UCC) for that purpose will be the State of New York. In no event may any Financial Asset held in any Account be registered in the name of, payable to the order of, or specially Indorsed to, the Issuer unless such Financial Asset has also been indorsed in blank or to the Custodian or other Securities Intermediary that holds such Financial Asset in such Account. Each Account shall be held and maintained at an office located in Chicago, Illinois.

### Section 10.2    General Provisions Applicable to Accounts

The Payment Account, Collateral Account, Uninvested Proceeds Account, Collection Account, Expense Reserve Account, the Hedge Counterparty Collateral Account, Interest Reserve Account and Ramp-Up Period Interest Reserve Account (including, in each case, any Collateral Sub-Account therein) shall remain at all times with a financial institution having a long-term debt rating of at least "A+" by S&P.

(a)    The Trustee agrees to give the Issuer prompt notice (with a copy to each Hedge Counterparty, the Collateral Manager, each Rating Agency and the Income Note Paying Agent) if any Account or any funds on deposit therein, or otherwise standing to the credit of any Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process.

(b)    The Collateral Manager by Issuer Order shall direct the Trustee to invest and reinvest any funds on deposit in any of the Accounts (other than the Payment Account) (which may be in the form of standing instructions). In the event that the Collateral Manager has not delivered investment instructions to the Trustee or after the occurrence of an Event of Default, the Trustee shall invest and reinvest any funds on deposit in any Account (other than the

Payment Account) as fully as practicable in investments described in clause (iii) of the definition of Eligible Investments maturing not later than the earlier of (i) 30 days after the date of such investment or (ii) the Business Day immediately preceding the next Payment Date. With respect to each Account, all interest and other income from Eligible Investments purchased with funds on deposit in such Account shall be deposited in such Account, any gain realized from such investments shall be credited to such Account, and any loss resulting from such investments shall be charged to such Account. Any gain or loss with respect to an Eligible Investment shall be allocated in such a manner as to increase or decrease, respectively, Collateral Principal Collections and/or Collateral Interest Collections in the proportion that the amount of Collateral Principal Collections and/or Collateral Interest Collections used to acquire such Eligible Investment bears to the purchase price thereof. The Trustee shall not in any way be held liable by reason of any insufficiency of any such Account resulting from any loss relating to any such investment. Nothing herein shall be deemed to relieve the Bank or its Affiliates from any duties or liabilities with respect to investments in obligations of the Bank or any Affiliate thereof.

(c)    All funds deposited from time to time in the Collection Account, the Expense Reserve Account, the Ramp-Up Period Interest Reserve Account, the Uninvested Proceeds Account, the Collateral Account, the Hedge Counterparty Collateral Account, the Payment Account or the Interest Reserve Account (including, in each case, any Collateral Sub-Account established therein) pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided.

(d)    In addition to any credit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.2, any credit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.2.

### Section 10.3    Collateral Account

The Trustee shall, prior to the Closing Date, cause the Custodian to establish a Securities Account which shall be designated as the "Collateral Account," which shall be in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties and into which the Trustee shall from time to time credit all Collateral. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. All Collateral Debt Securities from time to time standing to the credit of the Collateral Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes herein provided. The Issuer shall not have any legal, equitable or beneficial interest in the Collateral Account other than in accordance with the Priority of Payments.

### Section 10.4    Uninvested Proceeds Account

The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "Uninvested Proceeds Account," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties, into which the Trustee shall deposit on the Closing Date all Uninvested Proceeds equal to $86,467,348.54 into the Uninvested Proceeds Account and, until the end of the Ramp-Up Date,

such funds may be used, together with reinvestment income, to purchase Collateral Debt Securities, or invested in Eligible Investments pending such purchase of Collateral Debt Securities. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Uninvested Proceeds Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On or prior to the Effective Date, the Collateral Manager on behalf of the Issuer may by Issuer Order direct the Trustee to, and upon such direction the Trustee will be required to apply funds in the Uninvested Proceeds Account to purchase additional Collateral Debt Securities, pending such investment in additional Collateral Debt Securities, such funds will be invested in Eligible Investments, as directed by the Collateral Manager, with stated maturities no later than the Business Day immediately preceding the next Payment Date.

On the Payment Date immediately following the later of the Effective Date and the date on which a Ratings Confirmation or a Ratings Confirmation Failure is received, amounts remaining in the Uninvested Proceeds Account will be applied as follows:

(i)    If a Ratings Confirmation Failure with respect to any Class of Secured Notes occurs, all amounts in the Uninvested Proceeds Account will be applied on the immediately following Payment Date to the repayment of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, in that order, in the amounts necessary for each Rating Agency to confirm its respective ratings of the Secured Notes assigned on the Closing Date or until each Class of Notes is paid in full. If such ratings are reinstated and funds remain in the Uninvested Proceeds Account, such funds will be deposited in the Collection Account, treated as Collateral Principal Collections and applied in accordance with the Priority of Payments; and

(ii)    If a Ratings Confirmation has been obtained, the Collateral Manager may, at its option, elect to designate up to $6,000,000 from such funds as Collateral Interest Collections, to be deposited in the Collection Account (for subsequent transfer to the Payment Account) and applied in accordance with the Priority of Payments. Any such election must be made on a one-time basis by written notice and must be made no later than the 20th Business Day after the Effective Date. Any amounts in the Uninvested Proceeds Account not so designated as Collateral Interest Collections by the Collateral Manager will be deposited in the Collection Account and treated as Collateral Principal Collections and applied in accordance with the Priority of Payments.

**Section 10.5   Collection Account**

(a)    The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "Collection Account" (which may be a sub-account of the Collateral Account), which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Collection Account shall be held in trust by the Trustee for the benefit of the Secured Parties. The Trustee shall cause to be established two sub-accounts of the Collection Account. The Trustee shall deposit Collateral Principal Collections into one sub-account (the "**Collateral Principal Collections Sub-Account**") and Collateral Interest Collections into the other sub-account (the "**Collateral Interest Collections**

**Sub-Account**"). At the direction of the Issuer (or the Collateral Manager on behalf of the Issuer) by Issuer Order, the Trustee shall invest funds on deposit in the Collection Account (including the Collateral Principal Collection Sub-Account) in Eligible Investments or Substitute Collateral Debt Securities in accordance with the requirements and limitations contained in Section 12.1(c). In addition, to the extent not inconsistent with this Indenture, the Issuer may, but under no circumstances shall be required to, credit or cause to be credited from time to time such monies to the Collection Account as it deems, in its sole discretion, to be advisable and by notice to the Trustee may designate such money to be treated as Collateral Principal Collections or Collateral Interest Collections hereunder at its discretion. All money credited from time to time to the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied in accordance with the terms hereof and to the purposes herein provided.

(b)    The Trustee, within one Business Day after receipt of any Distribution or other proceeds that are not Cash shall so notify the Issuer and the Issuer shall sell such Distribution or other proceeds for Cash in accordance with Section 12.1; **provided, however**, that the Issuer (or Collateral Manager on behalf of the Issuer) need not sell such Distributions or other proceeds if it delivers an Officer's certificate to the Trustee certifying that such Distributions or other proceeds constitute Collateral Debt Securities or Eligible Investments.

(c)    The Trustee shall transfer to the Payment Account for application pursuant to Section 11.1(a), (b) and (c) and in accordance with the calculations and the instructions contained in the Note Report prepared by the Issuer pursuant to Section 10.11(a), on or prior to the Business Day prior to each Payment Date, funds on deposit in the Collection Account (including reinvestment income) other than Collections received after the end of the Due Period with respect to such Payment Date.

(d)    The Trustee shall withdraw and apply amounts on deposit in the Collection Account in accordance with any Redemption Date Statement delivered to the Trustee in connection with the redemption of Secured Notes pursuant to Section 9.1.

### Section 10.6    Expense Reserve Account

The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "Expense Reserve Account," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Expense Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On the Closing Date, the Trustee shall deposit into the Expense Reserve Account an amount equal to U.S.$50,000. At the direction of the Issuer (or the Collateral Manager on behalf of the Issuer), the Trustee shall invest all funds on deposit in the Expense Reserve Account in Eligible Investments. Thereafter, the Trustee shall transfer to the Expense Reserve Account from the Payment Account amounts required to be deposited therein pursuant to Section 11.1(a), (b) and (c) and in accordance with the calculations and the instruction contained in the Note Report prepared by the Issuer pursuant to Section 10.11(a). On any Payment Date after the second Payment Date following the Closing Date, the Trustee shall transfer all amounts on deposit in the Expense Reserve Account in excess of U.S.$25,000 into the Collection Account as Collateral

Interest Collections for distribution pursuant to Section 11.1 on the immediately succeeding Payment Date. Except as provided above and in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Expense Reserve Account shall be to pay (on any day other than a Payment Date) accrued and unpaid Administrative Expenses of the Issuer, together with an amount sufficient to pay any outstanding fees and expenses of the Issuer in relation to the offering of the Secured Notes and the Income Notes which are not paid on the Closing Date; **provided** that the Trustee shall deposit all amounts remaining on deposit in the Expense Reserve Account at the time when substantially all of the Issuer's assets have been sold or otherwise disposed of into the Collection Account for application as Collateral Interest Collections on the immediately succeeding Payment Date.

### Section 10.7    Interest Reserve Account

The Trustee shall, prior to the Closing Date, cause to be established a Securities Account which shall be designated as the "Interest Reserve Account," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Interest Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties. On each date on which the Trustee receives Collateral Interest Collections on a Non-Monthly Pay Asset the Trustee shall deposit an amount equal to one month's worth of interest on such Collateral Debt Security (determined by dividing the scheduled interest payment by the number of months between payment dates on the Non-Monthly Pay Asset) into the Collection Account and shall deposit the remaining portion into the Interest Reserve Account. With respect to each Non-Monthly Pay Asset, on the fourth Business Day prior to each Payment Date as to which the Trustee has not made a direct deposit of interest into the Collection Account on account of a Non-Monthly Pay Asset, the Trustee shall transfer from the Interest Reserve Account to the Collection Account, for distribution in accordance with the Priority of Payments, one month's worth of interest to the extent interest in respect of such Non-Monthly Pay Asset was deposited into the Interest Reserve Account. All funds on deposit in the Interest Reserve Account shall be invested in Eligible Investments.

### Section 10.8    Payment Account

The Trustee shall, prior to the Closing Date, establish a Securities Account which shall be designated as the "Payment Account," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Payment Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Except as provided in Section 11.1, the only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, the Payment Account shall be to pay the interest on and the principal of the Secured Notes in accordance with their terms and the provisions of this Indenture and, upon Issuer Order, to pay Administrative Expenses and other amounts specified therein, each in accordance with the Priority of Payments. The Issuer shall not have any legal, equitable or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

### Section 10.9   Ramp-Up Period Interest Reserve Account

The Trustee shall, prior to the Closing Date, establish a Securities Account which shall be designated as the "Ramp-Up Period Interest Reserve Account," which shall be held in the name of the Trustee as Entitlement Holder in trust for the benefit of the Secured Parties. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Ramp-Up Period Interest Reserve Account shall be held in trust by the Trustee for the benefit of the Secured Parties. Prior to the first Payment Date after the Effective Date, the Collateral Manager shall direct the Trustee to deposit into the Collection Account on the Business Day prior to each Payment Date, an amount, if any, equal to the lesser of (a) the Balance of the Ramp-Up Period Interest Reserve Account or (b) any shortfall in the payment of Periodic Interest due on the Secured Notes that is expected to occur on such Payment Date, with such amounts to be distributed as Collateral Interest Collections in accordance with the Priority of Payments on the related Payment Date. Any amounts remaining in the Ramp-Up Period Interest Reserve Account on the Payment Date immediately following the Effective Date shall be transferred to the Payment Account and treated as Collateral Interest Collections.

### Section 10.10   Reports by Trustee

The Trustee shall supply, in a timely fashion, to the Issuer, the Income Note Paying Agent, each Rating Agency (so long as any Notes are rated by such Rating Agency), the Placement Agent and the Collateral Manager any information regularly maintained by the Trustee that each such Person may from time to time request with respect to the Pledged Securities or the Accounts reasonably needed to complete the Payment Report and the Note Report or to provide any other information reasonably available to the Trustee by reason of its acting as Trustee hereunder and required to be provided by Section 10.11.

The Trustee shall forward to the Collateral Manager or the Income Note Paying Agent, copies of notices and other writings received by it from the issuer of any Collateral Debt Security or from any Clearing Agency with respect to any Collateral Debt Security advising the holders of such security of any rights that the holders might have with respect thereto (including notices of calls and redemptions of securities) as well as all periodic financial reports received from such issuer and Clearing Agencies with respect to such issuer; **provided** that the Trustee shall not disclose any unpublished S&P Rating assigned by S&P with respect to any Collateral Debt Security without the prior consent of S&P.

### Section 10.11   Accountings

(a)      **Payment Date Accounting**.  Commencing with the Payment Date in May 2007, not later than each Payment Date, the Issuer shall prepare an accounting of the amounts that will be paid in accordance with the Priority of Payments (each, a "**Payment Report**"). Commencing in May 2007, the Issuer shall, not later than the related Payment Date and after the reconciliation process described in this Section 10.11, prepare an accounting (a "**Note Report**"), determined as of each Calculation Date.  The Issuer shall deliver the Payment Report and the Note Report to each Rating Agency, the Trustee and the Collateral Manager and make available via the Trustee's internet website, initially located at www.cdotrustee.net to the Trustee, any Hedge Counterparty, the Income Note Paying Agent, the Transfer Agent, the Placement Agent

and, upon written request therefor, any Holder of a Secured Note shown on the Note Register and any beneficial holder of a Note that provides evidence of its ownership satisfactory to the Trustee. The Payment Report may be combined with the Note Report. The Note Report shall contain the following information (which shall, in the case of any Note Report delivered to S&P, be presented in a form that complies with and includes the information required by S&P's Preferred Format) determined, unless otherwise specified below, as of the related Calculation Date:

(i)    the calculation showing compliance with each of the Coverage Tests, accompanied by a list setting forth the applicable maximum or minimum value, percentage or ratio which must be maintained pursuant to this Indenture with respect to each of the Coverage Tests and a list setting forth the results of the calculation of each of the Coverage Tests with respect to the Collateral Debt Securities, the calculation showing whether the S&P CDO Monitor Test is satisfied (including the weighted average rating, the default measure, variability measure and correlation measure, the scenario default rate and/or such other information required to be computed with respect to the S&P CDO Monitor Test), and the calculation showing whether each of the other Collateral Quality Tests and Collateral Concentration Limitations have been satisfied, including the Weighted Average Fixed Rate Coupon, the Weighted Average Spread, the Weighted Average Life, the S&P Weighted Average Recovery Rate, the Moody's Weighted Average Recovery Rate and the Moody's WARF;

(ii)    the estimated remaining Average Life of each of the Collateral Debt Securities;

(iii)    the Applicable Periodic Interest Rate in respect of each Class of Notes and the amount of Periodic Interest payable to the Holders of the Notes for such Payment Date (in the aggregate and by Class);

(iv)    the Aggregate Outstanding Amount of the Class A Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes, Class F Notes, the Class A-3 Component, the Income Note Component and the Combination Note Principal Balance expressed in Dollars;

(v)    the aggregate fees and expenses payable pursuant to the Priority of Payments on the next Payment Date on an itemized basis;

(vi)    the aggregate fees and expenses paid during a period of 12 months ending on the next Payment Date on an itemized basis;

(vii)    for the Collection Account:

(A)    the Balance on deposit in the Collection Account and the Collateral Principal Collections Sub-Account at the end of the related Due Period;

(B)    the nature and source of any Collections in the Collection Account and the Collateral Principal Collections Sub-Account, including Collections received since the date of the last Note Report;

(C)    the amounts payable from the Collection Account in accordance with the priority set forth in Section 11.1 on the next Payment Date; and

(D)    the Balance remaining in the Collection Account immediately after all payments and deposits to be made on such Payment Date.

