UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee, : | |
| : | |
| Interpleader Plaintiff, : | 11-CV-9199 (WHP) |
| : | |
| - against - : | **ECF Case** |
| : | |
| BARCLAYS BANK PLC; THE BANK OF NEW YORK MELLON; MBIA INSURANCE : CORPORATION; and ANGELO, GORDON & CO., L.P., : | **Electronically Filed** |
| : | |
| Interpleader Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
<u>BARCLAYS BANK PLC'S MOTION FOR SUMMARY JUDGMENT</u>**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jay B. Kasner
Christopher P. Malloy
Michael H. Gruenglas
Julie E. Cohen
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Interpleader Defendant
  Barclays Bank PLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    The Parties ...............................................................................................................3

    B.    Overview of the Cedarwoods CRE CDO II Transaction....................................4

    C.    The Cedarwoods CRE CDO II Coverage Tests....................................................5

        1.    "Haircut Adjustments" to the Coverage Test..............................................6

        2.    The Consequences of a Failing Coverage Test............................................7

    D.    The Undisputed Mischaracterizations of Securities Held by Cedarwoods
        Resulted in the Misstatement of Coverage Tests and Violations of the
        Priority of Payments ..............................................................................................8

        1.    Securities Were Indisputably Mischaracterized.........................................8

        2.    The Misreporting of the Class D/E Principal Coverage Test Led to
            a Failure to Pay Principal and a Violation of the Waterfall.....................10

    E.    Events of Default That are the Subject of This Summary Judgment Motion........11

ARGUMENT ......................................................................................................................12

    A.    Summary Judgment Is Appropriate Where the Contractual Language Is
        Unambiguous and the Material Facts Are Undisputed .........................................12

    B.    Events of Default Occurred Under Sections 5.1(b) and 5.1(c) of the
        Indenture ...............................................................................................................13

        1.    An Event of Default Occurred Under Section 5.1(b) ...............................14

        2.    An Event of Default Occurred Under Section 5.1(c)................................21

    C.    The Defaulted Securities Cannot Be "Cured" of That Status ...............................23

    D.    The Court Should Direct the Liquidation of the Collateral ...................................25

## TABLE OF AUTHORITIES

### CASES

*Bank of America v. AIG Financial Products Corp., No.*,
   10 Civ. 5242 (JSR), 2010 WL 5065477 (S.D.N.Y. Dec. 7, 2010) .........................................12

*Bank of New York v. First Millennium Inc.*,
   607 F.3d 905 (2d Cir. 2010)...........................................................................13

*Bazin v. Walsam 240 Owner LLC*,
   72 A.D.3d 190, 894 N.Y.S. 2d 411 (1st Dep't 2010) ...............................................15

*Beal Savings Bank v. Sommer*,
   8 N.Y.3d 318, 865 N.E. 2d 1210 (2007)........................................................18, 22

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,
   17 N.Y.3d 269, 952 N.E. 2d 995 (2011)...........................................................25

*Deutsche Bank Trust Co. Americas v. Elliot International, L.P.*,
   No. 09-CV-5242 (WHP) (S.D.N.Y. Feb. 14, 2011) .................................................12

*Finest Investments v. Security Trust Co.*,
   96 A.D.2d 227, 468 N.Y.S.2d 256 (4th Dept. 1983) ...............................................16

*Fosco v. City University of N.Y.*,
   No. 09 Civ. 5242 7173 (WHP), 2012 WL 75189 (SDNY Jan. 5, 2012) ...............................12

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562, 780 N.E. 2d 166 (2002)...........................................................15

*Katel L.L.C. v. AT&T Corp.*,
   No. 02-cv-02440-RJH, 2009 WL 773498 (S.D.N.Y. Mar. 17, 2009) .................................13

*MBIA Insurance Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*,
   No. 09-CV-10093 (RJS), 2011 WL 1197634 (S.D.N.Y. Mar. 25, 2011)..........................13, 25

*Omni Quartz, Ltd. v. CVS Corp.*,
   287 F.3d 61 (2d Cir. 2001)...........................................................................13

*Red Ball Interior Demolition v. Palmadessa*,
   173 F.3d 481 (2d Cir. 1999)...........................................................................13

*Sterling Investor Services, Inc. v. 1155 Nobo Assocs., LLC*,
  30 A.D.3d 579, 818 N.Y. S. 2d 513 (2d Dep't 2006)..............................................25

*U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*,
  839 F.Supp.2d 639 (S.D.N.Y. 2011).......................................................................12

*Vector Capital Corp. v. Ness Technologies, Inc.*,
  No. 11 Civ. 6259, 2012 WL 913245 (S.D.N.Y. Mar. 19, 2012) ............................17

## Other Authorities

Black's Law Dictionary (9th ed. 2009) ........................................................................17

Interpleader Defendant Barclays Bank PLC ("Barclays") respectfully submits this memorandum of law in support of its motion for summary judgment.[1]

## PRELIMINARY STATEMENT

This is an interpleader action relating to Cedarwoods CRE CDO II (the "CDO"), a collateralized debt obligation that invests in commercial real estate debt securities. Plaintiff U.S. Bank N.A. ("U.S. Bank") is the successor trustee (the "Trustee") under a February 27, 2007 Indenture (the "Indenture") with Cedarwoods CRE CDO II, Ltd. ("Cedarwoods" or the "Issuer"). U.S. Bank also serves as the Collateral Administrator for the CDO, while Angelo Gordon & Co., L.P. ("AGC") is the Collateral Manager.

As discussed below, because an Event of Default indisputedly occurred under the Indenture, the Trustee is required to follow the direction of Barclays, as holder of 100% of the Class A-1 Notes issued by Cedarwoods, to liquidate the collateral held by Cedarwoods. At the request of the other interpleader defendants – led by MBIA Insurance Company ("MBIA"), which is seeking to avoid liability on its surety contract covering the Class A-2 Notes – this Court deferred proceedings on Barclays' initial summary judgment motion while the parties engaged in expedited discovery. That discovery is now complete and the core facts entitling Barclays to summary judgment remain unchanged and undisputed.

The issues now before the Court are straightforward questions of contract interpretation. As detailed below, party admissions and documentary evidence in this case establish

---

[1] Citations to "¶ ___" are to the Local Rule 56.1 Statement of Undisputed Facts in Support of the Motion for Summary Judgment of Interpleader Defendant Barclays Bank PLC. Citations to "Ex. __" are to the exhibits accompanying the Declaration of Jake Scrivens (the "JS Decl."). Citations to "CM Ex. ___" are to the exhibits accompanying the Declaration of Christopher Malloy (the "CM Decl."). Citations to "VK Ex. ___" are to the exhibits accompanying the Declaration of Vikram Kuriyan (the "VK Decl.").

conclusively that, at the very least, for the December 2010 "Payment Date" (i) a certain "Coverage Test" set forth in the Indenture failed; (ii) the failure of that test was not timely disclosed to the investors of the CDO; (iii) as a consequence of the failure of this test, mandatory payments of principal were owed on the Class A-1 Notes and indisputably were not paid; and (iv) the payments that should have been made on the Class A-1 Notes were instead paid to other parties in violation of the "Priority of Payments" mandated by the Indenture.

