# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action 11 CIV 9199

U.S. BANK NATIONAL ASSOCIATION, as Indenture Trustee

Plaintiff,

vs.

BARCLAYS BANK PLC, THE BANK OF NEW YORK MELLON, MBIA INSURANCE CORPORATION and ANGELO GORDON & COMPANY, L.P.,

Defendants.

DEPOSITION OF: GENE PHILLIPS

- - - - - - - - - - - - - -

****CONFIDENTIAL****

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before CAROLYN CHEVANCE, a Shorthand Reporter, and Notary Public of the State of New Jersey, held at the office of WEIL GOTSHAL & MANGES, 767 Fifth Avenue, New York, New York, on June 18, 2012, commencing at 10:02 a.m.

APPEARANCES:

JONES DAY
BY: TODD GEREMIA, ESQ.
MAHESH VENKATAKRISHNAN, ESQ.
EDWARD J. O'CONNELL, ESQ.
222 East 41st Street
New York, New York 10017
Attorneys for U.S. Bank

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
BY: JULIE E. COHEN, ESQ.
4 Times Square
New York, New York 10036
Attorneys for Defendant

AKIN GUMP STRAUSS HAUER & FELD LLP
BY: CHRISTOPHER W. CARTY, ESQ.
One Bryant Park
New York, New York 10036
Attorneys for Angelo Gordon

SEWARD & KISSEL LLP
BY: CELINDA J. METRO, ESQ.
One Battery Park Plaza
New York, New York 10004
Attorneys for Bank of New York Mellon

WEIL GOTSHAL & MANGES LLP
BY: LAYNE S.R. BEHRENS, ESQ.
JAY H. PARK, JR., ESQ.
767 Fifth Avenue
New York, New York 10153
Attorneys for MBIA

Also present: Jose Rivera, Videographer

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| GENE PHILLIPS | MS. BEHRENS | 6 |
| | MS. COHEN | 211 |
| | MR. CARTY | 223 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Phillips 1, Document, was marked | | 22 |
| Phillips 2, Document, Bates stamped 0001403, was marked | | 58 |
| Phillips 3, Document, Bates stamped PF 0001382, was marked | | 94 |
| Phillips 4, Document, Bates stamped PF 0002164, was marked | | 101 |
| Phillips 5, E-mail, Bates stamped PF 0002167, was marked | | 105 |
| Phillips 6, Document, Bates stamped PF 000001, was marked | | 117 |
| Phillips 7, Document, was marked | | 139 |
| Phillips 8, Excel Spreadsheet, Bates stamped PF 0002170, was marked | | 148 |
| Phillips 9, Document, Bates stamped MBIA 00001707, was marked | | 167 |
| Jacobs 11, Document, Bates stamped USB 0008431, previously marked | | 169 |
| Phillips 10, Document, Bates stamped PF 000233, was marked | | 196 |

| | | |
|---|---|---|
| Phillips 11, E-mail, Bates stamped PF 0000576, was marked | | 206 |
| Jacobs 20, Document, previously marked | | 208 |

Q I take it that you also relied on the data that you received from Bloomberg in performing your analysis for each of the securities?
A That's correct. We relied on Bloomberg's data. For one specific security we that demarcate that we relied more extensively on the Trustee reports.
Q Is this the footnote you are referencing on page BARC 3601?
A That's correct.
Q That states, "Only for this bond was analysis performed in examining Trustee reports, for the remainder Bloomberg data was relied upon", what exactly did you mean by that statement?
A This statement could have been better worded. What is meant is that we found the Bloomberg data to be sufficiently reliable, based on our cross-checking of the Trustee reports, so I continued using it.
That is true of all the bonds including the L8s to an extent. There were certainly instances with respect to the L8

bonds that gave us reason to want to rely more heavily on the Trustee reporting information, so we would have checked that.
Q Just to kind of quickly walk through the conclusions that you have drawn so I understand what this particular sheet shows, so for example, the first CUSIP here 12513XAM4; am I correct where it says 5/15/2011 defaulted that that would mean that PF2's conclusion is that as of May 15, 2011, that particular security was defaulted according to the Cedar Woods II indenture, according to the language in the Cedar Woods II indenture?
A Right, because we are not making the comment that it ought to immediately be classified as such.
We were remarking that it ought to have been considered defaulted had the Trustee had instantaneous knowledge at that point.
Q I'm going to move documents now.
What has been previously marked as Phillips Exhibit 6, it's the bulky

