# Exhibit F

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action 11 CIV 9199

U.S. BANK NATIONAL          :
ASSOCIATION, as            :
    Indenture Trustee     :
                          :
          Plaintiff,   :
                          :
        vs.              :
              :  DEPOSITION OF:
BARCLAYS BANK PLC,   :
THE BANK OF NEW YORK   :  ANDREW SOLOMON
MELLON, MBIA         :
INSURANCE CORPORATION  :
  and ANGELO GORDON &   :
COMPANY, L.P.,       :
                     :
    Defendants.   :

- - - - - - - - - - - - -
****CONFIDENTIAL****
TRANSCRIPT of the stenographic notes
of the proceedings in the above-entitled
matter, as taken by and before
CAROLYN CHEVANCE, a Shorthand Reporter, and
Notary Public of the State of New Jersey, held
at the office of SKADDEN ARPS, 4 Times Square,
New York, New York, on July 20, 2012,
commencing at 10:05 a.m.

## Page 2

1  A P P E A R A N C E S :
2
3
4        JONES DAY
5    BY:  MAHESH VENKATAKRISHNAN, ESQ.
6         TODD GEREMIA, ESQ.
7    222 East 41st Street
8    New York, New York 10017
9    Attorneys for U.S. Bank
10
11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12      BY:  CHRISTOPHER P. MALLOY, ESQ.
13      MICHAEL H. GRUENGLAS, ESQ.
14         THOMAS HALEY, ESQ.
15   4 Times Square
16       New York, New York  10036
17   Attorneys for Defendant
18
19   AKIN GUMP STRAUSS HAUER & FELD LLP
20   BY: ROBERT H. PEES, ESQ.
21         RYAN J. DONOHUE, ESQ.
22      CHRISTOPHER W. CARTY, ESQ.
23   One Bryant Park
24   New York, New York  10036
25       Attorneys for Angelo Gordon
26
27   SEWARD & KISSEL LLP
28      BY:  BRIAN P. MALONEY, ESQ.
29   One Battery Park Plaza
30     New York, New York  10004
31   Attorneys for Bank of New York Mellon
32
33   WEIL GOTSHAL & MANGES LLP
34   BY: RICHARD L. LEVINE, ESQ.
35         LAYNE BEHRENS, ESQ.
36   JAY H. PARK, JR., ESQ.
37   767 Fifth Avenue
38   New York, New York 10153
39       Attorneys for MBIA

## Page 3

1
2                    INDEX
3
4    WITNESS      EXAMINATION BY      PAGE
5
6    ANDREW SOLOMON  MR. MALLOY        8
7            MR. VENKATAKRISHNAN  243
8            MS. BEHRENS        246
9            MR. MALLOY         270
10           MR. GEREMIA        272
11
12            EXHIBITS
13
14   NUMBER    DESCRIPTION      PAGE
15
16   Solomon 1, Notice of Deposition,
17       was marked          11
18
19       Solomon 2, Letter, Bates stamped
20   HECW 0142673 through 79, was marked  54
21   Jacobs 32, Document, previously
22       marked            59
23
24       Solomon 3, Document, Bates stamped
25   AGCWII 2322 through 2324, was
26       marked            110
27
28       Aldama 14, Indenture, previously
29   marked            117
30   Solomon 4, E-mail, was marked   126
31   Solomon 5, Document, was marked   128
32   Solomon 6, Document, was marked   128
33   Solomon 7, E-mail, was marked   139
34   Solomon 8, E-mail, Bates stamped
35       20167 through 171, was marked   144
36
37       Jacobs 16, Document, previously
38   marked            155
39

## Page 4

1
2
3       Solomon 9, Payment Report, was
4   marked            160
5   Solomon 10, E-mail, was marked   162
6   Solomon 11, E-mail, was marked   165
7   Solomon 12, Document, Bates stamped
8       AGCWII 0143308 through 143384, was
9   marked            185
10   Solomon 13, E-mail, Bates stamped
11       AGCWII 0111319, was marked    197
12
13       Solomon 14, Exhibit RR, was marked   199
14
15   Jacobs 37, Document, previously
16   marked            204
17   Solomon 15, E-mail, Bates stamped
18       AGCWII 0112928 through 112930, was
19   marked            205
20   Solomon 16, Document, Bates stamped
21   AGCWII 0120200, was marked     208
22
23   Jacobs 28, E-mail, previously
24   marked            218
25   Solomon 17, Spreadsheet, Bates
26       stamped AGCWII 0148300, was marked   226
27
28       Solomon 18, E-mail, Bates stamped
29   AGCWII 08180, was marked      231
30   Aldama 27, Collateral Management
31       Agreement, previously marked     238
32
33   Jacobs 26, Collateral
34   Administration Agreement,
35       previously marked        240
36
37       Solomon 19, Document, Bates stamped
38   USB 0039164, was marked       247
39

1
2      Q    Have you ever testified in a
3  court proceeding?
4      A    No.
5      Q    In an arbitration?
6      A    No.
7      Q    Have you ever provided an
8  Affidavit in a court proceeding?
9      A    Not that I'm aware of, no.
10     Q    Could you tell me how you
11  prepared for your deposition today?
12     A    Sure.  I spent a couple days
13  with counsel, about a day-and-a-half, read
14  through some documents, refreshed myself with
15  some of the timeline of what has taken place
16  in this case.
17     Q    Did you meet with anyone else
18  aside from your counsel?
19     A    No.
20     Q    Have you discussed your -- have
21  you discussed this deposition with anyone
22  other than your counsel?
23     A    In addition to outside counsel,
24  internal counsel, as well as other members of
25  my team at Angelo Gordon, people I work with.

1
2      Q    You mentioned that you reviewed
3  some documents during the course of your
4  preparation?
5      A    Correct.
6      Q    Just back up a minute, how many
7  days did you spend preparing for your
8  deposition?
9      A    About a day-and-a-half.
10     Q    Did any of the documents that
11  you reviewed refresh your recollection as to
12  any matter that you hadn't recalled before
13  looking at it?
14     A    Yeah, I think that's fair.
15  Yeah, refreshed, it's been a timeline that
16  goes back over a year.  So seeing some of the
17  documents and refreshing helped.
18     Q    Did any document in particular
19  you recall refreshing your recollection in
20  that matter?
21     A    No.
22     Q    Did you review any of the
23  depositions that have been given in this
24  matter?
25     A    I have.

1
2      Q    Which ones did you review?
3      A    I reviewed the deposition of
4  Caroline Platt.  Jaime Aldama.  Vick -- I'm
5  not sure how to pronounce his last name and
6  the representative from PF2.
7      Q    Did you review the deposition of
8  Mr. Jacobs?
9      A    Yes, I did.
10     Q    Do you keep a notebook or a
11  calendar of any sort?
12     A    I do keep a notebook throughout
13  the day.
14     Q    When you -- strike that.
15          Did you engage in a process of
16  collecting documents relating to the Cedar
17  Woods II CDO transaction for production in
18  this litigation?
19     A    All documents that we've
20  collected have been transferred to counsel.
21     Q    Did that include your notebook?
22     A    It did.
23          (Whereupon, Solomon 1, Notice of
24  Deposition, was marked by the reporter
25  for identification.)

1
2      Q    The court reporter just handed
3  you what has been marked as Exhibit 1; which
4  is a Notice of Deposition to Interpleader
5  Defendant and Cross-Claim Defendant Angelo
6  Gordon and Co., pursuant to Federal Rule of
7  Civil Procedure 30(b)6.
8          Is it your understanding that
9  you are here testifying in addition to in
10  your personal capacity, in your capacity as a
11  representative of Angelo Gordon?
12     A    That is correct.
13     Q    And Angelo Gordon is your
14  employer?
15     A    Correct.
16     Q    What is Angelo Gordon, what kind
17  of business is it in?
18     A    We are an alternative money
19  manager.
20     Q    What does that mean?
21     A    We manage money for a number of
22  different public and private institutions.
23     Q    What is your position at Angelo
24  Gordon?
25     A    In charge of our commercial real

1
2  estate debt business.
3      Q    What does the commercial real
4  estate debt business comprise?
5      A    We are investors primarily in
6  CMBS securities and we manage portfolios, a
7  number of different portfolios for a number
8  of different accounts.
9      Q    So you manage them on a --
10 strike that.
11     Do you manage these portfolios
12 on an advisory basis or are they funds
13 actually operated by Angelo Gordon?
14     A    Both.  We have what I would
15 consider the commingled funds where there are
16 a number of different investors, as well as a
17 number of separate accounts where there is a
18 single investor.
19     Q    Does Angelo Gordon also manage
20 collateralized debt obligations?
21     A    We do, my group and the firm
22 manages the two Cedar Woods commercial real
23 estate CDOs.
24     Q    Does Angelo Gordon manage any
25 other collateralized debt obligations?

1
2      A    No other CDOs.  We are the
3  manager for a number of collateralized loan
4  obligations, CLOs.
5      Q    How would you describe the
6  difference between a CDO and a CLO?
7      A    At Angelo Gordon the CLOs are
8  primarily corporate exposures as opposed to
9  commercial real estate exposures, and the
10 underlying within the vehicle are loans to
11 companies in the CLOs.
12     The underlying in our commercial
13 real estate CDOs are primarily securities
14 that are backed by commercial real estate.
15     Q    So the two Cedar Woods
16 transactions are the only CDOs that are
17 managed by Angelo Gordon?
18     A    Correct.
19     Q    And follows that they are the
20 only commercial real estate CDOs that are
21 managed by Angelo Gordon?
22     A    That's correct.
23     Q    What are your roles and
24 responsibilities at Angelo Gordon?
25     A    As the portfolio manager I'm

1
2  involved with the selection of the individual
3  securities that go into any portfolio.
4      I'm responsible for interfacing
5  with existing potential new clients,
6  investors, and overseeing the group that's
7  primarily doing the credit analysis of the
8  securities that we potentially purchase.
9      I'm also involved with the
10 trading aspect of the business, buying and
11 selling of individual bonds.
12     Q    How did it come about that
13 Angelo Gordon became the manager of the two
14 Cedar Woods CDOs?
15     A    In early 2006 we began selecting
16 individual securities for inclusion in the
17 first CRE CDO, with the idea that once we had
18 acquired a pool, a sufficient size, that that
19 would be packaged into a CDO, and what we
20 call liabilities or strips of the obligations
21 would be sold to third-party investors.
22     Q    Did the genesis for these CDOs
23 come from Angelo Gordon or did it come from
24 the structurer or some other party?
25     A    It came from Angelo Gordon

1
2  primarily.  The firm itself has a very active
3  successful business on the private equity
4  side of the commercial real estate business,
5  owning and operating properties, and this was
6  a way to develop a business on the debt side
7  of the commercial real estate space.
8      Q    So focusing for a minute on the
9  Cedar Woods II transaction, that transaction
10 closed in February 2007?
11     A    Correct.
12     Q    And Angelo Gordon is the
13 collateral manager for that transaction?
14     A    That's correct.
15     Q    Could you describe generally
16 what the collateral manager does for a CDO?
17     A    Sure.  In general the collateral
18 manager is typically responsible for
19 selecting the individual credits that go into
20 the deal.
21     The collateral manager may or
22 may not be involved with the marketing of
23 that transaction, going out to those
24 potential investors in the CDO and explaining
25 why they picked the assets that they picked.

