# Exhibit I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

U.S. BANK NATIONAL ASSOCIATION,          :
as Indenture Trustee,
                                         :

          Interpleader Plaintiff,        :

          v.                                      Index No. 11 CIV 9199 (WHP)
                                         :

BARCLAYS BANK PLC; THE BANK OF
NEW YORK MELLON; MBIA INSURANCE          :
CORPORATION; and ANGELO, GORDON
& CO., L.P.,                             :

          Interpleader Defendants.       :

---------------------------------------------------------X


## EXPERT REPORT OF DANIEL I. CASTRO, JR.
## PROVIDED AT THE REQUEST OF WEIL, GOTSHAL & MANGES LLP,
## <u>          AS COUNSEL FOR MBIA INSURANCE CORP.          </u>


<u>**July 24, 2012**</u>

## I.   <u>EXECUTIVE SUMMARY</u>

1.        In my opinion, Barclays Bank PLC ("<u>Barclays</u>" or the "<u>Controlling Class</u>") is attempting, via this litigation, to force a draconian and extraordinarily costly (in terms of lost value) result that will undermine the deal all investors agreed to, by asserting constructions of the indenture for Cedarwoods CRE CDO II Ltd. ("<u>Cedarwoods II</u>" or the "<u>Issuer</u>") that are not consistent with how CDOs, in general (including Cedarwoods II, which, in my professional opinion, is a typical CDO in terms of its structure and mechanisms), are designed to operate.  In a transaction as complex as a CDO, it is not unusual or infrequent for certain breaches to occur and mistakes to be made from time to time. Of course, not all breaches or mistakes are created equal.  Certain types of breaches or mistakes are generally considered by market participants to be so serious and adverse to the noteholders as a group, that most, if not all, CDOs classify them as "events of default," allowing the controlling noteholders to wind up the deal by directing an acceleration of all the notes and an early liquidation of all of the CDO's collateral.  Examples of such events of default typically include shortfalls in the payment of interest on the senior-most notes (Section 5.1(a) of the Cedarwoods II indenture), shortfalls in the payment of the full amount of principal of all notes when due and payable (Section 5.1(b) of the indenture), uncorrected payment distributions not in compliance with the trustee reports (Section 5.1(c) of the indenture), a bankruptcy event in respect of the issuer (Section 5.1(h) of the indenture), and the issuer or the collateral becoming required to be registered under the Investment Company Act (Section 5.1(e) of the indenture). [1]

2.        Most CDOs also include an event of default based on the non-satisfaction of an overcollateralization test (Section 5.1(d) of the Cedarwoods II indenture) in respect of the senior-

---

[1] Unless stated otherwise, all capitalized terms used in this Report have the same meaning as in the Cedarwoods II indenture.

most tranche of the CDO's notes, meant to be triggered only by a substantial impairment of the collateral so significant that the senior-most noteholders' structural and credit protections are deemed significantly threatened.  Tellingly, Barclays does not allege that such an Event of Default has occurred in Cedarwoods II, even though, in my experience, that is the most commonly triggered event of default in CDOs that have been liquidated due to an event of default.

3.     Every CDO that I am familiar with also has an event of default that covers other unspecified breaches of and mistakes under the indenture.  Such event of default in Cedarwoods II is set forth in Section 5.1(f) of the indenture, which has been asserted by Barclays as one of three bases for its acceleration direction.  As is the case with Sections 5.1(b) and (c) of the Cedarwoods II indenture, which Barclays also has cited, Section 5.1(f) of the indenture in most respects is a commonplace formulation in CDO indentures.  Because Section 5.1(f) covers all other breaches and mistakes in reports (with stated exceptions), it requires that certain thresholds and conditions be met before a breach or mistake gives rise to an Event of Default – namely that the breach has a material adverse effect on <u>all</u> Secured Noteholders and that a cure period has expired after the issuer or the collateral manager has knowledge of, or they receive a specified form of notice of, the breach.  Without such additional requirements, any immaterial and correctable breach of the indenture would be an event of default that renders the more specific events of default superfluous and, given the prevalence of minor or technical breaches in transactions as complex as CDOs, which minor or technical breaches often allow for a limited remedy, would essentially allow controlling noteholders to have a call option to wind up the transaction at almost any time to the potentially severe prejudice of other investors.  Of course, whether any junior investor would agree to or invest in such a deal is highly doubtful.

4.    That controlling noteholders cannot assert an event of default under Section 5.1(f) for breaches that do not have a material adverse effect on all Secured Noteholders does not leave such controlling noteholders without a remedy.  The collateral manager in a CDO is responsible for taking, on the issuer's behalf, most of the key actions that are required to be taken by the issuer.  Therefore, if a collateral manager does not perform its duties in a satisfactory manner, managed CDOs typically allow certain controlling noteholders to take action to remove and replace the collateral manager under specified circumstances.  Virtually all CDO collateral management agreements that I am familiar with have a collateral manager removal provision that is parallel in nature to the indenture event of default covering unspecified indenture breaches, but with a threshold that is lower than that for an event of default to arise.  Cedarwoods II is no different, in that it permits the controlling noteholders to direct removal of the collateral manager for material breaches of its obligations that have a material adverse effect on the holders of any single class of notes, rather than on all Secured Noteholders as required by Section 5.1(f) of the indenture.  Thus, to the extent that any breaches by the issuer are a result of breaches by the collateral manager (as are most of the breaches alleged by Barclays in this litigation), and such breaches have a material adverse effect on the controlling noteholders rather than on all Secured Noteholders, it is possible that the controlling noteholders could have the right to remove and replace the collateral manager, notwithstanding their inability to invoke an event of default.

5.    Of course, most breaches are unlikely to be material enough to allow for removal of the collateral manager, much less allow for controlling noteholders to assert an event of default. The indenture for a CDO typically contemplates lesser remedies for such breaches, which remedies depend on the nature of the breach.  Such remedies allow the transaction to continue forward without the deal being accelerated and liquidated or a significant party like the collateral

manager being terminated.  Such remedies include, among other things, corrections to trustee reports, clawback and redistribution of funds to redress previous distributions made in error, and asset sales and reinvestments.

6.     This regime of various levels of remedies in CDOs was refined over many years by CDO market participants through their experience with thousands of CDOs.  What Barclays is seeking to do here is upend this widely understood regime that the Cedarwoods II investors would have understood governed their investment at the time they made their investment, by attempting to leverage less significant breaches or mistakes into the intentionally narrow rubric of events of default, thereby hijacking the CDO from the investors' bargain.  The types of breaches alleged by Barclays in this litigation – misclassification of Collateral Debt Securities (and a resulting incorrect calculation of an overcollateralization ratio), noncompliance with collateral concentration limitations/eligibility criteria, and incorrect information in trustee reports – are the classic kinds of less significant and easily curable breaches never intended to give rise to events of default.  To the extent such breaches may permit the less drastic remedy of removing the collateral manager, my understanding is that Barclays has not even sought such remedy.  From my knowledge of the alleged breaches, however, such breaches, even if Barclays' allegations are correct, likely would not even give rise to a cause for removal under the collateral management agreement.  But this would not be surprising as the breaches alleged are easily disposed to cure, whether via correction of trustee reports, recalculation of coverage tests and waterfalls, or clawback and redistribution of misdirected funds – to the extent later distributions have not already cured any distribution mistakes.

7.     This would be consistent with my 15+ years of experience with CDOs, in which I have witnessed and been aware of many similarly minor breaches that were corrected without the

transaction being accelerated and the collateral being liquidated early.  I am not aware of any CDOs where minor breaches or mistakes of the types alleged by Barclays here were even alleged to have given rise to events of default under CDO indenture provisions parallel to Sections 5.1(b), (c), and (f) of the indenture, as Barclays asserts.

## II.   QUALIFICATIONS, PRIOR TESTIMONY, AND ENGAGEMENT

8.   I am an independent consultant focusing on structured finance markets, including collateralized debt obligations ("CDOs"), including CDOs of CDOs (called CDO-Squareds ("CDO^2s")), asset-backed securities ("ABS"), mortgage-backed securities ("MBS") (both residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS")), asset-backed commercial paper ("ABCP"), and structured investment vehicles ("SIVs").  I provide due diligence, valuation, expert witness, litigation support, and general consulting services.  I have frequently addressed structured finance-industry conferences, and have provided commentary on the structured finance markets in various publications.[2]

9.   From 2005 through 2008, I was Managing Director, Chief Credit Officer, and a Portfolio Manager for the Structured Finance Group at GSC Group.  During that time, GSC Group (formerly GSC Partners and Greenwich Street Capital Partners) was an investment management firm and asset manager that, among other things, served as a CDO collateral manager, and invested in, among other things, CMBS, RMBS, and other real estate structured products.  While at GSC Group, I participated in the collateral management of 13 CDOs, including a CDO^2 that closed in May 2007.  As part of my responsibilities for GSC's services as a collateral manager, I participated in the selection of assets for CDOs, the purchase and warehousing of those assets for particular transactions, and the structuring, documentation, and

---

[2] A copy of my complete *curriculum vitae* is attached as Exhibit A to this Report.

closing of CDOs.  As part of my role in documenting these CDOs, I reviewed and helped negotiate all of the primary transaction documents relating to such transactions, including the indentures and collateral management agreements.  I also provided credit analysis and trading advice to GSC Group's Structured Finance, Commercial Real Estate, and Leveraged Loan investment committees and their decisions involving ABS, MBS, CDOs, commercial real estate, other structured products, and leveraged loans.  Furthermore, I helped to manage a GSC hedge fund that invested, primarily, in CDO equity, and a GSC hedge fund that invested in illiquid/distressed ABS/MBS.  I also helped manage a Real Estate Investment Trust (known as a "<u>REIT</u>").

10.  Prior to joining GSC Group, I was the head of the Structured Finance Research Department at Merrill Lynch for over 13 years, from 1991 to 2004.  At Merrill Lynch, I was responsible for extensive research into structured finance markets and publishing periodic research reports regarding, among other structured products, CDOs, MBS, and ABS.  I interacted extensively with Merrill Lynch's institutional-investor clients regarding sales, trading, and origination of ABS/RMBS/CMBS-backed CDOs, non-agency MBS, ABS, collateralized loan obligations ("<u>CLOs</u>"), ABCP, SIVs, and other structured finance products.  During each year between 1992 and 2004, Institutional Investor magazine named me a member of some combination of its All-American Fixed Income Research Team for CDO strategy, ABS strategy, non-agency MBS, and prepayments—including multiple instances as a "First Team" member for ABS strategy.