(viii)    for the Interest Reserve Account:

(A)    the Balance on deposit in the Interest Reserve Account at the end of the related Due Period;

(B)    the amount payable from the Interest Reserve Account pursuant to the Priority of Payments on the next Payment Date;

(C)    the Balance remaining in the Interest Reserve Account immediately after all payments and deposits to be made on such Payment Date;

(ix)    for the Uninvested Proceeds Account:

(A)    the Balance on deposit in the Uninvested Proceeds Account at the end of the related Due Period;

(B)    the amount payable from the Uninvested Proceeds Account pursuant to the Priority of Payments on the next Payment Date;

(C)    the Balance remaining in the Uninvested Proceeds Account immediately after all payments and deposits to be made on such Payment Date;

(x)    for the Ramp-Up Interest Reserve Account:

(A)    the Balance on deposit in the Ramp-Up Interest Reserve Account at the end of the related Due Period;

(B)    the amount payable from the Ramp-Up Interest Reserve Account pursuant to the Priority of Payments on the next Payment Date;

(C)    the Balance remaining in the Ramp-Up Interest Reserve Account immediately after all payments and deposits to be made on such Payment Date;

(xi)    for the Expense Reserve Account:

(A)    the amount to be paid into the Expense Reserve Account on the next Payment Date; and

(B)    the Balance remaining in the Expense Reserve Account immediately after all payments and deposits to be made on such Payment Date;

(xii)    the Hedge Receipt Amount or the Hedge Payment Amount for the related Payment Date, and for each Hedge Agreement, the outstanding notional amount of such

Hedge Agreement and the amounts, if any, scheduled to be received or paid, as the case may be, by the Issuer pursuant to such Hedge Agreement for the related Payment Date, separately stating the portion payable in accordance with Section 11.1;

(xiii)    the current ratings of the credit support provider (if any) of each Hedge Counterparty;

(xiv)    if the ratings of any Hedge Counterparty or its credit-support provider have fallen below the minimum ratings specified in the Hedge Agreement, the type, maturity and principal amount of any cash or securities posted by the Hedge Counterparty;

(xv)    the amount of Income Note Excess Funds on the related Payment Date;

(xvi)    the amount of the Senior Collateral Management Fee, the amount of the Subordinate Collateral Management Fee and the amount of the Incentive Collateral Management Fee;

(xvii)    such other information as the Collateral Manager, the Trustee or S&P may reasonably request;

(xviii)    (A) the aggregate principal amount of all Collateral Debt Securities that are given a Moody's Rating based on a S&P rating, as described in the definition of "Moody's Rating," (B) the aggregate principal amount of all Collateral Debt Securities that are given a Moody's Rating based on a Fitch Rating as described in the definition of "Moody's Rating," (C) the aggregate principal amount of all Collateral Debt Securities that are given an S&P Rating based on a Moody's Rating as described in the definition of "S&P Rating" and (D) the aggregate principal amount of all Collateral Debt Securities that are given an S&P Rating based on a Fitch Rating as described in the definition of "S&P Rating";

(xix)    with respect to each Defaulted Security or Deferred Interest PIK Bond, the Moody's Recovery Rate, the S&P Recovery Rate and the Market Value of such Defaulted Security or Deferred Interest PIK Bond;

(xx)    with respect to each Collateral Debt Security, the Principal Balance, the annual coupon rate or spread to the relevant floating rate index, the frequency of coupon payments, the amount of principal payments received, the maturity date, the issuer, the country in which the issuer is incorporated or organized, the S&P Industry Classification Group, the S&P Recovery Rate, the Moody's Recovery Rate, the S&P Rating; and any S&P Rating which is determined from an implied rating, a credit estimate, a confidential rating or another non-public rating, shall not be distinguished and shall either (i) be reported in a single column with the public ratings of S&P (without distinguishing the source) or (ii) be reported in a separate column labeled "Non-public and Implied S&P Rating," the Moody's Rating; and if any Moody's Rating for any Collateral Debt Security is set forth in any identified as "estimated" or "shadow" rating, such rating shall be identified as "estimated" or "shadow rated," and shall be disclosed with a notation in the

place of the applicable estimated or shadow rating, and shall include the date as of which such rating was first provided by Moody's to the Issuer;

(xxi)    the Principal Balance, the maturity date, the S&P Rating, the Moody's Rating and the issuer of each Eligible Investment included in the Collateral;

(xxii)    (A) the identity and Principal Balance of each Collateral Debt Security that became a Credit Risk Security, a Defaulted Security, an Equity Security, a Written Down Security, a Withholding Tax Security, a Deferred Interest PIK Bond, (B) the date, as provided by the Collateral Manager, on which any Collateral Debt Security became a Credit Risk Security, a Defaulted Security, an Equity Security, a Written Down Security or a Withholding Tax Security and (C) whether the Collateral Manager has directed the Issuer to sell or not to sell such Collateral Debt Security;

(xxiii)    the identity of each Collateral Debt Security that was upgraded or downgraded or placed on watch for upgrade or downgrade by any Rating Agency since the date of the last Note Report;

(xxiv)    the Principal Balance and identity of each Collateral Debt Security that was released for sale indicating the reason for such sale and the amount and identity of each Collateral Debt Security that was granted since the date of the last Note Report;

(xxv)    the purchase price of each Pledged Security granted and the sale price of each Pledged Security subject to a sale since the date of the last Note Report; and whether such Pledged Security is a Collateral Debt Security, an Eligible Investment or proceeds in the Collection Account;

(xxvi)    the amount of Purchased Accrued Interest;

(xxvii)    a description of any transactions among the Collateral Manager, the Issuer, the Collateral Administrator and the Trustee and any Affiliates thereof;

(xxviii)    the Class A Note Break-Even Default Rate, the Class B Note Break-Even Default Rate, the Class C Note Break-Even Default Rate, the Class D Note Break-Even Default Rate, the Class E Note Break-Even Default Rate and the Class F Note Break-Even Default Rate;

(xxix)    the Class A Note Default Differential, the Class B Note Default Differential, the Class C Note Default Differential, the Class D Note Default Differential, the Class E Note Default Differential and the Class F Note Default Differential;

(xxx)    the Class A Note Scenario Default Rate, the Class B Note Scenario Default Rate, the Class C Note Scenario Default Rate, the Class D Note Scenario Default Rate, the Class E Note Scenario Default Rate and the Class F Note Scenario Default Rate; and

(xxxi)    amounts to be distributed on the related Payment Date pursuant to the Priority of Payments.

Information to be provided with respect to the results of any Collateral Quality Test or any Collateral Concentration Limitation shall only be provided on or after the Effective Date. Upon receipt of each Note Report, the Trustee and the Collateral Manager, on behalf of the Issuer, shall compare the information contained therein to the information contained in their respective records with respect to the Collateral and shall use commercially reasonable efforts within two Business Days after receipt of such Note Report to notify each of the Issuer and the Trustee if the information contained in the Note Report does not conform to the information maintained by the Trustee or the Collateral Manager, as applicable, on behalf of the Issuer, with respect to the Collateral, and detail any discrepancies. In the event that any discrepancy exists, the Trustee and the Issuer, or the Collateral Manager, on behalf of the Issuer, shall attempt to promptly resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after discovery of such discrepancy cause the Independent Accountants of recognized international reputation to review such Note Report and the Trustee's and the Collateral Manager's records to determine the cause of such discrepancy and to provide written notice to each Hedge Counterparty and S&P. If such review reveals an error in the Note Report or the records of the Trustee or the Collateral Manager, as the case may be, such item shall be revised accordingly and, as so revised, shall be utilized in making further calculations.

Subject to the terms of this Agreement, the Trustee shall be entitled to rely on the information supplied by the Collateral Manager in relation to the preparation of the Note Report, and by the Issuer in relation to the Payment Report, and shall not be liable for the accuracy or completeness of such information prepared by the Collateral Manager or the lack thereof.

In addition to the foregoing information, each Note Report and Payment Report if separate from the Note Report shall include a statement to the following effect as may be modified from time to time to conform to then-existing practice (as determined by the Collateral Manager) with the consent of the Trustee and an Opinion of Counsel to the effect that such statement, as modified, reflects the transfer restrictions applicable to the Notes:

"The Notes have not been and will not be registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"), or under any state securities laws, and the Issuer has not been and will not be registered under the United States Investment Company Act of 1940, as amended (the "**1940 Act**"). Each Holder of the Notes, other than those Holders that are not "U.S. persons" ("**U.S. Person**") within the meaning of Regulation S ("**Regulation S**") under the Securities Act and have acquired their Notes outside the United States pursuant to Regulation S, is required to be both (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act ("**Qualified Institutional Buyer**") and (ii) a "qualified purchaser" ("**Qualified Purchaser**") within the meaning of Section 3(c)(7) of the 1940 Act, purchasing for its own account or for the account of another Qualified Purchaser, that can make all of the representations in the Indenture applicable to a holder that is a U.S. Person and it, and each account for which it holds the Notes, shall hold at least the minimum denomination therefor. The beneficial interest in the Notes may be transferred only to a transferee that meets both of the criteria in clauses (i) and (ii) above and can make all of the representations in the Indenture applicable to a Holder that is a U.S. Person, except that any such transfer in reliance on Regulation S can be made only to a transferee that is not a U.S. Person. The Issuer has the right to compel any Holder that does not meet the qualifications and the

transfer restrictions set forth in the Indenture to sell its interest in the Notes, or may sell such interest on behalf of such owner, pursuant to the Indenture."

(b)    The Issuer hereby instructs the Trustee to transfer the amounts set forth in the related Payment Report from the Collection Account to the Payment Account pursuant to Section 10.5 and to withdraw on or prior to the Business Day prior to the related Payment Date from the Payment Account and pay or transfer the amounts set forth in the Payment Report, as applicable, in the manner specified, and in accordance with the priorities established, in Section 11.1 hereof.

(c)    **Redemption Date Instructions**.  Not less than five Business Days after receiving an Issuer Request (executed by the Issuer or the Collateral Manager) requesting information regarding a Redemption pursuant to Section 9.1 of the Secured Notes of a Class as of a proposed Redemption Date set forth in such Issuer Request, the Trustee shall compute the following information and provide such information in a statement (the "**Redemption Date Statement**") delivered to the Issuer, the Collateral Manager and each Rating Agency:

(i)    the Aggregate Outstanding Amount of the Secured Notes of the Class or Classes to be redeemed as of such Redemption Date and the Redemption Prices for each Class of Notes, as applicable;

(ii)    the amount of accrued interest due on such Secured Notes as of the last day of the Interest Period immediately preceding such Redemption Date; and

(iii)    the amount in the Collection Account available for application to the redemption of such Secured Notes.

(d)    If the Trustee shall not have received any accounting provided for in this Section 10.11 on the first Business Day after the date on which such accounting is due to the Trustee, the Trustee shall use reasonable efforts to cause such accounting to be made by the applicable Payment Date or Redemption Date.  To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.11 as a result of the failure of the Issuer to provide such information or reports, the Trustee shall be entitled to retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for such Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

The Trustee will make the Note Report available via its internet website initially located at www.cdotrustee.net.  All information made available on the Trustee's website will be restricted and the Trustee will only provide access to such reports to those parties entitled thereto pursuant to the Indenture.  In connection with providing access to its website, the Trustee may require registration and the acceptance of a disclaimer.

### Section 10.12  Release of Securities

(a)    If no Event of Default has occurred and is continuing and subject to Article XII, the Issuer shall, in connection with any sale required or permitted pursuant to Section 12.1, 9.1 or 9.2, by Issuer Order executed by an Authorized Officer of the Issuer or by an

Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the settlement date for any sale of a security certifying that the conditions set forth in Section 12.1 are satisfied, direct the Trustee to release such security from the lien of this Indenture against receipt of payment therefor.

(b)    The Issuer shall, if notified that the issuer of the Pledged Security requires delivery of such Pledged Security as a condition to redemption or payment in full, by Issuer Order executed by an Authorized Officer of the Issuer or by an Officer of the Collateral Manager and delivered to the Trustee at least two Business Days prior to the date set for redemption or payment in full of a Pledged Security, certifying that such security is being redeemed or paid in full, direct the Trustee or, at the Trustee's instructions, the Custodian, to deliver such security, if in physical form, duly endorsed, or, if such security is a Clearing Corporation Security, to cause it to be presented, to the appropriate paying agent therefor on or before the date set for redemption or payment, in each case against receipt of the redemption price or payment in full thereof.

(c)    If no Event of Default has occurred and is continuing, the Issuer (or the Collateral Manager on behalf of the Issuer) may, by Issuer Order delivered to the Trustee at least two Business Days prior to the date set for an exchange, tender or sale, certifying that a Collateral Debt Security is subject to an Offer and setting forth in reasonable detail the procedure for response to such Offer, direct the Trustee to deliver such Collateral against receipt of payment therefor.

(d)    The Trustee shall deposit any proceeds received by it from the disposition of a Pledged Security in the Collection Account unless simultaneously applied to the purchase of Eligible Investments or Substitute Collateral Debt Securities, in each case as permitted under and in accordance with the requirements of this Article X and Article XII.

(e)    The Trustee shall, upon receipt of an Issuer Order at such time as there are no Secured Notes Outstanding and all obligations of the Issuer hereunder have been satisfied, release the Collateral from the lien of this Indenture.

(f)    The Issuer may retain agents (including the Collateral Manager) to assist the Issuer in preparing any notice or other report required under this Section 10.12.

### Section 10.13 Reports by Independent Accountants

(a)    At the Closing Date the Issuer (or the Collateral Manager on its behalf) shall appoint a firm of Independent certified public accountants of recognized national reputation for purposes of preparing and delivering the reports or certificates of such accountants required by this Indenture.    Upon any resignation by such firm, the Issuer shall (after consultation with the Collateral Manager) propose a replacement firm meeting the criteria set forth in the preceding sentence for approval by the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class.    Upon approval by the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class, the Issuer (or the Collateral Manager on behalf of the Issuer) shall promptly appoint such firm by Issuer Order delivered to the Trustee, each Hedge Counterparty, the Collateral Manager and each Rating

Agency. If the Issuer shall fail to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after such resignation, the Issuer shall promptly notify the Trustee of such failure in writing. The fees of such Independent certified public accountants and its successor shall be payable as Administrative Expenses by the Issuer as provided in Section 11.1.

(b)    On or before February 25 of each year (commencing with February 2008), the Issuer shall cause to be delivered to the Trustee, the Income Note Paying Agent and each Rating Agency an Accountants' Report indicating (i) that such firm has reviewed all Payment Reports received since their last review and that the calculations within those Payment Reports have been performed in accordance with the applicable provisions of this Indenture, (ii) that such firm has reviewed at least two Note Reports (which are at least 4 months apart from each other) received since the last review and that the calculations within those Note Reports have been performed in accordance with the applicable provisions of this Indenture and (iii) the procedures applied with respect to their review of such Note Reports and Payment Reports. At least 60 days prior to the Payment Date in February 2008 (and, if at any time a successor firm of Independent certified public accountants is appointed, prior to the Payment Date in February following the date of such appointment), the Issuer shall deliver to the Trustee an Accountant's Report specifying in advance the procedures that such firm will apply in making the aforementioned findings throughout the term of its service as accountants to the Issuer. The Trustee shall promptly forward a copy of such Accountant's Report to each Hedge Counterparty, the Rating Agencies, the Income Note Paying Agent and each Holder of the Controlling Class, at the address shown on the Note Register. The Issuer shall not approve the institution of such procedures if the Holders of not less than 66⅔% of the Aggregate Outstanding Amount of the Controlling Class or the Collateral Manager, by notice to the Issuer and the Trustee within 30 days after the date of the related notice to the Trustee, object thereto.

(c)    Any statement delivered to the Trustee pursuant to Section 10.13(b) above shall be made available by the Trustee to any Holder of a Secured Note shown on the Note Register upon written request therefor.

### Section 10.14 Reports to Rating Agencies

In addition to the information and reports specifically required to be provided to the Rating Agencies, the Income Note Paying Agent, the Holders of the Secured Notes, the Holders of the Combination Notes and each Hedge Counterparty pursuant to the terms of this Indenture, the Income Note Paying Agency Agreement or each Hedge Agreement (as the case may be), the Issuer shall provide or procure to provide the Rating Agencies with (a) all information or reports delivered to the Trustee hereunder and (b) such additional information as the Rating Agencies or the Income Note Paying Agent may from time to time reasonably request and such information may be obtained and provided without unreasonable burden or expense. The Issuer shall promptly notify the Trustee, the Income Note Paying Agent and each Hedge Counterparty if the rating of any Class of Secured Notes has been, or it is known by the Issuer that such rating will be, changed or withdrawn. The Issuer shall promptly notify each Rating Agency in the case of (i) the removal, resignation or replacement for any reason of (A) the Collateral Manager or (B) the Trustee; (ii) the appointment of any successor to (A) the Collateral

Manager or (B) the Trustee; or (iii) a default in the payment when due and payable of any interest on any Secured Note.

### Section 10.15 Tax Matters

The Issuer agrees to treat, and hereby notifies the Trustee to treat, and, by accepting a Secured Note, each Holder of the Secured Notes agrees to treat, the Secured Notes, for U.S. federal, state and local income tax purposes, as indebtedness of the Issuer, and to treat the Combination Notes as direct ownership of the Class A-3 Notes and Income Notes constituting the Class A-3 Note Component and Income Note Component, to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment except as otherwise required by any taxing authority under applicable law. The Issuer agrees to treat the Combination Notes as consisting of Class A-3 Notes and Income Notes corresponding to their related Components. Each Holder of a Combination Note, by its acquisition of the Combination Note, agrees to treat the Combination Note as consisting of Class A-3 Notes and Income Notes corresponding to their related Components, and to treat the Income Notes as equity in the Issuer and the Class A-3 Notes as indebtedness of the Issuer for U.S. federal, state and local income tax purposes and not to take any action inconsistent with such treatment except as otherwise required by any taxing authority under applicable law. The Issuer agrees not to elect to be treated as other than a corporation for U.S. federal income tax purposes.