As a result of these errors, several Events of Default under the Indenture occurred.  First, there was an Event of Default under Section 5.1(b), which occurs when there is a "default in the payment of any principal, when due and payable of any Secured Note."  Second, there was an Event of Default under Section 5.1(c), which occurs where there is a "failure on any Payment Date to disburse amounts available in accordance with Section 11.1," where Section 11.1 requires the collections from the CDO's collateral to be distributed in accordance with a defined "waterfall" or Priority of Payments.  Section 11.1 was violated when the amounts that should have been paid as principal on the Class A-1 Notes were instead paid, *inter alia*, to subordinate noteholders and as fees to the collateral manager, AGC, or used to buy new assets.[2]  MBIA's own expert admitted that even a single dollar of missed principal is sufficient to trigger an Event of Default under either Section 5.1(b) or 5.1(c).  (*See* Argument, Section B, *infra*.)

While this motion describes, based on indisputable documentary evidence, the specifics of the Coverage Test failures in December 2010 through April 2011 and the indisputable

---

[2]  Barclays also contends that an indisputable Event of Default occurred under Section 5.1(f) of the Indenture because there were inaccurate reports issued in connection with the CDO, as well as breaches of numerous covenants, which had a material adverse effect on noteholders. Discovery has confirmed these defaults.  However, given the simplicity of the dispute surrounding the Section 5.1(b) and 5.1(c) defaults (which are dispositive of the entire action), Barclays is not seeking summary judgment on the Section 5.1(f) default.

violations of the Indenture that flowed therefrom, in light of the specific party admissions that a coverage test was failing and payments were misallocated for the December 2010 Payment Date, the *only* issues the Court needs to decide in order to determine whether to grant this motion are two straightforward questions regarding the interpretation of the unambiguous terms of Sections 5.1(b) and 5.1(c) of the Indenture:

- Does the term "due and payable" in Section 5.1(b) have a magical meaning when referring to "principal" that is different from both its ordinary meaning and its meaning when used in other places in the same Indenture?
- Can an Event of Default under Section 5.1(c), defined as "the failure on any Payment Date to disburse amounts available in accordance with Section 11.1" be avoided merely by complying with only 6 words, "in accordance with a Payment Report," out of the over eleven pages of substantive requirements in Section 11.1?

If this Court finds that the answer to *either* of these questions is "no," then Summary Judgment must be granted and the Trustee is required to follow the direction of Barclays, as the holder of 100% of the Class A-1 Notes and the "Controlling Class" under the Indenture, to liquidate the collateral held by the CDO and distribute the proceeds in accordance with the Indenture.

## BACKGROUND

A.     **The Parties**

Interpleader Plaintiff U.S. Bank is presently the Trustee under the Indenture.  (¶ 1.)  It is also the Collateral Administrator under a Collateral Administration Agreement dated February 27, 2007, between the Issuer, AGC, and LaSalle.  (¶ 1.)

Barclays is the Holder of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes under the Indenture, with an aggregate principal amount of $390,000,000 and an unpaid principal balance of approximately $371 million.  (JS Decl. ¶¶ 4, 9.)  These Notes represent approximately 65% of the total capitalization of the CDO.  (¶ 4.)

3

Interpleader defendant AGC is the Collateral Manager of the CDO and is a party, along with Cedarwoods, to a Collateral Management Agreement, dated February 27, 2007.  (¶ 7; Ex. C.)

Interpleader defendant BONY is the Holder of  the Class A-2 Notes, which have a principal amount of $78 million and are subordinate to Barclays' Class A-1 Notes.   Interpleader defendant MBIA claims to have a contract to act as surety for BONY's Class A-2 Notes and, as such, is entitled to enforce the rights of BONY as holder of those notes.  (¶¶ 5-6.)

## B.   Overview of the Cedarwoods CRE CDO II Transaction

The Cedarwoods CRE CDO II issued approximately $600 million in notes ("Notes")[3] secured by assets consisting of commercial mortgage-backed securities ("CMBS Securities") (a type of mortgage-backed security secured by loans on commercial properties), Real Estate Investment Trust ("REIT") Debt Securities, Real Estate CDO Securities and Real Estate Company Debt Interests, and were all required to comply with a set of eligibility criteria set forth in the Indenture.  (¶ 9.)  Proceeds from the asset portfolio are the only source of funds for payments on the Notes and other liabilities of the CDO.  (*Id.*)

The Notes are structured in layers, or tranches, that correspond to the respective Noteholders' rights to receive payment.  (JS Decl. ¶ 15.)  The Indenture includes detailed provisions regarding how collections from the underlying collateral are to be allocated to pay expenses of the CDO and to pay the interest and principal on the different classes of Notes.  (Ex. A § 11.1 at 170-81.)  Section 11.1 of the Indenture defines the "waterfall" for the distribution of

---

[3]   Cedarwoods issued: (i) $390 million Class A-1 Notes; (ii) $78 million Class A-2 Notes; (iii) $28.5 million Class A-3 Notes; (iv) $29.25 million Class B Notes; (v) $20.25 million Class C Notes; (vi) $19.5 million Class D Notes; (vii) $6 million Class E Notes; (viii) $10.5 million Class F Notes; (ix) $11 million Combination Notes; and (x) $18 million unsecured Income Notes.  (¶ 10.)  In addition, the Issuer currently has liability in excess of approximately $65 million under a Hedge Agreement, which is senior to its liabilities to the Noteholders.  (JS Decl. ¶ 14.)

Interest Proceeds (§11.1(a)), Principal Proceeds (§11.1(b)) and sale proceeds following the sale of the collateral after an Event of Default ((§11.1(c)).  (*Id.*)  The sequential allocation of funds under Section 11.1 is collectively defined as the "Priority of Payments."  (Ex. A § 1.1 at 47.)

Cedarwoods issues two types of monthly reports that are permitted to be, and in fact were, combined.  (JS Decl. ¶ 11; Ex. A § 10.11 at 161.)  The Note Report details the CDO's portfolio, and includes, among other things, a calculation showing compliance with certain "coverage tests" (discussed *infra*); a listing of all so-called non-performing assets, called Defaulted Securities and Deferred Interest PIK Bonds; and the S&P and Moody's rating for each Collateral Debt Security.  (JS Decl. ¶ 12; Ex. A § 10.11 at 160-66.)  The Payment Reports (together with the Note Reports, the "Reports") in turn, set forth "an accounting of the amounts that will be paid in accordance with the Priority of Payments."  (JS Decl. ¶ 12; Ex. A § 10.11 at 160.)

The Cedarwoods Indenture contains several provisions giving Barclays, as Controlling Class, the authority to direct the Trustee to take certain actions once an Event of Default has been declared. This right includes the authority to direct the Trustee to accelerate the maturity date of the Notes and sell and liquidate the collateral.  (¶ 151, Ex. A § 5.2 at 103, § 5.4 at 107-09, § 5.5 at 109-10.)

## C.    The Cedarwoods CRE CDO II Coverage Tests

The Indenture includes several coverage tests that determine whether the CDO's collateral assets are sufficient to support the Notes.  (JS Decl. ¶ 20; Ex. A § 1.1 at 10-13.)  Of particular relevance here is what is referred to as the Class D/E Principal Coverage Test.  (JS Decl. ¶ 22.)  The Class D/E Coverage Principal Coverage Test was indisputably failing in December 2010, and the facts establishing the failure of the test for January 2011-April 2011 are also beyond dispute.