document with the indenture.
I'm going to take you to page 24, rather infamous at this point, the definition of defaulted security.
Do you recall testifying earlier about reviewing the definition of defaulted security in connection with your analysis?
A I do.
Q Do you recall testifying that you reviewed the definition of defaulted security under part B with respect to CMBS securities?
A That's correct, and potentially with part A we looked through as well.
Q In connection with your analysis you would have done an independent review of the definition of defaulted security in this -- in the indenture?
A Potentially, not in full. We would have at least done a half-hearted approach to looking through part 1a and certainly part 1B would have received our attention.
We may not have cross-checked

each and every bell and whistle in part 1a.
Q So when you said half-hearted you meant in part little line, whole A, you may not have cross-checked every single capitalized defined term in the indenture, but are you fully satisfied that you -- with your review of this definition in connection with your analysis and the conclusions that you have made as a result of it?
A Yes, and it -- I'm not limiting my first comment to only cross-checking definitions. I'm saying generally I don't know that we were familiar with the definition in its entirety.
We are familiar with parts of it, and certainly the parts that were relevant to our determination.
Q What part was relevant to your determination?
A We felt that part B was relevant to our determination, and that certain of the language in part 1a helped us gain additional certainty that our analysis of part B and that our approach thereto was correct.

Q Can you just point me to the language in part A that you said helped you gain additional certainty with respect to your analysis?

A Certainly. There is a provision in part 1.a, I believe it's towards the end that says -- that describes the fact that "a defaulted debt security shall cease to be a defaulted security if such security has resumed current payments and scheduled principal in cash, including all past due interest and schedule principal and the collateral manager's judgement will continue to make such current payments of interest in cash", et cetera.

Q What about that made you certain with respect to your analysis?

A It helped us gain assurance that the curing mechanism that is not part of part B or the lack of that curing mechanism was intentional.

Q You briefly discussed the fact, and I'm going to try to explain this as well as I can, if you look at B, there is B1 and

B2, and that the definitions or the ratings required in those sections overlapped, do you recall that testimony?

A I'm not saying -- they certainly overlapped but there is a potential for a situation which a split rating could result in a security being considered in the one part, and the other part simultaneously.

Q Did you encounter that particular potential issue in connection with the analysis that you did for the Cedar Woods II CDO?

A As I currently remember, and I think this is correct, I think that was considered potentially for one security, maybe for two.

Q Do you recall which securities?

A I can look into it.

Q You don't recall sitting here today which securities, if any, that may have been an issue for?

A I think it's the final security in our spreadsheet. I would love to ensure that I'm correct, but I think it had a CUSIP

of SAG3, but I don't want to put my foot in my mouth. I think that is correct.

Q Sitting here today you are still fully comfortable with the conclusions that you came to in your November 29, 2011 report?

A Yes.

MS. COHEN: I think we have no further questions.

CONT'D EXAMINATION BY MR. CARTY:

Q Good afternoon, Mr. Phillips. My name is Christopher Carty, and I'm with Akin Gump and we represent Angelo Gordon in this matter.

I have a few more questions about the definition of defaulted security in Phillips 6 that you were just looking at.

Correct me if I'm wrong, but I believe you just testified that certain language in portion 1a of the definition, "that such collateral debt security shall cease to be a defaulted security if such security has resumed current payments of

interest and scheduled principal in cash; excluding all passed due interest and scheduled principal, and in the collateral manager's judgment will continue to make such current payments or interest in cash."

That led you to conclude that Section 1b of the definition with respect to a CMBS security does not allow for any curing, is that your -- is that accurate?

A It's partially accurate. My comment is not that that led me to the conclusion, but rather that that lent confidence to the conclusion.

So the language as it currently reads may very well have been sufficient for us to follow the language, and believe that a defaulted security cannot be cured in this way, aside from the RAC situation, it cannot be cured in this way, and the fact that this is explicit in the previous part of defaulted security gave us additional confidence.

Q So the language in part 1b is sufficient for you to conclude that a defaulted CMBS security could not later be

cured?

MR. GEREMIA: Object to the form of the question. You're mischaracterizing his testimony. Are you asking him to repeat what he just said?

MR. CARTY: He can tell me.

A Do you mind repeating your question?

Q I will withdraw it and ask it differently.

So were you saying that the language in part 1b by itself was sufficient for you to conclude that there is no curing for a CMBS security that at some point in time met the definition of defaulted security, and then later repaid all prior interest shortfalls and continued to pay interest?

A I think that even absent the presence of part 1a, it's likely we would have taken the position that a defaulted security once defaulted remained defaulted.