1
2          Once the deal is priced and
3    closed, the collateral manager's
4    responsibilities include ongoing monitoring
5    of the portfolio, potentially buying and
6    selling individual securities, and also
7    working with the Trustee, the collateral
8    administrator.
9          Q    Working with the Trustee and the
10   collateral administrator in what sense?
11         A    Reviewing remittance reports,
12   making sure the information related to
13   individual trades is conveyed to the Trustee,
14   and answering any questions that investors
15   may have.
16         Q    How about interaction with the
17   rating agencies, is that part of the
18   collateral manager's responsibilities?
19         A    That is.
20         Q    What does -- what type of
21   interaction would Angelo Gordon have with the
22   rating agencies?
23         A    You know, it depends.  A lot of
24   it is answering questions that the agencies
25   may have.  Certain transactions within the

1
2    CDO would require rating agency confirmation,
3    so working with the agencies to go get that
4    required confirmation.
5          Q    What is a rating agency
6    confirmation?
7          A    It's effectively the rating
8    agencies issuing a statement that says doing
9    this particular transaction, maybe it is a
10   buy, maybe it is a sell, they would confirm
11   that that in and of itself is not the sort of
12   thing that would result in a downgrade of any
13   of the CDO bonds, CDO liabilities.
14         Q    With respect to the Cedar Woods
15   II transaction, were rating agency
16   confirmations obtained with respect to any
17   transactions or other matters?
18         A    I know they were obtained with
19   respect to some of the swaps and hedges.
20         Q    What was the nature of the
21   rating agency confirmations with respect to
22   the swaps and hedges?
23         A    With the swaps and hedges, to
24   the extent that you were putting in a new
25   interest rate swap or taking out an existing

1
2    swap that was in the transaction, that
3    required rating agency confirmation.
4          Q    Do you know whether there were
5    any rating agency confirmations relating to
6    matters other than swaps and hedges?
7          A    I don't recall any.
8          Q    Are you aware that one of the
9    issues in the case is whether certain assets
10   were characterized as defaulted securities,
11   correct?
12         A    Correct.
13         Q    Do you know whether rating
14   agency confirmations were obtained with
15   respect to any of the securities that are now
16   claimed to have been defaulted securities?
17         A    Not to my recollection.
18         Q    Did you undertake to determine
19   whether rating agency confirmations had been
20   obtained with respect to any of those
21   securities in your preparation for this
22   deposition?
23         A    No.
24         Q    If there had been rating agency
25   confirmations is that something that would

1
2    have been brought to your attention with
3    respect to those securities?
4          A    Probably.
5          Q    Could you tell me kind of
6    organizationally with respect to Angelo
7    Gordon's work as collateral manager for the
8    Cedar Woods II CDO, who else at Angelo Gordon
9    was involved in the -- in providing those
10   services?
11         A    Sure.  As of today, in addition
12   to myself, there are four other members of my
13   team that work on the commercial real estate
14   debt strategies, exclusively.
15              My most recent hire joined us
16   several months ago, so he has had no
17   involvement in the Cedar Woods II
18   transactions.
19              On a monthly basis there are
20   some specific information related to the
21   collateral that we provide to the Trustee,
22   and the two members of my group do that on a
23   regular basis, on that monthly basis.
24         Q    Who was that?
25         A    Michael Lewin and Jenna Hines.

1
2      The other member of the team is Rick Finger
3  and he assists with all of the functions that
4  I mentioned earlier.
5      Q     This monthly information
6  regarding the collateral that is provided by
7  the Trustee, with the assistance of Mr. Lewin
8  and Ms. Hines, what does that information
9  consist of?
10     A     To clarify, it's information
11 that we provide to the Trustee.
12     Q     You're right that is what I
13 meant, to the Trustee.
14     A     It's a breakdown they call the
15 stratifications of property type geography,
16 that is for the loans within individual CMBS
17 positions, and then also the expected
18 weighted average lives of the individual
19 securities.
20     Q     Is that all the information they
21 provide to the Trustee?
22     A     On a regular basis, monthly
23 basis, correct.
24     Q     Which entity is the Trustee, is
25 that U.S. Bank?

1
2      A     Yes.
3      Q     And prior to U.S. Bank it was --
4      A     It was Lasalle at inception of
5  the deal, which was then acquired by Bank of
6  America and then the Trustee services was
7  sold or spun out from Bank of America to U.S.
8  Bank.
9      Q     Did the team, the Trustee team,
10 that you were dealing with change over time?
11     A     It did change over time.  I
12 don't believe that those changes were
13 connected with the change of the overall
14 institution, but it was just natural
15 attrition of people kind of coming through.
16     Q     Am I correct that the group that
17 was originally responsible for the Cedar
18 Woods deal at Lasalle transferred to Bank of
19 America and then transferred to U.S. Bank?
20     A     There were personnel changes
21 throughout, so the individual Trustee that
22 would be my primary contact certainly changed
23 over the years.
24     Q     Who was -- who is it currently
25 your primary contact?

1
2      A     Adam Jacobs.
3      Q     Who was it before Mr. Jacobs?
4      A     I believe it was Matthew Scott.
5      Q     When did Mr. Jacobs take over
6  for Mr. Scott?
7      A     I'm not sure of the exact date.
8      Q     Before Mr. Scott was there
9  somebody else?
10     A     Yes.  There was Lev Toker.  Also
11 the same person Lev Tensel, she was married
12 at some point, and a number of other
13 individuals that would at times be involved
14 as a secondary contact.
15         So for instance, today in
16 addition to working with Adam, Tom Idikkula
17 is involved in providing Trustee services
18 from that institution as well.
19     Q     Do you recall anyone else that
20 you dealt with on a regular basis?
21     A     Cheryl Ross.  Early on there was
22 an individual named Cyril, last name starts
23 with a T.
24     Q     Is there also a collateral
25 administrator for the Cedar Woods CDO?

1
2      A     I use the terms interchangeably,
3  Trustee and collateral administrator.
4      Q     The entity that serves as the
5  Trustee serves as the collateral manager?
6         MR. PEES:  Administrator.
7      A     Administrator.
8      Q     Do you distinguish at all
9  between their -- between U.S. Bank's role and
10 responsibility as Trustee versus collateral
11 administrator?
12     A     I do not.
13     Q     Turning to Exhibit 1, if you
14 have it in front of you.  Turn to page two,
15 there is a list of topics for examination, do
16 you see that?  Page two of Schedule A.
17     A     Yes.
18     Q     Have you reviewed this before,
19 this schedule of topics for examination?
20     A     I have.
21     Q     Are you here today prepared to
22 speak to the 13 topics listed here?
23     A     I am.
24     Q     Topic three is your procedures,
25 research, analysis, calculations or

Page 49

1
2   with the rating agencies?
3       A    That's correct.
4       Q    In that regard did Angelo Gordon
5   think it was important to keep track of the
6   ratings on the securities that it was
7   purchasing and holding for the Cedar Woods
8   transaction?
9       A    Yes.
10          MR. PEES:  When we reach a good
11      juncture it might be a good time to take
12      a break.
13          THE VIDEOGRAPHER:  The time is
14      11:04 a.m.  Going off the record.
15          (A short break is taken.)
16          THE VIDEOGRAPHER:  The time is
17      11:21 a.m.  Back on record.
18      Q    Mr. Solomon, aside from the
19  service providers, does Angelo Gordon utilize
20  any computer systems to monitor the Cedar
21  Woods II transaction?
22      A    No, there are no systems.  We
23  have Excel spreadsheets.
24      Q    Do you keep a database of the
25  collateral that is in the CDO?

Page 50

1
2       A    We do.
3       Q    How is that maintained?
4       A    There is internal system on
5   that, I believe it's called Tango.  But from
6   the management side what we are doing is the
7   collateral manager -- the primary system that
8   we are using, again, it's Excel based.
9       Q    What does Tango do or Tango's
10  capabilities?
11      A    It is more internal accounting
12  and compliance.
13      Q    I think my question was, do you
14  utilize it to track the collateral in the
15  CDO?
16      A    Certainly not the performance of
17  the collateral, and when Cedar Woods II was
18  originally constructed none of the securities
19  were included in Angel Gordon's internal
20  Tango system.
21          It was only over the last couple
22  years where there has been a migration of
23  those securities, or at least included in
24  that system.
25      Q    What did Angelo Gordon utilize

Page 51

1
2   prior to Tango?
3          MR. PEES:  Objection to the
4      form.
5       A    It was, again, the Excel sheets
6   that I mentioned, as well as coordination
7   with the Trustee.
8       Q    Does Angelo Gordon maintain a
9   trade log of some sort?
10      A    Yes.
11      Q    How is that maintained?
12      A    It's in Excel, and whenever a
13  security is purchased or sold it's included
14  as a line item in that trade log.
15      Q    Is the trade log a running tab
16  of the trades that are executed for Cedar
17  Woods?
18      A    Yes.
19      Q    What is Geneva?
20      A    Another internal software system
21  at Angelo Gordon that's very similar to what
22  I described with Tango.  Again, it's
23  primarily accounting driven.  So I have less
24  familiarity with the inter workings of our
25  internal Geneva system.

Page 52

1
2       Q    When you say it's related to the
3   internal accounting, is there another group
4   at Angelo Gordon that works on accounting
5   issues associated with the Cedar Woods
6   transaction?
7       A    There is.
8       Q    What functions do they perform?
9       A    The accounting rules have
10  changed over the life of this deal, and so at
11  different points in time Angelo Gordon's
12  auditors have asked for different information
13  related to the CDOs.
14          So I'm not exactly certain of
15  what the accounting group is doing on a
16  day-to-day basis as it relates specifically
17  to the CDOs.
18          I do know that I will talk with
19  our auditors as part of their annual audit to
20  give them an update on the transactions.
21      Q    Does somebody in your accounting
22  group keep track of the -- strike that.
23          Is there someone other than you
24  and the individuals that assist you that
25  tracks the trades that are executed, in a

Page 53

1
2   trade blotter, something like that?
3       A    When a trade is done we take a
4   ticket down to the group that we call trade
5   support, and so there is tracking that is
6   done internally in the Geneva and Tango
7   systems.
8       Q    So each trade that is executed
9   for Cedar Woods is entered in the accounting
10  system as well as your Excel spreadsheets?
11      A    Correct.
12      Q    Do you receive reports from that
13  accounting function, trade support function,
14  sorry?
15      A    What I get on a daily basis is a
16  listing across all of our different funds of
17  individual holdings for individual
18  securities.
19      Q    And what do you do with that
20  report?
21      A    We use it to get a sense of what
22  our exposures are in individual funds and
23  across all our funds, to specific securities.
24      Q    What information -- what fields
25  appear on this daily report?

Page 54

1
2       A    It's just a notional amount on
3   owned face amount.
4           (Whereupon, Solomon 2, Letter,
5       Bates stamped HECW 0142673 through 79,
6       was marked by the reporter for
7       identification.)
8       Q    The court reporter just handed
9   you what has been marked as Exhibit 2, which
10  is a letter dated January 31, 2007, on Trepp
11  letterhead, addressed to Angelo Gordon and
12  Co., and Bank of America securities.
13          If you look at -- it bears
14  control numbers HECW 204 -- 0142673 through
15  79.
16          If you look at page four of this
17  document, it bears your signature; is that
18  correct?
19      A    It does.
20          MR. DONOHUE:  There is another
21      e-mail attached to the end of the
22      version that we have, is that
23      unintentional?
24          MR. CARTY:  Looks like the same
25      for the witness'.