11.  From 2007 to 2010, I was on the Board of Directors of the American Securitization Forum ("<u>ASF</u>").  ASF is an industry trade organization that represents the structured finance and securitization industries.  I also served on ASF's Investor Committee (which addresses the issues

and concerns of investors in structured finance markets), on the Editorial Advisory Board of *American Securitization* (which is ASF's official journal), and as a CDO Program Advisory Committee member for the ASF 2008 conference.  As a representative of ASF, I provided expert advice and analysis to Congressional committees, the Federal Reserve, and the Department of the Treasury on issues related to securitization.  I also lectured to ASF program participants on "CDOs—Concepts and Topics" and "Securitization 101—Introduction to Securitization."

12.   In the past four years, I have provided expert testimony by deposition in two cases: Greywolf Capital Management LP v. Fortis Securities LLC, Case No. C08601171 (N.Y. Sup. Ct.), and Bank of America, N.A. and Bank of America Securities LLC v. Bear Stearns Asset Management Inc., Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal, Case No. 08-CV-9265 (U.S. District Court, S.D.N.Y.).  I have not testified as an expert at trial.  I have also published on many occasions.  A list of the publications I have authored in the previous ten years is attached as Exhibit B to this Report.

13.   I have been given access to all materials produced by both the parties and the non-parties, as well as to the transcripts of all depositions which have been taken by the parties in this action.  The specific material which I considered in forming my opinions is listed in Exhibit C to this Report.

14.   I have been retained in this matter by Weil, Gotshal & Manges LLP, on behalf of its client, MBIA Insurance Corporation ("MBIA"), as an expert consultant to express my opinions, including through testimony, regarding the dispute related to Cedarwoods II, and in particular, the market understanding of and market practice with respect to certain provisions of the indenture.

15.   My fee for this engagement will be calculated on an hourly basis at the rate of $800 per hour.  The payment of my fee is not contingent upon the nature or the content of the opinions I express or on the outcome of this action.

III.   **FACTUAL BACKGROUND**

A.   **Commercial Real Estate CDOs**

16. A CDO is an entity—and typically a bankruptcy-remote special-purpose vehicle ("SPV"), also referred to as a special-purpose entity ("SPE")—that purchases a pool of assets ("Collateral Assets") financed by the issuance of debt and equity securities ("CDO Securities"). The Collateral Assets can be any of a variety of debt instruments that generate cash flow from which the CDO can make payments to the investors in the CDO Securities the CDO issued. Collateral Assets can include RMBS, CMBS, leveraged business loans, trust preferred securities, and other cash-generating debt obligations.  CDO Securities, in turn, are issued in tranches, with each tranche assigned a different priority to the payment of principal and interest by the terms of the CDO's governing documents.

17. A commercial real estate CDO ("CRE CDO"), like Cedarwoods II, is a CDO whose Collateral Assets are commercial real estate assets.    In 2006-2007, when Cedarwoods II was being put together, the Collateral Assets for CRE CDOs generally were, in whole or in substantial part, CMBS, REIT debt, commercial real estate debt, and real estate company debt.

18.     The governing documents for CDOs typically have criteria specifying the eligibility of certain assets that can be Collateral Assets ("Eligibility Criteria") and limitations on the amount of the total portfolio that can be concentrated in any particular asset class ("Concentration Limitations").  Eligibility Criteria may address, among other things, asset ratings, the weighted average rating factor ("WARF") for the asset pool, default status, issuer jurisdiction, and cash-security or synthetic-security status.  Concentration Limitations may address, among other things, Collateral Asset types, geographic concentrations, issuer concentrations, property-type, and ratings.  The Cedarwoods II indenture has both Eligibility

Criteria and Concentration Limitations, each of which are meant to be satisfied (or, in the case of Concentration Limitations that are already exceeded, not worsened) each time the issuer purchases a new Collateral Debt Security.

19.     Cedarwoods II is an approximately $600 million CRE CDO that closed on February 27, 2007; the stated maturity date for Cedarwoods II's Secured Notes – which are the Class A, B, C, D, E, and F CDO Securities (described below) issued by Cedarwoods II – is February 25, 2052.  Angelo Gordon & Co., L.P. ("Angelo Gordon") serves as the Collateral Manager, in which capacity it is responsible for, among other things, investment decisions regarding the Collateral Debt Securities and for monitoring, classifying and valuing the Collateral Debt Securities.  U. S. Bank, N.A. ("U.S. Bank") serves as both the successor Trustee and the successor Collateral Administrator.  As Trustee, U.S.  Bank acts as a fiduciary for the Secured Noteholders.  As Collateral Administrator, U.S. Bank is also responsible for monitoring the Collateral Debt Securities and providing certain reports, schedules, calculations, and other data related to the Collateral Debt Securities based upon information it receives from the Collateral Manager and other sources.  The rights of all holders of the Cedarwoods II Secured Notes and Income Notes (collectively, the "Noteholders") are governed by the indenture dated as of February 27, 2007 (the "Indenture").

20.  Despite some specific limitations on Angelo Gordon's discretion as Collateral Manager, Cedarwoods II is considered a Managed CDO (one in which the collateral manager is relied upon to make sales and purchases of Collateral Assets during the life of the CDO) rather than a static CDO (in which the Collateral Asset portfolio is held constant and the collateral manager is afforded little or no discretion to purchase or sell Collateral Assets after the transaction's closing).  Managed CDOs have a Reinvestment Period during which time principal

11

collected on Collateral Assets, subject to specified conditions, can be reinvested in new Collateral Assets.  The collateral manager is also permitted to direct the Trustee to sell certain Collateral Assets in discretionary sales during the reinvestment period.  The collateral manager generally may also direct the issuer to sell or otherwise dispose of any Collateral Asset that goes into default.   Under the Cedarwoods II Indenture, the Collateral Manager may direct Discretionary Sales during the Reinvestment Period and the sale of Defaulted Securities, as well as Written Down Securities, Withholding Tax Securities, Credit Risk Securities or Equity Securities, during or after the Reinvestment Period.

21. Cedarwoods II issued the following classes of CDO Securities (principal amounts and ratings are as of issuance) (collectively, the "Notes"):

| Note Class | Rating(M/S) | Principal | % of Deal | Coupon |
|---|---|---|---|---|
| A-1 | Aaa/AAA | $390,000,000 | 65.0% | L* + 0.27% |
| A-2 | Aaa/AAA | 78,000,000 | 13.0% | L + 0.29% |
| A-3 | Aaa/AAA | 28,500,000 | 4.8% | L + 0.31% |
| B | Aa2/AA | 29,250,000 | 4.9% | L + 0.38% |
| C | A2/A | 20,250,000 | 3.4% | L + 0.60% |
| D | Baa2/BBB | 19,500,000 | 3.3% | L + 1.38% |
| E | Baa3/BBB- | 6,000,000 | 1.0% | L + 1.60% |
| F | Ba2/BB | 10,500,000 | 1.8% | L + 3.20% |
| Income Notes | N/A | 18,000,000 | 3.0% | N/A |
| Total | | $600,000,000 | 100.0% | |

*L = 1 month LIBOR

a. The "Super Senior."  The senior-most tranche of Cedarwoods II – the Class A-1 Notes –  is generally referred to as the "Super Senior" tranche and is owned by Barclays.   Every tranche below (i.e., junior to) the Super Senior provides credit enhancement to the Super Senior by absorbing credit losses prior to such losses being experienced by the Super Senior, and therefore reduces the Super Senior's credit risk. The Super Senior's relatively reduced credit risk, as compared to the tranches junior to it,

means that investors receive a lower yield on that tranche than investors receive on account of the junior tranches.

b.   The "Mezzanine Notes."   Between the Super Senior and the Income Notes (see below), Cedarwoods II issued seven tranches of CDO Securities: Class A-2 Notes, Class A-3 Notes, Class B Notes, Class C Notes, Class D Notes, Class E Notes, and Class F Notes.   The Class A-2 Notes are 100% owned by Bank of New York Mellon ("BONY") as a Collateral Agent for a separate investment program.   MBIA issued a surety bond to that other investment program that provides insurance coverage relating to payment of interest and principal due from the Issuer on the Class A-2 Notes.   The Class C Notes, Class D Notes, Class E Notes, and Class F Notes are "deferrable" notes, meaning that on any given Payment Date, failure by the Issuer to make interest payments on such CDO Securities is not considered a default.   Rather, such unpaid interest amounts are deferred until there are sufficient proceeds available from the Collateral Debt Securities to pay such amounts.

c.   The "Income Notes."   Cedarwoods II issued $18,000,000 of Income Notes. The Income Notes (which are sometimes called the CDO's "equity") hold the first-loss position for credit losses experienced by the Collateral Debt Securities, but receive all of the transaction's residual cash flow in each payment period (i.e., excess cash flow after paying various fees and expenses plus any principal and interest due on the Super Senior and Mezzanine Notes during that period).

## C.   **The Indenture's Priority of Payments**

22.   The Issuer's sole source of proceeds to pay interest and repay principal on the various classes of Notes issued by Cedarwoods II (other than potential payments by the hedge

13

counterparty and returns on certain safe "eligible investments") is the Collateral Debt Securities owned by the Issuer and managed by the Collateral Manager.  Proceeds from the Collateral Debt Securities are categorized under the Indenture as either Collateral Interest Collections or Collateral Principal Collections (together, the "Collateral Proceeds"), which are held in the Trustee's name in an account known as the "Collection Account." The amount of cash held in the Collection Account in relation to a given "Payment Date" is defined by the Indenture as "Available Funds." On each Payment Date, in accordance with the relevant Payment Report, the Trustee is required to disburse the Available Funds to pay certain fees and administrative costs associated with the operation of the CDO, to make payments in connection with hedge agreements, and to pay the Noteholders, all in accordance with the order of priority set forth in the "waterfall" set forth in the Indenture, discussed immediately below.   Payment Reports are prepared in advance of every Payment Date by the Collateral Administrator based on information it has received from the Collateral Manager. The Trustee is required by the Indenture to follow the payment instructions contained in the Payment Report. See Indenture, § 11.1.