### Section 10.16 Tax Information

The Issuer shall provide on a timely basis to any Holder or owner of a beneficial interest in any class of Notes (or its designee), upon written request therefor certifying that it is such a Holder or beneficial owner, (i) all information that a U.S. shareholder making a "qualified electing fund" election (as defined in the Code) is required to obtain for U.S. federal income tax purposes with respect to its ownership interest in (A) the Issuer or (B) any interest in a passive foreign investment company owned by the Issuer and (ii) a "PFIC Annual Information Statement" as described in Treasury Regulation Section 1.1295-1 (or any successor Internal Revenue Service release or Treasury Regulation), including all representations and statements required by such statement, and will take any other steps necessary to facilitate such election by a Holder or beneficial owner in any Notes. The Issuer shall also provide, upon request of a Holder or beneficial owner of any Notes, any information that such Holder or beneficial owner reasonably requests to assist such Holder or beneficial owner with regard to any filing requirements the Holder or beneficial owner may have as a result of the controlled foreign corporation rules under the Code. The cost and expense of the preparation and delivery of any of the information described in this Section 10.16 shall be borne by the Issuer.

## ARTICLE XI

## APPLICATION OF MONIES

**Section 11.1    Disbursements of Funds from Payment Account; Priority of Payments**

(a)    **Collateral Interest Collections**.    On any Payment Date that is not a Redemption Date or a Payment Date following the occurrence and continuation of an acceleration of the Secured Notes in connection with an Event of Default, in accordance with a Payment Report prepared by the Collateral Administrator on behalf of the Issuer as of the last day of the Due Period preceding such Payment Date, Collateral Interest Collections, to the extent of Available Funds in the Collection Account, will be deposited in the Payment Account and applied by the Trustee in the following order of priority:

(i)    to pay, in the following order:

(A)    taxes and filing fees and registration fees (including, without limitation, annual return fees) payable by the Issuer, if any; and then,

(B)    the amount of any due and unpaid Trustee Fee; and then,

(C)    the amount of any due and unpaid fees to the Administrator; and then,

(D)    the amount of any due and unpaid Trustee Expenses; and then,

(E)    the amount of any due and unpaid fees and expenses of the Rating Agencies; and then,

(F)    the amount of any due and unpaid expenses of the Administrator and any due and unpaid Administrative Expenses not included in (C), (D) and (E) above, including amounts payable to the Collateral Manager under the Collateral Management Agreement but excluding the Collateral Management Fee; and then,

(G)    to deposit to the Expense Reserve Account the amount needed to bring the amount on deposit therein to U.S.$25,000 (unless the Collateral Manager directs that a lesser amount be deposited to the Expense Reserve Account);

**provided** that the cumulative amount paid under (C) through (G) above (excluding any Administrative Expenses due or accrued with respect to the actions taken on or prior to the Closing Date and accounting fees that the Trustee is required to pay (other than certain accountants' fees related to annual reviews) and fees the Trustee pays in connection with any Event of Default and any default of the Collateral Debt Securities) may not exceed U.S.$250,000 in the aggregate in any consecutive 12-month period;

(ii)    to pay the Senior Collateral Management Fee with respect to such Payment Date and any Senior Collateral Management Fee with respect to a previous Payment Date that was not paid on a previous Payment Date (excluding any interest payable on such unpaid Senior Collateral Management Fee);

(iii)    to pay any Hedge Counterparty any amounts due to such Hedge Counterparty under any Hedge Agreement, excluding any termination payments where such Hedge Counterparty is the Defaulting Party or (unless the relevant termination event is an "Illegality" or a "Tax Event" as defined in the applicable Hedge Agreement) the sole Affected Party;

(iv)    as provided under the terms of such Notes, to pay Periodic Interest on the Class A-1 Notes and any Defaulted Interest thereon;

(v)    as provided under the terms of such Notes, to pay Periodic Interest on the Class A-2 Notes and any Defaulted Interest thereon;

(vi)    as provided under the terms of such Notes, to pay Periodic Interest on the Class A-3 Notes and any Defaulted Interest thereon;

(vii)    as provided under the terms of such Notes, to pay Periodic Interest on the Class B Notes and any Defaulted Interest thereon;

(viii)    if either of the Class A/B Coverage Tests is not satisfied as of the preceding Calculation Date, to pay principal as provided under the terms of such Notes to the most senior Class of Notes then Outstanding until such Class A/B Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and then to pay principal of the next most senior Class of Notes Outstanding until such Class A/B Coverage Test is satisfied as of such Calculation Date or until such next most senior Class of Notes is paid in full and so on, until such Class A/B Coverage Test is satisfied or until the Class B Notes are paid in full; **provided** that for purposes of determining if the Class A/B Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(a)(viii), the denominator of the Class A/B Principal Coverage Ratio shall be calculated after giving effect to any payments of principal on the Notes made pursuant to any of the clauses above and pursuant to this Section 11.1(a)(viii) on the related Payment Date;

(ix)    if a Ratings Confirmation Failure occurs and application of any Uninvested Proceeds in the Uninvested Proceeds Account is insufficient to cause the ratings assigned to each Class of Notes to be reinstated or each Class of Secured Notes to be paid in full, on each Payment Date commencing with the Payment Date following the Calculation Date following such Ratings Confirmation Failure, to pay principal as provided under the terms of such Notes, on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, in that order, in the amounts necessary for each Rating Agency to confirm its respective ratings of the Notes assigned on the Closing Date or until each Class of Notes is paid in full;

(x)      as provided under the terms of such Notes, to pay Periodic Interest on the Class C Notes (which, as defined, includes any interest on the Class C Cumulative Applicable Periodic Interest Shortfall Amount) and, if no Class A Notes and no Class B Notes are Outstanding, any Defaulted Interest on the Class C Notes;

(xi)      if either of the Class C Coverage Tests is not satisfied as of the preceding Calculation Date to pay principal (including any Class C Cumulative Applicable Periodic Interest Shortfall Amount) of the most senior Class of Notes then Outstanding until such Class C Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and then to pay principal as provided under the terms of such Notes, of the next most senior Class of Notes Outstanding until such Class C Coverage Test is satisfied as of such Calculation Date or until such next most senior Class of Notes is paid in full and so on, until such Class C Coverage Test is satisfied or until the Class C Notes, are paid in full; **provided** that for purposes of determining if the Class C Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(a)(xi), the denominator of the Class C Principal Coverage Ratio shall be determined after giving effect to any payments of principal on the Notes pursuant to any of the clauses above and pursuant to this Section 11.1(a)(xi) on the related Payment Date; **provided, further**, that with respect to the Class C Notes, payment of principal constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xii)      as provided under the terms of such Notes, to pay the Class C Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xiii)      as provided under the terms of such Notes, to pay Periodic Interest on the Class D Notes (which, as defined, includes any interest on the Class D Cumulative Applicable Periodic Interest Shortfall Amount) and, if no Class A Notes, no Class B Notes and no Class C Notes are Outstanding, any Defaulted Interest on the Class D Notes;

(xiv)      as provided under the terms of such Notes, to pay the Class D Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xv)      as provided under the terms of such Notes, to pay Periodic Interest on the Class E Notes (which, as defined, includes any interest on the Class E Cumulative Applicable Periodic Interest Shortfall Amount) and, if no Class A Notes, nó Class B Notes, no Class C Notes and no Class D Notes are Outstanding, any Defaulted Interest on the Class E Notes;

(xvi)      if either of the Class D/E Coverage Tests is not satisfied as of the preceding Calculation Date to pay principal as provided under the terms of such Notes (including any Class E Cumulative Applicable Periodic Interest Shortfall Amount) of the most senior Class of Notes then Outstanding until such Class D/E Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and then to pay principal of the next most senior Class of Notes Outstanding until

such Class D/E Coverage Test is satisfied as of such Calculation Date or until such next most senior Class of Notes is paid in full and so on, until such Class D/E Coverage Test is satisfied or until the Class E Notes are paid in full; **provided** that for purposes of determining if the Class D/E Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(a)(xvi), the denominator of the Class D/E Principal Coverage Ratio shall be determined after giving effect to any payments of principal on the Notes pursuant to any of the clauses above and pursuant to this Section 11.1(a)(xvi) on the related Payment Date; **provided, further**, that with respect to the Class E Notes, payment of principal constituting the Class E Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class E Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xvii)    as provided under the terms of such Notes, to pay the Class E Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xviii)    as provided under the terms of such Notes, to pay Periodic Interest on the Class F Notes (which, as defined, includes any interest on the Class F Cumulative Applicable Periodic Interest Shortfall Amount) and, if no Class A Notes, no Class B Notes, no Class C Notes, no Class D Notes and no Class E Notes are Outstanding, any Defaulted Interest on the Class F Notes;

(xix)    as provided under the terms of such Notes, to pay the Class F Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xx)    to pay any termination payments payable by the Issuer under any Hedge Agreement upon the termination of the related Hedge Agreement (to be allocated *pro rata* among all applicable Hedge Counterparties), if such termination occurred solely as the result of an event of default or a termination event with respect to which such Hedge Counterparty is the Defaulting Party or the sole Affected Party, as the case may be (but only to the extent not paid pursuant to Section 11.1(a)(iii) above);

(xxi)    to pay, in the following order:

(A)    any due and unpaid Trustee Expenses and Administrative Expenses, including amounts payable to the Collateral Manager under the Collateral Management Agreement but excluding the Collateral Management Fee, in each case, in the same order of priority as provided in Section 11.1(a)(i) above and to the extent not paid in full under Section 11.1(a)(i) above without regard to any limitation on any maximum amounts payable on such date contained therein; and

(B)    on a *pro rata* basis, any due and unpaid expenses and other liabilities of the Issuer to the extent not paid under Section 11.1(a)(i) above, whether as a result of an amount limitation imposed thereunder or otherwise;

(xxii)    to pay, **first**, the Subordinate Collateral Management Fee with respect to such Payment Date and any due and unpaid Subordinate Collateral Management Fee with respect to a previous Payment Date that was not paid on a previous Payment Date, and

**second**, any accrued and unpaid interest on the then-due and unpaid Collateral Management Fee (that was deferred due to insufficient funds under Section 11.1(a)(ii)); and

(xxiii)     to pay (A) to the Collateral Manager, the Incentive Collateral Management Fee (if any) and (B) all Income Note Excess Funds to the Income Note Paying Agent, on behalf of the Issuer, for distributions on the Income Notes in accordance with the Income Note Paying Agency Agreement.

(b)     **Collateral Principal Collections**.  On any Payment Date that is not a Redemption Date or a Payment Date following the occurrence and continuation of an acceleration of the Secured Notes in connection with an Event of Default, in accordance with a Payment Report prepared by the Collateral Administrator on behalf of the Issuer as of the last day of the Due Period preceding such Payment Date, Collateral Principal Collections, to the extent of Available Funds in the Collection Account, will be deposited in the Payment Account and applied by the Trustee in the following order of priority:

(i)     to the payment of the amounts referred to in Section 11 1(a)(i) through (vii), in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(ii)     if either of the Class A/B Coverage Tests is not satisfied as of the preceding Calculation Date and to the extent that the amounts paid pursuant to Section 11.1(a)(viii) are insufficient to cause the Class A/B Coverage Tests to be satisfied, to pay principal, as provided under the terms of such Notes, of the most senior Class of Notes then Outstanding until such Class A/B Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and then to pay principal, as provided under the terms of such Notes, of the next most senior Class of Notes Outstanding until such Class A/B Coverage Test is satisfied as of such Calculation Date or until such next most senior Class of Notes is paid in full and so on, until such Class A/B Coverage Test is satisfied or until the Class B Notes are paid in full; **provided** that for purposes of determining if the Class A/B Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(b)(ii), the denominator of the Class A/B Principal Coverage Ratio shall be calculated after giving effect to any payments of principal on the Notes made pursuant to any clause or subclause of Section 11.1(a) on the related Payment Date and pursuant to Section 11.1(b)(i) above and this Section 11.1(b)(ii); and **provided, further**, that the numerator of the Class A/B Principal Coverage Ratio shall be calculated after giving effect to any Collateral Principal Collections applied pursuant to any of the clauses above and pursuant to this Section 11.1(b)(ii) on the related Payment Date;

(iii)     if a Ratings Confirmation Failure occurs and application of any Uninvested Proceeds in the Uninvested Proceeds Account and the amounts paid pursuant to Section 11.1(a)(ix) are insufficient to cause the ratings assigned to each Class of Notes to be reinstated or each Class of Secured Notes to be paid in full, on each Payment Date commencing with the Payment Date following the Calculation Date following such Ratings Confirmation Failure, to pay principal, as provided under the terms of such

Notes, on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes, in that order, in the amounts necessary for each Rating Agency to confirm its respective ratings of the Notes assigned on the Closing Date or until each Class of Notes is paid in full;

(iv)    if the Class A Notes and the Class B Notes are no longer Outstanding, to pay Periodic Interest on the Class C Notes, as provided under the terms of such Notes, (which, as defined, includes any interest on the Class C Cumulative Applicable Periodic Interest Shortfall Amount) and any Defaulted Interest on the Class C Notes, to the extent that the amounts paid pursuant to Section 11.1(a)(x) are insufficient to pay such amounts in full thereunder;

(v)    if either of the Class C Coverage Tests is not satisfied as of the preceding Calculation Date and to the extent that the amounts paid pursuant to Section 11.1(a)(xi) are insufficient to cause the Class C Coverage Tests to be satisfied, to pay principal, as provided under the terms of such Notes (including any Class C Cumulative Applicable Periodic Interest Shortfall Amount), of the most senior Class of Notes then Outstanding until such Class C Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and then to pay principal of the next most senior Class of Notes Outstanding until such Class C Coverage Test is satisfied as of such Calculation Date or until such next most senior Class of Notes is paid in full and so on, until such Class C Coverage Test is satisfied or until the Class C Notes are paid in full; **provided** that for purposes of determining if the Class C Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(b)(v), the denominator of the Class C Principal Coverage Ratio shall be determined after giving effect to any payments of principal on the Notes made pursuant to any clause or subclause of Section 11.1(a) on the related Payment Date and pursuant to any clause above and this Section 11.1(b)(v); **provided, further**, that for purposes of determining if the Class C Principal Coverage Test is satisfied, the numerator of the Class C Principal Coverage Ratio shall be calculated after giving effect to any Collateral Principal Collections to be applied pursuant to any clause above and this Section 11.1(b)(v) on the related Payment Date; and **provided, further**, that with respect to the Class C Notes, payment of principal constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(vi)    if the Class A Notes and the Class B Notes are no longer Outstanding, to pay the Class C Cumulative Applicable Periodic Interest Shortfall Amount, to the extent that the amounts paid pursuant to Section 11.1(a)(xii) are insufficient to pay such amounts in full thereunder;

(vii)    if the Class A Notes, the Class B Notes and the Class C Notes are no longer Outstanding, to pay Periodic Interest on the Class D Notes (which, as defined, includes any interest on the Class D Cumulative Applicable Periodic Interest Shortfall Amount) and any Defaulted Interest on the Class D Notes, to the extent that the amounts

paid pursuant to Section 11.1(a)(xiii) are insufficient to pay such amounts in full thereunder;

(viii)    if the Class A Notes, the Class B Notes, and the Class C Notes are no longer Outstanding, to pay the Class D Cumulative Applicable Periodic Interest Shortfall Amount, to the extent that amounts paid pursuant to Section 11.1(a)(xiv) are insufficient to pay such amounts in full thereunder;

(ix)    if the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are no longer Outstanding, to pay Periodic Interest on the Class E Notes (which, as defined, includes any interest on the Class E Cumulative Applicable Periodic Interest Shortfall Amount) and any Defaulted Interest on the Class E Notes, to the extent that the amounts paid pursuant to Section 11.1(a)(xv) are insufficient to pay such amounts in full thereunder;

(x)    if either of the Class D/E Coverage Tests is not satisfied as of the preceding Calculation Date and to the extent that amounts paid pursuant to Section 11.1(a)(xvi) are insufficient to cause the Class D/E Coverage Tests to be satisfied, to pay principal (including any Class C Cumulative Applicable Periodic Interest Shortfall Amount, Class D Cumulative Applicable Periodic Interest Shortfall Amount or Class E Cumulative Applicable Periodic Interest Shortfall Amount, as applicable) of the most senior Class of Notes then Outstanding until such Class D/E Coverage Test is satisfied as of such Calculation Date or until such most senior Class of Notes is paid in full, and so on, until such Class D/E Coverage Test is satisfied or until the Class E Notes are paid in full; **provided** that for purposes of determining if the Class D/E Principal Coverage Test is satisfied after giving effect to any payments under this Section 11.1(b)(x), the denominator of the Class D/E Principal Coverage Ratio shall be determined after giving effect to any payment of principal on the Notes made pursuant to any clause of Section 11.1(a) on the related Payment Date and pursuant to any clause above and this Section 11.1(b)(x); **provided, further**, that for purposes of determining if the Class D/E Principal Coverage Test is satisfied, the numerator of the Class D/E Principal Coverage Ratio shall be calculated after giving effect to any Collateral Principal Collections to be applied pursuant to any clause above and this Section 11.1(b)(x) on the related Payment Date; and **provided, further**, that with respect to (a) the Class C Notes, payment of principal constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class C Cumulative Applicable Periodic Interest Shortfall Amount, if any; and (b) the Class D Notes, payment of principal constituting the Class D Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class D Cumulative Applicable Periodic Interest Shortfall Amount, if any; and (c) the Class E Notes, payment of principal constituting the Class E Cumulative Applicable Periodic Interest Shortfall Amount shall be paid before principal not constituting the Class E Cumulative Applicable Periodic Interest Shortfall Amount, if any;