The Class D/E Principal Coverage Test is expressed as a ratio: the numerator, defined as the "Principal Coverage Amount," is the sum of the principal amount of all the Collateral Debt Securities, with certain "haircut" adjustments, plus the cash amount of Collateral Principal Collections; the denominator is the sum of the Aggregate Outstanding Amount of the Class A, B, C, D and E Notes.  (JS Decl. ¶ 22; Ex. A § 1.1 at 13, 46-47.)  To pass the test, this ratio must exceed 102.5%.  (JS Decl. ¶ 22; Ex. A § 1.1 at 13.)  A diagram summarizing the test is set forth below:

$$\frac{\text{Aggregate Principal Balance of CDS as Adjusted for Non-Performing Assets + Collateral Principal Collections}}{\text{Balance of Class A + B + C + D + E Notes}} \geq 102.50\%$$

The ratio measures whether the senior notes of the CDO are adequately secured.  In other words, to pass the test, the adjusted value of the total principal amount of the CDO's collateral plus any cash from principal collections must exceed the total outstanding amount of the Class A though E Notes by a 2.5% margin.

**1.      "Haircut Adjustments" to the Coverage Test**

The adjustments, or "haircuts," to the Principal Coverage Amount (the numerator) are critical because they value Collateral Debt Securities that are impaired or that have low ratings at a fraction of their principal amount for purposes of calculating the ratio.

**(a)      Required Haircuts for Defaulted Securities**

First, commercial mortgage-backed securities (defined as "CMBS Securities") rated below "Baa3" or "BBB-" by Moody's or S&P, respectively, are Defaulted Securities once "there has been a failure to pay interest in whole or in part for . . . three consecutive payment periods." (Ex. A § 1.1 at 24-25.)  For purposes of calculating the coverage ratios, the value ascribed to Defaulted Securities is significantly reduced.  Specifically, Defaulted Securities are carried at a Defaulted Security Amount, an amount equal to the lesser of the market value of the security or

6

an amount calculated based on rating agency recovery rates defined in the Indenture.  (JS Decl. ¶ 23; Ex. A § 1.1 at 24, 46-47.)

### (b)   Required Haircuts for Deferred Interest PIK Bonds

Second, securities that by their terms permit interest to be deferred or capitalized, or which issue additional securities in lieu of cash interest payments (so-called "Payment-in-Kind" or "PIK Bonds"), are treated as impaired when they defer interest for the lesser of two consecutive payment dates or six months.  These are called "Deferred Interest PIK Bonds" and are carried at their "Deferred Interest PIK Bond Amount," which is similarly calculated as the lesser of market value or a reduced amount based on the applicable rating agency recovery rates. (Ex. A § 1.1 at 26, 46-47.)

### (c)   Required Haircuts for Low-Rated Securities

Third, securities with low investment ratings are treated as impaired.  Securities that have ratings of "Ba1" by Moody's or "BB+" by S&P, or lower, are carried at defined lowered percentages.  For example, a bond with a Moody's/S&P rating of "Caa1"/"CCC+" or lower is generally carried at 60% of its principal amount for purposes of the coverage tests.  (¶ 36; Ex. A § 1.1 at 46-47.)  In addition, securities rated "Ca" or lower by Moody's or "CC" or lower by S&P are treated as Defaulted Securities.  (Ex. A § 1.1 at 26.)

### 2.   The Consequences of a Failing Coverage Test

When the Class D/E Principal Coverage Test is failing, under the Priority of Payments cash flows that would otherwise be (a) deposited to an account for reinvestment in new collateral; (b) used to pay interest and make other distributions to noteholders subordinate to the Class E Notes; or (c) to pay AGC's Subordinate Collateral Management Fee, must all instead be used to pay down the principal of the most senior class of Notes outstanding (here, the Class A-1 Notes) until the test is passing.  (Ex. A § 11.1(a)(xvi) at 172-73, § 11.1(b)(x) at 176.)

Relatedly, under Section 9.8, the failure of a Coverage Test is a Mandatory Redemption event. (¶ 43; Ex. A § 9.8 at 154.)  Specifically, when the Class D/E Principal Coverage Test fails, on a given Payment Date "all collections that would otherwise be used . . . to make payments in respect of any Class of Secured Notes subordinate to [the Class D and Class E Notes], distributions in respect of the Income Notes, payments of certain other expenses and reinvestments in Substitute Collateral Debt Securities *will be used instead to redeem … (i) first, each class of Secured Notes Senior to [the Class D and Class E Notes]*." (Ex. A § 9.8 at 154 (emphasis added).)  Here, when the Class D/E Principal Coverage Test fails, the designated collections must be used instead to redeem the Class A-1 Notes until the test is satisfied. (*Id.*)

**D.  The Undisputed Mischaracterizations of Securities Held by Cedarwoods Resulted in the Misstatement of Coverage Tests and Violations of the Priority of Payments**

**1.  Securities Were Indisputably Mischaracterized**

Due to several misclassifications of Cedarwoods' assets, demonstrated by uncontested facts, the Class D/E Principal Coverage Test was failing no later than December 2010, leading to a violation of the Priority of Payments for the December 2010 through April 2011 Payment Dates. (JS Decl. ¶¶ 31-53.)  Although the Court need not decide which party is at fault, what happened was the equivalent of a second baseman and shortstop watching a fly ball drop directly between them, each assuming the other was going to make the catch.  AGC's corporate representative testified that AGC did not monitor the portfolio on an ongoing basis for purposes of identifying securities that had become Defaulted Securities and instead relied on U.S. Bank. (Solomon Dep. 100:11-14, 102:4-9; 104:23-105:8.)[4]

---

[4]   Excerpted transcripts for all deposition testimony referenced herein are attached to the CM Decl. as Exhibits A-F.

**REDACTED AT THE REQUEST OF US BANK**

The result of this apparent lack of communication was the undisputed misclassification of multiple securities.  First, two CMBS Securities, WBCMT 2005-C18 F and WBCMT 2005-C18 G, were downgraded on December 10, 2010 to "Caa3" and "Ca," respectively.  (JS Decl. ¶¶ 50-51.)  The downgrade of WBCMT 2005-C18 G to "Ca" should have resulted in the asset being categorized as a Defaulted Security under the Indenture.  (Ex. A § 1.1 at 26.)  The December 2010 Report did not reflect these downgrades nor did it reflect the proper categorization of WBCMT 2005-C18 G as a Defaulted Security—even though AGC received notice of the downgrade of nine classes of WBCMT 2005-C18 securities on December 10, 2010.  (Ex. K at 55, 64, 67; ¶ 51-53.)  Second, at least five securities – LBUBS 2007-C1 C , LBUBS 2007-C1 D , LBUBS 2007-C1 H, LBUBS 2006-C7 H, and CD 2006-CD3 E – should have been, but were not, classified as Defaulted Securities. (JS Decl. ¶¶ 33-42; Ex. A § 1.1 at 24-25.)  Third, a PIK Bond, CREST 2003-1A C1, should have been, but was not, categorized as a Deferred Interest PIK Bond.  (JS Decl. ¶¶ 47-48; Ex. A § 1.1 at 26.)  Appendix I is a table summarizing these errors.