However, it may be the case that

a party could argue that and absent part 1a, we felt that their argument may be more persuasive.

So we were not concerned at all about this argument coming about.

Q Just focus on part 1b of the definition of defaulted security, where in part 1b does it say that a defaulted security once defaulted must remain defaulted?

A The language doesn't say that specifically. It says that a defaulted security is one as to which in our clause, as to which there has been a failure to pay in whole or in part, there has been.

It doesn't preface this with saying "and is still existing", and it also doesn't say "or it has been cured".

So the fact that it has been implies that to me that we continue to treat it as such, there is no -- there is no proviso that tells us to stop treating it as such.

Q But part 1b doesn't say one way or the other whether a CMBS security that at

one point met the definition of defaulted security can or cannot be cured?

MR. GEREMIA: Objection to the form of the question. You're just arguing with him now. He already answered that question.

MR. CARTY: I don't believe he has.

A The language is somewhat clear, it says "as to which there has been a failure to pay interest." It is not saying "as to which there is existing."

There is plentiful language in part one describing situations in which a defaulted security could not -- could be treated other than -- in part 1a, could be cured. The language -- the word "cured" is specifically used.

Q Right, and I'm talking about part 1b, and I believe you testified earlier that the language in part 1b by itself, without reference to part 1a would be sufficient to support your interpretation?

A Right, and I'm again saying the

language in part B says there has been a failure to pay. It doesn't say "and is continuing". Even that language is in part 1a.

So in part 1a it says, "except with respect to CMBS securities there is" -- "except with respect to CMBS there has occurred and is continuing a default", that language as well is not present in part B.

So the -- one would consider a security to be defaulted under the condition that there has been and there has -- to the extent that there has, we continue to treat it as such.

There is no alleviating clause that requires that this failure be continuing.

Q In your analysis of part 1b of the definition of defaulted security, did you rely in any way on market standards and practice?

A Yes, we did.

Q In your analysis of whether defaulted security pursuant to 1b could be

cured, did you rely in any way on market standards and practice?

A No, I don't believe we did. We felt that that was a clear reading of the indenture, and unless one can regard the interpretation of the indenture as a market standard, and I think that is possibly relevant to some people may not take seriously the indenture, as a -- as the governing document, but we did and we are applying our approach relative to the indenture language.

Q Did you ask -- did you at any point ask the Trustee or any other party how Section 1b of the definition of defaulted security was interpreted with respect to curing the security?

MR. GEREMIA: By "party" you mean party to this lawsuit?

MR. CARTY: Yes.

Q Let me withdraw the question.

At any point while doing your analysis did you ask the Trustee how Section 1b of the definition of defaulted security

was interpreted through the course of dealing of this deal with respect to the curing of the security?

A No.

Q Mr. Phillips, as part of your analysis in your two reports in November of 2011, did you analyze whether an event of default had occurred under the indenture?

A I did not.

Q Did you analyze whether any classification issue with respect to the securities had a material adverse effect on any security noteholders?

A We did no such analysis. It's reasonable to infer that, however, if you were to consider certain securities defaulted that that may have an adverse effect on certain noteholders.

So it may have been inference, but there was no analysis done.

Q At the time you did the -- your report did you infer that there had been an adverse effect on secured noteholders?

A Let me answer this differently

-- actually, let me say I don't understand the difference between this question and the prior one.

Q You testified that it's reasonable to infer that, however, if you were to consider certain securities defaulted that may have an adverse effect on certain noteholders, and I'm asking is that something you did infer or sitting here right now you are saying it is reasonable to infer?

A I can't be sure whether I inferred at the time. In fairness, you are asking relative to the definition of default, but even -- any classification often benefits certain noteholders at the expense of others.

So an inference is that however we classify these securities, certain participants maybe benefitted and others may be -- let's call it hurt, not necessarily damaged.

To the extent this is somewhat of a zero some game, so to the extent we classify a security as A or B or C certain parties might benefit and other parties may

feel that they are -- that they are on the wrong side of that.

Q But as of your November 29, 2011, report you did not do that analysis, did you?

A No.

Q And since November 29, 2011, have you done any analysis of whether an event of default has occurred?

A No, we haven't.

Q And since November 29, 2011, have you done any analysis of whether there has been a material adverse effect on any noteholders?

A We haven't done any such analysis.

MR. CARTY: No further questions.

MR. GEREMIA: No questions.

THE VIDEOGRAPHER: The time is 4:33 p.m. July 18, 2012. This completes today's deposition of Gene Phillips.

(Deposition was concluded at 4:33 p.m.)