Page 55

1
2           MR. MALLOY:  Tear off the
3   attachment.
4           MR. LEVINE:  We are going to
5       change the original?
6           MR. MALLOY:  Yes.
7       Q    Is this an engagement letter
8   with Trepp relating to the Cedar Woods II
9   transaction?
10      A    It is.
11      Q    What services -- are you
12  familiar with this document?
13      A    I am.
14      Q    What services was Trepp
15  providing specifically relating to the Cedar
16  Woods II transaction?
17      A    They -- this is similar to the
18  services that I described earlier, in terms
19  of how you can use Trepp to get information
20  on individual commercial real estate CDOs.
21          In this case what they were
22  engaged to do was to create a projected cash
23  flow model at issuance of the CDO, as well as
24  to update that model and update the
25  information with the type of collateral

Page 56

1
2   that's in the CDO at a particular point in
3   time.
4       Q    Was that model created?
5       A    To the best of my knowledge it
6   was.
7       Q    And is that something that
8   Angelo Gordon had access to?
9       A    We do -- did and do.
10      Q    Who else has access to the Trepp
11  model?
12      A    I believe anybody that
13  subscribes to Trepp, and has notified Trepp
14  that they are a holder of the securities.
15      Q    Was there somebody that worked
16  with Trepp to -- in formulating their model?
17      A    I believe that was primarily
18  done by the bankers responsible for this
19  transaction.  That was Bank of America
20  Securities.
21      Q    The process of preparing the
22  note valuation reports, mechanically how does
23  that work, does someone send you -- prepare a
24  draft and send it to Angelo Gordon?
25      A    That's correct.

Page 57

1
2      Q    When does that occur on a
3  monthly basis?
4      A    The deals typically -- it
5  depends where weekends fall, but in a typical
6  month the deals payout on the 25th of every
7  month.  The cut off date is usually the 19th.
8            Some time around the 19th or
9  20th of the month we will provide the Trustee
10 with that property type and geographic and
11 average life information.
12           Around a day or two after that
13 cut off date of the 19th, the Trustee will
14 provide me with a draft of the note valuation
15 report.
16     Q    Okay.
17     A    Sometimes there are pieces of
18 information that aren't fully updated in the
19 draft, they will try to get the draft out a
20 day or two after the cut off date.
21           I will review that draft note
22 valuation report and provide the Trustee with
23 any comments or questions that we might have.
24           Those issues hopefully get
25 resolved in the next day or two and by the

Page 58

1
2  25th of the month there should be a note
3  valuation report that is posted that we've
4  signed off on and agreed to.
5      Q    You mentioned a cut off date,
6  what is the cut off date?
7      A    It's basically the end of each
8  monthly period.  So for things like principal
9  payments and interest collections there needs
10 to be a date each month that is basically
11 okay, this is the end of this particular
12 month and the following day is going to be
13 the start of a new month.
14     Q    In terms of the note report,
15 what is the significance of the cut off date?
16     A    The note valuation report, as
17 well as the payments that are made, relate to
18 that period from the first day of that
19 particular period to the cut off date.
20     Q    Which is typically the 19th of
21 the month?
22     A    Correct.  So in a typical month
23 it's from the 20th of a month to the 19th of
24 the following month, and the note valuation
25 report and payments are made on the 25th.

Page 59

1
2      Q    So is it fair to say the funds
3  -- the principal and interest that is
4  collected and the various calculations that
5  are run in the note valuation reports, those
6  are calculated as of the cut off date based
7  on the funds that were received on or prior
8  to the cut off date?
9      A    That's correct.
10           (Whereupon, Jacobs 32, Document,
11     previously marked was shown to the
12     witness.)
13     Q    Handing you what has been
14 previously marked as Exhibit 32 to the Jacobs
15 deposition.
16           Do you have exhibit -- Jacobs
17 Exhibit 32 in front of you?
18     A    I do.
19     Q    Is this a note valuation report
20 for the Cedar Woods II transaction?
21     A    It is.
22     Q    Just looking at the top right
23 corner there is an as-of-date that says 21
24 December '10, is that -- would that have been
25 the cut off date?

Page 60

1
2      A    That's correct.
3      Q    For this note valuation report.
4           So in this instance it was the
5  21st, why would that have been the case?
6      A    It could have been a couple of
7  things.  Where a holiday fell in the month or
8  where the weekends fell.
9           It would not be unusual to see a
10 date that was a day or two after a 19th cut
11 off date.
12     Q    The formula for determining what
13 the cut off date is set in the indenture; is
14 that correct?
15     A    I believe so.
16     Q    The next line says current
17 payment, 27 December '10, is that the date
18 when the payments are made?
19     A    Correct.
20     Q    This document, this note
21 valuation report from December 2010, would
22 this have been a document that you reviewed
23 in accordance with the procedure that you
24 described earlier?
25     A    Yes.

1
2     Q   Looking at the first page, over
3  on the left side there is reference to a
4  number of data files, do you know what those
5  are?
6     A   I don't.  I assume that they are
7  files used by the Trustee to help create this
8  report.
9     Q   If you turn to page three of the
10  report, on the lower left corner there is a
11  table of asset positions, and it lists four
12  types of assets, CDO, CMBS, REIT debt and
13  cash, do you see that?
14     A  I do.
15     Q   What do these figures depict?
16     A   They show the notional amount,
17  the face amount of securities owned by this
18  CDO that fall into these three different
19  buckets, and then as well as how much cash is
20  in the transaction at a particular point in
21  time.
22     Q   And the current count number, 18
23  CDO, 198 CMBS, 5 REIT debt, those are -- that
24  is the number of individual bonds that are
25  held by the CDO?

1
2     A   Correct.
3     Q   With respect to each of those
4  asset positions?
5     A   Right.
6     Q   And is that information that was
7  within Angelo Gordon's knowledge at the time
8  that you would have reviewed this note
9  report, the current count of assets of each
10  class?
11     A   That is information that we
12  would have internally, yes.
13     Q   Would this have been something
14  you reviewed in connection with reading the
15  -- reading and reviewing the report?
16     A   Yes.
17         MR. LEVINE:  Draft.
18     Q   Draft?
19     A   Draft of the report.
20     Q   Where it says CDO, you mentioned
21  earlier that the only types of CDO that Cedar
22  Woods would purchase are commercial real
23  estate CDOs?
24     A   Correct.
25     Q   So that 18 count of CDOs would

1
2  have been exclusively real estate CDOs?
3     A   Correct.
4     Q   If you turn to page five, there
5  is a table that goes on for a couple pages
6  until page eight that is titled Distribution
7  Detail, do you know what this table depicts?
8     A   I do.
9     Q   Can you describe it for the
10  record?
11     A   It shows -- it is also called
12  the waterfall.  It shows how available
13  interest proceeds, as well as available
14  redemption monies or principal proceeds, are
15  directed to individual classes.
16     Q   On -- looking at the left panel,
17  the far left there is a series of numbers
18  under the column "priority", do you know what
19  those numbers and letters, do you know what
20  those are?
21     A   I believe they relate to
22  specific parts of the indenture.
23     Q   The parts of the indenture that
24  lay out the priority of payments with respect
25  to, in the case of the left panel, interest

1
2  payments?
3     A   Correct.
4     Q   And in the case of the right
5  panel the principal distributions?
6     A   Correct.
7     Q   So in this particular month
8  there was a total of -- looking at the top of
9  the column, about 2.7 million, $2,737,560.14
10  in available interest proceeds?
11     A   That's correct.
12     Q   And that would have been
13  calculated as of the cut off date that you
14  described?
15     A   Yes.
16     Q   And that in a sense is the top
17  of the waterfall that then is distributed in
18  accordance with the priorities listed here?
19     A   Yes.
20     Q   And the third -- there is a
21  number of entries, again I'm focused on the
22  left panel for the time being, there is a
23  number of entries with a dash or a hyphen,
24  those are entries where no distribution was
25  made; is that fair?

1
2          A    These stratification tables are
3   not something that is a primary focus of ours
4   when we are reviewing the monthly reports.
5          Q    But you did read them?
6          A    In summary, yeah.
7          Q    Looking at page 76, there is a
8   table captioned Stratifications Asset, do you
9   see that?
10         A    Yes.
11         Q    There is an entry on the table
12  that is captioned distributions of specific
13  types, there is an entry for specified type
14  CDO of CDOs, and it lists six assets with a
15  principal balance of $30,834,494, do you see
16  that?
17         A    I do.
18         Q    What is a CDO of CDOs?
19         A    I believe it is also called a
20  CDO squared, but it's a pool where the
21  underlying is all CDOs.
22         Q    So a CDO that contains interests
23  in other CDOs?
24         A    I believe so.
25         Q    Did you buy any CDO squared's

1
2   for the Cedar Woods II CDO?
3          A    No.
4          Q    Sitting here today you would
5   agree that that entry is inaccurate, that
6   states that there are six assets in the pool
7   that are -- of the specified type CDO of CDO?
8          A    That's correct.
9          Q    Was one of your Angelo Gordon's
10  responsibilities as a collateral manager
11  determining whether a particular security was
12  a defaulted security?
13         A    In conjunction with working with
14  the Trustee, yeah, we have some
15  responsibility for that.
16         Q    What was the division of labor
17  between -- strike that.
18              With reference to the Cedar
19  Woods II transaction, what was the -- strike
20  that too.
21              With reference to the Cedar
22  Woods II CDO what is a defaulted security?
23         A    There are a number of different
24  criteria that could create a defaulted
25  security.

1
2              The most straightforward is a
3   downgrade by either the rating agencies below
4   the CCC level.  So if a bond were to be rated
5   D or CC or single C, that is a defaulted
6   security.
7              In addition, there are a number
8   of other variances from how that security was
9   originally expected to perform that could
10  result in the security being classified as a
11  defaulted security.
12         Q    And that depends on the
13  definition in the indenture; is that correct?
14         A    Correct.
15         Q    And with respect to a CMBS
16  security, one of the ways in which a CMBS
17  security can become a defaulted security is
18  by missing interest payments?
19         A    Correct.
20         Q    Going back again, you said that
21  the evaluation of whether a security is a
22  defaulted security is something that was done
23  in conjunction with the Trustee?
24         A    Correct.
25         Q    When I say the Trustee, are we

1
2   talking about also the collateral
3   administrator, because you don't draw a
4   distinction between the two?
5          A    Yes.
6          Q    What was the division of labor
7   between the collateral manager on the one
8   hand and the Trustee/collateral administrator
9   on the other, with respect to determining
10  whether a security was a defaulted security?
11         A    The way that it works is shortly
12  after a cut off date the Trustee, the
13  collateral administrator, will provide us
14  with a list of defaulted securities.
15         Q    How -- where -- how do they
16  generate that list?
17         A    I'm not sure.
18              MS. BEHRENS:  Object to the
19  form.
20         Q    What do you do with the list?
21         A    One of our responsibilities as
22  the collateral manager is to assign a market
23  value to defaulted securities, so we will
24  take that list, we will look at where those
25  securities are marked by third-party pricing