23.   The payment instructions set forth in each Payment Report are meant to reflect the "Priority of Payments" in Section 11.1 of the Indenture, often referred to by market participants as the "waterfall," which is comprised of an "interest waterfall" (dealing with the allocation of Collateral Interest Collections) and a "principal waterfall" (dealing with the allocation of Collateral Principal Collections).   The interest waterfall and principal waterfall (which are similar in most respects) are set forth in Sections 11.1(a) and 11.1(b) of the Indenture, respectively.   Under the waterfall provisions, certain stakeholders have priority over other stakeholders when it comes to receiving Available Funds on each Payment Date.  For example,

under each of the waterfalls, certain fees and expenses of the CDO must be paid before Class A-1 Noteholders receive any payments; Class A-1 Noteholders must receive payments before Class A-2 Noteholders; Class A-2 Noteholders must receive payments before Class A-3 Noteholders; Class A-3 Noteholders must receive payments before Class B Noteholders, and so forth.  During the Reinvestment Period, which in Cedarwoods II ran until February 2012, Collateral Principal Collections that would otherwise go to Noteholders are instead directed to the purchase of Substitute Collateral Debt Securities or to the Collection Account for reinvestment in Eligible Investments pending investment in Substitute Collateral Debt Securities in accordance with the Reinvestment Criteria.  If the Collateral Manager determines that investments in additional Collateral Debt Securities would either be impractical or not beneficial, then available Collateral Principal Collections for reinvestment would become the Special Amortization Amount and be applied to the payment of principal on the Secured Notes on the next succeeding payment date. In the absence of such a Special Amortization, Noteholders do not generally receive distributions of principal received on Collateral Debt Securities until after the Reinvestment Period.

24.   The amount of Available Funds varies from Payment Date to Payment Date based on, among other things, the Collateral Proceeds received from the Collateral Debt Securities. Importantly, amounts paid pursuant to the waterfalls are limited to the amount of Available Funds; there is no other source of funds.  Thus, a Noteholder will only receive a payment on a Payment Date to the extent there are sufficient Available Funds left over after any stakeholders that have priority over it have been paid. Thus, Class A-1 Noteholders will only receive payments if there are sufficient funds remaining after certain fees and expenses have been paid, and Class A-2 Noteholders will only receive payment if there are sufficient funds remaining after Class A-1 Noteholders have been paid what is owed to them on such Payment Date.

15

25.   It is crucial to note that Section 11.1 does not provide whether any amounts and, if so, how much, are <u>owed</u> to Noteholders on a given Payment Date.  Rather, Section 11.1 is simply a waterfall that provides the order of priority in which Available Funds are disbursed on a Payment Date.  Whether a Noteholder or any other stakeholder was entitled to receive a payment on a Payment Date regardless of whether there were sufficient Available Funds available at the relevant point in the waterfall to make such payment is set forth in other parts of the Indenture, the Notes, or in the other transaction documents.  Thus, the waterfall is simply a set of payment priorities – it does not address whether any amounts are due and payable.

26.   In addition to the credit enhancement provided by subordination of junior classes, certain classes of Cedarwoods II are also protected by various "tests" or "triggers" built into the structure of the transaction.  CDOs typically have asset coverage tests, which, if violated in relation to a payment date, will redirect collateral proceeds from payment to lower-rated tranches to pay down the principal of the senior-most CDO Security outstanding until such time that such coverage tests are met.  A CDO may have a coverage test for each rated class of securities (<u>e.g.</u>, a Class A test, a Class B test), or it may have tests that cover multiple classes (<u>e.g.</u>, a Class A/B test, a Class C/D test).  Coverage tests are designed to protect senior noteholders by accelerating the pay down of principal and thereby increasing subordination (<u>i.e.</u>, credit enhancement).  The higher the coverage ratios, the better off senior noteholders are, since higher ratios represent greater credit enhancement in the form of overcollateralization.

   a.   Cedarwoods II has three principal coverage tests: one covers Class A and Class B ("<u>Class A/B Principal Coverage Test</u>"); one covers Class C ("<u>Class C Principal Coverage Test</u>"); and another covers Class D and Class E ("<u>Class D/E Principal Coverage Test</u>").  On any given determination date in respect of a Payment Date, if one

or more of those tests are not satisfied, then Collateral Proceeds are diverted from the lower ranking CDO Securities (including the Income Notes) and redirected to pay down principal, first, on the Super Senior, and if the Super Senior is already paid down, then, subsequently, to the lower classes sequentially due principal payments.[3]

  b. Each of the Principal Coverage Tests described above is satisfied if it meets a specified overcollateralization ("O/C") ratio.[4]  The O/C ratio is calculated generally as the principal amount of Collateral Debt Securities outstanding divided by the principal amount of Cedarwoods II Notes outstanding starting from the senior-most position in the capital structure (i.e., the Super Senior) down to the classes named in the particular test. The O/C ratios for the Class A/B, Class C, and Class D/E Principal Coverage Tests in Cedarwoods II are 106.5%, 104.8%, and 102.5%, respectively.  The O/C tests are dynamic in nature because the O/C ratio changes as the aggregate value of assets fluctuates and tranches pay down.  Two aspects of the O/C ratios in particular are pertinent to this litigation:  (1) the principal amount of certain underperforming Collateral Debt Securities are not included in the numerator at full par value; rather, a "haircut" is taken so that some amount less than par is included in the numerator such that, all else being equal, the numerator is reduced and the O/C ratio is decreased, and (2) a pay down

---

[3] In Cedarwoods II, if the Class A/B Principal Coverage Test is violated, Collateral Proceeds are diverted from the Class C, Class D, Class E, and Class F Notes, as well as funds otherwise payable to the Income Notes and funds earmarked for reinvestment in Collateral Debt Securities.  All of that cash flow must be used to pay down principal of first, the Super Senior Class A-1 Notes, second, the Class A-2 Notes, third, the Class A-3 notes, fourth, the Class B Notes, and fifth, the Class C Notes, in each case to the extent needed for the Class A/B Principal Coverage Test to be satisfied.  Similarly, if the Class C Principal Coverage Test is not satisfied, Collateral Proceeds are redirected from Class D, Class E, Class F, and the Income Notes in the same manner as in the Class A/B Principal Coverage Test.  If the Class D/E Principal Coverage Test is violated, Collateral Proceeds are redirected from Class F and the Income Notes in the same manner as in the Class A/B Principal Coverage Test.

[4] The Cedarwoods II Indenture also has Interest Coverage Tests, which I do not address in this Report because they do not appear to be at issue in the litigation.

of principal of the Class A-1 Notes will, all else being equal, reduce the denominator in the O/C ratio and thereby increase the O/C ratio.

27.   There is a separate O/C ratio that is critically important to Cedarwoods II:   The "Class A Principal Coverage Ratio" is defined as the ratio of the principal amount of Collateral Debt Securities outstanding divided by the outstanding balance of Class A Notes (i.e., the "Super Senior" Notes, the Class A-2 Notes, and the Class A-3 Notes).   Failure of this test (such ratio must be equal to or greater than 101.75%) is an event of default ("EOD") under Section 5.1(d) of the Indenture.   Notably, the haircuts in the numerator described above in respect of the Class A/B, Class C, and Class D/E Principal Coverage Tests are not considered when calculating the Class A Principal Coverage Ratio.   Market participants generally consider this Event of Default, and similar EODs in other CDOs using varying ratios, the most critical, because it is intended to ensure that there is enough collateral to support cashflows due to bondholders.   During the recent financial crisis, this type of EOD was the primary cause of acceleration for deals that were liquidated early.   Importantly, Barclays does not claim that this Event of Default has been triggered; indeed, the Class A Principal Coverage Ratio has been passing at all times by a considerable margin.

28.   If any Coverage Test (which, under the Indenture, does not include the Class A Principal Coverage Ratio) is not satisfied while any Class of Senior Secured Notes (Classes A through E) is outstanding, then a so-called "Mandatory Redemption" under Section 9.8 of the Indenture may be required.   A Mandatory Redemption under the Indenture is a payment to reduce the principal balance of the senior-most class of Notes outstanding to a level where the applicable Coverage Test is satisfied, i.e., the denominator of the relevant O/C ratio is reduced to reflect such pay downs of such principal on the senior-most Notes until such ratio is back in

compliance with the relevant Coverage Test.  Whether or not a Mandatory Redemption must, in fact, take place in such a circumstance depends on which Coverage Test is not satisfied and whether there are any Available Funds to make a redemption at the point in the payment waterfall relating to such Coverage Test.  This is because a Mandatory Redemption payment, as is the case with any other payments to Noteholders under the Indenture, must be in compliance with the order of priority set forth in the waterfalls.  Importantly, if a Coverage Test is not satisfied in respect of a Payment Date, but there are no Available Funds at the point in the payment waterfall relating to such Coverage Test, then no payment is owed to any Noteholders as a result, i.e., no Mandatory Redemption is required.  If a Coverage Test is not satisfied in respect of a Payment Date and there are Available Funds remaining at the relevant priority level of the waterfall, then Collateral Proceeds that would otherwise be used to make payments to stakeholders who are subordinate in the waterfall, or to fund reinvestments in Substitute Collateral Debt Securities, are used instead to redeem a portion of the principal outstanding on the most senior class of CDO Securities still outstanding until each failed Coverage Test is satisfied or the principal on such class of CDO Securities has been paid in full (in which case the next most senior class of CDO Securities will be redeemed until such failed Coverage Test is satisfied).  Thus, for example, if the Class D/E Coverage Tests (principal and/or interest) fail, then under the relevant provisions of the waterfall, i.e., Sections 11.1(a)(xvi) and 11.1(b)(x) of the Indenture, a Mandatory Redemption should occur, but only to the extent there are Available Funds.  If there are Available Funds, then the Collateral Proceeds that would otherwise have been used to pay the lower waterfall positions (i.e., 11.1(a)(xvii) and below, and 11.1(b)(xi) and below), would instead be used to pay down the principal balance of the most senior class of CDO Securities then outstanding until the test is satisfied.  If, however, the Class D/E Coverage Tests

fail, but there are no Available Funds at such points in the waterfalls, then the most senior class of CDO Securities will not be entitled to receive any payments or redemptions as a result of the failure of such Coverage Tests.

29.   Whether a Coverage Test has been satisfied in respect of a Payment Date, whether there are any Available Funds to pay down the principal on the senior-most CDO Securities – a Mandatory Redemption – as a result thereof, and, if so, the amount of Collateral Proceeds that should be diverted from paying subordinate stakeholders, are all set forth in the Payment Report prepared by the Collateral Administrator.  The Trustee is expressly required by the Indenture to follow such Payment Report in distributing Collateral Proceeds.   Although the Priority of Payments in the Indenture is a set of instructions that governs the payment directions in the Payment Reports, the Indenture itself does not provide the specific direction (i.e., the actual dollar amounts) that the Trustee is to distribute on a Payment Date.   Therefore, to determine whether a Coverage Test has not been satisfied and, if so, whether a Mandatory Redemption should result, the Trustee is required to follow the Payment Report. Not only is there is no other source of information that would inform the Trustee otherwise, but even if there were such a source, the Trustee would not be permitted to make distributions in accordance with such other source rather than the Payment Report.