(xi)    if the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are no longer Outstanding, to pay the Class E Cumulative Applicable Periodic

Interest Shortfall Amount, to the extent that amounts paid pursuant to Section 11.1(a)(xvii) are insufficient to pay such amounts in full thereunder;

(xii)    if the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes are no longer Outstanding, to pay Periodic Interest on the Class F Notes (which, as defined, includes any interest on the Class F Cumulative Applicable Periodic Interest Shortfall Amount) and any Defaulted Interest on the Class F Notes, to the extent that the amounts paid pursuant to Section 11.1(a)(xviii) are insufficient to pay such amounts in full thereunder;

(xiii)    if the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes are no longer Outstanding, to pay the Class F Cumulative Applicable Periodic Interest Shortfall Amount, to the extent that amounts paid pursuant to Section 11.1(a)(xix) are insufficient to pay such amounts in full thereunder;

(xiv)    during the Reinvestment Period,

(A)    to the purchase of Substitute Collateral Debt Securities or to the Collection Account for reinvestment in Eligible Investments pending investment in Substitute Collateral Debt Securities in accordance with the Reinvestment Criteria; or

(B)    upon the occurrence of a Special Amortization, Collateral Principal Collections in an amount determined by the Collateral Manager (notice of which shall be provided to the Trustee on or prior to the related Calculation Date) will be applied as follows:

(1)    if the Special Amortization Pro Rata Condition is satisfied, to pay principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes on a *pro rata* basis (based on the Aggregate Outstanding Amount of each such Class of Secured Notes); or

(2)    if the Special Amortization Pro-Rata Condition is not satisfied, the following payments, as provided under the terms of such Notes, in the following order of priority:

A)    to pay principal of any outstanding Class A-1 Notes;

B)    if the principal balance of the Class A-1 Notes has been repaid in full, to pay principal of the Class A-2 Notes;

C)    if the principal balance of the Class A-2 Notes has been repaid in full, to pay principal of the Class A-3 Notes;

D)    if the principal balance of the Class A-3 Notes has been repaid in full, to pay principal of the Class B Notes;

E)    if the principal balance of the Class B Notes has been repaid in full, to pay principal of the Class C Notes;

F)    if the principal balance of the Class C Notes has been repaid in full, to pay principal of the Class D Notes;

G)    if the principal balance of the Class D Notes has been repaid in full, to pay principal of the Class E Notes; and

H)    if the principal balance of the Class E notes has been repaid in full, to pay principal of the Class F Notes;

(xv)    after the end of the Reinvestment Period, as provided under the terms of such Notes, to pay each Class of Secured Notes:

(A)    **first**, to the Class A-1 Notes, until the Class A-1 Notes have been paid in full;

(B)    **second**, to the Class A-2 Notes, until the Class A-2 Notes have been paid in full;

(C)    **third**, to the Class A-3 Notes, until the Class A-3 Notes have been paid in full;

(D)    **fourth**, to the Class B Notes, until the Class B Notes have been paid in full;

(E)    **fifth**, to the Class C Notes, until the Class C Notes have been paid in full;

(F)    **sixth**, to the Class D Notes, until the Class D Notes have been paid in full;

(G)    **seventh**, to the Class E Notes, until the Class E Notes have been paid in full; and

(H)    **eighth**, to the Class F Notes, until the Class F Notes have been paid in full.

(xvi)    to pay termination payments payable to any Hedge Counterparty upon the termination of the related Hedge Agreement (to be allocated *pro rata* among all applicable Hedge Counterparties), if such termination occurred solely as the result of an event of default or a termination event with respect to which such Hedge Counterparty is the Defaulting Party or the sole Affected Party, as the case may be, to the extent that the amounts paid pursuant to Section 11.1(a)(xx) are insufficient to pay such amounts in full thereunder;

(xvii)    to pay, in the following order, any due and unpaid Trustee Fee, Trustee Expenses and any other unpaid Administrative Expenses, including amounts payable to the Collateral Manager under the Collateral Management Agreement but excluding the Collateral Management Fee, in each case, in the same order of priority as provided in Section 11.1(b)(i) above and to the extent not paid in full under Section 11.1(b)(i) and to the extent that the amounts paid pursuant to Section 11.1(a)(i) and (xxi) are insufficient to pay such amounts in full thereunder;

(xviii)    to pay, **first**, the Subordinate Collateral Management Fee with respect to such Payment Date and any due and unpaid Subordinate Collateral Management Fee with respect to a previous Payment Date that was not paid on a previous Payment Date, and **second**, any accrued and unpaid interest on the then-due and unpaid Collateral Management Fee (that was deferred due to insufficient funds under Section 11.1(a)(ii) or Section 11.1(b)(i)), to the extent that the amounts paid pursuant to Section 11.1(a)(xxii) are insufficient to pay such amounts in full thereunder; and

(xix)    to pay (A) to the Collateral Manager the Incentive Collateral Management Fee (if any) and (B) all Income Note Excess Funds to the Income Note Paying Agent, on behalf of the Issuer, for distributions on the Income Notes in accordance with the Income Note Paying Agency Agreement.

(c)    If an Event of Default has occurred and is continuing and a declaration of acceleration of the maturity of the Secured Notes occurs, the Trustee will pay, as provided under the terms of such Secured Notes, from all collections from, and proceeds of the sale or liquidation of, the Collateral, in the following order:

(i)    amounts corresponding to the amounts set forth in Section 11.1(a)(i) through (iii), without giving effect to any limitations on amounts payable set forth therein;

(ii)    the Periodic Interest on the Class A-1 Notes (including Defaulted Interest on such Class A-1 Notes, if any), and then outstanding principal on the Class A-1 Notes until paid in full;

(iii)    the Periodic Interest on the Class A-2 Notes (including Defaulted Interest on such Class A-2 Notes, if any), and then outstanding principal on the Class A-2 Notes until paid in full;

(iv)    the Periodic Interest on the Class A-3 Notes (including Defaulted Interest on such Class A-3 Notes, if any), and then outstanding principal on the Class A-3 Notes until paid in full;

(v)    the Periodic Interest on the Class B Notes (including Defaulted Interest on the Class B Notes, if any) and then outstanding principal on the Class B Notes until paid in full;

(vi)    the Periodic Interest on the Class C Notes (including Defaulted Interest on the Class C Notes, if any) and then outstanding principal on the Class C Notes (including

Class C Cumulative Applicable Periodic Interest Shortfall Amount, if any) until paid in full;

(vii)    the Periodic Interest on the Class D Notes (including Defaulted Interest on the Class D Notes, if any) and then outstanding principal on the Class D Notes (including Class D Cumulative Applicable Periodic Interest Shortfall Amount, if any) until paid in full;

(viii)    the Periodic Interest on the Class E Notes (including Defaulted Interest on the Class E Notes, if any) and then outstanding principal on the Class E Notes (including Class E Cumulative Applicable Periodic Interest Shortfall Amount, if any) until paid in full;

(ix)    the Periodic Interest on the Class F Notes (including Defaulted Interest on the Class F Notes, if any) and then outstanding principal on the Class F Notes (including Class F Cumulative Applicable Periodic Interest Shortfall Amount, if any) until paid in full;

(x)    amounts corresponding to the amounts set forth in Section 11.1(a)(xx) through (xxiii)(A); and

(xi)    to the Income Note Paying Agent, any remaining amounts for distributions on the Income Notes as set forth in Section 11.1(a)(xxiii)(B).

(d)    Not later than 12:00 p.m., New York time, on or before the Business Day preceding each Payment Date, the Issuer shall, pursuant to Article X, remit or cause to be remitted to the Trustee for deposit in the Payment Account an amount of Cash sufficient to pay the amounts described in Section 11.1(a) and 11.1(b) required to be paid on such Payment Date.

(e)    If, on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by the Payment Report furnished by the Issuer pursuant to Section 10.11(a), the Trustee shall make the disbursements called for in the order and according to the priority set forth under Sections 11.1(a) and 11.1(b), subject to Section 13.1, to the extent funds are available therefor.

(f)    Except as otherwise expressly provided in this Section 11.1, if on any Payment Date the amount of funds is insufficient to make the full amount of the disbursements required by any clause or subclause of Section 11.1(a) or 11.1(b) to different Persons, the Trustee shall make the disbursements called for by such clause or subclause ratably in accordance with the respective amounts of such disbursements then due and payable to the extent funds are available therefor.

(g)    Any amounts to be paid to the Income Note Paying Agent pursuant to Section 11.1(a)(xxiii)(B) or to Section 11.1(b)(xix)(B) will be released from the lien of this Indenture.

(h)    No Collateral Principal Collections will be paid to a Class of Secured Notes in accordance with the Priority of Payments on a Payment Date if, after giving effect to such payment, any Principal Coverage Test for a more Senior Class of Secured Notes would have failed.

(i)    On any Redemption Date, the Trustee shall pay, from the Payment Account the Available Funds deposited therein from the Collection Account, in the following order, (x) the Redemption Price of each Class of Notes in accordance with Section 11.1(b) and (y) all amounts payable under Section 11.1(a)(i), Section 11.1(a)(ii), Section 11.1(a)(iii) and Section 11.1(a)(xx) through (xxiii)(A). All remaining amounts, if any, will constitute Income Note Excess Funds, distributable to the Income Note Paying Agent, on behalf of the Issuer, for distributions to the Income Notes in accordance with the Income Note Paying Agency Agreement.

# ARTICLE XII

## PURCHASE AND SALE OF COLLATERAL DEBT SECURITIES

### Section 12.1    Sale of Collateral Debt Securities

(a)    **Sale of Collateral Debt Securities**.

(i)    Subject to the satisfaction of the conditions specified in Section 10.12, as applicable, the Collateral Manager, on behalf of the Issuer, may pursuant to this Article XII, at any time direct the Trustee to sell any Temporary Ramp-Up Security, Defaulted Security, Equity Security, Credit Risk Security, Written Down Security or Withholding Tax Security, and the Trustee shall sell in the manner directed by the Collateral Manager, any Temporary Ramp-Up Security, Defaulted Security, Equity Security, Credit Risk Security, Written Down Security or Withholding Tax Security.

(ii)    During the Ramp-Up Period, and in any event, no later than the Effective Date, the Collateral Manager shall direct the Issuer to sell or otherwise dispose of all Temporary Ramp-Up Securities. Sale Proceeds received with respect to Temporary Ramp-Up Securities shall be reinvested only in Ramp-Up Collateral Debt Securities that are Fixed Rate Collateral Debt Securities, **provided** that any Sale Proceeds received with respect to Temporary Ramp-Up Securities that are not reinvested in Fixed Rate Collateral Debt Securities, other than not more than U.S.$500,000 of such Sale Proceeds that may be reinvested in Substitute Collateral Debt Securities that are not Fixed Rate Collateral Debt Securities, shall be treated as Collateral Principal Collections and shall be applied by the Issuer to the making of payments on the Notes, subject to and in accordance with the Priority of Payments, on the Payment Date immediately following the Effective Date.

(iii)    The Collateral Manager will direct the Trustee to sell, and, the Trustee will sell in accordance with such direction, all Collateral Debt Securities in connection with a Redemption of the Notes, subject to the satisfaction of the conditions set forth in Article IX herein and upon such sale the Trustee shall release such Collateral from the lien of this Indenture.

(b)    **Reinvestment Criteria**.  During the Reinvestment Period, Sale Proceeds received on Collateral Debt Securities that are Defaulted Securities, Equity Securities, Credit Risk Securities, Written Down Securities or Withholding Tax Securities, as well as Sale Proceeds from Discretionary Sales and Collateral Principal Payments, may be reinvested in Substitute Collateral Debt Securities meeting the Eligibility Criteria and subject to the satisfaction of the Reinvestment Criteria described below, or shall be temporarily reinvested in the Eligible Investments pending such reinvestment in Substitute Collateral Debt Securities in accordance with the Priority of Payments.  Such Sale Proceeds and Collateral Principal Payments will be eligible to be reinvested in Substitute Collateral Debt Securities by the Issuer and pledged to the Trustee only if after giving effect to such reinvestment, each of the Reinvestment Criteria are satisfied as of the date of the commitment to purchase (if such commitment is for a period of 30 days or less), or the date of purchase (if the purchase of such Substitute Collateral Debt Securities has not been settled within 30 days after the commitment date), such Substitute Collateral Debt Securities.

(i)    During the Ramp-Up Period, Substitute Collateral Debt Securities will be purchased with Collateral Principal Collections, if sufficient Collateral Principal Collections are available, and only if sufficient Collateral Principal Collections are not available, with Uninvested Proceeds.

(ii)    For purposes of any applicable calculation or determination under this Indenture, the date on which any Collateral Debt Security or Eligible Investment will be deemed to be acquired, sold or Granted will be the trade date (and not the settlement date) for such acquisition or sale unless such acquisition or sale has not been settled by the 30th day after the applicable trade date, in which case the determination date will be the settlement date.

(iii)    The Reinvestment Criteria shall be "satisfied" if the same are satisfied, maintained or improved after reinvestment in a Collateral Debt Security in accordance with the definition of "Reinvestment Criteria."

(iv)    With respect to any series of trades expected to settle within five Business Days in which the Issuer purchases or sells or commits to purchase and/or sell multiple Collateral Debt Securities, compliance with Section 12.2(b)(i) above may, at the option of the Collateral Manager, be measured by determining the aggregate effect of such trades on the Issuer's level of compliance with such clauses rather than considering the effect of each purchase and sale of such Collateral Debt Securities individually.

(c)    **Discretionary Sales**.  So long as no Event of Default has occurred and is continuing, the Collateral Manager, on behalf of the Issuer, may, during the Reinvestment Period, direct the Trustee to sell, and the Trustee will sell in the manner directed by the Collateral Manager, any Collateral Debt Security (in addition to sales of any Defaulted Securities, Credit Risk Securities, Withholding Tax Securities, Equity Securities and Written Down Securities) so long as each of the following applies:

(i)    the aggregate Principal Balance of all Collateral Debt Securities sold pursuant to such Discretionary Sales for a given calendar year does not exceed 10% of

the CDS Principal Balance at the beginning of that year (or, with respect to calendar year 2007, as of the Closing Date);

(ii)    the Collateral Manager believes in good faith that Sale Proceeds from such sale can be reinvested within 30 Business Days after the sale of such Collateral Debt Security in one or more Substitute Collateral Debt Securities having an aggregate Principal Balance of not less than 100% of the Principal Balance of the Collateral Debt Security being sold;

(iii)   after giving effect to such sale and to the purchase of Substitute Collateral Debt Securities with the Sale Proceeds thereof, the Reinvestment Criteria will be satisfied; and

(iv)    such Collateral Manager has not been removed, or voted to be removed, for "cause" as set forth in the Collateral Management Agreement.

Anything in this Section 12.1 to the contrary notwithstanding, if a resigning or terminated Collateral Manager petitions a court of competent jurisdiction for the appointment of a Replacement Collateral Manager (as defined in the Collateral Management Agreement) as provided in Section 13(c) of the Collateral Management Agreement, no sales of Collateral Debt Securities in Discretionary Sales or reinvestments in Substitute Collateral Debt Securities will be permitted until a Replacement Collateral Manager is duly appointed pursuant to the Collateral Management Agreement.