AGC's representative admitted (i) the failure to account for the downgrades of the WBCMT 2005-C18 F and WBCMB 2005-18 G bonds (¶ 118); (ii) that each of the LBUBS 2007-C1 Class C, D and H securities should have been classified as Defaulted Securities in the May 2010 Payment Report  (Ex. WW at 6; ¶¶ 65, 74, 83); (iii) that the CD 2006-CD3 Class E security should have been classified as a Defaulted Security commencing with the April 2011 Payment Report (¶ 100); and (iv) as AGC had conceded before the litigation even started, that the CREST 2003-1A C1 security should have been, but was not, classified as a Deferred Interest PIK Bond beginning with the March 2011 Payment Report (Ex. WW at 6; ¶ 107.)).

9

2.      **The Misreporting of the Class D/E Principal Coverage Test Led to a Failure to Pay Principal and a Violation of the Waterfall**

Notably, as even AGC's representative admitted, without giving effect to the other misclassifications, the failure to account for the downgrades of WBCMT 2005-C18 F and WBCMT 2005-C18 G alone would have caused the Class D/E Principal Coverage Test to fail at 102.43% for the December 2010 Payment Period.  (JS Decl. ¶ 55; ¶ 119.)[5]  Standing alone, this undisputed, unreported failure of the Class D/E Principal Coverage Test on the December 2010 Payment Date is sufficient to trigger the Events of Default set forth below in Section B.

The misclassification of the WBCMT bonds, the six Defaulted Securities and the Deferred Interest PIK Bond collectively led to an overstatement of the Class D/E Principal Coverage Test, as set forth in the following table:

| Report Date | Class D/E Principal Coverage Test (Passing = 102.5%) | |
|---|---|---|
| | Reported | Actual |
| December 21, 2010 | 103.04% | 100.16% |
| January 19, 2010 | 102.69% | 100.40% |
| February 18, 2011 | 104.18% | 102.03% |
| March 21, 2011 | 104.02% | 101.62% |
| April 19, 2011 | 103.75% | 102.11% |

(JS Decl. ¶ 54.)   For all of these months, the Class D/E Principal Coverage Test was reported as passing, when, in fact, it was failing.

Because the Class D/E Principal Coverage Test was treated as passing when it was failing, from December 2010 through April 2011, the Priority of Payments was violated.  As noted above, when the Class D/E Principal Coverage Test is failing, amounts that would be paid to noteholders or for other distributions subordinate to the Class E Notes must instead be used "to

pay principal" on the Class A-1 Notes.  (Ex. A §§ 11.1(xvi), 11.1(b)(x) at 172-73, 176.)  These required payments on the Class A-1 Notes were not made; instead, the payments were made as if the Class D/E Principal Coverage Test was passing.  A summary of these inaccurate payments is set forth in Appendix II.

Barclays contends that more than $8.5 million in principal should have been paid to the Class A-1 Notes in December 2010 through April 2011.  The closest any party has come to contesting this failure to timely pay principal is MBIA's expert, who confirmed Barclays' calculation that over $6.7 million in principal should have been, but was not, paid on the Class A-1 Notes in December 2010 and January 2011, but erroneously claimed $4.2 million of that principal was paid back to Barclays in May 2011, long after applicable cure periods expired. (VK Decl. ¶ 10-17, VK Ex. A, CM Ex. H.)  *Thus, even under MBIA's analysis,  it is undisputed that at least $6.7 million was due and not timely paid on the Class A-1 Notes.*[6]

**E.  Events of Default That are the Subject of This Summary Judgment Motion**

The matters set forth above led to Events of Default under Sections 5.1(b) and 5.1(c) of the Indenture, each of which are set forth in full below:

---

*(cont'd from previous page)*

[5]  Although AGC had confirmed this violation by March 2012 and acknowledged that the error resulted in at least $220,808 in overpayment of fees to AGC, it neither advised the Trustee of this determination, nor took any steps in response.  (¶¶ 119-123)

[6]  Although not relevant to this motion given the above concessions, it should be noted that MBIA's attempt to reduce the amount of principal that was not paid on the Class A-1 Notes borders on the frivolous.  MBIA's expert, although conceding that the coverage test was failing in December 2010 and January 2011, contended that the coverage test was not failing in February – April 2011 and that Barclays recouped some of the missed payments in May 2011, long after they were due.  (CM Decl. Ex. G ¶¶ 23-24.)  At his deposition, however, this expert admitted that his calculations did not comply with the Indenture.  (Cohen-Cole Dep. 81:5-82:12, 88:19-89:25, 92:13-96:20, 98:11-25.)  Given that MBIA is on notice of this error, it would be surprising if these contentions were pursued in MBIA's opposition.

**5.1(b).**   [A] default in the payment of any principal, when due and payable of any Secured Note (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days)[.]

**5.1(c).**   [T]he failure on any Payment Date to disburse amounts available in accordance with Section 11.1 (except as provided in Section 5.1(a) and (b) above) and a continuation of such failure for five Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days)[.]   (Ex. A §§ 5.1(b), (c) at 101-102.)

## ARGUMENT

### A.   Summary Judgment Is Appropriate Where the Contractual Language Is Unambiguous and the Material Facts Are Undisputed

Summary judgment is appropriate where "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Fosco v. City Univ. of N.Y*, No. 00 Civ. 7173 (WHP), 2012 WL 75189, at *2 (S.D.N.Y. Jan. 5, 2012) (Pauley, J.) (quoting Fed. R. Civ. P. 56(a)).  Courts routinely grant summary judgment based on the unambiguous terms of CDO indentures.  *See, e.g.*, *Deutsche Bank Trust Co. Ams. v. Elliot Int'l, L.P.*, No. 09 Civ. 5242 (WHP) (S.D.N.Y. Feb. 14, 2011) (Pauley, J.); *U.S. Bank Nat'l Ass'n. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*, 839 F. Supp. 2d 639, 645 (S.D.N.Y. 2011); *Bank of America. v. AIG Fin. Prods. Corp.*, No. 10 Civ. 5242 (JSR), 2010 WL 5065477, at *5 (S.D.N.Y. Dec. 7, 2010).

Indentures "are interpreted in accordance with traditional contract law principles." *U.S. Bank*, 839 F. Supp. 2d. at 641 (citing *Jamie Sec. Co. v. Limited, Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989)).  Under New York law, which applies pursuant to Section 14.9 of the Indenture, "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir. 2001); *see also Bank of N.Y. v. First Millennium, Inc.*, 607

F.3d 905, 914 (2d Cir. 2010) (affirming grant of summary judgment to noteholder plaintiffs

under trust indenture).  It is well-settled that "a party cannot create an ambiguity in an otherwise

plain agreement merely by 'urg[ing] different interpretations in the litigation.'"  *Red Ball Interior*

*Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) (alternation in original)

(citation omitted); *see also MBIA Ins. Corp.  v. Cooperatieve Centrale Raiffeisen-*

*Boerenleenbank B.A.*, No. 09 Civ. 10093 (RJS), 2011 WL 1197634, at *6 (S.D.N.Y. Mar. 25,

2011) ("[T]he language of a contract is not made ambiguous simply because the parties urge

different interpretations." (citation omitted)).