1
2      services, and then report back to the Trustee
3      an estimate of market value for those bonds.
4          Q    Is there anything else to the
5      process of identifying defaulted securities
6      that is done as between you and the
7      Trustee/collateral administrator?
8          A    So I will look at that list of
9      securities and independently confirm that we
10     still believe all of those bonds that are
11     listed there should be classified as
12     defaulted, and then as we are doing our
13     review of a draft of the note valuation
14     report we are also looking for any securities
15     that might have been missed that should have
16     been included as defaulted.
17         Q    So you are in a sense looking
18     for instances where the Trustee/collateral
19     administrator missed identifying a defaulted
20     security when you are reviewing the note
21     valuation report?
22             MS. BEHRENS:  Objection to form.
23         A    As we are going through the
24     draft valuation report if we find securities
25     in there that we think should be classified

1
2      as defaulted we will communicate that to the
3      Trustee.
4          Q    But other than in the context of
5      reviewing the note valuation reports, did you
6      monitor the portfolio of securities on an
7      ongoing basis to determine whether any of the
8      securities became defaulted securities?
9          A    No.
10         Q    Would it become relevant at all
11     in the operation of the CDO that some
12     security became a defaulted security inter
13     period, between payment dates?
14         A    Can you repeat the question?
15         Q    I can give you a new question
16     that is clearer if that will help.
17             MR. PEES:  Why don't we go that
18     route.
19         Q    In connection with the operation
20     of the CDO, your management of the CDO, are
21     there situations where it would become
22     relevant that a particular security became a
23     defaulted security in between payment dates.
24             MS. BEHRENS:  Objection.
25         A    It depends.  If it's strictly

1
2      ratings based and a bond that had been rated
3      BB was downgraded to CC, but there was no
4      actual change in the credit characteristics
5      of that bond, I don't believe that it would
6      have an impact on where that bond would
7      necessarily trade.
8              It might, to the extent that the
9      buyer was ratings constrained, it would have
10     mattered a lot more in 2008, 2007.  Not so
11     much in the last couple of years.
12             If it was a defaulted security
13     because of a failure to pay interest, that
14     also depends.  If the market believed that
15     that was temporary it might not impact price
16     at all.
17             If the market believed that that
18     shortfall was going to be ongoing and non
19     recoverable, then it should have an impact on
20     price.
21         Q    Would it affect the collateral
22     concentration tests on an inter period basis?
23         A    I believe that as certain
24     securities are classified as defaulted, they
25     are moved from the denominator of a number of

1
2      these tests.
3          Q    In your work as managing the
4      Cedar Woods CDO do you need to rely on the
5      current as opposed to prior period, next
6      period, figures for the collateral
7      concentration tests?
8              MR. PEES:  Objection to the
9      form.
10         Q    In other words, do you need to
11     know what the collateral concentration test
12     is on a particular date as opposed to the end
13     of the prior period?
14         A    Yes.
15         Q    In what context would that
16     become relevant?
17         A    It is relevant to the extent
18     that there is purchases being made into the
19     vehicle or discretionary sales.
20             In general the indenture says
21     that purchases need to maintain or improve
22     any failing tests.
23         Q    So on a particular date in
24     between periods were you relying on the
25     Trustee or the collateral administrator to

Page 105

```
1
2    determine whether or not a security had
3    become a defaulted security in between -- to
4    ensure that those tests were calculated
5    properly.
6         MR. GEREMIA:  Object to the
7    form.
8         A    Yes.
9         Q    For those securities that became
10   defaulted securities or were candidates for
11   becoming defaulted securities, take a CMBS
12   security that was potentially defaulted
13   because of missed interest payments, that
14   would be one of the criteria?
15        MR. PEES:  Objection to the
16   form.
17        MS. BEHRENS:  Objection.
18        Q    How did you go about -- say it
19   came up in the context of reviewing a note
20   valuation report, how would you go about
21   determining for yourself, if you did that,
22   whether or not that security was a defaulted
23   security?
24        MR. PEES:  Objection to the
25   form.
```

Page 106

```
1
2         MS. BEHRENS:  Objection.
3         A    For the listing of securities
4    that we were provided as part of our review
5    on a month end basis, the easiest check and
6    you could go to Bloomberg to do this, is to
7    see what the rating is.
8              Majority of the defaulted
9    securities had a rating below CCC by either
10   Moody's or S&P, so that was a pretty easy
11   check.
12             For any other securities that
13   were included there because of missed
14   interest payments, you would need to go back
15   to the payment history of that security and
16   make a determination of whether or not it had
17   missed the requisite number of interest
18   payments.
19        Q    Who was doing that, who was
20   looking at the payment histories?
21        A    I was.
22        Q    On a monthly basis you were
23   looking at the payment histories for all of
24   the underlying securities to determine
25   whether they had missed the requisite number
```

Page 107

```
1
2    of payments to become defaulted securities?
3         A    For the securities that were
4    listed as defaulted.
5         Q    What about the securities that
6    weren't listed as defaulted?
7         A    For the securities that weren't
8    listed as defaulted, we were going through on
9    a monthly basis and checking the amount of
10   cash flow that was coming in on the
11   individual line items.
12        Q    So you -- you had no system in
13   place to check the payment histories of each
14   security on a monthly basis to determine
15   whether they had missed payments that were
16   scheduled?
17        MR. PEES:  Objection to the
18   form.
19        A    Other than comparing to what had
20   happened the prior month, no.
21        Q    If you wanted to look up the
22   payment history of a particular security, you
23   had access to the Trepp system to pull up the
24   actual remittance report that was issued by
25   that security, correct?
```

Page 108

```
1
2         A    Yeah, the nuance there is what
3    Trepp will have is the most recent remittance
4    report.  To go back and get historical
5    remittance reports it's easier to do it off
6    of Morningstar or Real Point.
7         Q    Okay, but you had access to that
8    information?
9         A    Correct.
10        THE VIDEOGRAPHER:  The time is
11   1:04 p.m.  Going off the record.
12
13        (A luncheon recess is taken.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1
2      A    Yes, I believe it was the
3  Standard & Poor's CDO monitor test.
4      Q    Do you know whether that test
5  was misstated for the Cedar Woods II
6  transaction as well?
7      A    I'm not certain.  I don't think
8  that it was.
9      Q    Did you undertake to determine
10  whether it was?
11      A    I believe that we did.  Again,
12  I'm not certain whether we did or not.
13      THE VIDEOGRAPHER:  The time is
14  3:00 p.m.  We are going off the record.
15      (A short break is taken.)
16      THE VIDEOGRAPHER:  This begins
17  tape number three.  The time is
18  3:18 p.m.  Back on the record.
19      Q    Mr. Solomon, before the break
20  you were discussing -- you testified that
21  there was a circumstance earlier this year
22  when you had requested -- when Angelo Gordon
23  requested the Trustee to make corrections to
24  the prior note reports for the Cedar Woods I
25  transaction?

1
2      A    Correct.
3      Q    You also testified that you had
4  identified at least a few other errors with
5  respect to the Cedar Woods II note reports,
6  including the failure to timely designate the
7  Crest 2003-1A bond as a deferred interest PIK
8  bond and the failure to designate the CD
9  2006-C3 bond as a defaulted security.
10      My question is, what is the
11  distinction as to when you would request the
12  Trustee to correct prior note reports, why
13  was it done for Cedar Woods I but not for
14  Cedar Woods II?
15      MS. BEHRENS:  Objection to form.
16      MR. VENKATAKRISHNAN:  Objection.
17      Q    Do you understand my question?
18      A    I do.
19      The decision to instruct the
20  Trustee to restate Cedar Woods I was made in
21  conjunction with discussions with internal
22  counsel.
23      With --
24      MR. PEES:  Don't elaborate
25  further on that conversation.  To the

1
2  extent you were going to say something
3  else, go ahead.
4      A    With Cedar Woods II that deal
5  was put into escrow.  I believe it was the
6  early part of the fourth quarter of -- the
7  early part of the fourth quarter of last
8  year, and that it has been subject to this
9  Interpleader action since the end of last
10  year, and that is really the reason that we
11  haven't instructed the Trustee to restate any
12  prior remittance reports.
13      Q    Because of the litigation?
14      A    I believe so.
15      (Whereupon, Jacobs 16, Document,
16  previously marked was shown to the
17  witness.)
18      Q    Handing you what was marked
19  previously marked as Jacobs Exhibit 16.
20      Jacobs 16 is a document bearing
21  Bates numbers BARC 109 through -- strike
22  that.
23      Jacobs 16 is a notice dated
24  October 12, 2011, from U.S. Bank as Trustee
25  addressed to the holders of CRE -- Cedar

1
2  Woods CRE CDO II; is that correct?
3      A    Yes.
4      Q    What I wanted to draw your
5  attention to was the last two pages of the
6  document which appears to be a letter dated
7  on Angelo Gordon letterhead, addressed to the
8  Trustee, U.S. Bank, Cedar Woods CRE CDO II,
9  the last two pages?
10      A    I see it.
11      Q    Is it fair to say that this
12  letter is a further explanation of the
13  reasons why Angelo Gordon at the time at
14  least disagreed with the assertions that
15  Barclays was making about the
16  mischaracterization of certain securities as
17  performing, when they should have been
18  characterized as defaulted?
19      A    Can you give me a minute to read
20  it?
21      Q    Sure.
22      A    Okay, I read it.
23      MR. PEES:  I want too make sure
24  we are literally on the same page, did
25  you read all four of these?

Page 157

```
 1
 2        A    No, thank you.
 3           MR. PEES:  Because the exhibit
 4    is double sided there was some ambiguity
 5    of what the last two pages were.
 6        A    Okay.
 7        Q    My question, this October 11th
 8    letter that is attached to this Trustee
 9    notice, is this a further explanation as of
10    October 11th of Angelo Gordon's position as
11    to whether or not the securities were
12    defaulted securities or -- strike.  Strike
13    all that.
14           This October 11th letter that is
15    attached to the Trustee notice, would it be
16    accurate to characterize this as Angelo
17    Gordon's response as of this date to the
18    contentions that Barclays was raising
19    regarding the mischaracterization of certain
20    securities in the Cedar Woods II deal?
21        A    Yes, I think that is a fair
22    characterization.
23        Q    Were you involved in preparing
24    the arguments that were set forth in this
25    letter?
```

Page 158

```
 1
 2        A    This letter was signed by
 3    in-house counsel.  I certainly assisted with
 4    gathering information and helping to prepare
 5    this.
 6        Q    And you are here today prepared
 7    to talk on behalf of Angelo Gordon with
 8    respect to the matters raised in this letter,
 9    correct?
10        A    Yes.
11           MR. PEES:  With the exception of
12    attorney/client communications of
13    course.
14        Q    Skipping down to the itemized
15    discussions about the particular securities,
16    first is Crest 2003-1A security we were
17    discussing before the break, and the letter
18    states the second -- looking at the second
19    sentence, "the second consecutive payment
20    deferral took place on 2/28/2011 and,
21    consequently, the first time the security
22    could have been classified as a deferred
23    interest PIK bond was in the 3/25/11
24    payment", do you see that?
25        A    I see that.
```

Page 159