30.   Lastly, the Indenture specifically provides for the return by transaction parties of monies distributed under the waterfall where it is determined that such payments had been made by the Trustee incorrectly, such as if a Payment Report is discovered to have contained an error. This mechanism is commonly referred to by market participants as a "clawback" provision, and is found in Section 13.1(h) of the Indenture.   Thus, in the event that any Noteholder receives a distribution that is contrary to the provisions of the Indenture, such distribution "shall be

received" by the recipient and held in trust for the benefit of the Trustee, who shall recover the incorrectly distributed funds (i.e., "claw" them back) and pay and deliver the same distribution to the rightful parties in accordance with the Indenture. Because misallocations of proceeds and other errors in payments occur commonly in CDOs and other structured finance securities transactions, clawback provisions are included in such transactions so that these misallocations and errors can be rectified without giving rise to an event of default. Similarly, in the event that errors are made in a Payment Report or other report in connection with a CDO or other structured finance transaction, it is common for the Trustee to re-state the report and re-allocate future distributions (or clawback prior distributions) in order to restore parties to the same economic positions they would have been in, but for the occurrence of the misallocation or error. These types of corrections also happen without giving rise to an event of default.

### D.    Events of Default Under the Indenture

31.    All CDOs contain language defining events of default. The idea underlying an event of default is the concept that certain catastrophic events or conditions (generally ones that cannot be corrected) should allow Noteholders or the Trustee on their behalf to accelerate the maturity date of the CDO Securities and direct the near term liquidation of Collateral Assets, among other remedies. This simply means that the collateral will be sold off, typically by way of auction, and the proceeds will pay down the CDO Securities in accelerated fashion, in accordance with the waterfall in the indenture.

32.    Section 5.1 of the Indenture defines the conditions that constitute an Event of Default for the Cedarwoods II transaction. Although there are eight possible Events of Default, only three of them – 5.1(b), (c) and (f) – are at issue in this matter:

33.    Section 5.1(b) provides for an Event of Default based upon

21

a default in the payment of any principal, when due and payable of any Secured Note (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days).

34.   Section 5.1(c) provides for an Event of Default based upon

the failure on any Payment Date to disburse amounts available in accordance with Section 11.1 (except as provided in Section 5.1(a) and (b) above) and a continuation of such failure for five Business Days (or, in the case of a default in payment resulting solely from an administrative error or omission by the Trustee, the Administrator, any Note Paying Agent or the Note Registrar, such default continues for a period of five Business Days).

35.   Section 5.1(f) provides for an Event of Default based upon

a default in the performance, or breach, of any other covenant (it being understood that non-compliance with any of the Coverage Tests, the Collateral Concentration Limitations or the Collateral Quality Tests will not constitute a default or breach) or of any representation or warranty of the Issuer under this Indenture or if any certificate or writing delivered pursuant hereto proves to be incorrect when made, which default or breach has a material adverse effect on the Secured Noteholders and continues for a period of 30 days (or, in the case of a Default, breach or failure of a representation or warranty regarding the Collateral, 15 days) of the earlier of knowledge by the Issuer or the Collateral Manager or notice to the Issuer and the Collateral Manager by the Trustee or to the Issuer and the Collateral Manager by the Holders of at least 25%, of the then Aggregate Outstanding Amount of the Secured Notes of any Class, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" under this Indenture.

**E. Barclays' Decision to Send a Notice of an Event of Default**

36.   On August 24, 2011, Barclays, as owner of the Controlling Class of Notes issued by Cedarwoods II, sent the Trustee a Notice of Event of Default, stating that an Event of Default pursuant to Section 5.1(c) of the Indenture had occurred and directing the Trustee to accelerate the Notes and liquidate the Collateral Debt Securities (the "First Default Notice"). Specifically, Barclays asserted that "a significant number of errors have been made with respect to the determination of whether certain Collateral Debt Securities are or were Defaulted Securities

and/or Deferred Interest PIK Bonds and that these errors have caused the Issuer to treat the Class D/E Par [sic] Principal Coverage Test as passing when this test was, in fact, failing. . .″  (First Default Notice, at 1.)  According to the First Default Notice, the failure of such Coverage Test should have caused Mandatory Redemptions of the Class A-1 Notes to occur on Payment Dates in December 2010, and January, February, March and April 2011.  Barclays alleges that the total amount of funds that should have been allocated to it under the waterfall provisions pursuant to Mandatory Redemptions, but were not, is approximately $8.5 million.

37.  On October 6, 2011, Barclays sent the Trustee an "Additional Notice of Event of Default and Direction to Accelerate" pursuant to Section 5.1(f) of the Indenture (the "<u>Second Default Notice</u>").  In particular, Barclays asserted in the Second Default Notice "that the failure to prepare accurate Payment Reports and Note Reports constitutes an Event of Default under Section 5.1(f) of the Indenture" because, following the First Default Notice, the errors that had been identified by Barclays were not remedied even though thirty days had passed.  (Second Default Notice, at 1.)  The Second Default Notice further asserted that the "misallocations represent a significant amount of money and the failure by the Issuer to perform its obligations in this regard has therefore had a material adverse effect on Secured Noteholders."

38.  On December 5, 2011, Barclays sent a Liquidation Direction Notice to the Trustee pursuant to Section 5.4(a)(iii) and Section 5.5(a)(ii) of the Indenture, directing the Trustee to liquidate the Collateral based upon an Event of Default having occurred under Section 5.1(f) (but not Sections 5.1(b) or 5.1(c)) of the Indenture.

39.  On December, 6, 2011, the Trustee, which had previously issued notices to Noteholders regarding the prior notices from Barclays, issued a notice to Noteholders stating that, pursuant to Section 5.5(a)(ii) of the Indenture, Barclays "has informed the Trustee that the

sale and liquidation of the Collateral is to be consummated as promptly as possible, subject to the terms of the Indenture." (Dec. 6, 2011 Trustee Notice at 2.)

40.   On December 13, 2011, the Trustee sent a notice to Noteholders stating that it had received written objection from each of the Collateral Manager and the representative of the Class A-2 Noteholder to the declaration of the Event of Default under Section 5.1(f) of the Indenture, the acceleration of the Notes, and the liquidation of the Collateral Debt Securities. Based upon such objections, the Trustee stated that it was indefinitely suspending the scheduled sale of the Collateral Debt Securities, escrowing all amounts payable under the waterfalls, and filing an interpleader action in the United States District Court for the Southern District of New York to allow the Court to resolve the dispute.

41.   On December 15, 2011, U.S. Bank filed the present interpleader action (the "Action").   On January 20, 2012, Barclays filed an Answer and Affirmative Claim to Interpleader Funds in which it asserted that Events of Default had occurred under Sections 5.1(c) and/or (f) of the Indenture.   On February 8, 2012, Barclays filed an Amended Answer and Affirmative Claim to Interpleader funds in which it asserted that Events of Default had occurred under Sections 5.1(b), (c), and/or (f) of the Indenture.

42.   On March 1, 2012, Barclays filed a motion for summary judgment (the "Summary Judgment Motion").   Barclays asked the Court to rule that there had been Events of Default under Sections 5.1(b), 5.1(c), and 5.1(f) of the Indenture.   Barclays argued, among other things, that there had been an event of default due to "the failure to pay over $8.5 million in principal to Barclays when it became due and payable…" (Brief in Support of the Summary Judgment Motion (the "Brief" or "Br." at 2)), even though the Payment Reports for the relevant Payment Dates did not indicate that such Collateral Proceeds were to be paid to Barclays.

24

## IV.    ANALYSIS AND OPINIONS

### A.    Alleged Default Under Section 5.1(b)

43.    Barclays' reliance on Section 5.1(b) in the circumstances presented here represents a fundamental misunderstanding of this section.   Section 5.1(b), which provides for an Event of Default for non-payment "of any principal, when due and payable of any Secured Note," is a standard clause found in the indentures for many CDOs and other structured finance vehicles.   It addresses a failure by the Trustee to pay the full amount of principal when due to be paid at a specific time, such as at the Stated Maturity Date, upon acceleration, or in connection with an Optional Redemption, a Tax Redemption, or an Auction Call Redemption – regardless of the amount of Available Funds on the relevant Payment Date. (See Indenture §§ 9.1(i), 9.1(ii), and 9.1(iii).)   Indeed, although the term "due and payable" is not specifically defined by the Indenture, in my opinion it has the same meaning that it carries in most securitization documents, i.e., it refers to an unconditional obligation to pay the entire outstanding principal amount at a time certain, due to the final maturity of the notes or after an event requiring a full pay down of the deal, regardless of whether there are Available Funds to make such payment.

44.    Indeed, when the term "due and payable" is used in the documentation of a CDO transaction, absent a specific definition otherwise, it is understood among practitioners to refer to an event where all principal associated with all classes of notes in a transaction is required to be paid down—in other words, a full redemption.   Thus, the classic example of a "due and payable" amount of principal is the amount that must be paid to Noteholders on the Stated Maturity Date, which is one specific date on which all principal must be paid off. See §2.6(b) of the Indenture. In addition to the Stated Maturity Date, under the Indenture at issue here, principal would also be "due and payable" – the full amount would have to be paid at a time certain – after an

25

acceleration of the Notes following an Event of Default and in connection with specific types of Redemptions, such as Optional Redemptions, Tax Redemptions, and Auction Call Redemptions, all of which require redemption of the entire unpaid principal amount of the Secured Notes.  See §§ 5.2, 9.1 and 9.6 of the Indenture.  The purpose of Section 5.1(b), thus, is to provide Noteholders with protection in the event that the full amount of principal on their Notes becomes "due and payable" in these aforementioned circumstances, but is not paid in full, regardless of the amount of Available Funds.  Such situations are universally understood and expected to result in events of default, triggering remedies for the noteholders.

45.  By contrast, in my experience, monies that are payable pursuant to a Mandatory Redemption resulting from a failed Coverage Test would not be considered "due and payable." Any funds reallocated due to failure of a Coverage Test are only to the extent that there are Available Funds, available for such purpose, and thus could not create a situation where the full principal outstanding must be paid at a time certain.  For example, if the Class D/E Principal Coverage Test in the Cedarwoods II Indenture were not satisfied, Collateral Proceeds would be diverted and reallocated away from classes subordinate to Classes D and E to reduce the principal on the most senior CDO Securities outstanding, but only to the extent of Available Funds until the Coverage Test comes back into compliance.  The section of the Indenture discussing Mandatory Redemption (Section 9.8) defines how Collateral Proceeds are to be redirected to redeem the principal of senior CDO Securities when Coverage Tests are not satisfied.  As opposed to the sections describing the principal amounts owed with respect to Tax Redemptions, Auction Call Redemptions, Optional Redemptions, or redemption following an acceleration, Section 9.8 does not use the term "due and payable" when describing the diversion of funds to redeem a portion of the principal owed on the senior CDO Securities.  Rather, it

states that to the extent a Coverage Test applicable to a particular class of Notes is not in

compliance, instead of payment to Notes subordinate to that class of Notes, Available Funds

> ***will be used instead to redeem*** (such redemption, a "Mandatory
> Redemption") (i) first, each class of Secured Notes Senior to such Class of
> Secured Notes (if any) in the order of Priority of Payments and (ii) second,
> such Class of Senior Secured Notes, in each case until each applicable
> Coverage Test is satisfied or the Class of Senior Secured Notes has been
> paid in full and in accordance with the Priority of Payments.