### Section 12.2    Portfolio Characteristics

Except as provided in Section 12.3(c), a security will be eligible for inclusion in the Collateral as a Collateral Debt Security only if, as evidenced by an Officer's certificate from the Collateral Manager to the Trustee which may take the form of a trade ticket, executed by an Officer of the Collateral Manager, each of the following eligibility criteria is satisfied immediately after the Issuer Grants such Collateral Debt Security to the Trustee (collectively, the "**Eligibility Criteria**"):

(a)    it is issued by an issuer incorporated or organized under the laws of the United States, the Bahamas, Bermuda, the Cayman Islands, the British Virgin Islands, the Netherlands Antilles, Jersey, Guernsey or Luxembourg or, it is issued by a Qualifying Foreign Obligor;

(b)    it is U.S. Dollar-denominated, and it is not convertible into, or payable in, any other currency;

(c)    it is one of the Specified Types of Collateral Debt Securities;

(d)    it has an S&P Rating (which rating does not include a "p," "pi," "q," "t" or "r" subscript) and a Moody's Rating;

(e)    either (A) such Collateral Debt Security is issued by an entity that is treated as a corporation that is not a United States real property holding corporation as defined in

Section 897(c)(2) of the Code for U.S. federal income tax purposes, (B) such Collateral Debt Security is treated as indebtedness for U.S. federal income tax purposes, or (C) the Issuer has received advice from Cadwalader, Wickersham & Taft LLP or Sidley Austin LLP or an opinion of other nationally recognized U.S. tax counsel experienced in such matters to the effect that the acquisition, ownership and disposition of such security will not cause the Issuer to be treated as engaged in a trade or business within the United States for U.S. federal income tax purposes or otherwise subject the Issuer to U.S. federal income tax on a net income basis;

(f)    does not provide for any payments which are or will be subject to deduction or withholding for or on account of any withholding or similar tax, unless the issuer of such security is required to make "gross-up" payments that ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding been required;

(g)    its acquisition would not cause the Issuer or the pool of Collateral to be required to register as an investment company under the Investment Company Act;

(h)    it is not a security that is ineligible under its Underlying Instruments to be purchased by the Issuer and pledged to the Trustee;

(i)    it is not an insurance-linked debt instrument containing a provision pursuant to which the issuer's obligation to pay interest or principal is deferred or forgiven in the event of loss due to certain natural catastrophes specified in the Underlying Instruments;

(j)    it provides for the payment of principal at not less than par upon maturity;

(k)    its Underlying Instruments do not obligate the Issuer or any other Person to make any future advances or any other payment except the purchase price thereof;

(l)    it is not a security with respect to which, in the reasonable judgment of the Collateral Manager, the timely repayment of principal and interest is subject to substantial non-credit related risks;

(m)    it is not an Interest Only Security;

(n)    it is not a security issued by an Emerging Market Issuer;

(o)    it is not a security that has an Actual Rating from Moody's lower than "B3" or an Actual Rating from S&P lower than "B-";

(p)    it is not a security that has, at the time of purchase, any deferred or capitalized interest;

(q)    it is not a security that, at the time it is purchased, is a Credit Risk Security, a Defaulted Security, a Written Down Security or a Deferred Interest PIK Bond;

(r)    it is not a REIT Debt Security that has a Moody's Rating lower than "Ba3" or an S&P Rating lower than "BB-";

(s)    it is not a Real Estate CDO Security that has a Moody's Rating lower than "B3" or an S&P Rating lower than "B-";

(t)    it is not a CMBS Credit Tenant Lease Security that has a Moody's Rating lower than "Ba3" or an S&P Rating lower than "BB-";

(u)    it is not a synthetic security or any security backed by a credit default swap or referencing a payment obligation or a synthetic collateralized debt obligation or a synthetic resecuritization;

(v)    it is not a "trust preferred security" (i.e., a security that entitles the holder thereof to receive payments that depend on the cash flow from either an individual trust security or a pool of trust securities);

(w)    at the time the security is purchased by the Issuer:

(i)    it is not a security issued by an issuer located in a country that imposes foreign exchange controls that effectively limit the availability or use of U.S. Dollars to make when due the scheduled payments of principal and interest on such security;

(ii)    it is not, and does not provide for conversion or exchange into, Margin Stock at any time over its life;

(iii)    it is not an obligation which (1) was incurred in connection with a merger, acquisition, consolidation or sale of all or substantially all of the assets of a person or entity or similar transaction and (2) by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancing;

(iv)    it is not the subject of (1) any offer by the issuer of such security or by any other person made to all of the holders of such security to purchase or otherwise acquire such security (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to convert or exchange such security into or for cash, securities or any other type of consideration or (2) any solicitation by an issuer of such security or any other person to amend, modify or waive any provision of such security or any related Underlying Instrument, and has not been called for redemption;

(v)    it is not an Equity Security;

(vi)    it is not a security that by the terms of its Underlying Instruments provides for conversion or exchange (whether mandatory or at the option of the issuer or the holder thereof) into equity capital at any time prior to its maturity;

(vii)    it is not a financing by a debtor-in-possession in any insolvency proceeding;

(viii)      it is not a first loss tranche of any securitization that does not have an S&P Rating (as defined in clause (a) of the definition of S&P Rating) and a Moody's Rating (as defined in clause (i) of the definition of "Moody's Rating") that addresses the obligation of the obligor (or guarantor, if applicable) to pay principal of and interest on the relevant Collateral Debt Security in full, which ratings are monitored on an ongoing basis by the relevant Rating Agency;

(ix)      it is not a security that provides for the payment of interest in cash less frequently than semi-annually;

(x)      if it is a Deemed Floating Rate Collateral Debt Security, the Deemed Floating Asset Hedge entered into with respect to such Deemed Floating Rate Collateral Debt Security conforms to all requirements set forth in the definition of "Deemed Floating Asset Hedge"; and

(xi)      it is not a Prohibited Asset.

**Section 12.3    Conditions Applicable to all Transactions Involving Sale or Grant**

(a)      Any transaction effected under Article V, Article IX, Section 10.2 or Section 12.1 shall be conducted on an arms' length basis and if effected with the Trustee or any Affiliate thereof, the Collateral Manager or any Affiliate thereof or any account managed by the Collateral Manager and/or its Affiliates, such purchases or sales shall be made on a basis no less favorable, taken as whole, to the Issuer than would be obtained in a similar transaction with an unaffiliated third party on arm's length terms for fair value and is otherwise consistent with applicable law and the Collateral Management Agreement; **provided**, that in connection with the purchase of a Collateral Interest or Eligible Investment from, or the sale of a Collateral Interest or Eligible Investment to, the Collateral Manager or any of its Affiliates or any account or portfolio managed or advised by the Collateral Manager or any of its Affiliates, the Board of Directors and the unaffiliated directors thereof as provided below shall have received from the Collateral Manager such information relating to such purchase or sale as it may reasonably require and will have approved such purchase or sale and the price in advance.  Each of the Issuer and each Holder of a Secured Note consents and agrees that, if any transaction relating to the Issuer, including any transaction effected between the Issuer and the Collateral Manager or its Affiliates or any account or portfolio managed or advised by the Collateral Manager or any Affiliate, shall be subject to the disclosure and consent requirements of Section 206(3) of the Investment Advisers Act, such requirements shall be satisfied with respect to the Issuer and all Holders of the Notes if disclosure shall be given to, and consent obtained from, a majority of the members of the Board of Directors who are not affiliated with the Collateral Manager or their delegates or other authorized representatives.  In addition, the Issuer will have the right to constitute one or more advisory committees or similar bodies to satisfy the foregoing disclosure and consent requirement and to address any other conflict of interest issues.  The Trustee shall have no responsibility to oversee compliance with this clause by the other parties.

Subject to the Collateral Manager's obligations described in the Collateral Management Agreement, the Collateral Manager is hereby authorized to effect client cross

transactions ("**Client Cross Transactions**") in which the Collateral Manager causes a purchase or sale of a Collateral Debt Security or Eligible Investment to be effected between the Issuer and another account advised by it or any of its Affiliates. In addition, except as otherwise permitted pursuant to the Collateral Management Agreement, with the prior authorization of the Issuer, which permission is hereby given and may be revoked at any time, the Collateral Manager is authorized to enter into agency cross transactions ("**Agency Cross Transactions**" and, together with Client Cross Transactions, "**Cross Transactions**") in which it or any of its Affiliates acts as broker for the Issuer and for the other party to the transaction, to the extent permitted under applicable law, in which case the Collateral Manager or any such Affiliate will receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding, both parties to the transaction. Also, with the prior authorization of the Issuer and in accordance with Section 11(a) of the Exchange Act, and Regulation 11a2-2T thereunder (or any similar rule that may be adopted in the future), the Collateral Manager is authorized to effect transactions for the Issuer on a national securities exchange of which any of its Affiliates is a member and retain commissions in connection therewith. The Issuer consents and agrees (and each Secured Noteholder by acceptance of a Secured Note consents and agrees) that such Cross-Transactions are authorized, and that any subsequent authorization by the Issuer or revocation of such authorization may be effected through the Board of Directions.

(b)     Upon any purchase or substitution pursuant to this Article XII, all of the Issuer's right, title and interest to the Pledged Security or Securities shall be, and hereby is, Granted to the Trustee pursuant to this Indenture, such Pledged Security or Securities shall be registered in the name of the Trustee, and, if applicable, the Trustee shall receive such Pledged Security or Securities. The Trustee shall receive, not later than the date of delivery of any Pledged Security pursuant to a purchase under this Article XII, (a) an Officer's certificate of the Collateral Manager certifying (1) compliance with the Reinvestment Criteria in accordance with Section 12.1(b), and (2) that any security to be purchased satisfies the definition of Collateral Debt Security and (b) an Officer's certificate of the Collateral Manager on behalf of the Issuer containing the statements set forth in Section 3.2(b)(ii) through (iv), (vi) and (vii).

(c)     Notwithstanding anything contained in this Article XII to the contrary, the Issuer shall, subject to Section 12.3(d), have the right to effect any transaction to which Holders of Secured Notes evidencing 100% of the Aggregate Outstanding Amount of each Class of Secured Notes, and each Income Noteholder has consented, and of which each Rating Agency has been notified in advance.

## ARTICLE XIII

## SECURED PARTIES' RELATIONS

### Section 13.1   Subordination

(a)     Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class A-1 Notes that the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the

Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes, the "**Class A-2 Subordinate Interests**") shall be subordinate and junior to the Class A-1 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided. If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived, the Class A-1 Notes shall be paid in full in Cash, before any further payment or distribution is made on account of the Class A-2 Subordinate Interests. The Holders of Secured Notes evidencing Class A-2 Subordinate Interests agree, for the benefit of the Holders of the Class A-1 Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class A-2 Subordinate Interests or hereunder until the payment in full of the Class A-1 Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(b)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes and the Class A-2 Notes, the "**Class A-3 Subordinate Interests**") shall be subordinate and junior to the Class A-1 Notes and the Class A-2 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided. If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived, the Class A-1 Notes and the Class A-2 Notes shall be paid in full in Cash or, before any further payment or distribution is made on account of the Class A-3 Subordinate Interests. The Holders of Secured Notes evidencing Class A-3 Subordinate Interests agree, for the benefit of the Holders of the Class A-1 Notes and the Class A-2 Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class A-3 Subordinate Interests or hereunder until the payment in full of the Class A-1 Notes and the Class A-2 Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(c)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class A-1 Notes, the Class A-2 Notes, and the Class A-3 Notes that the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A-1 Notes, the Class A-2 Notes, and the Class A-3 Notes, the "**Class B Subordinate Interests**") shall be subordinate and junior to the Class A-1 Notes, the Class A-2 Notes, and the Class A-3 Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided. If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived, the Class A-1 Notes, the Class A-2 Notes, and the Class A-3 Notes shall be paid in full in Cash, before any further payment or distribution is made on account of the Class B Subordinate Interests. The Holders of Secured Notes evidencing Class B Subordinate Interests agree, for the benefit of the Holders of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes, not to cause the filing of a petition in

bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class B Subordinate Interests or hereunder until the payment in full of the Class A-1 Notes, the Class A-2 Notes, and the Class A-3 Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(d)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class A Notes and the Class B Notes that the Class C Notes, the Class D Notes, the Class E Notes, the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes and the Class B Notes, the "**Class C Subordinate Interests**") shall be subordinate and junior to the Class A Notes and the Class B Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided.  If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived, the Class A Notes and the Class B Notes shall be paid in full in Cash, before any further payment or distribution is made on account of the Class C Subordinate Interests.  The Holders of Secured Notes evidencing Class C Subordinate Interests agree, for the benefit of the Holders of the Class A Notes and the Class B Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class C Subordinate Interests or hereunder until the payment in full of the Class A Notes and the Class B Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(e)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class D Notes, the Class E Notes and the Class F Notes agree for the benefit of the Holders of the Class A Notes, the Class B Notes and the Class C Notes that the Class D Notes, the Class E Notes, the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes, the Class B Notes and the Class C Notes, the "**Class D Subordinate Interests**") shall be subordinate and junior to the Class A Notes, the Class B Notes and the Class C Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided.  If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived the Class A Notes, the Class B Notes and the Class C Notes shall be paid in full in Cash, before any further payment or distribution is made on account of the Class D Subordinate Interests.  The Holders of Secured Notes evidencing Class D Subordinate Interests agree, for the benefit of the Holders of the Class A Notes, the Class B Notes and the Class C Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class D Subordinate Interests or hereunder until the payment in full of the Class A Notes, the Class B Notes and the Class C Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(f)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class E Notes and the Class F Notes agree for

the benefit of the Holders of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes that the Class E Notes, the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, the "**Class E Subordinate Interests**") shall be subordinate and junior to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided. If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class E Subordinate Interests. The Holders of Secured Notes evidencing Class E Subordinate Interests agree, for the benefit of the Holders of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class E Subordinate Interests or hereunder until the payment in full of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(g)    Anything in this Indenture or the Secured Notes to the contrary notwithstanding, the Issuer and the Holders of the Class F Notes agree for the benefit of the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes that the Class F Notes and the Issuer's rights in and to the Collateral (with respect to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, the "**Class F Subordinate Interests**") shall be subordinate and junior to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes to the extent and in the manner set forth in this Indenture including as set forth in Section 11.1(a), (b) and (c) and hereinafter provided. If any Event of Default (including an Event of Default specified in Section 5.1(g) or (h)) has occurred and has not been cured or waived the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Class F Subordinate Interests. The Holders of Secured Notes evidencing Class F Subordinate Interests agree, for the benefit of the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Secured Notes evidencing such Class F Subordinate Interests or hereunder until the payment in full of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes and not before one year and one day has elapsed since such payment or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

(h)    In the event that notwithstanding the provisions of this Indenture, any Holder of any Class A-1 Note or Subordinate Interest shall have received any payment or distribution in respect of such Class A-1 Note or Subordinate Interest contrary to the provisions of this Indenture, then, unless and until all amounts payable to each Hedge Counterparty pursuant to Section 11.1(a)(iii) or to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, shall have been paid

in full in Cash, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the applicable Hedge Counterparty or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, in accordance with this Indenture; **provided**, that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

(i)    Each Holder of Subordinate Interests agrees with each Hedge Counterparty and all Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of this Indenture including this Section 13.1; **provided**, that after all amounts payable pursuant to Section 11.1(a)(iii) and all amounts payable in respect of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of each Hedge Counterparty or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of Subordinate Interests.

For purposes of subordination, the Combination Notes shall not be treated as a separate Class but the Combination Note Components thereof will be treated as Notes of the applicable Class.

### Section 13.2    Standard of Conduct

In exercising any of its or their voting rights, rights to direct and consent or any other rights as a Secured Party or a Secured Noteholder, or a Combination Noteholder under this Indenture, subject to the terms and conditions of this Indenture, including Section 5.9, a Secured Party or Secured Parties or Secured Noteholder or Secured Noteholders (including any Secured Noteholder in its capacity as such, that is, or is an Affiliate of or any account managed by the Collateral Manager or any Affiliate thereof) or Combination Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether such action or inaction benefits or adversely affects any Secured Party, the Issuer, Noteholder or any other Person.

# ARTICLE XIV

# MISCELLANEOUS

### Section 14.1    Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or

covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer or the Collateral Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer or the Collateral Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer, the Collateral Manager or any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Collateral Manager or such other Person, unless such Authorized Officer of the Issuer or the Collateral Manager or such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Collateral Manager, stating that the information with respect to such matters is in the possession of the Issuer or the Collateral Manager, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture it is provided that the absence of the occurrence and continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of the Issuer, then notwithstanding that the satisfaction of such condition is a condition precedent to the Issuer's rights to make such request or direction, the Trustee shall be protected in acting in accordance with such request or direction if it does not have actual knowledge of the occurrence and continuation of such Default or Event of Default as provided in Section 6.1(d).

### Section 14.2    Acts of Secured Noteholders and Combination Noteholders

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Secured Noteholders or Combination Noteholders (any "**Act**") may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Secured Noteholders or Combination Noteholders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action or actions embodied therein and evidenced thereby) are herein sometimes referred to as the Act of the Secured Noteholders, signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent

shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 14 2.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)    The principal amount and registered numbers of Secured Notes held by any Person, and the date of his holding the same, shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Secured Notes or Combination Notes shall bind the Holder (and any transferee thereof) of such Secured Note and of every Secured Note, and such Combination Note and of every Combination Note, issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Secured Note or Combination Note.

### Section 14.3    Notices, Etc., to Trustee, the Issuer and the Rating Agencies

Any request, demand, authorization, direction, notice, consent, waiver or Act of Secured Noteholders or Combination Noteholders or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(a)    the Trustee or the Income Note Paying Agent by any Secured Noteholder, any Combination Noteholder or by the Issuer shall be sufficient for every purpose hereunder if in writing and sent by facsimile in legible form and confirmed by overnight courier service guaranteed next day delivery to the Trustee or the Income Note Paying Agent addressed to it at 181 West Madison Street, 32nd Floor, Chicago, Illinois 60602, Attention: CDO Trust Services Group – Cedarwoods CRE CDO II, Ltd., telephone number 312-904-0467, fax number 312-602-3935, or at any other address previously furnished in writing to the Issuer or Secured Noteholder by the Trustee or Income Note Paying Agent;

(b)    the Issuer by the Trustee or by any Secured Noteholder or Combination Noteholder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, PO Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention:  The Directors, facsimile no. (345) 945-7100, or at any other address previously furnished in writing to the Trustee by the Issuer;

(c)    the Rating Agencies by the Issuer or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by facsimile in legible form, (i) in the case of Moody's, addressed to Moody's Investors Service, 99 Church Street, New York, New York 10007, facsimile no. (212) 553-0355, Attention:   CMBS Surveillance (e-mail: moodys_cre_cdo_monitoring@moodys.com) and (ii) in the case of S&P, addressed to S&P, 55 Water Street, 41st Floor, New York, New York, 10041, Attention: CMBS

Surveillance and all Note Reports shall be sent to S&P electronically at cmbs_surveillance@sandp.com; or

(d)    each Hedge Counterparty by the Issuer or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first class postage prepaid, hand delivered or sent by overnight courier service or by facsimile in legible form to such Hedge Counterparty addressed to it at the address specified in the related Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by such Hedge Counterparty;

(e)    the Collateral Manager by the Issuer or by the Trustee or the Holders of not less than 66⅔% Aggregate Outstanding Amount of the Controlling Class, or by the Collateral Administrator shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and sent by facsimile in legible form and confirmed by overnight courier service guaranteed next day delivery, or by electronic mail (where expressly provided herein) to the Collateral Manager addressed to it at the address specified in the Collateral Management Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Collateral Manager;

(f)    the Income Note Paying Agent by the Trustee in writing sent by facsimile confirmed by overnight courier guaranteed next day delivery; and

(g)    the Placement Agent by the Issuer, the Collateral Manager or the Trustee shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service or by telecopy in legible form, to BAS addressed to Banc of America Securities LLC, 214 North Tryon Street, 14th Floor, Charlotte, North Carolina 28255, telecopy no. 704-386-0688, Attention: Global Structured Products.