       Here, the operative Indenture provisions are unambiguous.  Thus, any effort by MBIA or

any other party to manufacture a dispute regarding the terms of the Indenture by offering

"expert" evidence of industry practice, drafting history or otherwise is inadmissible and must be

rejected on this motion.  *See, e.g.*, *Katel L.L.C. v. AT&T Corp.*, No. 02-cv-02440-RJH, 2009 WL

773498, at *1 n.1 (S.D.N.Y. Mar. 17, 2009) ("[E]xpert testimony would not be admissible as

parol evidence to contradict the explicit language of the . . . agreement, because the agreement is

completely integrated."), *aff'd*, 607 F.3d 60 (2d Cir. 2010).[7]

## B.       Events of Default Occurred Under Sections 5.1(b) and 5.1(c) of the Indenture

       Because of the errors in characterizing the CDO's assets, the Class D/E Principal

Coverage Test should have been reported as failing no later than December 2010 and, as a result

of the misreporting, in each month from December 2010 through April 2011 (i) there was a

failure to pay principal when due and payable and (ii) there was a violation of the Priority of

---

[7]    Although expert testimony should not be considered on this motion, if the Court considers it
       appropriate to review MBIA's expert submissions, Barclays has submitted the expert rebuttal
       report of Ira Wagner for the Court's reference.  (CM Decl.Ex. J.)

Payments.  As MBIA's own expert admitted, even a single dollar of missed principal is sufficient to trigger an Event of Default under Section 5.1(b) and 5.1(c).  (Castro Dep. 57:23-58:18.)

To grant summary judgment, this Court need only conclude that the Class D/E Coverage Test was misreported in a single month and that there was (i) a failure to pay any amount of principal on the Class A-1 Notes and/or (ii) any violation of the Priority of Payments.  Because it is undisputed that all these events occurred, it is also beyond dispute that Events of Default under Section 5.1(b) and Section 5.1(c) have occurred and summary judgment should be granted.

### 1.    An Event of Default Occurred Under Section 5.1(b)

An Event of Default under Section 5.1(b) occurs when there is a "default in the payment of *any* principal, when due and payable of any Secured Note."  (Emphasis added.)  Here, when the Class D/E Principal Coverage Test is failing, funds must be reallocated pursuant to Sections 11.1(a)(xvi) and 11.1(b)(x) to pay principal on the Class A-1 Notes.  (Ex. A §§ 11.1(a), (b) at 172-73, 176.)  And, under Section 9.8, these amounts must be used to redeem the most senior Notes.  Thus, principal was "due and payable" on the Class A-1 Notes on each Payment Date when the Class D/E Principal Coverage Test failed, but was not paid for the December 2010 through April 2011 Payment Periods.

Barclays contends that Section 5.1(b) means exactly what it says – that when there is a default in the payment of *any* principal when due and payable, an Event of Default occurs under the Indenture.  MBIA, on the other hand, proffers an insupportable and plainly absurd interpretation of Section 5.1(b).

### (a)    MBIA Disputes That Section 5.1(b) Means What It Says

MBIA argues that a Section 5.1(b) default has not occurred because "due and payable" has a unique, magical meaning only when referring to the payment of principal, when it becomes a term of art referring *exclusively* to an unconditional obligation to pay the *entire* outstanding

principal amount at a time certain, namely, at the Stated Maturity or upon an acceleration of the transaction.  (CM Ex. I ¶ 43; *see also* Platt Dep. 109:24-110:11; Dkt. No. 31 at 14; CM Ex. L at 14.)  This interpretation, which arbitrarily excludes partial payments of principal required to be paid before the entire principal is due, has no basis in the text of the Indenture and runs afoul of bedrock principals of contractual interpretation.  Under New York law,

> [t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.  "The best evidence of what parties to a written agreement intend is what they say in their writing."  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E. 2d 166, 170, (2002) (citations omitted).  The Court should reject MBIA's attempt to ascribe to the phrase "due and payable" a meaning not supported by the text of the Indenture or the plain meaning of those words.

MBIA's proffered interpretation not only completely ignores the word "any" in Section 5.1(b), but also seeks to *add* language limiting the section's application to instances in which the *entire* outstanding principal amount is due.  But, if the parties had intended that an Event of Default under Section 5.1(b) would occur only if principal was not paid upon "maturity," or upon an acceleration, they could and would have said that.  *See Bazin v. Walsam 240 Owner, LLC*, 72 A.D.3d 190, 195, 894 N.Y.S. 2d 411, 414 (1st Dep't 2010) ("'[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" (alteration in original) (citation omitted)).  In essence, MBIA seeks to re-write Section 5.1(b) to state, "a default in the payment of *the entire outstanding*

principal, when due and payable of any Secured Note *at the Stated Maturity Date or upon a Redemption*."[8]

> **(b)   The Phrase "due and payable" Does Not Have Different Meanings in the Same Contract**

MBIA's contrived alteration of the meaning of the phrase "due and payable" when placed next to the word "principal" creates other absurd results in the Indenture.  Specifically, MBIA is forced to take the position that "due and payable" under Section 5.1(b) (an Event of Default for failure to pay principal) as it relates to principal has a completely different meaning than when it relates to interest  – in the immediately preceding paragraph.  This contradicts the principal of construction that presumes "that the same words used in different parts of a writing have the same meaning."  *Finest Investments v. Security Trust Co.*, 96 A.D.2d 227, 230, 468 N.Y.S.2d 256, 258 (4th Dept. 1983).

Section 5.1(a) defines an Event of Default as "a default for five Business Days in the payment, when due and payable, of any interest on any Class A Note or Class B Note . . . ."  MBIA's expert admitted that under Section 5.1(a), a failure to pay *any* interest on *any* Payment Date would trigger an Event of Default assuming the five day cure period had run (Castro Dep. 42:21-43:7; 44:19-46:9; 30:7-31:13).  But he contended that a failure to pay any amount of principal before *all* the principal is due cannot ever result in an Event of Default.  (Castro Dep. 59:12-61:10; Ex. I  ¶¶ 43-44.)  Aside from ascribing different meanings to the same phase, this

---

[8]   MBIA's proffered expert, Daniel Castro, admitted during his deposition that in conjuring up this argument, he did not review even a single other indenture.  (Castro Dep. 211:11-15.)  Had he undertaken to review, for example, the indentures of the CDOs that he worked on, he would have noted that Section 5.1(b) in those indentures is drafted precisely as he and MBIA suggest Section 5.1(b) in the Cedarwoods II Indenture should be rewritten by the Court.  Specifically, Section 5.1(b) in the GSC indentures refers to "'a default in the payment of principal on any Note when the same becomes due at its Stated Maturity or Redemption Date.'"  (CM Decl. Ex. K).)

interpretation also means that an Event of Default can occur for failure to pay even $1 of interest, while at the same time the Class A-1 Noteholder has *no recourse* for failure to pay any amount of principal as it becomes due and payable under the Priority of Payments set out in Section 11.1 on a Payment Date.  The Court should not credit this absurd and contrived interpretation.  *See, e.g.*, *Vector Capital Corp. v. Ness Techs., Inc.*, No. 11 Civ. 6259 (PKC), 2012 WL 913245, at *3 (S.D.N.Y. Mar. 19, 2012) ("[A] court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'") (citation omitted).

> ### (c)    Multiple Provisions of the Indenture Supports Barclays' Interpretation

MBIA's position also ignores several other provisions of the Indenture that make clear that principal may be "due and payable" on any Payment Date on which principal is to be paid under Section 11.1 or upon a Mandatory Redemption.[9]  For instance, Section 5.9 states that the holders of the Notes have an "absolute and unconditional" right to receive payment of principal and interest on the Notes "as such principal and/or interest *become due and payable* in accordance with Sections 13.1 *and 11.1*. . . ."  (Ex. A § 5.9 at 112 (emphasis added).)  This makes clear that Section 11.1 specifies when principal becomes "due and payable."