```
 1
 2        Q    Based on what you testified to
 3    earlier it would be accurate to say the
 4    security should have been classified as a
 5    deferred interest PIK bond in 3/25/11 payment
 6    report, correct?
 7        A    I think it should have, yes.
 8        Q    Item three, on the next page
 9    there is a discussion of the LBUBS 2007-C1
10    deal, Classes C, D and H, do you see that?
11        A    I do.
12        Q    First sentence says "All three
13    classes of securities from this transaction
14    incurred their third consecutive month of
15    interest shortfalls on 5/17/10, and should
16    have been classified as defaulted securities
17    in the May 2010 payment report", do you see
18    that?
19        A    I do.
20        Q    Do you know whether in fact
21    those three classes of securities were
22    classified as defaulted securities in the
23    May 2010 payment report?
24        A    I'm not sure.
25        Q    Did you ever go back to
```

Page 160

```
 1
 2    determine whether that had been done?
 3        A    I don't remember.
 4           (Whereupon, Solomon 9, Payment
 5    Report, was marked by the reporter for
 6    identification.)
 7        Q    The court reporter just handed
 8    you what has been marked as Exhibit 9, does
 9    this appear to you to be the May 2010 payment
10    report for the Cedar Woods II deal?
11        A    Yes.
12        Q    Page 65 is the list of non
13    performing assets, do you see that?
14        A    I do.
15        Q    Do you see any classes of the
16    LBUBS 2007-C1?
17        A    No, I do not.
18        Q    You would agree that they should
19    have been included on the list of non
20    performing assets in the May 2010 report?
21        A    Yes.
22        Q    When did it come to your
23    attention that the LBUBS 2007-C1 securities
24    should have been classified as defaulted
25    securities in the May 2010 payment report?
```

Page 161

1
2      A    Certainly as part of the
3  drafting of this letter.  I don't recall if
4  it had come to my attention prior to that.
5      Q    If it had come to your attention
6  prior to that what would you have done?
7          MS. BEHRENS:  Objection.
8      A    I'm not sure.  I think it
9  depends on the context, and it probably would
10 have been a matter of having an internal
11 discussion with counsel just to see how they
12 would recommend to proceed.
13     Q    At the very least would it have
14 impacted the fee that Angelo Gordon received
15 on the May 2010 payment date, correct?
16         MS. BEHRENS:  Objection.
17     A    Had these been classified as
18 defaulted, yes, I believe it would have.
19     Q    So we now identified at least
20 three months, May 2010, March 2011 and
21 April 2011 where Angelo Gordon was paid the
22 excessive fees?
23         MS. BEHRENS:  Objection.
24     A    The term "excessive" I don't
25 think --

Page 162

1
2      Q    By "excessive" I mean in excess
3  of what you were entitled to?
4      A    I would agree with that.
5      Q    As of today has Angelo Gordon
6  remitted any of its -- the prior fees it
7  received on the Cedar Woods II transaction to
8  the Trustee?
9      A    We have not.
10     Q    And why is that?
11     A    Again, it's a function of the
12 fact that this is a deal that is in
13 litigation.
14     Q    And then come down to six, the
15 CD -- 2006-CD2 Class E you state -- the
16 letter states "We do not dispute that the
17 securities should have been classified as a
18 defaulted security in the 6/27/11 payment
19 report"?
20     A    Correct.
21     Q    And in fact it was not
22 classified as a defaulted security in that
23 report, correct?
24     A    I believe that's true.
25         (Whereupon, Solomon 10, E-mail,

Page 163

1
2  was marked by the reporter for
3  identification.)
4      Q    The court reporter handed you
5  what has been marked as Exhibit 10, which is
6  an e-mail string, the top e-mail is an e-mail
7  from you to Rick Finger on August 30, 2011,
8  subject matter "How are you doing?"
9          I wanted to draw your attention
10 to the part of the string where you are
11 writing to Mr. Finger on August 30, 2011, at
12 7:35 a.m., do you see that?
13     A    I do.
14     Q    Were you on vacation at the time
15 you wrote this?
16     A    Yes.
17     Q    What is the reporting structure
18 as between you and Mr. Finger, do you work
19 for him or vice versa?
20     A    He works for me.
21     Q    In the second paragraph of that
22 part of the e-mail string you state "One
23 thing to let you know about is that Barclays
24 has told Lasalle to declare an EOD in C Wood
25 II", is that the Cedar Woods II transaction?

Page 164

1
2      A    Yes.
3      Q    "LaSalle thinks the controlling
4  class has no standing to do this, and that
5  the reason given is questionable at best".
6          Had you spoken to somebody at
7  LaSalle about the situation regarding Cedar
8  Woods II?
9      A    When I say Lasalle or I wrote
10 Lasalle here it is the Trustee, which at the
11 time was U.S. Bank.
12         Again, the when the deal started
13 Lasalle actually acted as the Trustee, but in
14 this case I was referring to U.S. Bank or the
15 Trustee.
16     Q    And had someone at U.S. Bank
17 told you that the reasons given by Barclays
18 for declaring an event of default were quote,
19 questionable at best?
20     A    I believe so.
21     Q    Who was that?
22     A    I believe it was in discussions
23 with Adam Jacobs.
24     Q    What else do you recall
25 discussing with Mr. Jacobs?

1
2      A    I think this pretty well
3  summarizes it.  I don't recall other aspects
4  of that conversation.
5      Q    So based on your understanding,
6  the Trustee wasn't taking this contention
7  that was raised by Barclays seriously?
8          MS. BEHRENS:  Objection.
9          MR. VENKATAKRISHNAN:  Objection
10  to form.
11     A    I don't think that is an
12  accurate description.  I think they were
13  taking it seriously and what the Trustee was
14  doing, encouraging me to speak directly to
15  Barclays.
16         (Whereupon, Solomon 11, E-mail,
17         was marked by the reporter for
18         identification.)
19     Q    The court reporter handed you
20  what has been marked as Exhibit 11, which is
21  an e-mail from you to Mr. Jacobs and
22  Mr. Scott at U.S. Bank, dated September 21,
23  2011, subject "Response", was this an e-mail
24  that you drafted and sent to Mr. Jacobs and
25  Mr. Scott at U.S. Bank?

1
2      A    It certainly appears like I sent
3  it.  I'm not sure whether I drafted it by
4  myself or in conjunction with Alan Krinsman.
5      Q    At this point in time did you
6  understand that U.S. Bank was proposing to
7  commence escrowing funds out of the Cedar
8  Woods II transaction until the contentions
9  with Barclays were resolved?
10     A    Let me --
11     Q    Go ahead.
12     A    Okay.
13     Q    At the time of this e-mail in
14  September 21, 2011, did you understand that
15  the Trustee was proposing to commence
16  escrowing funds flowing from the Cedar Woods
17  II transaction?
18     A    Yes.
19     Q    In this e-mail were you -- was
20  Angelo Gordon voicing its objection to that
21  procedure?
22     A    We were.
23     Q    What was the reason why Angelo
24  Gordon was objecting to the escrowing of
25  funds?

1
2      A    There are a couple of reasons
3  outlined here.  One, we believe that doing
4  this would be the sort of thing that would
5  result or could result in a downgrade of the
6  notes.
7      Q    Why was that?
8      A    A failure to make scheduled
9  interest payments, or just going ahead and
10  escrowing funds I think is the sort of thing
11  that I expected would get the attention of
12  the rating agencies, both Moody's and S&P,
13  and I thought it would be likely that just
14  that action alone could result in a downgrade
15  of some of the bonds.
16         The Cedar Woods CDO liabilities,
17  not the underlying securities.
18     Q    In the fourth paragraph, second
19  sentence, "Failure to make timely payments by
20  one or both rating agencies which in turn
21  will result in decline and value of the
22  notes", is that what you were referring to?
23     A    Yes.
24     Q    The failure to pay principal to
25  holders may result in a downgrade of the

1
2  notes is that fair, based on your
3  understanding of the way the rating agencies
4  operate?
5      A    I think that's possible.  I
6  think just the act of escrowing payments is a
7  high profile decision that would get the
8  rating agencies attention, and likely result
9  in a downgrade.
10     Q    Were there other reasons why
11  Angelo Gordon objected to the escrowing
12  process that was being proposed by the
13  Trustee?
14     A    Yeah, the second reason that we
15  outline here is a prohibition on us as the
16  collateral manager from being allowed to
17  execute trades, purchases or sales.
18         I'm not sure that is one in the
19  same as the escrowing, but around this time
20  we were told essentially the deal is being
21  frozen and you as the collateral manager
22  can't buy or sell any securities out of this
23  transaction, period, until this is resolved.
24         So we took some objection with
25  that and we thought that could potentially

Page 177

1
2    page 170, am I right that 11.1 deals with the
3    waterfall for interest collections, correct?
4            MS. BEHRENS:  Objection.
5      A    Correct.
6      Q    And the provisions of 11.1 roman
7    numeral one, for the next couple of pages
8    through 23, that is the waterfall for
9    interest collections?
10           The waterfall that is for the
11   applied interest collections?
12     A    Priority payments.
13     Q    If you look at Section 11.1
14   romanette 16 on page 172, it states "If
15   either of the Class D/E coverage tests is not
16   satisfied as of the preceding calculation
17   date to pay principal as provided under the
18   terms of such notes", skipping a little, "of
19   the most senior class of notes then
20   outstanding until such Class D/E coverage
21   test is satisfied, as of such calculation
22   date", et cetera.
23           Do you understand that that
24   provision, romanette 16, requires interest
25   collections that flow down to this point in

Page 178

1
2    the waterfall to be directed to pay down
3    principal on the senior most outstanding
4    class of notes, in this case the class A-1
5    notes until the test is passing?
6            MR. PEES:  Objection to the
7    form.
8      A    I do see that.
9      Q    Could that section be complied
10   with if those payments were not made, if the
11   payments of interest collections that made it
12   down this far in the waterfall were not used
13   to pay down principal in the most senior
14   class of notes outstanding?
15           MS. BEHRENS:  Objection.
16           MR. GEREMIA:  Objection.
17           MR. PEES:  Objection.
18     Q    Assuming the coverage test was
19   failing?
20     A    Can you repeat that question?
21     Q    Assume the Class D/E coverage
22   test was failing on a particular month, say
23   December 2010, if in that month the interest
24   collections were applied in a way that did
25   not pay down principal to the class A-1

Page 179

1
2    notes, and instead was used to pay items on
3    the waterfall that are listed below romanette
4    -- 11.1a, 11.1a16, for example, the
5    subordinated collateral managers fee, could
6    this section have been complied with, this
7    section of the waterfall 11.1a16?
8            MR. PEES:  Objection.
9            MS. BEHRENS:  Objection.
10     A    I don't know.
11     Q    Let me make sure that the
12   objections to my lengthy but otherwise clear
13   question, I will break it into some smaller
14   pieces.
15           Let's take December 2010, and
16   let's posit hypothetically the Class D/E
17   coverage test was failing but the payment
18   report indicated that it was passing, and as
19   a result payments were made, for example,
20   under 11.1a22 on page 173, to pay the
21   subordinate collateral management fee, and
22   that payments were not made under 11.1a16 to
23   pay down principal to the most senior class
24   of notes outstanding; would you agree in that
25   circumstance the waterfall was violated?

Page 180

1
2            MR. PEES:  Objection.
3            MS. BEHRENS:  Objection.
4            MR. GEREMIA:  Objection.
5      A    Again, I'm not sure.
6      Q    Well, was there compliance in
7    that scenario, was there compliance with
8    11.1a16?
9            MR. PEES:  Objection.
10           MS. BEHRENS:  Objection.
11     A    I'm not sure.
12     Q    What is the source of your --
13   what is it that you are not sure about?
14           MR. PEES:  Objection.
15     Q    Let me withdraw that.
16           If the waterfall provision of
17   Section 11.1a requires a payment to be made
18   to the class A-1 noteholders to pay down
19   principal and that payment was not made,
20   isn't that a violation of Section 11.1a?
21           MR. PEES:  Objection.
22           MS. BEHRENS:  Objection.
23     A    You know, again, I'm not sure.
24   This letter dated September 22nd was signed
25   by in-house counsel, drafted by counsel, and

Page 181