(emphasis added).   The absence of the phrase "due and payable" to describe principal

redemptions in the context of Mandatory Redemptions is consistent with the structured finance

market's understanding of such phrase and of the nature of a Mandatory Redemption.[5]

Moreover, nowhere in Section 9.8 (or anywhere else in the Indenture), is it suggested or even

implied that a Mandatory Redemption must result in the full pay down of the outstanding

principal of the Notes or that a failure to make a Mandatory Redemption could result in an Event

of Default.

    46.   Moreover, although Section 9.8 of the Indenture is what requires that a Mandatory

Redemption take place in certain circumstances, the actual payment of amounts in connection

with a Mandatory Redemption is to be made in accordance with the waterfall provisions of

Section 11.1.   Sections 11.1(a) and (b) of the Indenture make clear that amounts to be paid under

the waterfall provisions are only paid "to the extent of Available Funds" as specified in the

applicable Payment Report.   Thus, if a Coverage Test is reported as failing, triggering a Section

9.8 Mandatory Redemption, what is to be paid to redeem principal on the senior-most Notes is

determined in compliance with Section 11.1(a)(xvi) (from the Collateral Interest Collections) and

11.1(b)(x) (from the Collateral Principal Collections).   If  there are insufficient Available Funds

---

[5] By contrast, Section 9.6 of the Indenture states that with respect to an Optional Redemption, Tax Redemption, and
an Auction Call Redemption, "the Notes so to be redeemed shall, on the Redemption Date, become due and payable
at the Redemption Price therein specified…."

at the points in the waterfall relating to the failure of such Coverage Test (subsections 11.1(a)(xvi) and 11.1(b)(x)), then no money is to be paid to the senior Noteholders in connection with a Mandatory Redemption on such Payment Date.  So, if a Coverage Test is failing and there is only a single dollar of Available Funds at the relevant point in the waterfall, then that single dollar is required to be diverted from subordinate stakeholders to redeem a single dollar of the principal owed on the senior-most class of Notes outstanding, not the full principal amount.  If a Coverage Test is failing and there is only $50,000 of Available Funds at the relevant point in the waterfall, then that $50,000 is required to be diverted from subordinate stakeholders to redeem $50,000 of the principal owed on the senior-most class of Notes outstanding, not the full principal amount, unless a lesser amount of pay down would cause the unsatisfied Coverage Test to be satisfied.  **Therefore, whether a Mandatory Redemption is required to take place on a Payment Date and, if so, the amount of such Mandatory Redemption is entirely dependent on, inextricably linked to, and wholly limited by, the amount of Available Funds at the place in the waterfall relating to the relevant failed Coverage Test.**  Therefore, mechanically, there simply can never be a scenario – and the investors in the CDO can never claim to have envisioned a scenario – where a Noteholder can claim that there was a shortfall in respect of a Mandatory Redemption, i.e., that the Noteholder was owed more on a Payment Date pursuant to a Mandatory Redemption than the amount of Available Funds.

47.  This is in direct contrast to the situation on a Stated Maturity Date, accelerated maturity date, and other Redemption Dates to which Section 5.1(b) does apply.  In those situations, the Indenture requires that a specific amount (i.e., the full amount of principal outstanding) be paid to the Noteholders at a time certain, regardless of the amount of Available Funds on the date that the payment is due.  On any of these dates, if there are insufficient

Proceeds to pay the entire unpaid principal balance of all Secured Notes, the unpaid amount is still due and payable and the failure to pay such unpaid amount on such date should and does constitute an Event of Default under Section 5.1(b).  Thus, unlike a Mandatory Redemption where the amount owed to a Noteholder is, by definition, entirely **dependent on** the amount of Available Funds, these other situations call for the payment of the full amount of the principal outstanding **regardless of** the amount of Available Funds and, therefore, a shortage of Available Funds will necessarily result in a shortfall relative to what is owed.

48.   Thus, even if one were to assume that Barclays's allegations are correct – that the Class D/E Principal Coverage Ratio was miscalculated in respect of certain Payment Dates and that, as a result, approximately $8.5 million of Collateral Proceeds that should have been redirected to pay down Barclays's Class A-1 Notes pursuant to Mandatory Redemptions were instead reinvested or paid to subordinate stakeholders – such events simply cannot give rise to a Section 5.1(b) Event of Default.

49.   If Barclays' interpretation of Section 5.1(b) were correct, then investors below the most senior class in the structure would be vulnerable to a potentially hugely costly liquidation of the deal where any small Mandatory Redemption mistakes could easily be corrected.  For example, a rounding error could result in an underpayment of Mandatory Redemption by $1.00.  Under Barclays' approach, if that $1.00 underpayment were not corrected in a timely manner, an Event of Default could be triggered.  In this hypothetical circumstance, a de minimus error is creating a hair trigger default that could result in the premature acceleration of a deal.  If this interpretation were adopted, it would fundamentally alter the balance of interests between the Controlling Class and subordinate stakeholders.  In addition, the administration of CDOs would

become far more costly because of the need to avoid administrative errors given the potentially draconian consequences.

50.   In addition, it is important to bear in mind that a miscalculation of the Class D/E Principal Coverage Test and a failure of such Coverage Test has no bearing, impact or effect on the Section 5.1(d) Event of Default.  Only a failure of the Class A Principal Coverage Ratio gives rise to an Event of Default under Section 5.1(d), which is the Event of Default that market participants intended to be the acceleration trigger arising out of the deterioration in value of the Collateral Assets.

51.   In sum, Barclays is alleging that its failure to receive approximately $8.5 million of the approximately $380 million in outstanding principal on the Class A-1 Notes as a result of a Mandatory Redemption constituted an Event of Default under Section 5.1(b).  However, because there was no absolute obligation to pay such principal in connection with a Mandatory Redemption, and less than the full amount of the outstanding principal would have been payable, even if Barclays' allegations are correct – Section 5.1(b) simply has no application here.  In my professional opinion, Barclays is attempting to incorrectly characterize the effects of alleged calculation and reporting errors as retroactive principal shortfalls to shoehorn its allegations into an Event of Default that was never intended to, and cannot conceptually ever, apply to a Mandatory Redemption.

**B.**   **Alleged Default Under Section 5.1(c)**

52.   Section 5.1(c) of the Indenture provides, in relevant part, for an Event of Default based on "the failure on any Payment Date to disburse amounts available in accordance with Section 11.1."   Section 11.1 provides that disbursements of Collateral Proceeds from the Payment Account must be in accordance with a Payment Report prepared by the Collateral

Administrator on behalf of the Issuer.  Thus, so long as the Trustee distributes payments in accordance with the Payment Report, there can be no Event of Default under Section 5.1(c). Because the Trustee here distributed payments in accordance with the relevant Payment Reports, even if Barclays is correct that one or more Payment Reports contained errors, there can be no Event of Default under Section 5.1(c).

53.  Barclays appears to argue that Section 5.1(c) requires the Trustee to follow the Priority of Payments set forth in Section 11.1 without regard to the Payment Report and make distributions in accordance with something other than the Payment Report.  See Aldama Tr. at 248:14-19; Kuriyan Tr. at 63:14-16.  This is an impossibility, however, as Section 11.1 is merely an ordering of payment priorities and does not set forth exact dollar amounts that must be paid on any given Payment Date.  The primary purpose of Payment Reports is to provide the Trustee with what Section 11.1 cannot provide, i.e., the specific dollar amounts that should be paid to various stakeholders.  Indeed, based on my experience, the entire purpose of an event of default such as Section 5.1(c) is to prevent a trustee from diverging from the specific instructions of a payment report in making its distributions.

54.  What Barclays argues, then, is that the Trustee should engage in independent analysis and calculations without regard to the Payment Reports; I believe this is contrary to how CDOs are designed and the understanding of the responsibilities of trustees in the structured finance world.  Over the course of my years in the structured finance business and in the CDO business, I have become keenly aware of the duties performed by trustees.  What trustees generally do is follow the instructions of other parties in a transaction and do not undertake obligations that involve the exercise of discretion; in a CDO, that generally means, for most tasks, relying on the work performed by the collateral manager.  Thus, with regard to payment

reports and distributions to noteholders, trustees generally do not perform any analysis or make any of the underlying calculations necessary to determine how funds are to be allocated—rather, that task is performed by the collateral manager. This is consistent with the testimony of the Trustee in this case, who is not appropriately staffed to carry out such tasks. When asked in deposition what the role of a trustee is with respect to the designation of securities as defaulted or non-defaulted – a task that is essential to determine whether haircuts are to be taken in calculating the O/C Ratios – Adam Jacobs said that in his experience such information is provided by the Collateral Manager to the Trustee. See Jacobs Tr. at 38:12-18. Mr. Jacobs goes on to say that the classification of securities is provided by the Collateral Manager (See Jacobs Tr. at 53:14-15) as well as the trade log. See Jacobs Tr. at 56:21-57:14. Mr. Jacobs said that the Trustee does not actually do analysis, in his own words: "All we do is we put the information into the system and we produce a report based on the information that is provided to us." See Jacobs Tr. at 58: 16-19. The Trustee relies on other parties for information to do its job.

55. In sum, because there have been no allegations here that the Trustee failed to distribute funds in accordance with the Payment Reports, nor have I seen any information that would support such an allegation in my review of the files in this case, no Event of Default has occurred under Section 5.1(c) of the Indenture.