**Section 14.4    Notices and Reports to Secured Noteholders and Combination Noteholders; Waiver**

Except as otherwise expressly provided herein, where this Indenture provides for a report to Holders or for a notice to Holders of Secured Notes or Combination Notes of any event, such notice shall be sufficiently given to Holders of Secured Notes and Combination Notes if in writing and mailed, first-class postage prepaid, to each Holder of a Secured Note and Combination Note affected by such event, at the address of such Holder as it appears in the Note Register, not earlier than the earliest date and not later than the latest date, prescribed for the giving of such report or notice and such report or notice shall be in the English language. Notwithstanding any provision to the contrary contained herein or in any agreement or document related hereto, any report, statement or other information to be provided by the Trustee may be provided by providing access to the Trustee's website containing such information. Such reports and notices will be deemed to have been given on the date of such mailing.

The Trustee will deliver to the Holder of any Secured Note or Holder of any Combination Note shown on the Note Register any readily available information or notice requested to be so delivered by at least 25% of the Holders of any Class of Secured Notes or the

Combination Notes, as applicable, at the expense of the Issuer. In addition, for so long as any Class of Secured Notes is listed on the Cayman Islands Stock Exchange and so long as the rules of such exchange so require, notices to the Holders of such Secured Notes shall also be given by the Trustee to the Company Announcements Office of the Cayman Islands Stock Exchange.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Holder of a Secured Note shall affect the sufficiency of such notice with respect to other Holders of Secured Notes.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Secured Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity, or by reason of any other cause it shall be impractical to mail notice of any event to Secured Noteholders or Combination Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

### Section 14.5   Effect of Headings and Table of Contents

The Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

### Section 14.6   Successors and Assigns

All covenants and agreements in this Indenture by the Issuer shall bind its respective successors and assigns, whether so expressed or not. Written notice of any assignment shall be promptly provided by the Issuer to the Trustee, each Hedge Counterparty and each Rating Agency.

### Section 14.7   Severability

In case any provision in this Indenture or in the Secured Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby

### Section 14.8   Benefits of Indenture

Nothing in this Indenture or in the Secured Notes, expressed or implied, shall give to any Person, other than (i) the parties hereto and their successors hereunder and (ii) the Collateral Manager, each Hedge Counterparty, the Income Noteholders, the Income Note Paying Agent, the Secured Noteholders and the Combination Noteholders (each of whom, in the case of this subclause (ii), shall be an express third party beneficiary hereunder), any benefit or any legal or equitable right, remedy or claim under this Indenture. Notwithstanding the foregoing, any

rights of the Collateral Manager, each Hedge Counterparty, the Income Noteholders and the Income Note Paying Agent to receive any payment under this Indenture: (i) shall be as determined in the Collateral Management Agreement, the Income Note Paying Agency Agreement, and the Hedge Agreement and the agreements to which any of the Collateral Manager, each Hedge Counterparty, the Income Noteholders and the Income Note Paying Agent are parties (as opposed to third party beneficiaries), as applicable, and (ii) are limited in recourse to the Collateral and to the extent the proceeds of the Collateral, when applied in accordance with the Priority of Payments as set forth herein, are insufficient to meet all obligations of the Issuer to the Collateral Manager, each Hedge Counterparty, the Income Noteholders and the Income Note Paying Agent any such outstanding obligations and any claims against the Issuer shall be extinguished and shall not thereafter revive.

### Section 14.9    Governing Law

This Indenture, each Supplemental Indenture and each Secured Note shall be governed by, and construed in accordance with, the law of the State of New York.

### Section 14.10    Submission to Jurisdiction

The Issuer hereby irrevocably submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in Manhattan and the U.S. District Court for the Southern District of New York, and any court of appeal therefrom, in any action or proceeding arising out of or relating to the Secured Notes or this Indenture, and the Issuer hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or federal court. The Issuer hereby irrevocably waives, to the fullest extent that it may legally do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Issuer hereby irrevocably appoints and designates CT Corporation, 111 Eighth Avenue, 13th Floor, New York, New York 10011, or any other Person having and maintaining a place of business in the State of New York whom the Issuer may from time to time hereafter designate as the true and lawful attorney and duly authorized agent for acceptance of service of legal process of the Issuer. The Issuer agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

### Section 14.11    Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

### Section 14.12    Waiver of Jury Trial

EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING. Each party hereby (i) certifies that no representative, agent or attorney of the other has represented, expressly or otherwise, that the other would not, in the event of a Proceeding, seek to enforce the foregoing waiver and

(ii) acknowledges that it has been induced to enter into this Indenture by, among other things, the mutual waivers and certifications in this paragraph.

### Section 14.13 Judgment Currency

This is an international financing transaction in which the specification of Dollars (the "**Specified Currency**"), and the specification of the place of payment, as the case may be (the "**Specified Place**"), is of the essence, and the Specified Currency shall be the currency of account in all events relating to payments of or on the Secured Notes and the other Secured Obligations. The payment obligations of the Issuer under this Indenture and the Secured Notes shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent that the amount so paid on conversion to the Specified Currency and transfer to the Specified Place under normal banking procedures does not yield the amount of the Specified Currency at the Specified Place. If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder or the Secured Notes in the Specified Currency into another currency (the "**Second Currency**"), the rate of exchange which shall be applied shall be that at which in accordance with normal banking procedures the Trustee could purchase the Specified Currency with the Second Currency on the Business Day next preceding that on which such judgment is rendered. The obligation of the Issuer in respect of any such sum due from the Issuer hereunder shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by the Trustee of any sum adjudged to be due hereunder or under the Secured Notes in the Second Currency the Trustee may in accordance with normal banking procedures purchase and transfer to the Specified Place the Specified Currency with the amount of the Second Currency so adjudged to be due; and the Issuer hereby, as a separate obligation and notwithstanding any such judgment (but subject to the Priority of Payments as if such separate obligation in respect of each Class of Secured Notes constituted additional principal owing in respect of such Class of Secured Notes), agrees to indemnify the Trustee and each Secured Noteholder against, and to pay the Trustee or such Secured Noteholder, as the case may be, on demand in the Specified Currency, any difference between the sum originally due to the Trustee or such Secured Noteholder, as the case may be, in the Specified Currency and the amount of the Specified Currency so purchased and transferred.

### Section 14.14 Confidential Treatment of Documents; Tax Disclosure

Except as otherwise provided in this Indenture or as required by law or as required to maintain the listing of the Class A Notes, Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes on the Cayman Islands Stock Exchange, this Indenture and each Hedge Agreement shall be treated by the Trustee and the Collateral Manager as confidential. The Trustee shall provide a copy of this Indenture to the Income Note Paying Agent and to any Holder of a beneficial interest in any Secured Note upon written request therefor certifying that it is such a Holder.

Notwithstanding anything to the contrary herein, each party (and each employee, representative, or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction entered into pursuant to this Indenture, and all materials of any kind (including opinions or other tax analyses) that are

provided to the parties relating to such tax treatment and tax structure, except where confidentiality is reasonably necessary to comply with the securities laws of any applicable jurisdiction. This authorization of tax disclosure is retroactively effective to the commencement of the first discussions amongst the parties regarding the transaction contemplated herein.

## ARTICLE XV

## ASSIGNMENT OF AGREEMENTS, ETC.

### Section 15.1    Assignment

The Issuer, in furtherance of the covenants of this Indenture and as security for the Secured Notes and amounts payable to the Secured Noteholders hereunder and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Secured Parties, all of the Issuer's estate, right, title and interest in, to and under the Administration Agreement, the Collateral Management Agreement, any Trust Agreement and each Hedge Agreement, including (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; **provided** that nothing herein shall obligate the Trustee to determine independently whether "cause" exists for the removal of the Collateral Manager pursuant to the Collateral Management Agreement and **provided, further,** that the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Collateral Management Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture or the Collateral Management Agreement), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of an Event of Default hereunder until such time, if any, as such Event of Default is cured or waived. For the avoidance of doubt, in no event shall the Trustee be required to perform the obligations of the Collateral Manager under the Collateral Management Agreement.

### Section 15.2    No Impairment

The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Administration Agreement, the Collateral Management Agreement or each Hedge Agreement.

### Section 15.3    Termination, Etc.

Upon the redemption and cancellation of the Secured Notes and the release of the Collateral from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Secured Parties shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Administration Agreement, the Collateral Management Agreement and each Hedge Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

### Section 15.4   Issuer Agreements, Etc.

The Issuer represents that it has not executed any other assignment of the Collateral Management Agreement or any Hedge Agreement. The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably specify.

## ARTICLE XVI

### HEDGE AGREEMENT; PROVISIONS RELATED TO GRANTOR TRUSTS

### Section 16.1   Hedge Agreements

The Issuer will, on or prior to the Closing Date, enter into the Initial Hedge Agreement with the Initial Hedge Counterparty and on or after the Closing Date may enter into one or more additional Hedge Agreements in accordance with the terms of this Indenture. The Initial Hedge Agreement consists of (i) a fixed/floating interest rate swap (the "**Fixed/Floating Swap**") under which (A) the payments due from the Issuer to the Hedge Counterparty are calculated at a fixed rate applicable to the notional amount thereof, and (B) the payments due from the Initial Hedge Counterparty to the Issuer are calculated at a floating rate based on one-month LIBOR (except that the floating rate applicable to the first payment due from the Initial Hedge Counterparty (payable on the Payment Date in May 2007) is calculated by interpolation between two-month and three-month LIBOR), and (ii) a fixed/fixed interest rate swap (the "**Fixed Rate Swap**") under which (A) the Initial Hedge Counterparty will make an upfront cash payment to the Issuer on the Closing Date (the "**Upfront Payment**"), and (B) the Issuer and the Initial Hedge Counterparty will make certain fixed rate payments to each other. The terms of any Hedge Agreement may (but will not necessarily) permit the Issuer (or the Collateral Manager on behalf of the Issuer) or the applicable Hedge Counterparty to reduce the notional amount of such Hedge Agreement on each Payment Date to the extent that (i) the Aggregate Outstanding Amount of the Secured Notes is less than the scheduled aggregate notional amount of such Hedge Agreement for such Payment Date and/or (ii) in the case of a Deemed Floating Asset Hedge, Cash Flow Swap Agreement or other Hedge Agreement, the outstanding Principal Balance of the related underlying Collateral Debt Security is less than a percentage (as set forth in the related Hedge Agreement) of the scheduled notional amount of the related Hedge Agreement; **provided** that if any Secured Notes are then Outstanding, the Trustee shall first have received Rating Agency Confirmation with respect to any such reduction other than a reduction specifically provided for under the relevant Hedge Agreement. In addition, the Issuer may, from time to time, terminate the Initial Hedge Agreement in part and reduce the notional amount of the Initial Hedge Agreement in the event of a Mandatory Redemption or Special Amortization; **provided, however**, that Rating Agency Confirmation has been received with respect to such proposed reduction in notional amount. Subject to receipt of Rating Agency Confirmation (or a written waiver of formal review by the Rating Agencies), upon the sale or repayment of a Collateral Debt Security to which the Initial Hedge Agreement specifically relates, the Collateral Manager may on any subsequent Payment Date direct the Issuer to partially terminate a Hedge Agreement in an amount equal to the Principal Balance of such Collateral Debt Security sold or

repaid. The Collateral Manager may terminate any Deemed Floating Asset Hedge and Cash Flow Swap Agreement relating to a specific Collateral Debt Security upon the sale or repayment of the related Collateral Debt Security. The Issuer (directly or through the Collateral Manager) will monitor the Initial Hedge Agreement and notify the Issuer, the Trustee, the Initial Hedge Counterparty and each Rating Agency if it determines, in its reasonable discretion, that the aggregate outstanding principal amount of the Notes on any Payment Date will be less than the notional amount of either the Fixed/Floating Swap or the Fixed Rate Swap, with such notice to be delivered not less than 10 Business Days prior to such Payment Date.

(a)    The Trustee shall, on behalf of the Issuer and in accordance with the Note Report, pay amounts due to a Hedge Counterparty under the applicable Hedge Agreement on any Payment Date in accordance with Section 11.1.

(b)    If a Collateralization Event occurs (and no Substitution Event has occurred), the related Hedge Counterparty shall, at its sole cost and expense, within 30 days of the occurrence of such Collateralization Event either (i) enter into a Credit Support Annex (in form and substance acceptable to S&P, as evidenced by receipt of Rating Agency Confirmation from S&P) and deliver to the Trustee collateral of such types, in such amounts and at such times as are sufficient to maintain the then current rating of each Class of Secured Notes by S&P, (ii) find a replacement Hedge Counterparty as permitted under the related Hedge Agreement that is an Eligible Replacement, (iii) obtain a guarantee (in form and substance satisfying S&P's criteria) for the obligations of the relevant Hedge Counterparty under the Hedge Agreement from a guarantor who meets the Hedge Counterparty Ratings Requirement and has the Moody's Required Hedge Ratings or (iv) take such other steps as S&P may require (as evidenced by the receipt of Rating Agency Confirmation from S&P) to ensure that the then-current ratings on the Secured Notes by S&P are not qualified, downgraded or withdrawn. If the Hedge Counterparty has not, within 30 days of the occurrence of such Collateralization Event, taken any of the actions required above, an additional termination event with respect to which the Hedge Counterparty shall be the sole Affected Party will be deemed to have occurred and the Issuer shall have the right to terminate the related Hedge Agreement (with all costs and expenses in connection with any such termination to be paid by the Hedge Counterparty).

(c)    (i) If at any time a Substitution Event has occurred and is continuing, then the related Hedge Counterparty will, within ten Business Days following such Substitution Event, assign its rights and obligations under the related Hedge Agreements, at the Hedge Counterparty's sole cost, to a party (the "**Substitute Party**") selected by the applicable Hedge Counterparty that (A) with respect to which a Rating Agency Confirmation has been obtained and (B) assumes all of the applicable Hedge Counterparty's obligations under the related Hedge Agreement pursuant to an agreement reasonably satisfactory to the Issuer. If a Hedge Counterparty that is subject to a Substitution Event fails to assign its rights and obligations under the related Hedge Agreement to a Substitute Party within ten Business Days following such Substitution Event, then (x) such Hedge Counterparty shall, while it continues in good faith to search for an eligible Substitute Party, post and maintain, or continue to maintain, as the case may be, collateral in accordance with a Credit Support Annex (in form and substance acceptable to S&P, as evidenced by receipt of Rating Agency Confirmation from S&P) of such types, in amounts and on terms sufficient to maintain the then-current rating of each Class of Secured

Notes by S&P, and (y) the Issuer shall have the right to terminate the related Hedge Agreement with all costs of such termination to be paid by such Hedge Counterparty.

(ii)    If a Hedge Counterparty (or any person that unconditionally and absolutely guarantees the obligations of such Hedge Counterparty) fails to maintain the Moody's First Trigger Required Ratings but the Moody's Second Rating Trigger Requirements either do not apply or have applied for fewer than 30 consecutive Business Days (a "**Moody's First Downgrade Event**"), then the Issuer, and upon notice received from the Issuer to such effect, the Trustee, shall make a demand upon such Hedge Counterparty to post collateral within 30 Business Days following such Moody's First Downgrade Event to secure its obligations to the Issuer under the applicable Hedge Agreement subject, in each case, to the Hedge Counterparty's right (as set forth in the applicable Hedge Agreement) to assign its rights and obligations under the applicable Hedge Agreement to an Eligible Replacement. In this regard, the Issuer shall, simultaneously with the execution of any Hedge Agreement, execute with the relevant Hedge Counterparty a Credit Support Annex (New York law) setting forth the collateralization requirements that will apply to the Hedge Counterparty following any failure by the Hedge Counterparty (or its guarantor) to satisfy the Moody's First Trigger Required Ratings and/or the Moody's Second Trigger Required Ratings (each, an "**Initial Credit Support Annex**").