When confronted with this provision at their depositions, the *only* explanation proffered by both Caroline Platt, MBIA's representative, and Daniel Castro, MBIA's expert, was that

---

[9]    In plain English, an amount is due and payable if it is owed and the time specified for its payment has arrived.  *See* Black's Law Dictionary, 574, 1243 (9th ed. 2009) (defining "due" as "[i]mmediately enforceable" or "[o]wing or payable; constituting a debt" and defining "payable" as "([o]f a sum of money or a negotiable instrument) that is to be paid.  An amount may be payable without being due.  Debts are commonly payable long before they fall due.")

Section 5.9 must be a drafting error.  (Castro Dep. 110:18-111:12) ("*I will say that CDO Indentures do have drafting errors and this may be one of them*.").  Ms. Platt testified:

> **Q**  Do you agree that Section 5.9 contemplates circumstances under which principal becomes due and payable in accordance with Sections 13.1 and 11.1?
> **A**  It must be contemplating it,  yes, I agree.
> **Q**  Can you identify any of the circumstances that are being contemplated in that section?
> **A**  No, I cannot.  Perhaps it is a drafting error.

(Platt Dep. 143:23-144:9.)  Mr. Castro further stated that, assuming there was not a drafting error in Section 5.9, he did not believe the words "due and payable" in that section have the same meaning in Section 5.1(b), reasoning that "the document may contradict itself which is something that happens with some commonality i[n] some CDO documents." (Castro Dep. 113:11-114:6.)  This again contravenes the presumption that the same words used in different parts of a writing have the same meaning.  (*See supra* at 16.)  He also could not envision how principal could become due and payable in accordance with Section 11.1.  This position contravenes the principal that the Court should "'construe the agreements so as to give full meaning and effect to the material provisions'" and "should not render any portion meaningless." *Beal Savs. Bank v. Sommer*, 8 N.Y.3d 318, 324, 865 N.E. 2d 1210, 1213 (2007) (citation omitted).

Section 5.14 of the Indenture again demonstrates that Section 5.1(b) means exactly what it says.  Section 5.14 governs "Waiver of Past Defaults," and provides that "[t]he Holders of not less than 66 2/3% of the then Aggregate Outstanding Amount of the Controlling Class may waive any past Default and its consequences, *except*: . . . (b) a Default in the payment of principal on any Note *at its Stated Maturity Date or Redemption Date*[.]"  (Ex. A § 5.14 at 113 (emphasis added).)  This provision is conspicuously narrower than the Event of Default

contemplated by Section 5.1(b), which is triggered by "a default in the payment of *any* principal, *when due and payable* of any Secured Note. . . ." (Ex. A § 5.1(b) at 101 (emphasis added).) That stark difference demonstrates that the parties intended that principal could become due and payable before the Stated Maturity Date or Redemption Date of a Note, but that the failure to pay principal when due and payable other than at those times would be a waivable Event of Default. Had the parties intended Section 5.1(b) only to reach circumstances in which principal was not paid on the Stated Maturity Date or Redemption Date, they could and would have drafted Section 5.1(b) in the same way that they drafted Section 5.14(b). Again, the omission of any reference to the Stated Maturity Date or Redemption Date in Section 5.1(b) despite the inclusion of such references in Section 5.14(b) must be construed as intentional pursuant to accepted principals of contract construction. (*See* cases cited in Section C, *infra*.)

Section 2.6(b) further supports Barclays' interpretation of Section 5.1(b). It provides:

. . . the principal of each Secured Note shall be payable no later than the Stated Maturity Date thereof *unless* the unpaid principal of such Secured Note *becomes due and payable at an earlier date by . . . call for redemption or otherwise*; **provided** that:

(i) as provided under the terms of the Notes, for so long as any Class A-1 Notes are Outstanding, expect as provided in Sections 9.7 and 11.1, the payment of principal of the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes (x) may only occur after principal of the Class A-1 Notes has been paid in full and (y) *shall be subordinated to the payment on each Payment Date of the principal and interest due and payable on the Class A-1 Notes and other amounts payable in accordance with Section 11.1*[.]

(Ex. A § 2.6(b) at 85 (emphasis added).) Additionally, Section 2.6(c) states that principal is payable "(iii) on each Payment Date, *in accordance with Section 11.1*," which in turn sets forth the Priority of Payments that was violated here. (Ex. A § 2.6(c) at 86 (emphasis added).) Thus, these provisions specifically contemplate that principal becomes "due and payable" on each Payment Date, *i.e.*, not, as MBIA argues, at times when the entire outstanding amount is due, but

on *each interim Payment Date* when such payment is required by the waterfall set forth in Section 11.1.  Such payments of principal are required under the waterfall when a coverage test is failing. (*See, e.g.*, Ex. A §§ 11.1(a)(viii), (xi), (xvi), 11.1(b)(ii), (v), (x) at 170-176.)

Finally, Section 7.3 of the Indenture, entitled "Funds for Secured Payments to be Held in Trust" directs the Trustee to hold "[a]ll payments amounts" that "become due and payable" in trust and to turn them over to the Issuer if unclaimed after two years. (Ex. A § 7.3 at 130.) MBIA's reading of the Indenture would mean that the Trustee would, implausibly, be absolved of these obligations as to payments of principal that become due before maturity or acceleration of the entire principal, because in MBIA's view these amounts are not "due and payable."

### (d)      Mandatory Redemptions Are Fixed Prior to the Payment Date

MBIA attempts to invent a further restriction on when principal can become "due and payable," arguing that "[a] Mandatory Redemption cannot, by definition, occur if there are no collections available to be applied and such collections only become payable to the extent that the Payment Report allocates them for such purpose."  (CM Ex. L at 13; *see also* Ex. I ¶¶ 46-48.) The notion that payments of principal cannot be due and payable because they are tied to the availability of funds should also be summarily rejected.  As the Indenture makes clear, and as multiple parties testified, the amount of principal that is to be paid on a given Payment Date under the Section 11.1 waterfall is fixed as of the related Calculation Date, which precedes the Payment Date by several days. [10]  (¶ 30.)  Thus, as of each Calculation Date, a fixed amount of principal is calculated that is required to be paid at a time certain (i.e. on the Payment Date).

---

[10]    Sections 11.1(a) and (b) both require the Payment Report to be prepared "as of the last day of the Due Period preceding such Payment Date," (*see, e.g.*, Ex. A § 11.1(a) at 170), and "Calculation Date" is defined to "mean[], with respect to any Payment Date, the last day of the related Due Period."  (Ex. A § 1.1 at 8.)

##### 2.     An Event of Default Occurred Under Section 5.1(c)

Section 5.1(c) of the Indenture defines an Event of Default as the "failure on any Payment Date to disburse amounts available *in accordance with Section 11.1* . . . and a continuation of such failure for five Business Days . . . ."  (Ex. A § 5.1(c) at 102 (emphasis added).)  Section 11.1, in turn, requires that on each Payment Date, Collateral Interest Collections and Collateral Principal Collections be "applied by the Trustee in the following order of priority. . . ."  (Ex. A §§ 11.1(a), (b) at 170-79.)  Here, as set forth above, funds were improperly disbursed to the Income Noteholders, the Class F Noteholder, AGC and the Principal Collection Account, in violation of the Priority of Payments, constituting an Event of Default under Section 5.1(c).  (*See* Appx. II hereto.)  MBIA's contrary argument is a contrived reading of the Indenture which renders pages of substantive language in Section 11.1 meaningless.