```
1
2     it is our position in order for there to have
3     been an event of default under 5.1c the
4     payments would have needed to have been made
5     in a manner that was inconsistent with what
6     was in the payment report.
7          Q    And sitting here today you can't
8     explain why that would be the case?
9          MR. PEES:  Caution the witness
10     not to reveal any attorney/client
11     communications.
12         A    This is a determination that
13    Angelo Gordon came to in consultation with
14    counsel.
15         Q    So you are here on behalf of
16    Angelo Gordon to testify about Angelo
17    Gordon's evaluation concerning any event of
18    default alleged under the indenture; and
19    sitting here today as Angelo Gordon's
20    representative is it your position that you
21    can't explain why there is not an event of
22    default if a payment that is required to be
23    made under Section 11.1a16 is not made?
24         MR. PEES:  Objection, 30(b)6 is
25     not an invitation to reveal a privilege.
```

Page 182

```
1
2          A    I cannot recall the nuances of
3     this determination in the conversations we
4     had with internal counsel and external
5     counsel.
6          Q    Is that Angelo Gordon's position
7     today?
8          MR. PEES:  That is Angelo
9          Gordon's position.
10         Q    Can you personally explain --
11    can you personally provide any explanation --
12    setting aside your communications with
13    counsel as to how it could be that a payment
14    is not made that is required by Section
15    11.1a16 that is not made is not a violation
16    of 11.1?
17         MR. PEES:  Objection.
18         MS. BEHRENS:  Objection.
19         A    No.
20         Q    Going back to -- do you have
21    Jacobs Exhibit 16 in front of you, the
22    September 22nd letter?
23         A    Yes.
24         Q    The last paragraph on the first
25    page of this letter states "If any errors
```

Page 183

```
1
2     were made in the determination of the
3     coverage tests, the indenture expressly
4     provides that such errors may be corrected in
5     a reasonable period of time before an event
6     of default would occur", do you know where
7     does that appear in the indenture?
8          A    I believe there was a number of
9     different places within the events of default
10    that talk about remedies as well as timing.
11         Q    Well, looking back at 5.1c on
12    page 102, do you see any detailed provisions
13    -- strike that.
14              Looking at Section 11 -- strike
15    that.
16              Looking at Section 5.1c do you
17    see any provision that expressly provides
18    that violations of the waterfall may be
19    corrected within a reasonable period of time
20    before an event of default would occur?
21         A    There is language in here that
22    talks about five business days.
23         Q    Do you see anything else?
24         A    In 5.1c, no.
25         Q    Are you aware of any other
```

Page 184

```
1
2     provisions that would address the time period
3     for correcting a failure to comply with the
4     waterfall?
5          A    Again, through other parts of
6     the definition of defaulted security, and
7     discussions of remedies, there are a number
8     of other places in there that have some
9     different day counts, different periods.
10         Q    Are you thinking of something in
11    particular?
12         A    I'm looking through all the
13    various definitions of events of default, and
14    so there is talk about 30 days, 90
15    consecutive days.
16         Q    How long do you think it has
17    been since you -- since it came to your
18    attention that the CD 2006-CD3 bonds had been
19    improperly characterized as performing in the
20    March 2011 payment report?
21         A    Well, certainly since the letter
22    that we sent dated October 11th of 2011.
23         Q    How long do you think it has
24    been since you became aware that the LBUBS
25    2007-C1 classes C, D and H should have been
```

Page 185

1
2    but were not classified as defaulted
3    securities in the May 2010 payment report?
4        A    Same answer.  Since October 11,
5    2011.
6        Q    And possibly earlier?
7        A    Correct.
8        Q    How long do you think it has
9    been since you were aware that the Crest
10   2003-A1 security should have been but was not
11   characterized as a deferred interest PIK
12   bond in the March 2011 payment report?
13       A    Same answer, certainly since
14   October 11, 2011.
15           THE VIDEOGRAPHER:  The time is
16   4:16 p.m.  Going off the record.
17           (A short break is taken.)
18           THE VIDEOGRAPHER:  The time is
19   4:30 p.m.  Back on record.
20       Q    The court reporter handed you
21   what has been marked as Exhibit 12, which is
22   a document bearing control number AGCWII
23   0143308 through 143384.
24           (Whereupon, Solomon 12,
25           Document, Bates stamped AGCWII 0143308

Page 186

1
2        through 143384, was marked by the
3        reporter for identification.)
4        Q    Which appears to be a note
5    valuation report for the Cedar Woods II
6    transaction, dated as of 21 December 2010; is
7    that fair?
8            MS. BEHRENS:  Were the
9        handwritten notes on the document as
10       produced?
11           MR. MALLOY:  We will get to
12       that.
13       A    Yes.
14       Q    The answer is yes.
15           Do you know -- can you tell from
16   looking at this whether this is a draft or
17   final version?
18       A    I cannot tell.
19       Q    Do you recognize the handwriting
20   on the front?
21       A    Yes, that looks like my
22   handwriting.
23       Q    Who -- does that say Jackie?
24       A    Yes.
25       Q    Do you recognize that name and

Page 187

1
2    phone number, do you know who that is?
3        A    No, I don't.
4        Q    The handwriting on the top, can
5    you read any of that?
6        A    I can't.  I cannot.
7        Q    In connection with collecting
8    documents in connection with this litigation,
9    did you review hardcopy documents that you
10   had accumulated related to the Cedar Woods
11   deal and turn them over to counsel?
12       A    I collected any hardcopy
13   documents I had and handed them over to
14   counsel.
15       Q    If you turn to page 64, there is
16   two entries that are circled, this is the
17   page that is dealing with rating detail; am I
18   right that this is the section of the report
19   where the current ratings of the collateral
20   held by the CDO are reported?
21       A    Correct.
22       Q    The two entries that are circled
23   are -- the first is WBCMT 2005-C18F, and
24   second is WBCMT 2005-C18G, do you see those?
25       A    I do.

Page 188

1
2        Q    And the entries that are circled
3    are the -- under the column status and date,
4    does it look like that is something you
5    circled yourself?
6        A    It does.
7        Q    Do you have any recollection as
8    to why you circled those two entries?
9        A    I'm not sure.
10       Q    The entries that are circled
11   it's -- one is under the column status both
12   to say -- well, for the Class F bond the
13   current Moody's rating is BA3; is that right?
14       A    It's reported as BA3, correct.
15       Q    And Class G is reported as B2?
16       A    Yes.
17       Q    And the status which is one of
18   the items circled is CW minus, that on
19   credit watch by Moody's; is that right?
20       A    Yeah, credit watch would have
21   negative implications.
22       Q    What does that mean?
23       A    Moody's is reviewing the
24   transaction and it is likely that their
25   review will result in a downgrade of the

Page 189

```
 1
 2        Class F and G bonds.  The bond is on review
 3   for possible downgrade.
 4        Q    It had been since October 28,
 5   2010?
 6        A    Yeah, according to this report.
 7        Q    If a bond is on a ratings watch
 8   with negative implications, is that something
 9   that you would keep an eye out for as a
10   collateral manager?
11        A    Not necessarily.
12        Q    When would you keep an eye out
13   for the downgrade that is anticipated by that
14   kind of notation?
15        A    Very early on in the life of
16   this deal before a number of the collateral
17   quality tests were breached, the implications
18   of a downgrade of a bond were more
19   significant.
20        We looked at an earlier
21   remittance report that had showed, I believe,
22   three pages of rating activity or down grades
23   that had taken place in a one month period,
24   so in 2009, 2010 and 2011 literally thousands
25   of securities were being downgraded.
```

Page 190

```
 1
 2        So to have two securities that
 3   were on credit watch negative, in and of
 4   itself wouldn't necessarily cause alarm.
 5        Q    Is it something that you or
 6   somebody else at Angelo Gordon would have
 7   monitored for further down grades?
 8        A    It's possible, but not
 9   necessarily the sort of thing that we would
10   be tracking day by day.
11        Q    And the ratings detail starts on
12   page 56 of this report, by my count I see two
13   other bonds that are on credit watch with
14   negative implications, aside from the two
15   bonds, does that sound right?
16        A    I see the two that you are
17   referring to.  I'm just checking to see if
18   there are any more.
19        Not that I see.  So I would
20   agree with that.
21        Q    So at this stage in the security
22   there weren't torrents of bonds being put on
23   ratings watch, is that fair to say?
24        MS. BEHRENS:  Objection.
25        A    Go to 53, 54 and 55, these are a
```

Page 191

```
 1
 2   listing of all the securities that had rating
 3   changes during this period.
 4        Q    During the prior period --
 5        A    Just this month.
 6        Q    In December?
 7        A    Correct.
 8        Q    Did it come to your attention
 9   that the two WBCMT bonds, 2005-C18F and G had
10   also been downgraded in December 2010 prior
11   to the issuance of this report?
12        MR. PEES:  Objection.
13        A    No, I believe that I found out
14   that those bonds had been downgraded as part
15   of reading the Affidavit related to this
16   dispute.
17        Q    So sitting here today you have
18   no recollection of why you circled those two
19   bonds on this report?
20        A    I don't know when I made that
21   circle, and it very easily could have been
22   after reading the Affidavit related to this,
23   where I went back to the copy of the
24   remittance report that I had and went ahead
25   and circled that.
```

Page 192

```
 1
 2        Q    Do you recall -- did you go away
 3   for the holidays in December 2010, were you
 4   out of the office?
 5        A    I'm not sure.
 6        Q    Is it your practice to go out of
 7   the office at the end of December?
 8        A    No, it really depends.
 9   Sometimes it is, sometimes it's other members
10   of my team that are taking that week of
11   vacation.
12        Q    Is it possible that you had
13   learned of the downgrade of the two WBCMT
14   2005-C18 bonds in December or maybe January?
15        A    I don't believe so.
16        Q    Well, let's say hypothetically
17   you had caught that error after the note
18   report was published, what would you have
19   done?
20        A    It would have been a
21   conversation that I would have had with
22   counsel.
23        I'm sure there would have been
24   talk of context and what the implications
25   would be for bonds that were reported with
```

Page 193

```
1
2     ratings that were inconsistent with what the
3     actual rating is, but I'm not sure what we
4     would have done if we had determined that
5     there were errors.
6         Q     Would you have -- if you turn to
7     page 14, as of 21 December 2010 the Class D
8     coverage test ratio was reported at
9     103.04 percent and passing is 1023.5 percent,
10    correct?
11        A     Correct.
12        Q     If you had learned of -- that
13    two securities -- well, strike that.
14            Do you know what the principal
15    amount of the WBCMT-2005-C18 bonds were?
16        A     Go to page 42.  Middle of the
17    page, 9.5 million for the F's and 1 million
18    for the G's.
19        Q     That is 11-and-a-half together?
20        A     Ten-and-a-half.
21        Q     Correct, ten-and-a-half.
22            Is that a significant size
23    investment for the Cedar Woods deal?
24        A     A $9.5 million investment is one
25    of the larger line items that are in this
```

Page 194