### C.   **Alleged Event of Default Under Section 5.1(f)**

56. Of the various Events of Default set forth in Section 5.1 of the Indenture, in my opinion, the only one that possibly could be triggered based on the mistakes of the type alleged by Barclays is Section 5.1(f). However, because 5.1(f) would otherwise cover all, even immaterial mistakes, it includes various conditions before such a mistake can give rise to an Event of Default -- conditions that were not satisfied here. The breaches and incorrect reports

alleged by Barclays would constitute an Event of Default under Section 5.1(f) of the Indenture only if, among other things, the alleged breaches had a <u>material adverse effect</u> on all Noteholders and such breaches were not cured for 30 days from a proper notice, which was not sent here, or from knowledge by the Issuer or the Collateral Manager, which to my knowledge has not occurred because the parties are awaiting this Court's rulings.   Barclays misapplies this section because it principally contends there was a material adverse effect on itself, and not all "Secured Noteholders."   In my opinion, even if Barclays is correct as to all of its factual allegations, there was no material adverse effect on all Secured Noteholders (or even on Barclays).

57.   Barclays argues that inaccurate Payment Reports had a material adverse effect and continued for 30 days after the Issuer and Collateral Manager became aware of the mistake.   The definition of "Secured Notes" "means, collectively, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes."   Indenture, p. 56. Thus, any knowledgeable structured finance or CDO market participant (<u>e.g.</u>, investor, issuer, banker, etc.) understands that Section 5.1(f) requires that an alleged default or breach be evaluated on the basis of whether it "has a material adverse effect" on the <u>Secured Noteholders</u> collectively.

58.   Although it appears, according to the Expert Report of Dr. Ethan B. Cohen-Cole, that Barclays received most of the funds allegedly owed to it by May 2011, because Secured Noteholders include, in the aggregate, the holders of Class A, B, C, D, E, and F Notes, the fact that Barclays allegedly did not receive $8.5 million is insignificant; what matters is whether the aggregate cashflows to all Secured Noteholders were diminished by a material amount.   Here, however, virtually all of the allegedly misallocated funds were either distributed to Secured Noteholders or reinvested in additional Collateral for the benefit of all Secured Noteholders; only

a fairly small amount "leaked out" as a payment to the Collateral Manager, which is a party to this litigation.  What this means is that even if allocation mistakes were made, those mistakes resulted for the most part in an incorrect allocation among Secured Noteholders, so there was no material adverse effect on the Secured Noteholders as a group.

59.  Barclays attempts to justify its material adverse effect argument by stating that the Class A-1 Notes have "a face value of $390 million, representing 65% of the CDO's initial capital structure, and 100% of the current economic interest in the CDO, given the market value of the collateral." (Barclays Memorandum of Law, at 24).  I have several observations.  First, $8.5 million is only approximately 2% of the original face amount of the Class A-1 Notes, 2.2% of the current outstanding principal of the Class A-1 Notes,  and 1.4% of the original face amount of the Notes collectively – plainly immaterial amounts.  Second, while according to Dr. Cohen-Cole the amount at issue is much less than $8.5 million, whatever amount it is can most likely be recovered.  Third, the notion that the Class A-1 noteholders own 100% of the economic interest in Cedarwoods II is factually incorrect (besides being irrelevant).  As an initial matter, the Class A-2, Class A-3, and Class B Notes all are still receiving interest payments (absent the escrowing of all funds pending this litigation) and they all have the potential to receive repayment of at least some portion of their principal investment given the valuation of the collateral by Dr. Cohen-Cole and my personal expectation that there will be a substantial recovery in commercial real estate in future years.

60.  Barclays' argument that it is the only party with an economic interest in the Cedarwoods II CDO is based on its view that the value of the Collateral Debt Securities is less than the outstanding principal amount of the Class A-1 Notes and that the value of the Collateral Assets will never improve enough to provide other Noteholders with a return on their

investment.  Indeed, when asked if collateral values could possibly recover, Vikram Kuriyan, the Barclays employee who determined that Barclays was owed $8.5 million, responded: "Pigs could fly." Kuriyan Tr. at 179:23.  When asked what he meant by that statement, Mr. Kuriyan said, "That it's not possible for the collateral in this deal to recover." Id. at 180:18-19.   In my professional opinion, however, over the life of this deal the collateral values most certainly have the potential to recover most, if not all, of their lost value (or, at least enough so that Noteholders below the Class A-1 Notes may recover some portion of their principal).  I note that is MBIA's view, as well.  See Platt Tr. at 319:3-320:15.

61.   The reason I think the collateral values will substantially recover is that the market for commercial real estate and CMBS has been volatile over the past few years with collateral values sometimes rising in dramatic fashion.  First, in looking at individual commercial real estate loans or individual CMBS bonds, there are examples of collateral losing value and then recovering.  Most recently, there was a report on the front page of the June 29, 2012 Commercial Mortgage Alert titled "Sweet Surprise Awaits Investors in 2005 Deal" concerning the liquidation of a $76 million loan on the Astor Crowne Plaza hotel in New Orleans.  The loan, which is part of a $4 billion CMBS deal, GS Mortgage Securities Corp. II, 2005-GG4, was foreclosed in 2011 and put up for sale in late June 2012.  Investors interested in the property believe the offering will generate bids far in excess of the mortgage's balance—perhaps as much as $125 million. The special servicer, LNR, has held the property for 15 months since foreclosure and there has been a dramatic rebound in the valuation of New Orleans hotels during that time period.  It is common practice for a special servicer to hold a foreclosed property for more than a year before putting it up for sale, particularly if the property is large – which provides an opportunity for the property to appreciate in value.

62.   In the paragraph above, I provided anecdotal evidence that individual commercial property values can recover lost value.   An even more compelling argument is provided by looking at the Markit CMBX Indices.   Each CMBX Index is a synthetic tradable index referencing a basket of 25 commercial mortgage backed securities.   There are 5 Series of CMBX Indices and each Series has multiple Indexes ranging in quality from AAA to BB.   The CMBX Index is a widely used benchmark to gauge the performance of CMBS.   Its liquidity and standardization allows investors to gauge market sentiment regarding CMBS, and to take long (buy, own, or be long the index) or short (sell or be short the index) positions.   The Series 1 Index was started in March, 2006, is still tracked and traded in 2012, and is the most representative of the five Series, relative to the collateral underlying Cedarwoods II.   An analysis of the CMBX Series 1 shows that prices of underlying CMBS securities have fallen dramatically, but significantly recovered, over the past six years.

CMBX Series 1 AAA-AJ Prices[6]



[6] The CMBX Series 1 AAA-AJ Index was not created until January 2008.

37

CMBX Series 1 AA Prices



CMBX Series 1 A Prices



CMBX Series 1.1 BBB Prices



63.   The table below shows the initial high prices, low or trough prices, and second high prices for four Series 1 CMBX indices of varying credit quality.

| | Credit Quality | Initial High | Low | Second High |
|---|---|---|---|---|
| | AAA-AJ | | | |
| Date | | 1/7/08 | 4/20/09 | 2/14/11 |
| Index Price | | 99.32 | 36.06 | 95.17 |
| | AA | | | |
| Date | | 4/06/06 | 4/21/09 | 2/14/11 |
| Index Price | | 100.71 | 19.22 | 90.64 |
| | A | | | |
| Date | | 2/20/07 | 4/14/09 | 2/14/11 |
| Index Price | | 101.64 | 16.46 | 84.93 |
| | BBB | | | |
| Date | | 2/13/07 | 4/14/09 | 2/1511 |
| Index Price | | 102.99 | 11.20 | 58.75 |

It is obvious from the table that CMBS prices bottomed out in April of 2009 and then rebounded dramatically by February of 2011. Prices recovered from the low to second high by the four Indexes above, are as follows:

| | |
|---|---|
| AAA-AJ | 59.11 |
| AA | 71.42 |
| A | 68.47 |
| BBB | 47.55 |

The above values represent the amount of recovery after hitting bottom for each index. For example, the AA index rose by 71.42 from a low of 19.22 to a second high of 90.64. Clearly, CMBS prices, as represented by the CMBX Indices rebounded dramatically over the 22 month time period from April 2009 to February 2011.  CDOs have a lifetime that can span 30-40 years and recent history demonstrates that bond (collateral) values can recover in well under 10 years (as shown in this paragraph above)—any claims to the contrary, by Mr. Kuriyan or anyone else, are simply not true.

64.     As discussed above, the amount Barclays claims is at issue, $8.5 million would not be material even if it were lost entirely.  The fact that the vast majority of this amount was either paid back in a May 2011 Mandatory Redemption or reinvested in Collateral Debt Securities (and therefore will provide future interest and principal distributions to the Noteholders) or is capable of being clawed back makes this material adverse effect analysis even clearer.

65.     Indeed, as stated above, a good portion of the allegedly misallocated funds was reinvested in new collateral.  If the Class D/E Principal Coverage Test was failing, then according to the waterfall, cashflows that would otherwise be deposited to an account for reinvestment in new collateral (i.e., Substitute Collateral Debt Securities) would be diverted and used to pay down a very small portion of the outstanding principal amount of the Class A-1 Notes.  Such funds may not have been paid out to the Noteholders, but reinvesting in collateral for the benefit of the Noteholders generally would not have any adverse effect on them.  In fact, the new collateral would generate interest and principal cashflows for the benefit of Secured Noteholders which would be available for distribution in accordance with future Payment Reports.

66.     Barclays' claim that misclassification of certain Collateral Debt Securities led to $8,562,009 of funds not being properly paid to the Class A-1 Noteholders may be overstated. According to the Expert Report of Dr. Cohen-Cole, the brunt of the allegedly misdirected funds was paid to Barclays pursuant to Mandatory Redemptions beginning in May 2011.  Dr. Cohen-Cole concludes that approximately $8.1 million in Collateral Proceeds were diverted to pay down the principal of Barclays' Class A-1 Notes from May 2011 through August 2011, thereby rendering the amount that may actually be owed to Barclays (assuming that their allegations as to

the misclassification of certain Collateral Debt Securities are correct) substantially less than its claim of $8,562,009.

67.    Barclays also claims that the Collateral Manager invested in Collateral Assets in violation of (i) certain Collateral Concentration Limitations and certain ratings limitations set forth in Sections 1.1 and 12.1(b) of the Indenture, and (ii) certain Eligibility Criteria set forth in Section 12.2(o) and (r) of the Indenture. <u>See</u> Br. at 9-10. Barclays also claims that the Collateral Manager failed to report the accurate ratings of certain Collateral Debt Securities in violation of Sections 10.11(a)(xx)-(xxi) of the Indenture. <u>See</u> Br. at 10.  Barclays claims that these alleged violations are breaches of covenants under the Indenture and have a material adverse effect on the Secured Noteholders, also creating an Event of Default under Section 5.1(f) of the Indenture. Even if we assume these allegations of Barclays to be true, those breaches, in and of themselves, do not, in my professional opinion, cause a material adverse effect on Noteholders, particularly in light of the fact that the alleged violations apparently caused these criteria to be breached by very small amounts and easily can be fixed.  In addition, a parenthetical beginning in the first line of Section 5.1(f) provides that "non-compliance with any of the Coverage Tests, the Collateral Concentration Limitations or the Collateral Quality Tests will not constitute a default or breach," which to me is relevant in considering whether breaches related to noncompliance with one of those tests had a material adverse effect on the Secured Noteholders.