(iii)    If the Moody's Second Rating Trigger Requirements shall become applicable to a Hedge Counterparty (or any person that unconditionally and absolutely guarantees the obligations of such Hedge Counterparty) (a "**Moody's Second Downgrade Event**"), such Hedge Counterparty shall be required to use commercially reasonable efforts either to procure an Eligible Guarantee in respect of its obligations to the Issuer under the applicable Hedge Agreement from a guarantor that has the Moody's Required Hedge Ratings or to assign its rights and obligations under such Hedge Agreement to an Eligible Replacement (any such assignment to be made in accordance with the assignment procedures set forth in the applicable Hedge Agreement) and, pending the delivery of such Eligible Guarantee or the completion of such assignment, shall be required to post collateral to secure its obligations to the Issuer under such Hedge Agreement to the extent specified in such Hedge Agreement and the related Initial Credit Support Annex.

(iv)    If a Moody's First Downgrade Event or a Moody's Second Downgrade Event shall occur, and the Hedge Counterparty does not within any permitted grace period obtain an appropriate guarantee of its obligations under the applicable Hedge Agreement or transfer all of its rights and obligations under such Hedge Agreement to an Eligible Replacement or, failing such action by the Hedge Counterparty, if the Hedge Counterparty does not post collateral as required by the Initial Credit Support Annex, a "termination event" (as defined in the applicable Hedge Agreement) will occur and the Issuer will be entitled to terminate such Hedge Agreement. The Issuer or the applicable Hedge Counterparty may in connection with any such early termination of a Hedge Agreement owe a termination payment to the other party.

(v)    Any Hedge Counterparty that becomes subject to a Collateralization Event, a Substitution Event, a Moody's First Trigger Event or a Moody's Second Trigger Event and assigns the applicable Hedge Agreement to a replacement counterparty as described above will be responsible for any costs that the Issuer incurs in relation to such assignment.

(d)    The Issuer may, on or after the Closing Date, enter into additional Hedge Agreements (including Deemed Floating Asset Hedges and Cash Flow Swap Agreements) with additional Hedge Counterparties as the Issuer may elect in its sole discretion, in each case (i) subject to Rating Agency Confirmation, (ii) subject to the prior consent of the Initial Hedge Counterparty, if the aggregate notional amount of all such additional Hedge Agreements exceeds (or, upon execution of any proposed additional Hedge Agreement, would exceed) U.S.$50,000,000 (not including the notional amount of any other Hedge Agreement with the Initial Hedge Counterparty or other Hedge Agreement to which the Initial Hedge Counterparty has previously consented) and the existence or terms of any such additional Hedge Agreement would have a material adverse effect on the Initial Hedge Counterparty's rights or obligations under any Hedge Agreement between the Initial Hedge Counterparty and the Issuer (as reasonably determined by the Initial Hedge Counterparty), and (iii) in the case of additional Hedge Counterparties, with the delivery to the Issuer of an opinion of counsel to the additional Hedge Counterparty; **provided** that the Issuer will not be required to obtain Rating Agency Confirmation in connection with entering into any Deemed Floating Asset Hedges or Cash Flow Swap Agreements that are Form Approved Hedge Agreements with a Hedge Counterparty that satisfies the Hedge Counterparty Ratings Requirement and the Moody's Required Hedge Ratings. The amounts payable to a Hedge Counterparty will be limited to amounts payable under the Priority of Payments.

(e)    The Trustee shall, prior to the Closing Date, cause the Custodian to establish a segregated, non-interest bearing Securities Account which shall be designated as a "Hedge Counterparty Collateral Account" (with sub-accounts for each Hedge Counterparty) with respect to the Hedge Counterparties in respect of which the Trustee shall be the Entitlement Holder and which the Trustee shall hold in trust for the benefit of the Secured Parties. The Trustee shall deposit all collateral (if any) received from each Hedge Counterparty under the related Hedge Agreement in the appropriate sub-account of such Hedge Counterparty Collateral Account. Any and all funds at any time on deposit in, or otherwise standing to the credit of, the Hedge Counterparty Collateral Account shall be held in trust by the Trustee for the benefit of the Secured Parties. The only permitted withdrawal from or application of funds on deposit in, or otherwise standing to the credit of, each sub-account of the Hedge Counterparty Collateral Account shall be (i) for application to obligations of the Hedge Counterparty to the Issuer under the related Hedge Agreement that are not paid when due (whether when scheduled or upon early termination) or (ii) to return collateral to such Hedge Counterparty when and as required by the related Hedge Agreement in each case upon the direction of the Issuer (or the Collateral Manager, on behalf of the Issuer) pursuant to an Issuer Order. No assets credited to the Hedge Counterparty Collateral Account shall be considered an asset of the Issuer for purposes of any of the Coverage Tests unless and until the Issuer or the Trustee on its behalf is entitled to foreclose on such assets in accordance with the terms of the related Hedge Agreement.

(f)    Upon its receipt of notice that a Hedge Counterparty has defaulted in the payment when due of its obligations to the Issuer under any Hedge Agreement (or, if earlier, when the Trustee becomes aware of such default) the Trustee shall make a demand on such Hedge Counterparty, or any guarantor, if applicable, demanding payment forthwith. The Trustee shall give notice to the Secured Noteholders and each Rating Agency upon the continuance of the failure by such Hedge Counterparty to perform its obligations for two Business Days following a demand made by the Trustee on such Hedge Counterparty.

(g)     If at any time a Hedge Agreement becomes subject to early termination due to the occurrence of an "event of default" or a "termination event" (each as defined in each Hedge Agreement) solely attributable to such Hedge Counterparty or other comparable event, the Issuer and the Trustee shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee thereunder and under the Collateral Assignment of Hedge Agreement as may be permitted by the terms of such Hedge Agreement and consistent with the terms hereof, and shall apply any proceeds of any such actions (including the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty) to enter into a replacement Hedge Agreement on substantially identical terms or on such other terms as to which each Rating Agency shall have provided a Rating Agency Confirmation with a Substitute Party with respect to which the Hedge Counterparty Ratings Requirement is satisfied and each Rating Agency shall have provided a Rating Agency Confirmation unless, in the exercise of the Collateral Manager's business judgment, made in accordance with the standards of care set forth in the Collateral Management Agreement, the Issuer would be better off as a result of not entering into a replacement Hedge Agreement; **provided**, that Rating Agency Confirmation (or a written waiver of formal review by the Ratings Agencies) has been received with respect to the decision not to enter into a replacement Hedge Agreement.

(h)     The Issuer shall notify each Rating Agency if at any time a Hedge Counterparty is required to post collateral or assign its rights and obligations under a Hedge Agreement.

(i)     No Hedge Agreement may be amended or modified at any time unless the Issuer has obtained Rating Agency Confirmation (or a written waiver of formal review by the Rating Agencies) with respect to such amendments or modification (except with respect to the termination of an Asset Specific Hedge or a Cash Flow Swap Agreement relating to a specific Collateral Debt Security upon the sale, replacement, repayment, prepayment or redemption of the related Collateral Debt Security). The Trustee shall provide the Collateral Manager and the Rating Agencies with a copy of any such modification within 10 Business Days before effecting the same.

(j)     The Issuer will not terminate any Hedge Agreement without receiving Rating Agency Confirmation (or a written waiver of formal review by the Ratings Agencies) with respect to such termination (except to the extent provided in Section 16.1(g) above).

**Section 16.2    Grantor Trusts**

To the extent required to satisfy the Eligibility Criteria, upon acquisition by the Issuer of any Real Estate Company Debt Interest following the Closing Date that is not Registered (a "**Non-Registered Real Estate Company Debt Interest**"), such Non-Registered Real Estate Company Debt Interest shall be deposited into a newly formed grantor trust (an "**Underlying Trust**") either before or at the time the Issuer acquires such Non-Registered Real Estate Company Debt Interest), which Underlying Trust will be created under a trust agreement (a "**Trust Agreement**"), the execution of which will require Rating Agency Confirmation. The Underlying Trust will issue one or more trust certificates (individually or collectively, as the

context may require, each a "**Trust Certificate**") in the name of the Issuer, each representing an interest in the related Non-Registered Real Estate Company Debt Interest.

For all purposes hereunder, unless otherwise expressly provided herein or in the Underlying Trust Agreement or other document governing the Issuer's indirect ownership interest, unless the context otherwise requires, a Collateral Debt Security that is owned indirectly by the Issuer, through its ownership of a Trust Certificate or otherwise (an "**Underlying Asset**"), will be treated as if such Underlying Asset were owned directly by the Issuer. Without limiting the generality of the foregoing, an Underlying Asset will be included as a Collateral Debt Security under this Indenture having the payment and other characteristics of the Underlying Asset (and the Trust Certificate or similar interest shall be disregarded for this purpose), payments received by the Issuer in connection with its ownership of a Trust Certificate or similar instrument shall be characterized and applied as if such payment were received directly by the Issuer in respect of the applicable Underlying Asset, the criteria for the purchase or sale of such Collateral Debt Security set forth in Article XII or otherwise and the procedure and method of purchase or sale shall be applied to the Underlying Asset as if it were owned directly by the Issuer and the resulting distributions with respect to the Trust Certificate or similar instrument shall be characterized and applied as if such Underlying Asset had been sold directly by the Issuer; **provided**, that the requirement set forth in Article III regarding delivery of each Collateral Debt Security to the Trustee shall not apply to the applicable Underlying Assets, but shall apply to any Trust Certificates owned by the Issuer. In furtherance of the foregoing, any Trust Agreement and any other agreement through which the Issuer will own an Underlying Asset shall permit the holder of the Trust Certificates or similar instruments to exercise the rights (directly or indirectly through the trustee to the Underlying Trust) necessary to effectuate the provisions of this Indenture relating to the purchase, sale and maintenance of Collateral Debt Securities, and the Issuer, the Collateral Manager and the Trustee are authorized to take all reasonable actions necessary to accomplish the foregoing.

Amounts due to the trustee of any Underlying Trust (which shall be the same entity as the Trustee hereunder) pursuant to the compensation, reimbursement and indemnification provisions of the Trust Agreement in respect of any Trust Certificate owned by the Issuer shall be payable by the Issuer as Administrative Expenses in accordance with the Priority of Payments.

IN WITNESS WHEREOF, we have set our hands as of the date first above written.

Executed as a Deed by
**CEDARWOODS CRE CDO II, LTD.,**
as Issuer

By: _____
Name: **Christopher Watler**
Title: Director

**LASALLE BANK NATIONAL
ASSOCIATION,**
as Trustee

By: _____
Name:
Title:

IN WITNESS WHEREOF, we have set our hands as of the date first above written.

Executed as a Deed by
**CEDARWOODS CRE CDO II, LTD.,**
as Issuer

By: _____

    Name:
    Title:

**LASALLE BANK NATIONAL**
**ASSOCIATION,**
as Trustee

By: _____

    Name:
    Title:    Kirill Titomir
          Assistant Vice President

## SCHEDULE A

## COLLATERAL DEBT SECURITIES AS OF THE CLOSING DATE

| Issuer Name | CUSIP/ Identifier | Asset Type | Face Amount as of February 13, 2007 | S&P Public Rating | Moody's Public Rating | Fitch Public Rating |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Sch. A-1

| Issuer Name | CUSIP/ Identifier | Asset Type | | Face Amount as of February 13, 2007 | S&P Public Rating | Moody's Public Rating | Fitch Public Rating |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Sch. A-2

## SCHEDULE B

## LIBOR FORMULA

"**LIBOR**," for purposes of calculating the Applicable Periodic Interest Rate for the Secured Notes, shall be determined by the Secured Note Calculation Agent in accordance with the following provisions:

(a)    On the second London Banking Day prior to the commencement of an Interest Period (each such day, a "**LIBOR Calculation Date**"), LIBOR for such Interest Period shall equal the rate, as obtained by the Secured Note Calculation Agent, for one-month U.S. Dollar deposits which appears on Moneyline Telerate Page 3750 or such other page as may replace Moneyline Telerate Page 3750, as of 11:00 a.m. (London time) on such LIBOR Calculation Date as reported by Bloomberg Financial Markets Commodities News.

(b)    If on any LIBOR Calculation Date such rate does not appear on Moneyline Telerate Page 3750, the Secured Note Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks given to leading banks in the London interbank market for one-month U.S. Dollar deposits in an amount determined by the Secured Note Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Calculation Date made by the Secured Note Calculation Agent to the Reference Banks. If on any LIBOR Calculation Date at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If on any LIBOR Calculation Date only one or none of the Reference Banks provides such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Secured Note Calculation Agent (after consultation with the Collateral Manager) are quoting on the relevant LIBOR Calculation Date for one-month U.S. Dollar deposits in an amount determined by the Secured Note Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; **provided** that if the Secured Note Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Calculation Date. LIBOR for the first Interest Period shall be determined on the second London Banking Day prior to the Closing Date.

The Secured Note Calculation Agent will cause the Applicable Periodic Interest Rate and the Periodic Interest applicable for each Class of Secured Notes to be communicated to the Issuer, the Note Paying Agent, the Collateral Manager, the Trustee, the Depositary, Euroclear and Clearstream in accordance with Section 7.15(b) of this Indenture.

For purposes of clause (a) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clause (b) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

As used herein:

"**London Banking Day**" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"**Reference Banks**" means four major banks in the London interbank market selected by the Secured Note Calculation Agent.

The determination of the Applicable Periodic Interest Rate for each Class of Secured Notes by the Secured Note Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

**SCHEDULE C**

**TEMPORARY RAMP-UP SECURITIES AS OF THE CLOSING DATE**

NONE

## SCHEDULE D-1

## S&P'S RECOVERY RATE MATRIX

**A.**   If the Collateral Debt Security (other than a Collateral Debt Security guaranteed by a corporate guarantor, or a CMBS Security (but including a CMBS Re-REMIC Security)), is the senior-most tranche of securities issued by the issuer of such Collateral Debt Security the recovery rate is as follows*:

| S&P's Rating | Recovery Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA-," "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A-," "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB-," "BBB" or "BBB+" | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

**B.**   If the Collateral Debt Security (other than a Collateral Debt Security guaranteed by a corporate guarantor, or a CMBS Security (but including a CMBS Re-REMIC Security)) is not the senior-most tranche of securities issued by the issuer of such Collateral Debt Security the recovery rate is as follows*:

| S&P's Rating | Recovery Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| "AA-," "AA" or "AA+" | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| "A-," "A" or "A+" | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| "BBB-," "BBB" or "BBB+" | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| "BB-," "BB" or "BB+" | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| "B-," "B" or "B+" | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| "CCC+" and below | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

**C.**   If the Collateral Debt Security is a CMBS Security other than a CMBS Re-REMIC Security, the recovery rate is as follows:

| S&P's Rating | Recovery Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA-," "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A-," "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB-," "BBB" or "BBB+" | 45.0% | 50.0% | 55.0% | 60.0% | 65.0% | 70.0% | 75.0% |
| "BB-," "BB" or "BB+" | 35.0% | 40.0% | 45.0% | 45.0% | 50.0% | 50.0% | 50.0% |
| "B-," "B" or "B+" | 20.0% | 25.0% | 30.0% | 35.0% | 35.0% | 40.0% | 40.0% |
| "CCC" | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| No Rating | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

**D.**   If the Collateral Debt Security is guaranteed by a corporate guarantor (including Collateral Debt Securities guaranteed by a monoline financial insurance company), the recovery rate will be 37%.

E.   If the Collateral Debt Security is of a category listed on Schedule G (except for CDOs of Structured Finance and Real Estate Securities) the recovery rate will be assigned by S&P upon the acquisition of such security by the Issuer.

F.   If the Collateral Debt Security is a REIT Debt Security, the recovery rate will be 40%.

G.   If the Collateral Debt Security is a secured Real Estate Company Debt Interest in the form of a bond that is not subordinate in payment priority to debt interests issued by the same issuer, the recovery rate will be 47.5%.

H.   If the Collateral Debt Security is an unsecured Real Estate Company Debt Interest in the form of a bond that is not subordinate in payment priority to other debt interests issued by the same issuer, the recovery rate will be 40%.

I.   If the Collateral Debt Security is a Real Estate Company Debt Interest in the form of a bond that is subordinate in payment priority to other debt interests issued by the same issuer, the recovery rate will be 21.5%.

J.   If the Collateral Debt Security is a secured Real Estate Company Debt Interest in the form of a loan that is not subordinate in payment priority to other debt interests issued by the same issuer, the recovery rate will be 55%.

K.   If the Collateral Debt Security is an unsecured Real Estate Company Debt Interest in the form of a loan that is not subordinate in payment priority to other debt interests issued by the same issuer, the recovery rate will be 47.5%.

L.   If the Collateral Debt Security is a Real Estate Company Debt Interest in the form of a loan that is subordinate in payment priority to other debt interests issued by the same issuer, the recovery rate will be 25%.

## SCHEDULE D-2

## MOODY'S RECOVERY RATE MATRIX

## TABLE A

### This TABLE A is applicable to the following sectors, as each of these sectors is determined in accordance with methodology prescribed by Moody's.