##### (a)     The Plain Meaning of Section 5.1(c) Indicates an Event of Default Has Occurred

The only argument that has been advanced as to why the clear violation of the Priority of Payments described above was not an Event of Default under Section 5.1(c) is the contrived and unsupported argument—advanced by AGC, BONY and MBIA—that the priorities mandated by Section 11.1 are not violated so long as the Trustee applies the payments at issue "in accordance with a Payment Report," *even if the Payment Report is erroneous*.  (*See* Dkt. No. 17 at ¶ 77; Dkt. No. 27 at ¶ 77; Ex. I ¶¶ 52-55; CM Ex. L at 16.)  This theory would only make sense if Section 5.1(c) instead read, "the failure on any Payment Date to disburse amounts available in accordance with *the Payment Report*," rather than "in accordance with Section 11.1."

Specifically, AGC, BONY and MBIA's interpretation of 5.1(c) completely disregards the 11-plus pages of substantive requirements, setting out the Priority of Payments, that must be complied with in Section 11.1.  The reference in Section 5.1(c) to the entirety of Section 11.1,

rather than to only following a Payment Report, precludes this contrived reading.  The failure to comply with Sections 11.1(a)(xvi) and 11.1(b)(x), which require funds to be reallocated to pay down principal of Barclays' Class A-1 Notes so long as the Class D/E Principal Coverage Test is failing, obviously cannot be considered to be "in accordance with Section 11.1."  A failure to comply with Section 11.1 is therefore a Section 5.1(c) Event of Default.  Tellingly, AGC's Andrew Solomon admitted he could not explain why failing to make a payment required by Section 11.1(a)(xvi) is not a violation of Section 11.1.  (Solomon Dep. 182:10-19.)

Furthermore, out of the 11 pages of requirements in Section 11.1, the only language MBIA, AGC and BONY submit should be complied with is the six words: "in accordance with a Payment Report."  Respectfully, this is nonsense.  It completely ignores the entirety of Section 11.1, including the command that funds "*will be . . . applied* by the Trustee in the following order of priority . . . " as well as the over 11 pages of detailed provisions that follow regarding the priority of payments.  (Ex. A § 11.1 at 170 (emphasis added).)

Simply put, an event of Default occurs if *any* of the requirements of Section 11.1 are not complied with, not just the formalistic requirement that a Payment Report be created reflecting the Priority of Payments that is the subject of Section 11.1. MBIA's assertion that the phrase "in accordance with a Payment Report" means that the Priority of Payments—the very core provisions of the Indenture—can be violated without consequence creates an absurd result.  The Court should "'construe the agreements so as to give full meaning and effect to the material provisions'" and "should not render any portion meaningless."  *Beal Savs. Bank*, 8 N.Y.3d at 324.

### (b)    The Definition of "Payment Report" Also Supports Barclays' Position

The definition of a Payment Report is "an accounting of the amounts that will be paid in accordance with the Priority of Payments."  (Ex. A § 10.11(a) at 160.)  The Priority of Payments, in turn, is defined as "collectively, the priority of payments specified in Section 11.1(a), (b) and

(c)."  (Ex. A § 1.1 at 47.)  It would therefore not be possible for the Trustee to make payments "in accordance with a Payment Report" if the report did not comport with the Priority of Payments.  Thus, ultimately, the only logical way to read Section 11.1 consistent with Section 10.11 and the definitions is that payments must be made in accordance with the specified priorities in accordance with a report that accurately reflects those priorities.

<b>(c) Nothing in the Indenture Excuses the <i>Issuer's</i> Violation of the Priority of Payments</b>

MBIA has asserted that its reading makes sense because the Trustee is supposed to be protected if it relies on reports provided to it.  (CM Ex. I ¶¶ 53-54.)  The Trustee may be entitled to certain protections (assuming the reliance is in good faith), but that does not require material provisions of the Indenture to be ignored.  Section 10.11 of the Indenture provides:

> Subject to the terms of this Agreement, the Trustee shall be entitled to rely on the information supplied by the Collateral Manager in relation to the preparation of the Note Report, and by the Issuer in relation to the Payment Report, and shall not be liable for the accuracy or completeness of such information prepared by the Collateral Manager or the lack thereof.

(Ex. A § 10.11 at 165.)  This section exculpates the Trustee from *its own* liability where it relies on information provided by the Collateral Manager.  But it is the Issuer, not the Trustee, that is the obligor on the Notes and the party ultimately responsible for the Payment Report.  (Ex. A § 10.11(a) at 160.)  There is nothing in the Indenture that would excuse *the Issuer's* default if payments are made in violation of the Priority of Payments.

## C. The Defaulted Securities Cannot Be "Cured" of That Status

In the correspondence preceding this dispute, AGC contested that it had failed to properly characterize certain securities as Defaulted Securities.  As explained above, the Court does not need to resolve this issue because AGC admitted that it failed to properly report the downgrades of the WBCMT 2005-C18 Class F and WBCMT 2005-C18 Class G securities, and this failure

23

alone led to violations of the waterfall in December 2011 and Events of Default that warrant

summary judgment.  But if the Court decides to address the issue, there are no material facts in

dispute regarding the failure to identify five securities as Defaulted Securities.  The documentary

evidence shows that these securities missed the requisite number of payments to qualify as

Defaulted Securities.  AGC does not dispute this, but instead argued that these assets could

become performing assets if all past due interest is repaid.  This legal argument fails because

once a CMBS Security is a Defaulted Security, it cannot be "cured" by making up past shortfalls.

     "Defaulted Security" is defined in the Indenture with great specificity:

> "Defaulted Security" means any Collateral Debt Security or any other security
> included in the collateral: (i) as to which (a) *except with respect to CMBS
> Securities* there has occurred and is continuing a default with respect to the
> payment of interest or principal, *which default has not been cured . . . or (b) with
> respect to a CMBS Security*, (1) as to which there has been a failure to pay interest
> in whole or in part for the lesser of (A) six months or (B) three consecutive
> payment periods (if such security is rated (or privately rated for purposes of the
> issuance of the Notes) below "Baa3" by Moody's or "BBB-" by S&P), *even if by
> its terms it provides for the deferral and capitalization of interest thereon*;
> **provided, however** that if a Rating Agency Confirmation has been obtained, the
> Collateral Manager may choose not to treat such security as a Defaulted Security
> or (2) as to which there has been a failure to pay interest in whole or in part for
> the lesser of (A) one year or (B) six consecutive payment periods (if such security
> is rated (or privately rated for purposes of the issuance of the Notes) "BBB-" or
> higher by S&P or "Baa3" or higher by Moody's), even if by its terms it provides
> for the deferral and capitalization of interest thereon . . . .  (Ex. A § 1.1 at 24-25
> (emphasis added).) [11]

     While part (i)(a) of the above definition specifically permits the cure of a payment default

on a *non-CMBS Security*, similar cure language is omitted for CMBS Securities under Part (i)(b).

---

[11] The Collateral Manager may "choose not to treat" a CMBS Security "as a Defaulted
Security" only "if a Rating Agency Confirmation has been obtained."  (Ex. A § 1.1 at 25.)  A
Rating Agency Confirmation is a written certification from Moody's or S&P that the
specified action or event, here the repeated failure of the CMBS Security to timely pay
interest, "would not lead to a downgrade or other adverse action."  (Ex. A §1.1 at 49.)  No
Confirmations were obtained for the securities at issue here.  (JS Decl. ¶ 9; ¶ 58.)