```
1
2     deal.
3         Q     So if you had learned say in
4     January that those two bonds had been
5     downgraded would you have evaluated the
6     affect on the principal coverage tests --
7     would you have gone back to evaluate whether
8     that would have impacted the principal
9     coverage tests in the prior month?
10            MS. BEHRENS:  Objection.
11            MR. PEES:  Objection.
12        Q     Assuming hypothetically you had
13    caught this error in January?
14        A     I think that is a reasonable
15    assumption.  I mean, it is a hypothetical but
16    yeah, when we are told of errors or potential
17    errors, it is reasonable to check what the
18    magnitude of that error might be or what the
19    implications might be.
20        Q     Are there other circumstances
21    where you would look into the status of the
22    coverage tests on an inter period basis?
23        A     Sure.  Like I mentioned earlier,
24    if there were changes that we didn't expect
25    or no changes when we would have expected it,
```

Page 195

```
1
2     we would request back up from the Trustee in
3     determining how the calculation was made.
4         Q     And the -- how would the
5     downgrade of the two WBCMT bonds, let's say
6     they had -- you agree that they were in fact
7     downgraded in December 2010?
8         A     Yeah, I believe that is correct.
9         Q     And you verified that?
10        A     Yes.
11        Q     And they were not correctly
12    reported in the December 2010 payment report?
13        A     I believe that's correct also.
14        Q     How would they have impacted the
15    coverage tests?
16        A     Let's take them one at a time.
17    The Class F's were rated BA 3BB.
18            And if you go to page 14, the
19    principal coverage test that would fall into
20    the BB bucket, that is the less 10 percent
21    reduction.
22            There is some nuances to it in
23    terms of in excess of 40 percent, but we are
24    over that hurdle.
25            There is also talk about after
```

Page 196

```
1
2     you have done some of the earlier haircuts,
3     but in general roughly speaking they were --
4     a 10 percent haircut was applied to that
5     principal balance.
6             So in the base of a $9.5 million
7     bond it was being treated for the purpose of
8     this test as being worth 8.55, I think.
9             I don't recall what that
10    security was downgraded to.
11        Q     Well, if you assume that it was
12    downgraded to CA3 what would the impact have
13    been?
14            MS. BEHRENS:  Objection.
15        A     Assuming that is what the
16    downgrade was, it would fall into the
17    40 percent haircut bucket for a bond that is
18    rated CCC.
19            So your difference in the
20    haircut between what was applied and what
21    would have been applied is 40 minus 10,
22    30 percent.
23        Q     So it would have been reduced by
24    a further 30 percent in the coverage amount?
25        A     Correct.
```

1
2      Q    Assume the Class G was
3  downgraded to CA, that would have made it a
4  defaulted security, correct?
5      A    Correct.
6          MS. BEHRENS:  Objection.
7      Q    So it would have impacted the --
8  on page 14 are you referring to the section
9  that is reference to the ratings, is that the
10  haircut section?
11     A    Yes.
12         (Whereupon, Solomon 13, E-mail,
13     Bates stamped AGCWII 0111319, was marked
14     by the reporter for identification.)
15     Q    The court reporter just handed
16  you what has been marked as Exhibit 13, which
17  is a document bearing control number -- an
18  e-mail bearing control number AGCWII 0111319,
19  and it is from Moody's Alerts to you dated
20  December 10, 2010, do you see that?
21     A    I do.
22     Q    This an e-mail that you
23  received?
24     A    I believe so.
25     Q    And this was an alert from

1
2  Moody's advising you that nine classes of the
3  WBCMT 2005-C18 structure had been downgraded?
4      A    Correct.
5      Q    Is this something you would have
6  read at the time when it came in?
7      A    Possibly.  We looked at the
8  number of rating actions that took place in
9  this month, so it is likely this is one of up
10  to a hundred e-mails that were coming in from
11  Moody's over this monthly period.
12     Q    Do you share these alerts with
13  others on your staff?
14     A    I'm not sure others on the staff
15  get these e-mails directly.  I believe one of
16  the people working with me does, but I'm not
17  certain.
18         MR. MALLOY:  To the extent that
19     anyone else received an alert of this
20     nature we ask for its production.
21         MR. PEES:  Take it under
22     advisement.
23     Q    The body of the alert states
24  "you received this e-mail because you
25  currently have an alert set up as follows",

1
2  and it goes on to say portfolio name Cedar
3  Woods CDO II, do you see that?
4      A    I do.
5      Q    Did you set up an alert with
6  Moody's to provide you with e-mails like this
7  alerting you of down grades of securities
8  that are held by the Cedar Woods CDO II?
9      A    We certainly did at the issuance
10  of this transaction, at the start of this
11  CDO.
12     Q    You had a subscription to
13  Moody's, correct?
14     A    We did.
15     Q    So if you had clicked through on
16  this e-mail would you have been able to look
17  at the details of the down grades?
18     A    I believe so, yes.
19         (Whereupon, Solomon 14, Exhibit
20     RR, was marked by the reporter for
21     identification.)
22     Q    The court reporter handed you
23  what has been marked as Exhibit 14, which is
24  Exhibit RR to the declaration of Jake
25  Scrivens, which attaches Moody's investor

1
2  services rating action dated 10 December 2010
3  related to the WBCMT 2005-C18 bonds; is that
4  an accurate characterization of this
5  document?
6      A    Yes.
7      Q    And you would agree that this
8  report reflects the downgrade of the Class F
9  bond to CAA3?
10     A    Yes.
11     Q    And the down grade of the Class
12  G bond to CA.
13     A    Yes.
14     Q    Do you recall going back to
15  determine the impact on the coverage tests of
16  applying those two downgrades if they had
17  been applied correctly to December 2010 how
18  that would have impacted the coverage ratios?
19     A    Yes.
20     Q    What did you determine?
21     A    That the magnitude of those down
22  grades I believe would have caused the Class
23  D/E coverage ratio to have breached that
24  limit or it would have caused that test to
25  have been failed.

1
2        Q    Did you advise the Trustee of
3    that determination?
4        A    No.
5        Q    Did you take any steps in
6    response to that determination?
7        A    No.
8        Q    When did you make that
9    determination?
10       A    After -- shortly after reviewing
11   this Scrivens' Affidavit.
12       Q    That would have been in
13   March 2012?
14       A    That sounds like roughly the
15   right time, yeah.
16       Q    So approximately four months
17   ago?
18       A    Correct.
19       Q    What would the impact have been
20   if the Class D/E coverage test was failing in
21   December of 2010?
22       MS. BEHRENS:  Objection.
23       Q    On the payments that were made
24   in that month?
25       MS. BEHRENS:  Objection.

1
2        A    Look at Solomon 12.  December
3    payment report.  On page seven, sorry, page
4    six, the payment of interest to the Class C
5    of 9,500 still would have been made, but then
6    the next line down, XVI either the Class D/E
7    coverage tests are not satisfied any excess
8    cash flow would have been directed to pay
9    down the A-1s; so that is roughly $31,000
10   that was paid to the Class F.
11       $221,000 that was paid to Angelo
12   Gordon as a subordinate collateral management
13   fee, and $333,000 that was paid to the
14   equity.
15       Q    Did Angelo Gordon own the equity
16   at the time?
17       A    No.
18       Q    So those three amounts, $31,224,
19   $220,808 and $330,638, those three lines
20   cumulatively should have been applied on line
21   16 to principal of the Class A notes?
22       A    Correct.
23       Q    Would there have been an impact
24   on the principal side?
25       A    Yes, amounts that were in the

1
2    principal collection account would have been
3    paid out to the A-1 class as well, as opposed
4    to being available for purchase of additional
5    securities after the cut off.
6        Q    So that is the line 14a,
7    $1,257,775?
8        A    Correct.
9        Q    All or part of that would have
10   had to been applied to pay principal on the
11   A-1 notes?
12       A    I believe all of it would have,
13   yes.
14       Q    The funds that were paid to
15   Angelo Gordon, the $2,278,808, has Angelo
16   Gordon returned that to the Trustee?
17       A    We have not.
18       Q    Why not?
19       A    Again, the deal is in escrow and
20   subject to litigation.
21       Q    How does that explain -- you
22   would agree sitting here today that that
23   $202,000 was not a payment that Angelo Gordon
24   was entitled to?
25       A    Yeah, I would agree.

1
2        Q    So why does the pendency of this
3    litigation explain Angelo Gordon's failure to
4    pay that fee back to the Trustee?
5        MR. PEES:  Objection.
6        A    It is a determination that we've
7    made internally and in consultation with
8    counsel.
9            (Whereupon, Jacobs 37, Document,
10       previously marked was shown to the
11       witness.)
12       Q    The court reporter handed you
13   what has been previously marked as Jacobs 37,
14   January 19th -- January 2011 payment --
15   valuation report for the Cedar Woods II deal,
16   does that appear to be what this is?
17       A    Yes.
18       Q    If you turn to page 61, do you
19   see the two WBCMT bonds are listed at their
20   now correct ratings?
21       A    I do see that.
22       Q    CCA3 and CAA respectively.
23       Where a security is downgraded
24   and that downgrade is reflected for the first
25   time in a particular payment report, is there

Page 205

1
2    another section where it is discussed as
3    well, the downgrade?
4        A    Typically the down grades that
5    take place within a particular month are
6    detailed in the rating change history
7    section, I believe it is on page 52.
8        Q    Okay.
9            The two WBCMT 2005-C18 bonds are
10   not reflected on page 52 are they?
11       A    That's correct.
12       Q    Do you know why -- do you have
13   any information about why they were omitted
14   from the section, the rating change history
15   section of this report?
16       A    I don't.
17           (Whereupon, Solomon 15, E-mail,
18       Bates stamped AGCWII 0112928 through
19       112930, was marked by the reporter for
20       identification.)
21       Q    The court reporter handed you
22   what has been marked as Exhibit 15.
23           Which is an e-mail -- it is a
24   document -- an e-mail bearing control number
25   AGCWII 0112928 through 112930, with some

Page 206

1
2    attached spreadsheets that we attempted to
3    printout.
4            The e-mail is an e-mail from
5    Mr. Idikkula, he is at U.S. Bank; is that
6    correct?
7        A    Correct.
8        Q    To you, attaching these
9    spreadsheets, also copied some other people.
10           He is writing in response to
11   your e-mail in the middle of the first page
12   dated January 5, 2011?
13       A    Um-hum.
14       Q    And you say in the second
15   paragraph, "Also would it be possible for you
16   to send over a copy of the most recent
17   detailed OC calc in Excel", and then in
18   parentheses you say "the one with the
19   haircuts, et cetera, as of the prior cut off
20   is fine", do you see that?
21       A    Yeah.
22       Q    The spreadsheets he is
23   attaching, are these the spreadsheets that
24   U.S. Bank uses to calculate the coverage
25   tests?

Page 207

1
2        A    I believe so.
3        Q    This is a spreadsheet -- if you
4    wanted to recalculate the coverage test
5    yourself counting for the downgrade in WBMCT
6    bonds this is a spreadsheet that would aid
7    you in that calculation?
8        A    Yeah, that's fair.
9        Q    Sitting here today do you have a
10   recollection that that was why you were
11   asking for these spreadsheets?
12       A    No, I don't recall that being
13   the reason.
14       Q    Do you recall the reason why you
15   were asking for these spreadsheets?
16       A    I'm not sure.  Looking at the
17   earlier remittance report the coverage test
18   on -- the Class D/E level was close, so that
19   again would be the sort of thing where we
20   would want to make sure that we were tying
21   out with the Trustee of how the calculation
22   was being done.
23       Q    At that point, by January 5th,
24   the December report had already been
25   published, right?

Page 208

1
2        A    Correct.
3        Q    So why would you have been
4    looking at the prior month's coverage test
5    calculations on the fifth of the next month?
6        A    Again, I'm not sure.  It's not
7    unusual for us to be looking at these
8    calculations intra month.
9            (Whereupon, Solomon 16,
10       Document, Bates stamped AGCWII 0120200,
11       was marked by the reporter for
12       identification.)
13       Q    The court reporter handed you
14   what has been marked Exhibit 16, which is the
15   first document that bears control numbers
16   AGCWII 0120200, and attaches a series of
17   spreadsheets that we've attempted to printout
18   in a legible fashion, I hope we succeeded.
19           The e-mail is from Mr. Finger to
20   Tom Idikkula at U.S. Bank, and the message is
21   -- it says "Subject:  C Wood II trade log"
22   and the text is "Today's C Wood II purchased
23   600,000 LBUBS 2007-C7", do you see that?
24       A    I do.
25       Q    The attachment, is this the

Page 233