68.    Finally, Barclays claimed in its Second Notice of Default that "the Issuer and/or Collateral Manager would have acquired actual knowledge of these failures following delivery of our notice on 24[th] August, 2011…" thus allowing it to declare an Event of Default under Section 5.1(f) after 30 days passed without correction of the alleged errors in the Payment Report.  In my professional opinion, what the Issuer and Collateral Manager became aware of upon receipt of

the First Notice of Default was an <u>allegation</u> that errors were made.  There was no agreement among the parties that errors were actually made and, in fact, the alleged errors are in dispute. Thus, even if the alleged breaches were material for the purposes of Section 5.1(f), I do not believe that the 30 day cure period can commence until the Court makes a ruling as such. Moreover, the notice itself could not trigger a Section 5.1(f) Event of Default because it did not require that the alleged "default, breach or failure. . . be remedied."

### D. The Remedies Available to Barclays Under the Indenture

69.   As I indicated earlier in this Report, I have a long history in the CDO market in multiple roles: as a collateral manager, as an investor, as a seller and as a researcher. CDOs are purposely designed to protect investors in multiple ways: through structure, through credit enhancement, through collateral tests, through interest coverage tests, through overcollateralization tests, and through clawback mechanisms.  When breaches become more serious, they may give rise to a cause for removal of the collateral manager.  Only in extreme circumstances can the remedies that become available upon the occurrence of an Event of Default be invoked.  When errors in calculating amounts owed to Noteholders are made in payment reports and payments are then made in error, the appropriate remedies involve correcting any misclassifications, recreating the cashflows as they should have been had no mistakes been made, clawing back any misallocated funds pursuant to Section 13.1(h) of the Indenture, and redistributing funds according to the corrected allocations.  Acceleration and collateral liquidation based on an Event of Default – which I refer to as the "nuclear option," since it essentially involves blowing up the entire CDO with no ability to return to the *status quo ante* – are not available as remedies for such types of breaches and would be unacceptable to most participants in the CDO market except in the most extreme situations, as it would

43

essentially grant senior noteholders (here, Barclays), the right to exercise the nuclear option at potentially great losses to the junior noteholders any time there was an error – no matter how immaterial.  I believe that the Indenture at issue here is typical of indentures used in the CDO market and, not surprisingly, it lays out a series of remedies that are consistent with those I have identified above with respect to ordinary course errors.  Accordingly, the Indenture permits Barclays to require a correction of errors, a clawback of any funds distributed incorrectly, and payment of the monies it should have received, but it does not permit Barclays to direct acceleration and liquidation of the Collateral Debt Securities.

70.   Thus, Section 5.1(f) – which is the only Event of Default arguably applicable to the types of errors Barclays alleges – requires that the default or breach have a material adverse effect with respect to all Secured Noteholders.  As discussed above, the alleged breaches at issue here are not material with respect to even Barclays, let alone all of the Secured Noteholders.  Indeed, the $8.5 million Barclays contends is at issue here could still be clawed back under Section 13.1(h) and reallocated to Barclays, if it can successfully claim the entirety of that amount.  Moreover, as the Indenture at issue here is typical of indentures used throughout the CDO market, my view is that the parties did not intend that Barclays would have the right to accelerate and liquidate the Collateral Debt Securities because of the type of errors that it alleged to have transpired here.

71.   In fact, I find it odd that Barclays is claiming an Event of Default because of such errors and that it has been harmed in a material and adverse manner and yet it has not sought the termination and replacement of the Collateral Manager.   Section 13 of the Collateral Management Agreement says that "[t]his agreement may be terminated and the Collateral

Manager may be removed…at the direction of…the Controlling Class…For this purpose, 'cause' will mean any of the following events or circumstances:"

> (iii) the Collateral Manager breaches in any material respect any provision (including, without limitation, any breach of any material representation or warranty) of this Agreement or any terms of the Indenture applicable to it, <u>which breach has a material adverse effect on the Issuer or the Holders of any Class of Notes</u> and is not cured within 30 days after the earlier of (x) the date on which any professional employee of the Collateral Manager directly involved in the performance by the Collateral Manager of its duties hereunder has actual knowledge of it and (y) the Collateral Manager's receipt from the Issuer or the Trustee of notice of such breach; or in the case of a breach that is not capable of being cured within 30 days, the breach is not cured within the period in which a reasonably diligent person could cure such violation or breach (but in no event more than 120 days);

(§13(iii), Collateral Management Agreement at 16) (<u>emphasis added</u>).  The language here is strikingly similar to the language in Section 5.1(f) of the Indenture, except for the fact that it permits removal if the breach is material with respect to the "Holders of ***any*** Class of Notes" (<u>emphasis added</u>) as opposed to all Secured Noteholders.  While in my view the Collateral Manager's errors were not material even to Barclays, if the Collateral Manager, in fact, made material errors, as Barclays contends, why wouldn't Barclays seek then to terminate the Collateral Manager pursuant to Section 13(iii) of the Collateral Management Agreement?  If I were an investor in the Controlling Class and I believed that the Collateral Manager made material errors that significantly harmed me, then I would certainly seek to replace the Collateral Manager before even considering the "nuclear option."  Moreover, if I were an investor anywhere else in the structure, I would want the Controlling Class and the Trustee to remove and replace the Collateral Manager.

## V.    CONCLUSIONS

72.   The Cedarwoods II transaction, like other CDOs, is designed to have structural and other remedies to correct for underperforming collateral, diminishing cashflows, mistakes and other circumstances.  These remedies and protections, such as the Class D/E Principal Coverage Test and Mandatory Redemption, are in place to equitably protect all classes of Secured Noteholders.  In the situation described in the interpleader complaint, if errors were made, they can be corrected and all classes of Noteholders can be put in the position they would have and should be in if no errors were ever made.  This course of action would preserve the rights and interests of all Secured Noteholders without prejudicing or favoring one class over another. Instead of pursuing lesser remedies that would remediate the harm it claims to have suffered, Barclays has, instead, notwithstanding the plain terms of the Indenture that disallow it from doing so, chosen to pursue the "nuclear option," which would deprive the other classes of Noteholders of the cashflows to which they would be entitled if the errors (if there were, in fact, errors) were corrected and the cashflows correctly allocated.  As a matter of market practice, and based on my extensive experience in this area, what Barclays is trying to do here is not only out of the ordinary and in contravention of the Indenture, but runs contrary to the expectations of all CDO market participants as well as structured finance (a broader and larger market) market participants.  Carefully constructed bond issuances are not "blown up" over correctable errors in payment reports and the failure to properly allocate $8 million (or less), particularly in a situation where the claw back provision can easily return parties to the *status quo ante*.

73.   There are also potential adverse consequences to the structured finance market if Barclays is allowed to accelerate and liquidate in these circumstances.  Were acceleration of the Notes and liquidation of the Collateral Debt Securities permitted in this situation, it could have

the effect of frightening investors from purchasing any bonds below the most senior class in any CDO, whether it is a CRE CDO, an ABS CDO or even a CLO.  It might also give current holders of CDO bonds below the most senior class incentive to sell their holdings at fire-sale prices – and if enough investors had this perspective (to sell), market prices would fall, hurting the entire market.  Further, if the controlling class in a CDO is allowed to circumvent all of the carefully designed corrective remedies built into CDO Indentures and instead opt for the "nuclear option," all investors below the senior-most class will be at risk of liquidation, depriving them of CDO cashflows and the chance for the market to recover.  Investors could lose faith in the integrity of the CDO structure and would look for more stable, predictable, and safer investments—and would effectively shut down the CDO market.


Date: July 24, 2012


_____
DANIEL I. CASTRO, JR

**EXHIBIT A**

# Daniel I. Castro, Jr.

7 DeGraaf Court                    Home: (201) 236-1491
Mahwah, NJ 07430                   Cell: (646) 703-1315
                                   E-mail: d-castro@msn.com

**Professional**   2008-Present **Structured Finance Consultant**          New York, NY
**Experience**

Dan is an independent Fixed Income and Structured Finance consultant focusing
on ABS, MBS, CDOs, SIVs, CMBS, hedge funds, other funds and related fixed
income and structured finance products.  Dan provides Expert Witness services,
litigation support, due diligence, valuation, and general consulting support.

May 2010- April 2011 **BTIG LLC**                          New York, NY

**Managing Director, Head of Structured Finance Analytics and Strategy**

Dan was head of the group responsible for providing analysis of Structured
Finance products (ABS, MBS, CMBS, and CDOs) within the Fixed Income
Division of BTIG, a FINRA registered broker-dealer.  Dan was also responsible
for setting the strategy of the Structured Finance Group and disseminating it to
the firm's clients.

2008-April 2010 **Huxley Capital Management**              New York, NY

**Principal, Chief Risk Officer, Portfolio Manager**

Dan was the Chief Risk Officer of Huxley Capital Management.  In this capacity
he was responsible for managing all risk exposures for the company, its
investors, and affiliated portfolio managers.  Dan also co-managed Huxley's
TALF investment fund as well as formulating the firm's macro view of the
markets and economy.

2007-2010          **American Securitization Forum**       New York, NY

**Member, Board of Directors and Investor Committee**

Dan was on the Board of Directors of the American Securitization Forum, the
Industry Trade Group representing the Structured Finance and Securitization
Industries in the United States.  Dan also was a member of ASF's Investor
Committee.  On behalf of ASF, Dan has spent considerable time working with
Congressional Committees in the House and Senate as well as the Federal
Reserve and Treasury on issues related to securitization.

2005 - 2008     **GSC Group (formerly GSC Partners)**     New York, NY

**Managing Director, Chief Credit Officer, Portfolio Manager, Structured Finance Group**

Member of several GSC Investment Committees including Structured Finance CDOs, GSC Capital Corp., Eliot Bridge (long/short structured finance hedge fund), High Yield Real Estate (Commercial Mortgage Loans), Corporate Credit Group (leveraged loans), GSC Investment Corp. (Closed End Management Investment Company, ticker: GNV), and Pendulum (distressed structured finance hedge fund).

Make investment decisions and co-manage several structured finance vehicles including 13 CDOs, 2 hedge funds, and a REIT. Provide macro investment views to multiple investment units of the firm. Provide leadership for credit risk and analysis in ABS, MBS, and CDOs. Approve buy/sell decisions in ABS, MBS, CMBS, CDOs, commercial real estate, and leveraged loans in both cash and synthetic (CDS) markets.  Coordinate research for all structured finance related products.