ABS—Commercial Real Estate—CMBS Conduit Securities
ABS—Commercial Real Estate—CMBS Large Loans Securities

| Percentage of Total Capitalization upon Issuance of applicable Collateral Debt Security[1] | Moody's Rating upon Issuance of applicable Collateral Debt Security | | | | | | |
|---|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B | Below B |
| Greater than 70% | 85% | 80% | 65% | 55% | 45% | 30% | 0% |
| Less than or equal to 70%, but greater than 10% | 75% | 70% | 55% | 45% | 35% | 25% | 0% |
| Less than or equal to 10%, but greater than 5% | 65% | 55% | 45% | 35% | 25% | 15% | 0% |
| Less than or equal to 5%, but greater than 2% | 55% | 45% | 35% | 30% | 20% | 10% | 0% |
| Less than or equal to 2% | 45% | 35% | 25% | 20% | 10% | 5% | 0% |

(1)  For purposes of calculating the percentage of capital structure at issuance with respect to a CMBS certificate, such amount shall be a percentage equal to a fraction, the numerator of which is the aggregate principal balance of (a) such CMBS certificate and (b) any certificate that is pari passu with such CMBS certificate and secured by the same collateral, and the denominator of which is the total collateral balance of the CMBS deal from which the certificates were issued.

## TABLE B

### This TABLE B is applicable to the following sectors, as each of these sectors is determined in accordance with methodology prescribed by Moody's.

CRE CDO Securities and Re-REMIC Securities

| Percentage of Total Capitalization upon Issuance of applicable Collateral Debt Security[1] | Moody's Rating upon Issuance of applicable Collateral Debt Security | | | | | | |
|---|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B | Below B |
| Greater than 70% | 80% | 75% | 60% | 50% | 45% | 30% | 0% |
| Less than or equal to 70%, but greater than 10% | 70% | 60% | 55% | 45% | 35% | 25% | 0% |
| Less than or equal to 10%, but greater than 5% | 60% | 50% | 45% | 35% | 25% | 15% | 0% |
| Less than or equal to 5%, but greater than 2% | 50% | 40% | 35% | 30% | 20% | 10% | 0% |
| Less than or equal to 2% | 30% | 25% | 20% | 15% | 7% | 4% | 0% |

(1)  For purposes of calculating the percentage of capital structure at issuance with respect to a CRE CDO security, such amount shall be a percentage equal to a fraction, the numerator of which is the aggregate principal balance of (a) such CRE CDO security and (b) any security that is pari passu with such CRE CDO security and secured by the same collateral, and the denominator of which is the total collateral balance of the CRE CDO deal from which the securities were issued.

## TABLE C

**This TABLE C is applicable to the following sectors of Real Estate Company Debt Interests and REIT Debt Securities, as each of these sectors is determined in accordance with methodology prescribed by Moody's.**

| Obligor | Sector | Secured | Unsecured |
|---|---|---|---|
| REIT Debt Securities | Mortgage | N/A | 10% |
| | Healthcare | N/A | 10% |
| | Other | N/A | 40% |
| Real Estate Company Debt Interests | Mortgage | 15% | 10% |
| | Healthcare | 15% | 10% |
| | Other | 50% | 40% |

**The Moody's Recovery Rate for Credit Tenant Lease (CTL) securities with an underlying single asset or single borrower is 45%.**

## SCHEDULE E

## AUCTION PROCEDURES

This Schedule is Schedule E to the Indenture (the "**Indenture**") dated as of February 27, 2007, between Cedarwoods CRE CDO II, Ltd., as issuer, and LaSalle Bank National Association, as trustee (the "**Trustee**"). The following sets forth the auction procedures (the "**Auction Procedures**") to be followed in connection with a sale effected pursuant to Section 9.2(b) of the Indenture (such sale, an "**Auction Sale**"). Capitalized terms used herein that are not otherwise defined shall have the meanings assigned thereto in the Indenture.

### I.    Pre-Auction Process

(a)    The Trustee will initiate the Auction Procedures at least 20 Business Days prior to each Auction Date in the case of an Auction Sale by:

(i)    with the assistance of the Collateral Manager, preparing a list containing the names of the issuer and guarantor (if any), the par amount and the CUSIP number (if any) with respect to each Collateral Debt Security;

(ii)    delivering a list of the constituents of each Subpool received from the Collateral Manager as described in subparagraph (b) below, which the Collateral Manager shall prepare based upon the Collateral Manager's good faith determination of the composition of Subpools that will maximize sale proceeds; **provided** that the maximum number of Subpools shall be 20 and if the Trustee has not received such list from the Collateral Manager at least 20 Business Days prior to the Auction Date, the Trustee shall be entitled to assume that the Collateral Debt Securities will not be divided into Subpools for the purposes of the relevant Auction; and

(iii)    sending the lists prepared pursuant to clauses (i) and (ii) above to the Qualified Bidders identified on the then-current Qualified Bidder List (the "**Listed Bidders**") and requesting bids on the Auction Date.

(b)    The general solicitation package which the Trustee shall deliver to the Listed Bidders will include: (i) a form of a purchase agreement provided to the Trustee by the Collateral Manager (which shall, among other things, provide that (A) upon satisfaction of all conditions precedent therein, the purchaser is irrevocably obligated to purchase, and the Issuer is irrevocably obligated to sell, the Collateral Debt Securities (or relevant Subpool, as the case may be) on the date and on the terms and conditions set forth therein and (B) if the Subpools are to be sold to more than one bidder, the consummation of the purchase of each Subpool must occur simultaneously and the closing of each purchase is conditional on the closing of each of the other purchases); (ii) the minimum purchase price (which shall be the Total Redemption Price); (iii) a formal bid sheet (which shall permit the relevant bidder to bid for all of the Collateral Debt Securities, any Subpool or separately for each of the Subpools) provided to the

Trustee by the Collateral Manager including a representation from the bidder that it is eligible to purchase all of the Collateral Debt Securities; (iv) a detailed timetable; and (v) copies of all transfer documents compiled with the assistance of the Collateral Manager (including transfer certificates and subscription agreements which a bidder must execute pursuant to the Underlying Instruments and a list of the requirements which the bidder must satisfy under the Underlying Instruments (i.e., Qualified Institutional Buyer, Qualified Purchaser, etc.)). Notwithstanding anything to the contrary herein, the Trustee shall have no responsibility to verify compliance with transfer restrictions for the Underlying Instruments.

(c)     The Trustee shall send solicitation packages to all Listed Bidders at least 15 Business Days before the Auction Date.

(d)     No later than ten Business Days before the Auction Date, Listed Bidders may submit written due diligence questions relating to the legal documentation and other information contained in the general solicitation package (including comments on the draft purchase agreement to be used in connection with the Auction (the "**Auction Purchase Agreement**")) to the Collateral Manager; **provided** that the Collateral Manager shall only be obligated to answer questions relating to the Collateral to the extent that it is able to do so by reference to information which it is required to provide under the Collateral Management Agreement. The Collateral Manager shall be solely responsible for (i) responding to all relevant questions and/or comments submitted to it in accordance with the foregoing and (ii) distributing the questions, answers and revised final Auction Purchase Agreement to all Listed Bidders at least five Business Days prior to the Auction Date.

## II.     Auction Process

(a)     The Trustee or the Collateral Manager or its Affiliates or any account managed by the Collateral Manager and/or an Affiliate will be allowed to bid in the Auction if it deems appropriate, but will not be required to do so.

(b)     On the Auction Date, all bids will be due by facsimile to the offices of the Trustee by 11:00 a.m. New York City time, with the winning bidder to be notified by 2:00 p.m. New York City time. All bids from Listed Bidders will be due on the bid sheet contained in the solicitation package. Each bid shall be for the purchase and delivery to one purchaser of (i) all (but not less than all) of the Collateral Debt Securities or (ii) all (but not less than all) of the Collateral Debt Securities that constitute the components of one or more Subpools.

(c)     If the Issuer receives fewer than two bids from Listed Bidders to purchase all of the Collateral Debt Securities or to purchase each Subpool, the Trustee shall decline to consummate the sale.

Sch. E-2

(d)  Subject to clause (c), the Collateral Manager shall select as the winning bidder the bid or bids that result in the Highest Auction Price (in excess of the minimum purchase price) from one or more Listed Bidders and shall notify the winning bidder thereof on the Business Day following the Auction Date. In the event that more than one Listed Bidder submit bids of the same value for such Collateral Debt Securities (or each Subpool), which value is the Highest Auction Price, the Collateral Manager shall request the relevant Listed Bidders to submit revised bids (in accordance with the procedures described in this Schedule E) until the Collateral Manager is able to determine the winning bidder, being the revised bid or bids that result in the Highest Auction Price (in excess of the minimum purchase price).

(e)  Upon notification to the winning bidder(s), the winning bidder (or, if the Highest Auction Price requires the sale of Subpools to more than one bidder, each winning bidder) will be required to deliver to the Trustee by 4:00 p.m. New York City time on the second Business Day following the Auction Date (i) a signed counterpart of the Auction Purchase Agreement and (ii) a good faith deposit equal to 1% of the aggregate Principal Balance will be required to be wired to the Trustee no later than 4:00 p.m. New York City time on the Auction Date. If the Highest Auction Price requires the sale of Subpools to more than one bidder, each winning bidder shall contribute to the good faith deposit an amount equal to 1% of the aggregate Principal Balance of the Subpool or Subpools to which its bid relates. Such deposit will not be invested. This deposit will be credited to the purchase price but will not be refundable. The Trustee will establish a separate account for the acceptance of the good faith deposit, until such time as the winning bidder (or, if the Highest Auction Price requires the sale of Subpools to more than one bidder, each winning bidder) pays the full purchase price in Cash, at which time all monies will be transferred into the Collection Account, such payment in full of the purchase price to be made by the winning bidder prior to the sixth Business Day following the relevant Auction Date. If such good faith deposit or payment in full of the purchase price is not made when due (or, if the Subpools are to be sold to more than one bidder, if any bidder fails to make its contribution to the good faith deposit or make payment of the purchase price when due), the Trustee shall decline to consummate the sale of each Subpool and shall give notice that the Auction Call Redemption will not occur.

.

# SCHEDULE F

## S&P'S NOTCHING CRITERIA

Asset classes eligible for notching if they are not first loss tranches or combination securities.  If the security is rated by two rating agencies, notch down as shown below based on the lowest rating.

If rated only by one rating agency, then notch down what is shown below plus one more notch.  S&P's notching criteria may be modified or adjusted at any time, so please verify applicability.  Subject to the receipt of Rating Agency Confirmation from S&P, these notching criteria will be revised to reflect any or generally available changes to the S&P Notching Criteria without need for amendment or supplement hereto.

| | Issued prior to 8/1/01 | | Issued on or after 8/1/01 | |
|---|---|---|---|---|
| | Current rating is: Inv. Grade | Non Inv. Grade | Current rating is: Inv. Grade | Non Inv. Grade |
| 1. CONSUMER ABS<br>Automobile Loan Receivable Securities<br>Automobile Lease Receivable Securities<br>Car Rental Receivable Securities<br>Credit Card Securities<br>Healthcare Securities<br>Student Loan Securities | -1 | -2 | -2 | -3 |
| 2. COMMERCIAL ABS<br>Cargo Securities<br>Equipment Leasing Securities<br>Aircraft Leasing Securities<br>Small Business Loan Securities<br>Restaurant and Food Services Securities | -1 | -2 | -2 | -3 |
| 3. Non-Re-REMIC RMBS<br>Manufactured Housing Loan Securities | -1 | -2 | -2 | -3 |
| 4. Non-Re-REMIC CMBS<br>CMBS – Conduit<br>CMBS – Credit Tenant Lease<br>CMBS – Large Loan<br>CMBS – Single Borrower<br>CMBS – Single Property | -1 | -2 | -2 | -3 |
| 5. CDO CASHFLOW SECURITIES<br>Cash Flow CBO – at least 80% High Yield Corporate<br>Cash Flow CBO – at least 80% Investment Grade Corporate<br>Cash Flow CLO – at least 80% High Yield Corporate<br>Cash Flow CLO – at least 80% Investment Grade Corporate | -1 | -2 | -2 | -3 |
| 6. REITs<br>REIT – Multifamily & Mobile Home Park<br>REIT – Retail<br>REIT – Hospitality<br>REIT – Office<br>REIT – Industrial<br>REIT – Healthcare<br>REIT – Warehouse<br>REIT – Self-Storage<br>REIT – Mixed Use | -1 | -2 | -2 | -3 |
| 7. SPECIALTY STRUCTURED<br>Stadium Financings | -3 | -4 | -3 | -4 |

|  | Issued prior to 8/1/01 | | Issued on or after 8/1/01 | |
|---|---|---|---|---|
|  | Current rating is: Inv. Grade | Non Inv. Grade | Current rating is: Inv. Grade | Non Inv. Grade |
| Project Finance | | | | |
| 8. RESIDENTIAL MORTGAGES<br>Residential "A"<br>Residential "B/C"<br>Home equity loans | -1 | -2 | -2 | -3 |
| 9. REAL ESTATE OPERATING COMPANIES | -1 | -2 | -2 | -3 |

Sch. F-2

**SCHEDULE G**

**S&P'S TYPES OF ASSET-BACKED SECURITIES INELIGIBLE FOR NOTCHING**

The following asset classes are not eligible to be notched.

Credit estimates must be performed.

Subject to the receipt of Rating Agency Confirmation from S&P, this Schedule G will be revised to reflect any published or generally available changes to the S&P Types of Asset Backed Securities Ineligible for Notching without need for amendment or supplement hereto.

*Asset Type*

1.    Non-U.S. Structured Finance Securities

2.    Guaranteed Securities

3.    CBOs of CDOs

4.    CLOs of Distressed Debt

5.    Mutual Fund Fee Securities

6.    Catastrophic Bonds

7.    First Loss Tranches of any securitization

8.    Synthetics

9.    Synthetic CBOs

10.    Combination Securities

11.    Re-REMICs

12.    Market value CDOs

13.    Net Interest Margin Securities (NIMs)

14.    Structured Settlement Securities (Tobacco)

15.    CDOs of Trust Preferred Securities

16.    Hedge Fund CDOs

17.    Any asset class not listed on Schedule F

# SCHEDULE H

## S&P'S INDUSTRY CLASSIFICATION GROUPS

### CORPORATE OBLIGATIONS

| Industry Code | Description |
|---|---|
| 0 | Zero Default Risk |
| 1 | Aerospace & Defense |
| 2 | Air Transport |
| 3 | Automotive |
| 4 | Beverage & Tobacco |
| 5 | Radio & Television |
| 6 | Brokers, Dealers & Investment Houses |
| 7 | Building & Development |
| 8 | Business Equipment & Services |
| 9 | Cable & Satellite Television |
| 10 | Chemicals & Plastics |
| 11 | Clothing/Textiles |
| 12 | Conglomerates |
| 13 | Containers & Glass Products |
| 14 | Cosmetics/Toiletries |
| 15 | Drugs |
| 16 | Ecological Services & Equipment |
| 17 | Electronics/Electrical |
| 18 | Equipment Leasing |
| 19 | Farming/Agriculture |
| 20 | Financial Intermediaries |
| 21 | Food/Drug Retailers |
| 22 | Food Products |
| 23 | Food Service |
| 24 | Forest Products |
| 25 | Health Care |
| 26 | Home Furnishings |
| 27 | Lodging & Casinos |
| 28 | Industrial Equipment |
| 29 | Insurance |
| 30 | Leisure Goods/Activities/Movies |
| 31 | Nonferrous Metals/Minerals |
| 32 | Oil & Gas |
| 33 | Publishing |
| 34 | Rail Industries |
| 35 | Retailers (except food & drug) |
| 36 | Steel |
| 37 | Surface Transport |
| 38 | Telecommunications |
| 39 | Utilities |
| 40 | Reserve |
| 41 | Reserve |

### STRUCTURED FINANCE SECURITIES

| Asset Type | Description |
|---|---|
| 42 | Reserve |
| 43 | Reserve |
| 44 | Reserve |
| 45 | Reserve |
| 46 | Reserve |
| 47 | Reserve |
| 48 | Reserve |
| 49 | RMBS A |
| 50 | CDOs |
| 51 | ABS Consumer |
| 52 | ABS Commercial |
| 53 | CMBS Diversified (Conduit and CTL) |
| 54 | CMBS (Large Loan, Single Borrower, and Single Property) |
| 55 | REITs and REOCs |
| 56 | RMBS A |
| 57 | RMBS B&C, HELs, HELOCs, and Tax Lien |
| 58 | Manufactured Housing |
| 59 | U.S. Agency (Explicitly Guaranteed) |
| 60 | Monoline/FER Guaranteed |
| 61 | Non-FER Company Guaranteed |
| 62 | FFELP Student Loans (Over 70% FFELP) |
| 63 | CLO of SME's |
| 64 | Reserve |
| 65 | Reserve |
| 66 | Reserve |
| 67 | Reserve |
| 68 | Reserve |
| 69 | Reserve |
| 70 | Reserve |
| 71 | Reserve |
| 72 | Reserve |
| 73 | Reserve |
| 74 | Reserve |
| 75 | Reserve |
| 76 | Reserve |
| 77 | Reserve |