"[W]hen certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional."  *Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*, 30 A.D.3d 579, 581, 818 N.Y. S. 2d 513, 516 (2d Dep't 2006); *see also Centro Empresarial Cempesa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277, 952 N.E. 2d 995, 1001 (2011) (same); *MBIA*, 2011 WL 1197634, at *8 (same, in CDO context).[12]

**D.     The Court Should Direct the Liquidation of the Collateral**

Given that Events of Default have indisputably occurred, Barclays, as the Controlling Class, was entitled to direct the Trustee to accelerate the Notes and to "direct the sale and liquidation of the Collateral. . . ."  (Ex. A § 5.5(a)(ii) at 109.)  Barclays is entitled to have the collateral sold so that it is not forced to bear the risk of further declines in the market.  *See Citibank N.A. v. Solow*, No. 603697/08, 2012 N.Y. Slip Op 1347, at *1 (1st Dep't Feb. 23, 2012) (sale of bond collateral was reasonable and plaintiff was not obligated to risk a decline in value). This Court should grant summary judgment and direct the Trustee to conduct the liquidation and distribute the proceeds in accordance with the Indenture.

Dated:  New York, New York
        September 11, 2012

                                        Respectfully submitted,

                                          /s/ Christopher P. Malloy
                                        Christopher P. Malloy
                                        (christopher.malloy@skadden.com)

                                        Jay B. Kasner
                                        (jay.kasner@skadden.com)
                                        Christopher P. Malloy

---

[12]   The Trustee's independent expert, PF2 Securities Evaluations, Inc., confirmed that CMBS Securities could not be "cured" of Defaulted Security status, and agreed with Barclays' classification of the Defaulted Securities.  (Ex. ZZ; Phillips Dep. 225:11-228:18.)

(christopher.malloy@skadden.com)
Michael H. Gruenglas
(michael.gruenglas@skadden.com)
Julie E. Cohen
(julie.cohen@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

*Attorneys for Interpleader Defendant Barclays
   Bank PLC*

## APPENDIX I

| Improperly Reported Securities | Dates Misclassified | Reason |
|---|---|---|
| WBCMT 2005-C18 F | Dec. 2010 | Should have been identified as impaired for purposes of coverage tests as of December 2010 due to ratings downgrade (¶¶ 36, 45-49.) |
| WBCMT 2005-C18 G | Dec. 2010 | Should have been classified as a Defaulted Security as of December 2010 due to ratings downgrade (¶¶ 51-56.) |
| LBUBS 2007-C1 C | May 2010 to Dec. 2011 | Should have been classified as a Defaulted Security as of May 2010 due to failure to pay interest in whole or in part for three consecutive payment periods.  (¶¶ 60-65.) |
| LBUBS 2007-C1 D | May 2010 to Dec. 2011 | Should have been classified as a Defaulted Security as of May 2010 due to failure to pay interest in whole or in part for three consecutive payment periods.  (¶¶ 69-74.) |
| LBUBS 2007-C1 H | May 2010 and Dec. 2010 to Dec. 2011 | Should have been classified as a Defaulted Security as of May 2010 due to failure to pay interest in whole or in part for three consecutive payment periods. (¶¶ 78-83.) |
| LBUBS 2006-C7 H | Nov. 2010 to Apr. 2011 | Should have been classified as a Defaulted Security as of November 2010 due to failure to pay interest in whole or in part for three consecutive payment periods. (¶¶ 87-92.) |
| CD 2006-CD3 E | Apr. 2011 | Should have been classified as a Defaulted Security as of April 2011 due to failure to pay interest in whole or in part for three consecutive payment periods. (¶¶ 95-100.) |
| CREST 2003-1A C1 | Nov. 2010 Feb. 2011 | Should have been classified as a Deferred Interest PIK Bond as of March 2011 due to failure to pay interest for two consecutive payments dates (¶¶ 104-105.) |

### APPENDIX II

| Cedarwoods CRE CDO II | | | | | | |
|---|---|---|---|---|---|---|
| **Actual Cashflows Distributed 12/10 to 4/11** | | | | | | |
| **Interest Waterfall** | **Dec-2010** | **Jan-2011** | **Feb-2011** | **Mar-2011** | **Apr-2011** | **Total** |
| Available Interest Proceeds | 2,737,560 | 2,641,190 | 3,206,617 | 2,887,738 | 2,567,405 | 14,040,510 |
| Trustee Fee | (8,923) | (7,925) | (8,319) | (8,189) | (8,112) | (41,468) |
| Fees of Administrator | (13,332) | (6,573) | (52,903) | (36,342) | (6,342) | (115,492) |
| Senior CM Fee | (94,632) | (85,616) | (92,049) | (92,500) | (91,559) | (456,356) |
| Hedge Counterparty | (1,742,043) | (1,848,868) | (2,382,396) | (2,014,687) | (1,753,874) | (9,741,868) |
| Interest on Class A-1 Notes | (175,788) | (166,706) | (177,992) | (161,222) | (174,465) | (856,173) |
| Interest on Class A-2 Notes | (36,501) | (34,598) | (36,942) | (33,458) | (36,236) | (177,735) |
| Interest on Class A-3 Notes | (13,828) | (13,101) | (13,989) | (12,668) | (13,731) | (67,317) |
| Interest on Class B Notes | (15,955) | (15,095) | (16,120) | (14,594) | (15,856) | (77,619) |
| *Class A/B Coverage Test diversion* | - | - | - | - | - | - |
| Interest on Class C Notes | (14,882) | (14,039) | (14,996) | (13,569) | (14,813) | (72,299) |
| *Class C Coverage Test diversion* | - | - | - | - | - | - |
| Interest on Class D Notes | (27,428) | (25,772) | (27,538) | (24,896) | (27,362) | (132,996) |
| Interest on Class E Notes | (9,576) | (8,993) | (9,610) | (8,687) | (9,556) | (46,422) |
| *Class D/E Coverage Test diversion* | - | - | - | - | - | - |
| Interest on Class F Notes | (31,225) | (29,271) | (31,284) | (28,269) | (31,189) | (151,238) |
| Subordinate CM Fee | (220,809) | (199,770) | (214,782) | (215,833) | (213,638) | (1,064,831) |
| Income Notes Excess Funds | (332,638) | (184,864) | (127,697) | (222,826) | (170,671) | (1,038,696) |
| Total (below Class D/E Coverage Test diversion) | (584,672) | (413,905) | (373,762) | (466,927) | (415,498) | (2,254,765) |
| **Principal Waterfall** | | | | | | |
| Available Redemption Monies | 1,257,775 | 4,493,289 | 287,044 | 131,530 | 137,605 | 6,307,244 |
| *Class D/E Coverage Test diversion* | - | - | - | - | - | - |
| Collection Account for Reinvestment | (1,257,775) | (4,493,289) | (287,044) | (131,530) | (137,605) | (6,307,244) |
| Total (below Class D/E Coverage Test diversion) | (1,257,775) | (4,493,289) | (287,044) | (131,530) | (137,605) | (6,307,244) |
| **Total Amount Not Paid to Principal of Class A-1 Notes** | **1,842,447** | **4,907,194** | **660,807** | **598,457** | **553,103** | **8,562,009** |