```
1
2    certainly could be interpreted in the fashion
3    that I was trying to articulate, but that it
4    would also be a change in what is done --
5    what had been done historically.
6         And without a real compelling
7    reason to do it, their advice was, you know,
8    do not change what has been done already.
9         If you want to do it, if you
10   direct us to do it, I believe it was
11   something they said they wouldn't refuse but
12   their feeling was -- it was not advisable to
13   make changes to the way this calculation was
14   being done four years into the life of the
15   deal.
16       Q    Did you direct them to make this
17   change that you are suggesting in this
18   e-mail?
19       A    No, I didn't.  I directed them
20   to continue to do the calculation as it had
21   been done for the prior four years, over the
22   life of the deal.
23       Q    Why was that?
24       A    I agreed with their
25   interpretation of the document, and their
```

Page 234

```
1
2    recommendations.
3         Q    Do you have Aldama Exhibit 14 in
4    front of you?
5         A    Yes.
6         Q    Turn to page 46, there is a
7    definition of principal coverage amount.
8              Are these the definitions of
9    ratings haircuts we discussed a couple of
10   times today?
11        A    Yeah.  Yes.
12        Q    What is the change that you were
13   suggesting in this e-mail, did it relate to
14   this definition?
15        A    Yes, they are.
16        Q    Is it Angelo Gordon's position
17   today that the OC test should be calculated
18   the way the Trustee was calculating or that
19   it should have been calculated in accordance
20   with the method outlined in this e-mail that
21   has been marked as Exhibit 17?
22        A    I think the indenture, the
23   document is unclear.
24             MR. PEES:  For clarity of the
25   record the e-mail is Exhibit 18.
```

Page 235

```
1
2         Q    Is it Angelo Gordon's position
3    that the principal coverage amount should be
4    calculated the way that is reflected in this
5    e-mail, or the way that you have directed the
6    Trustee to continue to perform it back in
7    September of 2010?
8         A    Again, I think it's unclear in
9    the indenture that it could be interpreted
10   either way, but after discussing the issue
11   with the Trustee we are fine with the way
12   it's being calculated today, which is the way
13   it has always been calculated.
14        Q    Turn to page 47 of Aldama 14,
15   the indenture.
16             Does the discussion here relate
17   to part three of that -- the proviso to the
18   definition of principal coverage ratio --
19   principal coverage amount?
20        A    I believe it is, yes.
21        Q    Can you explain what the change
22   is that you wanted -- that you were at least
23   proposing in this e-mail?
24        A    Okay.  This is a second order
25   haircut, meaning that it is a haircut that is
```

Page 236

```
1
2    made after you already have the earlier
3    haircuts calculated, and it is one that we
4    talked about earlier, where it says what
5    percentage of the pool has a particular
6    rating low enough that it is over 40 percent
7    of the CDS principal balance.
8         Q    Is that after a reduction for
9    defaulted securities and written down
10   securities and deferred interest PIK bonds?
11        A    Yeah, I believe so.
12        Q    And that is the way you think it
13   should be done?
14        A    I think that is the way it
15   should be done.  I think that is the way it
16   is being done.
17        Q    And the 40 percent is 40 percent
18   of what?
19        A    Well, that's what we are
20   questioning here.  If you look in my e-mail,
21   that second to last paragraph, what I'm
22   saying is that I think -- equal cell C8 and
23   the haircut should not apply to the
24   denominator.
25             It's not the summary principal
```

Page 237

1
2      coverage tab, it's the next one, the big
3      file.
4            If you look up there there is D8
5      and C8.  So 40 percent of what -- I'm saying
6      it's 40 percent of the CDS principal balance,
7      which is a defined term; which I believe in
8      this case would have been $829 million, but
9      the calculations being done based on a
10     haircutted CDS principal balance, a lower
11     balance, it's being done based on the $755
12     million.
13     Q     Right, and looking back at the
14     indenture it's being done based on the $829
15     after giving effect to one and two above, the
16     first two ratings haircuts?
17     A     Correct.
18     Q     And your proposal was to read
19     that language as not being there?
20     A     My proposal was that the CDS
21     principal balance --
22     Q     Just use the CDS principal
23     balance without giving effect to the
24     parenthetical?
25     A     Yeah, I believe that's the way

Page 238

1
2      that I was interpreting it.
3            To say it another way, that
4      parenthetical relates to the numerator, and
5      that the denominator is a defined term is a
6      CDS principal balance.
7      Q     So how would the parenthetical
8      come into play?
9      A     You use the haircut for the
10     percentage of the pool that's rated below
11     investment grade; so BA1, BB+, that amount
12     has been haircut already, that is what the
13     parenthetical is referring to, it's not
14     referring to the defined term of CDS
15     principal balance.
16            THE VIDEOGRAPHER:  The time is
17     6:08 p.m.  Going off the record.
18            (A short break is taken.)
19            THE VIDEOGRAPHER:  The time is
20     6:23 p.m.  Back on the record.
21            (Whereupon, Aldama 27,
22     Collateral Management Agreement,
23     previously marked was shown to the
24     witness.)
25     Q     I just handed you what has been

Page 239

1
2      previously marked as Aldama Exhibit 27, which
3      is the collateral management agreement dated
4      February 27, 2007, between Cedar Woods CRE
5      CDO issuer and Angelo Gordon & Co. as
6      collateral manager.
7            Is this the collateral
8      management agreement under which Angelo
9      Gordon operates with respect to the Cedar
10     Woods II deal?
11     A     Yes.
12     Q     Is it your understanding that
13     this is a contract between Angelo Gordon and
14     the issuer?
15     A     Yes, that is my understanding.
16     Q     The services that are being
17     provided under this agreement are the
18     services that Angelo Gordon provides to the
19     issuer?
20     A     Correct.
21     Q     Section two, which starts on
22     page one, lists the services that the
23     collateral manager, Angelo Gordon in this
24     case, is to provide under the agreement?
25     A     It does.

Page 240

1
2      Q     Section 2A governs the --
3      determining the securities to be purchased or
4      sold by the issuer?
5      A     It does.
6      Q     And would you agree that all
7      purchases and sales of collateral on behalf
8      of the issuer are to be done in accordance
9      with the indenture?
10     A     I believe that's correct.
11     Q     Skipping over to page two,
12     paragraph G1, would you agree that Angelo
13     Gordon undertook an obligation to monitor the
14     collateral debt securities on an ongoing
15     basis?
16            MR. PEES:  Objection.
17     A     I would agree.
18     Q     In Subsection 2F, Angelo Gordon
19     undertook to determine whether any collateral
20     debt security is a defaulted security?
21            MR. PEES:  Objection.
22     A     I would agree.
23            (Whereupon, Jacobs 26,
24     Collateral Administration Agreement,
25     previously marked was shown to the

Page 241

1
2          witness.)
3      Q    I just handed you what has been
4  previously marked as Jacobs Exhibit 26, which
5  is the collateral administration agreement
6  dated February 27, 2007.
7          Would you agree with me that
8  this is a contract between the issuer, Angelo
9  Gordon as collateral manager and at least at
10  the time Lasalle National Bank?
11      A    I would.
12      Q    Which was to serve as collateral
13  administrator.
14          Based on what we discussed
15  earlier the entity that is now the collateral
16  administrator is U.S. Bank, correct?
17      A    Correct.
18      Q    Did you understand that Angelo
19  Gordon undertook certain responsibilities
20  under the collateral administrator agreement
21  as well as under the collateral management
22  agreement?
23      A    I do.
24      Q    States the issuer and collateral
25  manager shall cooperate with the collateral

Page 242

1
2  administrator including calculations relating
3  to the note reports, do you see that?
4      A    I do.
5      Q    In this paragraph Angelo Gordon
6  undertook to cooperate with the collateral
7  administrator in connection with the
8  calculations that were made in the note
9  reports?
10      A    Yes.
11      Q    And then in Paragraph D, on the
12  next page, it states "The collateral manager
13  shall review and to the best of its knowledge
14  verify the contents of the aforesaid reports
15  and statements", do you see that?
16      A    I do.
17      Q    Do you understand to refer to
18  among other things the note valuation reports
19  that we've looked at today?
20      A    I do.
21      Q    That section goes on to state
22  "To the extent that any information in such
23  reports or statements conflicts with data or
24  calculations in the records of the collateral
25  administrator -- the collateral manager, the

Page 243

1
2  collateral manager shall notify the
3  collateral administrator of such discrepancy
4  and use reasonable efforts to assist the
5  collateral manager, the collateral
6  administrator, in reconciling such
7  discrepancy", do you see that?
8      A    I do.
9      Q    You understand that Angelo
10  Gordon had undertaken that responsibility,
11  correct?
12      A    I do.
13          MR. MALLOY:  That is all I have,
14  subject to any further questions in
15  response to any issues that are raised
16  by my colleagues in the room.
17
18  CONT'D EXAMINATION BY MR. VENKATAKRISHNAN:
19
20      Q    Good evening, Mr. Solomon.
21          I'm Mahesh Venkatakrishnan, and
22  I'm an attorney for U.S. Bank.  I'm going to
23  ask you a couple of questions.
24          If I could direct you to the
25  exhibit you were just handed marked as Aldama

Page 244

1
2  27, do you recall you agreed with Mr. Malloy
3  that section two of the document lists
4  certain duties of the collateral manager; is
5  that correct?
6      A    That's correct.
7      Q    And you agree that Section 2F of
8  the collateral management agreement states
9  that the collateral manager that is
10  responsible for determining whether any
11  collateral debt securities are defaulted
12  securities?
13          MR. PEES:  Objection.
14      A    Well, I do see the language that
15  says "The collateral manager will provide and
16  is hereby authorized to provide the issuer
17  with the following services in accordance
18  with and subject to the application -- I'm
19  sorry, the applicable requirements of the
20  indenture in this agreement, and then
21  Subsection F is "Determining whether any
22  collateral debt security is a defaulted
23  security, a credit risk security, a written
24  down security, a withholding tax security or
25  an equity security.