**Board of Directors, American Securitization Forum (ASF)**
**Editorial Board, The American Securitization Journal**
**Board of Directors, LownHome Financial (Mortgage Originator) 2006-2007**


1991 - 2004     **Merrill Lynch & Co.**     New York, NY

**Managing Director, Structured Finance Research**

2002 – 2004     *Managing Director*, CDO Strategist
2000 – 2002     *Managing Director*, ABS Strategist
1993 – 2000     *Director*, ABS Research
1991 – 1992     *Vice President*, ABS Research

Head of Merrill Lynch's Asset Backed Securities Research Department since 1991.  Changed name of group to Structured Finance Research when responsibility for CDOs was added in 2002.  Responsible for research related to ABS, RE ABS, ABCP, CDOs, and at various times for CMBS and non-agency MBS (all credit-related Structured Finance).  Position involved significant interaction with Institutional investors, sales, trading, and origination.  Published the monthly *ABStract, Structured Credit Brief, CDO Surveillance,* and various product and relative value publications.


Member of **Institutional Investor All-American Fixed Income Research Team** for 13 consecutive years, every year from its inception in 1992 through 2004. Ranked first or second 10 times for ABS Strategy/Research and also ranked in various years for Real Estate ABS Research, ABS Prepayments, and Collateralized Debt Obligations (CDOs).  In 2004, Dan was runner up in CDO Research.


Dan was featured on the cover of Bloomberg Magazine in September, 1997— cover story: *Outlook for the Asset Backed Securities Market.*

1987 - 1991      **Moody's Investor's Service**                    New York, NY

**Senior Analyst, Structured Finance**

Dan managed client relationships with investment bankers and issuers for ABS and MBS transactions.  He was involved in all aspects of analyzing and rating new deals: structuring, negotiating deal parameters, analyzing legal aspects, and establishing credit enhancement levels.  He chaired rating committees for MBS and ABS deals in 1990-1991.  Dan managed and trained the analysts in the ABS and MBS groups.

1986 - 1987      **Citicorp Investment Bank**                     New York, NY

**AVP, Structured Finance**

Evaluated economics of proposed securities product structures.   Member of deal teams for automobile and credit card securitizations.  Helped structure new transactions, analyzed proposed securitizations, and worked on deal documents.

1985 - 1986      **Citicorp Homeowners**                          St. Louis, MO

**Pricing Manager/Funding Trader**

Managed pricing function for first-lien mortgage portfolio products. Conceptualized and implemented treasury forecasting models to manage liquidity and interest rate risk.  Made, posted, and executed two-way prices to other Citicorp business units.

1984 - 1985      **Citicorp Acceptance Company**                  St. Louis, MO

**Financial Analyst**

Prepared Treasury reports and analyses for the Division.  Special projects included analytical work on the sale/securitization of automobile receivables.

1982 - 1984      **McDonnell Douglas Corp.**                      St. Louis, MO

**Associate—Fiscal Development Program**

Associate in MBA Management Training Program.  Management Development assignments included the Accounting group, Contracts Department, Internal Auditing, and Supplier Auditing Group.

1980 - 1982      **Washington University**                        St. Louis, MO

**Graduate Teaching Assistant.**

Assistant to Professor of Quantitative Business Analysis in the following courses: Linear Programming, Operations Research, Probability, and Calculus.

Summer 1981    **Buick Motor Division, GM**                      Flint, MI

**Summer Intern**

Pricing and Analysis Department of Financial Division.  Summer project was to price options for the 1982 model year Buick Automobile lineup.

| | | |
|---|---|---|
| **Education** | 1980 - 1982   **Washington University** | St. Louis, MO |
| | **MBA**—Finance/International Business | |
| | 1976 - 1980   **University of Notre Dame** | Notre Dame, IN |
| | **BA**—Government/International Relations | |

**Additional Information**

Dan has been recognized as a leader in his filed by *Institutional Investor* magazine, which named him as a member of its All-American Fixed Income Research Team each year during 1992-2004 and also as a member of the First Team for ABS Strategy.

Dan speaks frequently at industry conferences, is quoted regularly in the financial press, magazines, the Wall Street Journal, Bloomberg, Reuters, and other newswires.   Dan is interviewed occasionally on television, usually on CNBC or Bloomberg TV, but he also has been interviewed on NBC, CBS, CNN, and Reuters TV.

Dan has written chapters and contributed to numerous books covering fixed income investments collaborating with Frank Fabozzi on several books, as well as Martin Fridson.  Most recently Dan wrote the chapter on Asset Backed Securities and co-authored the chapter on Mortgage Backed Securities in Gary Strumeyer's *Investing in Fixed Income Securities, Understanding the Bond Market*, published by John Wiley & Sons, Inc.

Possess FINRA Series 7, 24 and 63 registrations.

**EXHIBIT B**

# Daniel I Castro, Jr.—Publications*

- *BTIG Structured Finance Trading Strategies: More CLO Upgrades on the Way, Moody's Retooling CLO Models*, March 22, 2011
- *BTIG Structured Finance Trading Strategies: CLOs: Poised for Further Improvement, Leveraged Loans Performing Well*, March 10, 2011
- *BTIG Structured Finance Trading Strategies: CLOs for HY Investors, An Overlooked Opportunity*, March 3, 2011
- *BTIG Structured Finance Commentary: Impact of Treasury Rate Shocks, Pain for the Mortgage Market*, December 9, 2010
- *BTIG Structured Finance Commentary: Consumer Credit Improving, Balances falling, fundamentals better*, December 7, 2010
- *BTIG Structured Finance Commentary: 2011: Thoughts and Themes, Ideas and Views for the Coming Year*, December 2, 2010
- *BTIG Structured Finance Commentary, Observations on Structured Finance: More Questions than Answers*, October 7, 2010
- *BTIG Structured Finance Commentary, Observations in Structured Finance: Spector of Uncertainty*, September 29, 2010
- Chapter on Asset Backed Securities in Gary Strumeyer's *Investing in Fixed Income Securities: Understanding the Bond Market*, published by John Wiley & Sons, Inc. Feb. 2005
- *Merrill Lynch Fixed Income Strategy, Structured Credit, Structured Credit Brief: CDO Equity and the Efficient Frontier*, April 23, 2004
- *Merrill Lynch, 2004—The Year Ahead, The ABStract: 2004 ABS/CDO Outlook*, January 12, 2004
- *Merrill Lynch Fixed Income Strategy, Structured Credit: CDO Rating Methodologies Review*, November 14, 2003

---

\* I have listed all of my publications during the past ten years that I have been able to locate with reasonable diligence, including information concerning the periodic reports to which I recall contributing or which I recall publishing during my tenure at Merrill Lynch. If I published anything during the last ten years that is neither named specifically herein or covered by reference to a category of periodic publications (a possibility that I cannot discount to a certainty), then any such publication would almost certainly be one that was published during my tenure at Merrill Lynch that I currently do not recall and to which I do not have access. In the event any such publication or publication comes to my attention, I shall promptly amend this disclosure.

- *Merrill Lynch Fixed Income Strategy: ABS CDO Primer, Essential Knowledge for Investors*, October 7, 2003
- *Merrill Lynch Credit: Credit Derivative Handbook 2003, A Guide to Products, Valuation, Strategies and Risks*, April 16, 2003, Chapter 11, Synthetic CDO Valuation
- *Merrill Lynch Fixed Income Strategy: Synthetic CDO Valuation*, March 19, 2003
- *Merrill Lynch, 2003—The Year Ahead, The ABStract, 2003 ABS Market Outlook,* January 7, 2003
- *Merrill Lynch Fixed Income Strategy: Size & Structure of the World Bond Market: 2002, Governments, Corporates, Eurobonds, Emerging Markets,* April 2002, ABS Market
- *Merrill Lynch, 2002—The Year Ahead, The ABStract, 2002 ABS Market Outlook,* December 7, 2001
- *Merrill Lynch, 2001—The Year Ahead, Non-Real Estate ABS, A Maturing Market—Steady Growth, Stable Performance,* December 21, 2000
- *Merrill Lynch, 2001—The Year Ahead, Real Estate ABS, A Maturing Market Should Offer Greater Stability,* December 21, 2000
- *Merrill Lynch Fixed Income Strategy: ABS Product Analysis, 2001 Outlook for Consumer Credit,* December 19, 2000
- *The Yearbook of Fixed Income Investing 1995: The Fixed Income Analysts Society,* John D. Finnerty (Editor), Martin S. Fridson (Editor), Daniel Castro (Contributor), Chapter 1: *Recent Developments in the Market for Asset-Backed Securities*, Irwin Professional Publishing, The McGraw-Hill Companies

**Periodic Publications During Dan's tenure at Merrill Lynch (1991-2004):**

- Weekly Contributor to *Merrill Lynch Fixed Income Weekly*
- Monthly contributor to *Merrill Lynch: The Mortgage Investor*
- Monthly publisher/author of *Merrill Lynch: The ABStract*
- Monthly publisher/author of *Merrill Lynch: Structured Credit Brief*
- Monthly publisher/author of *Merrill Lynch CDO Surveillance Update*
- Weekly publisher/author of *Merrill Lynch Structured Finance Market Update*

**EXHIBIT C**

## Expert Report—Documents Considered

- Indenture
- Collateral  Administration Agreement
- Collateral Management Agreement
- Offering Circular
- Markit CMBX Historical Data spreadsheet
- Interpleader Complaint
- MBIA Insurance Corporation's Answer to Interpleader Complaint, Statement of Claim, and Counterclaim
- Amended Answer and Affirmative Claim to Interpleader Funds of Interpleader Defendant Barclays Bank PLC
- Joint Letter from Akin Gump, Seward & Kissel, Skadden Arps, and Weil Gotshal to the Hon. William H. Pauly III, dated March 21, 2012
- Notice of Interpleader Defendant Barclays Bank PLC's Motion for Summary Judgment
- Memorandum of Law in Support of Barclays Bank PLC's Motion for Summary Judgment
- Declaration of Jake Scrivens in Support of the Motion for Summary Judgment of Interpleader Defendant Barclays Bank PLC
- Commercial Mortgage Alert, June 29, 2012
- Jaime Aldama Deposition Transcript
- Adam Jacobs Deposition Transcript
- Vikram Kuriyan Deposition Transcript
- Caroline Platt Deposition Transcript
- Jake Scrivens Deposition Transcript
- Updated PF2 Report dated November 29, 2011
- Expert Report of Ethan B. Cohen-Cole, Ph.D. dated July 24, 2012